AO 91 (Rev. 11/82)   **CRIMINAL COMPLAINT**   ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>HEON-CHEOL CHI | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**16MJ02424** |

Complaint for violation of Title 18, United States Code, Section 1957.

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALKA SAGAR | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>2012 - 2015 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about March 22, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant HEON-CHEOL CHI, knowing that the funds involved represented the proceeds of some form of unlawful activity, conducted and attempted to conduct the following monetary transaction in criminally derived property of a value greater than $10,000, which property, in fact, was derived from specified unlawful activity, that is, bribery of a public official in connection with his official duties in violation of Article 129 of the Criminal Code of the Republic of Korea (South Korea): Deposit of check # 135, drawn on Bank of America account XXXXX-X8070 located in Glendora, California, into Merrill Lynch account XXX-X4235, located in New York, New York.

FILED
CLERK, U.S. DISTRICT COURT

DEC - 9 2016

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Jeffrey Coleman<br>OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>December 9, 2016 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Stephen Cazares   REC: Arrest Warrant/Detention

## AFFIDAVIT

I, Jeffrey Coleman, being duly sworn, hereby declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately eight years.  I currently am assigned to the International Corruption Squad in the Los Angeles FBI Field Office, where I specialize in the investigation of foreign bribery and other white-collar crimes, including money-laundering offenses.  During my career as an FBI Special Agent, I have received both formal and informal training from the FBI and other institutions regarding foreign-bribery investigations and the tracing of corrupt proceeds through a variety of financial transactions.

2.   I make this affidavit in support of a criminal complaint and arrest warrant charging HEON-CHEOL CHI ("CHI") with engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957 ("SUBJECT OFFENSE").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  This affidavit is not intended to include each and every fact and matter observed by me or known to the

1

government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts that are necessary to establish probable cause that CHI committed the SUBJECT OFFENSE.  This application seeks approval for the issuance of a criminal complaint charging CHI with the SUBJECT OFFENSE, as well as a warrant authorizing his arrest.

## II.   SUMMARY OF INVESTIGATION

4.    Evidence currently known to the U.S. Department of Justice, Criminal Division, Fraud Section, the U.S. Attorney's Office for the Central District of California, and the FBI (collectively, the "government") establishes that between approximately 2012 and 2015, CHI received illegal bribe payments into his Bank of America account located in Glendora, California, and then transferred large sums of these payments from this account to his Merrill Lynch brokerage account located in New York, New York, knowing that the transferred funds were criminally derived proceeds.

### A. CHI

5.    At all times relevant to this affidavit, CHI was a citizen and resident of South Korea.

6.    From at least in or around 2003 to the present, CHI served as a principal researcher at the Korea Institute of Geoscience and Mineral Resources ("KIGAM").  From at least in or around 2011 to the present, CHI also served as the director of KIGAM's Earthquake Research Center.

## B. KIGAM

7.   KIGAM was a government-funded geoscience research institute in South Korea that, among other things, tested seismological equipment and provided technical certifications for equipment used in government-funded projects.  Companies seeking to secure business in South Korea in connection with government-funded projects generally needed to meet the specified requirements set forth by KIGAM and obtain proper technical certifications from KIGAM.  In addition to setting the parameters for public tenders, KIGAM also purchased equipment directly from companies.

8.   KIGAM was sponsored by various ministries in the South Korean government, including, among others, the Ministry of Education, Science, and Technology, and the Ministry of Land, Transport, and Maritime Affairs.  KIGAM also was subject to inspections and routine audits performed by the Board of Audit & Inspection ("BOI") in South Korea.  The BOI was established to look into agencies that received government funds and evaluate whether these funds are being used for their intended purpose. In KIGAM's 2011 Annual Report, each one of its projects over $100 million was listed as funded by one of six Korean government agencies.  According to KIGAM's 2014 Annual Report, approximately 90 percent of KIGAM's funding came from the Korean government, with sponsored research and other sources of income totaling only 10 percent.

9.   As an employee and director at KIGAM, CHI thus served as a public official.

3

10. During his time at KIGAM, CHI played an influential role in steering business to companies through the process of setting requirements and providing certifications.

### C. Company A

11. Company A was a company based in the United Kingdom that specialized in the manufacture and distribution of seismic instruments used in early-warning systems. From at least 2003 to the present, Company A conducted business in South Korea, including in connection with government-funded projects. On or about December 10, 2015, and later in subsequent conversations, Company A, acting through its counsel, disclosed evidence to the government, including emails and financial records, showing that CHI asked Company A to wire substantial corrupt payments into CHI's bank account in California and take steps to conceal the parties' financial relationship in exchange for favorable treatment that CHI agreed to provide to Company A. As part of this arrangement, the evidence demonstrates that between 2009 and 2015, Company A paid CHI approximately $650,000 in order to facilitate KIGAM's approval of technical certifications for Company A's equipment, which steered business to Company A by permitting the company to participate in government-funded projects. CHI's emails made clear on several occasions that he did not want others to know about the arrangement because of his status as a public official.

### D. KOREAN BRIBERY LAW

12. In his roles at KIGAM, CHI was a public official as set forth in Article 129 of South Korea's Criminal Code, which

4

provided, in relevant part, that "[a] public official . . . who
receives, demands, or promises to accept a bribe in connection
with his duties shall be punished by imprisonment for not more
than five years or suspension of qualifications for not more
than ten years." As detailed below, CHI repeatedly acknowledged
to Company A's representatives that he was a public official and
that his payment arrangement with Company A was illegal.

13.   A violation of Article 129 of South Korea's Criminal
Code is an offense against a foreign nation involving bribery of
a public official, which is a specified unlawful activity under
18 U.S.C. § 1956(c)(7)(B)(iv).

### III. STATEMENT OF PROBABLE CAUSE

14.   As set forth in detail below, the government's
investigation has developed probable cause to believe that CHI
committed the SUBJECT OFFENSE.

### A. Company A's Presentation

15.   In or around mid-December 2015, I spoke with
prosecutors at the Department of Justice who told me the
following about the December 10, 2015 presentation by Company
A's counsel and their subsequent discussions with counsel:

a.   Counsel outlined payments made by Company A (and
its employees and agents) to CHI in exchange for benefits that
CHI provided to Company A in connection with Company A's
relationship with KIGAM.

b.   Counsel reviewed Company A's financial and
accounting records and identified at least $850,000 that Company
A paid to CHI between 2003 and 2015.

c.    Counsel stated that the vast majority of these payments—at least $650,000—were made by wire transfers into CHI's Bank of America bank account located in California.

d.    Counsel also provided emails in which CHI asked Company A's representatives to pay him cash in addition to the wire transfers.

e.    In certain emails, which are described in more detail below, CHI referred to these payments as "advice fees" and acknowledged that it was illegal for him to accept them in his capacity as a "governmental officer."

f.    Company A's counsel stated that Company A made payments to CHI in order to secure an unfair business advantage for Company A.  Counsel explained that the relationship between CHI and Company A was memorialized in an unsigned one-page agreement between CHI and Company A (the "Agreement") dated February 7, 2003.  The Agreement purported to address consulting services to be rendered by CHI to Company A.  The Agreement did not reference CHI's affiliation with KIGAM, nor did it discuss any specific services or other deliverables that he would render.  The Agreement did note, however, that "Dr Chi will be recommending [Company A's] products in general to South Korean Seismological equipment users" and that "[Company A's] products will be actively supported and recommended to the seismic community."

g.    Counsel noted that although the Agreement was purported to have a term of one year, Company A made payments to CHI for well over a decade.

## B. CHI's Incriminating Emails

16.   Based upon my review of the evidence provided by Company A's counsel and other sources, I have identified numerous emails that demonstrate the corrupt relationship between Company A and CHI, as well as CHI's efforts to conceal the existence of the relationship and his awareness that the payments were improper and, in fact, prohibited by law.  For example, in an email that CHI sent to representatives of Company A on or about June 23, 2014, CHI cautioned the representatives not to reference in emails the assistance that he was providing because "I am a governmental officer and I should not have any contact with private company.  Moreover, it is illegal to assist any company related to the test."  Nevertheless, CHI not only repeatedly had further "contact" with Company A, but he also solicited money from Company A in exchange for precisely the sort of "assist[ance]" that he knew was illegal, as reflected in the following emails, among others:.

a.   On or about October 31, 2007, CHI emailed Company A's head of sales to request payment of "the Euro money equivalent to $10,000 when I visit your office very personally like as before.  My collegue [sic], Mr. Lim do [sic] not need to know it."

b.   On or about November 25, 2007, CHI emailed Company A's head of sales a detailed explanation of the calculation of his "advice fee" for the year, requesting that "[y]ou already paid $10,000 when I visited your office. Therefore, please send $41,000 to my bank account in America."

7

c.   On or about February 7, 2008, CHI emailed Company A's head of sales and also its founder and principal owner regarding a recent bid for seismic readers by the Korea Gas Company ("KOGAS").   In the email, CHI informed them that Company A would be the only company to satisfy a technical requirement, and he also urged that "[a]fter reading this, please reply to me whether you get [sic] it and delete this file for safety."

d.   On or about March 3, 2008, CHI emailed Company A's head of sales about open bidding of seismic readers by KOGAS and included a calculation of his "advice fee," further noting that "[t]herefore, only $29,000 are [sic] needed to be sent to my account."

e.   On or about July 3, 2008, CHI emailed Company A's head of sales, copying its founder and principal owner, about the status of certain projects in Korea and stated that "I want to get my advice fee, $19,000 by Euro money [sic] when I visit your office . . . . And whenever you have any question, please reply to me separately.   Please do not re-forward this mail to me for safety."

f.   On or about April 29, 2009, CHI emailed Company A's founder and principal owner, copying its head of sales, to announce the successful proposal put forth by Company A for the KOGAS project.   In the email, CHI wrote that Company A would avoid a competitive bid and that "the result of [sic] evaluation committee for the bidding of gas company was the same as the expectation [sic] . . . . I am really very happy and excited with the result and I want to share this satisfaction with you."

8

g.    On or about September 8, 2009, CHI emailed Company A's head of sales, copying its founder and principal owner, and stated, "I want to ask you to send $8,000 to my account at [sic] America this week . . . . As you knew [sic], due to my position and status, I should not support any particular company privately, and my members have not known the relationship between you and me."

h.    On or about March 31, 2010, CHI emailed Company A's head of sales, stating, "Second, due to my position, I am not allowed to participate in any activity of private companies not only investment but also any assistance officially [sic] . . . . Third, the total of real estate and cash flow of me [sic] and my family should be reported to government [sic] every year. That is why I got the advice fee from you through the American bank. The cash flow between [Company A's distributor] and me is really very dangerous and strictly it should be limited within very small amount."

17.   Continuing to use his efforts to advance Company A's position in Korea, on or about October 3, 2010, CHI emailed Company A's head of sales, copying its founder and principal owner, and reported that "[r]ight now, your agent, . . . [Company A's distributor] was [sic] surrounded by enemies and they made a kind of anti-cartel.  In order to destroy it, I will make [Company A's distributor] to supply your systems."

18.   CHI also informed Company A that he was sending invoices from his friend's address in New Jersey in an effort to conceal the corrupt payments.  On or about June 21, 2012, CHI

9

emailed Company A's head of sales, copying its founder and
principal owner, stating, "I just sent the invoice of advice fee
to you today by DHL.  I used the home address of my friend at
[sic] New Jersey.  I asked my bank information.  They said that
routing number and my account number with bank [sic] address are
enough to send wire [sic] transfer."

19.  Confirming receipt of funds into his U.S.-based
account, on or about August 22, 2012, CHI emailed Company A's
head of sales, copying its founder and principal owner, stating,
"I checked my account yesterday and the first advice fee was
received.  Thank you so much."

20.  On or about August 28, 2012, CHI emailed Company A's
head of sales, copying its founder and principal owner, to
inform them of the status of a bid being conducted by the Korea
National Oil Company, and stating, "[d]o not trust or believe
GeoSIG [a Swiss company involved in seismic operations] and
never mention my name in any situation.  If possible, please
delete some old useless mails [sic] of mine."

21.  On or about September 26, 2012, CHI emailed Company
A's head of sales, copying its founder and principal owner, to
warn that "I am very afraid that [a representative from Company
A's distributor] might move to other companies in future [sic],
and the technical cooperation and friendship between me and your
company are ok in any cases.  But others, especially something
related to money should not be shown or open [sic] to him.
Please take into account."

## C. **Financial Tracing**

22.   Based upon my training and experience, I know that corrupt payments often are routed in international transactions and that their recipients thereafter frequently transfer the payments to other accounts and sources.

23.   I have collected and reviewed, among other evidence in this case, relevant banking information from CHI's Bank of America and Merrill Lynch accounts.

24.   CHI's Bank of America account is a bank account, number XXXXX-X8070, located in Glendora, California, within the Central District of California.

25.   CHI's Merrill Lynch account is a brokerage account, number XXX-X4235, located in New York, New York.

26.   Based upon my review of these financial records, I know that from approximately 2009 to 2015, Company A made wire transfers into CHI's Bank of America bank account totaling $650,000.  These wire transfers ranged in amounts from approximately $20,000 to $140,000 and did not occur in consistent intervals.

27.   During this period, CHI's Bank of America account also received a total of approximately $400,000 from two other sources.  The relationship between CHI and these other sources is still under investigation.

28.   After CHI received payments into his Bank of America account from these sources, he transferred substantial sums of money into his Merrill Lynch brokerage account.   These transfers

spanned the period 2010 to 2014 and ranged in amounts from $30,000 to $150,000.

29.  For example, CHI wrote a check in the amount of $50,000, Check No. 135, from his Bank of America account that was deposited into his Merrill Lynch brokerage account on March 22, 2013.  Prior to the time of this transfer, on August 16, 2012, CHI's Bank of America balance was a mere $5,216.48. Subsequently, Company A wired the following amounts into CHI's Bank of America account: $20,960 on August 20, 2012; $25,960 on October 15, 2012; and $24,960 on January 31, 2013.  Company A's transfers during this period totaled $71,880.  Within this time period, on December 5, 2012, another company wired $34,620 into CHI's Bank of America account.  Aside from the aforementioned payments, however, CHI's Bank of America account had no incoming sources of funds during this period.  Based upon Company A's substantial wire transfers to the Bank of America account just before CHI deposited the check at Merrill Lynch, I know that by the time that CHI transferred $50,000 on March 22, 2013, at least $10,001 of such amount was criminally derived proceeds, as follows:

| Portion of account balance reflecting Company A-related funds | Portion of account balance reflecting non-Company A funds | Amount of outgoing deposit to Merrill Lynch | Amount of outgoing deposit attributable to Company A-related funds |
|---|---|---|---|
| $30,271.39 | $39,836.48 | $50,000 | $50,000.00 <br> - $39,836.48 <br> **$10,163.52** |

## IV.   CONCLUSION

30.   Based upon the foregoing, probable cause exists that within the Central District of California and elsewhere, HEON-CHEOL CHI engaged in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

31.   Wherefore, I respectfully request that this Court issue a criminal complaint charging HEON-CHEOL CHI with a violation of 18 U.S.C. § 1957, as well as an arrest warrant authorizing his arrest.

JEFFREY COLEMAN, Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me
on December 9, 2016

UNITED STATES MAGISTRATE JUDGE

ALKA SAGAR

13