1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                       )
6               Plaintiff,             )    Case No.
                                       )
7          vs.                         )    CR 16-00824-JFW
                                       )
8   HEON-CHEOL CHI,                    )    PAGES 295 to 462
                                       )    VOLUME 3
9               Defendant.             )
    _____)

10

11

12

                     REPORTER'S TRANSCRIPT OF
13                        TRIAL DAY 2
                   WEDNESDAY, JULY 12, 2017
14                        8:19 A.M.
                   LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21

22   _____

23        MIRANDA ALGORRI, CSR 12743, RPR, CRR
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, SUITE 4455
            LOS ANGELES, CALIFORNIA 90012
25            MIRANDAALGORRI@GMAIL.COM


          UNITED STATES DISTRICT COURT

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         SANDRA R. BROWN
          Acting United States Attorney
5         BY:  POONAM KUMAR
          Assistant United States Attorney
6         United States Courthouse
          312 North Spring Street
7         Los Angeles, California 90012

8         DEPARTMENT OF JUSTICE
          BY:  DAVID M. FUHR
9         BY:  ANNA G. KAMINSKA
          1400 New York Avenue NW
10        Washington D.C., 20005

11

     **FOR THE DEFENDANT:**
12
          LAW OFFICES OF JOEL C. KOURY
13        BY:  JOEL C. KOURY
          3435 Ocean Park Boulevard
14        Suite 107-50
          Santa Monica, California 90405
15
          KAYE MCLANE BEDNARSKI & LITT, LLP
16        BY:  MARILYN E. BEDNARSKI
          BY:  KEVIN LAHUE
17        234 East Colorado Boulevard
          Suite 230
18        Pasadena, California 91101

19        LAW OFFICES OF RICHARD W. RAYNOR
          BY:  RICHARD W. RAYNOR
20        800 South Pacific Coast Highway
          Suite 8-284
21        Redondo Beach, California 90277

22
          CERTIFIED KOREAN INTERPRETERS
23        KATHY SIM
          HYON K. RO
24

25

**UNITED STATES DISTRICT COURT**

1              **I N D E X**

2

3         **WEDNESDAY, JULY 12, 2017; VOLUME 3**

4

5         **Chronological Index of Witnesses**

6

7    Witnesses:_____     Page

8

     POTTS, PH.D., Christopher Graeme
9
         Cross-examination by Mr. Koury            302
10        Redirect examination by Ms. Kaminska      330
         Recross-examination by Mr. Koury          342
11

12   HARRINGTON, Michelle

13        Direct examination by Ms. Kumar           347
         Cross-examination by Ms. Bednarski        382
14        Redirect examination by Ms. Kumar         400
         Recross-examination by Ms. Bednarski      402
15

16   PEARCE, Natalie Andra

17        Direct examination by Mr. Fuhr            406

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                        EXHIBITS

 2

 3            WEDNESDAY, JULY 12, 2017; VOLUME 3

 4
                                        For      In
 5    Exhibits                          ID       EVD

 6    61    E-mail                                436

 7    62    E-mail                                334

 8    65    E-mail                                438

 9    70    E-mail                                414

10    72    E-mail                                443

11    75    E-mail                                445

12    80    E-mail                                423

13    87    E-mail                                425

14    88    E-mail                                433

15    89    E-mail                                455

16    97    E-mail                                439

17    105   E-mail                                422

18    106   E-mail                                426

19    108   E-mail                                435

20    111   E-mail                                446

21    113   E-mail                                449

22    115   E-mail                                326

23    120   E-mail                                450

24    136   E-mail                                456

25    137   E-mail                                453
```

**UNITED STATES DISTRICT COURT**

```
 1                        EXHIBITS CON'T

 2

 3            WEDNESDAY, JULY 12, 2017; VOLUME 3

 4                                           For      In
 5      Exhibits                             ID       EVD

 6      139  E-mail                                   418

 7      141  E-mail                                   456

 8      144  E-mail                                   332

 9      154  E-mail                                   454

10      157  E-mail                                   420

11      165  E-mail                                   458

12      202  E-mail                                   363

13      203  E-mail                                   365

14      211  E-mail                                   361

15      214  E-mail                                   363

16      217  E-mail                                   367

17      222  E-mail                                   370

18      224  E-mail                                   355

19      225  E-mail                                   373

20      230  2013 Commission Schedule                374

21      238  E-mail                                   375

22      240  E-mail                                   380

23      241  E-mail                                   381

24      242  Wire Transfer Request Form              379

25      247  E-mail                                   376
```

<u>**EXHIBITS CON'T**</u>

**WEDNESDAY, JULY 12, 2017; VOLUME 3**

| Exhibits | For ID | In EVD |
|---|---|---|
| 255  Various Sales Orders | | 353 |
| 256  Various Wire Transfer Requests | | 377 |
| 504  Handwritten Agreement | | 304 |
| 521  Photograph | | 385 |

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 12, 2017

 2                            8:19 A.M.

 3                              ---

 4

 5         (The following proceedings were held in

 6          open court out of the presence of the jury:)

 7              THE COURT:  All right.  All counsel and the

 8    defendant are present.

 9              I'm still putting the final touches on the

10    rulings; so I'm not able to give it to you this morning.  We

11    had some delay with respect to the jurors.  All the jurors are

12    now present, and they will be coming in in a moment.

13              So let's put Mr. Potts back on the witness stand.

14         (The following proceedings were held in

15          open court in the presence of the jury:)

16              THE COURT:  All right.  Good morning, ladies and

17    gentlemen.

18              We're now going to proceed with the

19    cross-examination of Mr. Potts.

20              You may proceed, counsel.

21              THE CLERK:  And you remain sworn.

22    ///

23    ///

24    ///

25    ///
```

**UNITED STATES DISTRICT COURT**

**CHRISTOPHER GRAEME POTTS, PH.D.,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**CROSS-EXAMINATION**

BY MR. KOURY:

Q      Good morning, Mr. Potts.

A      Good morning.

Q      Now, considering the Korean market, would you agree that GSL products are superior to GeoSIG products or better value?  Let's put it that way.

A      I would certainly hope so, yeah.

Q      Would you also agree with the idea that GSL products are a better value in the Korean market than Nanometrics products?

A      Again, I would hope so, yeah.

Q      And is the same true of Revtek products?

A      I would hope so, yeah.

Q      In front of you is Exhibit 504.  There's a folder in front of you, and there should be a separate folder.

A      Yes.

Q      Do you see the document 504?

A      Yep.

Q      Now, that document was found at your business; correct?

A      It was, yeah.

Q      And that was found in the same area where you

1  found the other files connected with the agreements that

2  Dr. Chi had signed.

3        A       Yes, it was.

4        Q       And they were in the business file.

5        A       They're in a folder with contracts and commercial

6  documents, yeah.

7        Q       And in the time that you have been affiliated

8  with GSL, you believed that that might be in Dr. Chi's

9  handwriting?

10       A       I don't know.

11       Q       And you turned that document over to your

12  lawyers, and you turned it over to the Government?

13       A       We turned it over to the investigating agencies

14  in the U.K. and the U.S., yes.

15       Q       Okay.  Thank you.

16               And during the course of the investigation as it

17  relates to that document, you indicated that you thought that

18  it was not Cansun Guralp's handwriting but you suspected it was

19  Dr. Chi's handwriting.

20       A       I don't know whose handwriting it is for sure.

21       Q       Two days ago did you tell the agent, the

22  investigating agent, that you thought it was Dr. Chi's

23  handwriting?

24       A       I don't recall saying that, no.

25               MR. KOURY:  At this time, Your Honor, we would

1    move to admit the document as a business record.

2                    THE COURT:  The document being Exhibit 504?

3                    MR. KOURY:  Correct.

4                    THE COURT:  Is there any objection?

5                    MS. KUMAR:  Objection to hearsay, Your Honor.

6                    THE COURT:  The objection is overruled.  It will

7    be admitted.

8                    MR. KOURY:  Thank you.

9              (Received into evidence Exhibit No. 504.)

10        Q       BY MR. KOURY:  And, Mr. Potts, I wanted to ask

11   you some questions about your background.

12                    You got your university degree in '78; is that

13   correct?

14        A       My first degree in '78, yeah.

15        Q       And then you worked in oil exploration until

16   approximately 1981.

17        A       That's right.

18        Q       And then you left and pursued a Ph.D. '81 through

19   '85.

20        A       That's right.

21        Q       Followed shortly thereafter by getting an MBA in

22   1986?

23        A       1987 I think it was.

24        Q       In 1987 you went to work as a salesman at

25   Hoskins Group.

1          A       That's right.

2          Q       And five years later in '92 you were running

3    sales.

4          A       Part of the sales team for Hoskins, yeah.

5          Q       And then you left in '94 and was doing business

6    consulting.

7          A       Yes.

8          Q       '94 through '99, those five years, you worked at

9    Mondex which is essentially a credit card company.

10         A       That's not a credit card company.  It's a payment

11   systems company.  So it's a technology that underpins payment

12   systems.

13         Q       Dealing with financial credit and outstanding

14   debt.

15         A       Payment system.  So credit cards, debit cards,

16   electronic cash.  So payment systems.

17         Q       Similar to Bitcoin or something of that nature?

18         A       Not really similar.  It's electronic cash.  It's

19   not actually the same as Bitcoin.

20         Q       Okay.  And '99 through 2001 you left to form a

21   company called Citria, C-i-t-r-e-a?

22         A       R-i-a.

23         Q       R-i-a.  I apologize.

24                 And that was a website company designing websites

25   for businesses?

1     A     Yes.  Transactional websites.  We're very

2   familiar with them now booking flights.  We built very early

3   versions of those transactional websites.

4     Q     And you were there until that company -- you ran

5   that company, did you not?

6     A     I did, yeah.  Yeah.

7     Q     And then eventually that company collapsed in

8   2001?

9     A     Just after 9/11.  Many of our clients stopped

10  their projects in that electronic commerce area, and most of

11  our clients canceled their projects.

12    Q     The company collapsed.

13    A     It did.  Well, we closed down, yeah.

14    Q     And you left and went to Misys, M-y-s-i-s?

15    A     It's M-i-s-y-s, Misys.

16    Q     Okay.  And that was a financial service company?

17    A     No.  That's a software company.  We provided

18  software to financial services, companies like banks or asset

19  managers.

20    Q     And then eventually you left and went to

21  Primary Capital from 2006 to 2010?

22    A     No.  I ran a management buyout of the division of

23  Misys that I ran, and we were backed by Primary Capital as an

24  investor.  So I remained the CEO of the division that we bought

25  out of the group and managed that business for three years with

```
 1        Primary as an investor, and then the business was sold to an

 2        Indian parent company.  I stayed with the company for another

 3        three years after that.

 4             Q       So if I understand correctly, you went to work

 5        for Misys?

 6             A       Yes.

 7             Q       And then eventually you were head of buying out

 8        the ownership of Misys, and then you flipped it and sold it to

 9        another company?

10             A       What actually happened was I went to Misys to run

11        the asset management division of Misys.  The company suggested

12        to me that they wanted to sell --

13             Q       So my question is you wound up taking over Misys

14        and running Misys for a time?

15             A       No.  One division of Misys.

16             Q       And then eventually Misys was bought out by

17        Primary Capital?

18             A       The division of Misys went through a management

19        buyout process and Primary bid for the company, and they were a

20        successful bidder, and they backed us as a management buyout

21        team.

22             Q       And eventually that company then was sold?

23             A       Yes.  That company was then sold to an Indian

24        software company.

25             Q       And after that, that's when you went to work with
```

**UNITED STATES DISTRICT COURT**

1    GSL?

2         A       No.  I stayed with the --

3         Q       Primary Capital?

4         A       No.  I stayed with the company that was sold to

5    the Indian parent for another three years, and I went to a

6    different company called Rule Financial.

7         Q       And you stayed at Rule Financial as well until

8    you went -- got involved with GSL?

9         A       I stayed at Rule Financial for three years.  I

10   was the CEO there, and then that business was sold, and then I

11   joined Guralp Systems.

12        Q       So it's safe -- would you agree it's safe to say

13   that for the last 30 years or so you've primarily been working

14   in finance or investments?

15        A       I've primarily been working in software and

16   consultancy focused on the financial service industry.  I think

17   that's fair to say.

18        Q       Clearly you were not involved in seismic research

19   or developing seismic instruments.

20        A       No.  No.

21        Q       I assume you have no patents?

22        A       No.

23        Q       Now, GSL was founded by Cansun Guralp; correct?

24        A       That's correct.

25        Q       And he's run the business for 30 plus years?

1    A    He ran it until 2010, yes.

2    Q    He invented the products?

3    A    I guess he did, yep.

4    Q    He got patents for those products?

5    A    I don't know.

6    Q    You don't know whether the company you're running

7  has patents for the products?

8    A    The company doesn't have any patents.  I don't

9  know whether he had any patents originally.  Patents typically

10  last 20 years or so.  So there are no current patents.

11    Q    He marketed the products?

12    A    He did, yeah.

13    Q    He troubleshot and improved the products over the

14  years?

15    A    Yep.

16    Q    And these are very expensive products; so they

17  had to be warranted; correct?

18    A    They had warranties, yes.

19    Q    And Andrew Bell was your predecessor.  He was the

20  CEO from 2010 to 2015; correct?

21    A    No.  He was the CEO from beginning of 2014 to

22  beginning of 2015.

23    Q    And the CEO before Andrew Bell?

24    A    Was Steven Roh.

25    Q    And Tim Wall preceded him?

```
 1        A        Yeah.

 2        Q        And in 2015 you displaced Andrew Bell as CEO;

 3   correct?

 4        A        No.  Andrew Bell had a heart attack.

 5        Q        The question is you dis -- you replaced him?

 6        A        I replaced him, yes.  I didn't displace him.

 7        Q        Okay.  Now, when Primary Capital purchased the

 8   company from Cansun Guralp, it was sold for 18 million pounds

 9   approximately?

10        A        I believe so.  I don't know the exact number.

11        Q        Roughly around 23 million U.S.?

12        A        I don't know the exact number.

13        Q        As part of the transfer, Cansun Guralp was owed

14   9.2 million -- or excuse me -- 9.2 million pounds.

15        A        I wasn't around at the time of the transaction.

16   There are loan notes for that amount in existence now, yes.

17        Q        So there's a loan note that says that he is still

18   owed 9.2 million pounds?

19        A        Yeah.  That's a loan note -- original loan plus

20   the accrued interest.

21        Q        And that's roughly $11 million or so?

22        A        Yes.  The current rates I guess it is.

23                 MR. KOURY:  Your Honor, I want to reference

24   Exhibit 536 which I think is also in the folder.

25        Q        Mr. Potts, if --
```

```
 1        A       Yep.

 2        Q       That's an e-mail you received from Cansun Guralp

 3   on January 18, 2016; correct?

 4        A       That's correct, yeah.

 5        Q       And at that point he asked for payment of the

 6   outstanding 9.2 million pounds or $12 million?

 7        A       Yeah.

 8                MR. KOURY:  Your Honor, at this time this exhibit

 9   has not been admitted.  I would move to admit the document.

10                THE COURT:  Government have any objection?

11                MS. KUMAR:  Objection to hearsay, Your Honor.

12                THE COURT:  Objection is sustained.

13        Q       BY MR. KOURY:  Now, when you signed on to GSL as

14   CEO --

15        A       Yeah.

16        Q       -- you got a 6 percent interest in the company,

17   did you not?

18        A       Not immediately.  After a few months I did.

19        Q       But you did get a 6 percent interest in the

20   company?

21        A       Yes, I did.

22        Q       Did Andrew Bell get a 6 percent interest in the

23   company?

24        A       I think he already had a 4 percent interest in

25   the company.
```

1      Q      How about Steven Roh?  Did he have an interest in

2  the --

3      A      I don't think he did, no.

4      Q      How about Tim Wall?

5      A      Tony Wall.

6      Q      Tony Wall.

7      A      Yes.  That he did.

8      Q      Now, in the contract that Mr. Guralp signed with

9  GSL, there was a clause that basically said, if he's a bad

10  leaver or something illegal takes place or something along

11  those lines, the $12 million that he owed is canceled out.

12      A      Offhand I don't know that exact phraseology.

13      Q      I'm not asking about the exact phraseology.  I'm

14  talking about the idea.

15      A      I don't know the exact phraseology.  I think it's

16  a bit more complicated than that.

17      Q      Essentially, if there's some illegality that took

18  place during his tenure, then the note can be canceled?

19      A      I don't think that's the case, no.

20      Q      The note can be traded for one pound.

21      A      I don't think that's the case either.  I think

22  it's the equity that can be traded for one pound.

23      Q      And the equity is the amount of stock that is

24  worth approximately 12 million.

25      A      No.  No.  The loan note is separate from equity.

1    It's a different part of the structure in the original private

2    equity deal.

3         Q        The equity is worth at least millions?

4         A        The equity is worth whatever proportion it is of

5    the overall company.  I think he has 20 percent of the equity.

6    So it would be 20 percent of the value of the company, but the

7    loan note is separate from that.

8         Q        So 20 percent of the company can be purchased for

9    approximately a dollar twenty if -- can revert to GSL.

10        A        It can do under certain circumstances which are

11   defined quite carefully in that sale purchase agreement.

12        Q        The term of art was if he's a very bad leaver?

13        A        I believe that's the phraseology, yes.

14        Q        And a very bad leaver includes any kind of

15   criminal activity?

16        A        You'd have to remind me of the exact wording, but

17   that sort of thing, yes.

18                 THE COURT:  Are you saying bad leader?

19                 MR. KOURY:  Leaver, l-e-a-v-e-r.  Thank you.  I

20   apologize, Your Honor, for not making it clear.  It's a British

21   phrase.  I didn't choose it.

22        Q        And leaver, that phrase refers to Mr. Guralp

23   leaving the company?

24        A        Well, you said yourself it's an English phrase.

25   It's an antiquated phrase.  It quite often appears in

1    contracts, things like that.

2         Q       It essentially means the person leaves on bad

3    terms?

4         A       Yes.  In the same contract there's good leaver,

5    bad leaver, and very bad leaver.  I think there's different

6    levels to it.  Each level has a different set of criteria.

7    It's quite a bit more complicated than the old sayings and all

8    the words around it.

9         Q       I'm sure.

10                Now, this was -- Cansun Guralp is not an MBA, is

11   he?

12        A       I don't think so, no.

13        Q       Is he a lawyer?

14        A       No.

15        Q       And so these terms -- I have essentially

16   summarized it accurately although there's far more -- a much

17   broader definition?

18        A       I think you simplified it, but in essence, what

19   you're saying is true, yeah.

20        Q       Now, there is a lawsuit that you have helped

21   instigate.

22        A       As a director of the company that started the

23   suit, I'm part of the process of starting that lawsuit, yeah.

24        Q       And as part of that lawsuit, you have directed

25   payment of hundreds of thousands of dollars to law firms doing

```
 1   investigations.

 2        A       As part of the lawsuit, yes, we have, yeah.

 3        Q       And as part of that lawsuit, you have met with

 4   British authorities trying to convince them to file a criminal

 5   case?

 6        A       No.  It's entirely separate from the lawsuit.

 7        Q       But you have met with British authorities with

 8   your lawyers multiple times?

 9        A       Different lawyers, but yes.

10        Q       Half dozen times?  Dozen times?

11        A       I think two or three times.

12        Q       You have directed your lawyers to send them a

13   letter asking them to take action because your company is

14   having financial problems?

15        A       I don't recall that exact phraseology, no.

16        Q       Okay.  I'm not asking for the exact phraseology.

17                But you did notify your lawyers that you were

18   having credit issues raising capital.

19        A       We weren't trying to raise capital.  We have cash

20   flow problems because of the costs of the various legal cases,

21   and indeed, the trading of the business was not particularly

22   good.

23        Q       And when you went and met with the British

24   authorities and with the letters that you sent, you were trying

25   to get them to initiate a criminal investigation.
```

**UNITED STATES DISTRICT COURT**

```
 1        A       No, we weren't.  That was entirely their

 2   decision.  We weren't.

 3        Q       I know it's their decision.

 4        A       Yeah.

 5        Q       But you went to them to notify them of what you

 6   thought was criminal activity?

 7        A       We had to do that.

 8        Q       And then you met with the United States

 9   Department of Justice as well.

10        A       We had to do that as well, yeah.

11        Q       Well, you did it; correct?

12        A       Yep.

13        Q       And you met with them on multiple occasions.

14        A       Several occasions, yeah.

15        Q       And you flew over with your lawyers to give them

16   information and to assist the investigation.

17        A       I flew over, and then the lawyers are already

18   here.  But yes.

19        Q       And you personally signed a declaration at some

20   point indicating that you believed that Cansun Guralp was a

21   very bad leaver as part of the lawsuit.

22        A       I don't recall doing that.

23        Q       But you've made that allegation against

24   Cansun Guralp?

25        A       The companies have made allegations as part of a
```

        1    civil case in the high court in the U.K.  So the companies have

        2    made those charges.

        3            Q       So the company did make that charge?

        4            A       The company says that Cansun Guralp could be a

        5    very bad leaver, yes.  That hasn't been proven or that hasn't

        6    actually happened as an evaluation by the Court.

        7            Q       The Court hasn't resolved that issue yet?

        8            A       No.

        9            Q       And there's ongoing litigation?

       10            A       Yeah.

       11            Q       And as part of that ongoing litigation, there's a

       12    claim that someone at the company committed fraud in trying to

       13    extend the deadline to pay Cansun Guralp?

       14            A       There's a countersuit saying that, yes.

       15            Q       That your company committed fraud in its relation

       16    with Cansun Guralp?

       17            A       There's a countersuit saying somebody claims that

       18    somebody in the company misled Cansun Guralp, yes.

       19            Q       Just like your suit claims that Cansun Guralp is

       20    a very bad leaver?

       21            A       Our lawsuit isn't about being a very bad leaver.

       22    Our lawsuit is about the original transaction in 2010.

       23            Q       Now, I want to get back to your -- well, you're

       24    the CEO.  In the last three years, has the company been in the

       25    red two of the three years?

**UNITED STATES DISTRICT COURT**

1      A      We have been loss making for one of those two

2  years I believe.  We haven't published all of our important

3  accounts yet.

4      Q      So in the last two years, you have had a loss.

5      A      One of the three years we have had a loss, and

6  the last financial year, the one we just ended, we were

7  profitable.  The one before that we made a loss.

8      Q      And prior to you taking over, the company made --

9  was in the black every year since 2006?

10     A      I think there may have been a year when there was

11 a loss-making result.  I can't remember exactly.

12     Q      Once in the prior?

13     A      I can't remember.  I can't remember the whole

14 trading profile.

15     Q      And after you took over the company,

16 Mark Volanthen, V-o-l-a-n-t-h-e-n, the head of sales left the

17 company?

18     A      He was the head of sales for the oil and gas

19 sector, and he left the company, yes.

20     Q      And Nathan Pearce, who was head of other markets,

21 left the company?

22     A      He resigned in August 2015.

23     Q      And Sian Warner?

24     A      Sian Warner.

25     Q      She left the company as well.

```
 1          A       She resigned in September of 2015.

 2          Q       Few months after you took over?

 3          A       A year after I took over, yeah.

 4          Q       She was the controller of a multimillion dollar

 5   company at the time she left; right?

 6          A       She was the finance director, CFO.

 7          Q       Of a multimillion dollar company?

 8          A       Yes.

 9          Q       And she left to run a flower shop?

10          A       That's what she said.  On behalf of a friend is

11   what she said.

12          Q       Now, Nathan Pearce was married at the time, and

13   Michelle Pearce also left the company?

14          A       She left in 2011, I think, a long time ago.

15          Q       Now, you have told -- during the course of this

16   litigation that you have been involved in in the U.K., you've

17   repeatedly said that you believed Dr. Chi is a government

18   official.

19          A       The court papers -- the claim that we submitted

20   as part of the civil case talks about that, yes.

21          Q       But you have said it yourself, the words have

22   come out of your mouth that he is a government official?

23          A       Not as part of the civil case.  As part of the

24   proceedings here, for example, yes.

25          Q       On multiple occasions you have said he is a
```

**UNITED STATES DISTRICT COURT**

```
 1   government official?

 2        A      I believe him to be, yes.

 3        Q      You told Agent Coleman that about a few days or

 4   about a year ago or on multiple occasions?

 5        A      Well, I have certainly said it, yes.

 6        Q      You even compared KIGAM to the U.S. Geologic

 7   Survey?

 8        A      Yes.

 9        Q      And your lawyers -- well, yesterday you said

10   something very subtly different.  You said KIGAM is a

11   government-funded institute.

12               Do you remember saying that?

13        A      Yep.

14        Q      And the reason why you made that subtle change is

15   because your lawyers told you months ago that, as a result of

16   their investigation, KIGAM is not a government agency.

17        A      No.  That's not true.

18        Q      They never told you that?

19        A      No one said it isn't a government agency, no.

20        Q      So you believe it to still be a government

21   agency?

22        A      I think it is, yes.

23        Q      Would you be surprised if the president of KIGAM

24   disagreed with you?

25        A      Little bit.  But I don't know exactly the
```

```
 1   structure of the Korean government.

 2        Q     So Ms. Warner, before she left, told you that she

 3   believed that Dr. Chi was not a government employee?

 4        A     She also said she had never met him.

 5        Q     She told you that she believed he was not a

 6   government employee?

 7        A     She said she didn't believe he was a government

 8   employee, yeah.

 9        Q     Now, I want to talk to you about the agreement

10   that Chi had with Mr. Guralp.

11              Nathan Pearce told you that Dr. Chi provided

12   almost a warranty service essentially?

13        A     Natalie Pearce didn't say that to me.  She said

14   that he was very helpful to the company in South Korea,

15   provided some technical consulting, technical advice.

16        Q     Well, when Natalie Pearce said that to you, she

17   told you that he provided specifications for equipment?

18        A     Yep.

19              MS. KAMINSKA:  Object to hearsay, Your Honor.

20              THE COURT:  Overruled.

21        Q     BY MR. KOURY:  She also told you that he provided

22   logistical arrangements when items had to be repaired or

23   returned?

24        A     Yep.

25        Q     She told you that he provided advice about the
```

```
 1   Korean market?
 2        A       Yep.
 3               MR. KOURY:  That -- hold on for one second,
 4   Your Honor.  There's a transition taking place.  Thank you.
 5        Q       She told you that he provided invaluable
 6   information and support in the Korean marketplace?
 7        A       I don't know if he used the word invaluable, but
 8   she certainly said that he provided information and support,
 9   yeah.
10        Q       And when there were problems with the products,
11   she said that he was the person that they would call?
12        A       Who's "they" in this question?
13        Q       Everyone at your company would call Dr. Chi when
14   there were problems with the equipment in Korea?
15        A       I don't remember her saying that, but certainly
16   he was regarded as somebody you would turn to for help.
17        Q       And you were also aware that Ms. Pearce told you
18   that, if a product couldn't be fixed by Mr. Chi himself, that
19   he himself would pay out of his consulting fees, have GSL
20   people fly over to repair the product?
21        A       There was one instance on the spreadsheet that I
22   was talking about yesterday where it says that Dr. Chi waived
23   some of his fee in exchange for GSL engineers going to Korea to
24   work on instruments, yes.
25        Q       Andrew Bell also told you that Dr. Chi would do
```

**UNITED STATES DISTRICT COURT**

1    the same thing, that he would deduct from his advice fees the

2    costs of sending GSL people around the globe to work on

3    something in Korea?

4           A       Yes.  And Cansun Guralp said the same thing.

5           Q       In fact, isn't it true that Cansun Guralp sent

6    you a lengthy, detailed document about advice and support that

7    Dr. Chi supplied to your company from 2003 on?

8           A       That he did send us that, yeah.

9           Q       And in that lengthy report, he would say things

10   like Dr. Chi advised on solutions to power failure problems

11   with the CMG-3TB?

12                  MS. KAMINSKA:  Object to hearsay, Your Honor.

13                  THE COURT:  Sustained.

14          Q       BY MR. KOURY:  As part of your investigation,

15   you're aware that Mr. Guralp claimed that Dr. Chi was involved

16   in helping to implement platinum software.

17                  Is that true?

18                  MS. KAMINSKA:  Object to hearsay.

19                  THE COURT:  Sustained.

20                  MR. KOURY:  It's not being offered for the truth,

21   Your Honor.  It's being offered to --

22                  THE COURT:  The ruling stands.

23          Q       BY MR. KOURY:  Now, after you got this lengthy

24   document with all the specifics about the help that Dr. Chi had

25   supplied, did you verify -- did you contact Mr. Guralp to ask

**UNITED STATES DISTRICT COURT**

1  him more specifics about the document?

2      A      It's quite a long document.  I can't remember

3  everything that's in it.

4      Q      My question is did you call up Mr. Guralp and go

5  through the document line-by-line and verify?

6      A      No.  I didn't call him up to go through that

7  document line-by-line.

8      Q      It seems like it's very technical.  For example,

9  do you know exactly how Scream works?

10     A      It's a software product that we provide for

11 customers so that they can monitor the performance of an

12 instrument.

13     Q      And Scream obviously wasn't developed by you.  It

14 was developed by someone else?

15     A      It was developed by Guralp Systems, not by me

16 personally, no.

17     Q      And Nathan Pearce and other people told you that

18 Dr. Chi was instrumental in helping you to modify it for the

19 Korean market?

20     A      I don't remember anybody saying he was

21 instrumental, but I believe Dr. Chi did contribute to Scream

22 and the way it was used in Korea, yes.

23     Q      And based on his suggestions, Scream was also

24 able to be modified around the world in other areas?

25     A      I don't know about that.

1      Q      Nathan Pearce informed you that -- well, let

2    me -- Nathan Pearce informed you that, whenever there were

3    problems with sensors or the equipment, Dr. Chi was the person

4    that they would regularly go to in order to be the first person

5    to assess the problem.

6      A      I don't remember him using that phraseology, but

7    certainly Dr. Chi was someone that was useful in Korea in

8    assessing problems with instruments that had been deployed in

9    Korea.  He did say that or words to that effect.

10      Q      And the amount of products that were deployed in

11    Korea increased exponentially between 2003 and 2016?

12      A      Not exponentially, but they increased steadily

13    year-on-year.

14      Q      Dramatically?

15      A      Exponentially means it was a curve like that.  It

16    was a steady growth.

17      Q      Substantial though?

18      A      Steady growth year-on-year.

19      Q      And the more instruments that are deployed, the

20    more troubleshooting required?

21      A      Over time, yes.  But we also had a distributor

22    who did some of that work as well.

23      Q      Mr. Potts, can you take a look in a binder --

24    it's in the folder?

25              Inside the folder there's a document marked

**UNITED STATES DISTRICT COURT**

 1   Government's Exhibit 115.

 2        A       Yeah.

 3            MR. KOURY:  It hadn't previously been admitted,

 4   Your Honor.  It appears to be an e-mail from Dr. Chi to

 5   Nathan Pearce.

 6                THE COURT:  Are you offering 115?

 7                MR. KOURY:  Yes.

 8                THE COURT:  I take it the Government doesn't have

 9   any objection?

10                MS. KAMINSKA:  No objection, Your Honor.

11                THE COURT:  All right.  115 will be received into

12   evidence.

13         (Received into evidence Exhibit No. 115.)

14                MR. KOURY:  May it be published, Your Honor?

15                THE COURT:  Yes, it may.

16                MR. KOURY:  Thank you.

17        Q       That appears to be an e-mail from Dr. Chi to

18   Mr. Pearce on February 8 -- February 25th, 2008; correct?

19        A       That's right.

20        Q       In that document Dr. Chi indicates he's owed an

21   advice fee of $37,000, and he broke it down as 11,000 for 11

22   instruments that were shipped January 2007, 8 instruments that

23   were shipped July 10 of 2010, 4 instruments that were shipped

24   in the next line through Heesong, 4 more instruments that were

25   shipped through Heesong, 3 and then 6 and then 4 instruments

**UNITED STATES DISTRICT COURT**

```
 1    and 1 instrument shipped on July 6; is that correct?
 2         A      Yep.  Looks like it.
 3         Q      So that all came to 37,000 for all those
 4    instruments; correct?
 5         A      If you add them up right, yes.  Certainly.
 6         Q      Now, when the instruments are shipped, obviously
 7    this is highly specialized computerized equipment that goes
 8    around the world and arrives in an office somewhere.
 9                Is that true?
10         A      It's very delicate instruments, and they're
11    shipped carefully, and they arrive at the location and
12    unpacked, yeah.
13         Q      Well, you hope they're shipped carefully.
14         A      We hope they're shipped carefully, yeah.
15         Q      And before you deploy them, before you spend 50-
16    or $100,000, which is not uncommon depending on the instrument
17    to install, you want to test it before it goes out?
18         A      We always recommend to customers to test it
19    before they deploy it, yeah.
20         Q      And you were aware that Dr. Chi was the person
21    that, once the instrument arrived in Korea, would take it into
22    the lab to fire it up to make sure it was working
23    appropriately?
24         A      I don't know if that happened with all
25    instruments.  I'm not exactly sure.  Certainly this e-mail is
```

 1    from a period when I wasn't involved in the business at all.

 2    So I don't know exactly what the process was.

 3         Q     But your understanding, you were told that that

 4    was part of the service and advice he was giving?

 5         A     Actually, I wasn't told that.  I was told there

 6    was a testing capability at KIGAM, but I didn't know whether

 7    all instruments were tested.  I still don't know that now.

 8         Q     And then, once the instruments were tested, made

 9    sure they were functioning, then they were installed -- if they

10    were sent to KIGAM, they were installed by KIGAM employees?

11         A     Yeah.  I would imagine, yeah.

12         Q     Or subcontractors that they hired?

13         A     If they did that.  I don't know.

14         Q     Now, in this e-mail, it indicates Dr. Chi wrote

15    that the advice fee is 37,000, and he writes, "The items with

16    the stars are indicated for you for your some loss for RTU box,

17    delay penalty.  And for maintenance spares of express train

18    load, you give special discounts."

19         A     Uh-huh.

20         Q     "Hence, I want to use the advice fee for two

21    items.  $8,000 for the travel assistance of your colleagues in

22    Korea.  So please send only 29,000 to my account."

23               And it appears from this e-mail that he's

24    offsetting his advice fee by the cost, the $8,000, that it's

25    going to require for your colleagues to travel from the U.K. to

```
 1    Korea to fix any problems.
 2         A       That's right.
 3         Q       Now, obviously, if you weren't there in 2014, you
 4    don't know what was going on on a daily basis at GSL between
 5    Dr. Chi and the people there.
 6         A       I joined in December 2014.  So until then I knew
 7    nothing about what happened on a daily basis, no.
 8         Q       And the contracts that were submitted -- pardon
 9    me.
10               The invoices that were submitted by Dr. Chi,
11    initially Cansun Guralp personally approved them and signed off
12    on them.
13         A       I don't know.
14         Q       Was it Tim Wall?
15         A       Tony Wall.
16         Q       Tony Wall.
17         A       Yeah.
18         Q       Tony Wall signed off on the invoices?
19         A       I have never seen an invoice with his signature
20    on it, no.
21         Q       Someone approved them.
22         A       Well, the only invoices I have seen are the ones
23    we saw yesterday which were signed off by people other than
24    Tony Wall.
25         Q       Mark Bell signed off on them?
```

**UNITED STATES DISTRICT COURT**

```
1          A        Andrew Bell.

2          Q        Andrew Bell.  Andrew Bell signed off on them?

3          A        Yeah.  Yeah.

4          Q        And Andrew Bell, at the time he was signing off

5   on them, was the CEO in charge?

6          A        He was the finance director, the CFO in 2010, and

7   he became the CEO in the beginning -- late 2013 or very early

8   in 2014.

9          Q        And Andrew Bell had been with the company

10  substantially longer than you had?

11         A        Oh, yeah.  He joined in 2010.

12                  MR. KOURY:  Can I have a moment?

13                  THE COURT:  Yes.

14                  MR. KOURY:  I have nothing further, Your Honor.

15  Thank you.

16                  THE COURT:  All right.  Any redirect?

17                  MS. KAMINSKA:  Yes, Your Honor.

18                       REDIRECT EXAMINATION

19  BY MS. KAMINSKA:

20         Q        Good morning, Dr. Potts.

21         A        Good morning.

22         Q        Dr. Potts, you were asked on cross-examination

23  about KIGAM or Dr. Chi's affiliation with the South Korean

24  government.

25                  Do you remember that?
```

**UNITED STATES DISTRICT COURT**

```
 1          A       Yeah.

 2          Q       Now, you previously testified on direct

 3   examination that you believed Dr. Chi was affiliated with the

 4   South Korean government; is that right?

 5          A       That's right.

 6          Q       And when you visited KIGAM, did Dr. Chi take you

 7   on a personal tour of the facilities?

 8          A       He came on the first part of the tour, yes.

 9          Q       And what did that tour include?

10          A       It would include going to a room which was a

11   control room, and it was a room with monitors which displayed

12   seismic data from instruments around Korea.  And that was used,

13   he said, if there was a nuclear weapons test in North Korea,

14   for a conference call to the president to talk about the event,

15   the weapons test.

16          Q       And you also understood that Dr. Chi was part of

17   a working group for the United Nations Comprehensive Test-Ban

18   Treaty Organization; is that right?

19          A       Yeah.

20          Q       And you additionally testified about some

21   statements that Dr. Chi made to you in face-to-face meetings;

22   is that right?

23          A       Right.

24          Q       And in those meetings, what did Dr. Chi himself

25   tell you about whether he was a government official?
```

**UNITED STATES DISTRICT COURT**

1          A       He said he was a government official, and indeed,

2    in the second meeting in San Francisco, I specifically asked

3    him because I wanted to make absolutely sure of that.

4          Q       Dr. Potts, you testified that, in connection with

5    your internal investigation, you reviewed e-mails from Dr. Chi?

6          A       Yes, we did.

7          Q       And were there e-mails you reviewed in which

8    Dr. Chi told representatives of Guralp that he was, in fact, a

9    public official?

10         A       Yes.

11         Q       And were those e-mails something that ultimately

12   helped you decide to cut off the payments to him personally?

13         A       Yes.  It was part of our investigation.  When we

14   started the investigation, as I said yesterday, in September we

15   knew a little bit.  And then we started an investigation, and

16   we unearthed many, many e-mails including e-mails that we have

17   referred to in terms of his role, his status, and the nature of

18   the payments.

19              MS. KAMINSKA:  Your Honor, at this time the

20   Government would move to introduce Government Exhibit 144.

21              MR. KOURY:  I'm going to object, Your Honor.  It

22   exceeds the scope of cross-examination.

23              THE COURT:  Exhibit 144 will be received into

24   evidence, and the objection is overruled.

25              (Received into evidence Exhibit No. 144.)

```
 1          Q       BY MS. KAMINSKA:  Dr. Potts, drawing your

 2   attention to the top of the page, is this an e-mail

 3   from Dr. Chi to Nathan Pearce dated May 27, 2011?

 4          A       Yes, it is.

 5          Q       Let me refer you to the first part of the e-mail.

 6   Dr. Chi writes, "Dear Mr. Nathan Pearce, officially I cannot

 7   support any private company by regulation.  Therefore, you

 8   could not use or refer my name for your projects in Korea even

 9   if you fully supported behind.  I am very sorry for my status

10   as a governmental officer."

11                  Did I read that correctly?

12          A       That's right, yeah.

13          Q       Now, Dr. Potts, you also testified on

14   cross-examination that Dr. Chi was an individual to whom Guralp

15   would turn for help.

16          A       Yes.

17          Q       Do you recall that?

18                  And at the time of your meeting with Sian Warner

19   and Phil Hill on September 7, did you know exactly what Dr. Chi

20   was doing in exchange for the payments?

21          A       No, I did not.

22          Q       All right.  And did you later come to understand

23   what Dr. Chi was doing based, in part, on your review of

24   e-mails?

25          A       Partly in review of e-mails.  I asked
```

**UNITED STATES DISTRICT COURT**

1    Natalie Pearce and I asked Cansun Guralp to show me examples of

2    the work he had been doing.

3        Q      And, again, did you review e-mails during the

4    course of your investigation in which Dr. Chi told

5    representatives of Guralp what he was doing in exchange for the

6    advice fee?

7        A      We did see e-mails like that, yeah.

8               MS. KAMINSKA:  At this time the Government would

9    move to introduce Government Exhibit 62 into evidence.

10              THE COURT:  Is there any objection to 62?

11              MR. KOURY:  No.

12              THE COURT:  All right.  Exhibit 62 will be

13   received into evidence.

14          (Received into evidence Exhibit No. 62.)

15       Q      BY MS. KAMINSKA:  Drawing your attention to the

16   top half of the page, Dr. Potts, is this an e-mail from Dr. Chi

17   to Cansun Guralp dated June 19, 2003?

18       A      Yes, it is.

19       Q      It reads, "Thank you for your acceptance of

20   technical advice fee.  Here, I want to summarize the future

21   possibility in Korea as follows:

22              "No. 1, as you knew, all broadband borehole

23   stations of my institute will be installed with CMG-3TB, and

24   from next year I will order two sets every year.

25              "No. 2, Korean Meteorological Administration will

```
 1    order two sets of CMG-3TB for their two borehole stations in

 2    the future.

 3                  "No. 3, I recommended CMG-40T-1 as standard

 4    Short-Period Sensor in Korea earthquake society.  I will

 5    exchange all short-period seismic stations with it, and

 6    universities will order it too.

 7                  "No. 4, gas company will use your systems

 8    whenever the required regulation is passed.

 9                  "And, No. 5, I already met and discussed with

10    AFTAC persons to exchange the borehole sensors of your

11    company."

12                  Dr. Potts, is the reference to CMG in that e-mail

13    a reference to Guralp's instruments?

14         A      Yes, it is.

15         Q      Can you tell the jury what AFTAC stands for?

16         A      AFTAC is the Air Force Technical Applications

17    Center.

18         Q      Is that located in the United States?

19         A      It is, yeah.

20         Q      Dr. Potts, you testified on direct that Dr. Chi

21    asked you to keep the price list for your products consistent.

22                  Do you remember that?

23         A      Yeah.

24         Q      And can you explain to the jury how Guralp's

25    products were priced when the advice fees for Dr. Chi were
```

```
1    still being included in the price?
2         A      So we have a process in the company -- when we
3    produce a quote for a client, we have a costing sheet that
4    supports that quote, and that's an internal document that shows
5    all the costs associated with an instrument or a product.  On
6    the costing sheets for all Korean sales up until September
7    2015, there was a section called the advice fee which was where
8    the cost of the advice fee for Dr. Chi was included in the cost
9    of the instrument.  So each quote underlying it had the advice
10   fee built into it.
11        Q      And did Dr. Chi tell you in one of your
12   face-to-face meetings that the advice fee was included in all
13   the products that were sold across South Korea?
14        A      Yes, he did.
15        Q      And so is it true that, the more equipment Guralp
16   sold, the more Dr. Chi would be paid for the advice fee?
17        A      Yeah.
18        Q      All right.  And is it also true that, if the
19   advice fee were taken out, the price of Guralp's equipment
20   would be relatively lower?
21        A      It would drop, yes.  Yeah.
22        Q      So by virtue of adding his advice fee, the cost
23   of Guralp's product was higher, in fact, higher for end
24   customers like KIGAM?
25        A      Yes.
```

**UNITED STATES DISTRICT COURT**

1    Q       Let me turn your attention back to Exhibit 115

2    which was previously admitted.  And turning your attention to

3    the chart in the middle of the page, on the top of the box,

4    there's an indication for KIGAM and then some numbers.  Can you

5    explain what is the advice fee that Dr. Chi is collecting here?

6    A       Yes.  On the top line, the line which says

7    07-09-08, those instruments are digitizers, the first two.  4D2

8    is a sensor.  The 5T is a sensor.  There's 11 items -- 3 plus 3

9    plus 3 plus 2 -- times 1,000.  And the advice fee is $1,000.

10   So 11 times 1,000 is 11,000.

11   Q       So, Dr. Potts, is it fair to say that the end

12   price of the products to Guralp was higher because Dr. Chi was

13   taking an advice fee on each instrument?

14   A       Yes.

15   Q       Dr. Potts, after you launched your internal

16   investigation at Guralp, you self-reported the conduct of the

17   company to two prosecuting authorities; is that right?

18   A       That's right.

19   Q       Did law enforcement come knocking on your door

20   first?

21   A       No, they didn't.

22   Q       You disclosed yourself?

23   A       Yes, we did.

24   Q       And you testified on direct about the meeting

25   with Sian Warner and Phil Hill on September 7, 2015; is that

```
 1    right?

 2         A      Yes.

 3         Q      When did you report to the relevant prosecuting

 4    authorities?

 5         A      It was late in October of 2015, I believe.

 6         Q      And when did you disclose to the Department of

 7    Justice?

 8         A      I think it was about the same time.

 9         Q      All right.  And your company and its employees

10    are located in the United Kingdom; is that right?

11         A      Yes.

12         Q      And one of the prosecuting authorities to whom

13    you disclosed was the U.K. prosecuting authority?

14         A      That's right.  Yes.

15         Q      So as part of your self-disclosure, is your

16    company now under active investigation in the U.K.?

17              MR. KOURY:  Objection.  Irrelevant.

18              THE COURT:  Overruled.

19              THE WITNESS:  Yes, it is.

20         Q      BY MS. KAMINSKA:  And meanwhile here in the

21    United States, have you been given any assurances at all by the

22    Department of Justice that your company won't be prosecuted

23    here?

24         A      No.

25         Q      Have the disclosures that you voluntarily made
```

**UNITED STATES DISTRICT COURT**

```
 1    created a distraction for your business?

 2         A      Huge distraction, yep.

 3         Q      How much time would you estimate that you spend

 4    on dealing with the various litigation involved as a result of

 5    your self-disclosure?

 6                THE COURT:  That's irrelevant.  I will sustain my

 7    own objection.

 8         Q      BY MS. KAMINSKA:  Is it your understanding that a

 9    prosecuting authority can charge the company with a crime?

10         A      Yes, it can.

11         Q      Is it also your understanding, as part of the

12    charge, whether the authority can impose a punishment?

13                MR. KOURY:  Object as irrelevant.

14                THE COURT:  Sustained.

15         Q      BY MS. KAMINSKA:  Do you understand whether the

16    company can be charged with a fine?

17                MR. KOURY:  Objection.  Irrelevant.

18                THE COURT:  Sustained.

19         Q      BY MS. KAMINSKA:  Do your customers do business

20    with you in part based on your reputation?

21                MR. KOURY:  Objection.  Irrelevant.

22                THE COURT:  That's overruled.

23                THE WITNESS:  Yes, they do.

24         Q      BY MS. KAMINSKA:  And would a finding of illegal

25    conduct by a prosecuting authority threaten the relationship
```

1    with your customers?

2                MR. KOURY:  Objection.  Speculation and

3    irrelevant.

4                THE COURT:  Sustained.

5        Q     BY MS. KAMINSKA:  Now, Dr. Potts, you testified

6    that, in connection with the civil lawsuit in the

7    United Kingdom, there was made mention of the release of a

8    9 million pound note for Cansun Guralp; right?

9        A     Yes.  I learned that, yes.

10       Q     Dr. Potts, can you just explain what would have

11   to happen in order for Cansun Guralp to be able to take back

12   that money?

13               MR. KOURY:  Object as irrelevant.

14               THE COURT:  Well, the problem is you opened the

15   door.  The objection is overruled.

16       Q     BY MS. KAMINSKA:  You can answer.

17       A     I'm sorry.

18               THE COURT:  Why don't you rephrase the question

19   again.  I'm not sure it's accurate.

20       Q     BY MS. KAMINSKA:  Sure.  Dr. Potts, I'm asking

21   what would have to happen for Cansun Guralp to be able to take

22   back the debt?

23       A     Well, the first thing that would need to happen

24   potentially is the company was sold and the first tranche, the

25   first part of the money, would actually go to the private

1  equity firm.  And then the next tranche, which is the

2  9.7 million, would go to Cansun Guralp.  And whatever remained

3  would be divided up between shareholders.  That's in the event

4  of a company sale.

5           The other way that the loan could be repaid is if

6  Primary Capital, who is the senior investor who provided the

7  funds for the original acquisition, if they released their loan

8  note and called their loan in, then once their loan had been

9  repaid by the company, then Cansun Guralp's loan could be

10 repaid by the company.  There would have to be enough money to

11 pay them first before Cansun was paid.

12     Q     And so, Dr. Potts, is there any direct

13 relationship between whatever happens at trial here and

14 Cansun's ability to cash in?

15           MR. KOURY:  Speculation, Your Honor.

16           THE COURT:  Sustained.

17     Q     BY MS. KAMINSKA:  Dr. Potts, what's your

18 percentage equity share in the company?

19     A     6 percent roughly.

20     Q     What is that share valued at today?

21     A     Zero.

22     Q     Was it worth more before you self-reported to the

23 prosecuting authorities?

24     A     Yes, it was.

25     Q     Dr. Potts, why did you go to the authorities?

**UNITED STATES DISTRICT COURT**

```
 1        A        Two reasons.  It was the right thing to do --

 2                 MR. KOURY:  I'm going to object, Your Honor, as

 3   irrelevant.

 4                 THE COURT:  Overruled.

 5                 THE WITNESS:  And the other reason was, as

 6   director of the U.K. company, by law, if we think we have

 7   received funds from an act that we are suspicious may be a

 8   criminal act, we must report it to authorities.

 9                 MS. KAMINSKA:  No further questions.

10                 THE COURT:  All right.  Any additional questions?

11                 MR. KOURY:  Just a few.

12                        RECROSS-EXAMINATION

13   BY MR. KOURY:

14        Q        Mr. Potts, these items that were sent on, it

15   looks like, July 9, 2008 --

16        A        I'm not sure I can see the right image.

17        Q        Is it still on the screen?

18        A        I've got the advice fee table.

19        Q        Yes.  That's the one I'm talking about.

20        A        Okay.

21        Q        If those items were not functioning properly and

22   they were installed, your company would spend a great deal of

23   money taking them out of the installation, having them sent

24   back, and replacing them, would you not?

25        A        Yep.
```

**UNITED STATES DISTRICT COURT**

```
 1        Q        The cost would be substantially higher than
 2   $1,000 if one of those items was installed and malfunctioning.
 3        A        Possibly.  It depends on many things, but
 4   possibly.
 5        Q        So by assisting you, Dr. Chi actually provided a
 6   valuable service by warranting that your products were working
 7   properly?
 8        A        Well, it depended on how often that happened, I
 9   guess.
10        Q        And you have no idea how often that happened?
11        A        Not in those days, no.
12        Q        Because you weren't there?
13        A        I wasn't there, no.
14        Q        Now, you have talked to us about the statements
15   that he made.  These statements were after you -- well, first
16   off, in your conversations with Dr. Chi, his English is broken
17   at times.
18        A        I wouldn't describe it quite like that, no.
19        Q        You have to ask him to repeat multiple times in
20   order to understand what he's saying?
21        A        Not multiple times, no.
22        Q        It is hard to understand him at times, is it not?
23        A        I don't think so.  Not hard to understand.
24        Q        Do you recall telling Agent Coleman during the
25   investigation that at times Mr. -- Dr. Chi's English is
```

**UNITED STATES DISTRICT COURT**

```
 1   incorrect?

 2        A       I can't recall saying that.  I know that, when

 3   Dr. Chi speaks quickly, sometimes it is difficult to

 4   understand, and sometimes you ask him to repeat, but usually

 5   then it becomes clear.

 6        Q       And there's also times when his syntax is off in

 7   his speech?

 8        A       Sometimes.  And from the e-mails, you can see

 9   sometimes the grammar isn't correct.

10        Q       The times that he's made these statements

11   directly to you about being a government official, you

12   approached him, and the purpose of approaching him was to

13   inform him that you were not going to be paying the advice fees

14   any longer?

15        A       The first time we discussed that was

16   September 2015, and he visited us to meet to talk about the OBS

17   project, and I took that opportunity to say that we were not

18   going to proceed with that arrangement anymore.

19        Q       And that was the first thing you told him?

20        A       Quite early on in the conversation, yes.  Just

21   after I told him Natalie was leaving, we then talked a bit

22   more, and I told him we were not going to proceed with the

23   advice fee arrangement.

24        Q       And then later -- a few months later you

25   confronted him.  You went -- you went to confront him about the
```

1    advice fees.

2          A       No.  We were both at AGU, and he e-mailed me

3    saying he'd like to meet, and he came to meet me on the

4    Guralp Systems stand at the AGU conference.

5          Q       And you were prepared for him to come?

6          A       Up to a couple days before I didn't know he was

7    coming.

8          Q       But when you found out, your purpose, your goal

9    when you talked to him was to get more information?

10          A       I wanted to clarify things that were very unclear

11    to me.  So certain questions I wanted to ask; so I made sure I

12    did understand the situation properly.

13          Q       And then later on you met with him again and

14    talked about his advice fee.

15          A       No.  The last time I saw him was at AGU in

16    September -- December 2015.

17          Q       And, once again, you told him --

18          A       No.  That's the conversation I'm talking about.

19          Q       Yeah.  And in that conversation, the first thing

20    you told him again was you're not going to pay the advice fee?

21          A       I reminded him of the conversation we had in

22    September and said, do you remember the conversation we had in

23    September when I told you we're not going to carry on with the

24    advice fee?  So I told him that in September, and then I

25    reminded him of it again when I met him in December.

 1        Q        And your belief, as you sit here now, is you

 2    think he's a government official?

 3        A        Yes.

 4        Q        And because you believe he is a government

 5    official, that's why you think that these payments may be

 6    bribery?

 7        A        That's not the only reason.  I mean, you know --

 8        Q        But that component is essential, is it not?

 9        A        I'm not a lawyer.  It's not essential to me.  I

10    mean, bribery can be of people who are not government

11    officials.  It's not an essential part of a bribe.

12        Q        But that's why you believe these payments were

13    improper?

14        A        That's one of the reasons.  And he worked for a

15    customer which is more important.  He was an employee of a

16    customer, and we were paying someone who is an employee of a

17    customer a sum of money.

18                 MR. KOURY:  Thank you.  Nothing further.

19                 THE COURT:  All right.  May this witness be

20    excused?

21                 MS. KAMINSKA:  Yes, Your Honor.

22                 THE COURT:  Government call their next witness.

23                 MS. KUMAR:  The Government calls

24    Michelle Harrington to the stand.

25                 THE CLERK:  Please raise your right hand.

**UNITED STATES DISTRICT COURT**

```
 1              Do you solemnly state that the testimony you may
 2   give in the cause now pending before this court shall be the
 3   truth, the whole truth, and nothing but the truth, so help you
 4   God?
 5              THE WITNESS:  I do.
 6              THE CLERK:  Please be seated.
 7              Please state and spell your name for the record.
 8              THE WITNESS:  Michelle Harrington,
 9   M-i-c-h-e-l-l-e H-a-r-r-i-n-g-t-o-n.
10              THE COURT:  All right.  You may proceed.
11                     MICHELLE HARRINGTON,
12                GOVERNMENT'S WITNESS, SWORN:
13                     DIRECT EXAMINATION
14   BY MS. KUMAR:
15        Q    Good morning, Ms. Harrington.
16              Could you please describe your educational
17   background for the jury?
18        A    Yes.  I attended Cal State Long Beach and
19   graduated with a degree in accounting.
20        Q    Are you also a certified public accountant?
21        A    Yes.
22        Q    How are you currently employed?
23        A    I'm employed at Kinemetrics as a controller.
24        Q    And what is Kinemetrics?
25        A    Kinemetrics is a company that designs and
```

```
1    manufactures seismic monitoring equipment.

2         Q       And where is Kinemetrics based?

3         A       In Pasadena.

4         Q       Are you familiar with the company Quanterra,

5    Q-u-a-n-t-e-r-r-a?

6         A       Yes.

7         Q       What is Quanterra?

8         A       It's a wholly-owned subsidary of Kinemetrics.

9         Q       You testified that you are currently the

10   controller of Kinemetrics.  Can you describe your job

11   responsibilities?

12        A       Primarily responsible for preparing financial

13   statements and supporting schedules and supervising general

14   ledger reconciliations.

15        Q       How long have you been in your current position?

16        A       About two years.

17        Q       And you were first hired by Kinemetrics in July

18   of 2005; is that right?

19        A       Yes.

20        Q       And what was your position at that point?

21        A       I was the controller.

22        Q       And then were you promoted to chief financial

23   officer?

24        A       Yes.

25        Q       When did that happen?
```

1        A        Approximately a year later.

2        Q        And you remained CFO until 2014; is that right?

3        A        Yes.

4        Q        And what were your job responsibilities as CFO?

5        A        Primarily still preparing the financial

6    statements and overseeing general ledger activities and

7    supervising human resources.

8        Q        So, in sum, Ms. Harrington, other than about an

9    approximate five-month period in 2014, you have been employed

10   in some capacity in the financial part of Kinemetrics.

11               Is that fair?

12       A        Yes.

13       Q        What kind of customers does Kinemetrics have?

14       A        Research institutions like universities and

15   corporations and governments.

16       Q        And does Kinemetrics have both international and

17   domestic customers?

18       A        Yes.

19       Q        Approximately what percentage of sales is

20   attributable to international customers currently?

21       A        I would guess about 55 percent.

22       Q        Does Kinemetrics sell its equipment in Korea?

23       A        Yes.

24       Q        And has it done so during your period as

25   controller and CFO at Kinemetrics?

1        A        Yes.

2        Q        To your knowledge, what were the gross revenues

3    for Kinemetrics sales in Korea between 2009 and 2016

4    approximately?

5        A        I would say about 15 million.

6        Q        Can you identify some of the competitors of

7    Kinemetrics?

8        A        Yes.  Nanometrics in Canada and Guralp which is

9    in England.  There's Revtek and GeoSIG.

10       Q        Who is currently in charge of sales at

11   Kinemetrics?

12       A        Ogie Kuraica.

13       Q        Can you spell that name for us?

14       A        O-g-i-e K-u-r-a-i-c-a.

15       Q        Who supervised the sales department from

16   approximately 2009 through 2015?

17       A        The same, Ogie.

18       Q        And how is the sales department organized?

19       A        There's a head of sales, and then there are sales

20   managers.  The sales managers have particular regions.

21       Q        Is there a particular sales manager for Korea?

22       A        Yes.

23       Q        And who is that person?

24       A        Outhay Viengkhou.

25       Q        Is that Outhay, O-u-t-h-a-y, last name Viengkhou,

```
 1   V-i-e-n-g-k-h-o-u?

 2        A       Yes.

 3        Q       To your knowledge, how long has Viengkhou been

 4   employed at Kinemetrics?

 5        A       I'm not sure, but I would say at least 30 years.

 6        Q       Does Kinemetrics employ -- does Kinemetrics have

 7   sales representatives?

 8        A       Yes.

 9        Q       What do you understand a sales representative to

10   do?

11        A       The sales representatives would support the sales

12   activities for regions outside the U.S.

13        Q       And how are those sales representatives paid?

14        A       They're paid on a commission basis.

15        Q       Is that a set percentage per sale?

16        A       Yes.

17        Q       Do you know what the general range of commissions

18   are at Kinemetrics?

19        A       To my knowledge or recollection, it's between

20   5 and 15 percent.

21        Q       And how would a commission get paid?

22        A       A commission gets paid after a sale is made, the

23   order has been shipped and paid for.

24        Q       We're going to walk through that in a moment.

25                Are you familiar with any particular sales
```

1    representatives in Korea?

2         A       Yes.

3         Q       Do you know of Heon-Cheol Chi being a sales

4    representative on behalf of Kinemetrics in Korea?

5         A       Yes.

6         Q       To your knowledge, who maintained the

7    relationship with Mr. Chi?

8         A       That would have been the sales manager in charge

9    of the region.

10        Q       Mr. Viengkhou?

11        A       Yes.

12        Q       Have you ever met Mr. Chi?

13        A       No.

14        Q       We talked a little bit about the process by which

15   the sales commission is paid.

16                You stated first that the sales department

17   determines the sale.  Is that fair?

18                Finds out that a sale has been consummated; is

19   that right?

20        A       Right.  They would be awarded a contract or

21   receive a purchase order from a customer.

22        Q       And what document, if any, would they create at

23   that time?

24        A       They would create a sales order which is like a

25   booking.

1        Q        I'd like to direct -- at this point, Your Honor,

2    the Government would move into evidence the exhibit previously

3    identified as Exhibit 255 pursuant to the parties' pretrial

4    stipulation.

5              THE COURT:  All right.  Exhibit 255 will be

6    received into evidence.

7          (Received into evidence Exhibit No. 255.)

8        Q        BY MS. KUMAR:  Ms. Harrington, I would like to

9    direct your attention to Exhibit 255, page 12, and specifically

10   the top half of the page.

11             Is this the example of a sales order that you

12   were just referring to?

13       A        Yes.

14       Q        Let's walk through.

15             On the upper right-hand corner, it says "Sales

16   order"; is that right?

17       A        Yes.

18       Q        And then it has a number; is that right?

19       A        Right.

20       Q        Could you read that number for us?

21       A        340343.

22       Q        And is that number maintained in the database so

23   that sales order's progress can be monitored?

24       A        Correct.

25       Q        And what is the date of this particular sale?

1      A       May 6 of 2014 is the order date.

2      Q       And then a few lines below that it says,

3   "Currency, letter of credit."

4              Do you see that?

5      A       Yes.

6      Q       What is depicted there?

7      A       That means that the customer is going to pay via

8   a letter of credit.

9      Q       What is a letter of credit?

10     A       Letter of credit is a document that's issued by a

11  bank that -- so it implies that the customer has a credit line,

12  and the bank basically vouches for the credit of the engaging

13  institution.

14     Q       On the left-hand side there is a box called,

15  "Sold to."  Below that there's a number KORE0006.

16             Do you see that?

17     A       Yes.

18     Q       What does that number correspond to?

19     A       That's the customer ID that that particular

20  customer has been assigned to in the system.

21     Q       Does every customer ID correspond to only one

22  customer?

23     A       Yes.  So that -- there's only one customer for

24  that particular customer ID.

25     Q       Can you identify for us who the customer is

1    related to KORE0006?

2         A     Korea Institute of Geoscience and Mineral

3    Resources, KIGAM Earthquake Research Team.

4         Q     That's the customer; right, Ms. Harrington?

5         A     Yes.

6         Q     In the next box it says the ship to and bill to,

7    and that's where the product should be shipped and billed to;

8    is that right?

9         A     Yes.

10             MS. KUMAR:  At this time the Government would

11   move into evidence Exhibit 224.

12             THE COURT:  Any objection to 224?

13             MS. BEDNARSKI:  No, Your Honor.

14             THE COURT:  All right.  224 will be received into

15   evidence.

16         (Received into evidence Exhibit No. 224.)

17        Q     BY MS. KUMAR:  I will direct your attention to

18   the second page of this document.

19             What is this document?

20        A     This is a credit advice of a letter of credit.

21   It's sent by the bank to show when a payment has been received.

22        Q     And who is the particular payment, in this

23   instance, made on behalf of?

24        A     The applicant is Korea Institute of Geoscience

25   and Mineral Resources.

1    Q      Okay.  I'd like to turn your attention back to

2   Exhibit 255, page 12, which we were just looking at.  And

3   again, on the upper left-hand corner, again, the customer in

4   this instance is KIGAM Earthquake Research Team.

5           Do you see that?

6    A      Yes.

7    Q      And above the "Sold to," there is a phone number;

8   is that right?

9    A      Yes.

10   Q      Could you read that phone number for us?

11   A      82-11-437-1011.

12          MS. KUMAR:  Okay.  If we could move that portion

13  to the left hand of the screen.

14   Q      And I would now like to direct your attention to

15  Exhibit 58 on the right hand of the screen which is already in

16  evidence.

17          Again, on the left side you see that same number

18  we were looking at; is that right?

19   A      Yes.

20   Q      And then on the right side of the screen appears

21  to be a photocopy of a business card.

22          Does that seem fair to you, Ms. Harrington?

23   A      Okay.

24   Q      And could you read for us the name of the

25  individual on this business card?  Could you read the name for

```
 1   us?
 2        A        Heon-Cheol Chi.
 3        Q        And could you read the mobile number that's
 4   listed on the business card?
 5        A        82-42 -- sorry.  82-11-437-1011.
 6        Q        Ms. Harrington, does that match the phone number
 7   on the sales order we were just looking at?
 8        A        Yes.  It appears to.
 9        Q        So returning to Exhibit 25, page 12 -- 255 --
10   excuse me -- page 12, let's look at actually the bottom of the
11   page.
12              Are those the list of items that are being sold
13   in this particular instance to the KIGAM Earthquake Research
14   Center?
15        A        Yes.
16        Q        In the first line it says, "ASSY Digitizer Q330."
17              Do you see that?
18        A        Yes.
19        Q        What is that?
20        A        That is a product, a Q330 product.
21        Q        Is that a product Kinemetrics sells?
22        A        Yes.
23        Q        And was it originally designed by Quanterra?
24        A        Originally, yes.
25        Q        But Kinemetrics is the company that sells it now;
```

**UNITED STATES DISTRICT COURT**

```
 1    is that right?
 2         A     Yes.
 3         Q     And then if we can turn to page 13 of this
 4    exhibit, and on the first line in the middle of the page it
 5    says, "Seismometer STS-2.5."
 6               Do you see that?
 7         A     Yes.
 8         Q     What is that?
 9         A     Broadband seismometer.
10         Q     And who sells that particular item?
11         A     Kinemetrics and Quanterra sells it as well.
12         Q     So this, as we talked about earlier, is a sales
13    order for a purchase by KIGAM's Earthquake Research Team; is
14    that right?
15         A     Yes.
16         Q     So if we could direct your attention to the
17    middle of this page where it says "Commission due," could you
18    read that for us?
19         A     "Commission due to Heon Chi 15,000."
20         Q     What do you understand that note to be referring
21    to?
22         A     That on this particular order, Heon Chi would
23    earn a commission of $15,000.
24         Q     After the sales order is completed, does the
25    sales order get sent to your accounting department?
```

```
1          A       No.  The sales order is tracked through
2    manufacturing until the product is shipped, and then after it's
3    shipped, it comes to accounting.
4          Q       And is the sales order generally sent to the
5    customer?
6          A       No.  Not -- not generally.
7          Q       So after the sales order -- after the order is
8    shipped and it comes to accounting, what does accounting do
9    with the order?
10         A       So after it's shipped, then accounting would
11   review the sales order and prepare an invoice.
12         Q       I'd like to now draw your attention to
13   Exhibit 255, page 52.  If we could direct your attention to the
14   first half of the page.
15                 Is this an example of an invoice?
16         A       Yes.
17         Q       And it has an invoice number; is that right?
18         A       Yes.
19         Q       It also refers below the word invoice to the
20   sales order number; is that right?
21         A       Yes.
22         Q       And in this case, it's 340343.
23                 Do you see that?
24         A       Yes.
25         Q       And this is the same sales order -- this is the
```

**UNITED STATES DISTRICT COURT**

```
 1    corresponding invoice to the sales order we reviewed earlier;
 2    is that right?
 3         A       Yes.
 4         Q       And, again, the customer is identified as KIGAM
 5    Earthquake Research Team; is that right?
 6         A       Correct.
 7         Q       If we turn to the next page in this Exhibit 255,
 8    page 53, to the bottom half, is the commission noted on this
 9    invoice?
10         A       No.
11         Q       And why would that be?
12         A       Those -- all the notes on the sales order are
13    internal.  It's an internal document.  They're internal notes,
14    and they don't print on the invoice.
15         Q       And the invoice total on the bottom right in this
16    case, $237,325, that would include the commission; is that
17    right?
18         A       Not sure what -- are you saying that we're
19    billing the commission to the customer?
20         Q       Yes.
21         A       Well, the commission is a -- more of a sales
22    expense rather than a cost of goods sold.  Sorry.
23         Q       That's fine.
24         A       Yeah.  So it's not exact -- it's not exactly like
25    that.
```

**UNITED STATES DISTRICT COURT**

1       Q       But in the sales order we looked at earlier for

2  this particular sale, there was a $15,000 commission due to

3  Heon Chi; is that right?

4       A       Right.  Right.  And that's accrued.  It's just

5  that it's a selling expense.

6       Q       Okay.  And if -- after the invoice goes out to

7  the customer, when does the sales commission actually get paid?

8       A       So after the underlying -- in this case, this

9  particular order is paid for, then that commission would become

10 payable, available to be paid.

11      Q       And would the accounting department track what

12 amounts are payable to the sales representative?

13      A       Yes.

14      Q       I'd like to direct your attention -- first,

15 Your Honor, I'd like to move into evidence Exhibit 211 pursuant

16 to the parties' pretrial exhibit stipulation.

17              THE COURT:  All right.  Exhibit 211 will be

18 received into evidence.

19         (Received into evidence Exhibit No. 211.)

20      Q       BY MS. KUMAR:  I'd like to direct your attention

21 to the second page of this exhibit.  If we could look at the

22 top half first.

23              What is this document?

24      A       This document is a commission schedule.  It's a

25 summary of really what's in our commissions payable account at

```
 1    this date.
 2         Q        Commissions payable to sales representatives; is
 3    that right?
 4         A        Yes.  Correct.
 5         Q        What's the date range for this particular
 6    spreadsheet?
 7         A        So on this spreadsheet, it's dated June of '09.
 8    It's prepared at the end of the month.  So it would have been
 9    prepared as of June 30, 2009, and it looks like it's tracking
10    activity from October 1, 2008, to September 30, 2009 -- or
11    sorry -- June 30, 2009.
12         Q        And if we could go to the bottom half of the
13    page, do you see Korea listed there?
14         A        Yes.
15         Q        And do you see the name Chi, Heon-Cheol listed on
16    this spreadsheet?
17         A        Yes.
18         Q        There's a percentage number listed next to his
19    name.  Can you read that number for us?
20         A        15 percent.
21         Q        And then the first column is the beginning
22    balance; is that right?
23         A        Yes.
24         Q        And that's $15,500?
25         A        Uh-huh.
```

1    Q    And then the next column it's the accrual 23,300?

2    A    Yes.

3    Q    What does the accrual mean?

4    A    That means that, during that period that I

5  mentioned, October 2008 through June 2009, this particular rep

6  had accrued $23,300 in commission.

7    Q    And in the next column it says, "Payments

8  32,500."  Is that the total amount this rep had been paid from

9  October 2008 through June 2009?

10   A    Yes.

11   Q    And then the last column is the ending balance,

12  and that's how much is due; is that correct?

13   A    Yes.

14   Q    I'd like to direct your attention now to -- I'd

15  like to move into evidence Exhibit 214.

16           THE COURT:  Exhibit 214 will be received into

17  evidence.

18       (Received into evidence Exhibit No. 214.)

19           MS. KUMAR:  Actually, I'm sorry.  Can we move

20  into evidence first -- we'll come back to 214.

21           Exhibit 202 pursuant to the parties' pretrial

22  stipulation.

23           THE COURT:  202 will be received into evidence.

24       (Received into evidence Exhibit No. 202.)

25   Q    BY MS. KUMAR:  On the very top, Ms. Harrington,

```
1    can you read from whom this e-mail is?

2         A      Who it's to?

3         Q      Who it's from.

4         A      Oh, who it's from.  It's from Heon-Cheol Chi.

5         Q      And who is it to?

6         A      Outhay Viengkhou.

7         Q      And is that the e-mail domain name at the very

8    end, @kmi.com, for Kinemetrics?

9         A      Yes.

10        Q      And what's the date of this e-mail?

11        A      May 1 of 2009.

12        Q      And is that May 1 or January 5th?

13        A      I'm not sure because it's from him; so I don't

14   know what the date format is.

15        Q      But it's from 2009.

16               Is that fair?

17        A      Yeah.

18        Q      And the subject line?

19        A      "Status and fee."

20        Q      If we could go to the body of the e-mail.

21               In the second paragraph Mr. Chi says, "When I

22   accounted the order of last year, I was very surprised with

23   very limited orders."

24               Did I read that correctly?

25        A      Yes.
```

1      Q       And below that he lists some orders for customers

2   KIGAM and KMA.

3              Do you see that?

4      A       Uh-huh.  Yes.

5      Q       And the product listed there, are those products

6   that Kinemetrics sells and Quanterra?

7      A       Yes.

8      Q       And then below the list of KIGAM and KMA orders,

9   he says, "As shown above, only very small amounts were ordered

10  from Korea.  I want to earn more than my loss.  I hope that

11  more orders for early warning systems will be done this year."

12             Is that right?  Did I read that correctly?

13     A       Yes.

14     Q       And below that, he then calculates his, quote,

15  "advice fee"; is that right?

16     A       Yes.

17     Q       Including on the order to KIGAM; is that right?

18     A       That's what it says, yeah.

19             MS. KUMAR:  Your Honor, at this time the

20  Government would move into evidence Exhibit 203 pursuant to the

21  parties' pretrial stipulation.

22             THE COURT:  All right.  203 will be received into

23  evidence.

24         (Received into evidence Exhibit No. 203.)

25     Q       BY MS. KUMAR:  Is this another e-mail from

```
 1    Mr. Chi?

 2         A      Yes.

 3         Q      And who is it to?

 4         A      To Barbara Kemp.

 5         Q      Who is Barbara Kemp?

 6         A      Barbara Kemp is retired now but was an employee

 7    at Quanterra.

 8         Q      And the copy line is, again, to Mr. Viengkhou;

 9    right?

10         A      Yes.

11         Q      And is this e-mail also from 2009?

12         A      Yes.

13         Q      And what's the subject line?

14         A      "Request."

15         Q      If we can go to the body of the e-mail.

16                In the second paragraph Dr. Chi writes, "The

17    order from Korea to you was only from KMA for three sets of

18    Q4128 and ES-DH."

19                Did I read that correctly?

20         A      Yes.

21         Q      Are those items listed at the end of that

22    sentence products that Kinemetrics and Quanterra sell?

23         A      Yes.

24         Q      And the next line says, "The advice fee of Q4128

25    is $1,500, and the fee of ES-DH is 1,000 for each."
```

**UNITED STATES DISTRICT COURT**

1          Do you see that?

2     A     Uh-huh.  Yes.

3     Q     And then below that it says, "The total fee is

4  1,500 plus 1,000 times 3.  Please send the fee to my account at

5  BOA."

6          Did I read that correctly?

7     A     Yes.

8     Q     And then the last -- next line says, "Please do

9  not reply."

10          Is that correct?

11     A     Yes.

12          MS. KUMAR:  I'd now like to -- now, Your Honor,

13  I'd like to return to Exhibit 217 that the Court previously

14  admitted, I believe, or move to admit it if it hasn't yet been

15  admitted.  Actually, I believe -- I move to admit Exhibit 217,

16  Your Honor, pursuant to the parties' pretrial stipulation.

17          THE COURT:  217 will be admitted into evidence.

18       (Received into evidence Exhibit No. 217.)

19     Q     BY MS. KUMAR:  Ms. Harrington, I'd like to direct

20  your attention to the second page of this document, the upper

21  half of this page.

22          What is this document?

23     A     This document is an individual account of

24  activity for -- it says -- at the top it says,

25  "Heesong Geotek."

1    Q       All right.  If we can turn to the next page,

2  page 3 of this exhibit, again, top half, what is this page for?

3    A       This page is for Heon-Cheol Chi.

4    Q       The sales representative we were speaking of

5  earlier?

6    A       Yes.

7    Q       On the top there is some information regarding --

8  underneath the name Chi, Heon-Cheol.  Can you tell us what's

9  listed there?

10   A       It says, "Wire to Bank of America."  And the

11 address, routing number, and account number.

12   Q       And the address is 115 West Foothill Boulevard,

13 Glendora, California; is that right?

14   A       Yes.

15   Q       And what do you understand the name, bank

16 account, and address to be referring to?

17   A       That would be the bank account that the

18 commissions would be paid to.

19   Q       Ms. Harrington, I'd like to quickly walk you

20 through this chart.  In the first column is the date which is

21 self-explanatory, and the next column is customer.  What do you

22 believe that column to be referring to?

23   A       The customer column?

24   Q       Yes.

25   A       So the customer column looks like it's listing

```
 1    the customer ID's that we spoke of earlier.
 2         Q      And then next to that it says "S/O."  What do you
 3    understand that to refer to?
 4         A      The sales order number.
 5         Q      And that's one of the documents we looked at
 6    earlier; is that right?
 7         A      Yes.
 8         Q      And then the next one is "Invoice" which is also
 9    in the documents we looked at; is that right?
10         A      Uh-huh.
11         Q      Can you say "yes" or "no" for the court reporter?
12         A      Yes.  Yes.
13         Q      So if we look at the fourth line down, the
14    customer is identified as KORE0006.
15                Do you see that?
16         A      Yes.
17         Q      And that was the customer for the sales order we
18    were looking at earlier; is that right?
19         A      Uh-huh.  Yes.
20         Q      And that was the KIGAM Earthquake Research Team;
21    is that right?
22         A      Yes.
23         Q      And this particular sales order, it says 100,170
24    is the base.  Do you understand that to be the portion upon
25    which the commission percentage is applied?
```

```
 1        A       Actually, I don't know.

 2        Q       Okay.  Then it says, "Accrue."  Can you read that

 3   number?

 4        A       $9,100.

 5        Q       And what do you understand that number to

 6   correspond to?

 7        A       That would be the commission stipulated on the

 8   sales order for that particular order.

 9        Q       So in this case it's the commission that

10   Heon-Cheol Chi accrued on the order to the KIGAM Earthquake

11   Research Team; is that right?

12        A       That's what it looks like, yes.

13                MS. KUMAR:  I'd now like to direct your attention

14   to exhibit -- or I'd like to move into evidence Exhibit 217

15   pursuant to the parties' pretrial stipulation.

16                THE COURT:  217 is already in.

17                MS. KUMAR:  Sorry.  My apologies.

18                Now I'd like to move into evidence Exhibit 222

19   which has previously been marked for identification pursuant to

20   the parties' pretrial stipulation.

21                THE COURT:  All right.  222 will be received into

22   evidence.

23            (Received into evidence Exhibit No. 222.)

24        Q       BY MS. KUMAR:  Ms. Harrington, I'd like to direct

25   your attention to the second page.  Is this another one of
```

```
1    those summary commission schedules that we were looking at?

2         A     Yes.

3         Q     And this time period is October 1st, 2010, to

4    September of 2011; is that right?

5         A     Yes.

6         Q     I will direct your attention to the bottom half

7    where it says "Korea."  For this time period, Heon-Cheol Chi,

8    again, appears on the commission spreadsheet; is that right?

9         A     Yes.

10        Q     And Mr. Chi had a beginning balance of $28,800;

11   is that right?

12        A     Yes.

13        Q     And he accrued $70,150 during the course of that

14   time period; is that right?

15        A     Yes.

16              MS. KUMAR:  Your Honor, at this time I'd like to

17   move in Exhibit 214 which has been previously marked pursuant

18   to the parties' pretrial stipulation.

19              THE COURT:  Exhibit 214 will be received into

20   evidence.  Actually, it's already in.

21        Q     BY MS. KUMAR:  The very top of the page,

22   Ms. Harrington, is an e-mail from Dr. Chi to, again,

23   Outhay Viengkhou; is that right?

24        A     Yes.

25        Q     And if I can direct your attention to the bottom
```

1    e-mail, again, this is an e-mail from Heon-Cheol Chi to

2    Outhay Viengkhou?

3          A      Right.

4          Q      From 2010?

5          A      Uh-huh.

6          Q      Is that right?

7          A      Yes.

8          Q      In the second paragraph Dr. Chi writes, "I want

9    to know the status of STS-2, when it can be ordered and

10   delivered."

11              Again, Ms. Harrington, is STS-2 a product that

12   Kinemetrics sells?

13         A      Yes.

14         Q      Then it goes on to say, "Nanometrics called my

15   institute to ask the test of their Broadband Sensor."

16              Did I read that correctly?

17         A      Uh-huh.  Yes.

18         Q      And, Ms. Harrington, you earlier testified that

19   Nanometrics is a competitor of Kinemetrics; is that right?

20         A      Yes.

21         Q      And then the next sentence Mr. Chi says, "They

22   might try to replace STS-2 in future.  Hence, if STS-2 is

23   available this year, please inform to Heesong about the status

24   and availability."

25              He goes on to say, "Definitely, if STS-2 is

**UNITED STATES DISTRICT COURT**

```
 1   available, there is no sensor to replace it."

 2              Do you see that?

 3        A    Yes.

 4        Q    Did I read that correctly?

 5        A    Yes.

 6              MS. KUMAR:  Your Honor, at this time I'd move to

 7   admit Exhibit 225 pursuant to the parties' pretrial

 8   stipulation.

 9              THE COURT:  Exhibit 225 will be received into

10   evidence.

11          (Received into evidence Exhibit No. 225.)

12        Q    BY MS. KUMAR:  Ms. Harrington, I'd like to direct

13   your attention to the second page of this document.

14              Again, is this a commission schedule maintained

15   by Kinemetrics for sales representatives?

16        A    Yes.

17        Q    And this is for the time period 2010 through

18   20 -- June of 2012; is that right?

19        A    Yes.

20        Q    So if we look at the Korea line, in this

21   particular instance, again, Heon-Cheol Chi is listed as a sales

22   representative; is that right?

23        A    Yes.

24        Q    And it indicates that the beginning balance owed

25   to Mr. Chi is 49,450; is that right?
```

**UNITED STATES DISTRICT COURT**

1      A      Yes.

2      Q      And the total amount Mr. Chi accrued from October

3   2012 -- 2010 -- excuse me -- to June of 2012 was $41,950; is

4   that right?

5      A      I'm sorry.  Could you say those dates again?

6      Q      October 2010 through June of 2012.  I can direct

7   your attention to the top of the page so you can see it.

8      A      Yeah.  Can I see the top of the page?

9      Q      Sure.

10      A      That's probably not correct.  It's probably

11   10/1/11.

12      Q      Through June of 2012?

13      A      Yes.

14      Q      Okay.  If we go back to the Korea line, again, in

15   that time frame, Mr. Chi earned $41,950 in commissions in that

16   time frame; is that right?

17      A      Yes.

18           MS. KUMAR:  Your Honor, I'd move to admit

19   Exhibit 230 pursuant to the parties' stipulation.

20           THE COURT:  230 will be received into evidence.

21      (Received into evidence Exhibit No. 230.)

22      Q      BY MS. KUMAR:  Ms. Harrington, this is another

23   commission schedule from 2013.  Does that look familiar to you?

24      A      Yes.

25      Q      And this time it's from October 2012 through

```
 1    March of 2013; is that right?

 2         A      Yes.

 3         Q      If we go to the Korea line, again, Heon-Cheol Chi

 4    is listed; is that right?

 5         A      Yes.

 6         Q      And in this instance his beginning balance was

 7    $65,450; is that right?

 8         A      Yes.

 9         Q      And the amount he had accrued in commissions in

10    approximately six months was $25,600; is that right?

11         A      Yes.

12              MS. KUMAR:  Your Honor, at this time I'd move to

13    admit Exhibit 238 pursuant to the parties' stipulation.

14              THE COURT:  All right.  Exhibit 238 will be

15    admitted into evidence.

16           (Received into evidence Exhibit No. 238.)

17              MS. KUMAR:  If we can look at the second page,

18    again, Ms. Harrington, is this a spreadsheet of the commissions

19    owed to Kinemetrics sales representatives in 2015?

20         A      Yes.

21         Q      This is for the time period October 1, 2014,

22    through June of 2015?

23         A      Yes.

24         Q      And if we look, again, down to the Korea line,

25    Mr. Chi is, again, listed.  And it indicates his beginning
```

```
 1   balance was $41,850; is that right?

 2        A     Yes.

 3        Q     And that he accrued $91,400 in commissions during

 4   that time frame; is that right?

 5        A     Yes.

 6              MS. KUMAR:  Ms. Harrington -- Your Honor, I would

 7   move to admit Exhibit 247 pursuant to the parties' pretrial

 8   stipulation.

 9              THE COURT:  All right.  Exhibit 247 will be

10   received into evidence.

11          (Received into evidence Exhibit No. 247.)

12        Q     BY MS. KUMAR:  I will direct your attention to

13   the e-mail that's highlighted on the bottom.  This is an e-mail

14   from Tina Tran.  Who is Tina Tran?

15        A     She's a sales administrator.

16        Q     And are you a recipient on this e-mail?

17        A     Yes.

18        Q     And it says here, "I added notes in ESI under

19   admin about the bond we need to open for Korea."

20              Did I read that correctly?

21        A     Yes.

22        Q     And it says, "Accounting notes, one, commission

23   due to Agent Korea EMT $34,500."

24              Do you see that?

25        A     Yes.
```

**UNITED STATES DISTRICT COURT**

1    Q       And then the next line says, "Commission due to

2    Heon $50,700."

3                Is that right?

4    A       Yes.

5    Q       Ms. Harrington, those spreadsheets we just

6    reviewed talk about the amount of commissions owed to a

7    particular sales representative; is that right?

8    A       Yes.

9    Q       How does Kinemetrics know to make a payment to a

10   sales representative?

11   A       The accounting department -- the senior

12   accountant who maintained these spreadsheets would get a

13   request from the related sales manager.

14              MS. KUMAR:  Your Honor, at this time the

15   Government would move into evidence Exhibit 256 pursuant to the

16   parties' pretrial stipulation.

17              THE COURT:  Exhibit 256 will be received into

18   evidence.

19         (Received into evidence Exhibit No. 256.)

20   Q       BY MS. KUMAR:  Showing you the top half of this

21   page, what is this document?

22   A       This is a wire transfer request.

23   Q       Is that the document that the accounting

24   department would receive from the sales manager requesting

25   payment?

**UNITED STATES DISTRICT COURT**

```
 1        A       Yes.

 2        Q       And in this case, what is the date of request?

 3        A       February 5th, 2015.

 4        Q       And what's the amount of the requested wire?

 5        A       $30,050.

 6        Q       And who's the beneficiary?

 7        A       Heon-Cheol.

 8        Q       And if we look at the bottom half of this page,

 9   it says, "Reference."

10                Do you see that?

11        A       Yes.

12        Q       And then it says, "COMM for SO," and a series of

13   numbers.

14                Do you see that?

15        A       Yes.

16        Q       Do you understand those numbers to be sales order

17   numbers?

18        A       Yes.

19        Q       And one of those numbers is 340343.

20                Do you see that?

21        A       Yes.

22        Q       And that was the sales number for one of the

23   documents we looked at earlier.

24                Do you remember that?

25        A       Yes.
```

1      Q      And that was for the sale to the KIGAM Earthquake

2    Research Team; is that right?

3      A      Yes.

4      Q      So in this case is this -- do you understand this

5    request is being asked for Mr. Chi to be paid on these

6    particular -- his commission owed on these particular sales

7    orders?

8      A      Yes.

9            MS. KUMAR:  Your Honor, at this time the

10   Government would move in Exhibit 242 pursuant to the parties'

11   pretrial exhibit stipulation.

12           THE COURT:  Exhibit 242 will be received into

13   evidence.

14        (Received into evidence Exhibit No. 242.)

15     Q      BY MS. KUMAR:  Ms. Harrington, again, is this

16   another wire transfer request?

17     A      Yes.

18     Q      And, again, is this to Heon-Cheol Chi?

19     A      Yes.

20     Q      And the amount of the wire was $21,100; is that

21   right?

22     A      Yes.

23     Q      And on the bottom half we see a similar note for

24   reference, Commissions for sales orders."

25           Do you see that?

```
 1         A       Yes.

 2                 MS. KUMAR:  Your Honor, at this time the

 3    Government would move Exhibit 240 into evidence pursuant to the

 4    parties' pretrial exhibit stipulation.

 5                 THE COURT:  Exhibit 240 will be received into

 6    evidence.

 7             (Received into evidence Exhibit No. 240.)

 8         Q       BY MS. KUMAR:  Ms. Harrington, I'd like to direct

 9    your attention to the second page of this exhibit.  Is this,

10    yet, another wire transfer request that your accounting

11    department received in this case in about 2015?

12         A       Yes.

13         Q       And, again, the beneficiary is Heon-Cheol Chi; is

14    that right?

15         A       Yes.

16         Q       What was the amount of the wire requested?

17         A       $66,500.

18         Q       And again, if we look at the bottom of this page,

19    the reference line, again, states, "Commission for sales order

20    350052."

21                 Is that right?

22         A       Yes.

23         Q       When the accounting department receives a wire

24    transfer request, what do they do at that point?

25         A       When they receive a wire transfer request from a
```

```
 1    sales manager, they would open up the spreadsheet that had the
 2    details on it and check the figures and validate that the
 3    underlying orders have been paid.
 4         Q    And once they had validated that the orders had
 5    been paid, what would happen?
 6         A    Then they would sign off on it and send it -- set
 7    up the wire for approval.
 8              MS. KUMAR:  Your Honor, at this time the
 9    Government would move into evidence Exhibit 241 --
10              THE COURT:  All right.
11              MS. KUMAR:  -- pursuant to the parties'
12    stipulation.
13              THE COURT:  All right.  Received into evidence.
14         (Received into evidence Exhibit No. 241.)
15         Q    BY MS. KUMAR:  If I can direct your attention to
16    the second page of 241, do you recognize this document?
17         A    It's a confirmation that the wire has been
18    released.
19         Q    All right.  And this particular wire, if you look
20    about a quarter to halfway down, it says the amount is $66,500.
21              Do you see that?
22         A    Yes.
23         Q    And you see that the beneficiary is
24    Heon-Cheol Chi; is that right?
25         A    Yes.
```

1      Q      And the address listed for Mr. Chi's bank is

2  115 West Foothill Boulevard, Glendora, California; is that

3  right?

4      A      Yes.  Uh-huh.  Yes.

5      Q      Ms. Harrington, you believed Dr. Chi to be a

6  sales representative; is that right?

7      A      Yes.

8      Q      Did you know, at any point when these payments

9  were made, that Dr. Chi was a government official?

10     A      No.

11     Q      Would you have authorized the payment if you had

12  known that?

13     A      No.

14            MS. KUMAR:  At this time no further questions,

15  Your Honor.

16            THE COURT:  All right.  Cross-examination.

17                    **CROSS-EXAMINATION**

18  BY MS. BEDNARSKI:

19     Q      Good morning.

20     A      Good morning.

21     Q      When you started working at KMI, you had had a

22  previous job at a big accounting firm; is that right?

23     A      Yes.

24     Q      And when you started working at KMI, were you

25  already a CPA?

**UNITED STATES DISTRICT COURT**

1        A       Yes.

2        Q       Is that short for certified public accountant?

3        A       Yes.

4        Q       And a certified public accountant is someone

5   who's got a license; right?

6        A       Yes.

7        Q       And so what agency kind of monitors the status --

8   the good status of CPA's?  Is there a certain agency in

9   California, or is it national?

10        A       State Board of Accountancy.

11        Q       And that State Board of Accountancy, of course,

12   requires for you to be ethical and honest; right?

13        A       Correct.

14        Q       Now, you told us that KMI makes seismology

15   equipment; right?

16        A       Yes.

17        Q       And it's very sophisticated, isn't it?

18        A       Yes.

19        Q       And you also told us that at some point KMI --

20   well, at the current time a subsidiary of KMI is Quanterra;

21   right?

22        A       Yes.

23        Q       Another company that made seismology equipment;

24   right?

25        A       Yes.

1     Q       When something is a subsidiary, does it mean that
2   the two companies are now joined?
3     A       From a legal status, yes.
4     Q       Okay.
5     A       Are you speaking operationally or --
6     Q       Well, the originator or founder of KMI was a
7   Dr. Joe Steim; right?
8     A       Yes.
9     Q       S-t-e-i-m.
10            Okay.  Do you have the exhibit book that says
11   "Defense Exhibits" on it in front of you?  It's kind of a fat
12   exhibit -- that will be it.
13            Can you turn to page 521?  There will be a tab
14   there.
15            THE COURT:  Do you mean Exhibit 521?
16            MS. BEDNARSKI:  Yes.
17     Q       Do you have 521 in front of you?
18     A       Yes.  I believe so.  Is it a photo?
19     Q       It's a photo.
20     A       Okay.
21     Q       And do you recognize the man, the second from the
22   left wearing the blazer and a pair of glasses and maybe his
23   hair is a little bit balding?
24     A       Yes.
25     Q       Is that Joe Steim?

```
1          A       Yes.

2          Q       Okay.  And do you recognize the man to his left?

3          A       No.

4          Q       Okay.

5                  MS. BEDNARSKI:  Your Honor, I'd seek the

6     admission of Exhibit 521.

7                  THE COURT:  Does the Government have any

8     objection?

9                  MS. KUMAR:  No, Your Honor.

10                 THE COURT:  All right.  521 will be received into

11    evidence.

12          (Received into evidence Exhibit No. 521.)

13                 MS. BEDNARSKI:  And let's show that to the jury.

14         Q       And the man second to the left in the blazer

15    wearing the glasses, that's Joe Steim?  I think I said that all

16    wrong.

17                 The man who is standing -- if you move from the

18    left side to the right, he's the second person in?  That's

19    Joe Steim?

20         A       Yeah.  Do you have a pointer?  I mean, I can

21    just --

22         Q       I think I can probably mark it.

23         A       That, yeah.  That's Joe.

24         Q       All right.  And you see Dr. Chi here in court

25    seated at the defense table?
```

```
1          A          (Inaudible.)

2          Q          And is this Dr. Chi in the picture, the man

3    furthest on the right?

4          A          That looks like the same person, yes.

5          Q          Do you recognize what that piece of equipment is

6    in between Dr. Steim and Dr. Chi, that silver cylinder?

7          A          Right.  That looks like a downhole product.

8          Q          Is that one of KMI's or Quanterra's products?

9          A          That I don't know.

10         Q          Okay.  And are you familiar with the name of a

11   product that KMI sells called a borehole sensor?

12         A          Yes.

13         Q          Is that the same thing as a downhole whatever you

14   were just referring to?

15         A          Well, I think a borehole is slightly different

16   than a downhole.  I think they're slightly different depths.

17   I'm not sure.

18         Q          Okay.  Okay.  Now, do you know when KMI acquired

19   Quanterra?

20         A          I think it was in 1991.

21         Q          And you came in 2005; right?

22         A          Yes.

23         Q          And did you know at the time that you worked --

24   well, you work at KMI now.

25                    Did you know before this trial began that Dr. Chi
```

**UNITED STATES DISTRICT COURT**

1    and Dr. Steim had a relationship?

2          A        No.

3          Q        Were you there when they entered into their

4    agreements regarding the services that he would provide to

5    Quanterra and Dr. Steim?

6          A        Since I didn't know of the relationship, then,

7    no.

8          Q        Have you ever talked to Dr. Steim about the terms

9    that he entered into with Dr. Chi about what services Dr. Steim

10   needed in Korea for his products?

11         A        No.

12         Q        You have mentioned frequently in your testimony a

13   man who was in the sales department named Outhay -- it sounds

14   like -- Viengkhou.

15         A        Uh-huh.

16         Q        And have you ever talked to -- and you said

17   Outhay had a relationship with Dr. Chi; right?

18         A        I don't -- I think I said that he was in charge

19   of Korea.

20         Q        Okay.  So his region included Korea.

21         A        Yes.

22         Q        And do you know how often he interacted with

23   Dr. Chi?

24         A        No.

25         Q        Have you ever talked to Outhay Viengkhou about

**UNITED STATES DISTRICT COURT**

```
 1    the terms of the relationship and services that Dr. Chi would

 2    be providing to KMI?

 3         A     No.

 4         Q     Have you ever talked to him about the terms of

 5    the services of the -- what he would be providing to Quanterra

 6    even though Quanterra was part of -- as a subsidiary?  Did you

 7    ever talk to him about that?

 8         A     No.

 9         Q     Now, would you ever -- we still have the

10    photograph 521 up on the screen.

11              Would you, yourself, ever attend these

12    seismological conferences?

13         A     No.

14         Q     As someone in finance, would you be familiar with

15    sort of paying the bills for people from KMI or Quanterra who

16    did go to the conferences?

17         A     Yes.

18         Q     And so were you aware, generally, that Dr. Steim

19    would attend those conferences?

20         A     Yes.  Sometimes.

21         Q     And --

22         A     Actually, his -- because he is at Quanterra, I

23    wouldn't have seen expenses for that.  I would have just heard

24    secondhand that he had attended a particular event.

25         Q     Did your accounting department -- is that the
```

```
 1   right phrase for it?  Did your accounting department handle all
 2   the accounting for Quanterra?
 3       A     No.  Not when -- not when I was the CFO.
 4   Starting about a year ago, now we have centralized those -- the
 5   bill paying.
 6       Q     Okay.  And are -- is Dr. Steim in a different
 7   city than KMI?
 8       A     Yes.
 9       Q     Where is he?
10       A     He's in Massachusetts.
11       Q     And he's a professor at Harvard; right?
12       A     I don't know that.
13       Q     Have -- he's the inventor of the Quanterra
14   products.
15       A     Yes.
16       Q     And he's a very smart man; right?
17       A     That's what I've been told.
18       Q     He's not a lawyer, is he?
19       A     Not that I'm aware of.
20       Q     And do you have any knowledge of whether or not
21   Dr. Steim consulted with a lawyer about how to come up with the
22   terms of his agreement with Dr. Chi?
23            MS. KUMAR:  Objection, Your Honor.  Relevance.
24   Speculation.
25            THE COURT:  Sustained.
```

**UNITED STATES DISTRICT COURT**

1          Q          BY MS. BEDNARSKI:  Through all the years that you

2   have worked at KMI, have you been -- have you become familiar

3   with the general nature of the products that your company

4   markets?

5          A          I think so.

6          Q          And is your equipment, your seismology equipment,

7   in your opinion, of the highest quality of those types of

8   products in the marketplace?

9          A          That's my understanding.

10          Q          And is it your understanding that it's better

11   than those four competitors that the prosecutor asked you

12   about?

13          A          Yes.

14          Q          And it's also quite high priced, isn't it?

15          A          Yes.

16          Q          In the marketplace, its costs are actually higher

17   than those lesser quality competitors; right?

18          A          Actually, I don't know their prices.

19          Q          Okay.  You talked about the sales orders.  Do you

20   still have 255 in front of you?  That was in the Government's

21   book.

22          A          Okay.

23          Q          Okay.  Just so we're on the same page.

24                When you testified, you said that generally these

25   wouldn't be sent to the customer.  Were there times when the

```
1    sales orders were sent to the customer?

2        A      If they were, I am not aware of it because they

3    wouldn't have come from the -- the accounting department

4    wouldn't send a sales order to the customer.

5        Q      Why did you use the word "generally" in your

6    testimony?

7        A      Because I just don't know whether or not they --

8    I didn't know if there was an exception.

9        Q      Okay.

10       A      I was just trying to be very -- as honest as I

11   could.

12       Q      So you know you didn't send them, but you don't

13   know whether other people did.

14              Is that fair to say?

15       A      Yes.

16       Q      Now, you gave us a figure for a several-year

17   period about -- I think you said from 2009 to 2016 your

18   estimate is that KMI's gross revenue for its sales in Korea was

19   about 15 million?

20       A      Yes.

21       Q      Korea is only one customer in the world market;

22   right?

23       A      Yes.

24       Q      And would you say that, on the high-end, the

25   highest you could remember is that -- in any one year is that
```

**UNITED STATES DISTRICT COURT**

```
1    KMI grossed 37 million in the world?
2         A     Yes.
3         Q     And would you say, on the lower end, it might be
4    in the high 20 millions?
5         A     Yes.  Sounds about right.
6         Q     Now, you have never actually spoken with Dr. Chi;
7    is that right?
8         A     No.
9         Q     And the two of you have never even directly
10   corresponded by e-mail; is that correct?
11        A     Correct.
12        Q     And he never coerced or pressured you in any way
13   into paying the amounts that were due him; right?
14        A     We never spoke or e-mailed; so no.
15        Q     And there's -- you have no information from which
16   to believe he ever pressured or coerced anyone with respect to
17   KMI or Quanterra paying him for the services he provided; is
18   that right?
19              MS. KUMAR:  Objection, Your Honor.  Speculation.
20              THE COURT:  Overruled.
21        Q     BY MS. BEDNARSKI:  Is that fair?
22        A     That's correct.
23        Q     Now, KMI is actually a company of about
24   60 people.  Is that fair?
25              And I guess I should say, including Quanterra,
```

```
 1    could you give us an estimate of how many employees there are?

 2          A      Yeah.  That's a good approximation, 60 people.

 3          Q      And you actually are part of a small management

 4    team of about five people at KMI; is that right?

 5          A      Yes.  That was true up until 2014.  So during my

 6    tenure as a -- as the CFO.

 7                 THE COURT:  What is that?

 8                 MS. BEDNARSKI:  I think it's an alert for a

 9    coffee break.

10                 THE COURT:  I was going to ask you how much

11    longer do you have?

12                 MS. BEDNARSKI:  Another probably ten minutes.

13                 THE COURT:  Let's wrap it up in five, and then

14    we'll have a coffee break.

15                 MS. BEDNARSKI:  If you bring coffee in, can I do

16    four minutes?  All right.

17          Q      You were asked several -- one of the -- so of the

18    five, you were one, and Joe Steim was one; right?

19          A      Yes.

20          Q      Now, Outhay Viengkhou has been an employee of KMI

21    for more than 30 years, hasn't he?

22          A      That's my estimation.

23          Q      And other than -- is that true of most of the

24    employees of KMI?  Have they been there for decades?

25          A      A number of them have been.
```

**UNITED STATES DISTRICT COURT**

1       Q       You talked on a number of occasions about

2    commission spreadsheets, and over and over again in the

3    questioning, the prosecutor used the word "sales

4    representative" when referring to Dr. Chi.

5               Do you recall that?

6       A       Yes.

7       Q       Now, Dr. Chi has never represented himself in any

8    e-mail you have ever seen or to you or anyone else that you

9    know of as a sales representative; right?

10      A       To my knowledge, right.

11      Q       And did you create those commission spreadsheets

12   that the prosecutor had asked you so many questions about?

13      A       No.

14      Q       Do you know who created those, what person?

15      A       The senior accountant in the department.  There

16   were a couple different people who have that position.

17      Q       And what are those persons' names?

18      A       Veronica Paredes and Shelley Hu.

19      Q       And they go back many years.  And would you agree

20   that nowhere on there does it say "Sales representative"?

21      A       I don't know.

22      Q       Okay.  Let's look at 211 just for an example.

23      A       Okay.

24              MS. BEDNARSKI:  Can we put it on the screen?

25   Let's go to the second page to the top so we can see it.

**UNITED STATES DISTRICT COURT**

```
 1          Q       All right.  This is 211, right?  This is page 1?
 2          A       Right.
 3          Q       Okay.  And you see at the top it says, "2009
 4   commission schedule."
 5                  Right?
 6          A       Right.
 7          Q       And the other commission schedules that she asked
 8   you about, they're all in this same format; right?
 9          A       I believe so.
10          Q       And it doesn't say, "Schedule for sales
11   representatives," does it?
12          A       No.
13          Q       And --
14          A       At the top it doesn't.
15          Q       Right.  And there's nowhere on here that it says
16   this is the schedule for sales representatives; right?
17          A       No.  The one heading says, "Representative name."
18          Q       Right.  And under that column "Representative
19   name," there's just dozens and dozens of people -- right? -- or
20   companies sometimes?
21          A       Yes.
22          Q       And you don't know those names or entities
23   personally, do you?
24          A       No.
25          Q       You have not talked to any of those people
```

**UNITED STATES DISTRICT COURT**

```
 1   personally to say, are you a sales representative?  Would that

 2   be an accurate characterization of who you are?

 3        A       Correct.

 4        Q       Some of those people on there could be

 5   consultants; right?

 6        A       I don't know.

 7        Q       You don't know how Dr. Steim and Dr. Chi came up

 8   with a way to value the services he provides as being a

 9   percentage of a sale; right?

10        A       Correct.

11        Q       If -- is it possible that someone could end up on

12   this commission schedule because the way they were paid was

13   based on a percentage as opposed to their actual duty being a

14   sales representative?

15        A       I'm not sure about that.

16        Q       You're not sure because you didn't make it;

17   right?

18        A       Right.  But the sales order notes usually would

19   indicate -- usually they would use the phrase "sales rep."

20        Q       And over and over again we have seen in

21   e-mails -- and can you look at Exhibit 202, and let's -- that

22   should be in your book in front of you.  Let's put that up on

23   the screen.  Let's go down a bit so I can see the bottom.

24   Let's just show you as an example here.

25               Do you see how Dr. Chi refers to his advice fees?
```

```
 1        A       Yes.

 2        Q       Do you see that?

 3                And over and over again and in e-mails and in

 4     internal records of KMI you've seen him referring to his advice

 5     fees; right?

 6        A       I have never seen any e-mails.

 7        Q       Okay.

 8        A       From --

 9        Q       So all these e-mails that the prosecutor showed

10     you today, you haven't seen those before this case?

11        A       Correct.

12        Q       So you hadn't written them, and you hadn't seen

13     them; right?

14        A       Right.

15        Q       So they're asking you about things that you

16     hadn't seen; right?

17        A       Correct.

18        Q       So do you know whether or not his payments were

19     commission sales representative payments or advice fee

20     consultancy payments?

21                Do you know?

22        A       Well, I was always under the impression they were

23     commission payments.

24        Q       And is that because it was based on some kind of

25     percentage of an amount of a sale?
```

**UNITED STATES DISTRICT COURT**

1        A        Well, yes.  And also on the notes -- the sales

2    order notes would refer to it as sales rep.

3        Q        You're saying the internal administrative notes

4    on the sales --

5        A        On the sales order.

6        Q        And who wrote the sales orders?

7        A        The sales orders were created with the sales

8    administrator from information they got from the sales manager.

9        Q        And that would be Outhay Viengkhou?

10       A        Yes.

11       Q        And, again, you have never talked to him about

12   how Dr. Steim and Dr. Chi arrived at that formula; right?

13       A        Correct.

14       Q        Now, with respect to the payments, you talked

15   about the wire transfers.

16       A        Uh-huh.

17       Q        There was nothing suspicious about wire transfers

18   being made to a Bank of America account; right?

19       A        Correct.

20       Q        And the Bank of America account that you have

21   seen in the records was the same from the beginning of time of

22   payment on all the records you have seen until 2015; right?

23       A        That I don't know because that was maintained by

24   the senior accountant.

25       Q        Have you ever seen anything other than Bank of

```
 1    America in Glendora?

 2         A       No.

 3         Q       Was it -- there was nothing unusual about the

 4    manner of payment or the frequency of payment; right?

 5         A       Right.

 6         Q       There was nothing unusual about a wire going to

 7    an individual; right?

 8         A       Correct.

 9         Q       There was nothing unusual about paying someone in

10    the U.S. for work done in another country; right?

11         A       Right.

12         Q       In fact, there were other people that KMI used to

13    do work for them who also got paid in United States accounts;

14    right?

15         A       That's correct.

16         Q       At no time that you were working at KMI did you

17    believe you were participating in any illegal activity; is that

18    correct?

19         A       That's correct.

20         Q       And you would not have participated if you had

21    ever thought any payments were illegal; is that right?

22         A       That's correct.

23         Q       And that's because, not only are you law-abiding,

24    but your profession requires it; correct?

25         A       Correct.
```

**UNITED STATES DISTRICT COURT**

```
 1                    MS. BEDNARSKI:  No other questions, Your Honor.
 2                    THE COURT:  Does the Government have any
 3   questions?
 4                    MS. KUMAR:  Just a few, Your Honor.
 5                    THE COURT:  What does that mean?
 6                    MS. KUMAR:  I would think no more than five
 7   minutes, Your Honor.
 8                    THE COURT:  All right.
 9                         REDIRECT EXAMINATION
10   BY MS. KUMAR:
11        Q    Ms. Harrington, Ms. Bednarski asked you a
12   question about representatives.  I'd like to direct your
13   attention to Exhibit 238, which is in evidence, to the first
14   page, the top half of that page.
15        A    Oh, yes.
16        Q    Is this an e-mail from you to Toby Beiner,
17   B-e-i-n-e-r?
18        A    Yes.
19        Q    Who's Toby Beiner?
20        A    He's the current CFO.
21        Q    And the date of this e-mail is 2015; is that
22   right?
23        A    Yes.
24        Q    On the bottom you say, "Here's a scan of working
25   document comparing commission accrual to rep agreement
```

```
 1    checklist."
 2                  Is that right?
 3         A       Right.
 4         Q       And then if we look at the second page, it's one
 5    of the many commission schedules we talked about earlier.  And
 6    if we look at the top half, as you were indicating in the third
 7    column, it says, "Representative name."
 8                  Is that right?
 9         A       Yes.
10         Q       And that was the place where Mr. Chi's name
11    appears; is that right?
12         A       Yes.
13         Q       Ms. Bednarski also asked you about payments to an
14    American bank account.  I'd like to direct your attention to
15    Exhibit 217 which is in evidence.  If we could direct your
16    attention to the second page.  This is one of those individual
17    commission spreadsheets for a particular sales representative.
18                  Is that right, Ms. Harrington?
19         A       Yes.
20                  MS. KUMAR:  Blow up the top half of the page,
21    please.
22         Q       Who is the representative in this particular
23    instance?
24         A       Heesong Geotek.
25         Q       Could you read for us the bank where this
```

1  particular entity, Heesong Geotek, is paid?

2      A      "Korea Exchange Bank, Samchondong Branch, Taejon,

3  Korea."

4      Q      I will read that for the court reporter.  It's

5  S-a-m-c-h-o-n-d-o-n-g, and then the city is Taejon,

6  T-a-e-j-o-n.

7             Did I spell that correctly, Ms. Harrington?

8      A      Yes.

9      Q      And do you understand that to be a bank in Korea?

10     A      It looks like it, yes.

11     Q      Now, if we could turn to the next page, this is

12  the spreadsheet for Dr. Chi; is that right?

13     A      Yes.

14     Q      And in this case, Dr. Chi is getting paid to a

15  bank account in Glendora; California; is that right?

16     A      Yes.

17             MS. KUMAR:  No further questions at this time,

18  Your Honor.

19             THE COURT:  May this witness be excused?

20             MS. BEDNARSKI:  No, Your Honor.  The last areas

21  of questioning, I have a few questions.

22             THE COURT:  All right.

23                    **RECROSS-EXAMINATION**

24  BY MS. BEDNARSKI:

25     Q      So, Ms. Harrington, you were asked about an

**UNITED STATES DISTRICT COURT**

1    e-mail to Mr. Beiner about an e-mail saying that the attached

2    document commission accrual list was compared to rep

3    agreements?

4           A      Yes.

5           Q      Okay.  The -- KMI enters into representation

6    agreements with salespeople; right?

7           A      Yes.

8           Q      And is there like a form or standard agreement?

9           A      I don't know.

10          Q      Okay.  And did you do this comparison yourself of

11   representatives' standard agreements to their commission

12   payments?

13          A      It was a -- it looks like I was comparing the

14   names -- I think the sales department had provided files -- you

15   know, they were scanning copies of the rep agreements, and I

16   think Toby asked me to compare, you know, what they said over

17   to us with our list.

18          Q      Now, Dr. Chi never had a standard sales rep

19   agreement, did he?

20          A      Not to my knowledge.

21          Q      Did you ever see the agreements that he had

22   entered into with Dr. Steim about the services he would

23   provide?

24          A      I saw them after all this started.

25          Q      Okay.  And were those agreements agreements that

**UNITED STATES DISTRICT COURT**

```
 1    you had seen prior to sending this e-mail to Toby Beiner?

 2         A     No.

 3         Q     And the Government also asked you about

 4    Exhibit 217, some bank payments made on a spreadsheet to

 5    Heesong.

 6               Do you remember that?

 7         A     Yes.

 8         Q     And at page 2 we have the payments to Heesong.

 9    Let's look at the top of that page.

10               Go down a little bit, Richard, the other way.

11               Heesong Geotek -- go down a little bit more.

12    There we go -- is a distributor in Korea; right?

13         A     I don't know.

14         Q     Heesong Geotek Company is not Dr. Chi; right?

15         A     Correct.

16         Q     And Heesong Geotek Company has its own Korean

17    bank account; right?

18         A     That's what it appears.

19         Q     Let's go to the next page.  In the next page --

20    let's go to the top -- is -- shows his bank at Bank of America;

21    right?

22         A     Correct.

23         Q     So let's just be clear.  He didn't have a Korean

24    bank account.  It was Heesong Geotek who had it; right?

25         A     Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1                    MS. BEDNARSKI:  No other questions, Your Honor.
 2   Thank you.
 3                    THE COURT:  May this witness be excused?
 4                    MS. KUMAR:  Yes.  Thank you.
 5                    THE COURT:  We will take our first recess.  We'll
 6   be in recess for 15 minutes.
 7               (A recess was taken at 10:37 a.m.)
 8               (The following proceedings were held in
 9               open court out of the presence of the jury:)
10                    THE COURT:  The jury will be here in a second.
11   All counsel and the defendant are present.
12                    Who's the next witness?
13                    MR. FUHR:  Your Honor, the next witness is
14   Natalie Pearce.
15                    THE COURT:  All right.  Is that witness present
16   in the courtroom?
17                    MR. FUHR:  Not yet, but she will be here in a
18   minute.
19                    THE COURT:  How long do you anticipate to be on
20   direct examination?
21                    MR. FUHR:  I'm hoping an hour and a half to two
22   hours.
23                    THE COURT:  All right.  Why don't you remain
24   there until the jury comes in.  You can have a seat.
25   ///
```

```
 1              (The following proceedings were held in

 2         open court in the presence of the jury:)

 3              THE COURT:  All right.  The jury is present.  The

 4   Government may call its next witness.

 5              MR. FUHR:  Your Honor, the Government calls

 6   Natalie Pearce.

 7              THE CLERK:  Please raise your right hand.

 8              Do you solemnly state that the testimony you may

 9   give in the cause now pending before this court shall be the

10   truth, the whole truth, and nothing but the truth, so help you

11   God?

12              THE WITNESS:  I do.

13              THE CLERK:  Thank you.  Be seated.

14              Please state and spell your name for the record.

15              THE WITNESS:  My name is Natalie.  That's

16   N-a-t-a-l-i-e, Andra, A-n-d-r-a, Pearce, P-e-a-r-c-e.

17              THE COURT:  All right.  You may proceed.

18                   NATALIE ANDRA PEARCE,

19              GOVERNMENT'S WITNESS, SWORN:

20                   DIRECT EXAMINATION

21   BY MR. FUHR:

22        Q    Good morning, Ms. Pearce.

23        A    Good morning.

24        Q    Where are you from, Ms. Pearce?

25        A    I'm from the United Kingdom.
```

UNITED STATES DISTRICT COURT

 1          Q       Can you briefly describe your education and your
 2   work history?
 3          A       So I have a degree in cybernetics which is
 4   control systems engineering.  I graduated in 1995.  I then
 5   worked as a researcher in R&D for the University of Reading at
 6   Guralp Systems until about 1997 when I was then employed as the
 7   senior systems engineer through until 2010.  I started at
 8   Guralp Systems.  At 2010 I was made the head of sales and
 9   marketing.  In May 2011 I had a job title change to director of
10   sales, and I left Guralp Systems in November 2015.
11          Q       And, Ms. Pearce, where do you work now?
12          A       I now work for a company in the U.K. called
13   ELPRO, E-l-p-r-o, U.K., Ltd., where I'm their managing
14   director.
15          Q       And what does that company do?
16          A       That company provides products and services for
17   compliance monitoring of temperature and humidity for
18   pharmaceutical products.
19          Q       Focusing on your time at Guralp, Guralp is a
20   company that manufactures and sells seismic equipment; is that
21   right?
22          A       That's correct.  It designs and manufactures
23   seismological equipment.
24          Q       And going back to when you started at that
25   company in the mid '90s, tell us a little about the structure

**UNITED STATES DISTRICT COURT**

1    of the company, how many people worked there, and so on?

2        A      So when I started in about '95, there were about

3    14 employees in the company.  The company grew over the years

4    to be about 65 people in 2010 when the company changed

5    ownership.  And when I left in 2015, it was somewhere between

6    100 to 120 people.

7        Q      And who was in charge of the company when you

8    began in the 1990s?

9        A      So when I began, the company was run by the

10   founder Dr. Cansun Guralp until he sold the business in 2010

11   where a management team took over the running of the company.

12       Q      And did Dr. Guralp continue to work at the

13   company even after 2010?

14       A      Yes, he did.  He continued on in a role as a

15   technical director.

16       Q      Now, Ms. Pearce, are you testifying here today

17   under a non-prosecution agreement between you and the

18   U.S. Department of Justice?

19       A      Yes, I am.

20       Q      Okay.  Focusing on South Korea, did

21   Guralp Systems sell products into South Korea?

22       A      Yes, it did.

23       Q      And in your role at Guralp, were you one of the

24   people responsible for selling products into South Korea?

25       A      Yes.  Part of my role was sales support.

1      Q      And when, approximately, did you start being

2  involved in selling products to South Korea?

3      A      I was involved probably from around early 2000s

4  because a lot of my role was the supporting side of sales

5  initially.  Then as I gained more knowledge and skills, I took

6  over under Dr. Guralp's direction primarily leading sales.

7      Q      And would you tell the jury who the main

8  customers were in South Korea?

9      A      So from memory, the main customers in Korea were

10  an organization called KIGAM, KMA, Water Company, The Gas

11  Company, the Express Train Company.  I don't remember all their

12  acronyms or full names.

13      Q      Now sticking with KIGAM for a moment, what's your

14  understanding of what KIGAM does?

15      A      So KIGAM --

16              MR. KOURY:  Objection, Your Honor.  Lacking

17  foundation.

18              THE COURT:  Overruled.

19              THE WITNESS:  So KIGAM does research into

20  earthquakes and also does testing of seismological products to

21  allow -- to prove that they meet technical specifications.

22      Q      BY MR. FUHR:  And does KIGAM also purchase

23  equipment?

24      A      Yes, it does.

25      Q      And did KIGAM purchase systems from

1    Guralp Systems?

2          A       Yes, it did.

3          Q       What about certifying equipment?

4          A       Yes.  Which is common in our industry.  You would

5    have technical requirements that equipment had to meet, and

6    equipment would have to have test evidence to show that it was

7    compliant with specifications.  That's one of the functions

8    that KIGAM provided.

9          Q       Ms. Pearce, during your time at Guralp, did you

10   have interactions with an individual named Heon-Cheol Chi?

11         A       Yes, I did.

12         Q       Do you see him in the courtroom today?

13         A       Yes, I do.  It's the gentleman sat there.

14                 THE COURT:  Sitting at the end of the table?

15                 THE WITNESS:  Sitting at the end of the table

16   with the glasses.

17                 THE COURT:  The record will reflect that the

18   witness has identified the defendant.

19         Q       BY MR. FUHR:  And, Ms. Pearce, what do you

20   understand Dr. Chi's role to have been at KIGAM?

21         A       He was a seismologist, and also he was, from

22   memory, the director of the earthquake research institution

23   within KIGAM.  And in addition to that, I also understand he

24   had a role in the United Nations called the Comprehensive

25   Nuclear Test-Ban Treaty Organization because KIGAM also has the

1    national data center for South Korea under that treaty.

2        Q    And you mentioned that he was a director of the

3    Earthquake Research Center at KIGAM.  What was he in position

4    to do for a company like Guralp?

5        A    What do you mean?  Generally or --

6        Q    Yeah.  Start generally.

7        A    Generally, I guess what he did for us was he

8    provided us with -- well, he was a customer for his own

9    research.  He would provide us with information about technical

10   specifications, what these meant.  They provided testing, help

11   for us, technical support for us, installation support for us.

12   He recommended our products, and he also provided us feedback

13   on, you know, what was going on in the market in South Korea

14   and what our competitors were up to.

15       Q    So when you say he was a customer, what does that

16   mean when you say he was a customer?

17       A    Well, his group at KIGAM were doing research into

18   earthquakes, and they would purchase equipment for that

19   research.

20       Q    And as part of interacting with Dr. Chi, did you

21   speak and e-mail with him over the course of the years?

22       A    Yes.  Predominantly by e-mail, but, yes.

23       Q    In what language were those e-mails that you

24   received from Dr. Chi?

25       A    They were in English.

1        Q        And when you e-mailed him back, did you e-mail

2   him back in English?

3        A        Yes.

4        Q        And when you spoke with him, in what language did

5   you speak with him?

6        A        English.

7        Q        And did he ever have an interpreter with him?

8        A        No, he did not.

9        Q        Now, did Dr. Chi enter into a contract with

10  Guralp sometime early in 2003?

11       A        That is correct.  Dr. Guralp and Dr. Chi entered

12  into an agreement about technical collaboration.

13       Q        I'm showing you what's been admitted into

14  evidence as Government Exhibit 52.  Ms. Pearce, I'd like to

15  direct your attention to the top of the agreement.

16                Who are the parties to this agreement?

17       A        The parties are Dr. Chi, Heon-Cheol, and

18  Guralp Systems Limited.

19       Q        All right.  If we could go to the second

20  paragraph, this agreement here states that *Dr. Chi --* the third

21  line *-- will be recommending Guralp Systems products in general*

22  *to South Korean seismological equipment users and seismological*

23  *institutions and that the interests of both parties will be*

24  *upheld under all circumstances and that Guralp Systems products*

25  *will be actively supported and recommended to the seismic*

```
 1   community?

 2              Is that correct?

 3        A    That is correct.

 4        Q    Ms. Pearce, take a look at the full page.

 5              Can you see, does anyone sign this agreement on

 6   behalf of KIGAM?

 7        A    No, they do not.

 8        Q    Is the word "KIGAM" found anywhere in this

 9   agreement?

10        A    No, it is not.

11        Q    Showing you what's been admitted into evidence as

12   Government Exhibit 53, Ms. Pearce, does this document purport

13   to be a contract between Guralp Systems Limited and KIGAM?

14        A    Yes, it does.  That's correct.

15        Q    I'd like to direct your attention to the second

16   page of the document.

17              What is the date of this -- the signatures on

18   this contract?

19        A    The 4th of November, 2003.

20        Q    And so was this agreement signed after the

21   agreement we looked at a minute ago, Exhibit 52?

22        A    That is correct.

23        Q    So they're two contracts; right?  One with KIGAM

24   and one with Dr. Chi.

25              Is that correct?
```

**UNITED STATES DISTRICT COURT**

```
1       A       Yes.  There was a personal contract and a
2  contract between the two corporations.
3       Q       And, Ms. Pearce, did the company -- did
4  Guralp Systems pay Dr. Chi after entering into either of those
5  agreements?
6       A       The company paid Dr. Chi after entering into the
7  personal agreement.
8       Q       So the payments were under the personal
9  agreement, not under the second agreement that we looked at?
10      A       That is my understanding, yes.
11      Q       To whom did the company send those payments to?
12      A       They sent the monies to Dr. Chi.
13      Q       Are you aware of any monies paid to KIGAM?
14      A       Other than for -- no.  Actually, no, I'm not.
15      Q       How did the defendant refer to the payments that
16  he received from your company?  Did he use a particular term?
17      A       It was referred to as a "technical advice fee."
18              MR. FUHR:  Okay.  At this time I'd like to move
19  to admit into evidence Government Exhibit 70 pursuant to the
20  parties' stipulation.
21              THE COURT:  All right.  Exhibit 70 will be
22  received into evidence.
23          (Received into evidence Exhibit No. 70.)
24      Q       BY MR. FUHR:  Ms. Pearce, what is this document?
25      A       This is an e-mail from Dr. Chi to Dr. Guralp and
```

**UNITED STATES DISTRICT COURT**

1    myself under my former name from Thursday, October 30, 2003.

2         Q      So just to be clear, when it refers to

3    Nathan Pearce, that is you; correct?

4         A      That was my former name, yes.

5         Q      And the other person in the line is

6    Cansun Guralp.  Who is that?

7         A      Dr. Cansun Guralp is the owner and founder of

8    Guralp Systems.

9         Q      Okay.  If you would look at the first line of the

10   document, who's writing this e-mail?

11        A      Dr. Chi is writing this e-mail.

12        Q      And what does it say on the first line there?

13        A      "I and my colleague will be at your office on

14   November 4, Tuesday, and 5th, Wednesday."

15        Q      And if you recall the contract, Government

16   Exhibit 53, a minute ago, do you remember the date that that

17   contract was signed?

18        A      That was the 4th of November, 2003.

19        Q      And that was a contract that KIGAM and

20   Guralp Systems entered; is that correct?

21        A      That is correct.

22        Q      Okay.  And so here, when are you expecting

23   Dr. Chi and his colleague to come to your offices?

24        A      November 4th and 5th, 2003.

25        Q      So it would be the same day?

**UNITED STATES DISTRICT COURT**

```
1         A       That is correct.

2         Q       I want to focus your attention to the bottom of

3    the e-mail beginning with the portion that begins, "Please read

4    below and delete."  What is the defendant referring to here in

5    the first line, the technical advice fee?

6         A       So the technical advice fee was -- this was

7    agreed when the personal contract was signed between Dr. Chi

8    and Dr. Guralp that, when equipment was sold -- so for each

9    particular product, there would be, within that sale price, a

10   set fee that was referred to as the technical advice fee.  So

11   it may be that one product would be sold for, say, $2,500, and

12   it may have been an advice fee of either $500 or $1,000 or some

13   other amount depending on what that product was.

14        Q       Is he saying to you that he wants to pick up this

15   advice fee in pounds?

16        A       Yes, he is.

17        Q       And what are pounds?

18        A       Pounds is the British sterling currency.

19        Q       And does he then write that, "If possible, I want

20   to get the equivalent pound at your office without notice of my

21   colleague.  My colleague is working below me, and I do not want

22   to open this to anyone.  Delete this note, please."

23                Is that correct?

24        A       That is correct.

25        Q       Did the defendant ask you to delete e-mails on
```

**UNITED STATES DISTRICT COURT**

1    occasion?

2        A      Yes, he did.

3        Q      Did anyone else that you worked with, while you

4    were at Guralp Systems, ever ask you to delete e-mails?

5               MR. KOURY:  Objection.  Irrelevant, Your Honor.

6               THE COURT:  Overruled.

7               THE WITNESS:  No, they did not.

8        Q      BY MR. FUHR:  Ms. Pearce, over what time period,

9    approximately, did Guralp Systems make payments to the

10   defendant?

11       A      I believe from 2003 until 2015.

12       Q      And can you give the jury a sense of how much

13   money Guralp Systems paid the defendant over this period?

14               MR. KOURY:  Objection.  No personal knowledge.

15               THE COURT:  You're going to have to lay a better

16   foundation for that.

17       Q      BY MR. FUHR:  Ms. Pearce, the payments were made

18   during what time period?

19       A      They were made from 2003 until 2015.

20       Q      And in what form were these payments made?

21       A      Those payments would have been made --

22               MR. KOURY:  Same objection, Your Honor.

23               THE COURT:  Overruled.

24               THE WITNESS:  They were made initially in cash,

25   but after a period of time, they were then made by bank

```
 1   transfer.
 2               MR. FUHR:  I'd like to move into evidence what's
 3   been marked for identification purposes as Exhibit 139 per the
 4   pretrial stipulation.
 5               THE COURT:  Any objection to 139?
 6               MR. KOURY:  No objection.
 7               THE COURT:  It's in the pretrial exhibit
 8   stipulation, so it will be admitted into evidence.
 9          (Received into evidence Exhibit No. 139.)
10      Q       BY MR. FUHR:  Ms. Pearce, what is this?
11      A       This is an e-mail from Dr. Chi to myself copied
12   to Dr. Guralp dated Tuesday, November 10, 2009.
13      Q       And I'd like to direct your attention to the top
14   of the second page.  Do you see where it says, "Advice fee is
15   somewhat very large, $3,500 times 55 minus delay penalty equals
16   $192,500 minus delay penalty.  So you should divide into proper
17   amounts and then send them with interval like as before."
18               Do you see that?
19      A       Yes, I do.
20      Q       Do you know approximately how much the defendant
21   was paid over time?
22      A       It was many hundreds of thousands of dollars.
23      Q       And what were these payments based on?  How were
24   they calculated?
25      A       So as I mentioned before, they were a range of
```

**UNITED STATES DISTRICT COURT**

```
 1    products that we sold in Korea.  For example, an accelerometer,

 2    a digitizer, communication modules, different seismometers.

 3    And each one of those products had a set amount of advice fee

 4    against them.  So in this case, where it says three-and-a-half

 5    thousand times 55, that 55 would be 55 systems that were

 6    delivered.  That would have comprised of several different

 7    products.  So I'm not sure exactly in this case what the

 8    details were.

 9         Q     So in other words, you would have sold 55

10    systems, and then, in return, the defendant would receive his

11    advice fee, in this case $3,500 per system; is that correct?

12         A     That is correct.

13         Q     You mentioned a minute ago, Ms. Pearce, that he

14    was also paid in cash.  Let's focus on that for a minute.

15               Can you explain to the jury usually how that

16    would happen, how the defendant received cash payments from

17    you?

18         A     So when I was informed about the agreement and it

19    was signed, I was made the point of contact for Dr. Chi in this

20    process because Dr. Guralp was travelling and was very busy.

21    So he would make his requests to me typically by e-mail.  Those

22    I would obviously pass on to Dr. Guralp, and he would decide to

23    pay him cash or whatever.  And Dr. Guralp would then arrange

24    that.

25               MR. FUHR:  I'd like to move into evidence
```

**UNITED STATES DISTRICT COURT**

1    Government Exhibit 157.  It has been marked for pretrial

2    exhibit stipulation.

3              THE COURT:  All right.  157 will be received into

4    evidence.

5         (Received into evidence Exhibit No. 157.)

6         Q    BY MR. FUHR:  Ms. Pearce, what is this document?

7         A    This is an e-mail from myself to Dr. Chi dated

8    Monday, April 29, 2013.

9         Q    And in this document, is this a chain of e-mails?

10        A    Yes.  This is a chain of e-mails back and forth

11   from an iPhone.

12        Q    I was going to say look at the third line.  Can

13   you explain why the format of this e-mail is slightly different

14   from some of the other e-mails we have seen?

15        A    It is because it's sent from my iPhone, but I

16   used to have text only, not HTML formatting on my iPhone

17   because it used less data.

18        Q    I'd like to go to the section of the message that

19   the defendant sent to you.  Do you see the third line from the

20   bottom?

21        A    Uh-huh.

22        Q    Let me back up here.

23              Third line from the top.  Do you see where it

24   says "Heon-Cheol Chi wrote"?

25        A    Yes.

1       Q       So below that, is that the message from the

2   defendant to you?

3       A       Yes.

4       Q       Okay.  Can we focus on the third line from the

5   bottom, please.  Can you read what it says there?

6       A       "Explain the situation at your office.  If

7   possible, at your office, on April 30 I want to receive 3,000

8   euro.  30 bills of 100 euro from advice fee in order to use it

9   at Moscow."

10      Q       And the euro, is that a currency used in Europe?

11      A       That is a currency in Europe, yes.

12      Q       And in the parentheses, what does that mean when

13  he says, "30 bills of 100 euro"?

14      A       So that means he would want to receive it in

15  denominations of 100 euro bills and 30 of them.

16      Q       And the date of the e-mail is 2013; right?

17      A       That is correct.

18      Q       Was it your understanding that the company was

19  already paying Dr. Chi into his bank account as well as in cash

20  at this point?

21      A       Yes.

22              MR. FUHR:  I'd like to move into evidence

23  Government Exhibit 105.

24              THE COURT:  All right.  105 will be received into

25  evidence.

**UNITED STATES DISTRICT COURT**

```
 1              (Received into evidence Exhibit No. 105.)

 2       Q       BY MR. FUHR:  Ms. Pearce, what is this document?

 3       A       This is an e-mail from Dr. Chi to myself dated

 4  Wednesday, October 31, 2007.

 5       Q       And what's the subject line in this document?

 6       A       "It's a personal request."

 7       Q       I'd like to direct your attention to the

 8  paragraph beginning "Second."  Do you see where it says, "I

 9  have not calculated my advice fee"?

10       A       Yes.

11       Q       "It should be more than $40,000 now."

12              What does the defendant say after that?  Can you

13  read that?

14       A       "From that I want to receive the euro money

15  equivalent to 10,000 U.S. dollars when I visit your office very

16  personally like as before.  My colleague Mr. Lim do not need to

17  know it."

18       Q       Do you know who Mr. Lim is?

19       A       Mr. Lim was somebody who worked at the earthquake

20  institute in KIGAM.

21       Q       So was he a colleague of Mr. Chi's?

22       A       Yes.

23       Q       Ms. Pearce, I think you mentioned there came a

24  time when Mr. Guralp started to pay Mr. Chi into a bank

25  account; is that correct?
```

**UNITED STATES DISTRICT COURT**

```
 1        A       That is correct.

 2        Q       And whose idea was that?

 3        A       That was a request from Dr. Chi.

 4        Q       Do you know where that bank account was located?

 5   Where you sent the payments to?

 6        A       It's located in the United States of America.

 7        Q       And based on your interactions with Dr. Chi, do

 8   you know where he lived?

 9        A       He lived in South Korea.

10                MR. FUHR:  Moving into evidence Government

11   Exhibit 80.

12                THE COURT:  All right.  80 will be received into

13   evidence.

14           (Received into evidence Exhibit No. 80.)

15        Q       BY MR. FUHR:  Ms. Pearce, what is this document?

16        A       This is an e-mail from Dr. Chi to myself dated

17   Tuesday, December 21, 2004.

18        Q       If you would focus your attention on the middle

19   of the page where the e-mail refers to the number of projects

20   listed 1 through 6.

21                Do you see that?

22        A       Yes.

23        Q       And very generally, what is listed Nos. 1 through

24   6?  What is this?

25        A       So this is a list informing us about projects
```

**UNITED STATES DISTRICT COURT**

```
 1   that will happen and when we may expect to receive the orders

 2   for those projects.

 3        Q       And can you tell based on this list whether some

 4   were KIGAM orders and some were other customers in Korea?

 5        A       The first one, upgrade of my old stations, would

 6   be for KIGAM.

 7                No. 2, systems for the Gas Company which is a

 8   separate organization.

 9        Q       Where is that organization, the Gas Company?

10        A       It's in Korea.

11        Q       Okay.

12        A       Systems for joint stations in China I guess is

13   also KIGAM.

14                Systems for Water Company, the Water Company is a

15   separate organization.

16        Q       And where is the Water Company?

17        A       In Korea.

18                Systems for mobile stations is also probably

19   KIGAM.

20                And systems for Korea Express Train is the

21   Express Train Company in Korea.

22        Q       So is it fair to say that these were projects for

23   which your company, Guralp Systems, would have an opportunity

24   to contract for or bid?

25        A       Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1        Q       Okay.  Let's just stay with No. 6.

 2                Would you read what it says below starting with

 3   "Frankly speaking"?

 4        A       "Frankly speaking, I want to make a large fortune

 5   by the order 6."

 6        Q       And does it say below there, "You might worry

 7   about the payment, but you do not need.  I have a bank account

 8   in America, and you can send the technical advice fee to my

 9   bank account like as agent fee"?

10                Is that correct?

11        A       That is correct.

12        Q       To your recollection, Ms. Pearce, did

13   Guralp Systems get to participate in the project described here

14   under order No. 6?

15        A       We did, yes, do an Express Train project in 2005.

16                MR. FUHR:  I'd like to move into evidence

17   Government Exhibit 87, please.

18                THE COURT:  All right.  87 will be received into

19   evidence.

20           (Received into evidence Exhibit No. 87.)

21        Q       BY MR. FUHR:  Ms. Pearce, what is this document?

22        A       This is an e-mail from Dr. Chi to myself copied

23   to Dr. Guralp from Wednesday, the 11th of May, 2005.

24        Q       Uh-huh.  And do you see a reference here to the

25   Korea Railway Authority?
```

**UNITED STATES DISTRICT COURT**

1        A        Yes, I do.

2        Q        And does it relate to the order for Express Train

3   that we just saw in order No. 6?

4        A        Yes.  It is the same project.

5        Q        So is this a project that the company won?

6        A        Yes, it did.

7        Q        And what is the defendant saying here -- what do

8   you understand the defendant to say for this project that he's

9   doing so you can participate in it?

10        A        So he's saying here that his institute KIGAM has

11   made a contract with the Korea Railway Authority, and now he's

12   going in the process of ordering our equipment for the project.

13        Q        So when you spoke about the large fortune a

14   minute ago, that refers to this project; correct?

15        A        Yes.

16                MR. FUHR:  Moving into evidence Government

17   Exhibit 106, please.

18                THE COURT:  106 will be received into evidence.

19          (Received into evidence Exhibit No. 106.)

20        Q        BY MR. FUHR:  Ms. Pearce, what is this document?

21        A        This is an e-mail from Dr. Chi to myself dated

22   Sunday, November 25th, 2007.

23        Q        And if you would focus on the middle of the page,

24   who is the customer for these projects here?

25        A        The customer for these projects was KIGAM.

**UNITED STATES DISTRICT COURT**

 1      Q      And briefly, what does the table depict?  What's

 2  listed on this table?  Can you explain that?

 3      A      So this table is talking about a date of

 4  contract, the type of equipment provided, the quantities,

 5  whether it has been completed, and what advice fee is then due.

 6      Q      And so, for example, if we take just the first

 7  line, the date of contract there is April 19, the DM24, DCM3,

 8  what are those products?

 9      A      So the DM24-3 is a Guralp Systems product.  It's

10  a three-channel 24-bit seismic digitizer.  The DCM is a data

11  communication module that we had to go with it.  And the 5T is

12  a strong motion accelerometer.

13      Q      So is it fair to say these are all Guralp

14  products?

15      A      Yes.  These are all Guralp products.

16      Q      And so what relationship exists between the

17  advice fee, the fee paid to the defendant, and the sale of

18  these products?

19      A      Okay.  If you see here, it says that there are,

20  in brackets afterwards, there are three digitizers, three DCM's

21  and three 5T's.  So that's nine units in total.  And it's

22  saying the fee is three sets.  I'm guessing each one had an

23  advice fee of $1,000 at this time.  So the total advice fee due

24  here is $9,000.

25      Q      So it's the number and the type of order that

**UNITED STATES DISTRICT COURT**

```
 1    Guralp receives directly tied to the payment to the defendant?

 2         A     Yeah.

 3               MR. FUHR:  If we can go back to the document,

 4    please.

 5         Q     Do you see below the table the portion where it

 6    says, "As shown above, the advice fee for already shipped and

 7    paid contracts are totaling $51,000.  You already paid $10,000

 8    when I visited your office.  Therefore, please send $41,000 to

 9    my bank account in America."

10               Is this the bank account that you referenced a

11    minute ago when you said the defendant had a bank account in

12    the U.S.?

13         A     Yes.

14         Q     Now, we've seen e-mails in which the defendant

15    asked for a payment.  Did there come a time when he began

16    invoicing, sending invoices to the company when he started

17    receiving payments?

18         A     Yes.  Sometime after 2010, 2011 then payments had

19    to be made by invoice.

20         Q     And are you aware of why that change happened,

21    why -- after that time why he sent invoices?

22         A     So before the change in ownership in 2010, it was

23    Dr. Guralp's decision what and how things were done.  After

24    2010, our finance director, when he was given the invoice from

25    Dr. Chi -- I'm sorry -- the request from Dr. Chi for advice fee
```

1    required invoices in order to do that properly.

2         Q    Showing you what's already been admitted into

3    evidence as Government Exhibit 57.

4              Ms. Pearce, do you recognize what this is?

5         A    Yes.  This is an invoice that Dr. Chi would have

6    sent us for his advice fee.

7         Q    If you focus on the top, what address is listed

8    for Dr. Chi?

9         A    1265 15th Street, 9-K Fort Lee, New Jersey,

10   07024, United States of America.

11        Q    And where did you understand the defendant to

12   live?

13        A    In South Korea.

14        Q    If you can go down to the bottom of this invoice,

15   where did the defendant direct you to make payments?

16        A    To this bank account at the Bank of America in

17   California.

18        Q    Who is the account holder?

19        A    Heon-Cheol Chi.

20        Q    Can you look in your binder, there's the second

21   invoice in there.  Or we can have it on the screen.  Sorry.

22             Do you see the date of this invoice?

23        A    10th of July, 2012.

24        Q    Okay.  If you look at the body of that document,

25   Ms. Pearce, does this appear to be very similar to the first

**UNITED STATES DISTRICT COURT**

1    invoice we looked at?

2          A       Yes.  The number of units are different, and the

3    period of time we invoiced is different, and therefore the

4    total is different.  Other than that, they are identical.

5          Q       So the way this is done, in this case there are

6    26 units?

7          A       Uh-huh.

8          Q       And per unit he's invoicing for $1,000?

9          A       Yeah.

10         Q       A moment ago we looked at the advice fee in one

11   of the e-mails, and I think you said was $3,500 per instrument.

12   So it was not actually always $1,000?

13         A       So what would happen is Dr. Chi would have, for

14   the entire, say, year of 2011 in this case, would have

15   calculated his entire advice fee due, and then he would have

16   divided it up into different invoices like this with a unit

17   cost of, say, $1,000 just picked for convenience.

18         Q       In any of these invoices, does he mention KIGAM?

19         A       No.

20         Q       And did Guralp pay the defendant according to

21   these invoices into his bank account?

22         A       I believe, yes.

23         Q       Ms. Pearce we've talked a little bit about how

24   Guralp paid the defendant.  I'd like to turn now into why

25   Guralp made payments to him.

**UNITED STATES DISTRICT COURT**

 1           You stated earlier that KIGAM purchased equipment

 2  from Guralp and also tested and certified; is that correct?

 3      A     Yes.

 4      Q     And what was the defendant -- as the director of

 5  the Earthquake Research Center, what was he able to do for

 6  Guralp in exchange for the payments?

 7      A     Some of these technical requirements are very

 8  detailed, and he would be able to explain and advise us on how

 9  we could develop our equipment to meet those.

10           In addition, during testing, for example, our

11  equipment had failed once or twice initial tests.  So he was

12  able to give us feedback and information on why they had failed

13  and perhaps help us resolve that so that we could pass.

14      Q     Pass what?  Pass --

15      A     Pass the tests we needed for certification

16  because we needed a certificate in order to participate in

17  certain bids to be compliant.

18      Q     So he gave you information about those things

19  that helped you with testing and certification; is that

20  correct?

21      A     Yes.

22           MR. KOURY:  Objection.  Vague.

23           THE COURT:  Overruled.

24      Q     BY MR. FUHR:  What about contracts and bids?

25  What, if anything, did the defendant do for you in that

**UNITED STATES DISTRICT COURT**

```
 1  respect?
 2       A       He would be able to advise us of bids and
 3  projects he was aware of that were upcoming so that we could be
 4  prepared for them.  For example, if a legislative requirement
 5  had changed or any specifications, you could know that in
 6  advance which would enable you to then hopefully develop and
 7  test and have the necessary documentation to participate in
 8  that bid.  These come up with short notice, and it can take a
 9  long time to develop and test and get through that process.
10  And also, he could give us some information about what maybe
11  competitors might be up to, things like that.
12       Q       So that was valuable information for your company
13  to have; is that correct?
14       A       It's always vital to have, yes.
15       Q       But it helped you make more sales; correct?
16       A       Our sales in Korea grew.
17               MR. KOURY:  Objection.  Calls for speculation,
18  Your Honor.
19       Q       BY MR. FUHR:  If we can take -- sort of take that
20  into two buckets and start with the purchasing and recommending
21  products.
22               I'd like to move into evidence Exhibit 88,
23  please.
24               THE COURT:  All right.  88 will be received into
25  evidence.
```

**UNITED STATES DISTRICT COURT**

```
 1              (Received into evidence Exhibit No. 88.)

 2         Q        BY MR. FUHR:  Ms. Pearce, what is this document?

 3         A        This is an e-mail from Dr. Chi to myself copied

 4    to Dr. Guralp dated Wednesday, May 18, 2005.

 5         Q        Okay.  And directing your attention to the middle

 6    of the page that begins with, "As you knew I got four more

 7    quotations including the order for Express Train," can you read

 8    the next sentence, please?

 9         A        "At present I officially asked the purchase

10    division to order your systems.  The personnel at the purchase

11    division told me that the amount of systems for Express Train

12    is very large.  So he wanted to ask some discount only for that

13    order."

14         Q        So, Ms. Pearce, when the defendant is ordering --

15    is asking the purchase division to order a system, how is that

16    beneficial for Guralp?

17         A        Our equipment has very long lead times.

18    Everything is made to order.  It can take many months, if not a

19    year in some cases, to build equipment.  To know things in

20    advance would help you with procurement of component systems

21    and give you confidence to put production underway, and that's

22    because often contracts could have a shorter delivery time than

23    the actual build time equipment and you would get delay

24    penalties.

25         Q        So that information helped you to be in a
```

**UNITED STATES DISTRICT COURT**

```
 1    position to --
 2                    MR. KOURY:  Objection.  Calls for speculation.
 3                    THE COURT:  I haven't heard the question yet.
 4    Why don't you go ahead and finish the question.
 5          Q    BY MR. FUHR:  Did that information then help you
 6    to make an order?
 7          A    That information helped us in terms of our
 8    internal operational planning, yes.
 9          Q    Moving to the second paragraph on this page under
10    the table where it begins with "I want to get $5,500," can you
11    read the last two lines, please.
12          A    "And I want to get 5,500 U.S. dollars without any
13    notice of others when I visit your office on May 23.  I want it
14    as euro currency in order to use it at Paris for the persons of
15    Train Company.
16          Q    Okay.  I'm going to the top of the second page.
17                    Does it say there, "Please do not mention the
18    relationship between me and your company.  Of course you should
19    not mention the advice fee or how the price was decided.  All
20    documents related to me should not be open to them."
21                    Is that correct?
22          A    That is correct.
23          Q    And who is he referring to there for you not to
24    mention the relationship?
25          A    Not to mention to Heesong Company who was our
```

```
 1    distributor and anybody else who was there at the time.

 2         Q      So what's your understanding when he says my

 3    members?

 4         A      His colleagues.

 5         Q      And your distributor is in Korea; is that

 6    correct?

 7         A      That is correct.

 8                MR. FUHR:  I'd like to move to admit into

 9    evidence Exhibit 108, please.

10                THE COURT:  All right.  108 will be received into

11    evidence.

12           (Received into evidence Exhibit No. 108.)

13         Q      BY MR. FUHR:  Ms. Pearce, what is this?

14         A      This is an e-mail from Dr. Chi to myself copied

15    to Dr. Guralp from Wednesday, December 26, 2007.

16         Q      At the end of the second paragraph where it says,

17    "All participants should submit to certificate of satisfied

18    system from my institute.  In another word without my

19    recognition no company can participate in the bidding."

20         A      Yes.

21         Q      This is an e-mail from Dr. Chi?

22         A      That is correct.

23         Q      And so what is he saying about his institute and

24    about his role in the institute in connection with bidding?

25         A      That it's very important.  Without the
```

1    certificate and without his recognition, as he says, you cannot

2    participate.

3         Q     So if you cannot participate, you cannot make a

4    sale; is that correct?

5         A     That is correct.

6         Q     Because the bidding has a requirement for you to

7    be able to make a sale?

8         A     Depending on the bid, that can be a requirement,

9    yes.

10        Q     Focusing on paragraph 4 in this document, do you

11   see the sentence that said, "I already pushed to top person at

12   the electrical company to use your equipment"?  What's the

13   electrical company?

14        A     The electrical company is, I guess, a company

15   that is at the dams producing power by hydroelectricity.

16        Q     Where is the electrical company located?

17        A     South Korea.

18        Q     Is this an example of the defendant recommending

19   your system to another customer?

20        A     Yes, it would be.

21             MR. FUHR:  I'd like to admit into evidence

22   Government Exhibit 61, please.

23             THE COURT:  61 will be received into evidence.

24        (Received into evidence Exhibit No. 61.)

25        Q     BY MR. FUHR:  Ms. Pearce, what is this document?

**UNITED STATES DISTRICT COURT**

```
 1        A      This is an e-mail from Dr. Chi to Dr. Guralp

 2   copied to myself from Wednesday, March 12, 2003.

 3        Q      I'd like to direct your attention to the last

 4   paragraph which begins with "I explained my idea."

 5               Can you please read that?

 6        A      "Hence, I explained my idea on a systems, and we

 7   agreed that Guralp borehole sensors are replaced."

 8        Q      Continue.

 9        A      "Of course officially both AFTAC and KIGAM must

10   agree on this due to MOU, even if the ownership belongs to

11   Korea."

12        Q      And continue.

13        A      "But I will be responsible for the replacement at

14   the Korean side, so definitely any replacement cannot be done

15   without my agreement.  Whenever it become realized, I will

16   inform you."

17        Q      And just so I understand, so it would be -- would

18   it be a benefit for Guralp to have any replacement of these

19   sensors by Dr. Chi?

20        A      Well, yes, because we would sell new equipment.

21        Q      And when you sell new equipment, you make money;

22   is that correct?

23        A      Yes.  That is correct.

24        Q      And in return, what does the defendant receive?

25        A      He receives an advice fee.
```

**UNITED STATES DISTRICT COURT**

1          MR. FUHR:  I'd like to move into evidence

2     Exhibit 65, please.

3          THE COURT:  Exhibit 65 will be received.

4        (Received into evidence Exhibit No. 65.)

5     Q     BY MR. FUHR:  Ms. Pearce, what is this document?

6     A     This is an e-mail from Dr. Chi to Dr. Guralp

7     copied to myself from the 31st of July, 2003.

8     Q     And focusing starting with the -- in the second

9     line it starts with, "As you knew, technical advice fee is

10    included inside the price of $3,900 of CMG-40T-1."

11          What is CMG-40T-1?

12    A     So that was our particular type of three

13    component seismometer that we made.  CMG goes in front of all

14    the models.  That is Dr. Guralp's initials.

15    Q     And further down I'd like to direct your

16    attention to the place where it starts, "I also asked the

17    purchase division to order CMG-3TB, and it will be informed

18    later to you.  Here I want to emphasize that, if you want to

19    change or modify the quotations or anything, please discuss

20    with me."

21          How is Dr. Chi assisting your company here?

22    A     He's assisting because he has asked the purchase

23    division to order our equipment and is informing us which

24    allows us to plan production.

25          MR. FUHR:  I'd like to move into evidence

 1   Government Exhibit 97, please.

 2               THE COURT:  All right.  97 will be received into

 3   evidence.

 4          (Received into evidence Exhibit No. 97.)

 5       Q       BY MR. FUHR:  Ms. Pearce, what is this document?

 6       A       This is an e-mail from myself to Dr. Chi copied

 7   to Dr. Guralp with a date of Friday, November 25th, 2005.

 8       Q       And directing your attention to page 2, please

 9   read the paragraph that starts with "Recent two years."

10       A       "So recent two years I've spent all my effort in

11   order to make your systems accepted as standard system for

12   strong-motion station, and officially your system was enrolled

13   as standard one in Korea.  Your systems are known to supply DSS

14   except to my colleagues and Heesong persons."

15       Q       And Heesong is what?

16       A       Heesong is a distributor.  It stands for

17   Heesong Geotek.

18       Q       And focusing on the phrase "I spent all my effort

19   in order to make your systems accepted as standard system for

20   strong-motion stations and officially your system was enrolled

21   as standard system," what does that mean for Guralp sales to be

22   enrolled in standard system?

23       A       If you are the standard system and somebody is

24   looking for a product that is needed for, say, a strong wave

25   sedation then they would typically go with the standard system.

1    So it's beneficial to help themselves.

2         Q     So let's go back to the second thing you

3    mentioned about the -- that Dr. Chi helped you with.  We talked

4    about purchasing and recommending, and let's turn to some of

5    the information that he provided the company with concerning

6    marketing and competitors.

7               Can you explain, generally, what you mean by

8    that?

9         A     So if you know what is going on in the market,

10   you can help to either update or focus marketing material.  You

11   can, if you know what company might have a project coming up,

12   you could go and present at them, make sure you have the right

13   relationships which always helps.  If you know where your

14   competitors might be weak again, it can help you focus your

15   proposals in marketing material.  And if you have any financial

16   information, then, you know, if you know that they're going to

17   come in with a new competitor and they're much cheaper, you

18   can, of course, take that into account when you make your bid.

19        Q     And that kind of information, would that be

20   information that is publicly available?

21        A     Not always, no.

22        Q     So he provided you information that was inside

23   information?

24        A     Inside --

25              MR. KOURY:  Objection, Your Honor.  That

```
 1   mischaracterizes the testimony.
 2               THE COURT:  The objection is overruled.
 3               THE WITNESS:  Sometimes, yes.
 4        Q      BY MR. FUHR:  You talked -- you mentioned the
 5   word bids.  Can you briefly describe how the contracting and
 6   how the bidding process worked in Korea in connection with
 7   seismic equipment?
 8        A      So typically a project would come --
 9               MR. KOURY:  Objection, Your Honor.  No
10   foundation.
11               THE COURT:  You're going to have to lay a better
12   foundation.  The objection is sustained.
13        Q      BY MR. FUHR:  Ms. Pearce, did Guralp participate
14   in bids in Korea?
15        A      Yes, it did.
16        Q      Did you participate in providing information
17   about your equipment that was then given to Korea for those
18   bids?
19        A      Yes, I did.
20        Q      Do you know how the bidding process in Korea
21   worked?
22               MR. KOURY:  Same objection, Your Honor.
23               THE COURT:  Overruled.
24               THE WITNESS:  So there would typically have to be
25   a technical proposal given.  So a project would come out with a
```

1    list of technical requirements that either functioning or

2    whatever the equipment had to meet.  So you had to then justify

3    how your equipment met those requirements.  They would often be

4    administrative requirements which are bits about a company or

5    about having the necessary certification to prove that you were

6    compliant.  And then, of course, there would be a financial

7    element, a financial part of the bid.

8         Q    BY MR. FUHR:  And was open bidding the only way

9    that contracts were awarded in Korea?

10        A    No.  Some were made by direct contract to which

11   you may know the term in the U.S. as sole-source contracting.

12        Q    And sole-source contracting means there's only

13   one company that is applying for the project; is that correct?

14        A    Well, it's a direct contract from the purchaser

15   to the company.

16        Q    And if you're selected as the sole-source

17   contractor, is that beneficial to the company?

18        A    Yeah.

19        Q    And why is that?

20        A    Well, one, you don't have to spend -- I mean,

21   some of these proposals would take maybe hours.  Others could

22   take weeks to arrive in tendering, and they could be very

23   complex documents.  But also, when you bid openly, there's a

24   risk.  There's no guarantee you will win it.

25        Q    There's a risk that someone else will win it; is

**UNITED STATES DISTRICT COURT**

```
 1    that correct?

 2         A      That's correct.

 3         Q      When it's a sole-source contract, you're

 4    guaranteed the sale of it; is that correct?

 5         A      Yes.  Sole-source contract.

 6                MR. FUHR:  I'd like to move into evidence

 7    Government Exhibit 72, please.

 8                THE COURT:  Exhibit 72 will be received into

 9    evidence.

10           (Received into evidence Exhibit No. 72.)

11         Q      BY MR. FUHR:  Ms. Pearce, what is this document?

12         A      This is an e-mail from Dr. Chi to myself copied

13    to Dr. Guralp dated Monday, May 3rd, 2004.

14         Q      And directing your attention to the middle

15    paragraph, do you see where it says, "One, I ordered your

16    products not by open bidding but by private contract"?

17         A      Yes.

18         Q      Is that what you refer to as a sole-source

19    contract?

20         A      Yes.

21         Q      And further down in this document, the last

22    paragraph, "For the project of KOWACO dams, if possible, I have

23    tried to do the private contract instead of open bidding.

24    Right now I am expected to be official advisor of the project

25    to review whether the project is properly planned or not.
```

**UNITED STATES DISTRICT COURT**

```
 1    Hence, it will be procured to the desired direction."
 2               Do you see that?  Did I read that correctly?
 3        A     Yes, you did.
 4        Q     What is KOWACO?
 5        A     KOWACO, it may well be the electric company we
 6    were talking about before, but it is a different institution in
 7    Korea --
 8        Q     So it's --
 9        A     -- monitoring in dams.
10        Q     Sorry.  I interrupted you.  Can you say that
11    again?
12        A     It's an organization that has to seismically
13    monitor its dams.
14        Q     Is it an organization that bought its equipment
15    from companies like you?
16        A     From companies like ourselves, yes.
17        Q     And in this case, what is the defendant doing for
18    you here?
19        A     He is recommending our products to them.
20        Q     And what position does he have with respect to
21    this project?  What does he say he is about this project?
22        A     He says he is the official advisor.
23        Q     And what does he say he's going to do?  In which
24    direction is he going to move this project?
25        A     He's saying it will be procured to the desired
```

**UNITED STATES DISTRICT COURT**

1    direction which I understand to be from ourselves as an order.

2         Q      So that you would get the order; correct?

3         A      Yes.

4         Q      And what would he get in return?

5         A      He would get his technical advice fee.

6                MR. FUHR:  I would like to move into evidence

7    Exhibit 75, please.

8                THE COURT:  Exhibit 75 will be received into

9    evidence.

10         (Received into evidence Exhibit No. 75.)

11        Q      BY MR. FUHR:  Ms. Pearce, what is this document?

12        A      This is an e-mail from Dr. Chi to myself copied

13   to Dr. Guralp from Wednesday, July 7, 2004.

14        Q      Would you please read the fourth line in the last

15   paragraph.  It starts with "Gas Company."

16        A      "Gas Company also wanted to know whether I can

17   recommend the specification for open bidding."

18        Q      What is the Gas Company?

19        A      The Gas Company was the company I think that

20   piped gas or compressed gas around Korea.  So it had pipelines

21   and valve stations and things like this.

22        Q      So is it an entity in Korea that purchased

23   equipment from seismic companies like you?

24        A      Yes.

25        Q      Okay.  And then further in the same paragraph,

```
 1   does it say, "Hence, when I make a specification, it should be

 2   proper to Quanterra as well as Guralp, but other companies

 3   cannot be accepted by specification.  Quanterra systems are

 4   very, very expensive.  So if your system meets the

 5   specification, your company is guaranteed to get the bidding."

 6              Did I read that correctly?

 7   A     Yes, you did.

 8   Q     What is Quanterra?

 9   A     Quanterra is one of our competitors in the

10   seismic community.  They make seismic data loggers, very

11   high-end ones.

12   Q     And when the defendant is talking about, quote,

13   "making a specification," does that refer to the bidding

14   specifications that you described a minute ago?

15   A     I would understand that to mean the technical

16   specifications for the bid, yes.

17   Q     Relates to setting terms for the bidding;

18   correct?

19   A     Yes.

20              MR. FUHR:  I'd like to move Exhibit 111 into

21   evidence, please.

22              THE COURT:  111 will be received.

23        (Received into evidence Exhibit No. 111.)

24   Q     BY MR. FUHR:  If we can focus first on the --

25   sorry.
```

**UNITED STATES DISTRICT COURT**

1          What is this, Ms. Pearce?

2     A     This is an e-mail from Dr. Chi to myself dated

3 Monday, February 11, 2008.

4     Q     In the subject line, does that indicate that he's

5 forwarding you something?

6     A     Yes.  It indicates he's forwarding me another

7 e-mail.

8     Q     The letters "FW" stands for forwarding; is that

9 correct?

10    A     That is correct.

11    Q     Can we focus first on the other e-mail below.

12          Who sent the e-mail below?

13    A     The e-mail below was sent from Dr. Chi to a

14 person called Talhan Biro.

15    Q     Do you know who Talhan Biro is?

16    A     I actually do know who he is.  He was a

17 counterpart of mine who we competed with and also collaborated

18 with on other projects for a company called GeoSIG based in

19 Switzerland.

20    Q     GeoSIG, is that a competitor of your company?

21    A     Yes.  It is also a competitor.

22    Q     Directing your attention to the fourth paragraph

23 in that e-mail, take a look there.  It's the paragraph that

24 begins with "I checked the website."

25          Ms. Pearce, is it fair to say that the defendant

**UNITED STATES DISTRICT COURT**

```
 1    informed you here that GeoSIG won't be getting a bid or won't
 2    be participating in it?
 3         A     Yes.  This e-mail is pointing out how they are
 4    not compliant.
 5         Q     And so going back to the top of the e-mail, the
 6    defendant is forwarding that to you and writing, "Dear
 7    Mr. Nathan Pearce, before rejecting, I should have to follow
 8    some procedure.  This mail is one of that procedure.  Please
 9    keep it personally."
10               What do you understand the words "before
11    rejecting" refer to?
12               MR. KOURY:  I'm going to object, Your Honor,
13    calls for speculation.
14               THE COURT:  Overruled.
15               THE WITNESS:  Before he says that they are not
16    compliant and, therefore, would be rejected from the bid.
17         Q     BY MR. FUHR:  So in other words, is he -- before
18    rejecting GeoSIG; is that correct?
19         A     That is correct.
20         Q     Is this information that you otherwise would have
21    had at this point?
22         A     No, we would not have had it at this point.
23         Q     And how is having this information about a
24    competitor helpful to your company?
25         A     Well, it's helpful because now, instead of
```

**UNITED STATES DISTRICT COURT**

1    feeling we had lost, we now potentially would know that we may

2    win this project.  So again, we can help to get production

3    underway and perhaps also use this information in marketing

4    campaigns against a competitor.

5               MR. FUHR:  I'd like to move into evidence

6    Exhibit No. 113.

7               THE COURT:  All right.  113 will be received into

8    evidence.

9          (Received into evidence Exhibit No. 113.)

10   Q       BY MR. FUHR:  Ms. Pearce, what is this document?

11   A       This is an e-mail from Dr. Chi to myself also

12   copied back to Dr. Chi dated the 13th of February, 2008.

13   Q       Okay.  If we focus on the body of the document,

14   in the middle of the first page, do you see where it says, "I

15   need proper explanation to protect DCM --" can we highlight

16   that?  "I need proper explanation to protect DCM."

17   A       Uh-huh.

18   Q       What does DCM refer to?

19   A       DCM was one of our products, the data

20   communication module.  It was our specialized Linux-based

21   embedded system.

22   Q       And that's a system that --

23   A       That we manufactured.

24   Q       Okay.  And so below that here it refers again to

25   Dr. Biro.

**UNITED STATES DISTRICT COURT**

1              Do you see that?

2        A    Yes.

3        Q    So this is, again, the person from GeoSIG?

4        A    That's correct.

5        Q    Do you see where it says but in -- in boldface

6   letters, "But please remove any possibility for anyone to

7   criticize your systems."

8              Do you see that?

9        A    Yes.

10        Q    Below that, can you read the sentence below?

11        A    Uh-huh.  "I need your help in order to make your

12   system a standard one in Korea.  I also attached the catalog of

13   a new sensor of GeoSIG AC-73."

14        Q    And when Dr. Chi is asking for your help to make

15   the system a standard one in Korea, how is that helping your

16   company?

17        A    It will help us because, again, if our system is

18   a standard one, it means we are more likely to have increased

19   sales from Korea.

20              MR. FUHR:  I'd like to move into evidence

21   Exhibit 120.

22              THE COURT:  All right.  120 will be received.

23          (Received into evidence Exhibit No. 120.)

24        Q    BY MR. FUHR:  Ms. Pearce, what is this document?

25        A    This is an e-mail from Dr. Chi to myself copied

1    to Dr. Guralp dated Thursday, July 3, 2008.

2         Q      And you see in the third paragraph it refers to

3    KRC, Korea Rural Community and Agriculture Corporation.

4                Do you know what that entity is?

5         A      Just that they had some dams that needed

6    monitoring, but I'm aware of them as the agricultural company

7    in Korea.

8         Q      Do you understand from this that they had

9    300 dams in this instance?

10        A      Yes.

11        Q      And they would be ordering some systems?

12        A      They would be ordering some systems for

13   monitoring of them, yes.

14        Q      If you go below to the fourth paragraph, can you

15   read the line that begins with "As you knew."

16        A      "As you knew, my institute will be responsible

17   for inspection of seismic instruments by law.  Even now we

18   inspected and gave the certificate of acceptance of your

19   systems for gas company."

20        Q      And, again, the Gas Company I think we talked

21   about it a minute ago.  Is that a customer in Korea?

22        A      Yes.

23        Q      What does the defendant say about his own

24   institute here and its importance?

25        A      It's very important in inspecting and giving the

```
 1    acceptance certificates for the equipment.

 2         Q     And below there on the document, do you see -- do

 3    you see a table with some numbers?

 4         A     Yes.

 5         Q     And do you see the right-hand column?  What does

 6    it say?

 7         A     It says, "Advice fee."

 8         Q     And does this refer to the defendant's payments?

 9         A     Yes, it does.

10         Q     What's the total of the advice fee here?

11         A     The total in this case is 19,000 U.S. dollars.

12         Q     Is he calculating his advice fee based on the

13    orders that the company had received?

14         A     He is basing that, yes, on the orders that have

15    been delivered to Korea.

16         Q     Okay.  Would you go to the bottom of the

17    document, please.  The last line, can you read that -- the last

18    two lines?

19         A     "I want your confirmation, and whenever you have

20    any question, please reply to me separately.  Please do not

21    re-forward this mail to me for safety."

22               MR. FUHR:  The Government would like to move into

23    evidence Exhibit 137, please.

24               THE COURT:  All right.  Exhibit 137 will be

25    received.
```

1           (Received into evidence Exhibit No. 137.)

2           Q      BY MR. FUHR:  Ms. Pearce, what is this document?

3           A      This is an e-mail from Dr. Chi to myself copied

4    to Dr. Guralp from Friday, September the 11th, 2009.

5           Q      Directing your attention to the last paragraph in

6    this e-mail, does it say here, "Important," three exclamation

7    marks.  "I visited GeoSIG and met some key persons.  I have

8    something to discuss with you and Dr. Cansun to protect your

9    prevailed market in Korea from GeoSIG.  It is really

10   important."

11          Is that correct?  Did I read that correctly?

12          A      You did.  That is correct.

13          Q      Who is Dr. Cansun?  Who is he referring to here?

14          A      That is Dr. Cansun Guralp.

15          Q      And, again, GeoSIG is your competitor; correct?

16          A      That is correct.

17          Q      Was GeoSIG developing products that were going to

18   compete with Guralp in Korea?

19          A      Yes.  It was developing products to compete with

20   us in Korea and globally.

21          Q      And was Dr. Chi helping you to protect your

22   market share from GeoSIG?

23          A      Yes.

24          MR. FURH:  I'd like to move into evidence

25   Exhibit 154, please.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Exhibit 154 will be received.

2          (Received into evidence Exhibit No. 154.)

3     Q     BY MR. FUHR:  Ms. Pearce, what is this document?

4     A     This is an e-mail from Dr. Chi to myself copied

5  to Dr. Guralp from Tuesday, August 28, 2012.

6     Q     What's the subject line, Ms. Pearce?  What's the

7  subject line?

8     A     "Urgent warning."

9     Q     And if you direct your attention to near the end,

10 do you see the sentence that begins "Do not trust or believe"?

11    A     Yes.

12    Q     Would you please read that.

13    A     "Do not trust or believe GeoSIG and never mention

14 my name in any situation.  If possible, please delete some old

15 useless mails of mine."

16    Q     Again, this is your competitor GeoSIG; is that

17 correct?

18    A     Yes, that is correct.

19    Q     And he's giving you information about GeoSIG once

20 again?

21    A     Yes.

22    Q     And that's valuable for your company to have; is

23 that correct?

24    A     Yes.

25    Q     Now, Ms. Pearce, switching topics a little bit,

**UNITED STATES DISTRICT COURT**

1    in addition to these e-mails we just looked at, did the

2    defendant send you other e-mails over time that made you

3    uncomfortable about the payments to the defendant?

4          A      Yes.

5                 MR. FUHR:  I'd like to admit into evidence

6    Exhibit 89, please.

7                 THE COURT:  All right.  89 will be received.

8            (Received into evidence Exhibit No. 89.)

9          Q      BY MR. FUHR:  Ms. Pearce, what is this document?

10         A      This is an e-mail from Dr. Chi to myself dated

11   Thursday, 21st of April, 2005.

12         Q      What is the subject line?

13         A      "Previous e-mail."

14         Q      Directing your attention to the third line of the

15   e-mail, does it say here, "I tried to find it, but I could not

16   do it.  Usually I deleted almost all e-mail or papers related

17   to agent fee or advice fee because I am the director of

18   Earthquake Research Center and I am not allowed to be involved

19   in it."

20                Did I read that correctly?

21         A      Yes, you did.

22         Q      And what does the advice fee refer to here?  Are

23   those the payments to the defendant?

24         A      Yes, they are.

25                MR. FUHR:  Next I'd like to admit Exhibit 136

1    into evidence, please.

2                    THE COURT:  All right.  136 will be received.

3          (Received into evidence Exhibit No. 136.)

4        Q    BY MR. FUHR:  Ms. Pearce, what is this document?

5        A    This is an e-mail from Dr. Chi to myself copied

6    to Dr. Guralp from Tuesday, September 8, 2009.

7        Q    If you would focus on the second page, please.

8    If you can read the sentence that begins with "As you know."

9        A    "As you knew, due to my position and status, I

10   should not support any particular company privately, and my

11   members have not known the relationship between you and me.

12   Therefore, I will try to get some times with you and Dr. Cansun

13   separately from my group."

14       Q    Ms. Pearce, the reference to "my members," did

15   you understand that to be other KIGAM employees?

16       A    Yes, I do.

17       Q    And at this time, did Dr. Chi support your

18   company?

19       A    Yes.  He was promoting our company.

20                    MR. FUHR:  I'd like to move into evidence

21   Exhibit 141.

22                    THE COURT:  Exhibit 141 will be received.

23          (Received into evidence Exhibit No. 141.)

24       Q    BY MR. FUHR:  Ms. Pearce, what is this document?

25       A    This is an e-mail from Dr. Guralp to myself from

Tuesday, March 30th, 2010.

Q      Is this around the time -- just so that the jury
is oriented, 2010, is that around the time there was a
management change at your company?

A      Yes.  It went through on the last day of
March 2010.

Q      So if you go to the bottom of the first page,
please, where it begins with "Second," can you please read
that.

A      "Second, due to my position, I am not allowed to
participate in any activity of private companies, not only
investment but also any assistance officially."

Q      Okay.  If we can continue on the next page,
please, where it says, "Third," at the very top of the page.

A      "Third, the total of real estate and cash flow of
me and my family should be reported to government every year.
That is why I got the advice fee from you through the American
bank.  The cash flow between Heesong and me is really very
dangerous, and strictly it should be limited within very small
amount."

Q      And the American bank that was referenced here,
is it your understanding that that is the bank you paid the
defendant into?

A      That is correct.

Q      If you can focus on the very last line of this

1    e-mail or the last two lines of the e-mail, does it say there,

2    "Whenever you ask your colleagues to pay advice fee, please let

3    me know just by," quote, "'your request was processed' or by

4    any expression you want."

5              Did I read that correctly?

6         A    Yes, you did.

7         Q    Is the defendant asking you to conceal the advice

8    fees to him?

9              MR. KOURY:  I'm going to object as

10   mischaracterizing --

11             THE COURT:  Overruled.

12             THE WITNESS:  Yes.  He is asking me to use a

13   simple phrase, I guess.

14        Q    BY MR. FUHR:  It does not mention the word

15   "advice fee"; is that correct?

16        A    That is correct.

17             MR. FUHR:  Next I'd like to move into evidence

18   Government Exhibit 165, please.

19             THE COURT:  165 will be received.

20          (Received into evidence Exhibit No. 165.)

21        Q    BY MR. FUHR:  Ms. Pearce, what is this document?

22        A    This document is an e-mail from Dr. Chi to a

23   colleague of mine, Murray Mcgowan, which is then also copied to

24   myself, Dr. Guralp, and another engineer from Monday,

25   June 23rd, 2014.

**UNITED STATES DISTRICT COURT**

1       Q       So you are copied on this e-mail along with other

2    people?

3       A       Yes.

4       Q       Can you read the second line that begins with "I

5    am."

6       A       "I am a governmental officer, and I should not

7    have any contact with private company.  Moreover, it is illegal

8    to assist any company related to the test.  Moreover,

9    Dr. Park, Youngdo, might become unexpected danger to threaten

10   me."

11      Q       Ms. Pearce, you were at Guralp Systems during the

12   entire time frame that the defendant was paid by the company;

13   is that correct?

14      A       That is correct.

15      Q       And can you describe, generally, how sales did in

16   Korea during the time that you paid the defendant?  Was there a

17   trajectory?

18      A       Yeah.  I mean, when we started in probably the

19   early 2000s, we maybe sold 20-, $50,000 worth of equipment a

20   year.  By the end certainly 2014, '15, around that time, it was

21   around a million U.S. dollars.  So it grew substantially.

22      Q       Ms. Pearce, when was the last time that you saw

23   the defendant?

24      A       I last saw him in a meeting which was either

25   August or September 2015.

1    Q       And can you describe the circumstances of that

2    meeting?

3    A       I was actually leaving Guralp Systems at this

4    time, and during that meeting -- that was already starting

5    internal investigation within Guralp Systems at that time into

6    this advice fee and agreement.  The meeting present was

7    Mr. Chi, myself, and the then CEO at that time Dr. Potts.

8    Q       So there were three people present for the

9    meeting in September 2015; correct?

10   A       Correct.

11   Q       What, if anything, was the defendant told at that

12   meeting?

13   A       There were two things.  He was told at that

14   meeting, one, that I was leaving Guralp Systems after a long

15   period there.  And, secondly, Dr. Potts informed him that this

16   agreement was now over, there would be no more payments.

17   Q       Did he give a reason for that?

18   A       Dr. Potts gave him a reason that he believed this

19   was bribery and illegal.

20   Q       So did the defendant seem surprised at the

21   suggestion that it was illegal?

22              MR. KOURY:  I'm going to object, Your Honor.

23              THE COURT:  What's the objection?

24              MR. KOURY:  Calls for speculation.

25              THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

1          THE WITNESS:  I don't recall there being much

2   surprise.  It was just accepted that that was the decision.

3       Q    BY MR. FUHR:  Sorry.  That that was the decision?

4       A    Uh-huh.

5       Q    Did he fight or disagree with you?

6       A    I don't recall any fighting or disagreement.

7          MR. FUHR:  May I have a moment, Your Honor?

8          THE COURT:  Yes.

9          MR. FUHR:  Nothing further.

10          THE COURT:  All right.  Ladies and gentlemen,

11   we're going to take our second break of the day.  We're going

12   to have a change in court reporters; so we'll be in recess for

13   15 minutes.

14          (A recess was taken at 12:11 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1           CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5           I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15                         DATED THIS  13TH  DAY OF JULY, 2017.

16

17

18                         /S/ MIRANDA ALGORRI
                           _____
19                         MIRANDA ALGORRI, CSR NO. 12743, CRR
                           FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$1,000** [7] - 337:9, 343:2, 416:12, 427:23, 430:8, 430:12, 430:17
**$1,500** [1] - 366:25
**$10,000** [1] - 428:7
**$100,000** [1] - 327:16
**$11** [1] - 310:21
**$12** [2] - 311:6, 312:11
**$15,000** [2] - 358:23, 361:2
**$15,500** [1] - 362:24
**$192,500** [1] - 418:16
**$2,500** [1] - 416:11
**$21,100** [1] - 379:20
**$23,300** [1] - 363:6
**$237,325** [1] - 360:16
**$25,600** [1] - 375:10
**$28,800** [1] - 371:10
**$3,500** [3] - 418:15, 419:11, 430:11
**$3,900** [1] - 438:10
**$30,050** [1] - 378:5
**$34,500** [1] - 376:23
**$37,000** [1] - 326:21
**$40,000** [1] - 422:11
**$41,000** [1] - 428:8
**$41,850** [1] - 376:1
**$41,950** [2] - 374:3, 374:15
**$5,500** [1] - 434:10
**$50,000** [1] - 459:19
**$50,700** [1] - 377:2
**$500** [1] - 416:12
**$51,000** [1] - 428:7
**$65,450** [1] - 375:7
**$66,500** [2] - 380:17, 381:20
**$70,150** [1] - 371:13
**$8,000** [2] - 328:21, 328:24
**$9,000** [1] - 427:24
**$9,100** [1] - 370:4
**$91,400** [1] - 376:3

## '

**'09** [1] - 362:7
**'15** [1] - 459:20
**'78** [2] - 304:12, 304:14
**'81** [1] - 304:18
**'85** [1] - 304:19
**'90S** [1] - 407:25
**'92** [1] - 305:2
**'94** [2] - 305:5, 305:8
**'95** [1] - 408:2
**'99** [2] - 305:8, 305:20
**'YOUR** [1] - 458:3

## /

**/S** [1] - 462:18

## 0

**07-09-08** [1] - 337:7
**07024** [1] - 429:10

## 1

**1** [9] - 327:1, 334:22, 362:10, 364:11, 364:12, 375:21, 395:1, 423:20, 423:23
**1,000** [4] - 337:9, 337:10, 366:25, 367:4
**1,500** [1] - 367:4
**10** [2] - 326:23, 418:12
**10,000** [1] - 422:15
**10/1/11** [1] - 374:11
**100** [4] - 408:6, 421:8, 421:13, 421:15
**100,170** [1] - 369:23
**105** [4] - 298:17, 421:23, 421:24, 422:1
**106** [4] - 298:18, 426:17, 426:18, 426:19
**107-50** [1] - 296:14
**108** [4] - 298:19, 435:9, 435:10, 435:12
**10:37** [1] - 405:7
**10TH** [1] - 429:23
**11** [4] - 326:21, 337:8, 337:10, 447:3
**11,000** [2] - 326:21, 337:10
**111** [4] - 298:20, 446:20, 446:22, 446:23
**113** [4] - 298:21, 449:6, 449:7, 449:9
**115** [8] - 298:22, 326:1, 326:6, 326:11, 326:13, 337:1, 368:12, 382:2
**11TH** [2] - 425:23, 453:4
**12** [12] - 295:13, 297:3, 298:3, 299:3, 300:3, 301:1, 312:24, 353:9, 356:2, 357:9, 357:10, 437:2
**120** [5] - 298:23, 408:6, 450:21, 450:22, 450:23
**1265** [1] - 429:9
**12743** [2] - 295:23, 462:19
**12:11** [1] - 461:14
**13** [1] - 358:3
**136** [4] - 298:24, 455:25, 456:2, 456:3
**137** [4] - 298:25, 452:23, 452:24, 453:1
**139** [4] - 299:6, 418:3, 418:5, 418:9

**13TH** [1] - 449:12
**13TH** [1] - 462:15
**14** [1] - 408:3
**1400** [1] - 296:9
**141** [4] - 299:7, 456:21, 456:22, 456:23
**144** [4] - 299:8, 332:20, 332:23, 332:25
**15** [6] - 350:5, 351:20, 362:20, 391:19, 405:6, 461:13
**15,000** [1] - 358:19
**154** [4] - 299:9, 453:25, 454:1, 454:2
**157** [4] - 299:10, 420:1, 420:3, 420:5
**15TH** [1] - 429:9
**16-00824-JFW** [1] - 295:7
**165** [4] - 299:11, 458:18, 458:19, 458:20
**18** [3] - 310:8, 311:3, 433:4
**19** [2] - 334:17, 427:7
**19,000** [1] - 452:11
**1981** [1] - 304:16
**1986** [1] - 304:22
**1987** [2] - 304:23, 304:24
**1990S** [1] - 408:8
**1991** [1] - 386:20
**1995** [1] - 407:4
**1997** [1] - 407:6
**1ST** [1] - 295:24
**1ST** [1] - 371:3

## 2

**2** [6] - 295:13, 334:25, 337:9, 404:8, 424:7, 439:8
**20** [7] - 309:10, 313:5, 313:6, 313:8, 373:18, 392:4, 459:19
**20005** [1] - 296:10
**2000S** [2] - 409:3, 459:19
**2001** [2] - 305:20, 306:8
**2003** [12] - 323:7, 325:11, 334:17, 412:10, 413:19, 415:1, 415:18, 415:24, 417:11, 417:19, 437:2, 438:7
**2004** [3] - 423:17, 443:13, 445:13
**2005** [7] - 348:18, 386:21, 425:15, 425:23, 433:4, 439:7, 455:11
**2006** [2] - 306:21, 318:9
**2007** [4] - 326:22, 422:4, 426:22, 435:15
**2008** [8] - 326:18, 342:15, 362:10, 363:5, 363:9, 447:3, 449:12, 451:1
**2009** [15] - 350:3, 350:16, 362:9, 362:10, 362:11,

**363:5, 363:9, 364:11, 364:15, 366:11, 391:17, 395:3, 418:12, 453:4, 456:6
**2010** [23] - 306:21, 309:1, 309:20, 317:22, 326:23, 330:6, 330:11, 371:3, 372:4, 373:17, 374:3, 374:6, 407:7, 407:8, 408:4, 408:10, 408:13, 428:18, 428:22, 428:24, 457:1, 457:3, 457:6
**2011** [6] - 319:14, 333:3, 371:4, 407:9, 428:18, 430:14
**2012** [8] - 373:18, 374:3, 374:6, 374:12, 374:25, 429:23, 454:5
**2013** [6] - 299:20, 330:7, 374:23, 375:1, 420:8, 421:16
**2014** [11] - 309:21, 329:3, 329:6, 330:8, 349:2, 349:9, 354:1, 375:21, 393:5, 458:25, 459:20
**2015** [23] - 309:20, 309:22, 310:2, 318:22, 319:1, 336:7, 337:25, 338:5, 344:16, 345:16, 350:16, 375:19, 375:22, 378:3, 380:11, 398:22, 400:21, 407:10, 408:5, 417:11, 417:19, 459:25, 460:9
**2016** [4] - 311:3, 325:11, 350:3, 391:17
**2017** [7] - 295:13, 297:3, 298:3, 299:3, 300:3, 301:1, 462:15
**202** [5] - 299:12, 363:21, 363:23, 363:24, 396:21
**203** [4] - 299:13, 365:20, 365:22, 365:24
**21** [1] - 423:17
**211** [6] - 299:14, 361:15, 361:17, 361:19, 394:22, 395:1
**214** [7] - 299:15, 363:15, 363:16, 363:18, 363:20, 371:17, 371:19
**217** [9] - 299:16, 367:13, 367:15, 367:17, 367:18, 370:14, 370:16, 401:15, 404:4
**21ST** [1] - 455:11
**222** [4] - 299:17, 370:18, 370:21, 370:23
**224** [5] - 299:18, 355:11, 355:12, 355:14, 355:16
**225** [4] - 299:19, 373:7, 373:9, 373:11
**23** [2] - 310:11, 434:13
**23,300** [1] - 363:1
**230** [5] - 296:17, 299:20, 374:19, 374:20, 374:21

**234** [1] - 296:17
**238** [5] - 299:21, 375:13, 375:14, 375:16, 400:13
**23RD** [1] - 458:25
**24-BIT** [1] - 427:10
**240** [4] - 299:22, 380:3, 380:5, 380:7
**241** [4] - 299:23, 381:9, 381:14, 381:16
**242** [4] - 299:24, 379:10, 379:12, 379:14
**247** [4] - 299:25, 376:7, 376:9, 376:11
**25** [1] - 357:9
**255** [10] - 300:6, 353:3, 353:5, 353:7, 353:9, 356:2, 357:9, 359:13, 360:7, 390:20
**256** [4] - 300:7, 377:15, 377:17, 377:19
**25TH** [3] - 326:18, 426:22, 439:7
**26** [2] - 430:6, 435:15
**27** [1] - 333:3
**28** [2] - 454:5, 462:8
**29** [1] - 420:8
**29,000** [1] - 328:22
**295** [1] - 295:8

### 3

**3** [13] - 295:8, 297:3, 298:3, 299:3, 300:3, 326:25, 335:3, 337:8, 337:9, 367:4, 368:2, 451:1
**3,000** [1] - 421:7
**30** [12] - 308:13, 308:25, 351:5, 362:9, 362:10, 362:11, 393:21, 415:1, 421:7, 421:8, 421:13, 421:15
**300** [1] - 451:9
**302** [1] - 297:9
**304** [1] - 300:8
**30TH** [1] - 457:1
**31** [1] - 422:4
**312** [1] - 296:6
**31ST** [1] - 438:7
**32,500** [1] - 363:8
**326** [1] - 298:22
**330** [1] - 297:10
**332** [1] - 299:8
**334** [1] - 298:7
**340343** [3] - 353:21, 359:22, 378:19
**342** [1] - 297:10
**3435** [1] - 296:13
**347** [1] - 297:13
**350** [1] - 295:24
**350052** [1] - 380:20
**353** [1] - 300:6
**355** [1] - 299:18

**361** [1] - 299:14
**363** [2] - 299:12, 299:15
**365** [1] - 299:13
**367** [1] - 299:16
**37** [1] - 392:1
**37,000** [2] - 327:3, 328:15
**370** [1] - 299:17
**373** [1] - 299:19
**374** [1] - 299:20
**375** [1] - 299:21
**376** [1] - 299:25
**377** [1] - 300:7
**379** [1] - 299:24
**380** [1] - 299:22
**381** [1] - 299:23
**382** [1] - 297:13
**385** [1] - 300:9
**3RD** [1] - 443:13

### 4

**4** [7] - 311:24, 326:23, 326:24, 326:25, 335:7, 415:14, 436:10
**400** [1] - 297:14
**402** [1] - 297:14
**406** [1] - 297:17
**414** [1] - 298:9
**418** [1] - 299:6
**420** [1] - 299:10
**422** [1] - 298:17
**423** [1] - 298:12
**425** [1] - 298:13
**426** [1] - 298:18
**433** [1] - 298:14
**435** [1] - 298:19
**436** [1] - 298:6
**438** [1] - 298:8
**439** [1] - 298:16
**443** [1] - 298:10
**445** [1] - 298:11
**4455** [1] - 295:24
**446** [1] - 298:20
**449** [1] - 298:21
**450** [1] - 298:23
**453** [1] - 298:25
**454** [1] - 299:9
**455** [1] - 298:15
**456** [2] - 298:24, 299:7
**458** [1] - 299:11
**462** [1] - 295:8
**49,450** [1] - 373:25
**4D2** [1] - 337:7
**4TH** [3] - 413:19, 415:18, 415:24

### 5

**5** [2] - 335:9, 351:20

**5,500** [1] - 434:12
**50** [1] - 327:15
**504** [5] - 300:8, 302:17, 302:20, 304:2, 304:9
**52** [3] - 359:13, 412:14, 413:21
**521** [8] - 300:9, 384:13, 384:15, 384:17, 385:6, 385:10, 385:12, 388:10
**53** [3] - 360:8, 413:12, 415:16
**536** [1] - 310:24
**55** [6] - 349:21, 418:15, 419:5, 419:9
**57** [1] - 429:3
**58** [1] - 356:15
**5T** [2] - 337:8, 427:11
**5T'S** [1] - 427:21
**5TH** [4] - 364:12, 378:3, 415:14, 415:24

### 6

**6** [13] - 311:16, 311:19, 311:22, 326:25, 327:1, 341:19, 354:1, 423:20, 423:24, 425:1, 425:5, 425:14, 426:3
**60** [2] - 392:24, 393:2
**61** [4] - 298:6, 436:22, 436:23, 436:24
**62** [5] - 298:7, 334:9, 334:10, 334:12, 334:14
**65** [5] - 298:8, 408:4, 438:2, 438:3, 438:4

### 7

**7** [3] - 333:19, 337:25, 445:13
**70** [4] - 298:9, 414:19, 414:21, 414:23
**72** [4] - 298:10, 443:7, 443:8, 443:10
**75** [4] - 298:11, 445:7, 445:8, 445:10
**753** [1] - 462:8

### 8

**8** [3] - 326:18, 326:22, 456:6
**8-284** [1] - 296:20
**80** [4] - 298:12, 423:11, 423:12, 423:14
**800** [1] - 296:20
**82-11-437-1011** [2] - 356:11, 357:5
**82-42** [1] - 357:5
**87** [4] - 298:13, 425:17,

**425:18, 425:20**
**88** [4] - 298:14, 432:22, 432:24, 433:1
**89** [4] - 298:15, 455:6, 455:7, 455:8
**8:19** [2] - 295:14, 301:2

### 9

**9** [2] - 340:8, 342:15
**9-K** [1] - 429:9
**9.2** [4] - 310:14, 310:18, 311:6
**9.7** [1] - 341:2
**9/11** [1] - 306:9
**90012** [2] - 295:24, 296:7
**90277** [1] - 296:21
**90405** [1] - 296:14
**91101** [1] - 296:18
**97** [4] - 298:16, 439:1, 439:2, 439:4

### A

**A.M** [1] - 405:7
**A.M** [2] - 295:14, 301:2
**ABIDING** [1] - 399:23
**ABILITY** [1] - 341:14
**ABLE** [9] - 301:10, 324:24, 340:11, 340:21, 431:5, 431:8, 431:12, 432:2, 436:7
**ABOVE** [1] - 462:11
**ABOVE-ENTITLED** [1] - 462:11
**ABSOLUTELY** [1] - 332:3
**AC-73** [1] - 450:13
**ACCELEROMETER** [2] - 419:1, 427:12
**ACCEPTANCE** [3] - 334:19, 451:18, 452:1
**ACCEPTED** [4] - 439:11, 439:19, 446:3, 461:2
**ACCORDING** [1] - 430:20
**ACCOUNT** [25] - 328:22, 361:25, 367:4, 367:23, 368:11, 368:16, 368:17, 398:18, 398:20, 401:14, 402:15, 404:17, 404:24, 421:19, 422:25, 423:4, 425:7, 425:9, 428:9, 428:10, 428:11, 429:16, 429:18, 430:21, 440:18
**ACCOUNTANCY** [2] - 383:10, 383:11
**ACCOUNTANT** [6] - 347:20, 377:12, 383:2, 383:4, 394:15, 398:24
**ACCOUNTED** [1] - 364:22
**ACCOUNTING** [1] - 376:22
**ACCOUNTING** [16] -

347:19, 358:25, 359:3, 359:8, 359:10, 361:11, 377:11, 377:23, 380:10, 380:23, 382:22, 388:25, 389:1, 389:2, 391:3
**ACCOUNTS** [2] - 318:3, 399:13
**ACCRUAL** [4] - 363:1, 363:3, 400:25, 403:2
**ACCRUE** [1] - 370:2
**ACCRUED** [8] - 310:20, 361:4, 363:6, 370:10, 371:13, 374:2, 375:9, 376:3
**ACCURATE** [2] - 340:19, 396:2
**ACCURATELY** [1] - 314:16
**ACQUIRED** [1] - 386:18
**ACQUISITION** [1] - 341:7
**ACRONYMS** [1] - 409:12
**ACT** [2] - 342:7, 342:8
**ACTING** [1] - 296:4
**ACTION** [1] - 315:13
**ACTIVE** [1] - 338:16
**ACTIVELY** [1] - 412:25
**ACTIVITIES** [2] - 349:6, 351:12
**ACTIVITY** [6] - 313:15, 316:6, 362:10, 367:24, 399:17, 457:11
**ACTUAL** [2] - 396:13, 433:23
**ADD** [1] - 327:5
**ADDED** [1] - 376:18
**ADDING** [1] - 336:22
**ADDITION** [3] - 410:23, 431:10, 455:1
**ADDITIONAL** [1] - 342:10
**ADDITIONALLY** [1] - 331:20
**ADDRESS** [5] - 368:11, 368:12, 368:16, 382:1, 429:7
**ADMIN** [1] - 376:19
**ADMINISTRATION** [1] - 334:25
**ADMINISTRATIVE** [2] - 398:3, 442:4
**ADMINISTRATOR** [2] - 376:15, 398:8
**ADMISSION** [1] - 385:6
**ADMIT** [13] - 304:1, 311:9, 367:14, 367:15, 373:7, 374:18, 375:13, 376:7, 414:19, 435:8, 436:21, 455:5, 455:25
**ADMITTED** [12] - 304:7, 311:9, 326:3, 337:2, 367:14, 367:15, 367:17, 375:15, 412:13, 413:11, 418:8, 429:2
**ADVANCE** [2] - 432:6, 433:20

**ADVICE** [2] - 418:14, 452:7
**ADVICE** [68] - 321:15, 321:25, 323:1, 323:6, 326:21, 328:4, 328:15, 328:20, 328:24, 334:6, 334:20, 335:25, 336:7, 336:8, 336:9, 336:12, 336:16, 336:19, 336:22, 337:5, 337:9, 337:13, 342:18, 344:13, 344:23, 345:1, 345:14, 345:20, 345:24, 355:20, 365:15, 366:24, 396:25, 397:4, 397:19, 414:17, 416:5, 416:6, 416:10, 416:12, 416:15, 419:3, 419:11, 421:8, 422:9, 425:8, 427:5, 427:17, 427:23, 428:6, 428:25, 429:6, 430:10, 430:15, 434:19, 437:25, 438:9, 445:5, 452:10, 452:12, 455:17, 455:22, 457:17, 458:2, 458:7, 458:15, 460:6
**ADVISE** [2] - 431:8, 432:2
**ADVISED** [1] - 323:10
**ADVISOR** [2] - 443:24, 444:22
**AFFILIATED** [2] - 303:7, 331:3
**AFFILIATION** [1] - 330:23
**AFTAC** [4] - 335:10, 335:15, 335:16, 437:9
**AFTERWARDS** [1] - 427:20
**AGENCIES** [1] - 303:13
**AGENCY** [5] - 320:16, 320:19, 320:21, 383:7, 383:8
**AGENT** [3] - 320:3, 343:24, 376:23
**AGENT** [2] - 303:21, 303:22, 425:9, 455:17
**AGO** [13] - 303:21, 319:14, 320:4, 320:15, 389:4, 413:21, 415:16, 419:13, 426:14, 428:11, 430:10, 446:14, 451:21
**AGREE** [5] - 302:8, 302:11, 308:12, 394:19, 437:10
**AGREED** [2] - 416:7, 437:7
**AGREEMENT** [22] - 313:11, 321:9, 389:22, 400:25, 403:8, 403:19, 408:17, 412:12, 412:15, 412:16, 412:20, 413:5, 413:9, 413:20, 413:21, 414:7, 414:9, 419:18, 437:15, 460:6, 460:16
**AGREEMENT** [1] - 300:8
**AGREEMENTS** [10] - 303:1, 387:4, 403:3, 403:6, 403:11,

403:15, 403:21, 403:25, 414:5
**AGRICULTURAL** [1] - 451:6
**AGRICULTURE** [1] - 451:3
**AGU** [3] - 345:2, 345:4, 345:15
**AHEAD** [1] - 434:4
**AIR** [1] - 335:16
**ALERT** [1] - 393:8
**ALGORRI** [4] - 295:23, 462:5, 462:18, 462:19
**ALLEGATION** [1] - 316:23
**ALLEGATIONS** [1] - 316:25
**ALLOW** [1] - 409:21
**ALLOWED** [2] - 455:18, 457:10
**ALLOWS** [1] - 438:24
**ALMOST** [2] - 321:12, 455:16
**AMERICA** [10] - 368:10, 398:18, 398:20, 399:1, 404:20, 423:6, 425:8, 428:9, 429:10, 429:16
**AMERICA** [1] - 295:5
**AMERICAN** [3] - 401:14, 457:17, 457:21
**AMOUNT** [16] - 310:16, 312:23, 325:10, 363:8, 374:2, 375:9, 377:6, 378:4, 379:20, 380:16, 381:20, 397:25, 416:13, 419:3, 433:11, 457:20
**AMOUNTS** [4] - 361:12, 365:9, 392:13, 418:17
**AND** [3] - 462:6, 462:9, 462:11
**ANDRA** [2] - 297:16, 406:16
**ANDRA** [2] - 406:16, 406:18
**ANDREW** [11] - 309:19, 309:23, 310:2, 310:4, 311:22, 322:25, 330:1, 330:2, 330:4, 330:9
**ANGELES** [3] - 295:14, 295:24, 301:1
**ANGELES** [1] - 296:7
**ANNA** [1] - 296:9
**ANSWER** [1] - 340:16
**ANTICIPATE** [1] - 405:19
**ANTIQUATED** [1] - 313:25
**APOLOGIES** [1] - 370:17
**APOLOGIZE** [2] - 305:23, 313:20
**APPEAR** [1] - 429:25
**APPEARANCES** [1] - 296:1
**APPLICANT** [1] - 355:24
**APPLICATIONS** [1] - 335:16
**APPLIED** [1] - 369:25
**APPLYING** [1] - 442:13

**APPROACHED** [1] - 344:12
**APPROACHING** [1] - 344:12
**APPROPRIATELY** [1] - 327:23
**APPROVAL** [1] - 381:7
**APPROVED** [2] - 329:11, 329:21
**APPROXIMATE** [1] - 349:9
**APPROXIMATION** [1] - 393:2
**APRIL** [4] - 420:8, 421:7, 427:7, 455:11
**AREA** [2] - 302:25, 306:10
**AREAS** [2] - 324:24, 402:20
**ARRANGE** [1] - 419:23
**ARRANGEMENT** [2] - 344:18, 344:23
**ARRANGEMENTS** [1] - 321:22
**ARRIVE** [2] - 327:11, 442:22
**ARRIVED** [2] - 327:21, 398:12
**ARRIVES** [1] - 327:8
**ART** [1] - 313:12
**ASSESS** [1] - 325:5
**ASSESSING** [1] - 325:8
**ASSET** [2] - 306:18, 307:11
**ASSIGNED** [1] - 354:20
**ASSIST** [2] - 316:16, 459:8
**ASSISTANCE** [2] - 328:21, 457:12
**ASSISTANT** [1] - 296:5
**ASSISTING** [3] - 343:5, 438:21, 438:22
**ASSOCIATED** [1] - 336:5
**ASSUME** [1] - 308:21
**ASSURANCES** [1] - 338:21
**ASSY** [1] - 357:16
**ATTACHED** [2] - 403:1, 450:12
**ATTACK** [1] - 310:4
**ATTEND** [2] - 388:11, 388:19
**ATTENDED** [2] - 347:18, 388:24
**ATTENTION** [42] - 333:2, 334:15, 337:1, 337:2, 353:9, 355:17, 356:1, 356:14, 358:16, 359:12, 359:13, 361:14, 361:20, 363:14, 367:20, 370:13, 370:25, 371:6, 371:25, 373:13, 374:7, 376:12, 380:9, 381:15, 400:13, 401:14, 401:16, 412:15, 413:15, 416:2, 418:13, 422:7, 423:18, 433:5, 437:3, 438:16, 439:8, 443:14,

447:22, 453:5, 454:9, 455:14
**ATTORNEY** [2] - 296:4, 296:5
**ATTRIBUTABLE** [1] - 349:20
**AUGUST** [3] - 318:22, 454:5, 459:25
**AUTHORITIES** [9] - 315:4, 315:7, 315:24, 337:17, 338:4, 338:12, 341:23, 341:25, 342:8
**AUTHORITY** [2] - 425:25, 426:11
**AUTHORITY** [4] - 338:13, 339:9, 339:12, 339:25
**AUTHORIZED** [1] - 382:11
**AVAILABILITY** [1] - 372:24
**AVAILABLE** [4] - 361:10, 372:23, 373:1, 440:20
**AVENUE** [1] - 296:9
**AWARDED** [2] - 352:20, 442:9
**AWARE** [10] - 322:17, 323:15, 327:20, 388:18, 389:19, 391:2, 414:13, 428:20, 432:3, 451:6

## B

**BACKED** [2] - 306:23, 307:20
**BACKGROUND** [2] - 304:11, 347:17
**BAD** [11] - 312:9, 313:12, 313:14, 313:18, 314:2, 314:5, 316:21, 317:5, 317:20, 317:21
**BALANCE** [5] - 362:22, 363:11, 371:10, 373:24, 375:6, 376:1
**BALDING** [1] - 384:23
**BAN** [2] - 331:17, 410:25
**BANK** [28] - 354:11, 354:12, 355:21, 368:15, 368:17, 382:1, 401:14, 401:25, 402:9, 402:15, 404:4, 404:17, 404:20, 404:24, 417:25, 421:19, 422:24, 423:4, 425:7, 425:9, 428:9, 428:10, 428:11, 429:16, 430:21, 457:18, 457:21, 457:22
**BANK** [7] - 368:10, 398:18, 398:20, 398:25, 402:2, 404:20, 429:16
**BANKS** [1] - 306:18
**BARBARA** [3] - 366:4, 366:5, 366:6
**BASE** [1] - 369:24
**BASED** [12] - 324:23,

333:23, 339:20, 348:2, 396:13, 397:24, 418:23, 423:7, 424:3, 447:18, 449:20, 452:12
**BASING** [1] - 452:14
**BASIS** [3] - 329:4, 329:7, 351:14
**BEACH** [2] - 296:21, 347:18
**BECAME** [1] - 330:7
**BECOME** [4] - 361:9, 390:2, 437:15, 459:9
**BECOMES** [1] - 344:5
**BEDNARSKI** [17] - 296:15, 296:16, 355:13, 382:18, 384:16, 385:5, 385:13, 390:1, 392:21, 393:8, 393:12, 393:15, 394:24, 400:1, 402:20, 402:24, 405:1
**BEDNARSKI** [4] - 297:13, 297:14, 400:11, 401:13
**BEGAN** [4] - 386:25, 408:8, 408:9, 428:15
**BEGINNING** [11] - 309:21, 309:22, 330:7, 362:21, 371:10, 373:24, 375:6, 375:25, 398:21, 416:3, 422:8
**BEGINS** [10] - 416:3, 433:6, 434:10, 437:4, 447:24, 451:15, 454:10, 456:8, 457:8, 459:4
**BEHALF** [4] - 319:10, 352:4, 355:23, 413:6
**BEHIND** [1] - 333:9
**BEINER** [4] - 400:16, 400:19, 403:1, 404:1
**BEINER** [1] - 400:17
**BELIEF** [1] - 346:1
**BELL** [12] - 309:19, 309:23, 310:2, 310:4, 311:22, 322:25, 329:25, 330:1, 330:2, 330:4, 330:9
**BELONGS** [1] - 437:10
**BELOW** [1] - 354:2, 354:15, 359:19, 365:1, 365:8, 365:14, 367:3, 416:4, 416:21, 421:1, 425:2, 425:6, 428:5, 447:11, 447:12, 447:13, 449:24, 450:10, 451:14, 452:2
**BENEFICIAL** [3] - 433:16, 440:1, 442:17
**BENEFICIARY** [3] - 378:6, 380:13, 381:23
**BENEFIT** [1] - 437:18
**BETTER** [5] - 302:9, 302:12, 390:10, 417:15, 441:11
**BETWEEN** [16] - 325:11, 329:4, 341:3, 341:13, 350:3, 351:19, 386:6, 408:5,

408:17, 413:13, 414:2, 416:7, 427:16, 434:18, 456:11, 457:18
**BID** [10] - 307:19, 424:24, 432:8, 436:8, 440:18, 442:7, 442:23, 446:16, 448:1, 448:16
**BIDDER** [1] - 307:20
**BIDDING** [12] - 435:19, 435:24, 436:6, 441:6, 441:20, 442:8, 443:16, 443:23, 445:17, 446:5, 446:13, 446:17
**BIDS** [6] - 431:17, 431:24, 432:2, 441:5, 441:14, 441:18
**BIG** [1] - 382:22
**BILL** [2] - 355:6, 389:5
**BILLED** [1] - 355:7
**BILLING** [1] - 360:19
**BILLS** [4] - 388:15, 421:8, 421:13, 421:15
**BINDER** [2] - 325:23, 429:20
**BIRO** [3] - 447:14, 447:15, 449:25
**BIT** [12] - 312:16, 314:7, 320:25, 332:15, 344:21, 352:14, 384:23, 396:23, 404:10, 404:11, 430:23, 454:25
**BITCOIN** [2] - 305:17, 305:19
**BITS** [1] - 442:4
**BLACK** [1] - 318:9
**BLAZER** [2] - 384:22, 385:14
**BLOW** [1] - 401:20
**BOA** [1] - 367:5
**BOARD** [2] - 383:10, 383:11
**BODY** [4] - 364:20, 366:15, 429:24, 449:13
**BOLDFACE** [1] - 450:5
**BOND** [1] - 376:19
**BOOK** [3] - 384:10, 390:21, 396:22
**BOOKING** [2] - 306:2, 352:25
**BOREHOLE** [6] - 334:22, 335:1, 335:10, 386:11, 386:15, 437:7
**BOTTOM** [18] - 357:10, 360:8, 360:15, 362:12, 371:6, 371:25, 376:13, 378:8, 379:23, 380:18, 396:23, 400:24, 416:2, 420:20, 421:5, 429:14, 452:16, 457:7
**BOUGHT** [3] - 306:24, 307:16, 444:14

**BOULEVARD** [4] - 296:13, 296:17, 368:12, 382:2
**BOX** [4] - 328:16, 337:3, 354:14, 355:6
**BRACKETS** [1] - 427:20
**BRANCH** [1] - 402:2
**BREAK** [3] - 393:9, 393:14, 461:11
**BRIBE** [1] - 346:11
**BRIBERY** [3] - 346:6, 346:10, 460:19
**BRIEFLY** [3] - 407:1, 427:1, 441:5
**BRING** [1] - 393:15
**BRITISH** [5] - 313:20, 315:4, 315:7, 315:23, 416:18
**BROADBAND** [2] - 334:22, 358:9
**BROADBAND** [1] - 372:15
**BROADER** [1] - 314:17
**BROKE** [1] - 326:21
**BROKEN** [1] - 343:16
**BROWN** [1] - 296:4
**BUCKETS** [1] - 432:20
**BUILD** [2] - 433:19, 433:23
**BUILT** [2] - 306:2, 336:10
**BUSINESS** [16] - 302:22, 303:4, 304:1, 305:5, 306:25, 307:1, 308:10, 308:25, 315:21, 328:1, 339:1, 339:19, 356:21, 356:25, 357:4, 408:10
**BUSINESSES** [1] - 305:25
**BUSY** [1] - 419:20
**BUYING** [1] - 307:7
**BUYOUT** [3] - 306:22, 307:19, 307:20
**BY** [84] - 296:5, 296:8, 296:9, 296:13, 296:16, 296:16, 296:19, 302:4, 304:10, 311:13, 321:21, 323:14, 323:23, 330:19, 333:1, 334:15, 338:20, 339:8, 339:15, 339:19, 339:24, 340:5, 340:16, 340:20, 341:17, 342:13, 347:14, 353:8, 355:17, 361:20, 363:25, 365:25, 367:19, 370:24, 371:21, 373:12, 374:22, 376:12, 377:20, 379:15, 380:8, 381:15, 382:18, 390:1, 392:21, 400:10, 402:24, 406:21, 409:22, 410:19, 414:24, 417:8, 417:17, 418:10, 420:6, 422:2, 423:15, 425:21, 426:20, 431:24, 432:19, 433:2, 434:5, 435:13, 436:25, 438:5, 439:5, 441:4, 441:13,

442:8, 443:11, 445:11, 446:24, 448:17, 449:10, 450:24, 453:2, 454:3, 455:9, 456:4, 456:24, 458:14, 458:21, 461:3

## C

CAL [1] - 347:18
CALCULATED [3] - 418:24, 422:9, 430:15
CALCULATES [1] - 365:14
CALCULATING [1] - 452:12
CALIFORNIA [5] - 295:2, 295:14, 295:24, 301:1, 462:7
CALIFORNIA [9] - 296:7, 296:14, 296:18, 296:21, 368:13, 382:2, 383:9, 402:15, 429:17
CAMPAIGNS [1] - 449:4
CANADA [1] - 350:8
CANCELED [3] - 306:11, 312:11, 312:18
CANNOT [6] - 333:6, 436:1, 436:3, 437:14, 446:3
CANSUN [31] - 303:18, 308:23, 310:8, 310:13, 311:2, 314:10, 316:20, 316:24, 317:4, 317:13, 317:16, 317:18, 317:19, 323:4, 323:5, 329:11, 334:1, 334:17, 340:8, 340:11, 340:21, 341:2, 341:9, 341:11, 408:10, 415:6, 415:7, 453:8, 453:13, 453:14, 456:12
CANSUN'S [1] - 341:14
CAPABILITY [1] - 328:6
CAPACITY [1] - 349:10
CAPITAL [6] - 306:21, 306:23, 307:17, 308:3, 310:7, 341:6
CAPITAL [2] - 315:18, 315:19
CARD [5] - 305:9, 305:10, 356:21, 356:25, 357:4
CARDS [2] - 305:15
CAREFULLY [4] - 313:11, 327:11, 327:13, 327:14
CARRY [1] - 345:23
CASE [1] - 295:6
CASE [22] - 312:19, 312:21, 315:5, 317:1, 319:20, 319:23, 359:22, 360:16, 361:8, 370:9, 378:2, 379:4, 380:11, 397:10, 402:14, 419:4, 419:7, 419:11, 430:5, 430:14, 444:17, 452:11
CASES [2] - 315:20, 433:19
CASH [11] - 305:16, 305:18,

315:19, 341:14, 417:24, 419:14, 419:16, 419:23, 421:19, 457:15, 457:18
CATALOG [1] - 450:12
CENTER [5] - 335:17, 357:14, 411:3, 431:5, 455:18
CENTER [1] - 411:1
CENTRAL [2] - 295:2, 462:7
CENTRALIZED [1] - 389:4
CEO [11] - 306:24, 308:10, 309:20, 309:21, 309:23, 310:2, 311:14, 317:24, 330:5, 330:7, 460:7
CERTAIN [4] - 313:10, 345:11, 383:8, 431:17
CERTAINLY [8] - 302:10, 320:5, 322:8, 322:15, 325:7, 327:5, 327:25, 459:20
CERTIFICATE [1] - 462:1
CERTIFICATE [4] - 431:16, 435:17, 436:1, 451:18
CERTIFICATES [1] - 452:1
CERTIFICATION [3] - 431:15, 431:19, 442:5
CERTIFIED [1] - 296:22
CERTIFIED [4] - 347:20, 383:2, 383:4, 431:2
CERTIFY [1] - 462:7
CERTIFYING [1] - 410:3
CFO [2] - 319:6, 330:6, 349:2, 349:4, 349:25, 389:3, 393:6, 400:20
CHAIN [2] - 420:9, 420:10
CHANGE [7] - 320:14, 407:9, 428:20, 428:22, 438:19, 457:4, 461:12
CHANGED [2] - 408:4, 432:5
CHANNEL [1] - 427:10
CHARACTERIZATION [1] - 396:2
CHARGE [8] - 317:3, 330:5, 339:9, 339:12, 350:10, 352:8, 387:18, 408:7
CHARGED [1] - 339:16
CHARGES [1] - 317:2
CHART [2] - 337:3, 368:20
CHEAPER [1] - 440:17
CHECK [1] - 381:2
CHECKED [1] - 447:24
CHECKLIST [1] - 401:1
CHEOL [19] - 352:3, 357:2, 362:15, 364:4, 368:3, 368:8, 370:10, 371:7, 372:1, 373:21, 375:3, 378:7, 379:18, 380:13, 381:24, 410:10, 412:17, 420:24, 429:19
CHEOL [1] - 295:8

CHI [158] - 303:2, 319:17, 321:3, 321:10, 321:11, 322:13, 322:18, 322:22, 322:25, 323:7, 323:10, 323:15, 323:24, 324:18, 324:21, 325:3, 325:7, 326:4, 326:17, 326:20, 327:20, 328:14, 329:5, 329:10, 331:3, 331:6, 331:16, 331:21, 331:24, 332:5, 332:8, 333:3, 333:6, 333:14, 333:19, 333:23, 334:4, 334:16, 335:20, 335:25, 336:8, 336:11, 336:16, 337:5, 337:12, 343:5, 343:16, 344:3, 352:3, 352:7, 352:12, 357:2, 358:19, 358:22, 361:3, 362:15, 364:4, 364:21, 366:1, 366:16, 368:3, 368:8, 370:10, 371:7, 371:10, 371:22, 372:1, 372:8, 372:21, 373:21, 373:25, 374:2, 374:15, 375:3, 375:25, 379:5, 379:18, 380:13, 381:24, 382:5, 382:9, 385:24, 386:2, 386:6, 386:25, 387:9, 387:17, 387:23, 388:1, 389:22, 392:6, 394:4, 394:7, 396:7, 396:25, 398:12, 402:12, 402:14, 403:18, 404:14, 410:10, 411:20, 411:24, 412:9, 412:11, 412:17, 412:20, 413:24, 414:4, 414:6, 414:12, 414:25, 415:11, 415:23, 416:7, 418:11, 419:19, 420:7, 420:24, 421:19, 422:3, 422:24, 423:3, 423:7, 423:16, 425:22, 426:21, 428:25, 429:5, 429:8, 429:19, 430:13, 433:3, 435:14, 435:21, 437:1, 437:19, 438:6, 438:21, 439:6, 440:3, 443:12, 445:12, 447:2, 447:13, 449:11, 449:12, 450:14, 450:25, 453:3, 453:21, 454:4, 455:10, 456:5, 456:17, 458:22, 460:7
CHI [1] - 295:8
CHI'S [9] - 303:8, 303:19, 303:22, 330:23, 343:25, 382:1, 401:10, 410:20, 422:21
CHIEF [1] - 348:22
CHINA [1] - 424:12
CHOOSE [1] - 313:21
CHRISTOPHER [1] - 297:8

CHRISTOPHER [1] - 302:1
CHRONOLOGICAL [1] - 297:5
CIRCUMSTANCES [3] - 313:10, 412:24, 460:1
CITREA [1] - 305:21
CITRIA [1] - 305:21
CITY [2] - 389:7, 402:5
CIVIL [4] - 317:1, 319:20, 319:23, 340:6
CLAIM [2] - 317:12, 319:19
CLAIMED [1] - 323:15
CLAIMS [2] - 317:17, 317:19
CLARIFY [1] - 345:10
CLAUSE [1] - 312:9
CLEAR [4] - 313:20, 344:5, 404:23, 415:2
CLEARLY [1] - 308:18
CLERK [5] - 301:21, 346:25, 347:6, 406:7, 406:13
CLIENT [1] - 336:3
CLIENTS [2] - 306:9, 306:11
CLOSED [1] - 306:13
CMG [2] - 335:12, 438:13
CMG-3TB [4] - 323:11, 334:23, 335:1, 438:17
CMG-40T-1 [3] - 335:3, 438:10, 438:11
COAST [1] - 296:20
CODE [1] - 462:8
COERCED [2] - 392:12, 392:16
COFFEE [3] - 393:9, 393:14, 393:15
COLEMAN [2] - 320:3, 343:24
COLLABORATED [1] - 447:17
COLLABORATION [1] - 412:12
COLLAPSED [2] - 306:7, 306:12
COLLEAGUE [7] - 415:13, 415:23, 416:21, 422:16, 422:21, 458:23
COLLEAGUES [5] - 328:21, 328:25, 435:4, 439:14, 458:2
COLLECTING [1] - 337:5
COLORADO [1] - 296:17
COLUMN [12] - 362:21, 363:1, 363:7, 363:11, 368:20, 368:21, 368:22, 368:23, 368:25, 395:18, 401:7, 452:5
COMING [3] - 301:12, 345:7, 440:11
COMM [1] - 378:12

**COMMERCE** [1] - 306:10
**COMMERCIAL** [1] - 303:5
**COMMISSION** [4] - 299:20, 358:17, 377:1, 380:19
**COMMISSION** [36] - 351:14, 351:21, 351:22, 352:15, 358:19, 358:23, 360:8, 360:16, 360:19, 360:21, 361:2, 361:7, 361:9, 361:24, 363:6, 369:25, 370:7, 370:9, 371:1, 371:8, 373:14, 374:23, 376:22, 379:6, 394:2, 394:11, 395:4, 395:7, 396:12, 397:19, 397:23, 400:25, 401:5, 401:17, 403:2, 403:11
**COMMISSIONS** [1] - 379:24
**COMMISSIONS** [9] - 351:17, 361:25, 362:2, 368:18, 374:15, 375:9, 375:18, 376:3, 377:6
**COMMITTED** [2] - 317:12, 317:15
**COMMON** [1] - 410:4
**COMMUNICATION** [3] - 419:2, 427:11, 449:20
**COMMUNITY** [1] - 451:3
**COMMUNITY** [2] - 413:1, 446:10
**COMPANIES** [10] - 306:18, 316:25, 317:1, 384:2, 395:20, 444:15, 444:16, 445:23, 446:2, 457:11
**COMPANY** [131] - 305:9, 305:10, 305:11, 305:21, 305:24, 306:4, 306:5, 306:7, 306:12, 306:16, 306:17, 307:2, 307:9, 307:11, 307:19, 307:22, 307:23, 307:24, 308:4, 308:6, 309:6, 309:8, 310:8, 311:16, 311:20, 311:23, 311:25, 313:5, 313:6, 313:8, 313:23, 314:22, 315:13, 317:3, 317:4, 317:12, 317:15, 317:18, 317:24, 318:8, 318:15, 318:17, 318:19, 318:21, 318:25, 319:5, 319:7, 319:13, 321:14, 322:13, 323:7, 330:9, 333:7, 335:7, 335:11, 336:2, 337:17, 338:9, 338:16, 338:22, 339:9, 339:16, 340:24, 341:4, 341:9, 341:10, 341:18, 342:6, 342:22, 347:25, 348:4, 357:25, 383:23, 390:3, 392:23, 407:12, 407:15, 407:16, 407:20, 407:25,

408:1, 408:3, 408:4, 408:7, 408:9, 408:11, 408:13, 411:4, 414:3, 414:6, 414:11, 414:16, 421:18, 424:23, 426:5, 428:16, 432:12, 434:18, 435:19, 436:12, 436:13, 436:14, 436:16, 438:21, 440:5, 440:11, 442:4, 442:13, 442:15, 442:17, 444:5, 445:19, 446:5, 447:18, 447:20, 448:24, 450:16, 451:6, 451:19, 452:13, 454:22, 456:10, 456:18, 456:19, 457:4, 459:7, 459:8, 459:12
**COMPANY** [18] - 404:14, 404:16, 409:10, 409:11, 424:7, 424:9, 424:14, 424:16, 424:21, 434:15, 434:25, 445:15, 445:16, 445:18, 445:19, 451:20
**COMPARE** [1] - 403:16
**COMPARED** [2] - 320:6, 403:2
**COMPARING** [2] - 400:25, 403:13
**COMPARISON** [1] - 403:10
**COMPETE** [2] - 453:18, 453:19
**COMPETED** [1] - 447:17
**COMPETITOR** [8] - 372:19, 440:17, 447:20, 447:21, 448:24, 449:4, 453:15, 454:16
**COMPETITORS** [8] - 350:6, 390:11, 390:17, 411:14, 432:11, 440:6, 440:14, 446:9
**COMPLETED** [2] - 358:24, 427:5
**COMPLEX** [1] - 442:23
**COMPLIANCE** [1] - 407:17
**COMPLIANT** [5] - 410:7, 431:17, 442:6, 448:4, 448:16
**COMPLICATED** [2] - 312:16, 314:7
**COMPONENT** [3] - 346:8, 433:20, 438:13
**COMPREHENSIVE** [2] - 331:17, 410:24
**COMPRESSED** [1] - 445:20
**COMPRISED** [1] - 419:6
**COMPUTERIZED** [1] - 327:7
**CON'T** [2] - 299:1, 300:1
**CONCEAL** [1] - 458:7
**CONCERNING** [1] - 440:5
**CONDUCT** [2] - 337:16, 339:25
**CONFERENCE** [2] - 331:14, 345:4

**CONFERENCE** [1] - 462:12
**CONFERENCES** [3] - 388:12, 388:16, 388:19
**CONFIDENCE** [1] - 433:21
**CONFIRMATION** [2] - 381:17, 452:19
**CONFORMANCE** [1] - 462:12
**CONFRONT** [1] - 344:25
**CONFRONTED** [1] - 344:25
**CONNECTED** [1] - 303:1
**CONNECTION** [4] - 332:4, 340:6, 435:24, 441:6
**CONSIDERING** [1] - 302:7
**CONSISTENT** [1] - 335:21
**CONSULTANCY** [2] - 308:16, 397:20
**CONSULTANTS** [1] - 396:5
**CONSULTED** [1] - 389:21
**CONSULTING** [3] - 305:6, 321:15, 322:19
**CONSUMMATED** [1] - 352:18
**CONTACT** [3] - 323:25, 419:19, 459:7
**CONTINUE** [4] - 408:12, 437:8, 437:12, 457:13
**CONTINUED** [1] - 408:14
**CONTRACT** [23] - 312:8, 314:4, 352:20, 412:9, 413:13, 413:18, 414:1, 414:2, 415:15, 415:17, 415:19, 416:7, 424:24, 426:11, 427:4, 427:7, 442:10, 442:14, 443:3, 443:5, 443:16, 443:19, 443:23
**CONTRACTING** [3] - 441:5, 442:11, 442:12
**CONTRACTOR** [1] - 442:17
**CONTRACTS** [8] - 303:5, 314:1, 329:8, 413:23, 428:7, 431:24, 433:22, 442:9
**CONTRIBUTE** [1] - 324:21
**CONTROL** [2] - 331:11, 407:4
**CONTROLLER** [5] - 319:4, 347:23, 348:10, 348:21, 349:25
**CONVENIENCE** [1] - 430:17
**CONVERSATION** [5] - 344:20, 345:18, 345:19, 345:21, 345:22
**CONVERSATIONS** [1] - 343:16
**CONVINCE** [1] - 315:4
**COPIED** [16] - 418:11, 425:22, 433:3, 435:14, 437:2, 438:7, 439:6, 443:12,

445:12, 449:12, 450:25, 453:3, 454:4, 456:5, 458:23, 459:1
**COPIES** [1] - 403:15
**COPY** [1] - 366:8
**CORNER** [2] - 353:15, 356:3
**CORPORATION** [1] - 451:3
**CORPORATIONS** [2] - 349:15, 414:2
**CORRECT** [1] - 462:9
**CORRECT** [99] - 302:23, 304:3, 304:13, 308:23, 308:24, 309:17, 309:20, 310:3, 311:3, 311:4, 316:11, 326:18, 327:1, 327:4, 344:9, 353:24, 360:6, 362:4, 363:12, 367:10, 374:10, 383:13, 392:10, 392:11, 392:22, 396:3, 396:10, 397:11, 397:17, 398:13, 398:19, 399:8, 399:15, 399:18, 399:19, 399:22, 399:24, 399:25, 404:15, 404:22, 407:22, 412:11, 413:2, 413:3, 413:14, 413:22, 413:25, 415:3, 415:20, 415:21, 416:1, 416:23, 416:24, 419:11, 419:12, 421:17, 422:25, 423:1, 425:10, 425:11, 426:14, 431:2, 431:20, 432:13, 432:15, 434:21, 434:22, 435:6, 435:7, 435:22, 436:4, 436:5, 437:22, 437:23, 442:13, 443:1, 443:2, 443:4, 445:2, 446:18, 447:9, 447:10, 448:18, 448:19, 450:4, 453:11, 453:12, 453:15, 453:16, 454:17, 454:18, 454:23, 457:24, 458:15, 458:16, 459:13, 459:14, 460:9, 460:10
**CORRECTLY** [16] - 307:4, 333:11, 364:24, 365:12, 366:19, 367:6, 372:16, 373:4, 376:20, 402:7, 444:2, 446:6, 453:11, 455:20, 458:5
**CORRESPOND** [3] - 354:18, 354:21, 370:6
**CORRESPONDED** [1] - 392:10
**CORRESPONDING** [1] - 360:1
**COST** [7] - 328:24, 336:8, 336:22, 343:1, 360:22, 430:17
**COSTING** [2] - 336:3, 336:6
**COSTS** [4] - 315:20, 323:2,

336:5, 390:16
**COUNSEL** [1] - 296:1
**COUNSEL** [3] - 301:7, 301:20, 405:11
**COUNTERPART** [1] - 447:17
**COUNTERSUIT** [2] - 317:14, 317:17
**COUNTRY** [1] - 399:10
**COUPLE** [2] - 345:6, 394:16
**COURSE** [10] - 303:16, 319:15, 334:4, 371:13, 383:11, 411:21, 434:18, 437:9, 440:18, 442:6
**COURT** [3] - 317:6, 317:7, 367:13
**COURT** [12] - 301:6, 301:15, 317:1, 319:19, 347:2, 369:11, 385:24, 402:4, 405:9, 406:2, 406:9, 461:12
**COURT** [123] - 295:1, 295:23, 301:7, 301:16, 304:2, 304:4, 304:6, 311:10, 311:12, 313:18, 321:20, 323:13, 323:19, 323:22, 326:6, 326:8, 326:11, 326:15, 330:13, 330:16, 332:23, 334:10, 334:12, 338:18, 339:6, 339:14, 339:18, 339:22, 340:4, 340:14, 340:18, 341:16, 342:4, 342:10, 346:19, 346:22, 347:10, 353:5, 355:12, 355:14, 361:17, 363:16, 363:23, 365:22, 367:17, 370:16, 370:21, 371:19, 373:9, 374:20, 375:14, 376:9, 377:17, 379:12, 380:5, 381:10, 381:13, 382:16, 384:15, 385:7, 385:10, 389:25, 392:20, 393:7, 393:10, 393:13, 400:2, 400:5, 400:8, 402:19, 402:22, 405:3, 405:5, 405:10, 405:15, 405:19, 405:23, 406:3, 406:17, 409:18, 410:14, 410:17, 414:21, 417:6, 417:15, 417:23, 418:5, 418:7, 420:3, 421:24, 423:12, 425:18, 426:18, 431:23, 432:24, 434:3, 435:10, 436:23, 438:3, 439:2, 441:2, 441:11, 441:23, 443:8, 445:8, 446:22, 448:14, 449:7, 450:22, 452:24, 454:1, 455:7, 456:2, 456:22,

458:11, 458:19, 460:23, 460:25, 461:8, 461:10, 462:6, 462:19
**COURTHOUSE** [1] - 296:6
**COURTROOM** [2] - 405:16, 410:12
**CPA** [1] - 382:25
**CPA'S** [1] - 383:8
**CR** [1] - 295:7
**CREATE** [3] - 352:22, 352:24, 394:11
**CREATED** [3] - 339:1, 394:14, 398:7
**CREDIT** [13] - 305:9, 305:10, 305:13, 305:15, 315:18, 354:3, 354:8, 354:9, 354:10, 354:11, 354:12, 355:20
**CRIME** [1] - 339:9
**CRIMINAL** [5] - 313:15, 315:4, 315:25, 316:6, 342:8
**CRITERIA** [1] - 314:6
**CRITICIZE** [1] - 450:7
**CROSS** [2] - 302:3, 382:17
**CROSS** [5] - 301:19, 330:22, 332:22, 333:14, 382:16
**CROSS** [2] - 297:9, 297:13
**CROSS-EXAMINATION** [2] - 302:3, 382:17
**CROSS-EXAMINATION** [2] - 297:9, 297:13
**CROSS-EXAMINATION** [5] - 301:19, 330:22, 332:22, 333:14, 382:16
**CRR** [2] - 295:23, 462:19
**CSR** [2] - 295:23, 462:19
**CURRENCY** [4] - 416:18, 421:10, 421:11, 434:14
**CURRENCY** [1] - 354:3
**CURRENT** [5] - 309:10, 310:22, 348:15, 383:20, 400:20
**CURVE** [1] - 325:15
**CUSTOMER** [36] - 346:15, 346:16, 346:17, 352:21, 354:7, 354:11, 354:19, 354:20, 354:21, 354:22, 354:23, 354:24, 354:25, 355:4, 356:3, 359:5, 360:4, 360:19, 361:7, 368:21, 368:23, 368:25, 369:1, 369:14, 369:17, 390:25, 391:1, 391:4, 391:21, 411:8, 411:15, 411:16, 426:24, 426:25, 436:19, 451:21
**CUSTOMERS** [12] - 324:11, 327:18, 336:24, 339:19, 340:1, 349:13, 349:17, 349:20, 365:1, 409:8, 409:9,

424:4
**CUT** [1] - 332:12
**CYBERNETICS** [1] - 407:3
**CYLINDER** [1] - 386:6

**D**

**D.C** [1] - 296:10
**DAILY** [2] - 329:4, 329:7
**DAMS** [6] - 436:15, 443:22, 444:9, 444:13, 451:5, 451:9
**DANGER** [1] - 459:9
**DANGEROUS** [1] - 457:19
**DATA** [6] - 331:12, 411:1, 420:17, 427:10, 446:10, 449:19
**DATABASE** [1] - 353:22
**DATE** [16] - 353:25, 354:1, 362:1, 362:5, 364:10, 364:14, 368:20, 378:2, 400:21, 413:17, 415:16, 421:16, 427:3, 427:7, 429:22, 439:7
**DATED** [1] - 462:15
**DATED** [14] - 333:3, 334:17, 362:7, 418:12, 420:7, 422:3, 423:16, 426:21, 433:4, 443:13, 447:2, 449:12, 451:1, 455:10
**DATES** [1] - 374:5
**DAVID** [1] - 296:8
**DAY** [2] - 295:13, 462:15
**DAYS** [4] - 303:21, 320:3, 343:11, 345:6
**DCM** [5] - 427:10, 449:15, 449:16, 449:18, 449:19
**DCM'S** [1] - 427:20
**DCM3** [1] - 427:7
**DEADLINE** [1] - 317:13
**DEAL** [2] - 313:2, 342:22
**DEALING** [2] - 305:13, 339:4
**DEAR** [2] - 333:6, 448:6
**DEBIT** [1] - 305:15
**DEBT** [2] - 305:14, 340:22
**DECADES** [1] - 393:24
**DECEMBER** [5] - 329:6, 345:16, 345:25, 423:17, 435:15
**DECIDE** [2] - 332:12, 419:22
**DECIDED** [1] - 434:19
**DECISION** [5] - 316:2, 316:3, 428:23, 461:2, 461:3
**DECLARATION** [1] - 316:19
**DEDUCT** [1] - 323:1
**DEFENDANT** [1] - 295:9
**DEFENDANT** [44] - 301:8, 405:11, 410:18, 414:15,

416:4, 416:25, 417:10, 417:13, 418:20, 419:10, 419:16, 420:19, 421:2, 422:12, 426:7, 426:8, 427:17, 428:1, 428:11, 428:14, 429:11, 429:15, 430:20, 430:24, 431:4, 431:25, 433:14, 436:18, 437:24, 444:17, 446:12, 447:25, 448:6, 451:23, 455:2, 455:3, 455:23, 457:23, 458:7, 459:12, 459:16, 459:23, 460:11, 460:20
**DEFENDANT** [1] - 296:11
**DEFENDANT'S** [1] - 452:8
**DEFENSE** [1] - 384:11
**DEFENSE** [1] - 385:25
**DEFINED** [1] - 313:11
**DEFINITELY** [1] - 437:14
**DEFINITELY** [1] - 372:25
**DEFINITION** [1] - 314:17
**DEGREE** [4] - 304:12, 304:14, 347:19, 407:3
**DELAY** [5] - 301:11, 328:17, 418:15, 418:16, 433:23
**DELETE** [5] - 416:4, 416:22, 416:25, 417:4, 454:14
**DELETED** [1] - 455:16
**DELICATE** [1] - 327:10
**DELIVERED** [3] - 372:10, 419:6, 452:15
**DELIVERY** [1] - 433:22
**DENOMINATIONS** [1] - 421:15
**DEPARTMENT** [1] - 296:8
**DEPARTMENT** [15] - 350:15, 350:18, 352:16, 358:25, 361:11, 377:11, 377:24, 380:11, 380:23, 387:13, 388:25, 389:1, 391:3, 394:15, 403:14
**DEPARTMENT** [4] - 316:9, 338:6, 338:22, 408:18
**DEPENDED** [1] - 343:8
**DEPICT** [1] - 427:1
**DEPICTED** [1] - 354:6
**DEPLOY** [2] - 327:15, 327:19
**DEPLOYED** [3] - 325:8, 325:10, 325:19
**DEPTHS** [1] - 386:16
**DESCRIBE** [7] - 343:18, 347:16, 348:10, 407:1, 441:5, 459:15, 460:1
**DESCRIBED** [2] - 425:13, 446:14
**DESIGNED** [1] - 357:23

DESIGNING [1] - 305:24
DESIGNS [2] - 347:25, 407:22
DESIRED [2] - 444:1, 444:25
DETAILED [2] - 323:6, 431:8
DETAILS [2] - 381:2, 419:8
DETERMINES [1] - 352:17
DEVELOP [3] - 431:9, 432:6, 432:9
DEVELOPED [3] - 324:13, 324:14, 324:15
DEVELOPING [3] - 308:19, 453:17, 453:19
DH [2] - 366:18, 366:25
DIFFERENT [18] - 308:6, 313:1, 314:5, 314:6, 315:9, 320:10, 386:15, 386:16, 389:6, 394:16, 419:2, 419:6, 420:13, 430:2, 430:3, 430:4, 430:16, 444:6
DIFFICULT [1] - 344:3
DIGITIZER [2] - 419:2, 427:10
DIGITIZER [1] - 357:16
DIGITIZERS [2] - 337:7, 427:20
DIRECT [2] - 347:13, 406:20
DIRECT [37] - 331:2, 335:20, 337:24, 341:12, 353:1, 353:9, 355:17, 356:14, 358:16, 359:13, 361:14, 361:20, 363:14, 367:19, 370:13, 370:24, 371:6, 371:25, 373:12, 374:6, 376:12, 380:8, 381:15, 400:12, 401:14, 401:15, 405:20, 412:15, 413:15, 418:13, 422:7, 429:15, 437:3, 438:15, 442:10, 442:14, 454:9
DIRECT [2] - 297:13, 297:17
DIRECTED [2] - 314:24, 315:12
DIRECTING [6] - 433:5, 439:8, 443:14, 447:22, 453:5, 455:14
DIRECTION [4] - 409:6, 444:1, 444:24, 445:1
DIRECTLY [3] - 344:11, 392:9, 428:1
DIRECTOR [2] - 314:22, 319:6, 330:6, 342:6, 407:9, 407:14, 408:15, 410:22, 411:2, 428:24, 431:4, 455:17
DIS [1] - 310:5
DISAGREE [1] - 461:5

DISAGREED [1] - 320:24
DISAGREEMENT [1] - 461:6
DISCLOSE [1] - 338:6
DISCLOSED [2] - 337:22, 338:13
DISCLOSURE [2] - 338:15, 339:5
DISCLOSURES [1] - 338:25
DISCOUNT [1] - 433:12
DISCOUNTS [1] - 328:18
DISCUSS [2] - 438:19, 453:8
DISCUSSED [2] - 335:9, 344:15
DISPLACE [1] - 310:6
DISPLACED [1] - 310:2
DISPLAYED [1] - 331:11
DISTRACTION [2] - 339:1, 339:2
DISTRIBUTOR [5] - 325:21, 404:12, 435:1, 435:5, 439:16
DISTRICT [5] - 295:1, 295:2, 295:3, 462:6, 462:7
DIVIDE [1] - 418:16
DIVIDED [2] - 341:3, 430:16
DIVISION [10] - 306:22, 306:24, 307:11, 307:15, 307:18, 433:10, 433:11, 433:15, 438:17, 438:23
DIVISION [1] - 295:2
DM24 [1] - 427:7
DM24-3 [1] - 427:9
DO [1] - 462:7
DOCUMENT [65] - 302:20, 302:22, 303:11, 303:17, 304:1, 304:2, 311:9, 323:6, 323:24, 324:1, 324:2, 324:5, 324:7, 325:25, 326:20, 336:4, 352:22, 354:10, 355:18, 355:19, 360:13, 361:23, 361:24, 367:20, 367:22, 367:23, 373:13, 377:21, 377:23, 381:16, 400:25, 403:2, 413:12, 413:16, 414:24, 415:10, 420:6, 420:9, 422:2, 422:5, 423:15, 425:21, 426:20, 428:3, 429:24, 433:2, 436:10, 436:25, 438:5, 439:5, 443:11, 443:21, 445:11, 449:10, 449:13, 450:24, 452:2, 452:17, 453:2, 454:3, 455:9, 456:4, 456:24, 458:21, 458:22
DOCUMENTATION [1] - 432:7
DOCUMENTS [6] - 303:6, 369:5, 369:9, 378:23,

434:20, 442:23
DOLLAR [3] - 313:9, 319:4, 319:7
DOLLARS [6] - 314:25, 418:22, 422:15, 434:12, 452:11, 459:21
DOMAIN [1] - 364:7
DOMESTIC [1] - 349:17
DONE [6] - 349:24, 365:11, 399:10, 428:23, 430:5, 437:14
DOOR [2] - 337:19, 340:15
DOWN [11] - 306:13, 326:21, 369:13, 375:24, 381:20, 396:23, 404:10, 404:11, 429:14, 438:15, 443:21
DOWNHOLE [3] - 386:7, 386:13, 386:16
DOZEN [2] - 315:10
DOZENS [2] - 395:19
DR [193] - 303:2, 303:8, 303:19, 303:22, 319:17, 321:3, 321:11, 322:13, 322:22, 322:25, 323:7, 323:10, 323:15, 323:24, 324:18, 324:21, 325:3, 325:7, 326:4, 326:17, 326:20, 327:20, 328:14, 329:5, 329:10, 330:20, 330:22, 330:23, 331:3, 331:6, 331:16, 331:21, 331:24, 332:4, 332:5, 332:8, 333:1, 333:3, 333:6, 333:13, 333:14, 333:19, 333:23, 334:4, 334:16, 335:12, 335:20, 335:25, 336:8, 336:11, 336:16, 337:5, 337:11, 337:12, 337:15, 340:5, 340:10, 340:20, 341:12, 341:17, 341:25, 343:5, 343:16, 343:25, 344:3, 366:16, 371:22, 372:8, 382:5, 382:9, 384:7, 385:24, 386:2, 386:6, 386:25, 387:1, 387:5, 387:8, 387:9, 387:17, 387:23, 388:1, 388:18, 389:6, 389:21, 389:22, 392:6, 394:4, 394:7, 396:7, 396:25, 398:12, 402:12, 402:14, 403:18, 403:22, 404:14, 408:10, 408:12, 409:6, 410:20, 411:20, 411:24, 412:9, 412:11, 412:17, 412:20, 413:24, 414:4, 414:6, 414:12, 414:25, 415:7, 415:11, 415:23, 416:7, 416:8, 418:11, 418:12, 419:19, 419:20,

419:22, 419:23, 420:7, 421:19, 422:3, 423:3, 423:7, 423:16, 425:22, 425:23, 426:21, 428:23, 428:25, 429:5, 429:8, 430:13, 433:3, 433:4, 435:14, 435:15, 435:21, 437:1, 437:19, 438:6, 438:14, 438:21, 439:6, 439:7, 440:3, 443:12, 443:13, 445:12, 445:13, 447:2, 447:13, 449:11, 449:12, 449:25, 450:14, 450:25, 451:1, 453:3, 453:4, 453:8, 453:13, 453:14, 453:21, 454:4, 454:5, 455:10, 456:5, 456:6, 456:12, 456:17, 456:25, 458:22, 458:24, 459:9, 460:7, 460:15, 460:18
DRAMATICALLY [1] - 325:14
DRAW [1] - 359:12
DRAWING [2] - 333:1, 334:15
DROP [1] - 336:21
DSS [1] - 439:13
DUE [13] - 358:17, 358:19, 361:2, 363:12, 376:23, 377:1, 392:13, 427:5, 427:23, 430:15, 437:10, 456:9, 457:10
DURING [16] - 303:16, 312:18, 319:15, 334:3, 343:24, 349:24, 363:4, 371:13, 376:3, 393:5, 410:9, 417:18, 431:10, 459:11, 459:16, 460:4
DUTY [1] - 396:13

## E

E-MAIL [38] - 298:6, 298:7, 298:8, 298:9, 298:10, 298:11, 298:12, 298:13, 298:14, 298:15, 298:16, 298:17, 298:18, 298:19, 298:20, 298:21, 298:22, 298:23, 298:24, 298:25, 299:6, 299:7, 299:8, 299:9, 299:10, 299:11, 299:12, 299:13, 299:14, 299:15, 299:16, 299:17, 299:18, 299:19, 299:21, 299:22, 299:23, 299:25
E-MAIL [78] - 311:2, 326:4, 326:17, 327:25, 328:14, 328:23, 333:2, 333:5, 334:16, 335:12, 364:1, 364:7, 364:10, 364:20, 365:25, 366:11, 366:15,

371:22, 372:1, 376:13,
376:16, 392:10, 394:8,
400:16, 400:21, 403:1,
404:1, 411:21, 411:22,
412:1, 414:25, 415:10,
415:11, 416:3, 418:11,
419:21, 420:7, 420:13,
421:16, 422:3, 423:16,
423:19, 425:22, 426:21,
433:3, 435:14, 435:21,
437:1, 438:6, 439:6, 443:12,
445:12, 447:2, 447:7,
447:11, 447:12, 447:13,
447:23, 448:3, 448:5,
449:11, 450:25, 453:3,
453:6, 454:4, 455:10,
455:13, 455:15, 455:16,
456:5, 456:25, 458:1,
458:22, 459:1
  **E-MAILED** [3] - 345:2,
392:14, 412:1
  **E-MAILS** [24] - 332:5,
332:7, 332:11, 332:16,
333:24, 333:25, 334:3,
334:7, 344:8, 396:21, 397:3,
397:6, 397:9, 411:23,
416:25, 417:4, 420:9,
420:10, 420:14, 428:14,
430:11, 455:1, 455:2
  **EARLY** [7] - 306:2, 330:7,
344:20, 365:11, 409:3,
412:10, 459:19
  **EARN** [2] - 358:23, 365:10
  **EARNED** [1] - 374:15
  **EARTHQUAKE** [1] - 335:4,
410:22, 422:19
  **EARTHQUAKE** [11] - 355:3,
356:4, 357:13, 358:13,
360:5, 369:20, 370:10,
379:1, 411:3, 431:5, 455:18
  **EARTHQUAKES** [2] -
409:20, 411:18
  **EAST** [1] - 296:17
  **EDUCATION** [1] - 407:1
  **EDUCATIONAL** [1] -
347:16
  **EFFECT** [1] - 325:9
  **EFFORT** [2] - 439:10,
439:18
  **EITHER** [6] - 312:21, 414:4,
416:12, 440:10, 442:1,
459:24
  **ELECTRIC** [1] - 444:5
  **ELECTRICAL** [4] - 436:12,
436:13, 436:14, 436:16
  **ELECTRONIC** [3] - 305:16,
305:18, 306:10
  **ELEMENT** [1] - 442:7
  **ELPRO** [2] - 407:13
  **EMBEDDED** [1] - 449:21

  **EMPHASIZE** [1] - 438:18
  **EMPLOY** [1] - 351:6
  **EMPLOYED** [5] - 347:22,
347:23, 349:9, 351:4, 407:6
  **EMPLOYEE** [7] - 321:3,
321:6, 321:8, 346:15,
346:16, 366:6, 393:20
  **EMPLOYEES** [6] - 328:10,
338:9, 393:1, 393:24, 408:3,
456:15
  **EMT** [1] - 376:23
  **ENABLE** [1] - 432:6
  **END** [4] - 336:23, 337:11,
362:8, 364:8, 366:21,
391:24, 392:3, 396:11,
410:14, 410:15, 435:16,
446:11, 454:9, 459:20
  **ENDED** [1] - 318:6
  **ENDING** [1] - 363:11
  **ENFORCEMENT** [1] -
337:19
  **ENGAGING** [1] - 354:12
  **ENGINEER** [2] - 407:7,
458:24
  **ENGINEERING** [1] - 407:4
  **ENGINEERS** [1] - 322:23
  **ENGLAND** [1] - 350:9
  **ENGLISH** [6] - 313:24,
343:16, 343:25, 411:25,
412:2, 412:6
  **ENROLLED** [3] - 439:12,
439:20, 439:22
  **ENTER** [1] - 412:9
  **ENTERED** [5] - 387:3,
387:9, 403:22, 412:11,
415:20
  **ENTERING** [2] - 414:4,
414:6
  **ENTERS** [1] - 403:5
  **ENTIRE** [3] - 430:14,
430:15, 459:12
  **ENTIRELY** [2] - 315:6,
316:1
  **ENTITIES** [1] - 395:22
  **ENTITLED** [1] - 462:11
  **ENTITY** [3] - 402:1, 445:22,
451:4
  **EQUALS** [1] - 418:15
  **EQUIPMENT** [42] - 321:17,
322:14, 325:3, 327:7,
336:15, 336:19, 348:1,
349:22, 383:15, 383:23,
386:5, 390:6, 407:20,
407:23, 409:23, 410:3,
410:5, 410:6, 411:18,
412:22, 416:8, 426:12,
427:4, 431:1, 431:9, 431:11,
433:17, 433:19, 433:23,
436:12, 437:20, 437:21,
438:23, 441:7, 441:17,

442:2, 442:3, 444:14,
445:23, 452:1, 459:19
  **EQUITY** [9] - 312:22,
312:23, 312:25, 313:2,
313:3, 313:4, 313:5, 341:1,
341:18
  **EQUIVALENT** [2] - 416:20,
422:15
  **ES** [2] - 366:18, 366:25
  **ES-DH** [2] - 366:18, 366:25
  **ESI** [1] - 376:18
  **ESSENCE** [1] - 314:18
  **ESSENTIAL** [3] - 346:8,
346:9, 346:11
  **ESSENTIALLY** [5] - 305:9,
312:17, 314:2, 314:15,
321:12
  **ESTATE** [1] - 457:15
  **ESTIMATE** [3] - 339:3,
391:18, 393:1
  **ESTIMATION** [1] - 393:22
  **ETHICAL** [1] - 383:12
  **EURO** [7] - 421:8, 421:10,
421:13, 421:15, 422:14,
434:14
  **EUROPE** [2] - 421:10,
421:11
  **EVALUATION** [1] - 317:6
  **EVD** [3] - 298:5, 299:5,
300:5
  **EVENT** [3] - 331:14, 341:3,
388:24
  **EVENTUALLY** [5] - 306:7,
306:20, 307:7, 307:16,
307:22
  **EVIDENCE** [121] - 304:9,
326:12, 326:13, 332:24,
332:25, 334:9, 334:13,
334:14, 353:2, 353:6, 353:7,
355:11, 355:15, 355:16,
356:16, 361:15, 361:18,
361:19, 363:15, 363:17,
363:18, 363:20, 363:23,
363:24, 365:20, 365:23,
365:24, 367:17, 367:18,
370:14, 370:18, 370:22,
370:23, 371:20, 373:10,
373:11, 374:20, 374:21,
375:15, 375:16, 376:10,
376:11, 377:15, 377:18,
377:19, 379:13, 379:14,
380:3, 380:6, 380:7, 381:9,
381:13, 381:14, 385:11,
385:12, 400:13, 401:15,
410:6, 412:14, 413:11,
414:19, 414:22, 414:23,
418:2, 418:8, 418:9, 419:25,
420:4, 420:5, 421:22,
421:25, 422:1, 423:10,
423:13, 423:14, 425:16,

425:19, 425:20, 426:16,
426:18, 426:19, 429:3,
432:22, 432:25, 433:1,
435:9, 435:11, 435:12,
436:21, 436:23, 436:24,
438:1, 438:4, 438:25, 439:3,
439:4, 443:6, 443:9, 443:10,
445:6, 445:9, 445:10,
446:21, 446:23, 449:5,
449:8, 449:9, 450:20,
450:23, 452:23, 453:1,
453:24, 454:2, 455:5, 455:8,
456:1, 456:3, 456:20,
456:23, 458:17, 458:20
  **EXACT** [9] - 310:10,
310:12, 312:12, 312:13,
312:15, 313:16, 315:15,
315:16, 360:24
  **EXACTLY** [8] - 318:11,
320:25, 324:9, 327:25,
328:2, 333:19, 360:24, 419:7
  **EXAMINATION** [15] - 297:9,
297:10, 297:10, 297:13,
297:13, 297:14, 297:14,
297:17, 301:19, 330:22,
331:3, 332:22, 333:14,
382:16, 405:20
  **EXAMINATION** [8] - 302:3,
330:18, 342:12, 347:13,
382:17, 400:9, 402:23,
406:20
  **EXAMPLE** [11] - 319:24,
324:8, 353:11, 359:15,
394:22, 396:24, 419:1,
427:6, 431:10, 432:4, 436:18
  **EXAMPLES** [1] - 334:1
  **EXCEEDS** [1] - 332:22
  **EXCEPT** [1] - 439:14
  **EXCEPTION** [1] - 391:8
  **EXCHANGE** [6] - 322:23,
333:20, 334:5, 335:5,
335:10, 431:6
  **EXCHANGE** [1] - 402:2
  **EXCLAMATION** [1] - 453:6
  **EXCUSE** [3] - 310:14,
357:10, 374:3
  **EXCUSED** [3] - 346:20,
402:19, 405:3
  **EXHIBIT** [126] - 302:17,
304:2, 304:9, 310:24, 326:1,
326:13, 332:20, 332:23,
332:25, 334:9, 334:12,
334:14, 337:1, 353:3, 353:5,
353:7, 353:9, 355:11,
355:16, 356:2, 356:15,
357:9, 359:13, 360:7,
361:15, 361:17, 361:19,
363:15, 363:16, 363:18,
363:21, 363:24, 365:20,
365:24, 367:13, 367:15,

367:18, 370:14, 370:18,
370:23, 371:17, 371:19,
373:7, 373:9, 373:11,
374:19, 374:21, 375:13,
375:16, 376:7, 376:11,
377:15, 377:19, 379:10,
379:12, 379:14, 380:3,
380:5, 380:7, 381:9, 381:14,
384:15, 385:6, 385:12,
396:21, 400:13, 401:15,
404:4, 412:14, 413:12,
413:21, 414:19, 414:21,
414:23, 415:16, 418:3,
418:9, 420:1, 420:5, 421:23,
422:1, 423:11, 423:14,
425:17, 425:20, 426:17,
426:19, 429:3, 432:22,
433:1, 435:9, 435:12,
436:22, 436:24, 438:2,
438:3, 438:4, 439:1, 439:4,
443:7, 443:8, 443:10, 445:7,
445:8, 445:10, 446:20,
446:23, 449:6, 449:9,
450:21, 450:23, 452:23,
452:24, 453:1, 453:25,
454:1, 454:2, 455:6, 455:8,
455:25, 456:3, 456:21,
456:22, 456:23, 458:18,
458:20

**EXHIBIT** [17] - 311:8, 353:2,
358:4, 361:16, 361:21,
368:2, 370:14, 375:14,
376:9, 377:17, 379:11,
380:4, 380:9, 384:10,
384:12, 418:7, 420:2

**EXHIBITS** [3] - 298:1,
299:1, 300:1

**EXHIBITS** [4] - 298:5,
299:5, 300:5, 384:11

**EXISTENCE** [1] - 310:16

**EXISTS** [1] - 427:16

**EXPECT** [1] - 424:1

**EXPECTED** [1] - 443:24

**EXPECTING** [1] - 415:22

**EXPENSE** [2] - 360:22,
361:5

**EXPENSES** [1] - 388:23

**EXPENSIVE** [2] - 309:16,
446:4

**EXPLAIN** [9] - 335:24,
337:5, 340:10, 419:15,
420:13, 421:6, 427:2, 431:8,
440:7

**EXPLAINED** [2] - 437:4,
437:6

**EXPLANATION** [2] -
449:15, 449:16

**EXPLANATORY** [1] -
368:21

**EXPLORATION** [1] -

304:15

**EXPONENTIALLY** [3] -
325:11, 325:12, 325:15

**EXPRESS** [7] - 409:11,
424:20, 424:21, 425:15,
426:2, 433:7, 433:11

**EXPRESS** [1] - 328:17

**EXPRESSION** [1] - 458:4

**EXTEND** [1] - 317:13

# F

**FACE** [4] - 331:21, 336:12

**FACE-TO-FACE** [2] -
331:21, 336:12

**FACILITIES** [1] - 331:7

**FACT** [4] - 323:5, 332:8,
336:23, 399:12

**FAILED** [2] - 431:11,
431:12

**FAILURE** [1] - 323:10

**FAIR** [12] - 308:17, 337:11,
349:11, 352:17, 356:22,
364:16, 391:14, 392:21,
392:24, 424:22, 427:13,
447:25

**FAMILIAR** [7] - 306:2,
348:4, 351:25, 374:23,
386:10, 388:14, 390:2

**FAMILY** [1] - 457:16

**FAR** [1] - 314:16

**FAT** [1] - 384:11

**FEBRUARY** [5] - 326:18,
378:3, 447:3, 449:12

**FEDERAL** [3] - 295:23,
462:5, 462:19

**FEE** [68] - 322:23, 326:21,
328:15, 328:20, 328:24,
334:6, 334:20, 336:7, 336:8,
336:10, 336:12, 336:16,
336:19, 336:22, 337:5,
337:9, 337:13, 342:18,
344:23, 345:14, 345:20,
345:24, 364:19, 365:15,
366:24, 366:25, 367:3,
367:4, 397:19, 414:17,
416:5, 416:6, 416:10,
416:12, 416:15, 418:14,
419:3, 419:11, 421:8, 422:9,
425:8, 425:9, 427:5, 427:17,
427:22, 427:23, 428:6,
428:25, 429:6, 430:10,
430:15, 434:19, 437:25,
438:9, 445:5, 452:7, 452:10,
452:12, 455:17, 455:22,
457:17, 458:2, 458:15, 460:6

**FEEDBACK** [2] - 411:12,
431:12

**FEES** [8] - 322:19, 323:1,
335:25, 344:13, 345:1,

396:25, 397:5, 458:8

**FEW** [8] - 311:18, 319:2,
320:3, 342:11, 344:24,
354:2, 400:4, 402:21

**FIGHT** [1] - 461:5

**FIGHTING** [1] - 461:6

**FIGURE** [1] - 391:16

**FIGURES** [1] - 381:2

**FILE** [2] - 303:4, 315:4

**FILES** [2] - 303:1, 403:14

**FINAL** [1] - 301:9

**FINANCE** [5] - 308:14,
319:6, 330:6, 388:14, 428:24

**FINANCIAL** [13] - 305:13,
306:16, 306:18, 308:16,
315:14, 318:6, 348:12,
348:22, 349:5, 349:10,
440:15, 442:6, 442:7

**FINANCIAL** [2] - 308:6,
308:7, 308:9

**FINE** [2] - 339:16, 360:23

**FINISH** [1] - 434:4

**FIRE** [1] - 327:22

**FIRM** [2] - 341:1, 382:22

**FIRMS** [1] - 314:25

**FIRST** [36] - 304:14, 325:4,
331:8, 333:5, 337:7, 337:20,
340:23, 340:24, 340:25,
341:11, 343:15, 344:15,
344:19, 345:19, 348:17,
352:16, 357:16, 358:4,
359:14, 361:14, 361:22,
362:21, 363:20, 368:20,
400:13, 405:5, 415:9,
415:12, 416:5, 424:5, 427:6,
429:25, 446:24, 447:11,
449:14, 457:7

**FIVE** [7] - 305:2, 305:8,
349:9, 393:4, 393:13,
393:18, 400:6

**FIVE-MONTH** [1] - 349:9

**FIX** [1] - 329:1

**FIXED** [1] - 322:18

**FLEW** [2] - 316:15, 316:17

**FLIGHTS** [1] - 306:2

**FLIPPED** [1] - 307:8

**FLOW** [3] - 315:20, 457:15,
457:18

**FLOWER** [1] - 319:9

**FLY** [1] - 322:20

**FOCUS** [13] - 416:2,
419:14, 421:4, 423:18,
426:23, 429:7, 440:10,
440:14, 446:24, 447:11,
449:13, 456:7, 457:25

**FOCUSED** [1] - 308:16

**FOCUSING** [5] - 407:19,
408:20, 436:10, 438:8,
439:18

**FOLDER** [6] - 302:17,

302:18, 303:5, 310:24,
325:24, 325:25

**FOLLOW** [1] - 448:7

**FOLLOWED** [1] - 304:21

**FOLLOWING** [4] - 301:5,
301:14, 405:8, 406:1

**FOLLOWS** [1] - 334:21

**FOOTHILL** [2] - 368:12,
382:2

**FOR** [4] - 296:3, 296:11,
462:6

**FORCE** [1] - 335:16

**FOREGOING** [1] - 462:9

**FORM** [3] - 305:20, 403:8,
417:20

**FORM** [1] - 299:24

**FORMAT** [3] - 364:14,
395:8, 420:13

**FORMAT** [1] - 462:11

**FORMATTING** [1] - 420:16

**FORMER** [2] - 415:1, 415:4

**FORMULA** [1] - 398:12

**FORT** [1] - 429:9

**FORTH** [1] - 420:10

**FORTUNE** [2] - 425:4,
426:13

**FORWARD** [1] - 452:21

**FORWARDING** [4] - 447:5,
447:6, 447:8, 448:6

**FOUNDATION** [4] - 409:17,
417:16, 441:10, 441:12

**FOUNDED** [1] - 308:23

**FOUNDER** [2] - 384:6,
408:10, 415:7

**FOUR** [3] - 390:11, 393:16,
433:6

**FOURTH** [4] - 369:13,
445:14, 447:22, 451:14

**FRAME** [4] - 374:15,
374:16, 376:4, 459:12

**FRANCISCO** [1] - 332:2

**FRANKLY** [1] - 425:3

**FRANKLY** [1] - 425:4

**FRAUD** [2] - 317:12, 317:15

**FREQUENCY** [1] - 399:4

**FREQUENTLY** [1] - 387:12

**FRIDAY** [2] - 439:7, 453:4

**FRIEND** [1] - 319:10

**FRONT** [7] - 302:17,
302:18, 384:11, 384:17,
390:20, 396:22, 438:13

**FUHR** [66] - 296:8, 405:13,
405:17, 405:21, 406:5,
406:21, 409:22, 410:19,
414:18, 414:24, 417:8,
417:17, 418:2, 418:10,
419:25, 420:6, 421:22,
422:2, 423:10, 423:15,
425:16, 425:21, 426:16,
426:20, 428:3, 431:24,

432:19, 433:2, 434:5, 435:8, 435:13, 436:21, 436:25, 438:1, 438:5, 438:25, 439:5, 441:4, 441:13, 442:8, 443:6, 443:11, 445:6, 445:11, 446:20, 446:24, 448:17, 449:5, 449:10, 450:20, 450:24, 452:22, 453:2, 454:3, 455:5, 455:9, 455:25, 456:4, 456:20, 456:24, 458:14, 458:17, 458:21, 461:3, 461:7, 461:9
**FUHR** [1] - 297:17
**FULL** [2] - 409:12, 413:4
**FULLY** [1] - 333:9
**FUNCTIONING** [3] - 328:9, 342:21, 442:1
**FUNCTIONS** [1] - 410:7
**FUNDED** [1] - 320:11
**FUNDS** [2] - 341:7, 342:7
**FURH** [1] - 453:24
**FURTHEST** [1] - 386:3
**FUTURE** [3] - 334:20, 335:2, 372:22
**FW** [1] - 447:8

**G**

**GAINED** [1] - 409:5
**GAS** [6] - 318:18, 335:7, 445:16, 445:20, 451:19
**GAS** [7] - 409:10, 424:7, 424:9, 445:15, 445:18, 445:19, 451:20
**GENERAL** [5] - 348:13, 349:6, 351:17, 390:3, 412:21
**GENERALLY** [11] - 359:4, 359:6, 388:18, 390:24, 391:5, 411:5, 411:6, 411:7, 423:23, 440:7, 459:15
**GENTLEMAN** [1] - 410:13
**GENTLEMEN** [2] - 301:17, 461:10
**GEOLOGIC** [1] - 320:6
**GEOSCIENCE** [2] - 355:2, 355:24
**GEOSIG** [16] - 302:8, 350:9, 447:18, 447:20, 448:1, 448:18, 450:3, 450:13, 453:7, 453:9, 453:15, 453:17, 453:22, 454:13, 454:16, 454:19
**GEOTEK** [8] - 367:25, 401:24, 402:1, 404:11, 404:14, 404:16, 404:24, 439:17
**GIVEN** [4] - 338:21, 428:24, 441:17, 441:25
**GLASSES** [3] - 384:22, 385:15, 410:16

**GLENDORA** [4] - 368:13, 382:2, 399:1, 402:15
**GLOBALLY** [1] - 453:20
**GLOBE** [1] - 323:2
**GOAL** [1] - 345:8
**GOD** [2] - 347:4, 406:11
**GOODS** [1] - 360:22
**GOVERNMENT** [36] - 303:12, 311:10, 326:8, 332:20, 334:8, 334:9, 346:22, 346:23, 353:2, 355:10, 365:20, 377:15, 379:10, 380:3, 381:9, 385:7, 400:2, 404:3, 406:4, 406:5, 412:14, 413:12, 414:19, 415:15, 420:1, 421:23, 423:10, 425:17, 426:16, 429:3, 436:22, 439:1, 443:7, 452:22, 458:18
**GOVERNMENT** [21] - 319:17, 319:22, 320:1, 320:11, 320:16, 320:19, 320:20, 321:1, 321:3, 321:6, 321:7, 330:24, 331:4, 331:25, 332:1, 344:11, 346:2, 346:4, 346:10, 382:9, 457:16
**GOVERNMENT'S** [3] - 302:2, 347:12, 406:19
**GOVERNMENT'S** [2] - 326:1, 390:20
**GOVERNMENT-FUNDED** [1] - 320:11
**GOVERNMENTAL** [2] - 333:10, 459:6
**GOVERNMENTS** [1] - 349:15
**GRADUATED** [2] - 347:19, 407:4
**GRAEME** [1] - 297:8
**GRAEME** [1] - 302:1
**GRAMMAR** [1] - 344:9
**GREAT** [1] - 342:22
**GREW** [3] - 408:3, 432:16, 459:21
**GROSS** [2] - 350:2, 391:18
**GROSSED** [1] - 392:1
**GROUP** [2] - 306:25, 331:17, 411:17, 456:13
**GROUP** [1] - 304:25
**GROWTH** [2] - 325:16, 325:18
**GSL** [13] - 302:8, 302:11, 303:8, 308:1, 308:8, 308:23, 311:13, 312:9, 313:9, 322:19, 322:23, 323:2, 329:4
**GUARANTEE** [1] - 442:24
**GUARANTEED** [2] - 443:4, 446:5
**GUESS** [9] - 309:3, 310:22,

343:9, 349:21, 392:25, 411:7, 424:12, 436:14, 458:13
**GUESSING** [1] - 427:22
**GURALP** [107] - 308:11, 308:23, 310:8, 310:13, 311:2, 312:8, 313:22, 314:10, 316:20, 316:24, 317:4, 317:13, 317:16, 317:18, 317:19, 321:10, 323:4, 323:5, 323:15, 323:25, 324:4, 324:15, 329:11, 332:8, 333:14, 334:1, 334:5, 334:17, 336:15, 337:12, 337:16, 340:8, 340:11, 340:21, 341:2, 345:4, 350:8, 407:6, 407:8, 407:10, 407:19, 408:10, 408:12, 408:21, 408:23, 410:1, 410:9, 411:4, 412:10, 412:11, 412:18, 412:21, 412:24, 413:13, 414:4, 414:25, 415:6, 415:7, 415:8, 415:20, 416:8, 417:4, 417:9, 417:13, 418:12, 419:20, 419:22, 419:23, 422:24, 424:23, 425:13, 425:23, 427:9, 427:13, 427:15, 428:1, 430:20, 430:24, 430:25, 431:2, 431:6, 433:4, 433:16, 435:15, 437:1, 437:7, 437:18, 438:6, 439:7, 439:21, 441:13, 443:13, 445:13, 446:2, 451:1, 453:4, 453:14, 453:18, 454:5, 456:6, 456:25, 458:24, 459:11, 460:3, 460:5, 460:14
**GURALP'S** [9] - 303:18, 335:13, 335:24, 336:19, 336:23, 341:9, 409:6, 428:23, 438:14

**H**

**H-A-R-R-I-N-G-T-O-N** [1] - 347:9
**HAIR** [1] - 384:23
**HALF** [18] - 315:10, 334:16, 353:10, 359:14, 360:8, 361:22, 362:12, 367:21, 368:2, 371:6, 377:20, 378:8, 379:23, 400:14, 401:6, 401:20, 405:21, 419:4
**HALFWAY** [1] - 381:20
**HAND** [8] - 346:25, 353:15, 356:14, 356:3, 356:13, 356:15, 406:7, 452:5
**HANDLE** [1] - 389:1
**HANDWRITING** [5] - 303:9,

303:18, 303:19, 303:20, 303:23
**HANDWRITTEN** [1] - 300:8
**HARD** [2] - 343:22, 343:23
**HARRINGTON** [27] - 346:24, 347:8, 347:15, 349:8, 353:8, 355:4, 356:22, 357:6, 363:25, 367:19, 368:19, 370:24, 371:22, 372:11, 372:18, 373:12, 374:22, 375:18, 376:6, 377:5, 379:15, 380:8, 382:5, 400:11, 401:18, 402:7, 402:25
**HARRINGTON** [2] - 297:12, 347:11
**HARVARD** [1] - 389:11
**HEAD** [6] - 307:7, 318:16, 318:18, 318:20, 350:19, 407:8
**HEADING** [1] - 395:17
**HEARD** [2] - 388:23, 434:3
**HEARSAY** [5] - 304:5, 311:11, 321:19, 323:12, 323:18
**HEART** [1] - 310:4
**HEESONG** [18] - 326:24, 326:25, 367:25, 372:23, 401:24, 402:1, 404:5, 404:8, 404:11, 404:14, 404:16, 404:24, 434:25, 439:14, 439:15, 439:16, 439:17, 457:18
**HELD** [1] - 462:10
**HELD** [4] - 301:5, 301:14, 405:8, 406:1
**HELP** [16] - 322:16, 323:24, 333:15, 347:3, 406:10, 411:10, 431:13, 433:20, 434:5, 440:1, 440:10, 440:14, 449:2, 450:11, 450:14, 450:17
**HELPED** [7] - 314:20, 332:12, 431:19, 432:15, 433:25, 434:7, 440:3
**HELPFUL** [3] - 321:14, 448:24, 448:25
**HELPING** [4] - 323:16, 324:18, 450:15, 453:21
**HELPS** [1] - 440:13
**HENCE** [4] - 328:20, 372:22, 437:6, 444:1
**HENCE** [1] - 446:1
**HEON** [23] - 352:3, 357:2, 358:19, 358:22, 361:3, 362:15, 364:4, 368:3, 368:8, 370:10, 371:7, 372:1, 373:21, 375:3, 377:2, 378:7, 379:18, 380:13, 381:24, 410:10, 412:17, 420:24,

429:19
**HEON** [1] - 295:8
**HEON-CHEOL** [19] - 352:3, 357:2, 362:15, 364:4, 368:3, 368:8, 370:10, 371:7, 372:1, 373:21, 375:3, 378:7, 379:18, 380:13, 381:24, 410:10, 412:17, 420:24, 429:19
**HEON-CHEOL** [1] - 295:8
**HEREBY** [1] - 462:7
**HIGH** [5] - 317:1, 390:14, 391:24, 392:4, 446:11
**HIGH-END** [2] - 391:24, 446:11
**HIGHER** [5] - 336:23, 337:12, 343:1, 390:16
**HIGHEST** [2] - 390:7, 391:25
**HIGHLIGHT** [1] - 449:15
**HIGHLIGHTED** [1] - 376:13
**HIGHLY** [1] - 327:7
**HIGHWAY** [1] - 296:20
**HILL** [2] - 333:19, 337:25
**HIMSELF** [4] - 322:18, 322:19, 331:24, 394:7
**HIRED** [2] - 328:12, 348:17
**HISTORY** [1] - 407:2
**HOLD** [1] - 322:3
**HOLDER** [1] - 429:18
**HONEST** [2] - 383:12, 391:10
**HONOR** [58] - 303:25, 304:5, 310:23, 311:8, 311:11, 313:20, 321:19, 322:4, 323:12, 323:21, 326:4, 326:10, 326:14, 330:14, 330:17, 332:19, 332:21, 341:15, 342:2, 346:21, 353:1, 355:13, 361:15, 365:19, 367:12, 367:16, 371:16, 373:6, 374:18, 375:12, 376:6, 377:14, 379:9, 380:2, 381:8, 382:15, 385:5, 385:9, 389:23, 392:19, 400:1, 400:4, 400:7, 402:18, 402:20, 405:1, 405:13, 406:5, 409:16, 417:5, 417:22, 432:18, 440:25, 441:9, 441:22, 448:12, 460:22, 461:7
**HONORABLE** [1] - 295:3
**HOPE** [6] - 302:10, 302:14, 302:16, 327:13, 327:14, 365:10
**HOPEFULLY** [1] - 432:6
**HOPING** [1] - 405:21
**HOSKINS** [2] - 304:25, 305:4

**HOUR** [1] - 405:21
**HOURS** [2] - 405:22, 442:21
**HTML** [1] - 420:16
**HU** [1] - 394:18
**HUGE** [1] - 339:2
**HUMAN** [1] - 349:7
**HUMIDITY** [1] - 407:17
**HUNDREDS** [2] - 314:25, 418:22
**HYDROELECTRICITY** [1] - 436:15
**HYON** [1] - 296:23

# I

**ID** [6] - 298:5, 299:5, 300:5, 354:19, 354:21, 354:24
**ID'S** [1] - 369:1
**IDEA** [6] - 302:11, 312:14, 343:10, 423:2, 437:4, 437:6
**IDENTICAL** [1] - 430:4
**IDENTIFICATION** [2] - 370:19, 418:3
**IDENTIFIED** [4] - 353:3, 360:4, 369:14, 410:18
**IDENTIFY** [2] - 350:6, 354:25
**ILLEGAL** [7] - 312:10, 339:24, 399:17, 399:21, 459:7, 460:19, 460:21
**ILLEGALITY** [1] - 312:17
**IMAGE** [1] - 342:16
**IMAGINE** [1] - 328:11
**IMMEDIATELY** [1] - 311:18
**IMPLEMENT** [1] - 323:16
**IMPLIES** [1] - 354:11
**IMPORTANCE** [1] - 451:24
**IMPORTANT** [1] - 453:6
**IMPORTANT** [5] - 318:2, 346:15, 435:25, 451:25, 453:10
**IMPOSE** [1] - 339:12
**IMPRESSION** [1] - 397:22
**IMPROPER** [1] - 346:13
**IMPROVED** [1] - 309:13
**IN** [3] - 462:6, 462:10, 462:11
**INAUDIBLE** [1] - 386:1
**INCLUDE** [3] - 331:9, 331:10, 360:16
**INCLUDED** [5] - 336:1, 336:8, 336:12, 387:20, 438:10
**INCLUDES** [1] - 313:14
**INCLUDING** [4] - 332:16, 365:17, 392:25, 433:7
**INCORRECT** [1] - 344:1
**INCREASED** [3] - 325:11, 325:12, 450:18

**INDEED** [2] - 315:21, 332:1
**INDEX** [1] - 297:5
**INDIAN** [3] - 307:2, 307:23, 308:5
**INDICATE** [2] - 396:19, 447:4
**INDICATED** [2] - 303:17, 328:16
**INDICATES** [5] - 326:20, 328:14, 373:24, 375:25, 447:6
**INDICATING** [2] - 316:20, 401:6
**INDICATION** [1] - 337:4
**INDIVIDUAL** [6] - 333:14, 356:25, 367:23, 399:7, 401:16, 410:10
**INDUSTRY** [2] - 308:16, 410:4
**INFORM** [3] - 344:13, 372:23, 437:16
**INFORMATION** [26] - 316:16, 322:6, 322:8, 345:9, 368:7, 392:15, 398:8, 411:9, 431:12, 431:18, 432:10, 432:12, 433:25, 434:5, 434:7, 440:5, 440:16, 440:19, 440:20, 440:22, 440:23, 441:16, 448:20, 448:23, 449:3, 454:19
**INFORMED** [6] - 325:1, 325:2, 419:18, 438:17, 448:1, 460:15
**INFORMING** [2] - 423:25, 438:23
**INITIAL** [1] - 431:11
**INITIALS** [1] - 438:14
**INITIATE** [1] - 315:25
**INSIDE** [4] - 325:25, 438:10, 440:22, 440:24
**INSPECTED** [1] - 451:18
**INSPECTING** [1] - 451:25
**INSPECTION** [1] - 451:17
**INSTALL** [1] - 327:17
**INSTALLATION** [2] - 342:23, 411:11
**INSTALLED** [5] - 328:9, 328:10, 334:23, 342:22, 343:2
**INSTANCE** [8] - 322:21, 355:23, 356:4, 357:13, 373:21, 375:6, 401:23, 451:9
**INSTEAD** [2] - 443:23, 448:25
**INSTIGATE** [1] - 314:21
**INSTITUTE** [2] - 355:2, 355:24
**INSTITUTE** [10] - 320:11, 334:23, 372:15, 422:20, 426:10, 435:18, 435:23,

435:24, 451:16, 451:24
**INSTITUTION** [3] - 354:13, 410:22, 444:6
**INSTITUTIONS** [2] - 349:14, 412:23
**INSTRUMENT** [8] - 324:12, 327:1, 327:16, 327:21, 336:5, 336:9, 337:13, 430:11
**INSTRUMENTAL** [2] - 324:18, 324:21
**INSTRUMENTS** [19] - 308:19, 322:24, 325:8, 325:19, 326:22, 326:23, 326:24, 326:25, 327:4, 327:6, 327:10, 327:25, 328:7, 328:8, 331:12, 335:13, 337:7, 451:17
**INTERACTED** [1] - 387:22
**INTERACTING** [1] - 411:20
**INTERACTIONS** [2] - 410:10, 423:7
**INTEREST** [6] - 310:20, 311:16, 311:19, 311:22, 311:24, 312:1
**INTERESTS** [1] - 412:23
**INTERNAL** [10] - 332:5, 336:4, 337:15, 360:13, 397:4, 398:3, 434:8, 460:5
**INTERNATIONAL** [2] - 349:16, 349:20
**INTERPRETER** [1] - 412:7
**INTERPRETERS** [1] - 296:22
**INTERRUPTED** [1] - 444:10
**INTERVAL** [1] - 418:17
**INTRODUCE** [2] - 332:20, 334:9
**INVALUABLE** [2] - 322:5, 322:7
**INVENTED** [1] - 309:2
**INVENTOR** [1] - 389:13
**INVESTIGATING** [2] - 303:13, 303:22
**INVESTIGATION** [14] - 303:16, 315:25, 316:16, 320:16, 323:14, 332:5, 332:13, 332:14, 332:15, 334:4, 337:16, 338:16, 343:25, 460:5
**INVESTIGATIONS** [1] - 315:1
**INVESTMENT** [1] - 457:12
**INVESTMENTS** [1] - 308:14
**INVESTOR** [3] - 306:24, 307:1, 341:6
**INVOICE** [1] - 369:8
**INVOICE** [17] - 329:19, 359:11, 359:15, 359:17, 359:19, 360:1, 360:9, 360:14, 360:15, 361:6,

428:19, 428:24, 429:5, 429:14, 429:21, 429:22, 430:1

**INVOICED** [1] - 430:3
**INVOICES** [9] - 329:10, 329:18, 329:22, 428:16, 428:21, 429:1, 430:16, 430:18, 430:21
**INVOICING** [2] - 428:16, 430:8
**INVOLVED** [9] - 308:8, 308:18, 319:16, 323:15, 328:1, 339:4, 409:2, 409:3, 455:18
**IPHONE** [3] - 420:11, 420:15, 420:16
**IRRELEVANT** [9] - 338:17, 339:6, 339:13, 339:17, 339:21, 340:3, 340:13, 342:3, 417:5
**IS** [2] - 462:9, 462:11
**ISSUE** [1] - 317:7
**ISSUED** [1] - 354:10
**ISSUES** [1] - 315:18
**ITEM** [1] - 358:10
**ITEMS** [9] - 321:22, 328:15, 328:21, 337:8, 342:14, 342:21, 343:2, 357:12, 366:21

# J

**JANUARY** [3] - 311:3, 326:22, 364:12
**JERSEY** [1] - 429:9
**JOB** [4] - 348:10, 349:4, 382:22, 407:9
**JOE** [6] - 384:7, 384:25, 385:15, 385:19, 385:23, 393:18
**JOEL** [2] - 296:12, 296:13
**JOHN** [1] - 295:3
**JOINED** [4] - 308:11, 329:6, 330:11, 384:2
**JOINT** [1] - 424:12
**JUDGE** [1] - 295:3
**JUDICIAL** [1] - 462:12
**JULY** [7] - 295:13, 297:3, 298:3, 299:3, 300:3, 301:1, 462:15
**JULY** [8] - 326:23, 327:1, 342:15, 348:17, 429:23, 438:7, 445:13, 451:1
**JUNE** [12] - 334:17, 362:7, 362:9, 362:11, 363:5, 363:9, 373:18, 374:3, 374:6, 374:12, 375:22, 458:25
**JURORS** [2] - 301:11
**JURY** [15] - 301:6, 301:15, 335:15, 335:24, 347:17,

385:13, 405:9, 405:10, 405:24, 406:2, 406:3, 409:7, 417:12, 419:15, 457:2
**JUSTICE** [4] - 316:9, 338:7, 338:22, 408:18
**JUSTICE** [1] - 296:8
**JUSTIFY** [1] - 442:2

# K

**K-U-R-A-I-C-A** [1] - 350:14
**KAMINSKA** [1] - 323:12
**KAMINSKA** [1] - 297:10
**KAMINSKA** [21] - 296:9, 321:19, 323:18, 326:10, 330:17, 330:19, 332:19, 333:1, 334:8, 334:15, 338:20, 339:8, 339:15, 339:19, 339:24, 340:5, 340:16, 340:20, 341:17, 342:9, 346:21
**KATHY** [1] - 296:23
**KAYE** [1] - 296:15
**KEEP** [2] - 335:21, 448:9
**KEMP** [3] - 366:4, 366:5, 366:6
**KEVIN** [1] - 296:16
**KEY** [1] - 453:7
**KIGAM** [51] - 320:6, 320:10, 320:16, 320:23, 328:6, 328:10, 330:23, 331:6, 336:24, 337:4, 355:3, 356:4, 357:13, 360:4, 365:2, 365:8, 365:17, 369:20, 370:10, 379:1, 409:10, 409:13, 409:14, 409:15, 409:19, 409:22, 409:25, 410:8, 410:20, 410:23, 410:25, 411:3, 411:17, 413:6, 413:8, 413:13, 413:23, 414:13, 415:19, 422:20, 424:4, 424:6, 424:13, 424:19, 426:10, 426:25, 430:18, 431:1, 437:9, 456:15
**KIGAM'S** [1] - 358:13
**KIND** [6] - 313:14, 349:13, 383:7, 384:11, 397:24, 440:19
**KINEMETRICS** [31] - 347:23, 347:24, 347:25, 348:2, 348:8, 348:10, 348:17, 349:10, 349:13, 349:16, 349:22, 349:25, 350:3, 350:7, 350:11, 351:4, 351:6, 351:18, 352:4, 357:21, 357:25, 358:11, 364:8, 365:6, 366:22, 372:12, 372:19, 373:15, 375:19, 377:9
**KINGDOM** [3] - 338:10,

340:7, 406:25
**KMA** [4] - 365:2, 365:8, 366:17, 409:10
**KMI** [23] - 382:21, 382:24, 383:14, 383:19, 383:20, 384:6, 386:11, 386:18, 386:24, 388:2, 388:15, 389:7, 390:2, 392:1, 392:17, 392:23, 393:4, 393:20, 393:24, 397:4, 399:12, 399:16, 403:5
**KMI'S** [2] - 386:8, 391:18
**KMI.COM** [1] - 364:8
**KNOCKING** [1] - 337:19
**KNOWLEDGE** [9] - 350:2, 351:3, 351:19, 352:6, 389:20, 394:10, 403:20, 409:5, 417:14
**KNOWN** [3] - 382:12, 439:13, 456:11
**KORE0006** [3] - 354:15, 355:1, 369:14
**KOREA** [85] - 321:14, 322:14, 322:23, 323:3, 324:22, 325:7, 325:9, 325:11, 327:21, 328:22, 329:1, 331:12, 331:13, 333:8, 334:21, 335:4, 336:13, 349:22, 350:3, 350:21, 352:1, 352:4, 355:2, 355:24, 362:13, 365:10, 366:17, 371:7, 373:20, 374:14, 375:3, 375:24, 376:19, 376:23, 387:10, 387:19, 387:20, 391:18, 391:21, 402:2, 402:3, 402:9, 404:12, 408:20, 408:21, 408:24, 409:2, 409:8, 409:9, 411:1, 411:13, 419:1, 423:9, 424:4, 424:10, 424:17, 424:20, 424:21, 425:25, 426:11, 429:13, 432:16, 435:5, 436:17, 437:11, 439:13, 441:6, 441:14, 441:17, 441:20, 442:9, 444:7, 445:20, 445:22, 450:12, 450:15, 450:19, 451:3, 451:7, 451:21, 452:15, 453:9, 453:18, 453:20, 459:16
**KOREAN** [14] - 302:7, 302:12, 321:1, 322:1, 322:6, 324:19, 330:23, 331:4, 334:25, 336:6, 404:16, 404:23, 412:22, 437:14
**KOREAN** [1] - 296:22
**KOURY** [50] - 296:12, 296:13, 302:4, 303:25, 304:3, 304:8, 304:10, 310:23, 311:8, 311:13,

313:19, 321:21, 322:3, 323:14, 323:20, 323:23, 326:3, 326:7, 326:14, 326:16, 330:12, 330:14, 332:21, 334:11, 338:17, 339:13, 339:17, 339:21, 340:2, 340:13, 341:15, 342:2, 342:11, 342:13, 346:18, 409:16, 417:5, 417:14, 417:22, 418:6, 431:22, 432:17, 434:2, 440:25, 441:9, 441:22, 448:12, 458:9, 460:22, 460:24
**KOURY** [2] - 297:9, 297:10
**KOWACO** [3] - 443:22, 444:4, 444:5
**KRC** [1] - 451:3
**KUMAR** [2] - 297:13, 297:14
**KUMAR** [48] - 296:5, 304:5, 311:11, 346:23, 347:14, 353:8, 355:10, 355:17, 356:12, 361:20, 363:19, 363:25, 365:19, 365:25, 367:12, 367:19, 370:13, 370:17, 370:24, 371:16, 371:21, 373:6, 373:12, 374:18, 374:22, 375:12, 375:17, 376:6, 376:12, 377:14, 377:20, 379:9, 379:15, 380:2, 380:8, 381:8, 381:11, 381:15, 382:14, 385:9, 389:23, 392:19, 400:4, 400:6, 400:10, 401:20, 402:17, 405:4
**KURAICA** [1] - 350:12

# L

**L-E-A-V-E-R** [1] - 313:19
**LAB** [1] - 327:22
**LACKING** [1] - 409:16
**LADIES** [2] - 301:16, 461:10
**LAHUE** [1] - 296:16
**LANGUAGE** [2] - 411:23, 412:4
**LARGE** [4] - 418:15, 425:4, 426:13, 433:12
**LAST** [23] - 308:13, 309:10, 317:24, 318:4, 318:6, 345:15, 350:25, 363:11, 364:22, 367:8, 402:20, 434:11, 437:3, 443:21, 445:14, 452:17, 453:5, 457:5, 457:25, 458:1, 459:22, 459:24
**LATE** [2] - 330:7, 338:5
**LAUNCHED** [1] - 337:15

**LAW** [2] - 296:12, 296:19
**LAW** [5] - 314:25, 337:19, 342:6, 399:23, 451:17
**LAW-ABIDING** [1] - 399:23
**LAWSUIT** [10] - 314:20, 314:23, 314:24, 315:2, 315:3, 315:6, 316:21, 317:21, 317:22, 340:6
**LAWYER** [4] - 314:13, 346:9, 389:18, 389:21
**LAWYERS** [9] - 303:12, 315:8, 315:9, 315:12, 315:17, 316:15, 316:17, 320:9, 320:15
**LAY** [2] - 417:15, 441:11
**LEAD** [1] - 433:17
**LEADER** [1] - 313:18
**LEADING** [1] - 409:6
**LEARNED** [1] - 340:9
**LEAST** [2] - 313:3, 351:5
**LEAVER** [12] - 312:10, 313:12, 313:14, 313:19, 313:22, 314:4, 314:5, 316:21, 317:5, 317:20, 317:21
**LEAVES** [1] - 314:2
**LEAVING** [4] - 313:23, 344:21, 460:3, 460:14
**LEDGER** [2] - 348:14, 349:6
**LEE** [1] - 429:9
**LEFT** [24] - 304:18, 305:5, 305:20, 306:14, 306:20, 318:16, 318:19, 318:21, 318:25, 319:5, 319:9, 319:13, 319:14, 321:2, 354:14, 356:3, 356:13, 356:17, 384:22, 385:2, 385:14, 385:18, 407:10, 408:5
**LEFT-HAND** [2] - 354:14, 356:3
**LEGAL** [2] - 315:20, 384:3
**LEGISLATIVE** [1] - 432:4
**LENGTHY** [3] - 323:6, 323:9, 323:23
**LESS** [1] - 420:17
**LESSER** [1] - 390:17
**LETTER** [6] - 315:13, 354:3, 354:8, 354:9, 354:10, 355:20
**LETTERS** [3] - 315:24, 447:8, 450:6
**LEVEL** [1] - 314:6
**LEVELS** [1] - 314:6
**LICENSE** [1] - 383:5
**LIKELY** [1] - 450:18
**LIM** [1] - 422:16
**LIM** [2] - 422:18, 422:19
**LIMITED** [2] - 364:23,

457:19
**LIMITED** [2] - 412:18, 413:13
**LINE** [44] - 324:5, 324:7, 326:24, 337:6, 354:11, 357:16, 358:4, 364:18, 366:8, 366:13, 366:24, 367:8, 369:13, 373:20, 374:14, 375:3, 375:24, 377:1, 380:19, 412:21, 415:5, 415:9, 415:12, 416:5, 420:12, 420:19, 420:23, 421:4, 422:5, 427:7, 438:9, 445:14, 447:4, 451:15, 452:17, 454:6, 454:7, 455:12, 455:14, 457:25, 459:4
**LINE-BY-LINE** [2] - 324:5, 324:7
**LINES** [5] - 312:11, 354:2, 434:11, 452:18, 458:1
**LINUX** [1] - 449:20
**LINUX-BASED** [1] - 449:20
**LIST** [8] - 335:21, 357:12, 365:8, 403:2, 403:17, 423:25, 424:3, 442:1
**LISTED** [15] - 357:4, 362:13, 362:15, 362:18, 365:5, 366:21, 368:9, 373:21, 375:4, 375:25, 382:1, 423:20, 423:23, 427:2, 429:7
**LISTING** [1] - 368:25
**LISTS** [1] - 365:1
**LITIGATION** [4] - 317:9, 317:11, 319:16, 339:4
**LITT** [1] - 296:15
**LIVE** [1] - 429:12
**LIVED** [2] - 423:8, 423:9
**LLP** [1] - 296:15
**LOAD** [1] - 328:18
**LOAN** [11] - 310:16, 310:17, 310:19, 312:25, 313:7, 341:5, 341:7, 341:8, 341:9
**LOCATED** [5] - 335:18, 338:10, 423:4, 423:6, 436:16
**LOCATION** [1] - 327:11
**LOGGERS** [1] - 446:10
**LOGISTICAL** [1] - 321:22
**LOOK** [22] - 325:23, 357:10, 361:21, 369:13, 373:20, 374:23, 375:17, 375:24, 378:8, 380:18, 381:19, 394:22, 396:21, 401:4, 401:6, 404:9, 413:4, 415:9, 420:12, 429:20, 429:24, 447:23
**LOOKED** [9] - 361:1, 369:5, 369:9, 378:23, 413:21, 414:9, 430:1, 430:10, 455:1

**LOOKING** [6] - 356:2, 356:18, 357:7, 369:18, 371:1, 439:24
**LOOKS** [9] - 327:2, 342:15, 362:9, 368:25, 370:12, 386:4, 386:7, 402:10, 403:13
**LOS** [1] - 296:7
**LOS** [3] - 295:14, 295:24, 301:1
**LOSS** [7] - 318:1, 318:4, 318:5, 318:7, 318:11, 328:16, 365:10
**LOSS-MAKING** [1] - 318:11
**LOST** [1] - 449:1
**LOWER** [2] - 336:20, 392:3
**LTD** [1] - 407:13

# M

**MAIL** [118] - 298:6, 298:7, 298:8, 298:9, 298:10, 298:11, 298:12, 298:13, 298:14, 298:15, 298:16, 298:17, 298:18, 298:19, 298:20, 298:21, 298:22, 298:23, 298:24, 298:25, 299:6, 299:7, 299:8, 299:9, 299:10, 299:11, 299:12, 299:13, 299:14, 299:15, 299:16, 299:17, 299:18, 299:19, 299:21, 299:22, 299:23, 299:25, 311:2, 326:4, 326:17, 327:25, 328:14, 328:23, 333:2, 333:5, 334:16, 335:12, 364:1, 364:7, 364:10, 364:20, 365:25, 366:11, 366:15, 371:22, 372:1, 376:13, 376:16, 392:10, 394:8, 400:16, 400:21, 403:1, 404:1, 411:21, 411:22, 412:1, 414:25, 415:10, 415:11, 416:3, 418:11, 419:21, 420:7, 420:13, 421:16, 422:3, 423:16, 423:19, 425:22, 426:21, 433:3, 435:14, 435:21, 437:1, 438:6, 439:6, 443:12, 445:12, 447:2, 447:7, 447:11, 447:12, 447:13, 447:23, 448:3, 448:5, 448:8, 449:11, 450:25, 452:21, 453:3, 453:6, 454:4, 455:10, 455:13, 455:15, 455:16, 456:5, 456:25, 458:1, 458:22, 459:1
**MAILED** [3] - 345:2, 392:14, 412:1
**MAILS** [25] - 332:5, 332:7,

332:11, 332:16, 333:24, 333:25, 334:3, 334:7, 344:8, 396:21, 397:3, 397:6, 397:9, 411:23, 416:25, 417:4, 420:9, 420:10, 420:14, 428:14, 430:11, 454:15, 455:1, 455:2
**MAIN** [2] - 409:7, 409:9
**MAINTAINED** [5] - 352:6, 353:22, 373:14, 377:12, 398:23
**MAINTENANCE** [1] - 328:17
**MALFUNCTIONING** [1] - 343:2
**MAN** [7] - 384:21, 385:2, 385:14, 385:17, 386:2, 387:13, 389:16
**MANAGED** [1] - 306:25
**MANAGEMENT** [7] - 306:22, 307:11, 307:18, 307:20, 393:3, 408:11, 457:4
**MANAGER** [6] - 350:21, 352:8, 377:13, 377:24, 381:1, 398:8
**MANAGERS** [3] - 306:19, 350:20
**MANAGING** [1] - 407:13
**MANNER** [1] - 399:4
**MANUFACTURED** [1] - 449:23
**MANUFACTURES** [3] - 348:1, 407:20, 407:22
**MANUFACTURING** [1] - 359:2
**MARCH** [4] - 375:1, 437:2, 457:1, 457:6
**MARILYN** [1] - 296:16
**MARK** [2] - 329:25, 385:22
**MARK** [1] - 318:16
**MARKED** [5] - 325:25, 370:19, 371:17, 418:3, 420:1
**MARKET** [9] - 302:7, 302:12, 322:1, 324:19, 391:21, 411:13, 440:9, 453:9, 453:22
**MARKETED** [1] - 309:11
**MARKETING** [5] - 407:9, 440:6, 440:10, 440:15, 449:3
**MARKETPLACE** [3] - 322:6, 390:8, 390:16
**MARKETS** [2] - 318:20, 390:4
**MARKS** [1] - 453:7
**MARRIED** [1] - 319:12
**MASSACHUSETTS** [1] - 389:10
**MATCH** [1] - 357:6
**MATERIAL** [2] - 440:10, 440:15

MATTER [1] - 462:11
MBA [2] - 304:21, 314:10
MCGOWAN [1] - 458:23
MCLANE [1] - 296:15
MEAN [15] - 346:7, 346:10, 363:3, 384:1, 384:15, 385:20, 400:5, 411:5, 411:16, 421:12, 439:21, 440:7, 442:20, 446:15, 459:18
MEANS [7] - 314:2, 325:15, 354:7, 363:4, 421:14, 442:12, 450:18
MEANT [1] - 411:10
MEANWHILE [1] - 338:20
MEET [7] - 344:16, 345:3, 409:21, 410:5, 431:9, 442:2
MEETING [10] - 332:2, 333:18, 337:24, 459:24, 460:2, 460:4, 460:6, 460:9, 460:12, 460:14
MEETINGS [3] - 331:21, 331:24, 336:12
MEETS [1] - 446:4
MEMBERS [3] - 435:3, 456:11, 456:14
MEMORY [2] - 409:9, 410:22
MENTION [8] - 340:7, 430:18, 434:17, 434:19, 434:24, 434:25, 454:13, 458:14
MENTIONED [8] - 363:5, 387:12, 411:2, 418:25, 419:13, 422:23, 440:3, 441:4
MESSAGE [2] - 420:18, 421:1
MET [12] - 315:3, 315:7, 315:23, 316:8, 316:13, 321:4, 335:9, 345:13, 345:25, 352:12, 442:3, 453:7
METEOROLOGICAL [1] - 334:25
MICHELLE [2] - 347:9, 347:11
MICHELLE [4] - 297:12, 319:13, 346:24, 347:8
MID [1] - 407:25
MIDDLE [8] - 337:3, 358:4, 358:17, 423:18, 426:23, 433:5, 443:14, 449:14
MIGHT [8] - 303:8, 372:22, 392:3, 425:6, 432:11, 440:11, 440:14, 459:9
MILLION [16] - 310:8, 310:11, 310:14, 310:18, 310:21, 311:6, 312:11, 312:24, 340:8, 341:2, 350:5, 391:19, 392:1, 459:21
MILLIONS [2] - 313:3,

392:4
MINE [3] - 447:17, 454:15, 458:23
MINERAL [2] - 355:2, 355:25
MINUS [2] - 418:15, 418:16
MINUTE [9] - 405:18, 413:21, 415:16, 419:13, 419:14, 426:14, 428:11, 446:14, 451:21
MINUTES [5] - 393:12, 393:16, 400:7, 405:6, 461:13
MIRANDA [4] - 295:23, 462:5, 462:18, 462:19
MIRANDAALGORRI@
GMAIL.COM [1] - 295:25
MISCHARACTERIZES [1] - 441:1
MISCHARACTERIZING [1] - 458:10
MISLED [1] - 317:18
MISYS [12] - 306:14, 306:15, 306:23, 307:5, 307:8, 307:10, 307:11, 307:13, 307:14, 307:15, 307:16, 307:18
MISYS [1] - 306:15
MOBILE [2] - 357:3, 424:18
MODELS [1] - 438:14
MODIFIED [1] - 324:24
MODIFY [2] - 324:18, 438:19
MODULE [2] - 427:11, 449:20
MODULES [1] - 419:2
MOMENT [6] - 301:12, 330:12, 351:24, 409:13, 430:10, 461:7
MONDAY [4] - 420:8, 443:13, 447:3, 458:24
MONDEX [1] - 305:9
MONEY [8] - 340:12, 340:25, 341:10, 342:23, 346:17, 417:13, 422:14, 437:21
MONICA [1] - 296:14
MONIES [2] - 414:12, 414:13
MONITOR [2] - 324:11, 444:13
MONITORED [1] - 353:23
MONITORING [5] - 348:1, 407:17, 444:9, 451:6, 451:13
MONITORS [2] - 331:11, 383:7
MONTH [2] - 349:9, 362:8
MONTHS [6] - 311:18, 319:2, 320:15, 344:24, 375:10, 433:18
MOREOVER [2] - 459:7,

459:8
MORNING [11] - 301:10, 301:16, 302:5, 302:6, 330:20, 330:21, 347:15, 382:19, 382:20, 406:22, 406:23
MOSCOW [1] - 421:9
MOST [2] - 306:10, 393:23
MOTION [3] - 427:12, 439:12, 439:20
MOU [1] - 437:10
MOUTH [1] - 319:22
MOVE [4] - 304:1, 311:9, 332:20, 334:9, 353:2, 355:11, 356:12, 361:15, 363:15, 363:19, 365:20, 367:14, 367:15, 370:14, 370:18, 371:17, 373:6, 374:18, 375:12, 376:7, 377:15, 379:10, 380:3, 381:9, 385:17, 414:18, 418:2, 419:25, 421:22, 425:16, 432:22, 435:8, 438:1, 438:25, 443:6, 444:24, 445:6, 446:20, 449:5, 450:20, 452:22, 453:24, 456:20, 458:17
MOVING [3] - 423:10, 426:16, 434:9
MR [114] - 302:4, 303:25, 304:3, 304:8, 304:10, 310:23, 311:8, 311:13, 313:19, 321:21, 322:3, 323:14, 323:20, 323:23, 326:3, 326:7, 326:14, 326:16, 330:12, 330:14, 332:21, 334:11, 338:17, 339:13, 339:17, 339:21, 340:2, 340:13, 341:15, 342:2, 342:11, 342:13, 346:18, 405:13, 405:17, 405:21, 406:5, 406:21, 409:16, 409:22, 410:19, 414:18, 414:24, 417:5, 417:8, 417:14, 417:17, 417:22, 418:2, 418:6, 418:10, 419:25, 420:6, 421:22, 422:2, 423:10, 423:15, 425:16, 425:21, 426:16, 426:20, 428:3, 431:22, 431:24, 432:17, 432:19, 433:2, 434:2, 434:5, 435:8, 435:13, 436:21, 436:25, 438:1, 438:5, 438:25, 439:5, 440:25, 441:4, 441:9, 441:13, 441:22, 442:8, 443:6, 443:11, 445:6, 445:11, 446:20, 446:24, 448:12, 448:17, 449:5, 449:10,

450:20, 450:24, 452:22, 453:2, 453:24, 454:3, 455:5, 455:9, 455:25, 456:4, 456:20, 456:24, 458:9, 458:14, 458:17, 458:21, 460:22, 460:24, 461:3, 461:7, 461:9
MS [83] - 304:5, 311:11, 321:19, 323:12, 323:18, 326:10, 330:17, 330:19, 332:19, 333:1, 334:8, 334:15, 338:20, 339:8, 339:15, 339:19, 339:24, 340:5, 340:16, 340:20, 341:17, 342:9, 346:21, 346:23, 347:14, 353:8, 355:10, 355:13, 355:17, 356:12, 361:20, 363:19, 363:25, 365:19, 365:25, 367:12, 367:19, 370:13, 370:17, 370:24, 371:16, 371:21, 373:6, 373:12, 374:18, 374:22, 375:12, 375:17, 376:6, 376:12, 377:14, 377:20, 379:9, 379:15, 380:2, 380:8, 381:8, 381:11, 381:15, 382:14, 382:18, 384:16, 385:5, 385:9, 385:13, 389:23, 390:1, 392:19, 392:21, 393:8, 393:12, 393:15, 394:24, 400:1, 400:4, 400:6, 400:10, 401:20, 402:17, 402:20, 402:24, 405:1, 405:4
MULTIMILLION [2] - 319:4, 319:7
MULTIPLE [6] - 315:8, 316:13, 319:25, 320:4, 343:19, 343:21
MURRAY [1] - 458:23
MUST [2] - 342:8, 437:9
MYSIS [1] - 306:14

N

NAME [21] - 333:8, 347:7, 350:13, 350:25, 356:24, 356:25, 362:15, 362:19, 364:7, 368:8, 368:15, 386:10, 395:17, 395:19, 401:7, 401:10, 406:14, 406:15, 415:1, 415:4, 454:14
NAMED [2] - 387:13, 410:10
NAMES [4] - 394:17, 395:22, 403:14, 409:12
NANOMETRICS [4] - 302:13, 350:8, 372:14, 372:19
NATALIE [8] - 297:16,

321:13, 321:16, 334:1, 344:21, 405:14, 406:6, 406:15

**NATALIE** [2] - 406:16, 406:18

**NATHAN** [11] - 318:20, 319:12, 321:11, 324:17, 325:1, 325:2, 326:5, 333:3, 333:6, 415:3, 448:7

**NATIONAL** [2] - 383:9, 411:1

**NATIONS** [2] - 331:17, 410:24

**NATURE** [3] - 305:17, 332:17, 390:3

**NEAR** [1] - 454:9

**NECESSARY** [2] - 432:7, 442:5

**NEED** [7] - 340:23, 376:19, 422:16, 425:7, 449:15, 449:16, 450:11

**NEEDED** [5] - 387:10, 431:15, 431:16, 439:24, 451:5

**NEVER** [12] - 320:18, 321:4, 329:19, 392:6, 392:9, 392:12, 392:14, 394:7, 397:6, 398:11, 403:18, 454:13

**NEW** [2] - 296:9, 429:9

**NEW** [4] - 437:20, 437:21, 440:17, 450:13

**NEXT** [27] - 326:24, 334:24, 341:1, 346:22, 355:6, 360:7, 362:18, 363:1, 363:7, 366:24, 367:8, 368:1, 368:21, 369:2, 369:8, 372:21, 377:1, 402:11, 404:19, 405:12, 405:13, 406:4, 433:8, 455:25, 457:13, 458:17

**NINE** [1] - 427:21

**NO** [1] - 462:19

**NON** [1] - 408:17

**NON-PROSECUTION** [1] - 408:17

**NORTH** [2] - 296:6, 331:13

**NOS** [1] - 423:23

**NOTE** [11] - 310:17, 310:19, 312:18, 312:20, 312:25, 313:7, 340:8, 341:8, 358:20, 379:23, 416:22

**NOTED** [1] - 360:8

**NOTES** [9] - 310:16, 360:12, 360:13, 376:18, 376:22, 396:18, 398:1, 398:2, 398:3

**NOTHING** [10] - 329:7, 330:14, 346:18, 347:3, 398:17, 399:3, 399:6, 399:9,

406:10, 461:9

**NOTICE** [3] - 416:20, 432:8, 434:13

**NOTIFY** [2] - 315:17, 316:5

**NOVEMBER** [8] - 407:10, 413:19, 415:14, 415:18, 415:24, 418:12, 426:22, 439:7

**NOWHERE** [2] - 394:20, 395:15

**NUCLEAR** [1] - 410:25

**NUCLEAR** [1] - 331:13

**NUMBER** [7] - 310:10, 310:12, 353:18, 353:20, 353:22, 354:15, 354:18, 356:7, 356:10, 356:17, 357:3, 357:6, 359:17, 359:20, 362:18, 362:19, 368:11, 369:4, 370:3, 370:5, 378:22, 393:25, 394:1, 423:19, 427:25, 430:2

**NUMBERS** [6] - 337:4, 378:13, 378:16, 378:17, 378:19, 452:3

**NW** [1] - 296:9

**O**

**OBJECT** [10] - 321:19, 323:12, 323:18, 332:21, 339:13, 340:13, 342:2, 448:12, 458:9, 460:22

**OBJECTION** [1] - 432:17

**OBJECTION** [34] - 304:4, 304:5, 304:6, 311:10, 311:11, 311:12, 326:9, 326:10, 332:24, 334:10, 338:17, 339:7, 339:17, 339:21, 340:2, 340:15, 355:12, 385:8, 389:23, 392:19, 409:16, 417:5, 417:14, 417:22, 418:5, 418:6, 431:22, 434:2, 440:25, 441:2, 441:9, 441:12, 441:22, 460:23

**OBS** [1] - 344:16

**OBVIOUSLY** [4] - 324:13, 327:6, 329:3, 419:22

**OCCASION** [1] - 417:1

**OCCASIONS** [5] - 316:13, 316:14, 319:25, 320:4, 394:1

**OCEAN** [1] - 296:13

**OCTOBER** [11] - 338:5, 362:10, 363:5, 363:9, 371:3, 374:2, 374:6, 374:25, 375:21, 415:1, 422:4

**OF** [13] - 295:2, 295:5, 295:12, 296:1, 296:8, 296:12, 296:19, 462:1, 462:7, 462:9, 462:12, 462:15

**OFFERED** [2] - 323:20, 323:21

**OFFERING** [1] - 326:6

**OFFHAND** [1] - 312:12

**OFFICE** [8] - 327:8, 415:13, 416:20, 421:6, 421:7, 422:15, 428:8, 434:13

**OFFICER** [3] - 333:10, 348:23, 459:6

**OFFICES** [1] - 415:23

**OFFICES** [2] - 296:12, 296:19

**OFFICIAL** [12] - 319:18, 319:22, 320:1, 331:25, 332:1, 332:9, 344:11, 346:2, 346:5, 382:9, 443:24, 444:22

**OFFICIAL** [4] - 295:23, 462:1, 462:5, 462:19

**OFFICIALLY** [4] - 333:6, 433:9, 437:9, 439:12, 439:20, 457:12

**OFFICIALS** [1] - 346:11

**OFFSETTING** [1] - 328:24

**OFTEN** [6] - 313:25, 343:8, 343:10, 387:22, 433:22, 442:3

**OGIE** [2] - 350:12, 350:17

**OGIE** [1] - 350:14

**OIL** [2] - 304:15, 318:18

**OLD** [3] - 314:7, 424:5, 454:14

**ONCE** [8] - 318:12, 327:21, 328:8, 341:8, 345:17, 381:4, 431:11, 454:19

**ONE** [1] - 443:15

**ONE** [51] - 307:15, 312:20, 312:22, 318:1, 318:5, 318:6, 318:7, 320:19, 322:3, 322:21, 336:11, 338:12, 342:19, 343:2, 346:14, 354:21, 354:23, 369:5, 369:8, 370:25, 376:22, 378:19, 378:22, 386:8, 391:21, 391:25, 393:17, 393:18, 395:17, 401:4, 401:16, 408:23, 410:7, 413:23, 413:24, 416:11, 419:3, 424:5, 427:22, 430:10, 439:13, 442:13, 442:20, 446:9, 448:8, 449:19, 450:12, 450:15, 450:18, 460:14

**ONES** [2] - 329:22, 446:11

**ONGOING** [2] - 317:9, 317:11

**OPEN** [12] - 301:6, 301:15, 376:19, 381:1, 405:9, 406:2, 416:22, 434:20, 442:8, 443:16, 443:23, 445:17

**OPENED** [1] - 340:14

**OPENLY** [1] - 442:23

**OPERATIONAL** [1] - 434:8

**OPERATIONALLY** [1] - 384:5

**OPINION** [1] - 390:7

**OPPORTUNITY** [2] - 344:17, 424:23

**OPPOSED** [1] - 396:13

**ORDER** [66] - 325:4, 334:24, 335:1, 335:6, 340:11, 343:20, 351:23, 352:21, 352:24, 353:11, 353:16, 354:1, 357:7, 358:13, 358:22, 358:24, 358:25, 359:1, 359:4, 359:7, 359:9, 359:11, 359:20, 359:25, 360:1, 360:12, 361:1, 361:9, 364:22, 365:17, 366:17, 369:4, 369:17, 369:23, 370:8, 370:10, 378:16, 380:19, 391:4, 396:18, 398:2, 398:5, 421:8, 425:5, 425:14, 426:2, 426:3, 427:25, 429:1, 431:16, 433:7, 433:10, 433:13, 433:15, 433:18, 434:6, 434:14, 438:17, 438:23, 439:11, 439:19, 445:1, 445:2, 450:11

**ORDER'S** [1] - 353:23

**ORDERED** [3] - 365:9, 372:9, 443:15

**ORDERING** [4] - 426:12, 433:14, 451:11, 451:12

**ORDERS** [1] - 300:6

**ORDERS** [16] - 364:23, 365:1, 365:8, 365:11, 379:7, 379:24, 381:3, 381:4, 390:19, 391:1, 398:6, 398:7, 424:1, 424:4, 452:13, 452:14

**ORGANIZATION** [2] - 331:18, 410:25

**ORGANIZATION** [6] - 409:10, 424:8, 424:9, 424:15, 444:12, 444:14

**ORGANIZED** [1] - 350:18

**ORIENTED** [1] - 457:3

**ORIGINAL** [4] - 310:19, 313:1, 317:22, 341:7

**ORIGINALLY** [3] - 309:9, 357:23, 357:24

**ORIGINATOR** [1] - 384:6

**OTHERWISE** [1] - 448:20

**OURSELVES** [2] - 444:16, 445:1

**OUTHAY** [10] - 350:24, 350:25, 364:6, 371:23, 372:2, 387:13, 387:17, 387:25, 393:20, 398:9

**OUTHAY** [1] - 350:25

**OUTSIDE** [1] - 351:12
**OUTSTANDING** [2] - 305:13, 311:6
**OVERALL** [1] - 313:5
**OVERRULED** [17] - 304:6, 321:20, 332:24, 338:18, 339:22, 340:15, 342:4, 392:20, 409:18, 417:6, 417:23, 431:23, 441:2, 441:23, 448:14, 458:11, 460:25
**OVERSEEING** [1] - 349:6
**OWED** [8] - 310:13, 310:18, 312:11, 326:20, 373:24, 375:19, 377:6, 379:6
**OWN** [4] - 339:7, 404:16, 411:8, 451:23
**OWNED** [1] - 348:8
**OWNER** [1] - 415:7
**OWNERSHIP** [4] - 307:8, 408:5, 428:22, 437:10

# P

**P-E-A-R-C-E** [1] - 406:16
**P.M** [1] - 461:14
**PACIFIC** [1] - 296:20
**PAGE** [64] - 333:2, 334:16, 337:3, 353:9, 353:10, 355:18, 356:2, 357:9, 357:10, 357:11, 358:3, 358:4, 358:17, 359:13, 359:14, 360:7, 360:8, 361:21, 362:13, 367:20, 367:21, 368:1, 368:2, 368:3, 370:25, 371:21, 373:13, 374:7, 374:8, 375:17, 377:21, 378:8, 380:9, 380:18, 381:16, 384:13, 390:23, 394:25, 395:1, 400:14, 401:4, 401:16, 401:20, 402:11, 404:8, 404:9, 404:19, 413:4, 413:16, 418:14, 423:19, 426:23, 433:6, 434:9, 434:16, 439:8, 449:14, 456:7, 457:7, 457:13, 457:14
**PAGE** [1] - 462:11
**PAGE** [1] - 297:7
**PAGES** [1] - 295:8
**PAID** [32] - 336:16, 341:11, 351:13, 351:14, 351:21, 351:22, 351:23, 352:15, 361:7, 361:9, 361:10, 363:8, 368:18, 379:5, 381:3, 381:5, 396:12, 399:13, 402:1, 402:14, 414:6, 414:13, 417:13, 418:21, 419:14, 427:17, 428:7, 430:24, 457:22, 459:12, 459:16

**PAIR** [1] - 384:22
**PAPERS** [2] - 319:19, 455:16
**PARAGRAPH** [19] - 364:21, 366:16, 372:8, 412:20, 422:8, 434:9, 435:16, 436:10, 437:4, 439:9, 443:15, 443:22, 445:15, 445:25, 447:22, 447:23, 451:2, 451:14, 453:5
**PARDON** [1] - 329:8
**PAREDES** [1] - 394:18
**PARENT** [2] - 307:2, 308:5
**PARENTHESES** [1] - 421:12
**PARIS** [1] - 434:14
**PARK** [1] - 296:13
**PARK** [1] - 459:9
**PART** [31] - 305:4, 310:13, 313:1, 314:23, 314:24, 315:2, 315:3, 316:21, 316:25, 317:11, 319:20, 319:23, 323:14, 328:4, 331:8, 331:16, 332:13, 333:5, 333:23, 338:15, 339:11, 339:20, 340:25, 346:11, 349:10, 388:6, 393:3, 408:25, 411:20, 442:7
**PARTICIPANTS** [1] - 435:17
**PARTICIPATE** [10] - 425:13, 426:9, 431:16, 432:7, 435:19, 436:2, 436:3, 441:13, 441:16, 457:11
**PARTICIPATED** [1] - 399:20
**PARTICIPATING** [2] - 399:17, 448:2
**PARTICULAR** [29] - 350:20, 350:21, 351:25, 353:25, 354:19, 354:24, 355:22, 357:13, 358:10, 358:22, 361:2, 361:9, 362:5, 363:5, 369:23, 370:8, 373:21, 377:7, 379:6, 381:19, 388:24, 401:17, 401:22, 402:1, 414:16, 416:9, 438:12, 456:10
**PARTICULARLY** [1] - 315:21
**PARTIES** [3] - 412:16, 412:17, 412:23
**PARTIES'** [17] - 353:3, 361:16, 363:21, 365:21, 367:16, 370:15, 370:20, 371:18, 373:7, 374:19, 375:13, 376:7, 377:16, 379:10, 380:4, 381:11, 414:20
**PARTLY** [1] - 333:25

**PASADENA** [1] - 348:3
**PASADENA** [1] - 296:18
**PASS** [5] - 419:22, 431:13, 431:14, 431:15
**PASSED** [1] - 335:8
**PATENTS** [7] - 308:21, 309:4, 309:7, 309:8, 309:9, 309:10
**PAY** [10] - 317:13, 322:19, 341:11, 345:20, 354:7, 414:4, 419:23, 422:24, 430:20, 458:2
**PAYABLE** [4] - 361:10, 361:12, 361:25, 362:2
**PAYING** [8] - 344:13, 346:16, 388:15, 389:5, 392:13, 392:17, 399:9, 421:19
**PAYMENT** [17] - 305:10, 305:11, 305:15, 305:16, 311:5, 314:25, 355:21, 355:22, 377:9, 377:25, 382:11, 398:22, 399:4, 425:7, 428:1, 428:15
**PAYMENTS** [1] - 363:7
**PAYMENTS** [35] - 332:12, 332:18, 333:20, 346:5, 346:12, 382:8, 397:18, 397:19, 397:20, 397:23, 398:14, 399:21, 401:13, 403:12, 404:4, 404:8, 414:8, 414:11, 414:15, 417:9, 417:17, 417:20, 417:21, 418:23, 419:16, 423:5, 428:17, 428:18, 429:15, 430:25, 431:6, 452:8, 455:3, 455:23, 460:16
**PEARCE** [2] - 297:16, 406:18
**PEARCE** [69] - 318:20, 319:12, 319:13, 321:11, 321:13, 321:16, 322:17, 324:17, 325:1, 325:2, 326:5, 326:18, 333:3, 333:6, 334:1, 405:14, 406:6, 406:16, 406:22, 406:24, 407:11, 408:16, 410:9, 410:19, 412:14, 413:4, 413:12, 414:3, 414:24, 415:3, 417:8, 417:17, 418:10, 419:13, 420:6, 422:2, 422:23, 423:15, 425:12, 425:21, 426:20, 429:4, 429:25, 430:23, 433:2, 433:14, 435:13, 436:25, 438:5, 439:5, 441:13, 443:11, 445:11, 447:1, 447:25, 448:7, 449:10, 450:24, 453:2, 454:3, 454:6, 454:25, 455:9, 456:4, 456:14,

456:24, 458:21, 459:11, 459:22
**PENALTIES** [1] - 433:24
**PENALTY** [3] - 328:17, 418:15, 418:16
**PENDING** [2] - 347:2, 406:9
**PEOPLE** [22] - 322:20, 323:2, 324:17, 329:5, 329:23, 346:10, 388:15, 391:13, 392:24, 393:2, 393:4, 394:16, 395:19, 395:25, 396:4, 399:12, 408:1, 408:4, 408:6, 408:24, 459:2, 460:8
**PER** [5] - 351:15, 418:3, 419:11, 430:8, 430:11
**PERCENT** [11] - 311:16, 311:19, 311:22, 311:24, 313:5, 313:6, 313:8, 341:19, 349:21, 351:20, 362:20
**PERCENTAGE** [8] - 341:18, 349:19, 351:15, 362:18, 369:25, 396:9, 396:13, 397:25
**PERFORMANCE** [1] - 324:11
**PERHAPS** [2] - 431:13, 449:3
**PERIOD** [1] - 335:4
**PERIOD** [17] - 328:1, 335:5, 349:9, 349:24, 363:4, 371:3, 371:7, 371:14, 373:17, 375:21, 391:17, 417:8, 417:13, 417:18, 417:25, 430:3, 460:15
**PERSON** [13] - 314:2, 322:11, 325:3, 325:4, 327:20, 350:23, 385:18, 386:4, 394:14, 415:5, 436:11, 447:14, 450:3
**PERSONAL** [7] - 331:7, 414:1, 414:7, 414:8, 416:7, 417:14, 422:6
**PERSONALLY** [8] - 316:19, 324:16, 329:11, 332:12, 395:23, 396:1, 422:16, 448:9
**PERSONNEL** [1] - 433:10
**PERSONS** [4] - 335:10, 434:14, 439:14, 453:7
**PERSONS'** [1] - 394:17
**PH.D** [1] - 304:18
**PH.D** [2] - 297:8, 302:1
**PHARMACEUTICAL** [1] - 407:18
**PHIL** [2] - 333:19, 337:25
**PHONE** [3] - 356:7, 356:10, 357:6
**PHOTO** [2] - 384:18, 384:19
**PHOTOCOPY** [1] - 356:21
**PHOTOGRAPH** [1] - 388:10

PHOTOGRAPH [1] - 300:9
PHRASE [8] - 313:21, 313:22, 313:24, 313:25, 389:1, 396:19, 439:18, 458:13
PHRASEOLOGY [7] - 312:12, 312:13, 312:15, 313:13, 315:15, 315:16, 325:6
PICK [1] - 416:14
PICKED [1] - 430:17
PICTURE [1] - 386:2
PIECE [1] - 386:5
PIPED [1] - 445:20
PIPELINES [1] - 445:20
PLACE [5] - 312:10, 312:18, 322:4, 401:10, 438:16
PLAINTIFF [1] - 295:6
PLAINTIFF [1] - 296:3
PLAN [1] - 438:24
PLANNED [1] - 443:25
PLANNING [1] - 434:8
PLATINUM [1] - 323:16
PLUS [6] - 308:25, 310:19, 337:8, 337:9, 367:4
POINT [11] - 311:5, 316:20, 348:20, 353:1, 380:24, 382:8, 383:19, 419:19, 421:20, 448:21, 448:22
POINTER [1] - 385:20
POINTING [1] - 448:3
POONAM [1] - 296:5
PORTION [4] - 356:12, 369:24, 416:3, 428:5
POSITION [8] - 348:15, 348:20, 394:16, 411:3, 434:1, 444:20, 456:9, 457:10
POSSIBILITY [2] - 334:21, 450:6
POSSIBLE [5] - 396:11, 416:19, 421:7, 443:22, 454:14
POSSIBLY [2] - 343:3, 343:4
POTENTIALLY [2] - 340:24, 449:1
POTTS [2] - 297:8, 302:1
POTTS [25] - 301:13, 301:19, 302:5, 304:10, 310:25, 325:23, 330:20, 330:22, 332:4, 333:1, 333:13, 334:16, 335:12, 335:20, 337:11, 337:15, 340:5, 340:10, 340:20, 341:12, 341:17, 341:25, 342:14, 460:7, 460:18
POTTS [1] - 460:15
POUND [4] - 312:20, 312:22, 340:8, 416:20

POUNDS [7] - 310:8, 310:14, 310:18, 311:6, 416:15, 416:17, 416:18
POWER [2] - 323:10, 436:15
PRECEDED [1] - 309:25
PREDECESSOR [1] - 309:19
PREDOMINANTLY [1] - 411:22
PREPARE [1] - 359:11
PREPARED [4] - 345:5, 362:8, 362:9, 432:4
PREPARING [2] - 348:12, 349:5
PRESENCE [4] - 301:6, 301:15, 405:9, 406:2
PRESENT [9] - 301:8, 301:12, 405:11, 405:15, 406:3, 433:9, 440:12, 460:6, 460:8
PRESIDENT [2] - 320:23, 331:14
PRESSURED [2] - 392:12, 392:16
PRETRIAL [16] - 353:3, 361:16, 363:21, 365:21, 367:16, 370:15, 370:20, 371:18, 373:7, 376:7, 377:16, 379:11, 380:4, 418:4, 418:7, 420:1
PREVAILED [1] - 453:9
PREVIOUS [2] - 382:22, 455:13
PREVIOUSLY [1] - 302:2
PREVIOUSLY [7] - 326:3, 331:2, 337:2, 353:2, 367:13, 370:19, 371:17
PRICE [7] - 335:21, 336:1, 336:19, 337:12, 416:9, 434:19, 438:10
PRICED [2] - 335:25, 390:14
PRICES [1] - 390:18
PRIMARILY [5] - 308:13, 308:15, 348:12, 349:5, 409:6
PRIMARY [8] - 306:21, 306:23, 307:1, 307:17, 307:19, 308:3, 310:7, 341:6
PRINT [1] - 360:14
PRIVATE [7] - 313:1, 333:7, 340:25, 443:16, 443:23, 457:11, 459:7
PRIVATELY [1] - 456:10
PROBLEM [2] - 325:5, 340:14
PROBLEMS [8] - 315:14, 315:20, 322:10, 322:14, 323:10, 325:3, 325:8, 329:1
PROCEDURE [2] - 448:8

PROCEDURED [1] - 441:1
PROCEED [6] - 301:18, 301:20, 344:18, 344:22, 347:10, 406:17
PROCEEDINGS [1] - 462:10
PROCEEDINGS [5] - 301:5, 301:14, 319:24, 405:8, 406:1
PROCESS [10] - 307:19, 314:23, 328:2, 336:2, 352:14, 419:20, 426:12, 432:9, 441:6, 441:20
PROCESSED' [1] - 458:3
PROCURED [1] - 444:25
PROCUREMENT [1] - 433:20
PRODUCE [1] - 336:3
PRODUCING [1] - 436:15
PRODUCT [19] - 322:18, 322:20, 324:10, 336:5, 336:23, 355:7, 357:20, 357:21, 359:2, 365:5, 372:11, 386:7, 386:11, 416:9, 416:11, 416:13, 427:9, 439:24
PRODUCTION [3] - 433:21, 438:24, 449:2
PRODUCTS [47] - 302:8, 302:12, 302:13, 302:15, 309:2, 309:4, 309:7, 309:11, 309:13, 309:16, 322:10, 325:10, 335:21, 335:25, 336:13, 337:12, 343:6, 365:5, 366:22, 386:8, 387:10, 389:14, 390:3, 390:8, 407:16, 407:18, 408:21, 408:24, 409:2, 409:20, 411:12, 412:21, 412:24, 419:1, 419:3, 419:7, 427:8, 427:14, 427:15, 427:18, 432:21, 443:16, 444:19, 449:19, 453:17, 453:19
PROFESSION [1] - 399:24
PROFESSOR [1] - 389:11
PROFILE [1] - 318:14
PROFITABLE [1] - 318:7
PROGRESS [1] - 353:23
PROJECT [19] - 344:17, 425:13, 425:15, 426:4, 426:5, 426:8, 426:12, 426:14, 440:11, 441:8, 441:25, 442:13, 443:22, 443:24, 443:25, 444:21, 444:24, 449:2
PROJECTS [11] - 306:10, 306:11, 333:8, 423:19, 423:25, 424:2, 424:22, 426:24, 426:25, 432:3, 447:18

PROMOTED [1] - 348:22
PROMOTING [1] - 456:19
PROPER [4] - 418:16, 446:2, 449:15, 449:16
PROPERLY [5] - 342:21, 343:7, 345:12, 429:1, 443:25
PROPORTION [1] - 313:4
PROPOSAL [1] - 441:25
PROPOSALS [2] - 440:15, 442:21
PROSECUTED [1] - 338:22
PROSECUTING [7] - 337:17, 338:3, 338:12, 338:13, 339:9, 339:25, 341:23
PROSECUTION [1] - 408:17
PROSECUTOR [4] - 390:11, 394:3, 394:12, 397:9
PROTECT [4] - 449:15, 449:16, 453:8, 453:21
PROVE [2] - 409:21, 442:5
PROVEN [1] - 317:5
PROVIDE [4] - 324:10, 387:4, 403:23, 411:9
PROVIDED [19] - 306:17, 321:11, 321:15, 321:17, 321:21, 321:25, 322:5, 322:8, 341:6, 343:5, 392:17, 403:14, 410:8, 411:8, 411:10, 411:12, 427:4, 440:5, 440:22
PROVIDES [2] - 396:8, 407:16
PROVIDING [3] - 388:2, 388:5, 441:16
PUBLIC [4] - 332:9, 347:20, 383:2, 383:4
PUBLICLY [1] - 440:20
PUBLISHED [2] - 318:2, 326:14
PUNISHMENT [1] - 339:12
PURCHASE [11] - 313:11, 352:21, 358:13, 409:22, 409:25, 411:18, 433:9, 433:10, 433:15, 438:17, 438:22
PURCHASED [4] - 310:7, 313:8, 431:1, 445:22
PURCHASER [1] - 442:14
PURCHASING [2] - 432:20, 440:4
PURPORT [1] - 413:12
PURPOSE [2] - 344:12, 345:8
PURPOSES [1] - 418:3
PURSUANT [1] - 462:8
PURSUANT [17] - 353:3, 361:15, 363:21, 365:20, 367:16, 370:15, 370:19,

371:17, 373:7, 374:19, 375:13, 376:7, 377:15, 379:10, 380:3, 381:11, 414:19
**PURSUED** [1] - 304:18
**PUSHED** [1] - 436:11
**PUT** [5] - 301:13, 302:9, 394:24, 396:22, 433:21
**PUTTING** [1] - 301:9

# Q

**Q330** [2] - 357:16, 357:20
**Q4128** [2] - 366:18, 366:24
**QUALITY** [2] - 390:7, 390:17
**QUANTERRA** [22] - 348:4, 348:7, 357:23, 358:11, 365:6, 366:7, 366:22, 383:20, 386:19, 387:5, 388:5, 388:6, 388:15, 388:22, 389:2, 389:13, 392:17, 392:25, 446:2, 446:3, 446:8, 446:9
**QUANTERRA** [1] - 348:5
**QUANTERRA'S** [1] - 386:8
**QUANTITIES** [1] - 427:4
**QUARTER** [1] - 381:20
**QUESTIONING** [2] - 394:3, 402:21
**QUESTIONS** [11] - 304:11, 342:9, 342:10, 345:11, 382:14, 394:12, 400:1, 400:3, 402:17, 402:21, 405:1
**QUICKLY** [2] - 344:3, 368:19
**QUITE** [7] - 313:11, 313:25, 314:7, 324:2, 343:18, 344:20, 390:14
**QUOTATIONS** [2] - 433:7, 438:19
**QUOTE** [6] - 336:3, 336:4, 336:9, 365:14, 446:12, 458:3

# R

**R&D** [1] - 407:5
**R-I-A** [2] - 305:22, 305:23
**RAILWAY** [2] - 425:25, 426:11
**RAISE** [3] - 315:19, 346:25, 406:7
**RAISING** [1] - 315:18
**RAN** [4] - 306:4, 306:22, 306:23, 309:1
**RANGE** [3] - 351:17, 362:5, 418:25
**RATES** [1] - 310:22
**RATHER** [1] - 360:22
**RAYNOR** [2] - 296:19,

296:19
**RE** [1] - 452:21
**RE-FORWARD** [1] - 452:21
**READ** [40] - 333:11, 353:20, 356:10, 356:24, 356:25, 357:3, 358:18, 362:19, 364:1, 364:24, 365:12, 366:19, 367:6, 370:2, 372:16, 373:4, 376:20, 401:25, 402:4, 416:3, 421:5, 422:13, 425:2, 433:7, 434:11, 437:5, 439:9, 444:2, 445:14, 446:6, 450:10, 451:15, 452:17, 453:11, 454:12, 455:20, 456:8, 457:8, 458:5, 459:4
**READING** [1] - 407:5
**READS** [1] - 334:19
**REAL** [1] - 457:15
**REALIZED** [1] - 437:15
**REALLY** [4] - 305:18, 361:25, 453:9, 457:18
**REALTIME** [1] - 462:5
**REASON** [5] - 320:14, 342:5, 346:7, 460:17, 460:18
**REASONS** [2] - 342:1, 346:14
**RECEIVE** [9] - 352:21, 377:24, 380:25, 419:10, 421:7, 421:14, 422:14, 424:1, 437:24
**RECEIVED** [93] - 304:9, 311:2, 326:11, 326:13, 332:23, 332:25, 334:13, 334:14, 342:7, 353:6, 353:7, 355:14, 355:16, 355:21, 361:18, 361:19, 363:16, 363:18, 363:23, 363:24, 365:22, 365:24, 367:18, 370:21, 370:23, 371:19, 373:9, 373:11, 374:20, 374:21, 375:16, 376:10, 376:11, 377:17, 377:19, 379:12, 379:14, 380:5, 380:7, 380:11, 381:13, 381:14, 385:10, 385:12, 411:24, 414:16, 414:22, 414:23, 418:9, 419:16, 420:3, 420:5, 421:24, 422:1, 423:12, 423:14, 425:18, 425:20, 426:18, 426:19, 432:24, 433:1, 435:10, 435:12, 436:23, 436:24, 438:3, 438:4, 439:2, 439:4, 443:8, 443:10, 445:8, 445:10, 446:22, 446:23, 449:7, 449:9, 450:22, 450:23, 452:13, 452:25, 453:1, 454:1, 454:2, 455:7, 455:8, 456:2, 456:3, 456:22,

456:23, 458:19, 458:20
**RECEIVES** [3] - 380:23, 428:1, 437:25
**RECEIVING** [1] - 428:17
**RECENT** [1] - 439:9
**RECENT** [1] - 439:10
**RECESS** [5] - 405:5, 405:6, 405:7, 461:12, 461:14
**RECIPIENT** [1] - 376:16
**RECOGNITION** [2] - 435:19, 436:1
**RECOGNIZE** [5] - 381:16, 384:21, 385:2, 386:5, 429:4
**RECOLLECTION** [2] - 351:19, 425:12
**RECOMMEND** [2] - 327:18, 445:17
**RECOMMENDED** [3] - 335:3, 411:12, 412:25
**RECOMMENDING** [5] - 412:21, 432:20, 436:18, 440:4, 444:19
**RECONCILIATIONS** [1] - 348:14
**RECORD** [4] - 304:1, 347:7, 406:14, 410:17
**RECORDS** [3] - 397:4, 398:21, 398:22
**RECROSS** [2] - 297:10, 297:14
**RECROSS** [2] - 342:12, 402:23
**RECROSS-EXAMINATION** [2] - 342:12, 402:23
**RECROSS-EXAMINATION** [2] - 297:10, 297:14
**RED** [1] - 317:25
**REDIRECT** [3] - 330:16, 330:18, 400:9
**REDIRECT** [2] - 297:10, 297:14
**REDONDO** [1] - 296:21
**REFER** [11] - 333:5, 333:8, 369:3, 398:2, 414:15, 443:18, 446:13, 448:11, 449:18, 452:8, 455:22
**REFERENCE** [1] - 378:9
**REFERENCE** [7] - 310:23, 335:12, 335:13, 379:24, 380:19, 425:24, 456:14
**REFERENCED** [2] - 428:10, 457:21
**REFERRED** [3] - 332:17, 414:17, 416:10
**REFERRING** [10] - 353:12, 358:20, 368:16, 368:22, 386:14, 394:4, 397:4, 416:4, 434:23, 453:13

**REFERS** [8] - 313:22, 359:19, 396:25, 415:2, 423:19, 426:14, 449:24, 451:2
**REFLECT** [1] - 410:17
**REGARDED** [1] - 322:16
**REGARDING** [2] - 368:7, 387:4
**REGION** [2] - 352:9, 387:20
**REGIONS** [2] - 350:20, 351:12
**REGULARLY** [1] - 325:4
**REGULATION** [2] - 333:7, 335:8
**REGULATIONS** [1] - 462:12
**REJECTED** [1] - 448:16
**REJECTING** [3] - 448:7, 448:11, 448:18
**RELATE** [1] - 426:2
**RELATED** [5] - 355:1, 377:13, 434:20, 455:16, 459:8
**RELATES** [2] - 303:17, 446:17
**RELATION** [1] - 317:15
**RELATIONSHIP** [11] - 339:25, 341:13, 352:7, 387:1, 387:6, 387:17, 388:1, 427:16, 434:18, 434:24, 456:11
**RELATIONSHIPS** [1] - 440:13
**RELATIVELY** [1] - 336:20
**RELEASE** [1] - 340:7
**RELEASED** [2] - 341:7, 381:18
**RELEVANCE** [1] - 389:23
**RELEVANT** [1] - 338:3
**REMAIN** [2] - 301:21, 405:23
**REMAINED** [3] - 306:24, 341:2, 349:2
**REMEMBER** [16] - 318:11, 318:13, 320:12, 322:15, 324:2, 324:20, 325:6, 330:25, 335:22, 345:22, 378:24, 391:25, 404:6, 409:11, 415:16
**REMIND** [1] - 313:16
**REMINDED** [2] - 345:21, 345:25
**REMOVE** [1] - 450:6
**REP** [8] - 363:5, 363:8, 396:19, 398:2, 400:25, 403:2, 403:15, 403:18
**REPAID** [3] - 341:5, 341:9, 341:10
**REPAIR** [1] - 322:20
**REPAIRED** [1] - 321:22

**REPEAT** [2] - 343:19, 344:4
**REPEATEDLY** [1] - 319:17
**REPHRASE** [1] - 340:18
**REPLACE** [2] - 372:22, 373:1
**REPLACED** [3] - 310:5, 310:6, 437:7
**REPLACEMENT** [3] - 437:13, 437:14, 437:18
**REPLACING** [1] - 342:24
**REPLY** [2] - 367:9, 452:20
**REPORT** [3] - 323:9, 338:3, 342:8
**REPORTED** [1] - 462:10
**REPORTED** [3] - 337:16, 341:22, 457:16
**REPORTER** [2] - 369:11, 402:4
**REPORTER** [4] - 295:23, 462:1, 462:6, 462:19
**REPORTER'S** [1] - 295:12
**REPORTERS** [1] - 461:12
**REPRESENTATION** [1] - 403:5
**REPRESENTATIVE** [16] - 351:9, 352:4, 361:12, 368:4, 373:22, 377:7, 377:10, 382:6, 394:4, 394:9, 394:20, 396:1, 396:14, 397:19, 401:17, 401:22
**REPRESENTATIVE** [3] - 395:17, 395:18, 401:7
**REPRESENTATIVES** [12] - 332:8, 334:5, 351:7, 351:11, 351:13, 352:1, 362:2, 373:15, 375:19, 395:11, 395:16, 400:12
**REPRESENTATIVES'** [1] - 403:11
**REPRESENTED** [1] - 394:7
**REPUTATION** [1] - 339:20
**REQUEST** [1] - 299:24
**REQUEST** [13] - 366:14, 377:13, 377:22, 378:2, 379:5, 379:16, 380:10, 380:24, 380:25, 422:6, 423:3, 428:25, 458:3
**REQUESTED** [2] - 378:4, 380:16
**REQUESTING** [1] - 377:24
**REQUESTS** [1] - 419:21
**REQUESTS** [1] - 300:7
**REQUIRE** [1] - 328:25
**REQUIRED** [2] - 325:20, 335:8, 429:1
**REQUIREMENT** [3] - 432:4, 436:6, 436:8
**REQUIREMENTS** [5] - 410:5, 431:7, 442:1, 442:3, 442:4

**REQUIRES** [2] - 383:12, 399:24
**RESEARCH** [11] - 355:3, 356:4, 357:13, 358:13, 360:5, 369:20, 370:11, 379:2, 411:3, 431:5, 455:18
**RESEARCH** [7] - 308:18, 349:14, 409:19, 410:22, 411:9, 411:17, 411:19
**RESEARCHER** [1] - 407:5
**RESIGNED** [2] - 318:22, 319:1
**RESOLVE** [1] - 431:13
**RESOLVED** [1] - 317:7
**RESOURCES** [1] - 349:7
**RESOURCES** [2] - 355:3, 355:25
**RESPECT** [5] - 301:11, 392:16, 398:14, 432:1, 444:20
**RESPONSIBILITIES** [2] - 348:11, 349:4
**RESPONSIBLE** [4] - 348:12, 408:24, 437:13, 451:16
**RESULT** [3] - 318:11, 320:15, 339:4
**RETIRED** [1] - 366:6
**RETURN** [4] - 367:13, 419:10, 437:24, 445:4
**RETURNED** [1] - 321:23
**RETURNING** [1] - 357:9
**REVENUE** [1] - 391:18
**REVENUES** [1] - 350:2
**REVERT** [1] - 313:9
**REVIEW** [5] - 333:23, 333:25, 334:3, 359:11, 443:25
**REVIEWED** [4] - 332:5, 332:7, 360:1, 377:6
**REVTEK** [2] - 302:15, 350:9
**RICHARD** [2] - 296:19, 296:19
**RICHARD** [1] - 404:10
**RIGHT-HAND** [2] - 353:15, 452:5
**RISK** [2] - 442:24, 442:25
**RO** [1] - 296:23
**ROH** [2] - 309:24, 312:1
**ROLE** [8] - 332:17, 408:14, 408:23, 408:25, 409:4, 410:20, 410:24, 435:24
**ROOM** [2] - 331:10, 331:11
**ROUGHLY** [3] - 310:11, 310:21, 341:19
**ROUTING** [1] - 368:11
**RPR** [1] - 295:23
**RTU** [1] - 328:16
**RULE** [3] - 308:6, 308:7, 308:9

**RULING** [1] - 323:22
**RULINGS** [1] - 301:10
**RUN** [4] - 307:10, 308:25, 319:9, 408:9
**RUNNING** [4] - 305:2, 307:14, 309:6, 408:11
**RURAL** [1] - 451:3

# S

**S-T-E-I-M** [1] - 384:9
**S/O** [1] - 369:2
**SAFE** [2] - 308:12
**SAFETY** [1] - 452:21
**SALE** [16] - 313:11, 341:4, 351:15, 351:22, 352:17, 352:18, 353:25, 361:2, 379:1, 396:9, 397:25, 416:9, 427:17, 436:4, 436:7, 443:4
**SALES** [99] - 305:3, 305:4, 318:16, 318:18, 336:6, 349:19, 350:3, 350:10, 350:15, 350:18, 350:19, 350:20, 350:21, 351:7, 351:9, 351:11, 351:13, 351:25, 352:3, 352:8, 352:15, 352:16, 352:24, 353:11, 353:23, 357:7, 358:12, 358:24, 358:25, 359:1, 359:4, 359:7, 359:11, 359:20, 359:25, 360:1, 360:12, 360:21, 361:1, 361:7, 361:12, 362:2, 368:4, 369:4, 369:17, 369:23, 370:8, 373:15, 373:21, 375:19, 376:15, 377:7, 377:10, 377:13, 377:24, 378:16, 378:22, 379:6, 379:24, 380:19, 381:1, 382:6, 387:13, 390:19, 391:1, 391:4, 391:18, 394:3, 394:9, 395:10, 395:16, 396:1, 396:14, 396:18, 396:19, 397:19, 398:1, 398:2, 398:4, 398:5, 398:6, 398:7, 398:8, 401:17, 403:14, 403:18, 407:8, 407:10, 408:25, 409:4, 409:6, 432:15, 432:16, 439:21, 450:19, 459:15
**SALES** [3] - 300:6, 353:15, 394:20
**SALESMAN** [1] - 304:24
**SALESPEOPLE** [1] - 403:6
**SAMCHONDONG** [1] - 402:2
**SAMCHONDONG** [1] - 402:5
**SAN** [1] - 332:2
**SANDRA** [1] - 296:4

**SANTA** [1] - 296:14
**SAT** [1] - 410:13
**SATISFIED** [1] - 435:17
**SAW** [6] - 329:23, 345:15, 403:24, 426:3, 459:22, 459:24
**SAYINGS** [1] - 314:7
**SCAN** [1] - 400:24
**SCANNING** [1] - 403:15
**SCHEDULE** [2] - 299:20, 395:10
**SCHEDULE** [6] - 361:24, 373:14, 374:23, 395:4, 395:16, 396:12
**SCHEDULES** [4] - 348:13, 371:1, 395:7, 401:5
**SCOPE** [1] - 332:22
**SCREAM** [4] - 324:9, 324:13, 324:21, 324:23
**SCREEN** [8] - 342:17, 356:13, 356:15, 356:20, 388:10, 394:24, 396:23, 429:21
**SEAT** [1] - 405:24
**SEATED** [3] - 347:6, 385:25, 406:13
**SECOND** [2] - 422:8, 457:8
**SECOND** [34] - 322:3, 332:2, 355:18, 361:21, 364:21, 366:16, 367:20, 370:25, 372:8, 373:13, 375:17, 380:9, 381:16, 384:21, 385:14, 385:18, 394:25, 401:4, 401:16, 405:10, 412:19, 413:15, 414:9, 418:14, 429:20, 434:9, 434:16, 435:16, 438:8, 440:2, 456:7, 457:10, 459:4, 461:11
**SECONDHAND** [1] - 388:24
**SECONDLY** [1] - 460:15
**SECTION** [1] - 462:8
**SECTION** [2] - 336:7, 420:18
**SECTOR** [1] - 318:19
**SEDATION** [1] - 439:25
**SEE** [58] - 302:20, 334:7, 342:16, 344:8, 354:4, 354:16, 356:5, 356:17, 357:17, 358:6, 359:23, 362:13, 362:15, 365:3, 367:1, 369:15, 373:2, 374:7, 374:8, 376:24, 378:10, 378:14, 378:20, 379:23, 379:25, 381:21, 381:23, 385:24, 394:25, 395:3, 396:23, 396:25, 397:2, 403:21, 410:12, 413:5, 418:14, 418:18, 420:19, 420:23, 422:8, 423:21,

425:24, 427:19, 428:5, 429:22, 436:11, 443:15, 444:2, 449:14, 450:1, 450:5, 450:8, 451:2, 452:2, 452:3, 452:5, 454:10

**SEEK** [1] - 385:5

**SEEM** [2] - 356:22, 460:20

**SEISMIC** [13] - 308:18, 308:19, 331:12, 335:5, 348:1, 407:20, 412:25, 427:10, 441:7, 445:23, 446:10, 451:17

**SEISMICALLY** [1] - 444:12

**SEISMOLOGICAL** [5] - 388:12, 407:23, 409:20, 412:22

**SEISMOLOGIST** [1] - 410:21

**SEISMOLOGY** [3] - 383:14, 383:23, 390:6

**SEISMOMETER** [1] - 358:5

**SEISMOMETER** [2] - 358:9, 438:13

**SEISMOMETERS** [1] - 419:2

**SELECTED** [1] - 442:16

**SELF** [5] - 337:16, 338:15, 339:5, 341:22, 368:21

**SELF-DISCLOSURE** [2] - 338:15, 339:5

**SELF-EXPLANATORY** [1] - 368:21

**SELF-REPORTED** [2] - 337:16, 341:22

**SELL** [6] - 307:12, 349:22, 366:22, 408:21, 437:20, 437:21

**SELLING** [3] - 361:5, 408:24, 409:2

**SELLS** [8] - 357:21, 357:25, 358:10, 358:11, 365:6, 372:12, 386:11, 407:20

**SEND** [12] - 315:12, 323:8, 328:22, 367:4, 381:6, 391:4, 391:12, 414:11, 418:17, 425:8, 428:8, 455:2

**SENDING** [3] - 323:2, 404:1, 428:16

**SENIOR** [5] - 341:6, 377:11, 394:15, 398:24, 407:7

**SENSE** [1] - 417:12

**SENSOR** [5] - 337:8, 373:1, 386:11, 450:13

**SENSOR** [2] - 335:4, 372:15

**SENSORS** [4] - 325:3, 335:10, 437:7, 437:19

**SENT** [18] - 315:24, 323:5, 328:10, 342:14, 342:23, 355:21, 358:25, 359:4,

390:25, 391:1, 414:12, 420:15, 420:19, 423:5, 428:21, 429:6, 447:12, 447:13

**SENTENCE** [7] - 366:22, 372:21, 433:8, 436:11, 450:10, 454:10, 456:8

**SEPARATE** [6] - 302:18, 312:25, 313:7, 315:6, 424:8, 424:15

**SEPARATELY** [2] - 452:20, 456:13

**SEPTEMBER** [16] - 319:1, 332:14, 333:19, 336:6, 337:25, 344:16, 345:16, 345:22, 345:23, 345:24, 362:10, 371:4, 453:4, 456:6, 459:25, 460:9

**SERIES** [1] - 378:12

**SERVICE** [5] - 306:16, 308:16, 321:12, 328:4, 343:6

**SERVICES** [9] - 306:18, 387:4, 387:9, 388:1, 388:5, 392:17, 396:8, 403:22, 407:16

**SET** [5] - 314:6, 351:15, 381:6, 416:10, 419:3

**SETS** [4] - 334:24, 335:1, 366:17, 427:22

**SETTING** [1] - 446:17

**SEVERAL** [4] - 316:14, 391:16, 393:17, 419:6

**SEVERAL-YEAR** [1] - 391:16

**SHALL** [2] - 347:2, 406:9

**SHARE** [3] - 341:18, 341:20, 453:22

**SHAREHOLDERS** [1] - 341:3

**SHEET** [1] - 336:3

**SHEETS** [1] - 336:6

**SHELLEY** [1] - 394:18

**SHIP** [1] - 355:6

**SHIPPED** [9] - 326:22, 326:23, 326:25, 327:1, 327:6, 327:11, 327:13, 327:14, 351:23, 355:7, 359:2, 359:3, 359:8, 359:10, 428:6

**SHOP** [1] - 319:9

**SHORT** [3] - 335:5, 383:2, 432:8

**SHORT** [1] - 335:4

**SHORT-PERIOD** [1] - 335:4

**SHORT-PERIOD** [1] - 335:5

**SHORTER** [1] - 433:22

**SHORTLY** [1] - 304:21

**SHOW** [5] - 334:1, 355:21, 385:13, 396:24, 410:6

**SHOWED** [1] - 397:9

**SHOWING** [4] - 377:20, 412:13, 413:11, 429:2

**SHOWN** [2] - 365:9, 428:6

**SHOWS** [2] - 336:4, 404:20

**SIAN** [4] - 318:23, 318:24, 333:18, 337:25

**SIDE** [6] - 354:14, 356:17, 356:20, 385:18, 409:4, 437:14

**SIGN** [2] - 381:6, 413:5

**SIGNATURE** [1] - 329:19

**SIGNATURES** [1] - 413:17

**SIGNED** [12] - 303:2, 311:13, 312:8, 316:19, 329:11, 329:18, 329:23, 329:25, 330:2, 413:20, 415:17, 416:7, 419:19

**SIGNING** [1] - 330:4

**SILVER** [1] - 386:6

**SIM** [1] - 296:23

**SIMILAR** [4] - 305:17, 305:18, 379:23, 429:25

**SIMPLE** [1] - 458:13

**SIMPLIFIED** [1] - 314:18

**SIT** [1] - 346:1

**SITTING** [2] - 410:14, 410:15

**SITUATION** [3] - 345:12, 421:6, 454:14

**SIX** [1] - 375:10

**SKILLS** [1] - 409:5

**SLIGHTLY** [3] - 386:15, 386:16, 420:13

**SMALL** [3] - 365:9, 393:3, 457:19

**SMART** [1] - 389:16

**SO** [1] - 378:12

**SOCIETY** [1] - 335:4

**SOFTWARE** [6] - 306:17, 306:18, 307:24, 308:15, 323:16, 324:10

**SOLD** [2] - 354:15, 356:7

**SOLD** [18] - 307:1, 307:8, 307:22, 307:23, 308:4, 308:10, 310:8, 336:13, 336:16, 340:24, 357:12, 360:22, 408:10, 416:8, 416:11, 419:1, 419:9, 459:19

**SOLE** [6] - 442:11, 442:12, 442:16, 443:3, 443:5, 443:18

**SOLE-SOURCE** [6] - 442:11, 442:12, 442:16, 443:3, 443:5, 443:18

**SOLEMNLY** [2] - 347:1, 406:8

**SOLUTIONS** [1] - 323:10

**SOMEONE** [10] - 317:12, 324:14, 325:7, 329:21, 346:16, 383:4, 388:14, 396:11, 399:9, 442:25

**SOMETIME** [2] - 412:10, 428:18

**SOMETIMES** [7] - 344:3, 344:4, 344:8, 344:9, 388:20, 395:20, 441:3

**SOMEWHAT** [1] - 418:15

**SOMEWHERE** [2] - 327:8, 408:5

**SOPHISTICATED** [1] - 383:17

**SORRY** [13] - 333:9, 340:17, 357:5, 360:22, 362:11, 363:19, 370:17, 374:5, 428:25, 429:21, 444:10, 446:25, 461:3

**SORT** [3] - 313:17, 388:15, 432:19

**SOUNDS** [2] - 387:13, 392:5

**SOURCE** [6] - 442:11, 442:12, 442:16, 443:3, 443:5, 443:18

**SOUTH** [16] - 296:20, 321:14, 330:23, 331:4, 336:13, 408:20, 408:21, 408:24, 409:2, 409:8, 411:1, 411:13, 412:22, 423:9, 429:13, 436:17

**SPARES** [1] - 328:17

**SPEAKING** [4] - 368:4, 384:5, 425:3, 425:4

**SPEAKS** [1] - 344:3

**SPECIAL** [1] - 328:18

**SPECIALIZED** [2] - 327:7, 449:20

**SPECIFICALLY** [2] - 332:2, 353:9

**SPECIFICATION** [5] - 445:17, 446:1, 446:3, 446:5, 446:13

**SPECIFICATIONS** [7] - 321:17, 409:21, 410:7, 411:10, 432:5, 446:14, 446:16

**SPECIFICS** [2] - 323:24, 324:1

**SPECULATION** [8] - 340:2, 341:15, 389:24, 392:19, 432:17, 434:2, 448:13, 460:24

**SPEECH** [1] - 344:7

**SPELL** [4] - 347:7, 350:13, 402:7, 406:14

**SPEND** [4] - 327:15, 339:3, 342:22, 442:20

**SPENT** [2] - 439:10, 439:18

**SPOKEN** [1] - 392:6

**SPREADSHEET** [9] - 322:21, 362:6, 362:7, 362:16, 371:8, 375:18,

381:1, 402:12, 404:4
**SPREADSHEETS** [5] - 377:5, 377:12, 394:2, 394:11, 401:17
**SPRING** [1] - 296:6
**STAND** [3] - 301:13, 345:4, 346:24
**STANDARD** [14] - 335:3, 403:8, 403:11, 403:18, 439:11, 439:13, 439:19, 439:21, 439:22, 439:23, 439:25, 450:12, 450:15, 450:18
**STANDING** [1] - 385:17
**STANDS** [4] - 323:22, 335:15, 439:16, 447:8
**STARS** [1] - 328:16
**START** [3] - 409:1, 411:6, 432:20
**STARTED** [12] - 314:22, 332:14, 332:15, 382:21, 382:24, 403:24, 407:7, 407:24, 408:2, 422:24, 428:16, 459:18
**STARTING** [5] - 314:23, 389:4, 425:2, 438:8, 460:4
**STARTS** [4] - 438:9, 438:16, 439:9, 445:15
**STATE** [5] - 347:1, 347:7, 383:10, 406:8, 406:14
**STATE** [2] - 347:18, 383:11
**STATEMENTS** [6] - 331:21, 343:14, 343:15, 344:10, 348:13, 349:6
**STATES** [5] - 295:1, 295:5, 462:6, 462:8, 462:13
**STATES** [9] - 296:4, 296:5, 296:6, 316:8, 335:18, 338:21, 399:13, 423:6, 429:10
**STATES** [2] - 380:19, 412:20
**STATION** [1] - 439:12
**STATIONS** [8] - 334:23, 335:1, 335:5, 424:5, 424:12, 424:18, 439:20, 445:21
**STATUS** [9] - 332:17, 333:9, 364:19, 372:9, 372:23, 383:7, 383:8, 384:3, 456:9
**STAY** [1] - 425:1
**STAYED** [5] - 307:2, 308:2, 308:4, 308:7, 308:9
**STEADILY** [1] - 325:12
**STEADY** [2] - 325:16, 325:18
**STEIM** [16] - 384:7, 384:25, 385:15, 385:19, 386:6, 387:1, 387:5, 387:8, 387:9, 388:18, 389:6, 389:21,

393:18, 396:7, 398:12, 403:22
**STENOGRAPHICALLY** [1] - 462:10
**STERLING** [1] - 416:18
**STEVEN** [2] - 309:24, 312:1
**STICKING** [1] - 409:13
**STILL** [9] - 301:9, 310:17, 320:20, 328:7, 336:1, 342:17, 349:5, 388:9, 390:20
**STIPULATED** [1] - 370:7
**STIPULATION** [20] - 353:4, 361:16, 363:22, 365:21, 367:16, 370:15, 370:20, 371:18, 373:8, 374:19, 375:13, 376:8, 377:16, 379:11, 380:4, 381:12, 414:20, 418:4, 418:8, 420:2
**STOCK** [1] - 312:23
**STOPPED** [1] - 306:9
**STREET** [1] - 295:24
**STREET** [2] - 296:6, 429:9
**STRICTLY** [1] - 457:19
**STRONG** [4] - 427:12, 439:12, 439:20, 439:24
**STRONG-MOTION** [2] - 439:12, 439:20
**STRUCTURE** [3] - 313:1, 321:1, 407:25
**STS-2** [5] - 372:9, 372:11, 372:22, 372:25
**STS-2.5** [1] - 358:5
**SUBCONTRACTORS** [1] - 328:12
**SUBJECT** [7] - 364:18, 366:13, 422:5, 447:4, 454:6, 454:7, 455:12
**SUBMIT** [1] - 435:17
**SUBMITTED** [3] - 319:19, 329:8, 329:10
**SUBSIDIARY** [4] - 348:8, 383:20, 384:1, 388:6
**SUBSTANTIAL** [1] - 325:17
**SUBSTANTIALLY** [3] - 330:10, 343:1, 459:21
**SUBTLE** [1] - 320:14
**SUBTLY** [1] - 320:10
**SUCCESSFUL** [1] - 307:20
**SUGGESTED** [1] - 307:11
**SUGGESTION** [1] - 460:21
**SUGGESTIONS** [1] - 324:23
**SUIT** [2] - 314:23, 317:19
**SUITE** [1] - 295:24
**SUITE** [3] - 296:14, 296:17, 296:20
**SUM** [2] - 346:17, 349:8
**SUMMARIZE** [1] - 334:20
**SUMMARIZED** [1] - 314:16
**SUMMARY** [2] - 361:25,

371:1
**SUNDAY** [1] - 426:22
**SUPERIOR** [1] - 302:8
**SUPERVISED** [1] - 350:15
**SUPERVISING** [2] - 348:13, 349:7
**SUPPLIED** [2] - 323:7, 323:25
**SUPPLY** [1] - 439:13
**SUPPORT** [10] - 322:6, 322:8, 323:6, 333:7, 351:11, 408:25, 411:11, 456:10, 456:17
**SUPPORTED** [2] - 333:9, 412:25
**SUPPORTING** [2] - 348:13, 409:4
**SUPPORTS** [1] - 336:4
**SURPRISE** [1] - 461:2
**SURPRISED** [3] - 320:23, 364:22, 460:20
**SURVEY** [1] - 320:7
**SUSPECTED** [1] - 303:18
**SUSPICIOUS** [2] - 342:7, 398:17
**SUSTAIN** [1] - 339:6
**SUSTAINED** [9] - 311:12, 323:13, 323:19, 339:14, 339:18, 340:4, 341:16, 389:25, 441:12
**SWITCHING** [1] - 454:25
**SWITZERLAND** [1] - 447:19
**SWORN** [1] - 301:21
**SWORN** [3] - 302:2, 347:12, 406:19
**SYNTAX** [1] - 344:6
**SYSTEM** [20] - 305:15, 354:20, 419:11, 433:15, 435:18, 436:19, 439:11, 439:12, 439:19, 439:20, 439:21, 439:22, 439:23, 439:25, 446:4, 449:21, 449:22, 450:12, 450:15, 450:17
**SYSTEMS** [25] - 308:11, 324:15, 345:4, 407:6, 407:8, 407:10, 408:21, 410:1, 412:18, 412:21, 412:24, 413:13, 414:4, 415:8, 415:20, 417:4, 417:9, 417:13, 424:23, 425:13, 427:9, 459:11, 460:3, 460:5, 460:14
**SYSTEMS** [27] - 305:11, 305:12, 305:16, 335:7, 365:11, 407:4, 407:7, 409:25, 419:5, 419:10, 424:7, 424:12, 424:14, 424:18, 424:20, 433:10,

433:11, 433:20, 437:6, 439:11, 439:13, 439:19, 446:3, 450:7, 451:11, 451:12, 451:19

---

**T**

**T-A-E-J-O-N** [1] - 402:6
**TAB** [1] - 384:13
**TABLE** [10] - 342:18, 385:25, 410:14, 410:15, 427:1, 427:2, 427:3, 428:5, 434:10, 452:3
**TAEJON** [2] - 402:2, 402:5
**TALHAN** [2] - 447:14, 447:15
**TALKS** [1] - 319:20
**TEAM** [4] - 305:4, 307:21, 393:4, 408:11
**TEAM** [7] - 355:3, 356:4, 358:13, 360:5, 369:20, 370:11, 379:2
**TECHNICAL** [1] - 335:16
**TECHNICAL** [21] - 321:15, 324:8, 334:20, 408:15, 409:21, 410:5, 411:9, 411:11, 412:12, 414:17, 416:5, 416:6, 416:10, 425:8, 431:7, 438:9, 441:25, 442:1, 445:5, 446:15
**TECHNOLOGY** [1] - 305:11
**TEMPERATURE** [1] - 407:17
**TEN** [1] - 393:12
**TENDERING** [1] - 442:22
**TENURE** [2] - 312:18, 393:6
**TERM** [3] - 313:12, 414:16, 442:11
**TERMS** [9] - 314:3, 314:15, 332:17, 387:8, 388:1, 388:4, 389:22, 434:7, 446:17
**TEST** [2] - 331:17, 410:25
**TEST** [9] - 327:17, 327:18, 331:13, 331:15, 372:15, 410:6, 432:7, 432:9, 459:8
**TEST-BAN** [2] - 331:17, 410:25
**TESTED** [3] - 328:7, 328:8, 431:2
**TESTIFIED** [10] - 331:2, 331:20, 332:4, 333:13, 335:20, 337:24, 340:5, 348:9, 372:18, 390:24
**TESTIFYING** [1] - 408:16
**TESTIMONY** [5] - 347:1, 387:12, 391:6, 406:8, 441:1
**TESTING** [5] - 328:6, 409:20, 411:10, 431:10, 431:19
**TESTS** [2] - 431:11, 431:15

**TEXT** [1] - 420:16
**THAT** [3] - 462:7, 462:8, 462:11
**THE** [150] - 296:3, 296:11, 301:7, 301:16, 301:21, 304:2, 304:4, 304:6, 311:10, 311:12, 313:18, 321:20, 323:13, 323:19, 323:22, 326:6, 326:8, 326:11, 326:15, 330:13, 330:16, 332:23, 334:10, 334:12, 338:18, 338:19, 339:6, 339:14, 339:18, 339:22, 339:23, 340:4, 340:14, 340:18, 341:16, 342:4, 342:5, 342:10, 346:19, 346:22, 346:25, 347:5, 347:6, 347:8, 347:10, 353:5, 355:12, 355:14, 361:17, 363:16, 363:23, 365:22, 367:17, 370:16, 370:21, 371:19, 373:9, 374:20, 375:14, 376:9, 377:17, 379:12, 380:5, 381:10, 381:13, 382:16, 384:15, 385:7, 385:10, 389:25, 392:20, 393:7, 393:10, 393:13, 400:2, 400:5, 400:8, 402:19, 402:22, 405:3, 405:5, 405:10, 405:15, 405:19, 405:23, 406:3, 406:7, 406:12, 406:13, 406:15, 406:17, 409:18, 409:19, 410:14, 410:15, 410:17, 414:21, 417:6, 417:7, 417:15, 417:23, 417:24, 418:5, 418:7, 420:3, 421:24, 423:12, 425:18, 426:18, 431:23, 432:24, 434:3, 435:10, 436:23, 438:3, 439:2, 441:2, 441:3, 441:11, 441:23, 441:24, 443:8, 445:8, 446:22, 448:14, 448:15, 449:7, 450:22, 452:24, 454:1, 455:7, 456:2, 456:22, 458:11, 458:12, 458:19, 460:23, 460:25, 461:1, 461:8, 461:10, 462:6, 462:7, 462:8, 462:9, 462:10, 462:11, 462:12, 462:13
**THEMSELVES** [1] - 440:1
**THEREAFTER** [1] - 304:21
**THEREFORE** [5] - 333:7, 428:8, 430:3, 448:16, 456:12
**THIRD** [1] - 457:14
**THIRD** [9] - 401:6, 412:20, 420:12, 420:19, 420:23, 421:4, 451:2, 455:14, 457:15
**THIS** [1] - 462:15

**THOUSAND** [1] - 419:5
**THOUSANDS** [2] - 314:25, 418:22
**THREATEN** [1] - 339:25, 459:9
**THREE** [18] - 306:25, 307:3, 308:5, 308:9, 315:11, 317:24, 317:25, 318:5, 366:17, 419:4, 427:10, 427:20, 427:21, 427:22, 438:12, 453:6, 460:8
**THREE-AND-A-HALF** [1] - 419:4
**THREE-CHANNEL** [1] - 427:10
**THURSDAY** [3] - 415:1, 451:1, 455:11
**TIED** [1] - 428:1
**TIM** [3] - 309:25, 312:4, 329:14
**TINA** [2] - 376:14
**TITLE** [1] - 407:9
**TITLE** [1] - 462:8
**TO** [1] - 462:8
**TOBY** [4] - 400:16, 400:19, 403:16, 404:1
**TODAY** [4] - 341:20, 397:10, 408:16, 410:12
**TONY** [6] - 312:5, 312:6, 329:15, 329:16, 329:18, 329:24
**TOOK** [7] - 312:17, 318:15, 319:2, 319:3, 344:17, 408:11, 409:5
**TOP** [30] - 333:2, 334:16, 337:3, 337:6, 353:10, 361:22, 363:25, 367:24, 368:2, 368:7, 371:21, 374:7, 374:8, 377:20, 394:25, 395:3, 395:14, 400:14, 401:6, 401:20, 404:9, 404:20, 412:15, 418:13, 420:23, 429:7, 434:16, 436:11, 448:5, 457:14
**TOPICS** [1] - 454:25
**TOTAL** [10] - 360:15, 363:8, 367:3, 374:2, 427:21, 427:23, 430:4, 452:10, 452:11, 457:15
**TOTALING** [1] - 428:7
**TOUCHES** [1] - 301:9
**TOUR** [3] - 331:7, 331:8, 331:9
**TRACK** [1] - 361:11
**TRACKED** [1] - 359:1
**TRACKING** [1] - 362:9
**TRADED** [2] - 312:20, 312:22
**TRADING** [2] - 315:21, 318:14

**TRAIN** [8] - 409:11, 424:20, 424:21, 425:15, 426:2, 433:7, 433:11, 434:15
**TRAIN** [1] - 328:17
**TRAJECTORY** [1] - 459:17
**TRAN** [2] - 376:14
**TRANCHE** [2] - 340:24, 341:1
**TRANSACTION** [2] - 310:15, 317:22
**TRANSACTIONAL** [2] - 306:1, 306:3
**TRANSCRIPT** [3] - 295:12, 462:9, 462:11
**TRANSFER** [2] - 299:24, 300:7
**TRANSFER** [7] - 310:13, 377:22, 379:16, 380:10, 380:24, 380:25, 418:1
**TRANSFERS** [2] - 398:15, 398:17
**TRANSITION** [1] - 322:4
**TRAVEL** [2] - 328:21, 328:25
**TRAVELLING** [1] - 419:20
**TREATY** [1] - 411:1
**TREATY** [2] - 331:18, 410:25
**TRIAL** [1] - 295:13
**TRIAL** [2] - 341:13, 386:25
**TRIED** [2] - 443:23, 455:15
**TROUBLESHOOTING** [1] - 325:20
**TROUBLESHOT** [1] - 309:13
**TRUE** [1] - 462:9
**TRUE** [10] - 302:15, 314:19, 320:17, 323:5, 323:17, 327:9, 336:15, 336:18, 393:5, 393:23
**TRUST** [2] - 454:10, 454:13
**TRUTH** [7] - 323:20, 347:3, 406:10
**TRY** [2] - 372:22, 456:12
**TRYING** [5] - 315:4, 315:19, 315:24, 317:12, 391:10
**TUESDAY** [6] - 415:14, 418:12, 423:17, 454:5, 456:6, 457:1
**TURN** [11] - 322:16, 333:15, 337:1, 356:1, 358:3, 360:7, 368:1, 384:13, 402:11, 430:24, 440:4
**TURNED** [3] - 303:11, 303:12, 303:13
**TURNING** [1] - 337:2
**TWENTY** [1] - 313:9
**TWICE** [1] - 431:11
**TWO** [25] - 303:21, 315:11, 317:25, 318:1, 318:4,

328:20, 334:24, 335:1, 337:7, 337:17, 342:1, 348:16, 384:2, 392:9, 405:21, 413:23, 414:2, 432:20, 434:11, 439:9, 439:10, 452:18, 458:1, 460:13
**TYPE** [3] - 427:4, 427:25, 438:12
**TYPES** [1] - 390:7
**TYPICALLY** [5] - 309:9, 419:21, 439:25, 441:8, 441:24

## U

**U.K** [9] - 303:14, 317:1, 319:16, 328:25, 338:13, 338:16, 342:6, 407:12, 407:13
**U.S** [13] - 295:3, 303:14, 310:11, 320:6, 351:12, 399:10, 408:18, 422:15, 428:12, 434:12, 442:11, 452:11, 459:21
**ULTIMATELY** [1] - 332:11
**UNCLEAR** [1] - 345:10
**UNCOMFORTABLE** [1] - 455:3
**UNCOMMON** [1] - 327:16
**UNDER** [14] - 313:10, 338:16, 376:18, 395:18, 397:22, 408:17, 409:6, 411:1, 412:24, 414:8, 414:9, 415:1, 425:14, 434:9
**UNDERLYING** [3] - 336:9, 361:8, 381:3
**UNDERNEATH** [1] - 368:8
**UNDERPINS** [1] - 305:11
**UNDERSTOOD** [1] - 331:16
**UNDERWAY** [2] - 433:21, 449:3
**UNEARTHED** [1] - 332:16
**UNEXPECTED** [1] - 459:9
**UNIT** [2] - 430:8, 430:16
**UNITED** [5] - 295:1, 295:5, 462:6, 462:8, 462:13
**UNITED** [14] - 296:4, 296:5, 296:6, 316:8, 331:17, 335:18, 338:10, 338:21, 340:7, 399:13, 406:25, 410:24, 423:6, 429:10
**UNITS** [3] - 427:21, 430:2, 430:6
**UNIVERSITIES** [2] - 335:6, 349:14
**UNIVERSITY** [1] - 304:12
**UNIVERSITY** [1] - 407:5
**UNPACKED** [1] - 327:12
**UNUSUAL** [3] - 399:3,

399:6, 399:9

**UP** [25] - 307:13, 324:4, 324:6, 327:5, 327:22, 336:6, 341:3, 345:6, 381:1, 381:7, 388:10, 389:21, 393:5, 393:13, 396:7, 396:11, 396:22, 401:20, 411:14, 416:14, 420:22, 430:16, 432:8, 432:11, 440:11
**UPCOMING** [1] - 432:3
**UPDATE** [1] - 440:10
**UPGRADE** [1] - 424:5
**UPHELD** [1] - 412:24
**UPPER** [3] - 353:15, 356:3, 367:20
**URGENT** [1] - 454:8
**USEFUL** [1] - 325:7
**USELESS** [1] - 454:15
**USERS** [1] - 412:22

# V

**VAGUE** [1] - 431:22
**VALIDATE** [1] - 381:2
**VALIDATED** [1] - 381:4
**VALUABLE** [3] - 343:6, 432:12, 454:22
**VALUE** [4] - 302:9, 302:12, 313:6, 396:8
**VALUED** [1] - 341:20
**VALVE** [1] - 445:21
**VARIOUS** [2] - 300:6, 300:7
**VARIOUS** [1] - 315:20, 339:4
**VERIFY** [2] - 323:25, 324:5
**VERONICA** [1] - 394:18
**VERSIONS** [1] - 306:3
**VIA** [1] - 354:7
**VIENGKHOU** [12] - 350:24, 350:25, 351:3, 352:10, 364:6, 366:8, 371:23, 372:2, 387:14, 387:25, 393:20, 398:9
**VIENGKHOU** [1] - 351:1
**VIRTUE** [1] - 336:22
**VISIT** [2] - 422:15, 434:13
**VISITED** [4] - 331:6, 344:16, 428:8, 453:7
**VITAL** [1] - 432:14
**VOLANTHEN** [1] - 318:16
**VOLANTHEN** [1] - 318:16
**VOLUME** [5] - 295:8, 297:3, 298:3, 299:3, 300:3
**VOLUNTARILY** [1] - 338:25
**VOUCHES** [1] - 354:12
**VS** [1] - 295:7

# W

**WAIVED** [1] - 322:22

**WALK** [3] - 351:24, 353:14, 368:19
**WALL** [9] - 309:25, 312:4, 312:5, 312:6, 329:14, 329:15, 329:16, 329:18, 329:24
**WALTER** [1] - 295:3
**WANTS** [1] - 416:14
**WARNER** [1] - 321:2
**WARNER** [4] - 318:23, 318:24, 333:18, 337:25
**WARNING** [2] - 365:11, 454:8
**WARRANTED** [1] - 309:17
**WARRANTIES** [1] - 309:18
**WARRANTING** [1] - 343:6
**WARRANTY** [1] - 321:12
**WASHINGTON** [1] - 296:10
**WATER** [4] - 409:10, 424:14, 424:16
**WAVE** [1] - 439:24
**WEAK** [1] - 440:14
**WEAPONS** [2] - 331:13, 331:15
**WEARING** [2] - 384:22, 385:15
**WEBSITE** [2] - 305:24, 447:24
**WEBSITES** [3] - 305:24, 306:1, 306:3
**WEDNESDAY** [6] - 295:13, 297:3, 298:3, 299:3, 300:3, 301:1
**WEDNESDAY** [7] - 415:14, 422:4, 425:23, 433:4, 435:15, 437:2, 445:13
**WEEKS** [1] - 442:22
**WEST** [2] - 368:12, 382:2
**WEST** [1] - 295:24
**WESTERN** [1] - 295:2
**WHOLE** [3] - 318:13, 347:3, 406:10
**WHOLLY** [1] - 348:8
**WHOLLY-OWNED** [1] - 348:8
**WIN** [3] - 442:24, 442:25, 449:2
**WIRE** [14] - 377:22, 378:4, 379:16, 379:20, 380:10, 380:16, 380:23, 380:25, 381:7, 381:17, 381:19, 398:15, 398:17, 399:6
**WIRE** [3] - 299:24, 300:7, 368:10
**WITH** [1] - 462:12
**WITNESS** [10] - 301:13, 346:19, 346:22, 402:19, 405:3, 405:12, 405:13, 405:15, 406:4, 410:18
**WITNESS** [19] - 302:2,

338:19, 339:23, 342:5, 347:5, 347:8, 347:12, 406:12, 406:15, 406:19, 409:19, 410:15, 417:7, 417:24, 441:3, 441:24, 448:15, 458:12, 461:17
**WITNESSES** [2] - 297:5, 297:7
**WON** [1] - 426:5
**WORD** [8] - 322:7, 359:19, 391:5, 394:3, 413:8, 435:18, 441:5, 458:14
**WORDING** [1] - 313:16
**WORDS** [6] - 314:8, 319:21, 325:9, 419:9, 448:10, 448:17
**WORKS** [1] - 324:9
**WORLD** [4] - 324:24, 327:8, 391:21, 392:1
**WORRY** [1] - 425:6
**WORTH** [5] - 312:24, 313:3, 313:4, 341:22, 459:19
**WOUND** [1] - 307:13
**WRAP** [1] - 393:13
**WRITE** [1] - 416:19
**WRITES** [4] - 328:15, 333:6, 366:16, 372:8
**WRITING** [3] - 415:10, 415:11, 448:6
**WRITTEN** [1] - 397:12
**WROTE** [3] - 328:14, 398:6, 420:24

# Y

**YEAR** [22] - 318:6, 318:9, 318:10, 319:3, 320:4, 325:13, 325:18, 334:24, 349:1, 364:22, 365:11, 372:23, 389:4, 391:16, 391:25, 430:14, 433:19, 457:16, 459:20
**YEAR-ON-YEAR** [2] - 325:13, 325:18
**YEARS** [24] - 305:2, 305:8, 306:25, 307:3, 308:5, 308:9, 308:13, 308:25, 309:10, 309:14, 317:24, 317:25, 318:2, 318:4, 318:5, 348:16, 351:5, 390:1, 393:21, 394:19, 408:3, 411:21, 439:9, 439:10
**YESTERDAY** [4] - 320:9, 322:22, 329:23, 332:14
**YORK** [1] - 296:9
**YOUNGDO** [1] - 459:9
**YOURSELF** [5] - 313:24, 319:21, 337:22, 388:11, 403:10

# Z

**ZERO** [1] - 341:21