1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,        )
                                      )
6                    Plaintiff,       )
                                      )
7           vs.                       )    Case No. CR 16-824 JFW
                                      )
8    HEON-CHEOL CHI,                  )         VOLUME 4
                                      )      (Pages 463 - 554)
9                    Defendant.       )
     _____)

10

11

12                    REPORTER'S TRANSCRIPT OF
                            TRIAL DAY 2
13               WEDNESDAY, JULY 12, 2017
                            12:30 P.M.
14               LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21
     _____
22
                 MYRA L. PONCE, CSR 11544, RPR, RMR, RDR, CRR
23                 FEDERAL OFFICIAL COURT REPORTER
                   350 WEST 1ST STREET, SUITE 4455
24                 LOS ANGELES, CALIFORNIA 90012
                      MYRAPONCE@SBCGLOBAL.NET
25

                     UNITED STATES DISTRICT COURT

1                        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        SANDRA R. BROWN
         Acting United States Attorney
5        BY:  POONAM KUMAR
             Assistant United States Attorney
6        312 North Spring Street
         Los Angeles, California  90012
7
         DEPARTMENT OF JUSTICE
8        BY:  DAVID M. FUHR
         BY:  ANNA G. KAMINSKA
9            Assistant United States Attorneys
         1400 New York Avenue NW
10       Washington, DC  20005

11

12   **FOR THE DEFENDANT:**

13       LAW OFFICES OF JOEL C. KOURY
         BY:  JOEL C. KOURY
14           Attorney at law
         3435 Ocean Park Boulevard, Suite 107-50
15       Santa Monica, California  90405

16       KAYE MCLANE BEDNARSKI & LITT, LLP
         BY:  MARILYN E. BEDNARSKI
17       BY:  KEVIN J. LAHUE
             Attorneys at Law
18       234 East Colorado Boulevard, Suite 230
         Pasadena, California  91101
19
         LAW OFFICES OF RICHARD W. RAYNOR
20       BY:  RICHARD W. RAYNOR
             Attorney at Law
21       800 South Pacific Coast Highway, Suite 8-284
         Redondo Beach, California  90277
22

23
     **ALSO PRESENT:**
24
         HYON K. RO, Certified Korean Interpreter
25       SOYOUN MCCONNELL, Certified Korean Interpreter

**UNITED STATES DISTRICT COURT**

1 **INDEX OF WITNESSES**

2

3 PLAINTIFF'S WITNESSES                                                    PAGE

4 PEARCE, Natalie

5     Cross-Examination by Mr. Koury                              469
      Redirect Examination by Mr. Fuhr                            503
6     Recross-Examination by Mr. Koury                            512

7

8 ZIMMERMAN, Lindsay

9     Direct Examination by Ms. Kumar                             514

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**INDEX OF EXHIBITS**

2

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 22 | - Stipulation | 513 | 513 |
| 25 | - Bank of America records for Chi | 517 | 517 |
| 26 | - Merrill Lynch records for Chi | 528 | 528 |
| 27 | - Merrill Lynch records for Chi | 528 | 528 |
| 28 | - Bank of the West records (Kinemetrics) | 522 | 522 |
| 31 | - Summary chart:  Kinemetrics deposits into defendant's Bank of America account | 520 | 520 |
| 32 | - Summary chart:  Guralp deposits into defendant's Bank of America account | 522 | 522 |
| 33 | - Summary chart:  Checks from defendant's Bank of America account to defendant's Merrill Lynch account | 531 | 531 |
| 34 | - Summary chart:  Source of funds in defendant's Bank of America account | 523 | 523 |
| 35 | - Summary chart:  Use of funds from defendant's Bank of America account | 526 | 526 |
| 36 | - Summary chart:  Transactional summary of defendant's Merrill Lynch account | 530 | 530 |
| 149 | - 6/21/2012 e-mail from defendant to Guralp and Pearce re: Status | 494 | 495 |

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                  WEDNESDAY, JULY 12, 2017; 12:30 P.M.

 2                      LOS ANGELES, CALIFORNIA

 3                             VOLUME 4

 4                               ---

 5            (Out of the presence of the jury:)

 6            THE COURT:  The jury will be here in a moment.

 7            Who's going to conduct the cross-examination?

 8            MR. KOURY:  I am.

 9            THE COURT:  And how long do you anticipate?

10            MR. KOURY:  I -- really, optimistically, we'll

11   finish before -- before the 2:00 o'clock hour.

12            THE COURT:  Oh, I guarantee you we'll do that.

13            MR. KOURY:  Absolutely.  I would say roughly an

14   hour.

15            THE COURT:  All right.  I know you're an experienced

16   cross-examiner.  And getting in and getting out like you did

17   with Mr. Potts, I think, is the way to go.

18            MR. KOURY:  I will do my best, Your Honor.  That's

19   my plan as well.

20            MS. KUMAR:  Your Honor, just to alert the Court, the

21   parties have spoken.  And after Ms. Pearce's testimony, the

22   parties plan to read a stipulation into evidence, Exhibit 22,

23   regarding the testimony of Mr. Czeranko, who is an FDIC --

24            THE COURT:  Have I been graced with a copy of the

25   stipulation yet?
```

```
 1              MS. KUMAR:  You have not.  We can wait until
 2   tomorrow if you want.  We just signed it earlier today.
 3              THE COURT:  Do you have a copy for me?
 4              MS. KUMAR:  I can make a copy, Your Honor.  We
 5   haven't actually been able to make a photocopy for you.
 6              THE COURT:  You have all that -- the plush offices
 7   in this building, don't you?
 8              MS. KUMAR:  I know, Your Honor.
 9              THE COURT:  A suite down there with a copier.  The
10   defense lawyers don't have the same --
11              MS. BEDNARSKI:  You heard about that -- right? --
12   the attorney lounge, the problem?
13              THE COURT:  No.
14              MS. BEDNARSKI:  Because I'm a CJA rep, of course.
15   They installed only electric plugs -- you'll understand this --
16   which go to sleep after 15 minutes.  So you cannot use a
17   computer.
18              THE COURT:  Wait a minute.  That's all in chambers.
19              MS. BEDNARSKI:  Yeah.  So no printers, no computers.
20              THE COURT:  We have the same thing in chambers, my
21   chambers.
22              MS. BEDNARSKI:  Unbelievable.  You have extension
23   cords running everywhere?
24              THE COURT:  Yes.
25              THE COURTROOM DEPUTY:  All rise for the jury.
```

**UNITED STATES DISTRICT COURT**

```
 1                    (In the presence of the jury:)
 2              THE COURT:  All right.  The jury is present.  All
 3    counsel and the defendant is present.
 4              You may proceed with the cross-examination of this
 5    witness.
 6              MR. KOURY:  Thank you, Your Honor.
 7              THE COURT:  And if you could get a little closer to
 8    the microphone because you have a soft voice and I'm having a
 9    hard time picking it up.
10              All right.  Thank you.
11              You may proceed.
12                           NATALIE PEARCE,
13       PLAINTIFF'S WITNESS, PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:
14                          CROSS-EXAMINATION
15    BY MR. KOURY:
16         Q.   Good afternoon, Ms. Pearce.
17         A.   Good afternoon.
18         Q.   Now, when you started at GSL, it was a very small
19    company, was it not?
20         A.   Yes.  It was around 14 people.
21         Q.   By the time you left, there was over a hundred?
22         A.   That's correct.
23         Q.   And the company was started by Cansun Guralp.  And
24    you characterized him as a pure scientist?
25         A.   It was started by Dr. Guralp.  I wouldn't just
```

1    classify him as a pure scientist, but he is a scientist.

2        Q.    I didn't mean to limit him.

3             But you characterized him as kind of a pure

4    scientist when it came to running the business and developing

5    his products?

6        A.    He was a very knowledgeable and intelligent man in a

7    wide variety of areas.  I would not be able to limit it to just

8    that.

9        Q.    Now, when you were working for him, you were working

10   quite a bit, sometimes a hundred hours a week?

11       A.    I did work very long hours, yes.

12       Q.    And it's already been admitted, there's an

13   Exhibit 504 that's in a binder in front of you, which is a copy

14   of the technical service agreement that Dr. Chi had.

15            Can you find that?  504.  Do you see it?

16       A.    Yes.

17       Q.    And that was a technical service agreement between

18   Cansun Guralp and Dr. Chi; correct?

19       A.    I have not seen -- have a recollection of seeing

20   this before.

21       Q.    You don't recall that?

22       A.    This -- this handwritten document, no, not in

23   detail.  No.

24       Q.    But you know that Dr. Guralp told you that he had

25   executed a technical advice contract with Dr. Chi?

1    A.    Yes.

2    Q.    And in the other book, Exhibit 53, you were present

3  when that agreement was actually signed, were you not?

4    A.    Um, on this one, on -- I believe so.  I don't have a

5  memory of it, but I believe I was present, yes.

6    Q.    And you were aware that Dr. Chi was getting paid per

7  instrument?

8    A.    Yes.

9    Q.    And advice contracts, that -- that's not out of the

10  ordinary in your business?

11    A.    We didn't have any with anybody else, so I'm not

12  really sure how I could answer you that that was not out of the

13  ordinary.

14    Q.    But you had other GSL programs that were paid per

15  unit; correct?

16    A.    There was one gentleman in Guralp Systems who was

17  paid a commission for products sold, of product he was

18  developing, yes.

19    Q.    Mike Smart?

20    A.    That's correct.

21    Q.    And he was paid per instrument that was sold?

22    A.    I believe so.  Yes.

23    Q.    And previously, you've told others that it was

24  other -- other programmers were also paid the same way

25  Mike Smart was paid?

**UNITED STATES DISTRICT COURT**

```
 1         A.    I don't have any recollection of saying that.  I'm

 2    aware of Mike Smart.  I wouldn't necessarily be aware of how

 3    everybody else was remunerated at the company.

 4         Q.    You were upset when you found out Dr. Chi was going

 5    to be paid per unit shipped to Korea?

 6         A.    I was upset that we were going to -- that Dr. Guralp

 7    felt we had to pay in order to have a relationship like this,

 8    yes.

 9         Q.    You were so upset, you broke your phone.

10         A.    I threw my phone on the floor, yes, and it broke.

11         Q.    And the reason why you were upset was because you

12    felt you were working really hard, and you didn't like the idea

13    that other people would get paid per unit?

14         A.    No.   It's far more complex than that.  Um, it was

15    not only that conversation.  We had a conversation about many

16    other things because I was working on a project in Turkey at

17    the time.  And, yeah, my discussions with Cansun could become

18    quite heated.  He was not somebody that you could disagree

19    with.

20               But I was not happy about this because I was

21    building relationships like this with many people.  That was my

22    job.

23         Q.    Understood.

24               But at the time, 2003, sales in Korea were $20,000

25    or less?
```

```
 1        A.    Very small.

 2        Q.    And by the time you left, sales were almost a

 3   million dollars a year?

 4        A.    That's the number I recall, yeah.

 5        Q.    Dr. Chi was instrumental in helping to increase

 6   sales to that point?

 7        A.    I believe so, yes.

 8        Q.    Now, you've talked about how Dr. Chi was paid in

 9   cash.  That was initially very early on, the first years, 2003,

10   2004?

11        A.    It was early on, yes.  I don't recall the exact year

12   it started, but yes.

13        Q.    And that's when the sales amounts were relatively

14   small, so a thousand -- a few thousand dollars here, a few

15   thousand dollars there; correct?

16        A.    I -- I would presume so, but I don't exactly have

17   that information to answer you.

18        Q.    Well, you have told us that the initial sales were

19   roughly 20 to $50,000 in the first few years?

20        A.    Yeah.  2000, 2003, yeah.

21        Q.    And by the time sales increased to a significant

22   figure, that's when GSL required Dr. Chi to start submitting

23   invoices?

24        A.    No.  The invoices were quite after the change in

25   management because the finance director required invoices to
```

1    pay people.

2        Q.    You helped design the invoice form for Dr. Chi?

3        A.    I did not design it.  It was given to me as a

4    suggestion from my finance director, which I passed on to

5    Dr. Chi.

6        Q.    So you took the form that was given to you from the

7    finance director, and you e-mailed it or faxed it to Dr. Chi?

8        A.    I believe it was e-mailed, yes.

9        Q.    And you provided instructions to the effect of this

10   is the form that they want you to fill out in order to submit

11   your -- in order to get paid?

12       A.    No, I believe it was along the lines of you need to

13   invoice us, you know, this is the type of invoice you should

14   send but left it to him to do what he wanted.

15       Q.    And at that time, you knew the address that he was

16   using in New Jersey was a mailing address?

17       A.    I wasn't really sure what that address was, but I

18   knew it was an address in New Jersey that he didn't live at.

19       Q.    When other colleagues or customers or technical

20   advice people came to Europe, occasionally cash was given to

21   them to help them with expenses, transportation around town,

22   food and lodging, things of that sort?

23       A.    Sorry.  Could you repeat that again?  I didn't quite

24   catch the first part.

25       Q.    When other colleagues or technical people or

**UNITED STATES DISTRICT COURT**

```
 1    customers came to the U.K. to visit with you and Mr. Guralp,
 2    occasionally cash was given to them to pay for expenses while
 3    they were in town?
 4         A.    Not that I'm aware of.
 5         Q.    But then why did you tell Mr. Fuhr in a meeting that
 6    that was the case?
 7         A.    I don't recall telling Mr. Fuhr that was the case.
 8         Q.    You don't recall being --
 9         A.    What I recall -- the only thing I recall saying
10    about cash was if our engineers traveled abroad, they would
11    often be given cash to pay for expenses and things.
12         Q.    Okay.
13         A.    They were traveling abroad, but not what you were
14    saying.
15         Q.    So when people were traveling abroad, they were
16    often given cash?
17         A.    They would often be given a cash advance because not
18    every place you travel to has credit cards and not every
19    employee had a credit card.
20         Q.    You do recall on September 29th, 2015, being
21    interviewed at the Law Office of Addleshaw Goddard?
22         A.    I did attend, yes.
23         Q.    That was after the investigation began?
24         A.    That was when the company investigation was going on
25    internally, yes.
```

1    Q.    You hired a lawyer to accompany you?

2    A.    No, I did not have a lawyer present for me at that

3 meeting.

4    Q.    But you consulted with a lawyer?

5    A.    No, I did not consult with a lawyer.  I was meeting

6 the company lawyers.

7    Q.    And you went in and you were completely honest?

8    A.    I went in and gave as honest account as I could

9 recall at that time, yes.

10    Q.    And that was closer in time, so the events were

11 fresh in your mind -- correct? -- fresher than a year and a

12 half later?

13    A.    Sorry.  Closer in time to what?

14    Q.    When the events happened.

15    A.    What?  This whole event?

16    Q.    Yeah.

17    A.    I wouldn't have said it was fresher in my mind then

18 than it is now, no.

19    Q.    So when you went into that interview, you told the

20 investigators that it's not possible to tilt the specifications

21 in Korea?  Did you make that statement?

22    A.    I'm sorry.  I can't recall exactly what I said --

23    Q.    But you did --

24    A.    -- in detail --

25    Q.    -- say something to that effect?

 1          A.     -- at the time.

 2          Q.     That the specifications requirements are set and

 3    it's not possible to manipulate them or tilt them.

 4          A.     I'm sorry.  I can't recall what I said at that time.

 5    For me to -- I don't have a transcript from that time.

 6          Q.     The specifications are set by the end customer;

 7    correct?

 8          A.     I presume, yes.  Specifications are normally set by

 9    a regulator or by the end customer.

10          Q.     I'm just talking about your practice when you were

11    selling these products.  The specifications were set by the end

12    user or regulations or someone?

13          A.     Typically they are, yes.

14          Q.     And Dr. Chi was not involved in setting those

15    specifications, as far as you're aware?

16          A.     I only know what he's written to me in the e-mails,

17    which I have now seen.

18          Q.     As far as you're aware, he was not involved in

19    setting those specifications?

20          A.     He has told us on occasions he was part of setting

21    those specifications, which is information --

22          Q.     Is that --

23          A.     -- that's here.

24          Q.     Is that for his projects or other projects?

25          A.     Well, he mentions in his e-mails a variety --

1       Q.    I'm not asking what he mentions in his e-mails.  I'm

2  asking when you were doing this.  Were you aware whether he had

3  any input into the specifications?

4       A.    I am now aware of that, yes.

5       Q.    Were you then?

6       A.    I can't recall exactly back to what I knew and did

7  not know at that time because that's -- it's a 15-year period.

8       Q.    Dr. Chi had no influence over bids; is that correct?

9  In other words, he couldn't manipulate one company to get a bid

10  versus another, based on your experience in dealing with him?

11       A.    After a bid is submitted and a review of the bid, I

12  would believe that to be the case.

13       Q.    In fact, you've pointed out to investigators in this

14  case that there were situations where bids were denied and

15  Dr. Chi was upset that the bid was denied?

16       A.    Well, we did lose some open bids, yes.

17       Q.    And when those open bids were lost, Dr. Chi was

18  upset that your products weren't selected, just like you?

19       A.    Probably, yes.

20       Q.    When you were dealing with Dr. Chi, he was providing

21  technical advice to you substantially; correct?

22       A.    He did provide a lot of technical advice, yes.

23       Q.    And he would provide technical details about the

24  products at times; is that true?

25       A.    That's true.

1       Q.    He provided technical specifications for how the
2   products would be used?
3       A.    That's true.
4       Q.    For example, you saw an e-mail just a few minutes
5   ago with Dr. Biro, B-i-r-o, the one where they mentioned the
6   GeoSIG products?
7       A.    Yeah.
8       Q.    And you were aware that Dr. Chi had done research
9   and contacted USGS about the GeoSIG products.  Were you aware
10  of that?
11      A.    I don't have any recollection of that.
12      Q.    Well, do you remember Dr. Chi mentioning to you that
13  the GeoSIG products are PC-based?
14      A.    That's correct.
15      Q.    And did he mention to you that the PC-based systems
16  had been rejected by USGS because they crash?
17            MR. FUHR:  Objection, Your Honor.  Hearsay.
18            THE COURT:  Overruled.
19            THE WITNESS:  I -- I don't have any recollection of
20  that.
21  BY MR. KOURY:
22      Q.    Do you recall him telling you that GeoSIG had
23  deleted the PC logo from their catalog after he had done his
24  research?
25      A.    Again, I'm sorry.  I don't have a recollection of

1    that.

2        Q.    And in your encounters with Dr. Chi, was it your

3    experience that Dr. Chi kind of wore two hats, KIGAM

4    responsibilities and technical advice consulting with your

5    company?

6        A.    I'm not -- sorry.  Could you -- I'm not quite sure

7    what you mean by that.

8        Q.    Well, you were the one who used the phrase "two

9    hats" in the interview at Addleshaw Goddard.  Do you remember

10   using that phrase?

11       A.    It's a phrase I may have used.

12       Q.    And "two hats" suggests that a person has two

13   different sets of responsibilities, does it not?

14       A.    Uh-huh.  Or plays two different roles, yes.

15       Q.    Okay.  So if they play two different roles, when you

16   were doing this interview at Addleshaw Goddard, it was in

17   connection with what you viewed Dr. Chi's responsibilities to

18   be; correct?

19       A.    I'm not sure it's what I mean by "viewed his

20   responsibilities to be."  But I did see him, yeah, looking

21   after KIGAM work and was looking after our work.

22       Q.    And you also knew that Dr. Chi also provided

23   technical advice to KMI?

24       A.    It was mentioned to me by Dr. Guralp, that he had

25   some involvement with Quanterra, but I never knew the details

1    of what he did with KMI.

2         Q.    But you knew that there was a relationship between

3    Dr. Chi and KMI?

4         A.    Well, he mentioned that there was an official

5    contract between KIGAM and KMI.

6         Q.    And you knew your products to be often as reliable

7    as KMI products; correct?

8         A.    Our products were not often reliable.

9         Q.    Your products weren't that reliable?

10        A.    In some situations, they were not reliable.

11        Q.    Other situations, they were?

12        A.    There were some situations where they were reliable,

13   yes.

14        Q.    As reliable or more reliable than KMI products?

15        A.    I don't really know how reliable KMI's are to be

16   able to give you an exact comparison.

17        Q.    But you know that your products are substantially

18   less costly than Kinemetrics products?

19        A.    They're substantially less expensive than Quanterra

20   products.  I don't know all the prices of KMI's stuff.  I know

21   that might now be the same company.

22        Q.    You -- you did this for how many years?  How long

23   were you selling DSL products?

24        A.    Fifteen years.  But I'm not primarily a salesperson.

25        Q.    And you travel around the world and you tried to

```
 1   sell your products around the world to different customers and

 2   you didn't know what your competitors were charging?

 3        A.    Competitors' prices vary from country to country and

 4   project to project.  It's very hard to find a stable catalog

 5   price.  Everybody varies depending on where they are.

 6        Q.    So you're saying that the same product may sell for

 7   one price in Mexico and sell for a different price in

 8   Guatemala?

 9        A.    They would be different prices, for example, in

10   South America or against Europe, against the U.S., yes.  It

11   would not be uncommon.

12        Q.    And one of the factors that would impact the

13   different prices is whether or not there was someone locally to

14   provide technical advice to make sure it was installed properly

15   and the right equipment; isn't that true?

16        A.    There may often -- that may often be a factor, yes.

17        Q.    And the other price -- the other price difference

18   between these two countries is what?  The company just felt

19   like they could charge more in one country than another?

20        A.    No.  Sometimes, if there was a new project that

21   might be a very large continual product, then companies were

22   going very, very low with the price because they knew they

23   would get continued, long business.

24        Q.    For example, when Dr. Chi pointed out to you that

25   the damn project was going to be going on and there was going
```

UNITED STATES DISTRICT COURT

 1    to be a great need for many sensors, that's the kind of

 2    situation where the company -- most companies would consider

 3    adjusting their price; correct?

 4        A.    You might well, yes, consider reducing the price,

 5    absolutely.

 6        Q.    Because your hope is if you reduce the price, you're

 7    going to get this very large bid?

 8        A.    Yeah.

 9        Q.    And that's a common practice across the industry?

10        A.    It's not uncommon.  That's true.

11        Q.    One of the benefits of Dr. Chi's contract with GSL

12    was it operated almost like a warranty for the products in

13    Korea.  Would you agree with that?

14        A.    Can you explain what you mean by "warranty" there?

15        Q.    Certainly.

16              Dr. Chi would be in Korea, he would know what the --

17    what equipment is needed for a particular job, and so he would

18    help the company and help you choose the specifications that

19    would meet the job while he was on the ground.  Would you agree

20    with that?

21        A.    Could you just repeat what you said about help us

22    to --

23        Q.    Determine the specifications needed for particular

24    equipment.

25        A.    Yeah.

```
 1        Q.    He would then help the customer place the order for
 2   the appropriate equipment with GSL; is that true?
 3        A.    Uh-huh.  Yes.
 4        Q.    And the equipment would often have different
 5   options, different power supplies, different communication
 6   devices that would attach to it?
 7        A.    We had a very wide equipment catalog, yes, with
 8   options and variables.
 9        Q.    And so it's often difficult and complex to figure
10   out which component should go with -- which recorder should go
11   with which sensor, which power supply should go with those
12   equipments, et cetera?
13        A.    Yeah.  That was the main part of my job, advising
14   that to people.
15        Q.    But then distinct from your job, once the equipment
16   was manufactured and it was sent over to Korea, Dr. Chi was on
17   the ground there to make sure that it was functioning before it
18   got installed; isn't that true?
19        A.    Yeah.  KIGAM did that as well as our distributor in
20   Korea.
21        Q.    Dr. Chi did that as well.  That was part of his
22   agreement with you?
23        A.    Yeah.
24        Q.    And you just said KIGAM did that.  But the only
25   reason there's a KIGAM agreement is because Dr. Chi made a
```

1    KIGAM agreement happen with GSL; correct?

2         A.    Uh-huh.  Yes.

3         Q.    And so your very delicate computer-based equipment

4    would get shipped around the world, and it would wind up on

5    someone's desk somewhere.  And then Dr. Chi, with a technical

6    advice contract, would open it up, make sure that it's -- all

7    the components are still in place, fire it up to make sure that

8    it's working.  That was something that he would do at times;

9    correct?

10        A.    I believe so.  Yes.

11        Q.    And there were occasions when he notified you, oh,

12   there's a problem with the sensor that came in or there's a

13   problem with this recorder that came in or there's a problem,

14   we need to repair it.  He notified you about those problems;

15   correct?

16        A.    Yes.

17        Q.    And at times, if possible, he would program or he

18   would repair the devices or have someone else repair them;

19   correct?

20        A.    On -- yeah.  For some items, it could be done that

21   way, yes.

22        Q.    And there were times when GSL would have to send

23   parts to Dr. Chi in order to repair the products that were

24   sent; correct?

25        A.    I'm -- I'm sure there were occasions, yes, when

**UNITED STATES DISTRICT COURT**

1   parts, even engineers, had to be sent out to help repair stuff,

2   yeah.

3       Q.   So there were also times when the product couldn't

4   be repaired in Korea, and then it would have to be sent back to

5   the U.K. for repairs.  Do you remember that?

6       A.   Depending on the type of fault, yes.  Some faults

7   could be repaired in the field.  Some would have to be done in

8   the factory only.

9       Q.   And then there were other occasions when Dr. Chi

10  notified you that he's incapable of repairing the product, and

11  there were occasions where GSL people would fly all the way to

12  Korea to repair the product; correct?

13      A.   Yeah.  I do recall engineers flying to Korea to do

14  maintenance and repairs, yeah.

15      Q.   It has to be very expensive to send GSL engineers

16  for three, four, five days to repair a product in Korea, is it

17  not?

18      A.   It's all relative.  I mean, compared to the cost of

19  the equipment, it isn't necessarily expensive, but it is still

20  a significant cost.

21      Q.   Well, certainly inconvenient to GSL, is it not, to

22  have its engineers gone for a week or two weeks?

23      A.   Yeah.  I would assume so.  Absolutely.

24      Q.   GSL's paying the salary while the engineers are

25  gone; right?

1      A.     Uh-huh.

2      Q.     GSL's paying for the airfare for the engineers to

3  go; right?

4      A.     Yeah.

5      Q.     GSL's paying for the food and the hotel and anything

6  else; correct?

7      A.     Yeah.  I presume, yeah.

8      Q.     Isn't it much more cost effective to have Dr. Chi do

9  the same thing for $500?

10     A.     If it was $500, yes, that would be more economical.

11     Q.     And on those occasions when engineers did have to

12 get sent over to Korea, there were occasions where Dr. Chi had

13 received a technical service fee for the products.  And you're

14 aware that on some of those occasions, he said "I will pay for

15 the engineers to come out of my service fee"; correct?

16     A.     Yeah.  I believe there have been occasions where he

17 has done that, yes.

18     Q.     Now, Dr. Chi also provided technical advice on how

19 to improve the equipment and make it better; is that true?

20     A.     Yeah.  He'd provide technical advice on how we

21 should develop for new upcoming requirements and needs, yeah.

22     Q.     For example, he was very helpful in talking about

23 the Korean early warning system and what your equipment would

24 need to have in order to be compatible with that system?

25     A.     Uh-huh.

```
 1        Q.    Is that true?
 2        A.    Yeah.  He and I had lots of conversations about
 3   earthquake early warning because that was a passion of mine as
 4   well.
 5        Q.    It's a passion of his as well, is it not?
 6        A.    Yeah.  He's one of the experts in that area.
 7        Q.    And the reason why the two of you had these
 8   conversations was because you knew how important early warning
 9   systems are to saving lives?
10        A.    Absolutely.  That was one of the joys of the job,
11   was making a difference to people's lives.
12        Q.    And when you were having these conversations with
13   Dr. Chi, he was genuinely concerned about creating an early
14   warning system in Korea?
15        A.    I would say yes, he was.
16        Q.    And that was a motivating factor, was it not, in the
17   discussions about why --
18              MR. FUHR:  Your Honor, objection.  Hearsay.
19              THE COURT:  You have to rephrase the question.
20              Do you understand the question?  Do you understand
21   the question?
22              THE WITNESS:  No, I didn't quite get the --
23              MR. KOURY:  Actually, I didn't finish it,
24   Your Honor.  I apologize.
25              THE COURT:  Well, even the beginning of it --
```

```
1              MR. KOURY:  I'll start over.

2              THE COURT:  All right.

3   BY MR. KOURY:

4       Q.    Dr. Chi mentioned to you in these conversations

5   about the early warning system, about how important it is to

6   have cost effective equipment to create the early warning

7   system, did he not?

8              MR. FUHR:  Your Honor, same objection.  Hearsay.

9              THE COURT:  The objection is overruled.

10             THE WITNESS:  Sorry.  I --

11  BY MR. KOURY:

12      Q.    I apologize.  I'll repeat the question.

13      A.    Thank you.

14      Q.    So in the conversations when you're talking to

15  Dr. Chi about the early warning system, he mentioned to you

16  that it's important to have cost effective equipment so that

17  the early warning system could be built?

18      A.    That's true for pretty much every government or

19  high-risk seismic area.  I mean, I spent five years traveling

20  the world, lecturing about how low-cost and quick early warning

21  devices could be made.  So, yes, we had many conversations

22  about that.

23      Q.    As I understand early warning systems, it requires

24  multiple stations over a broad area; is that true?

25      A.    You require high density, yes, to have the best
```

1    system.

2        Q.    And to have a better system, the more -- it would

3    require more stations?

4        A.    Yeah.

5        Q.    And if you're paying 100,000 or 150,000 for one

6    station, it's going to be difficult to have more stations, is

7    it not?

8        A.    Well, absolutely, unless you've got very deep

9    pockets.

10       Q.    When you're a developing country like Korea, Dr. Chi

11   told you that it was important to him to have reliable, good

12   equipment as inexpensively as possible?

13       A.    I think that's every customer's wish.

14       Q.    Fair enough.

15            But Dr. Chi made it clear that that was important to

16   him and people in Korea as well?

17       A.    Yeah.

18       Q.    Now, you are aware that when KIGAM would purchase

19   products from GSL, there would be a steep discount from what

20   most other end users would use -- or what other end users would

21   get?

22       A.    Sorry.  What discount?

23       Q.    KIGAM would get a larger discount than other

24   customers.

25       A.    What -- in Korea?

**UNITED STATES DISTRICT COURT**

1      Q.    Yes.

2      A.    No, I think they had the same end price for products

3  that everybody had.  One price remained across all of Korea,

4  apart from individual projects which may have had a particular

5  discount for a particular reason.

6      Q.    Well, you saw an e-mail a few minutes ago about

7  direct bidding, private bidding?

8      A.    Uh-huh.

9      Q.    Those prices are different than the bidding process

10  that goes out in public, and numbers are submitted to some

11  organization somewhere; is that not true?

12      A.    Well, um, our distributor would have submitted the

13  open bids where I would not have known the end price they would

14  have bid.  I would have only known the price that we would have

15  sold to them at, which would have been the same price that we

16  would have sold to KIGAM, for example, or somebody else in

17  direct contracting it.

18      Q.    So let me see if I understand correctly.  If I hear

19  you, GSL would sell to a distributor at a certain price.  And

20  then that distributor might put a markup on top of your product

21  and sell it to an end user?

22      A.    Yeah, depending on what other services they had to

23  include in their costings.

24      Q.    And that markup could be significant; correct?

25      A.    Yeah.  If they have a lot of work to do, if they

1    have to build stations and store them, absolutely.

2         Q.    Sometimes that markup could be as much or more than

3    this -- the equipment cost itself?

4         A.    I don't actually know.  I can't answer that.

5         Q.    Well, KIGAM -- for the products that KIGAM

6    purchased, KIGAM took responsibility for installing,

7    troubleshooting, and maintaining the equipment that they

8    installed; correct?

9         A.    Yeah.  We may have sent engineers to assist them

10   but -- yes.

11        Q.    And the agreement that KIGAM would install equipment

12   and hire the necessary people, that was the agreement that was

13   negotiated between Mr. Guralp and Dr. Chi November of 2003;

14   right?

15        A.    No.  I'm not -- sorry.  Just repeat that again.

16        Q.    The obligation that KIGAM had to be in charge of

17   installation of GSL equipment was a product of that November

18   2003 agreement that Dr. Chi and Cansun Guralp signed; correct?

19        A.    Well, no.  Is that not the contract from November

20   2003, the --

21        Q.    That's what I'm --

22        A.    The one between KIGAM?

23        Q.    Yes.

24        A.    Okay.

25        Q.    So it is based on that agreement.  That's where that

```
 1   obligation came from?
 2        A.   The November 2003 one, yes.
 3        Q.   Yes.
 4        A.   Between KIGAM and Guralp Systems.
 5        Q.   Yes.
 6             Now, you said that there's one price -- there's a
 7   markup if the distributor receives your product and gives it to
 8   the customer; correct?
 9        A.   Yeah.
10        Q.   And that includes an agent fee?
11        A.   Well, they -- we sell to them at a price.  What they
12   add on to it is what they need to.  So --
13        Q.   What they --
14        A.   -- it includes what they want.  They may call it an
15   "agent fee"; I don't know.
16        Q.   Okay.  Now, when you sold products to KIGAM, there
17   was no agent fee because they were the direct customer;
18   correct?
19        A.   We sold them at the same price we would have sold
20   them to the distributor at, yes.
21        Q.   So there was no agent fee involved in the sale
22   between GSL and KIGAM?
23        A.   There was no agent fee, no.  There was no agent
24   involved.
25        Q.   When you were communicating with Dr. Chi, there were
```

**UNITED STATES DISTRICT COURT**

 1    times when he would occasionally use a Gmail account; correct?

 2         A.    Yeah.  I think he used a Gmail account, yes.

 3         Q.    And that was when he was at home working after

 4    hours?

 5         A.    Well, I don't know why he would use a Gmail versus

 6    a -- or for what reason, but there could have been.

 7               MR. KOURY:  If I can just have a moment, Your Honor,

 8    I left something at the table.

 9               THE COURT:  Sure.

10               (Off-the-record discussion between counsel.)

11               MR. KOURY:  Has it been admitted?  Do you know if

12    it's been admitted?

13               MS. BEDNARSKI:  Not yet.

14               MR. KOURY:  Your Honor, I'd like to make reference

15    to Exhibit 149.

16               (Exhibit 149 for identification.)

17    BY MR. KOURY:

18         Q.    It should be in the big book in front of you,

19    Ms. Pearce.  Do you see it?  Actually, I'm not sure which --

20    pardon me, a small book, perhaps.

21               THE COURT:  It's the Government's Exhibit 149?

22               MR. KOURY:  It's Government's Exhibit 149.  I would

23    move to admit it.  We can put it up.

24               I'm just waiting to hear their response.

25               THE COURT:  Is there any objection to 149 from the

```
 1   Government?
 2              MR. FUHR:  Just a second, Your Honor.
 3              THE COURT:  I can't imagine there is.  It's your
 4   exhibit.
 5              MR. FUHR:  Then there's no objection.
 6              THE COURT:  All right.  It will be admitted.
 7              (Exhibit 149 received into evidence.)
 8              THE COURT:  You may publish it.
 9              Let me give the witness my copy.
10              MR. KOURY:  It's on the screen, Your Honor.
11              THE COURT:  It's on the screen?  All right.
12              THE WITNESS:  Thank you.
13   BY MR. KOURY:
14        Q.   So, Ms. Pearce, looking at a copy of this e-mail,
15   you received this e-mail from Dr. Chi June 21st, 2012?
16        A.   Yes.
17        Q.   See this line --
18              THE COURT:  Is there a question?
19              MR. KOURY:  Yes.
20   BY MR. KOURY:
21        Q.   See this line that Dr. Chi sent to you, "My
22   institute has strictly followed the regulations during the
23   test"?
24        A.   I do.
25        Q.   It was a common -- Dr. Chi regularly told you about
```

```
 1     how he would follow the regulations as required by his

 2     institute or the end user; correct?

 3          A.    Yes.  The equipment was tested thoroughly and

 4     properly.

 5          Q.    Now, in this e-mail, Dr. Chi informed you that the

 6     home address he was using on the invoice was for a friend at

 7     New Jersey; correct?

 8          A.    That's what it says there, yes.

 9          Q.    The -- by virtue of the contracts that Dr. Chi had

10     with KIGAM, he was able to get your equipment at a substantial

11     discount from what your distributor was paying -- or what your

12     distributor was selling the equipment for; is that true?

13          A.    So if you mean that the equipment made on direct

14     contract may cost the end user less than if it had gone through

15     open bidding, that is certainly a possibility, yes.

16          Q.    For example, he talked about the railroad project.

17          A.    Uh-huh.

18          Q.    And getting more sensors on the railroad project was

19     going to dramatically improve the safety of that particular

20     railroad line; correct?

21          A.    Yes.  It would improve safety because the more

22     sensors you have, the more you can do.

23          Q.    And shortly before you left GSL, you told

24     Chris Potts about all of the work that Dr. Chi was providing?

25          A.    I had told every CEO.  I had four CEO changes since
```

1  2010.  Yes, they were always informed and aware.

2       Q.    You told him that he was helping you with the

3  specifications of the equipment?

4       A.    Yes.

5       Q.    You told him that he was helping with logistical

6  arrangements in Korea?

7       A.    Yeah.  I believe so.

8       Q.    You told all of the CEOs that he would provide

9  invaluable advice about the Korean market and what was going

10 on?

11      A.    Yes.

12      Q.    That he provided invaluable support to your company

13 when it came to your equipment that you were putting in the

14 market?

15      A.    Yes, he did.

16      Q.    And you told them, particularly Chris Potts, that

17 Dr. Chi was invaluable to maintaining the business in Korea?

18      A.    Yes, he was.

19      Q.    And despite that, Mr. Potts said that he didn't

20 think it was worth it to spend the money to continue to employ

21 Dr. Chi in that capacity?

22      A.    No.  That isn't what Dr. Potts said to me.

23      Q.    He did say he was not going to pay Dr. Chi anymore?

24      A.    That is correct.

25      Q.    Mr. Potts was upset when he said it?

```
 1        A.    I -- I can't quite recall.  But Dr. Potts was often
 2  quite abrupt in his manner anyway.  So he may have been abrupt
 3  when he said it, but I don't actually recall his emotion.
 4        Q.    When he's abrupt, does he raise his voice?
 5        A.    No.  Not -- not often.  It's more tone.
 6        Q.    He's just very short, doesn't want to hear anything?
 7        A.    (No audible response.)
 8              MR. FUHR:  Objection.  Relevance.
 9              THE COURT:  Sustained.
10  BY MR. KOURY:
11        Q.    Now, as a result, Dr. -- Dr. Potts informed you that
12  he thought that this is bribery because Dr. -- he believes
13  Dr. Chi's a Government official or words -- or something to
14  that effect; correct?
15        A.    He believed it was bribery, as we never discussed
16  the exact details.
17        Q.    And as a result of that, you have had to hire an
18  attorney?
19        A.    Correct.
20        Q.    As a result of that, you've had to sit for multiple
21  interviews with investigators?
22        A.    Yes.
23        Q.    You yourself are concerned that you may be charged
24  with a crime?
25        A.    Yes, I am.
```

UNITED STATES DISTRICT COURT

1       Q.    It's frightening to you, is it not?

2       A.    It's not a very comfortable thing to go through.

3       Q.    And you're facing this even though you're being

4  completely honest about all the advice and all the assistance

5  that Dr. Chi provided GSL and you while you were working there?

6       A.    I have always tried to be open, yes.

7       Q.    You've already testified that Dr. Gee -- Dr. Chi

8  provided invaluable advice to GSL?

9            THE COURT:  Yes, he did.

10 BY MR. KOURY:

11      Q.    That's why -- that's why Cansun Guralp approved the

12 invoices to pay him; correct?

13      A.    You'd have to ask that to Dr. Guralp, but I -- one

14 would assume so.

15      Q.    That's why Andrew Bell approved payment of the

16 invoices; correct?

17            MR. FUHR:  Calls for speculation.  Objection.

18            THE COURT:  Sustained.

19 BY MR. KOURY:

20      Q.    During the time that you were there, every -- at

21 GSL, every CEO approved the invoices for Dr. Chi except for

22 Chris Potts; is that true?

23      A.    I don't know if it was a finance manager or --

24 sorry, finance director, finance manager, or CEO who did the

25 actual final approvals.  But one of that group would have to

```
 1   have approved them, yes.
 2        Q.   Someone in administration approved the payments?
 3        A.   Yes.
 4        Q.   And you were comfortable with the arrangement that
 5   Dr. Chi had with GSL during the entire time that you worked at
 6   GSL; correct?
 7        A.   Sorry.  Just repeat exactly the first part again.  I
 8   was comfortable, did you say?
 9        Q.   You had no problem with the technical advice
10   contract during that time?
11        A.   No, I would not say that's true.
12        Q.   Well --
13        A.   I was not happy with it throughout the entirety, but
14   that's for a lot of my own reasons.  But I'm not in a position
15   to have ever, I felt, do anything about it.
16        Q.   You didn't think it was illegal?
17        A.   Um, after 2013, when I received for the first time
18   training --
19        Q.   Well, let me ask you this.
20             THE COURT:  Well, wait a minute.  Let him finish his
21   answer.
22             Were you done with your answer?
23             THE WITNESS:  No, I was not.
24             THE COURT:  All right.  Go ahead and finish your
25   answer.
```

1                    THE WITNESS:  So after, um, we had -- or I had for

2      the first time any training on bribery and corruption --

3      because I had been introduced in the United Kingdom in 2013,

4      myself and many of my other sales colleagues were actually

5      concerned.  And we didn't sign our new policy on this straight

6      away.  We tried not to sign it because we were very unsure.

7      BY MR. KOURY:

8           Q.    So let me ask you.  Did you notify anyone in 2003

9      that you thought there was a problem with this contract?

10          A.    No.  I discussed my concerns with Dr. Guralp who is

11     the person telling me about it at that time, and he convinced

12     me at that time it was fine.  I was a very junior engineer in

13     2003.

14          Q.    2004, did you express any reservations about the

15     contract to anyone?

16          A.    Who am I going to tell it to?

17          Q.    I'm just asking if you expressed reservations to

18     anyone in 2004.

19          A.    No.

20          Q.    How about 2005?

21          A.    No.

22          Q.    2006?

23          A.    No.

24          Q.    Between 2007 and 2012, did you express reservations

25     to anyone about the contract?

1      A.    The contract was discussed with many people during

2  that time period.

3      Q.    Did you say that you thought it was illegal?

4      A.    Did I say that to anybody?  No.

5      Q.    Did you notify authorities in 2013 about the

6  contract?

7      A.    No, I did not, because I wasn't aware that

8  whistle-blowing was actually something I should do.

9      Q.    2014, did you notify authorities that you thought

10  the contract was illegal?

11      A.    No, I did not.

12      Q.    2015, did you tell anyone that you thought the

13  contract was illegal?

14      A.    No.  In 2015, I was leaving the company and

15  hopefully everything like this behind.

16      Q.    Do you remember making this statement

17  September 29th, 2015, at Addleshaw Goddard about the

18  illegality, quote, "The payments may have been naive, but there

19  was no mischievous intentions"?

20      A.    I have to take your word if I said that because I

21  don't recall exactly what I said during that meeting.

22      Q.    Do you believe that accurately reflects your opinion

23  on that day?

24      A.    At that time, it may well have.

25            MR. KOURY:  Thank you.  Nothing further.

```
 1              THE COURT:  All right.  Do you have any additional
 2   questions?
 3              MR. FUHR:  Yes, Your Honor.
 4              THE COURT:  All right.
 5                     REDIRECT EXAMINATION
 6   BY MR. FUHR:
 7      Q.    Ms. Pearce, just a few questions.
 8              Um, Mr. Koury asked you about cash payments during
 9   his examination.  Do you recall that?
10      A.    Uh-huh.  Yes.
11      Q.    And he told you that -- or he asked about the fact
12   that cash payments were only made in the early period of the
13   relationship with Dr. Chi.  Do you recall saying -- or do you
14   recall a question to that effect?
15      A.    Yes.
16              MR. FUHR:  Okay.  Can we put back up Government
17   Exhibit 157, which is already in evidence?
18   BY MR. FUHR:
19      Q.    Ms. Pearce, we looked at this an hour ago.  What is
20   this e-mail?
21      A.    This is an e-mail from myself to Dr. Chi from
22   Monday, April 29, 2013.
23      Q.    And do you recall that that e-mail also included a
24   part from Dr. Chi to you?
25      A.    Yes.
```

1       Q.    Okay.  And this is -- again, the date is 2013?

2       A.    Correct.

3       Q.    So that would be at a time in your relationship with

4  Dr. Chi where he already had long ago established his bank

5  account; correct?

6       A.    Correct.

7       Q.    And does it refer to -- in the third line from the

8  bottom, does it refer to Dr. Chi -- or Dr. Chi request

9  3,000 euro in 30 bills of 100 euro denomination here?  Is that

10  correct?

11      A.    That is correct.

12      Q.    Would that have been a cash payment?

13      A.    That would have been a cash request, yes.

14      Q.    Okay.  Um, I also want to ask you briefly about the

15  discussion you had with Mr. Koury about technical advice.

16            Dr. Chi gave you information, inside information

17  about a whole range of things, didn't he?

18      A.    Yes.

19      Q.    You testified --

20            MR. KOURY:  Objection.

21  BY MR. FUHR:

22      Q.    -- you testified about that on direct, didn't you?

23            MR. KOURY:  I object.  It mischaracterizes the

24  testimony.

25            THE COURT:  That objection is overruled.

```
 1              You want the question again, or do you have the
 2    question?
 3              THE WITNESS:  Yes, I have the question.
 4              THE COURT:  Okay.  Go ahead.  You may answer it.
 5              THE WITNESS:  Yes.  And we have discussed some of
 6    those in those e-mails.
 7    BY MR. FUHR:
 8        Q.    All right.  And do you recall discussing that he
 9    gave you inside information about competitors --
10              MR. KOURY:  I'm going to object.
11    BY MR. FUHR:
12        Q.    -- about the market, about upcoming bids, about
13    pricing, and about specifications for those bids?  Do you
14    recall that?
15              MR. KOURY:  Now I'm going to object as compound.
16              THE COURT:  That objection is overruled.
17              MR. KOURY:  And it's argumentative and assumes facts
18    not in evidence.
19              THE COURT:  Those objections will also be overruled.
20              You may answer the question.
21              THE WITNESS:  Sorry.  Could you just --
22    BY MR. FUHR:
23        Q.    I'll repeat it.
24              Dr. Chi gave you inside information about what
25    competitors were doing, about the market, about upcoming bids,
```

1    about specifications for those bids, about pricing; is that

2    correct?

3        A.    Yes.  That is correct.

4        Q.    The other thing that Mr. Koury asked you about was

5    whether he was wearing two hats, whether he was wearing a KIGAM

6    hat and a hat when he was giving you advice.

7              Ms. Pearce, where did -- where did Dr. Chi work?

8    What was his position?

9        A.    He was a director of the Research Institute at

10   KIGAM.

11             MR. KOURY:  Your Honor, I'm going to object to that

12   as vague as to time.

13             THE COURT:  That objection is overruled.

14   BY MR. FUHR:

15       Q.    And when he purchased equipment from -- from Guralp

16   or when he recommended that other customers purchase equipment

17   in Korea, was he doing that in his capacity as a director of

18   KIGAM, according to your understanding?

19             MR. KOURY:  I'm going to object as speculation.

20             THE COURT:  That objection will be sustained.

21             You have to lay a better foundation for that.

22   BY MR. FUHR:

23       Q.    Did you understand Dr. Chi to be purchasing things

24   for the KIGAM Earthquake Research department?

25       A.    Yes, I did.

1      Q.    And that includes Guralp products; correct?

2      A.    Yes.

3      Q.    And so when he ordered for KIGAM Guralp products,

4  was it your understanding that he's doing that in his capacity

5  as a director of the Earthquake Research Institute at KIGAM?

6      A.    Yes.

7      Q.    And for that, he was paid his fee; correct?

8            MR. KOURY:  I'm going to object to that as it calls

9  for speculation.

10           THE COURT:  Overruled.

11           THE WITNESS:  Yes.  If we made the sale in Korea, he

12  would receive his technical advice fee, yes.

13  BY MR. FUHR:

14     Q.    And similarly, when he provided you inside

15  information about what other companies were doing and where the

16  market was, did you understand that to have been in his

17  capacity as a director at KIGAM?

18     A.    I believe that's where his knowledge would have come

19  from, that capacity, yes.

20     Q.    There was also a couple of questions about the

21  technical advice that Dr. Chi provided you in Korea and how

22  necessary that was for your company.

23           You also had a distributor in Korea; correct?

24     A.    That is correct.

25     Q.    And that's Heesong; correct?

    1          A.    That's one -- one of their names, yes.  They had

    2    other names as well.

    3          Q.    What's the other name?

    4          A.    KMT.

    5          Q.    Right.

    6                And so that distributor was assisting you with sales

    7    in Korea; correct?

    8          A.    Yes.

    9          Q.    And they were also giving you other support.  They

   10    would help with technical problems that arose from time to

   11    time; right?

   12          A.    Yes, they would.  They would do --

   13          Q.    So you had -- sorry.

   14          A.    They would do installation on products as well and

   15    maintenance.

   16          Q.    So you already had someone in Korea assisting you

   17    with those kinds of things?

   18          A.    We worked with them to develop that servicing career

   19    over the years, yes.

   20          Q.    And you paid Heesong an agent fee for that; is that

   21    correct?

   22          A.    Well, they themselves generated that agent fee.

   23    They would put that into their margin on bids.

   24          Q.    Fair enough.

   25                And on that point, there were a few questions about

```
 1    the agent fee.  And I just want to make sure that was clear.
 2              The agent fee, when someone refers to the "agent
 3    fee," who is collecting the agent fee?
 4         A.   Usually the agent, the distributor.
 5         Q.   And in this case for South Korea, who would that be?
 6         A.   That would have been Heesong Geotek.
 7         Q.   Right.  And that is different from the advice fee;
 8    correct?
 9         A.   Correct.  Yes.
10         Q.   The so-called advice fee in this case, who was
11    receiving the so-called advice fee?
12              MR. KOURY:  I'm going to object as argumentative.
13              THE COURT:  Overruled.
14              THE WITNESS:  The advice fee was received by
15    Dr. Chi.
16    BY MR. FUHR:
17         Q.   And did Dr. Chi get that advice fee on every single
18    sale of every single product that the company sold in Korea
19    from 2003 to 2015?
20         A.   That's my understanding, yes.
21         Q.   Regardless of whether it was KIGAM or another
22    customer in Korea that bought that product?
23         A.   That is correct.
24         Q.   And so the distinction about advice fee versus agent
25    fee, the agent would not collect the fee on KIGAM sales;
```

1    correct?

2         A.    Correct.  KIGAM was excluded from that contract.

3         Q.    But Dr. Chi received a fee on every single sale

4    regardless of KIGAM or other customers; right?

5         A.    Correct.

6         Q.    Okay.  And finally, Mr. Koury asked you about your

7    concerns about what was going on at the company and how you

8    didn't go to the authorities in 2004 and 2005.

9              Did you only recently become concerned about Dr. Chi

10   and what Dr. Chi was doing, or did you have reason to be

11   concerned much earlier?

12        A.    It's very hard to explain, I guess, to somebody from

13   the outside.  And I guess -- I'm sorry to digress a little bit,

14   but if I give you an analogy, it might explain it to you

15   slightly better.

16             I've always had gender identity issues all my life.

17   I've known about what transgender is all my life.  I didn't

18   realize I was -- I identified that way until very early last

19   year.  And in the same way, with this process, I've been

20   uncomfortable with it for personal reasons.

21             There have been things that make you question, but

22   there are a lot of people around me who are professionals and

23   who are very experienced who didn't seem concerned.  But if I

24   look at the training we had finally or if I actually look at

25   what I learned and understood since 2013 and then the process

1    I've been through for the last few years of investigation and

2    everything else, yeah.

3         Q.    And to be sure, it was the defendant, it was Dr. Chi

4    who wrote the e-mail year after year after year to you about

5    what he was doing; right?

6         A.    Correct.

7         Q.    And we had an e-mail that we looked at from 2005 in

8    which he was writing about the Earthquake Research Center and

9    that he was a director there.

10            MR. FUHR:  If we can pull that up maybe for a

11   second.  I think that's Exhibit 89.

12            MR. KOURY:  Your Honor, I think this exceeds the

13   scope of cross.  And asked and answered.

14            THE COURT:  Yeah, I'm going to sustain the

15   objection.

16            MR. FUHR:  Okay.  If I may have one further

17   question.

18   BY MR. FUHR:

19        Q.    You received e-mails over time from the defendant in

20   which the defendant himself described what he was doing was

21   improper or illegal; correct?

22        A.    For him, yes.

23        Q.    And that was not a recent revelation to you?

24        A.    No.

25            MR. FUHR:  All right.  Nothing further.

1          THE COURT:  All right.  May this witness be excused?

2          MR. KOURY:  Just briefly, Your Honor.

3                        **RECROSS-EXAMINATION**

4     BY MR. KOURY:

5          Q.   So you said it's just the last two years or so that

6     you've now become concerned about this contract?

7          A.   No.  I think from my viewpoint, I'm understanding it

8     for what it potentially is.

9          Q.   And you're understanding it based on what

10    Chris Potts and others have told you in law enforcement?

11         A.   It's what Chris Potts and my own lawyers may have

12    told me.

13         Q.   Have you gone to Korea and talked to anyone in Korea

14    about the arrangement?

15         A.   No, I have not.

16         Q.   Have you talked to anyone at KIGAM about whether

17    this poses a problem?

18         A.   No, I have not.

19         MR. KOURY:  Thank you.  Nothing further.

20         THE COURT:  All right.  May this witness be excused?

21         MR. FUHR:  Yes, Your Honor.

22         THE COURT:  All right.  Thank you very much.

23         Call your next witness.

24         MS. KUMAR:  Yes, Your Honor.

25         May the Government read in the stipulation we

1      discussed earlier?

2              THE COURT:  All right.  This is a fact stipulation

3      or a testimonial stipulation?

4              MS. KUMAR:  Testimonial stipulation, Your Honor.

5              THE COURT:  All right.

6              MS. KUMAR:  The parties hereby stipulate to the

7      following testimony that will be treated at trial as having

8      already been admitted into evidence:

9              1.  If called as a witness at trial, James Czeranko,

10     C-z-e-r-a-n-k-o, would testify that he is a supervisory

11     examiner with the Federal Deposit Insurance Corporation, FDIC,

12     and that from at least 1999 to the present, Bank of America has

13     been a federally insured financial institution whose deposits

14     are insured by the FDIC.

15             The parties agree and stipulate that the stipulation

16     be entered into evidence at trial.  It is so stipulated and

17     signed by the parties, including the defendant.

18             And, Your Honor, this is marked for identification

19     as Exhibit 22 for the Government.

20                 (Exhibit 22 for identification

21                  and received into evidence.)

22             THE COURT:  All right.  Ladies and gentlemen, the

23     Government and the defendant have stipulated, in effect, what

24     that witness would testify to if called and sworn and testified

25     here in court.  You're to treat that testimony in the same way

```
 1    as if the testimony had been given in open court.
 2              All right.  Call your next witness.
 3              MS. KUMAR:  The Government calls Lindsay Zimmerman
 4    to the stand.
 5              THE COURTROOM DEPUTY:  Please raise your right hand.
 6              Do you solemnly swear that the testimony you shall
 7    give in the cause now before this Court shall be the truth, the
 8    whole truth, and nothing but the truth, so help you God?
 9              THE WITNESS:  Yes, I do.
10              THE COURTROOM DEPUTY:  Thank you.  Be seated.
11              Please state and spell your name for the record.
12              THE WITNESS:  Lindsay Zimmerman, L-i-n-d-s-a-y,
13    Z-i-m-m-e-r-m-a-n.
14              MS. KUMAR:  Your Honor, may I approach with the
15    binder for the witness?
16              THE COURT:  Yes.
17                         **LINDSAY ZIMMERMAN**,
18        **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**
19                         **DIRECT EXAMINATION**
20    BY MS. KUMAR:
21        Q.    Good afternoon, Ms. Zimmerman.
22        A.    Good afternoon.
23        Q.    Please tell us how you are currently employed.
24        A.    I'm currently employed with the Federal Bureau of
25    Investigation.  We're commonly known as the FBI.
```

1       Q.    And how long have you been employed at the FBI?

2       A.    Since 2010.

3       Q.    And what is your current job with the FBI?

4       A.    I'm currently a forensic accountant.

5       Q.    And prior to joining the FBI, were you employed?

6       A.    Yes, I was.

7       Q.    How?

8       A.    I was employed at KPMG as an auditor and then

9   Deloitte as a financial management consultant.

10      Q.    And can you briefly tell us about your educational

11  background?

12      A.    Yes.  I have a bachelor's degree in mathematics, a

13  master's degree in accounting from the University of

14  North Carolina, and I'm a certified public accountant, also

15  known as a CPA.

16      Q.    Ms. Zimmerman, have you had the occasion to review

17  bank documents in connection with the investigation into

18  Heon-Cheol Chi?

19      A.    Yes, I have.

20      Q.    In particular, did you review bank documents for an

21  account at Bank of America in the name of Heon-Cheol Chi?

22      A.    Yes.

23      Q.    Are the documents, to your knowledge, you reviewed

24  marked for identification as Exhibit 25?

25      A.    Yes.

1          MS. KUMAR:  Your Honor, at this time, the Government
2    would move to admit Exhibit 25, as per the parties' pretrial
3    stipulation.
4          THE COURT:  Exhibit 25 will be --
5          MS. BEDNARSKI:  Your Honor, excuse me.
6          THE COURT:  Yes.
7          MS. BEDNARSKI:  Per the Court's Friday ruling, I
8    object.
9          THE COURT:  All right.  Well, there's nothing in the
10   pretrial exhibit stipulation.  It says no objections, so
11   they'll be admitted.
12         MS. BEDNARSKI:  Your Honor, that was prior to
13   Friday.
14         THE COURT:  Well, then you should have notified the
15   Court that there was an issue.  What's the issue?
16         MS. BEDNARSKI:  It relates to the specifics of the
17   expenditures --
18         THE COURT:  Right, the one chart.  I assume that's
19   not in this exhibit anymore.
20         MS. BEDNARSKI:  No.
21         THE COURT:  All right.
22         MS. BEDNARSKI:  That's not the issue.
23         THE COURT:  Okay.  What's the issue?
24         MS. BEDNARSKI:  Um, there's a motion in limine that
25   was made pertaining to the specific expenditures.

1          THE COURT:  Right.  That's what I'm saying.  It was

2   on one chart or one bank statement.  And those documents, I

3   assume, have been removed from the exhibit.  Correct?

4          MS. KUMAR:  Your Honor, there are references to

5   the -- in the bank statements that are -- the Government didn't

6   understand that that was an issue with the -- it was the chart

7   in issue.

8          THE COURT:  Right.  So it will go into evidence, and

9   then you'll remove those exhibits that I ruled were not

10  admissible in the motion in limine.

11         (Exhibit 25 for identification

12          and received into evidence.)

13         MS. KUMAR:  Okay.  Very well, Your Honor.

14         THE COURT:  All right.  Go forward.

15  BY MS. KUMAR:

16     Q.   Ms. Zimmerman, I'd like to direct your attention to

17  page 1 of Exhibit 25.  Do you recognize this document?

18     A.   Yes, I do.

19     Q.   What is it?

20     A.   It was the signature card provided by Bank of

21  America for the defendant's bank account.

22     Q.   And what's the account number?

23     A.   241 -- I think that's a 5, but it might be a 6.

24  Hard to read on the screen.  But it ends in 08070.

25     Q.   And is this a signature card, as far as you're

1    aware?

2         A.    Yes.  That was what the bank provided.

3         Q.    If I can direct your attention to page 3 of this

4    exhibit.

5              MS. KUMAR:  And if we can blow up the top portion.

6    BY MS. KUMAR:

7         Q.    Ms. Zimmerman, is this an example of the Bank of

8    America account statements that you reviewed in preparation for

9    your testimony here?

10        A.    Yes, it is.

11        Q.    And in the upper left-hand corner, can you identify

12   whose name this account is in?

13        A.    Heon-Cheol Chi.

14        Q.    And can you identify the name -- the address listed

15   on this document?

16        A.    Yes.  115 West Foothill Boulevard, Glendora,

17   California 91741.

18        Q.    And if you look at the right-hand side where it says

19   "Account number," do you see that that's the same account

20   number, ending in 8070?

21        A.    Yes.

22        Q.    And below that, it says, "Written inquiries.  Bank

23   of America.  Glendora branch."  Do you see that?

24        A.    Yes, I do.

25        Q.    And below that, it says, "Customer since 2001."  Did

1    I read that correctly?

2        A.   Yes.

3        Q.   Ms. Zimmerman, did you prepare any charts during the

4    course of your work on this case?

5        A.   Yes, I did.

6        Q.   When you first reviewed the Bank of America account

7    documents at Exhibit 25, what did you do?

8        A.   First, I took all of the bank records, the

9    statements, and the supporting checks and wire information we

10   received, and I put all the transactions into an Excel

11   spreadsheet.

12       Q.   And during your review of the defendant's Bank of

13   America account statements, did you note incoming wire

14   transfers?

15       A.   Yes, I did.

16       Q.   Were those -- were there incoming wire transfers

17   from a company called Kinemetrics?

18       A.   Yes.

19       Q.   Were there also incoming wire transfers from a

20   company called Quanterra?

21       A.   Yes.

22            MS. KUMAR:  Your Honor, at this time, the Government

23   would move into evidence Exhibit 31, pursuant to the parties'

24   pretrial stipulation.

25            THE COURT:  All right.  Exhibit 31 will be received

1    into evidence.

2              (Exhibit 31 for identification

3               and received into evidence.)

4    BY MS. KUMAR:

5        Q.    Ms. Zimmerman, is that a copy of one of the charts

6    you prepared in anticipation of your testimony?

7        A.    Yes, it is.

8        Q.    Can you describe for the jury what the chart

9    depicts?

10       A.    This chart is based on the master transaction list

11   from Excel that I was describing earlier.  This chart depicts

12   all the wires received into the defendant's bank account from

13   either Kinemetrics or Quanterra.

14       Q.    And how did you go about identifying the specific --

15   the specific transactions?

16       A.    I reviewed the transactions that -- as they were

17   noted on the bank statement and also the supplemental wire

18   information provided by Bank of America.

19       Q.    So for this first row, could you describe for the

20   jury what's listed in that first line item?

21       A.    Yes.  "Line Number" was just a reference number that

22   I had so I could sort the items in chronological order and

23   easily reference them.  "Posted Date" is the date the

24   transaction hit the bank account.  "Transaction Description" is

25   a combination of what was on the bank statements as well as in

1     the supporting wire information.  "Credits" is the amount of

2     the wire.  In this case, $16,970.  "Category," it was either

3     from Kinemetrics or Quanterra.  And Exhibit 25, page 4, in the

4     "Reference" column is where that particular transaction can be

5     found in Exhibit 25.

6          Q.    Did you follow that process for each of the

7     Kinemetrics and Quanterra transactions listed here?

8          A.    Yes, I did.

9          Q.    Can you tell the jury how many incoming wire

10    transfers there were into defendant's Bank of America account

11    from Kinemetrics and Quanterra between 2009 and 2016?

12         A.    Twelve wires.

13         Q.    And what was the total amount of incoming wire

14    transfers from these two companies into defendant's Bank of

15    America account between 2009 and 2016?

16         A.    $393,970.

17         Q.    During the course of your review, did you also

18    review bank documents for accounts in the name -- name of

19    Kinemetrics and Quanterra?

20         A.    Yes, I did.

21         Q.    Were those records from the Bank of the West?

22         A.    Yes.

23               MS. KUMAR:  Your Honor, at this time, the Government

24    would move into evidence Exhibit 28, pursuant to the parties'

25    pretrial stipulation.

```
 1                 THE COURT:  All right.  Exhibit 28 will be received
 2    into evidence.
 3                 (Exhibit 28 for identification
 4                  and received into evidence.)
 5    BY MS. KUMAR:
 6         Q.   Ms. Zimmerman, did you also, during your review of
 7    the bank account documents, note incoming wire transfers from a
 8    company called Guralp Systems Limited?
 9         A.   Yes, I did.
10                 MS. KUMAR:  At this time, Your Honor, the Government
11    would move into evidence Exhibit 32, previously marked for
12    identification, as per the parties' pretrial stipulation.
13                 THE COURT:  That exhibit will be received in
14    evidence.
15                 (Exhibit 32 for identification
16                  and received into evidence.)
17    BY MS. KUMAR:
18         Q.   Ms. Zimmerman, is this the chart you created of all
19    wires from Guralp into the defendant's bank account?
20         A.   Yes, it is.
21         Q.   And did you follow this similar -- same process you
22    did with regards to the Kinemetrics and Quanterra chart?
23         A.   Yes.  Exactly the same process.
24         Q.   So, for example, on the last column, it says,
25    "Reference," and that indicates the exhibit number and page on
```

1   which that particular wire can be found; is that right?

2        A.    Yes.  That's correct.

3        Q.    Could you tell the jury how much -- how many wires

4   were incoming into the defendant's Bank of America account in

5   California between 2009 and 2016 from Guralp?

6        A.    Nineteen wires.

7        Q.    And what was the total amount of wires that

8   encompassed those wires from 2009 to 2016?

9        A.    The total amount was $650,720.

10       Q.    Would it be fair to say, then, Ms. Zimmerman, that

11   the defendant received more than $1 million in wire transfers

12   from Guralp, Kinemetrics, and Quanterra between January 2009

13   and November 2016?

14       A.    Yes.

15       Q.    Based on your review of the bank documents, did you

16   analyze the sources of funds for defendant's Bank of America

17   account?

18       A.    Yes, I did.

19            MS. KUMAR:  Your Honor, at this time, the Government

20   would move Exhibit 34 into evidence, pursuant to the parties'

21   pretrial stipulation.

22            THE COURT:  All right.  Exhibit 34 will be received

23   into evidence.

24            (Exhibit 34 for identification

25             and received into evidence.)

```
 1   BY MS. KUMAR:
 2        Q.    Ms. Zimmerman, what is this chart?
 3        A.    This chart visually depicts in a pie chart the
 4   source of funds into the defendant's Bank of America account.
 5        Q.    Could you describe for us what's depicted in the
 6   green?
 7        A.    The green portion is the beginning balance and
 8   credits which were comprised of check card refunds.
 9        Q.    And do you -- do you understand that to be refunds
10   to purchases previously made?
11        A.    Yes.
12        Q.    And the beginning balance was approximately how much
13   in January of 2009?
14        A.    Approximately $9,000.
15        Q.    So in total, the beginning balance and refunds
16   account was just under $11,000; is that right?
17        A.    Yes.  That's correct.
18        Q.    Could you tell us what the blue on your pie chart
19   represents?
20        A.    The blue represents the wires that we saw on the
21   previous chart from Guralp into the defendant's Bank of America
22   account.
23        Q.    And can you remind us of the amount?
24        A.    $650,720.
25        Q.    And what percentage of the source of funds do the
```

1    Guralp incoming wires account for in the defendant's Bank of

2    America account?

3         A.    62 percent.

4         Q.    Could you tell us what's in the red portion of the

5    chart?

6         A.    Yes.  The red are the wires received from either

7    Kinemetrics or Quanterra.

8         Q.    And what was the total amount of those wires?

9         A.    $393,970.

10        Q.    What was the total percentage of funds in the -- in

11   defendant's bank account from 2009 on that originated from

12   Kinemetrics or Quanterra?

13        A.    37 percent.

14        Q.    So, Ms. Zimmerman, what was the total percentage in

15   defendant's bank account that is attributable to wires incoming

16   from Kinemetrics, Quanterra, and Guralp?

17        A.    99 percent.

18        Q.    And in addition to analyzing the sources of funds

19   into defendant's Bank of America account, did you analyze the

20   use of funds?

21        A.    Yes, I did.

22             MR. KUMAR:  At this time, Your Honor, the Government

23   would move into evidence Exhibit 35.

24             THE COURT:  All right.  Exhibit 35 will be received

25   into evidence.

1                   (Exhibit 35 for identification

2                    and received into evidence.)

3    BY MS. KUMAR:

4         Q.    Ms. Zimmerman, if -- direct your attention to just

5    the left portion of the chart.  Do you recognize this chart?

6         A.    Yes, I do.

7         Q.    And could you describe to us what it represents?

8         A.    Yes.  Similar to the -- the chart we just saw for

9    the source of funds, this visually depicts the use of funds by

10   payment category from the Bank of America account.

11        Q.    And you denote a payment category based on your

12   review of the individual bank records; is that right?

13        A.    Yes.

14        Q.    And could you tell us what's depicted in the blue in

15   this chart?

16        A.    Yes.  The blue are checks written to defendant's

17   Merrill Lynch account.

18        Q.    From defendant's Bank of America account?

19        A.    Yes.  That's correct.

20        Q.    What percentage of defendant's Bank of America

21   account is attributable to checks written to his Merrill Lynch

22   account?

23        A.    The checks written to Merrill Lynch account for

24   50 percent of the use of funds from the Bank of America

25   account.

```
 1        Q.    And what was the total amount in checks?
 2        A.    $521,000.
 3        Q.    From defendant's Bank of America account, did you
 4   identify any wire transfers to the Korea Institute of
 5   Geoscience and Mineral Resources?
 6        A.    No.
 7        Q.    From defendant's bank account, did you -- Bank of
 8   America account, did you identify any wire transfers to KIGAM,
 9   K-I-G-A-M?
10        A.    No.
11        Q.    You just referred to an account at Merrill Lynch.
12   Did you also review account documents received from
13   Merrill Lynch?
14        A.    Yes, I did.
15        Q.    And were those for an account in defendant's name?
16        A.    Yes.
17        Q.    What kind of accounts were those?
18        A.    They were three investment accounts.
19        Q.    And would those accounts, to your knowledge, be at
20   Exhibits 26 and 27?
21        A.    To my knowledge, yes.
22        Q.    And those span thousands of pages; is that right?
23        A.    Yes.
24              MS. KUMAR:  Your Honor, at this time, the Government
25   would move in Exhibits 26 and 27, pursuant to the parties'
```

528

```
 1   pretrial stipulation.
 2            THE COURT:  They'll be received in evidence, 26 and
 3   27.
 4            (Exhibits 26 and 27 for identification
 5             and received into evidence.)
 6   BY MS. KUMAR:
 7       Q.   Ms. Zimmerman, I'd like to direct your attention to
 8   Exhibit 26, page 1.  Will you look at the top half of this
 9   document?  Could you -- do you recognize this document?
10       A.   Yes, I do.
11       Q.   What is it?
12       A.   It was provided by Merrill Lynch upon opening of the
13   account.
14       Q.   Could you read the name, in whose name this account
15   is in?
16       A.   Heon-Cheol Chi.
17       Q.   And could you identify the account number?
18       A.   850-14235.
19       Q.   And on the very bottom, could you identify who the
20   financial advisor is for this particular -- sorry, right below
21   that.
22       A.   Peter Hwang.
23       Q.   That's a number with a (212) area code; is that
24   right?
25       A.   Yes.
```

**UNITED STATES DISTRICT COURT**

1          Q.    I'd now like to direct your attention to Exhibit 26,

2   page 3, to the very top of this page.

3               Was this also part of the account opening documents?

4          A.    Yes.

5          Q.    Could you identify for the jury the city and state

6   listed under Mr. Chi's name?

7          A.    Yes.  Fort Lee, New Jersey.

8          Q.    On the bottom of this page, there's a signature.  Do

9   you recognize the signature?

10         A.    Yes.

11         Q.    How do you recognize it?

12         A.    It appears to be the same signature that is on the

13  signature card provided by Bank of America for defendant's

14  other bank account.

15         Q.    Now, Ms. Zimmerman, upon receipt of the Bank of

16  America account -- sorry, excuse me -- the Merrill Lynch bank

17  statements, did you follow a similar process as you had from

18  the defendant's Bank of America account?

19         A.    Yes.

20         Q.    And did you schedule out all of the transactions in

21  that account?

22         A.    Yes.

23              MS. KUMAR:  At this time, Your Honor, the Government

24  would move into evidence Exhibit 36.

25              THE COURT:  All right.  Exhibit 36 will be received.

**UNITED STATES DISTRICT COURT**

1        MS. BEDNARSKI:  Your Honor, I think we have the same

2  issue.

3        It's really hard to read.  Can I have one moment?

4        THE COURT:  Yes.

5        (Off-the-record discussion between counsel.)

6        MS. BEDNARSKI:  Thank you, Your Honor.  I'm clear.

7  I withdraw my objection.

8        THE COURT:  All right.  Exhibit 36 will be received

9  into evidence.

10        (Exhibit 36 for identification

11         and received into evidence.)

12  BY MS. KUMAR:

13     Q.   And is this --

14        MS. KUMAR:  Can we bring up Exhibit 36, please?

15  BY MS. KUMAR:

16     Q.   I know it's very hard to read, Ms. Zimmerman.  But

17  does this document generally accurately reflect the process you

18  used in scheduling out the transactions?

19     A.   Yes.  This appears to be a printout from the Excel

20  spreadsheet I prepared for the Merrill Lynch accounts.

21     Q.   So you followed a similar process as with the

22  defendant's Bank of America account, I think you said?

23     A.   Yes, I did.

24     Q.   So if we look in the last column, it says

25  "Reference," and that contains an exhibit number and, in some

```
 1   instances, a specific pin cite to a page; is that right?

 2        A.    Yes.  That's correct.

 3        Q.    From this chart, did you create other charts in

 4   preparation for your testimony?

 5        A.    Yes, I did.

 6              MS. KUMAR:  At this time, Your Honor --

 7   BY MS. KUMAR:

 8        Q.    Did you also -- excuse me.

 9              Did you create a chart documenting all of the checks

10   drawn on defendant's Bank of America account in California

11   which were there -- thereafter deposited into defendant's

12   Merrill Lynch account in New York?

13        A.    Yes.

14              MS. KUMAR:  At this time, Your Honor, I would move

15   in Exhibit 33.

16              THE COURT:  33 will be received into evidence.

17              (Exhibit 33 for identification

18               and received into evidence.)

19   BY MS. KUMAR:

20        Q.    Ms. Zimmerman, does this look like an accurate

21   representation of the chart you created?

22        A.    Yes, it does.

23        Q.    And could you describe -- did you follow a similar

24   process as you had with your prior charts?

25        A.    Yes, I did.
```

1     Q.    So this is essentially a subset of the chart that we

2  just looked at?

3     A.    This is a subset of the Bank of America account

4  records.

5     Q.    Okay.  And what specific transactions does this

6  denote?

7     A.    This denotes the checks written from defendant's

8  Bank of America account and deposited into the defendant's

9  Merrill Lynch account.

10    Q.    How many checks were there in total between 2009 and

11 2016?

12    A.    Nine checks.

13    Q.    And what was the total amount of these checks?

14    A.    $521,000.

15    Q.    So about four lines down, we have a check that has a

16 posted date of May 21st, 2012.  Do you see that?

17    A.    Yes.

18    Q.    And that's Check No. 134; is that right?

19    A.    Yes.

20    Q.    And this is the check referenced in Count 1 of the

21 Indictment; is that right?

22    A.    Yes.  That's correct.

23    Q.    So if we look at the "Reference" column, do you

24 identify specific pin cites for this particular check?

25    A.    Yes.

1        Q.    And this is the location where this check can be
2    found; is that right?
3        A.    Yes.
4        Q.    So I'd like to now direct your attention to
5    Exhibit 26, page 1043.
6              Do you recognize this document, Ms. Zimmerman?
7        A.    Yes, I do.
8        Q.    What is it?
9        A.    It's the deposit slip from Merrill Lynch for the
10   deposit of the check from Bank of America.
11       Q.    And what's the amount of the check?
12       A.    $60,000.
13       Q.    And it's being deposited into Account No. 850-14235;
14   is that right?
15       A.    Yes.
16       Q.    I'd now like to turn your attention to page 1044.
17              Is this the actual check that was deposited,
18   Ms. Zimmerman?
19       A.    Yes.
20       Q.    On the left-hand side, could you identify the name
21   of the individual on whose account this was drawn?
22       A.    Heon-Cheol Chi.
23       Q.    And the address?
24       A.    115 West Foothill Boulevard, Glendora, California.
25       Q.    To whom is this check made out to?

```
1        A.    It's paid to the order of Merrill Lynch.

2        Q.    And the amount?

3        A.    $60,000.

4        Q.    And is there anything noted in the memo line?

5        A.    Yes.

6        Q.    What is it?

7        A.    It says "Account 850-14235."  And then in

8   parentheses, it says "Peter Hwang."

9        Q.    Do you recall the name Peter Hwang from earlier

10  today from your testimony?

11       A.    Yes.  The Merrill Lynch documents indicate he is the

12  financial advisor for the account.

13       Q.    So this particular check was deposited -- drawn on

14  the defendant's Bank of America account and then deposited into

15  his Merrill Lynch account; is that right?

16       A.    Yes.

17       Q.    So if we could return to Exhibit 33 and look at the

18  line for Count 2.

19             Do you see that, Ms. Zimmerman?

20       A.    Yes.

21       Q.    And is that a check that was posted on March 22nd,

22  2013?

23       A.    Yes.

24       Q.    Check No. 135; is that right?

25       A.    That's correct.
```

1        Q.    In the amount of $50,000?

2        A.    Yes.

3        Q.    I'd now like to direct your attention to Exhibit 26,

4   page 1046.

5              Is this a copy of that check?

6        A.    Yes.

7        Q.    And is it similar to the prior check we looked at?

8        A.    Yes, it is.

9        Q.    It's drawn on the same account based on the upper

10  left-hand corner and the account on the bottom; is that right?

11       A.    Yes.  That's correct.

12       Q.    And, in fact, on the bottom, it specifically states

13  08070.  Do you understand that to be the last four digits of

14  the defendant's Bank of America account in California?

15       A.    Yes.

16       Q.    And this check is written out to whom?

17             THE COURT:  You're too close to the microphone.  You

18  sound reverb.

19  BY MS. KUMAR:

20       Q.    Who is this check written out to?

21       A.    Pay to the order of Merrill Lynch.

22       Q.    And again, the amount?

23       A.    $50,000.

24       Q.    And in the memo line?

25       A.    It says Account 850-14235, which is the defendant's

```
 1   Merrill Lynch account.  And it says Peter Hwang.
 2        Q.   And, Ms. Zimmerman, was there a similar deposit slip
 3   accompanying this check?
 4        A.   Yes.
 5        Q.   I'd like to turn back to Exhibit 33.
 6             And now, to the check for Count 3 of the Indictment
 7   that was posted on December 26th, 2013.  Do you see that?
 8        A.   Yes.
 9        Q.   And the check number was 136; is that right?
10        A.   Yes.
11        Q.   And the amount?
12        A.   $60,000.
13        Q.   And in the "Reference" column, you reference
14   Exhibit 26, page 1047 and 1048; is that right?
15        A.   Yes.
16        Q.   You also reference Exhibit 25, page 175.  Is that
17   the location of the check in the Bank of America records?
18        A.   Yes.
19        Q.   Let me direct your attention to Exhibit 26 at
20   page 1048.
21             Is this the check underlying Count 3 of the
22   Indictment?
23        A.   Yes.
24        Q.   And this, again, follows the similar form as the
25   prior ones; is that right?
```

1       A.    That's correct.

2       Q.    It's drawn on the defendant's bank account in

3    California and written out to Merrill Lynch in the amount of

4    $60,000; is that right?

5       A.    Yes.

6       Q.    Ms. Zimmerman, do you recognize this signature on

7    the bottom right?

8       A.    Yes.

9       Q.    And how do you recognize this signature?

10       A.    It's the same signature that appears on the

11    signature card provided by Bank of America, as well as on the

12    account opening documents for Merrill Lynch for the defendant's

13    bank account.

14       Q.    And who do you identify the signatures to be of?

15       A.    Heon-Cheol Chi.

16       Q.    Ms. Zimmerman, let's go back to Exhibit 33.

17            And the check in Count 4 was posted on August 14th,

18    2014, according to your chart; is that right?

19       A.    Yes.

20       Q.    And in this instance, the pin cite for Exhibit 26 is

21    1049 and 1050.  Am I right?

22       A.    Yes, you're correct.

23       Q.    So if we could look at Exhibit 26, page 1050.

24            Is this the check underlying Count 4 of the

25    Indictment, Ms. Zimmerman?

```
 1        A.    Yes.

 2        Q.    And does it follow similar forms as the ones we

 3   looked at before?

 4        A.    Yes, it does.

 5        Q.    What's the amount?

 6        A.    $50,000.

 7        Q.    And it's drawn on the defendant's California bank

 8   account; is that right?

 9        A.    Yes.

10        Q.    And who's it paid to the order of?

11        A.    Merrill Lynch.

12        Q.    And in the memo line?

13        A.    "For Account 850-14235" and, again, in parentheses,

14   "Peter Hwang."

15        Q.    And that's the defendant's Merrill Lynch account in

16   New York; is that right?

17        A.    Yes.

18        Q.    And the signature?

19        A.    It appears to be Heon-Cheol Chi.

20        Q.    Ms. Zimmerman, let's go back to Exhibit 33.  And

21   look at the check -- I'm sorry.  One minute.

22              That check we just looked at was a check for

23   $50,000; is that right --

24        A.    I believe so.  Yes.

25        Q.    -- Count 4?
```

1          You reviewed the underlying bank records for this

2   account; is that right?

3        A.    For the Merrill Lynch account or the Bank of America

4   account?

5        Q.    For both.

6        A.    Yes.  Yes.  That's correct.

7        Q.    And so if I can turn your attention to Exhibit 27,

8   page 933.

9          Is this one of the account statements you reviewed

10  for the Merrill Lynch account of defendant?

11       A.    Yes.

12       Q.    And on the upper portion, it says "Primary account

13  850-14235."  Do you see that?

14       A.    Yes.  That's correct.

15       Q.    Do you understand that to be one of the defendant's

16  investment accounts?

17       A.    Yes.

18       Q.    And if we could turn to page -- what's the date

19  range of this particular statement?

20       A.    August 1st, 2014, through August 29th, 2014.

21       Q.    And does that cover the date range of the check we

22  were just looking at for Count 4?

23       A.    Yes, it does.

24       Q.    And if I could turn your attention to page 941 of

25  the same exhibit, Exhibit 27.

1          About three-quarters of the way down, right there --

2          MS. KUMAR:  If we can blow that up for

3    Ms. Zimmerman.

4    BY MS. KUMAR:

5      Q.    Do you see on the left side August 14th, "Funds

6    Received," check deposit in the amount of $50,000?

7      A.    Yes.

8      Q.    And does that match the information that's listed on

9    your chart in Exhibit 33?

10     A.    Yes.

11     Q.    Turning back to Exhibit 33.

12          Can we look at the check -- your line item for the

13   check in Count 5 of the Indictment?  What was the date of its

14   posting?

15     A.    May 20th, 2015.

16     Q.    And the check number?

17     A.    140.

18     Q.    And the amount?

19     A.    $30,000.

20     Q.    At this time, I'd like to direct your attention to

21   Exhibit 26, page 1052.

22          Ms. Zimmerman, is this the check that was deposited

23   on the defendant's bank account in Merrill Lynch in May of

24   2015?

25     A.    Yes.

1    Q.    And again, it's drawn on the defendant's California

2  bank account; is that right?

3    A.    Yes.

4    Q.    And it's in the amount of $30,000?

5    A.    Yes.

6    Q.    And could you read the memo line for us again?

7    A.    "For Account 850-14235," in parentheses,

8  "Peter Hwang."

9    Q.    And who's the check signed by?

10    A.    Heon-Cheol Chi.

11    Q.    And, Ms. Zimmerman, for each of these checks, is

12  there a corresponding deposit slip?

13    A.    Yes.  I believe so.

14    Q.    Let's go back to Exhibit 33, please.

15        The final count, Count 6, could you describe for the

16  jury the date that it was posted?

17    A.    November 22nd, 2016.

18    Q.    And could you describe the other information

19  indicated on your chart?

20    A.    Yes.  It was Check 101 for $56,000.  The check memo

21  stated Account 850-14235 for Peter Hwang.

22    Q.    So each of these checks, Ms. Zimmerman, were drawn

23  on the defendant's bank account in California and deposited

24  into his Merrill Lynch account in New York; is that correct?

25    A.    Yes.

```
 1          Q.    Ms. Zimmerman, if we can go back to Exhibit 34.
 2          Could you remind the jury what percentage of the
 3   funds in defendant's Bank of America account came from Guralp,
 4   Kinemetrics, and Quanterra?
 5          A.    Approximately 99 percent.
 6          Q.    And what is the remaining 1 percent comprised of?
 7          A.    It would be the beginning balance and some small
 8   check card refunds.
 9          Q.    So we could call that approximately $11,000,
10   Ms. Zimmerman?
11          A.    Yes.
12          Q.    We'll return to Exhibit 33.
13          Are each of the checks listed in the six counts of
14   the Indictment greater than $11,000 in value?
15          A.    Yes, they are.
16          Q.    So for the check in Count 1, what was its amount?
17          A.    $60,000.
18          Q.    And if you were to subtract that approximate
19   beginning balance and check card refund amount of $11,000, what
20   is the remaining value?
21          A.    $49,000.
22          Q.    And what conclusion, if any, can you reach regarding
23   the source of those funds, given your source of chart -- your
24   source-of-funds chart that we looked at earlier?
25          A.    If you subtract the approximately 11,000 from the
```

1    beginning balance and credits, at least $49,000 of the check

2    was comprised of funds from Kinemetrics, Quanterra, or Guralp.

3          Q.    And then if we look at the check in Count 2, what's

4    the total value?

5          A.    It's $50,000.

6          Q.    And if we were to subtract, again, that $11,000

7    beginning balance and check card refunds?

8          A.    You would have $39,000.

9          Q.    And what conclusion, if any, can you reach regarding

10   the source of those funds?

11         A.    At least $39,000 of that check was comprised of

12   funds from Kinemetrics, Guralp, or Quanterra.

13         Q.    Ms. Zimmerman, for the check in Count 3, what's its

14   value?

15         A.    $60,000.

16         Q.    And, again, if you were to subtract that $11,000,

17   what would be the remaining value?

18         A.    Again, 49,000.

19         Q.    And what conclusion, if any, could you reach

20   regarding the source of those funds?

21         A.    At least that $49,000 was comprised of funds from

22   Kinemetrics, Quanterra, or Guralp.

23         Q.    And then for the check in Count 4, what was the

24   value?

25         A.    $50,000.

1      Q.   And again, if you subtract that beginning balance

2  and the refunds, what -- of $11,000, what would be the

3  remaining balance?

4      A.   $39,000.

5      Q.   And what conclusion, if any, could you draw

6  regarding the source of those funds?

7      A.   That $39,000 was comprised of at least -- well, at

8  least $39,000 of the check was comprised of funds from

9  Kinemetrics, Quanterra, or Guralp.

10     Q.   And, Ms. Zimmerman, the check in Count 5, what was

11 its value?

12     A.   30,000.

13     Q.   So, again, if we subtract that $11,000, you're left

14 with approximately 19,000.  Am I right?

15     A.   Yes.

16     Q.   And what conclusion, if any, could you draw or could

17 you come to regarding the source of the funds of that 19,000?

18     A.   That $19,000 would have been comprised of funds from

19 Kinemetrics, Quanterra, Guralp.

20     Q.   At least that amount; right?

21     A.   Yes.

22     Q.   And if we look at the check in Count 6, what is the

23 amount?

24     A.   56,000.

25     Q.   And, again, if we subtract that 11,000, what would

**UNITED STATES DISTRICT COURT**

1  be the remaining balance?

2      A.    45,000.

3      Q.    And what conclusion, if any, could you draw

4  regarding the source of funds for that $45,000?

5      A.    At least $45,000 of that Check 101 would be

6  comprised of funds from Kinemetrics, Quanterra, or Guralp.

7      Q.    Ms. Zimmerman, I'd like to switch topics.

8          THE COURT:  Well, we're going to switch topics.

9  We'll take it up in the morning because we're going to take our

10  evening break.

11         MS. KUMAR:  Very well, Your Honor.

12         THE COURT:  Ladies and gentlemen, I want to remind

13  you of the instruction that I've given you, and that is you're

14  not to discuss this case with anyone, including your fellow

15  jurors, members of your family, people involved in the trial,

16  or anyone else.

17         Also, I want to remind you to keep an open mind

18  until all of the evidence has been received, you heard the

19  arguments of counsel, instructions of the Court, and the views

20  of your fellow jurors.

21         We will commence promptly tomorrow at 8:00 o'clock,

22  so please be on time.

23         Thank you very much.

24         THE COURTROOM DEPUTY:  All rise for the jurors.

25         THE COURT:  The Court will remain in session.

```
 1              (Out of the presence of the jury:)

 2              THE COURT:  All right.  The jury is not present.

 3              What's the issue with respect to Exhibit 25?

 4              MS. BEDNARSKI:  My understanding, Your Honor, was

 5   that the Court had decided it was irrelevant, the specifics

 6   regarding his expenditures in Korea.  And my recollection was

 7   you would also have excluded it under 403.

 8              THE COURT:  But only specifics items.  That was the

 9   massages and the golf.

10              MS. BEDNARSKI:  Okay.  And the --

11              THE COURT:  So are there massages and golf on

12   these -- I take it that these are the -- the B of A statements

13   that are subject to the motion in limine?

14              MS. KUMAR:  They are, Your Honor.  We can remove

15   those pages and work with defense counsel to ensure that

16   there's no reference to them.

17              MS. BEDNARSKI:  And I -- I have one other suggestion

18   that just -- because I think it will be a lot of work to redact

19   all those pages, is I will agree that the references that she

20   makes on her charts to the reference pages and Bank of America

21   records are accurate.  I'll stipulate that those pages support

22   her findings in the chart.

23              I don't know if that solves the Government's

24   problem, but --

25              MS. KUMAR:  I think that will go a long way,
```

```
 1    Your Honor.  We would just also ask that we be able to

 2    separately take out the, uh -- the signature card as well as,

 3    you know, maybe one cover page of one of the statements as well

 4    as the checks.

 5              MS. BEDNARSKI:  I have no problem with that.

 6              THE COURT:  All right.  Sounds to me like, then,

 7    you'll be able to work that issue out.

 8              So in the morning, please advise me as to what the

 9    status of Exhibit 25 is because currently it has been admitted

10    into evidence.  But to the extent there are going to be any

11    modifications to Exhibit 25 by the removal or redaction, you

12    need to make sure that those end up in the original exhibit.

13              MS. KUMAR:  Absolutely, Your Honor.

14              THE COURT:  All right.  The lineup for tomorrow --

15    how much more do you have with Ms. Zimmerman?

16              MS. KUMAR:  I would say no more than 30 minutes,

17    Your Honor.

18              THE COURT:  And the cross-examination?  Who's going

19    to do the cross?

20              MS. BEDNARSKI:  I'm going to.

21              I'd say at this point, um, probably 45 minutes

22    total.

23              THE COURT:  All right.  And then we've had a

24    stipulation as to the FDIC witness.  What about the other

25    witnesses -- Lee, Jackson, and Hamilton?
```

1          MS. KUMAR:  Your Honor, the Government currently

2   intends to call those witnesses.  I don't believe we've reached

3   a stipulation that obviates their testimony.

4          THE COURT:  Okay.  So we'll definitely be in the

5   defense case tomorrow.

6          And let me ask the defense if any of the witnesses

7   that were included in the defense exhibit list are not going to

8   be appearing?  Or are they all anticipated to appear and you're

9   going to call them all?

10         MS. BEDNARSKI:  If they all arrived as planned,

11   which would have been around noon today, I would anticipate

12   calling them all.

13         I haven't been able to leave the courtroom to touch

14   base, but it sounds like the plane arrived and our courier who

15   was retrieving them from the airport -- it sounds like that

16   part was successful.  So I think the witness list is -- all

17   those people are testifying.

18         I don't know the order, but I can inform the

19   Government of the order tonight.

20         THE COURT:  Okay.  That was going to be my next --

21   my next question.

22         And the defendant has been listed as a witness.  Is

23   he going to testify, or are you going to make that decision at

24   a later point in time?

25         MS. BEDNARSKI:  I'm going to make that decision at a

1    later point.

2              THE COURT:  All right.

3              MS. KUMAR:  Your Honor, may I just ask a clarifying

4    question regarding the witnesses that are coming from Korea?

5              Based on the opening statement and the variety of

6    arguments made thus far, I don't know this, but it seems as

7    though defendant may elicit testimony from the witnesses that

8    this arrangement was legal, otherwise commonplace, and that --

9    and that KIGAM defined the scope of his official duties.

10             And the Government would -- would object to some of

11   those questions.  Obviously, what he actually did and their

12   percipient knowledge of it would be relevant, but their

13   conclusions as to whether or not it was in the scope of his

14   work or was otherwise legal in Korea, um, the Government would

15   object as inadmissible and prejudicial.

16             THE COURT:  Well, I will make an appropriate ruling

17   at the time that the Government makes its objection.  I can't

18   rule in a vacuum.  I'm sure that counsel is not going to ask

19   any improper questions.

20             All right.  The final item that I want to accomplish

21   today is the ruling on the admissibility of the testimony of

22   Professor Roh, R-o-h.  This was presented by way of a proffer

23   on June 10th, 2017, by the defense.  It appears -- the proffer

24   appears as Docket No. 142.  On the same day, July 10th, the

25   Government filed its opposition, Docket No. 144.

 1          So I'll hear from the defense if you wish to add

 2   anything to your arguments.  But otherwise, I'm prepared to

 3   rule.

 4          MR. RAYNOR:  Your Honor, I think we've exhaustedly

 5   briefed the issue and --

 6          THE COURT:  I agree.

 7          MR. RAYNOR:  -- we would submit.

 8          THE COURT:  All right.  So the Court -- the Court

 9   will make the following ruling:

10          For the reasons stated in the Government's

11   opposition, the Court concludes that Professor Roh will not be

12   allowed to testify to the proffered opinions.  It's the Court's

13   role to instruct the jury on foreign law that will govern this

14   case.

15          Moreover, as to Professor Roh's factual testimony,

16   the Court concludes that the proposed testimony is irrelevant,

17   lacks foundation, and/or will merely confuse and mislead the

18   jury.  Specifically, the Court concludes that the first area of

19   his testimony is factual testimony that does not bear on the

20   issues in this case.

21          As the Government points out, whether South Korea

22   encouraged the creation of financial relationships does not

23   bear on whether defendant, a public official, demanded and

24   accepted bribes in exchange for performing an act within his

25   official duties.

1          The proposed testimony also has no bearing on the

2     Article 20 defense or defendant's subjective belief that his

3     private contacts -- contracts were legal because the

4     South Korean Government's encouragement and financial

5     relationships with private institutions certainly does not

6     equate to bribery being recognized as legal or an accepted

7     business practice.

8          With respect to the second area of his proposed

9     testimony, the Court concludes that defendant has failed to

10    demonstrate this testimony is within the scope of his

11    expertise.  Professor Roh was a prosecutor, and there is no

12    basis in his qualifications to believe he is qualified to

13    testify as to the views of the Government of South Korea or as

14    to the commonality of the practice of researchers and

15    professors providing technical advice.

16         More importantly, the Court does not believe that

17    Professor Roh's proposed testimony regarding the practice of

18    researchers and professors and providing technical advice would

19    assist the jury.

20         The Court intend to instruct the jury on the

21    elements of bribery under Article 129 of the Korean --

22    South Korean Criminal Code.  Nothing about the Court's

23    instructions suggests that giving of technical advice is, by

24    itself, a bribery.

25         Rather, in order to be bribery, the defendant must

1    have received, demanded, or promised to accept a payment in

2    exchange for exercising his official duties or, in other words,

3    as a quid pro quo for exercising his official duties.

4    Likewise, the Court concludes that the witness's third proposed

5    area of testimony is not appropriate expert testimony.

6              It is the Court's job and responsibility to instruct

7    the jury on relevant contours of foreign law.  And this

8    proposed testimony would merely distract the jury from the

9    elements that it must find.

10             The relevant issue for the jury to determine is

11   whether an act was done in the scope of the official's duties,

12   as defined by the Court in the Court's instructions, which is a

13   fact-intensive question for the jury.

14             Finally, the Court concludes that the witness's

15   fourth area of testimony is irrelevant.  The September 2016 law

16   has no bearing on whether the defendant violated Article 129.

17             So for all of the foregoing reasons, the Court will

18   not permit Professor Roh to testify to the proffered opinions

19   in his offer of proof filed on July 10th, 2017.

20             All right.  We will see you tomorrow at 8:00 a.m.

21             MR. RAYNOR:  Your Honor, can I just inquire briefly?

22             The Court had indicated that there was the one

23   unresolved issue related to the jury instruction.  And just --

24   we weren't sure whether the Court had finalized that and, if

25   not, when we could expect to hear.

```
 1            THE COURT:  The issue that -- the "assist" issue?
 2            MR. RAYNOR:  Yes, Your Honor.
 3            THE COURT:  I will resolve that issue.  I got your
 4   supplemental brief.  I read it -- I lost track of the days.  I
 5   read it when I got it.
 6            I understand the issue.  And I understand the
 7   Government's position.  And, quite frankly, I'll leave this --
 8   I'll certainly hear argument on it.
 9            But I -- my memory is that I was not -- I didn't
10   quite see any real significant difference between the "assist"
11   language and the "influence" language.  And if we have the
12   "influence" language in there, I thought that the "assist"
13   language was really irrelevant because I couldn't imagine any
14   situation where there could be influence without any
15   assistance.
16            MS. KUMAR:  I'm not sure I completely understand the
17   Court's reference to the "influence" language.
18            THE COURT:  Well, we'll talk about it.
19            MS. KUMAR:  Okay.
20            THE COURT:  But probably tomorrow afternoon.  I
21   mean, we're not going to instruct the jury until probably
22   Friday afternoon.
23            MR. RAYNOR:  Thank you, Your Honor.
24            (Volume 4 concluded at 2:21 p.m.)
25
```

**UNITED STATES DISTRICT COURT**

1            **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                         )

4    STATE OF CALIFORNIA     )

5

6           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17                 DATED THIS 13TH DAY OF JULY, 2017.

18

19

20                 /S/ MYRA L. PONCE

                 _____

21           MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

## $

**$11,000** [8] - 524:16, 542:9, 542:14, 542:19, 543:6, 543:16, 544:2, 544:13
**$16,970** [1] - 521:2
**$19,000** [1] - 544:18
**$20,000** [1] - 472:24
**$30,000** [2] - 540:19, 541:4
**$39,000** [5] - 543:8, 543:11, 544:4, 544:7, 544:8
**$393,970** [2] - 521:16, 525:9
**$45,000** [2] - 545:4, 545:5
**$49,000** [3] - 542:21, 543:1, 543:21
**$50,000** [8] - 473:19, 535:1, 535:23, 538:6, 538:23, 540:6, 543:5, 543:25
**$500** [2] - 487:9, 487:10
**$521,000** [2] - 527:2, 532:14
**$56,000** [1] - 541:20
**$60,000** [6] - 533:12, 534:3, 536:12, 537:4, 542:17, 543:15
**$650,720** [2] - 523:9, 524:24
**$9,000** [1] - 524:14

## 0

**08070** [2] - 517:24, 535:13

## 1

**1** [7] - 513:9, 517:17, 523:11, 528:8, 532:20, 542:6, 542:16
**100** [1] - 504:9
**100,000** [1] - 490:5
**101** [2] - 541:20, 545:5
**1043** [1] - 533:5
**1044** [1] - 533:16
**1046** [1] - 535:4
**1047** [1] - 536:14
**1048** [2] - 536:14, 536:20
**1049** [1] - 537:21
**1050** [2] - 537:21,

537:23
**1052** [1] - 540:21
**10TH** [3] - 549:23, 549:24, 552:19
**11,000** [2] - 542:25, 544:25
**115** [2] - 518:16, 533:24
**12** [1] - 467:1
**129** [2] - 551:21, 552:16
**12:30** [1] - 467:1
**134** [1] - 532:18
**135** [1] - 534:24
**136** [1] - 536:9
**14** [1] - 469:20
**140** [1] - 540:17
**142** [1] - 549:24
**144** [1] - 549:25
**149** [6] - 494:15, 494:16, 494:21, 494:22, 494:25, 495:7
**14TH** [2] - 537:17, 540:5
**15** [1] - 468:16
**15-YEAR** [1] - 478:7
**150,000** [1] - 490:5
**157** [1] - 503:17
**175** [1] - 536:16
**19,000** [2] - 544:14, 544:17
**1999** [1] - 513:12
**1ST** [1] - 539:20

## 2

**2** [2] - 534:18, 543:3
**20** [2] - 473:19, 551:2
**2000** [1] - 473:20
**2001** [1] - 518:25
**2003** [10] - 472:24, 473:9, 473:20, 492:13, 492:18, 492:20, 493:2, 501:8, 501:13, 509:19
**2004** [4] - 473:10, 501:14, 501:18, 510:8
**2005** [3] - 501:20, 510:8, 511:7
**2006** [1] - 501:22
**2007** [1] - 501:24
**2009** [8] - 521:11, 521:15, 523:5, 523:8, 523:12, 524:13, 525:11, 532:10
**2010** [2] - 497:1, 515:2

**2012** [3] - 495:15, 501:24, 532:16
**2013** [8] - 500:17, 501:3, 502:5, 503:22, 504:1, 510:25, 534:22, 536:7
**2014** [4] - 502:9, 537:18, 539:20
**2015** [7] - 475:20, 502:12, 502:14, 502:17, 509:19, 540:15, 540:24
**2016** [8] - 521:11, 521:15, 523:5, 523:8, 523:13, 532:11, 541:17, 552:15
**2017** [3] - 467:1, 549:23, 552:19
**20TH** [1] - 540:15
**212** [1] - 528:23
**21ST** [2] - 495:15, 532:16
**22** [3] - 467:22, 513:19, 513:20
**22ND** [2] - 534:21, 541:17
**241** [1] - 517:23
**25** [12] - 515:24, 516:2, 516:4, 517:11, 517:17, 519:7, 521:3, 521:5, 536:16, 546:3, 547:9, 547:11
**26** [13] - 527:20, 527:25, 528:2, 528:4, 528:8, 529:1, 533:5, 535:3, 536:14, 536:19, 537:20, 537:23, 540:21
**26TH** [1] - 536:7
**27** [6] - 527:20, 527:25, 528:3, 528:4, 539:7, 539:25
**28** [3] - 521:24, 522:1, 522:3
**29** [1] - 503:22
**29TH** [3] - 475:20, 502:17, 539:20
**2:00** [1] - 467:11
**2:21** [1] - 553:24

## 3

**3** [5] - 518:3, 529:2, 536:6, 536:21, 543:13
**3,000** [1] - 504:9

**30** [2] - 504:9, 547:16
**30,000** [1] - 544:12
**31** [3] - 519:23, 519:25, 520:2
**32** [2] - 522:11, 522:15
**33** [11] - 531:15, 531:16, 531:17, 534:17, 536:5, 537:16, 538:20, 540:9, 540:11, 541:14, 542:12
**34** [4] - 523:20, 523:22, 523:24, 542:1
**35** [3] - 525:23, 525:24, 526:1
**36** [5] - 529:24, 529:25, 530:8, 530:10, 530:14
**37** [1] - 525:13

## 4

**4** [8] - 467:3, 521:3, 537:17, 537:24, 538:25, 539:22, 543:23, 553:24
**403** [1] - 546:7
**45** [1] - 547:21
**45,000** [1] - 545:2
**49,000** [1] - 543:18

## 5

**5** [3] - 517:23, 540:13, 544:10
**50** [1] - 526:24
**504** [2] - 470:13, 470:15
**53** [1] - 471:2
**56,000** [1] - 544:24

## 6

**6** [3] - 517:23, 541:15, 544:22
**62** [1] - 525:3

## 8

**8070** [1] - 518:20
**850-14235** [8] - 528:18, 533:13, 534:7, 535:25, 538:13, 539:13, 541:7, 541:21
**89** [1] - 511:11
**8:00** [2] - 545:21, 552:20

## 9

**91741** [1] - 518:17
**933** [1] - 539:8
**941** [1] - 539:24
**99** [2] - 525:17, 542:5

## A

**A.M** [1] - 552:20
**ABLE** [7] - 468:5, 470:7, 481:16, 496:10, 547:1, 547:7, 548:13
**ABROAD** [3] - 475:10, 475:13, 475:15
**ABRUPT** [3] - 498:2, 498:4
**ABSOLUTELY** [7] - 467:13, 483:5, 486:23, 488:10, 490:8, 492:1, 547:13
**ACCEPT** [1] - 552:1
**ACCEPTED** [2] - 550:24, 551:6
**ACCOMPANY** [1] - 476:1
**ACCOMPANYING** [1] - 536:3
**ACCOMPLISH** [1] - 549:20
**ACCORDING** [2] - 506:18, 537:18
**ACCOUNT** [79] - 476:8, 494:1, 494:2, 504:5, 515:21, 517:21, 517:22, 518:8, 518:12, 518:19, 519:6, 519:13, 520:12, 520:24, 521:10, 521:15, 522:7, 522:19, 523:4, 523:17, 524:4, 524:16, 524:22, 525:1, 525:2, 525:11, 525:15, 525:19, 526:10, 526:17, 526:18, 526:21, 526:22, 526:23, 526:25, 527:3, 527:7, 527:8, 527:11, 527:12, 527:15, 528:13, 528:14, 528:17, 529:3, 529:14, 529:16, 529:18, 529:21, 530:22, 531:10, 531:12, 532:3, 532:8, 532:9,

533:21, 534:12, 534:14, 534:15, 535:9, 535:10, 535:14, 536:1, 537:2, 537:12, 537:13, 538:8, 538:15, 539:2, 539:3, 539:4, 539:9, 539:10, 539:12, 540:23, 541:2, 541:23, 541:24, 542:3

**ACCOUNT** [7] - 518:19, 533:13, 534:7, 535:25, 538:13, 541:7, 541:21

**ACCOUNTANT** [2] - 515:4, 515:14

**ACCOUNTING** [1] - 515:13

**ACCOUNTS** [6] - 521:18, 527:17, 527:18, 527:19, 530:20, 539:16

**ACCURATE** [2] - 531:20, 546:21

**ACCURATELY** [2] - 502:22, 530:17

**ACT** [2] - 550:24, 552:11

**ACTUAL** [2] - 499:25, 533:17

**ADD** [2] - 493:12, 550:1

**ADDITION** [1] - 525:18

**ADDITIONAL** [1] - 503:1

**ADDLESHAW** [4] - 475:21, 480:9, 480:16, 502:17

**ADDRESS** [7] - 474:15, 474:16, 474:17, 474:18, 496:6, 518:14, 533:23

**ADJUSTING** [1] - 483:3

**ADMINISTRATION** [1] - 500:2

**ADMISSIBILITY** [1] - 549:21

**ADMISSIBLE** [1] - 517:10

**ADMIT** [2] - 494:23, 516:2

**ADMITTED** [7] - 470:12, 494:11, 494:12, 495:6, 513:8, 516:11, 547:9

**ADVANCE** [1] - 475:17

**ADVICE** [28] - 470:25, 471:9, 474:20, 478:21, 478:22, 480:4, 480:23, 482:14, 485:6, 487:18, 487:20, 497:9, 499:4, 499:8, 500:9, 504:15, 506:6, 507:12, 507:21, 509:7, 509:10, 509:11, 509:14, 509:17, 509:24, 551:15, 551:18, 551:23

**ADVISE** [1] - 547:8

**ADVISING** [1] - 484:13

**ADVISOR** [2] - 528:20, 534:12

**AFTERNOON** [6] - 469:16, 469:17, 514:21, 514:22, 553:20, 553:22

**AGENT** [15] - 493:10, 493:15, 493:17, 493:21, 493:23, 508:20, 508:22, 509:1, 509:2, 509:3, 509:4, 509:24, 509:25

**AGO** [4] - 479:5, 491:6, 503:19, 504:4

**AGREE** [5] - 483:13, 483:19, 513:15, 546:19, 550:6

**AGREEMENT** [10] - 470:14, 470:17, 471:3, 484:22, 484:25, 485:1, 492:11, 492:12, 492:18, 492:25

**AHEAD** [2] - 500:24, 505:4

**AIRFARE** [1] - 487:2

**AIRPORT** [1] - 548:15

**ALERT** [1] - 467:20

**ALLOWED** [1] - 550:12

**ALMOST** [2] - 473:2, 483:12

**AMERICA** [38] - 482:10, 513:12, 515:21, 517:21, 518:8, 518:23, 519:6, 519:13, 520:18, 521:10, 521:15, 523:4, 523:16, 524:4, 524:21, 525:2,

525:19, 526:10, 526:18, 526:20, 526:24, 527:3, 527:8, 529:13, 529:16, 529:18, 530:22, 531:10, 532:3, 532:8, 533:10, 534:14, 535:14, 536:17, 537:11, 539:3, 542:3, 546:20

**AMOUNT** [22] - 521:1, 521:13, 523:7, 523:9, 524:23, 525:8, 527:1, 532:13, 533:11, 534:2, 535:1, 535:22, 536:11, 537:3, 538:5, 540:6, 540:18, 541:4, 542:16, 542:19, 544:20, 544:23

**AMOUNTS** [1] - 473:13

**ANALOGY** [1] - 510:14

**ANALYZE** [2] - 523:16, 525:19

**ANALYZING** [1] - 525:18

**AND** [1] - 514:18

**ANDREW** [1] - 499:15

**ANGELES** [1] - 467:2

**ANSWER** [8] - 471:12, 473:17, 492:4, 500:21, 500:22, 500:25, 505:4, 505:20

**ANSWERED** [1] - 511:13

**ANTICIPATE** [2] - 467:9, 548:11

**ANTICIPATED** [1] - 548:8

**ANTICIPATION** [1] - 520:6

**ANYWAY** [1] - 498:2

**APART** [1] - 491:4

**APOLOGIZE** [2] - 488:24, 489:12

**APPEAR** [1] - 548:8

**APPEARING** [1] - 548:8

**APPROACH** [1] - 514:14

**APPROPRIATE** [3] - 484:2, 549:16, 552:5

**APPROVALS** [1] - 499:25

**APPROVED** [5] -

499:11, 499:15, 499:21, 500:1, 500:2

**APPROXIMATE** [1] - 542:18

**APRIL** [1] - 503:22

**AREA** [8] - 488:6, 489:19, 489:24, 528:23, 550:18, 551:8, 552:5, 552:15

**AREAS** [1] - 470:7

**ARGUMENT** [1] - 553:8

**ARGUMENTATIVE** [2] - 505:17, 509:12

**ARGUMENTS** [3] - 545:19, 549:6, 550:2

**AROSE** [1] - 508:10

**ARRANGEMENT** [3] - 500:4, 512:14, 549:8

**ARRANGEMENTS** [1] - 497:6

**ARRIVED** [2] - 548:10, 548:14

**ARTICLE** [3] - 551:2, 551:21, 552:16

**AS** [2] - 469:13, 514:18

**ASSIST** [5] - 492:9, 551:19, 553:1, 553:10, 553:12

**ASSISTANCE** [2] - 499:4, 553:15

**ASSISTING** [2] - 508:6, 508:16

**ASSUME** [4] - 486:23, 499:14, 516:18, 517:3

**ASSUMES** [1] - 505:17

**ATTACH** [1] - 484:6

**ATTEND** [1] - 475:22

**ATTENTION** [12] - 517:16, 518:3, 526:4, 528:7, 529:1, 533:4, 533:16, 535:3, 536:19, 539:7, 539:24, 540:20

**ATTORNEY** [2] - 468:12, 498:18

**ATTRIBUTABLE** [2] - 525:15, 526:21

**AUDIBLE** [1] - 498:7

**AUDITOR** [1] - 515:8

**AUGUST** [4] - 537:17, 539:20, 540:5

**AUTHORITIES** [3] - 502:5, 502:9, 510:8

**AWARE** [15] - 471:6, 472:2, 475:4,

477:15, 477:18, 478:2, 478:4, 479:8, 479:9, 487:14, 490:18, 497:1, 502:7, 518:1

---

## B

**BACHELOR'S** [1] - 515:12

**BACKGROUND** [1] - 515:11

**BALANCE** [10] - 524:7, 524:12, 524:15, 542:7, 542:19, 543:1, 543:7, 544:1, 544:3, 545:1

**BANK** [38] - 513:12, 515:21, 517:20, 518:7, 518:22, 519:6, 519:12, 520:18, 521:10, 521:14, 521:21, 523:4, 523:16, 524:4, 524:21, 525:1, 525:19, 526:10, 526:18, 526:20, 526:24, 527:3, 527:7, 529:13, 529:15, 529:18, 530:22, 531:10, 532:3, 532:8, 533:10, 534:14, 535:14, 536:17, 537:11, 539:3, 542:3, 546:20

**BANK** [29] - 504:4, 515:17, 515:20, 517:2, 517:5, 517:21, 518:2, 519:8, 520:12, 520:17, 520:24, 520:25, 521:18, 522:7, 522:19, 523:15, 525:11, 525:15, 526:12, 527:7, 529:14, 529:16, 537:2, 537:13, 538:7, 539:1, 540:23, 541:2, 541:23

**BASE** [1] - 548:14

**BASED** [11] - 478:10, 479:13, 479:15, 485:3, 492:25, 512:9, 520:10, 523:15, 526:11, 535:9, 549:5

**BASIS** [1] - 551:12

**BEAR** [2] - 550:19, 550:23
**BEARING** [2] - 551:1, 552:16
**BECOME** [3] - 472:17, 510:9, 512:6
**BEDNARSKI** [21] - 468:11, 468:14, 468:19, 468:22, 494:13, 516:5, 516:7, 516:12, 516:16, 516:20, 516:22, 516:24, 530:1, 530:6, 546:4, 546:10, 546:17, 547:5, 547:20, 548:10, 548:25
**BEGAN** [1] - 475:23
**BEGINNING** [9] - 488:25, 524:7, 524:12, 524:15, 542:7, 542:19, 543:1, 543:7, 544:1
**BEHIND** [1] - 502:15
**BELIEF** [1] - 551:2
**BELIEVES** [1] - 498:12
**BELL** [1] - 499:15
**BELOW** [3] - 518:22, 518:25, 528:20
**BENEFITS** [1] - 483:11
**BEST** [2] - 467:18, 489:25
**BETTER** [4] - 487:19, 490:2, 506:21, 510:15
**BETWEEN** [17] - 470:17, 481:2, 481:5, 482:18, 492:13, 492:22, 493:4, 493:22, 494:10, 501:24, 521:11, 521:15, 523:5, 523:12, 530:5, 532:10, 553:10
**BID** [6] - 478:9, 478:11, 478:15, 483:7, 491:14
**BIDDING** [4] - 491:7, 491:9, 496:15
**BIDS** [10] - 478:8, 478:14, 478:16, 478:17, 491:13, 505:12, 505:13, 505:25, 506:1, 508:23
**BIG** [1] - 494:18
**BILLS** [1] - 504:9

**BINDER** [2] - 470:13, 514:15
**BIRO** [1] - 479:5
**BIRO** [1] - 479:5
**BIT** [2] - 470:10, 510:13
**BLOW** [2] - 518:5, 540:2
**BLOWING** [1] - 502:8
**BLUE** [4] - 524:18, 524:20, 526:14, 526:16
**BOOK** [3] - 471:2, 494:18, 494:20
**BOTTOM** [6] - 504:8, 528:19, 529:8, 535:10, 535:12, 537:7
**BOUGHT** [1] - 509:22
**BOULEVARD** [2] - 518:16, 533:24
**BRANCH** [1] - 518:23
**BREAK** [1] - 545:10
**BRIBERY** [7] - 498:12, 498:15, 501:2, 551:6, 551:21, 551:24, 551:25
**BRIBES** [1] - 550:24
**BRIEF** [1] - 553:4
**BRIEFED** [1] - 550:5
**BRIEFLY** [4] - 504:14, 512:2, 515:10, 552:21
**BRING** [1] - 530:14
**BROAD** [1] - 489:24
**BROKE** [2] - 472:9, 472:10
**BUILD** [1] - 492:1
**BUILDING** [2] - 468:7, 472:21
**BUILT** [1] - 489:17
**BUREAU** [1] - 514:24
**BUSINESS** [5] - 470:4, 471:10, 482:23, 497:17, 551:7
**BY** [38] - 469:15, 479:21, 489:3, 489:11, 494:17, 495:13, 495:20, 498:10, 499:10, 499:19, 501:7, 503:6, 503:18, 504:21, 505:7, 505:11, 505:22, 506:14, 506:22, 507:13, 509:16, 511:18, 512:4, 514:20, 517:15, 518:6, 520:4, 522:5, 522:17, 524:1,

526:3, 528:6, 530:12, 530:15, 531:7, 531:19, 535:19, 540:4

---

# C

**CALIFORNIA** [9] - 518:17, 523:5, 531:10, 533:24, 535:14, 537:3, 538:7, 541:1, 541:23
**CALIFORNIA** [1] - 467:2
**CANNOT** [1] - 468:16
**CANSUN** [5] - 469:23, 470:18, 472:17, 492:18, 499:11
**CAPACITY** [5] - 497:21, 506:17, 507:4, 507:17, 507:19
**CARD** [10] - 475:19, 517:20, 517:25, 524:8, 529:13, 537:11, 542:8, 542:19, 543:7, 547:2
**CARDS** [1] - 475:18
**CAREER** [1] - 508:18
**CAROLINA** [1] - 515:14
**CASE** [12] - 475:6, 475:7, 478:12, 478:14, 509:5, 509:10, 519:4, 521:2, 545:14, 548:5, 550:14, 550:20
**CASH** [11] - 473:9, 474:20, 475:2, 475:10, 475:11, 475:16, 475:17, 503:8, 503:12, 504:12, 504:13
**CATALOG** [3] - 479:23, 482:4, 484:7
**CATCH** [1] - 474:24
**CATEGORY** [3] - 521:2, 526:10, 526:11
**CENTER** [1] - 511:8
**CEO** [4] - 496:25, 499:21, 499:24
**CEOS** [1] - 497:8
**CERTAIN** [1] - 491:19
**CERTAINLY** [5] - 483:15, 486:21, 496:15, 551:5, 553:8
**CERTIFIED** [1] - 515:14

**CETERA** [1] - 484:12
**CHAMBERS** [3] - 468:18, 468:20, 468:21
**CHANGE** [1] - 473:24
**CHANGES** [1] - 496:25
**CHARACTERIZED** [2] - 469:24, 470:3
**CHARGE** [2] - 482:19, 492:16
**CHARGED** [1] - 498:23
**CHARGING** [1] - 482:2
**CHART** [28] - 516:18, 517:2, 517:6, 520:8, 520:10, 520:11, 522:18, 522:22, 524:2, 524:3, 524:18, 524:21, 525:5, 526:5, 526:8, 526:15, 531:3, 531:9, 531:21, 532:1, 537:18, 540:9, 541:19, 542:23, 542:24, 546:22
**CHARTS** [5] - 519:3, 520:5, 531:3, 531:24, 546:20
**CHECK** [45] - 524:8, 532:15, 532:20, 532:24, 533:1, 533:10, 533:11, 533:17, 533:25, 534:13, 534:21, 535:5, 535:7, 535:16, 535:20, 536:3, 536:6, 536:9, 536:17, 536:21, 537:17, 537:24, 538:21, 538:22, 539:21, 540:6, 540:12, 540:13, 540:16, 540:22, 541:9, 541:20, 542:8, 542:16, 542:19, 543:1, 543:3, 543:7, 543:11, 543:13, 543:23, 544:8, 544:10, 544:22
**CHECK** [4] - 532:18, 534:24, 541:20, 545:5
**CHECKS** [14] - 519:9, 526:16, 526:21, 526:23, 527:1, 531:9, 532:7, 532:10, 532:12,

532:13, 541:11, 541:22, 542:13, 547:4
**CHEOL** [8] - 515:18, 515:21, 518:13, 528:16, 533:22, 537:15, 538:19, 541:10
**CHI** [79] - 470:14, 470:18, 470:25, 471:6, 472:4, 473:5, 473:8, 473:22, 474:2, 474:5, 474:7, 477:14, 478:8, 478:15, 478:17, 478:20, 479:8, 479:12, 480:2, 480:3, 480:22, 481:3, 482:24, 483:16, 484:16, 484:21, 484:25, 485:5, 485:23, 486:9, 487:8, 487:12, 487:18, 488:13, 489:4, 489:15, 490:10, 490:15, 492:13, 492:18, 493:25, 495:15, 495:21, 495:25, 496:5, 496:9, 496:24, 497:17, 497:21, 497:23, 499:5, 499:7, 499:21, 500:5, 503:13, 503:21, 503:24, 504:4, 504:8, 504:16, 505:24, 506:7, 506:23, 507:21, 509:15, 509:17, 510:3, 510:9, 510:10, 511:3, 515:18, 515:21, 518:13, 528:16, 533:22, 537:15, 538:19, 541:10
**CHI'S** [4] - 480:17, 483:11, 498:13, 529:6
**CHOOSE** [1] - 483:18
**CHRIS** [5] - 496:24, 497:16, 499:22, 512:10, 512:11
**CHRONOLOGICAL** [1] - 520:22
**CITE** [2] - 531:1, 537:20
**CITES** [1] - 532:24
**CITY** [1] - 529:5

**CJA** [1] - 468:14
**CLARIFYING** [1] - 549:3
**CLASSIFY** [1] - 470:1
**CLEAR** [3] - 490:15, 509:1, 530:6
**CLOSE** [1] - 535:17
**CLOSER** [3] - 469:7, 476:10, 476:13
**CODE** [1] - 528:23
**CODE** [1] - 551:22
**COLLEAGUES** [3] - 474:19, 474:25, 501:4
**COLLECT** [1] - 509:25
**COLLECTING** [1] - 509:3
**COLUMN** [5] - 521:4, 522:24, 530:24, 532:23, 536:13
**COMBINATION** [1] - 520:25
**COMFORTABLE** [3] - 499:2, 500:4, 500:8
**COMING** [1] - 549:4
**COMMENCE** [1] - 545:21
**COMMISSION** [1] - 471:17
**COMMON** [2] - 483:9, 495:25
**COMMONALITY** [1] - 551:14
**COMMONLY** [1] - 514:25
**COMMONPLACE** [1] - 549:8
**COMMUNICATING** [1] - 493:25
**COMMUNICATION** [1] - 484:5
**COMPANIES** [4] - 482:21, 483:2, 507:15, 521:14
**COMPANY** [19] - 469:19, 469:23, 472:3, 475:24, 476:6, 478:9, 480:5, 481:21, 482:18, 483:2, 483:18, 497:12, 502:14, 507:22, 509:18, 510:7, 519:17, 519:20, 522:8
**COMPARED** [1] - 486:18
**COMPARISON** [1] - 481:16
**COMPATIBLE** [1] - 487:24

**COMPETITORS** [3] - 482:2, 505:9, 505:25
**COMPETITORS'** [1] - 482:3
**COMPLETELY** [3] - 476:7, 499:4, 553:16
**COMPLEX** [2] - 472:14, 484:9
**COMPONENT** [1] - 484:10
**COMPONENTS** [1] - 485:7
**COMPOUND** [1] - 505:15
**COMPRISED** [9] - 524:8, 542:6, 543:2, 543:11, 543:21, 544:7, 544:8, 544:18, 545:6
**COMPUTER** [2] - 468:17, 485:3
**COMPUTER-BASED** [1] - 485:3
**COMPUTERS** [1] - 468:19
**CONCERNED** [7] - 488:13, 498:23, 501:5, 510:9, 510:11, 510:23, 512:6
**CONCERNS** [2] - 501:10, 510:7
**CONCLUDED** [1] - 553:24
**CONCLUDES** [6] - 550:11, 550:16, 550:18, 551:9, 552:4, 552:14
**CONCLUSION** [6] - 542:22, 543:9, 543:19, 544:5, 544:16, 545:3
**CONCLUSIONS** [1] - 549:13
**CONDUCT** [1] - 467:7
**CONFUSE** [1] - 550:17
**CONNECTION** [2] - 480:17, 515:17
**CONSIDER** [2] - 483:2, 483:4
**CONSULT** [1] - 476:5
**CONSULTANT** [1] - 515:9
**CONSULTED** [1] - 476:4
**CONSULTING** [1] - 480:4
**CONTACTED** [1] - 479:9

**CONTACTS** [1] - 551:3
**CONTAINS** [1] - 530:25
**CONTINUAL** [1] - 482:21
**CONTINUE** [1] - 497:20
**CONTINUED** [1] - 482:23
**CONTOURS** [1] - 552:7
**CONTRACT** [16] - 470:25, 481:5, 483:11, 485:6, 492:19, 496:14, 500:10, 501:9, 501:15, 501:25, 502:1, 502:6, 502:10, 502:13, 510:2, 512:6
**CONTRACTING** [1] - 491:17
**CONTRACTS** [3] - 471:9, 496:9, 551:3
**CONVERSATION** [2] - 472:15
**CONVERSATIONS** [6] - 488:2, 488:8, 488:12, 489:4, 489:14, 489:21
**CONVINCED** [1] - 501:11
**COPIER** [1] - 468:9
**COPY** [8] - 467:24, 468:3, 468:4, 470:13, 495:9, 495:14, 520:5, 535:5
**CORDS** [1] - 468:23
**CORNER** [2] - 518:11, 535:10
**CORPORATION** [1] - 513:11
**CORRECT** [71] - 469:22, 470:18, 471:15, 471:20, 473:15, 476:11, 477:7, 478:8, 478:21, 479:14, 480:18, 481:7, 483:3, 485:1, 485:9, 485:15, 485:19, 485:24, 486:12, 487:6, 487:15, 491:24, 492:8, 492:18, 493:8, 493:18, 494:1, 496:2, 496:7, 496:20, 497:24, 498:14, 498:19,

499:12, 499:16, 500:6, 504:2, 504:5, 504:6, 504:10, 504:11, 506:2, 506:3, 507:1, 507:7, 507:23, 507:24, 507:25, 508:7, 508:21, 509:8, 509:9, 509:23, 510:1, 510:2, 510:5, 511:6, 511:21, 517:3, 523:2, 524:17, 526:19, 531:2, 532:22, 534:25, 535:11, 537:1, 537:22, 539:6, 539:14, 541:24
**CORRECTLY** [2] - 491:18, 519:1
**CORRESPONDING** [1] - 541:12
**CORRUPTION** [1] - 501:2
**COST** [8] - 486:18, 486:20, 487:8, 489:6, 489:16, 489:20, 492:3, 496:14
**COSTINGS** [1] - 491:23
**COSTLY** [1] - 481:18
**COUNSEL** [6] - 469:3, 494:10, 530:5, 545:19, 546:15, 549:18
**COUNT** [1] - 541:15
**COUNT** [16] - 532:20, 534:18, 536:6, 536:21, 537:17, 537:24, 538:25, 539:22, 540:13, 541:15, 542:16, 543:3, 543:13, 543:23, 544:10, 544:22
**COUNTRIES** [1] - 482:18
**COUNTRY** [4] - 482:3, 482:19, 490:10
**COUNTS** [1] - 542:13
**COUPLE** [1] - 507:20
**COURIER** [1] - 548:14
**COURSE** [3] - 468:14, 519:4, 521:17
**COURT** [91] - 467:6, 467:9, 467:12, 467:15, 467:24, 468:3, 468:6, 468:9, 468:13, 468:18,

468:20, 468:24, 469:2, 469:7, 479:18, 488:19, 488:25, 489:2, 489:9, 494:9, 494:21, 494:25, 495:3, 495:6, 495:8, 495:11, 495:18, 498:9, 499:9, 499:18, 500:20, 500:24, 503:1, 503:4, 504:25, 505:4, 505:16, 505:19, 506:13, 506:20, 507:10, 509:13, 511:14, 512:1, 512:20, 512:22, 513:2, 513:5, 513:22, 514:16, 516:4, 516:6, 516:9, 516:14, 516:18, 516:21, 516:23, 517:1, 517:8, 517:14, 519:25, 522:1, 522:13, 523:22, 525:24, 528:2, 529:25, 530:4, 530:8, 531:16, 535:17, 545:8, 545:12, 545:25, 546:2, 546:8, 546:11, 547:6, 547:14, 547:18, 547:23, 548:4, 548:20, 549:2, 549:16, 550:6, 550:8, 553:1, 553:3, 553:18, 553:20
**COURT** [2] - 513:25, 514:1
**COURT** [20] - 467:20, 514:7, 516:15, 545:19, 545:25, 546:5, 550:8, 550:11, 550:16, 550:18, 551:9, 551:16, 551:20, 552:4, 552:12, 552:14, 552:17, 552:22, 552:24
**COURT'S** [6] - 516:7, 550:12, 551:22, 552:6, 552:12, 553:17
**COURTROOM** [1] - 548:13
**COURTROOM** [4] - 468:25, 514:5,

514:10, 545:24
**COVER** [2] - 539:21, 547:3
**CPA** [1] - 515:15
**CRASH** [1] - 479:16
**CREATE** [3] - 489:6, 531:3, 531:9
**CREATED** [2] - 522:18, 531:21
**CREATING** [1] - 488:13
**CREATION** [1] - 550:22
**CREDIT** [2] - 475:18, 475:19
**CREDITS** [3] - 521:1, 524:8, 543:1
**CRIME** [1] - 498:24
**CRIMINAL** [1] - 551:22
**CROSS** [6] - 467:7, 467:16, 469:4, 511:13, 547:18, 547:19
**CROSS** [1] - 469:14
**CROSS-EXAMINATION** [3] - 467:7, 469:4, 547:18
**CROSS-EXAMINATION** [1] - 469:14
**CROSS-EXAMINER** [1] - 467:16
**CURRENT** [1] - 515:3
**CUSTOMER** [1] - 518:25
**CUSTOMER** [6] - 477:6, 477:9, 484:1, 493:8, 493:17, 509:22
**CUSTOMER'S** [1] - 490:13
**CUSTOMERS** [6] - 474:19, 475:1, 482:1, 490:24, 506:16, 510:4
**CZERANKO** [2] - 467:23, 513:9
**CZERANKO** [1] - 513:10

### D

**DAMN** [1] - 482:25
**DATE** [1] - 520:23
**DATE** [7] - 504:1, 520:23, 532:16, 539:18, 539:21, 540:13, 541:16
**DAYS** [2] - 486:16, 553:4

**DEALING** [2] - 478:10, 478:20
**DECEMBER** [1] - 536:7
**DECIDED** [1] - 546:5
**DECISION** [2] - 548:23, 548:25
**DEEP** [1] - 490:8
**DEFENDANT** [14] - 469:3, 511:3, 511:19, 511:20, 513:17, 513:23, 523:11, 539:10, 548:22, 549:7, 550:23, 551:9, 551:25, 552:16
**DEFENDANT'S** [40] - 517:21, 519:12, 520:12, 521:10, 521:14, 522:19, 523:4, 523:16, 524:4, 524:21, 525:1, 525:11, 525:15, 525:19, 526:16, 526:18, 526:20, 527:3, 527:7, 527:15, 529:13, 529:18, 530:22, 531:10, 531:11, 532:7, 532:8, 534:14, 535:14, 535:25, 537:2, 537:12, 538:7, 538:15, 539:15, 540:23, 541:1, 541:23, 542:3, 551:2
**DEFENSE** [8] - 468:10, 546:15, 548:5, 548:6, 548:7, 549:23, 550:1, 551:2
**DEFINED** [2] - 549:9, 552:12
**DEFINITELY** [1] - 548:4
**DEGREE** [2] - 515:12, 515:13
**DELETED** [1] - 479:23
**DELICATE** [1] - 485:3
**DELOITTE** [1] - 515:9
**DEMANDED** [2] - 550:23, 552:1
**DEMONSTRATE** [1] - 551:10
**DENIED** [2] - 478:14, 478:15
**DENOMINATION** [1] - 504:9
**DENOTE** [2] - 526:11, 532:6

**DENOTES** [1] - 532:7
**DENSITY** [1] - 489:25
**DEPARTMENT** [1] - 506:24
**DEPICTED** [2] - 524:5, 526:14
**DEPICTS** [4] - 520:9, 520:11, 524:3, 526:9
**DEPOSIT** [1] - 513:11
**DEPOSIT** [5] - 533:9, 533:10, 536:2, 540:6, 541:12
**DEPOSITED** [8] - 531:11, 532:8, 533:13, 533:17, 534:13, 534:14, 540:22, 541:23
**DEPOSITS** [1] - 513:13
**DEPUTY** [4] - 468:25, 514:5, 514:10, 545:24
**DESCRIBE** [7] - 520:8, 520:19, 524:5, 526:7, 531:23, 541:15, 541:18
**DESCRIBED** [1] - 511:20
**DESCRIBING** [1] - 520:11
**DESCRIPTION** [1] - 520:24
**DESIGN** [2] - 474:2, 474:3
**DESK** [1] - 485:5
**DESPITE** [1] - 497:19
**DETAIL** [2] - 470:23, 476:24
**DETAILS** [3] - 478:23, 480:25, 498:16
**DETERMINE** [2] - 483:23, 552:10
**DEVELOP** [2] - 487:21, 508:18
**DEVELOPING** [3] - 470:4, 471:18, 490:10
**DEVICES** [3] - 484:6, 485:18, 489:21
**DIFFERENCE** [3] - 482:17, 488:11, 553:10
**DIFFERENT** [12] - 480:13, 480:14, 480:15, 482:1, 482:7, 482:9, 482:13, 484:4, 484:5, 491:9, 509:7
**DIFFICULT** [2] -

484:9, 490:6
**DIGITS** [1] - 535:13
**DIGRESS** [1] - 510:13
**DIRECT** [14] - 491:7, 491:17, 493:17, 496:13, 504:22, 517:16, 518:3, 526:4, 528:7, 529:1, 533:4, 535:3, 536:19, 540:20
**DIRECT** [1] - 514:19
**DIRECTOR** [9] - 473:25, 474:4, 474:7, 499:24, 506:9, 506:17, 507:5, 507:17, 511:9
**DISAGREE** [1] - 472:18
**DISCOUNT** [5] - 490:19, 490:22, 490:23, 491:5, 496:11
**DISCUSS** [1] - 545:14
**DISCUSSED** [5] - 498:15, 501:10, 502:1, 505:5, 513:1
**DISCUSSING** [1] - 505:8
**DISCUSSION** [3] - 494:10, 504:15, 530:5
**DISCUSSIONS** [2] - 472:17, 488:17
**DISTINCT** [1] - 484:15
**DISTINCTION** [1] - 509:24
**DISTRACT** [1] - 552:8
**DISTRIBUTOR** [11] - 484:19, 491:12, 491:19, 491:20, 493:7, 493:20, 496:11, 496:12, 507:23, 508:6, 509:4
**DOCKET** [2] - 549:24, 549:25
**DOCUMENT** [7] - 470:22, 517:17, 518:15, 528:9, 530:17, 533:6
**DOCUMENTING** [1] - 531:9
**DOCUMENTS** [12] - 515:17, 515:20, 515:23, 517:2, 519:7, 521:18, 522:7, 523:15, 527:12, 529:3, 534:11, 537:12
**DOLLARS** [3] - 473:3, 473:14, 473:15

**DONE** [7] - 479:8, 479:23, 485:20, 486:7, 487:17, 500:22, 552:11
**DOWN** [3] - 468:9, 532:15, 540:1
**DR** [87] - 469:25, 470:14, 470:18, 470:24, 470:25, 471:6, 472:4, 472:6, 473:5, 473:8, 473:22, 474:2, 474:5, 474:7, 477:14, 478:8, 478:15, 478:17, 478:20, 479:5, 479:8, 479:12, 480:2, 480:3, 480:17, 480:22, 480:24, 481:3, 482:24, 483:11, 483:16, 484:16, 484:21, 484:25, 485:5, 485:23, 486:9, 487:8, 487:12, 487:18, 488:13, 489:4, 489:15, 490:10, 490:15, 492:13, 492:18, 493:25, 495:15, 495:21, 495:25, 496:5, 496:9, 496:24, 497:17, 497:21, 497:22, 497:23, 498:1, 498:11, 498:12, 498:13, 499:5, 499:7, 499:13, 499:21, 500:5, 501:10, 503:13, 503:21, 503:24, 504:4, 504:8, 504:16, 505:24, 506:7, 506:23, 507:21, 509:15, 509:17, 510:3, 510:9, 510:10, 511:3
**DRAMATICALLY** [1] - 496:19
**DRAW** [3] - 544:5, 544:16, 545:3
**DRAWN** [8] - 531:10, 533:21, 534:13, 535:9, 537:2, 538:7, 541:1, 541:22
**DSL** [1] - 481:23
**DURING** [11] - 495:22, 499:20, 500:5, 500:10, 502:1,

502:21, 503:8,
519:3, 519:12,
521:17, 522:6
**DUTIES** [5] - 549:9,
550:25, 552:2,
552:3, 552:11

# E

**E-MAIL** [10] - 479:4,
491:6, 495:14,
495:15, 496:5,
503:20, 503:21,
503:23, 511:4, 511:7
**E-MAILED** [2] - 474:7,
474:8
**E-MAILS** [5] - 477:16,
477:25, 478:1,
505:6, 511:19
**EARLY** [14] - 473:9,
473:11, 487:23,
488:3, 488:8,
488:13, 489:5,
489:6, 489:15,
489:17, 489:20,
489:23, 503:12,
510:18
**EARTHQUAKE** [1] -
488:3
**EARTHQUAKE** [3] -
506:24, 507:5, 511:8
**EASILY** [1] - 520:23
**ECONOMICAL** [1] -
487:10
**EDUCATIONAL** [1] -
515:10
**EFFECT** [5] - 474:9,
476:25, 498:14,
503:14, 513:23
**EFFECTIVE** [3] -
487:8, 489:6, 489:16
**EITHER** [3] - 520:13,
521:2, 525:6
**ELECTRIC** [1] -
468:15
**ELEMENTS** [2] -
551:21, 552:9
**ELICIT** [1] - 549:7
**EMOTION** [1] - 498:3
**EMPLOY** [1] - 497:20
**EMPLOYED** [5] -
514:23, 514:24,
515:1, 515:5, 515:8
**EMPLOYEE** [1] -
475:19
**ENCOMPASSED** [1] -
523:8
**ENCOUNTERS** [1] -
480:2
**ENCOURAGED** [1] -

550:22
**ENCOURAGEMENT**
[1] - 551:4
**END** [11] - 477:6,
477:9, 477:11,
490:20, 491:2,
491:13, 491:21,
496:2, 496:14,
547:12
**ENDING** [1] - 518:20
**ENDS** [1] - 517:24
**ENFORCEMENT** [1] -
512:10
**ENGINEER** [1] -
501:12
**ENGINEERS** [10] -
475:10, 486:1,
486:13, 486:15,
486:22, 486:24,
487:2, 487:11,
487:15, 492:9
**ENSURE** [1] - 546:15
**ENTERED** [1] - 513:16
**ENTIRE** [1] - 500:5
**ENTIRETY** [1] -
500:13
**EQUATE** [1] - 551:6
**EQUIPMENT** [26] -
482:15, 483:17,
483:24, 484:2,
484:4, 484:7,
484:15, 485:3,
486:19, 487:19,
487:23, 489:6,
489:16, 490:12,
492:3, 492:7,
492:11, 492:17,
496:3, 496:10,
496:12, 496:13,
497:3, 497:13,
506:15, 506:16
**EQUIPMENTS** [1] -
484:12
**ESSENTIALLY** [1] -
532:1
**ESTABLISHED** [1] -
504:4
**ET** [1] - 484:12
**EURO** [2] - 504:9
**EUROPE** [2] - 474:20,
482:10
**EVENING** [1] - 545:10
**EVENT** [1] - 476:15
**EVENTS** [2] - 476:10,
476:14
**EVERYWHERE** [1] -
468:23
**EVIDENCE** [33] -
467:22, 495:7,
503:17, 505:18,

513:8, 513:16,
513:21, 517:8,
517:12, 519:23,
520:1, 520:3,
521:24, 522:2,
522:4, 522:11,
522:14, 522:16,
523:20, 523:23,
523:25, 525:23,
525:25, 526:2,
528:2, 528:5,
529:24, 530:9,
530:11, 531:16,
531:18, 545:18,
547:10
**EXACT** [3] - 473:11,
481:16, 498:16
**EXACTLY** [6] -
473:16, 476:22,
478:6, 500:7,
502:21, 522:23
**EXAMINATION** [4] -
469:14, 503:5,
512:3, 514:19
**EXAMINATION** [4] -
467:7, 469:4, 503:9,
547:18
**EXAMINER** [2] -
467:16, 513:11
**EXAMPLE** [8] - 479:4,
482:9, 482:24,
487:22, 491:16,
496:16, 518:7,
522:24
**EXCEEDS** [1] - 511:12
**EXCEL** [3] - 519:10,
520:11, 530:19
**EXCEPT** [1] - 499:21
**EXCHANGE** [2] -
550:24, 552:2
**EXCLUDED** [2] -
510:2, 546:7
**EXCUSE** [3] - 516:5,
529:16, 531:8
**EXCUSED** [2] - 512:1,
512:20
**EXECUTED** [1] -
470:25
**EXERCISING** [2] -
552:2, 552:3
**EXHAUSTEDLY** [1] -
550:4
**EXHIBIT** [62] - 467:22,
470:13, 471:2,
494:15, 494:21,
494:22, 495:7,
503:17, 511:11,
513:19, 515:24,
516:2, 516:4,
517:17, 519:7,

519:23, 519:25,
520:2, 521:3, 521:5,
521:24, 522:1,
522:3, 522:11,
522:15, 523:20,
523:22, 523:24,
525:23, 525:24,
526:1, 528:8, 529:1,
529:24, 529:25,
530:8, 530:10,
530:14, 531:15,
531:17, 533:5,
534:17, 535:3,
536:5, 536:14,
536:16, 536:19,
537:16, 537:20,
537:23, 538:20,
539:7, 539:25,
540:9, 540:11,
540:21, 541:14,
542:1, 542:12,
546:3, 547:9, 547:11
**EXHIBIT** [14] - 494:16,
495:4, 513:20,
516:10, 516:19,
517:3, 517:11,
518:4, 522:13,
522:25, 530:25,
539:25, 547:12,
548:7
**EXHIBITS** [3] - 527:20,
527:25, 528:4
**EXHIBITS** [1] - 517:9
**EXPECT** [1] - 552:25
**EXPENDITURES** [2] -
516:17, 516:25,
546:6
**EXPENSES** [3] -
474:21, 475:2,
475:11
**EXPENSIVE** [3] -
481:19, 486:15,
486:19
**EXPERIENCE** [2] -
478:10, 480:3
**EXPERIENCED** [2] -
467:15, 510:23
**EXPERT** [1] - 552:5
**EXPERTISE** [1] -
551:11
**EXPERTS** [1] - 488:6
**EXPLAIN** [3] - 483:14,
510:12, 510:14
**EXPRESS** [2] -
501:14, 501:24
**EXPRESSED** [1] -
501:17
**EXTENSION** [1] -
468:22
**EXTENT** [1] - 547:10

# F

**FACING** [1] - 499:3
**FACT** [5] - 478:13,
503:11, 513:2,
535:12, 552:13
**FACT-INTENSIVE** [1]
- 552:13
**FACTOR** [2] - 482:16,
488:16
**FACTORS** [1] - 482:12
**FACTORY** [1] - 486:8
**FACTS** [1] - 505:17
**FACTUAL** [2] -
550:15, 550:19
**FAILED** [1] - 551:9
**FAIR** [3] - 490:14,
508:24, 523:10
**FAMILY** [1] - 545:15
**FAR** [5] - 472:14,
477:15, 477:18,
517:25, 549:6
**FAULT** [1] - 486:6
**FAULTS** [1] - 486:6
**FAXED** [1] - 474:7
**FBI** [4] - 514:25,
515:1, 515:3, 515:5
**FDIC** [4] - 467:23,
513:11, 513:14,
547:24
**FEDERAL** [2] -
513:11, 514:24
**FEDERALLY** [1] -
513:13
**FEE** [24] - 487:13,
487:15, 493:10,
493:15, 493:17,
493:21, 493:23,
507:7, 507:12,
508:20, 508:22,
509:1, 509:2, 509:3,
509:7, 509:10,
509:11, 509:14,
509:17, 509:24,
509:25, 510:3
**FELLOW** [2] - 545:14,
545:20
**FELT** [4] - 472:7,
472:12, 482:18,
500:15
**FEW** [8] - 473:14,
473:19, 479:4,
491:6, 503:7,
508:25, 511:1
**FIELD** [1] - 486:7
**FIFTEEN** [1] - 481:24
**FIGURE** [2] - 473:22,
484:9
**FILED** [2] - 549:25,
552:19

FILL [1] - 474:10
FINAL [3] - 499:25, 541:15, 549:20
FINALIZED [1] - 552:24
FINALLY [3] - 510:6, 510:24, 552:14
FINANCE [6] - 473:25, 474:4, 474:7, 499:23, 499:24
FINANCIAL [6] - 513:13, 515:9, 528:20, 534:12, 550:22, 551:4
FINDINGS [1] - 546:22
FINE [1] - 501:12
FINISH [4] - 467:11, 488:23, 500:20, 500:24
FIRE [1] - 485:7
FIRST [11] - 473:9, 473:19, 474:24, 500:7, 500:17, 501:2, 519:6, 519:8, 520:19, 520:20, 550:18
FIVE [2] - 486:16, 489:19
FLOOR [1] - 472:10
FLY [1] - 486:11
FLYING [1] - 486:13
FOLLOW [6] - 496:1, 521:6, 522:21, 529:17, 531:23, 538:2
FOLLOWED [2] - 495:22, 530:21
FOLLOWING [2] - 513:7, 550:9
FOLLOWS [1] - 536:24
FOLLOWS [2] - 469:13, 514:18
FOOD [2] - 474:22, 487:5
FOOTHILL [2] - 518:16, 533:24
FOREGOING [1] - 552:17
FOREIGN [2] - 550:13, 552:7
FORENSIC [1] - 515:4
FORM [4] - 474:2, 474:6, 474:10, 536:24
FORMS [1] - 538:2
FORT [1] - 529:7
FORWARD [1] - 517:14
FOUNDATION [2] -

506:21, 550:17
FOUR [4] - 486:16, 496:25, 532:15, 535:13
FOURTH [1] - 552:15
FRANKLY [1] - 553:7
FRESH [1] - 476:11
FRESHER [2] - 476:11, 476:17
FRIDAY [3] - 516:7, 516:13, 553:22
FRIEND [1] - 496:6
FRIGHTENING [1] - 499:1
FRONT [2] - 470:13, 494:18
FUHR [24] - 479:17, 488:18, 489:8, 495:2, 495:5, 498:8, 499:17, 503:3, 503:6, 503:16, 503:18, 504:21, 505:7, 505:11, 505:22, 506:14, 506:22, 507:13, 509:16, 511:10, 511:16, 511:18, 511:25, 512:21
FUHR [2] - 475:5, 475:7
FUNCTIONING [1] - 484:17
FUNDS [1] - 540:5
FUNDS [23] - 523:16, 524:4, 524:25, 525:10, 525:18, 525:20, 526:9, 526:24, 542:3, 542:23, 542:24, 543:2, 543:10, 543:12, 543:20, 543:21, 544:6, 544:8, 544:17, 544:18, 545:4, 545:6

## G

GEE [1] - 499:7
GENDER [1] - 510:16
GENERALLY [1] - 530:17
GENERATED [1] - 508:22
GENTLEMAN [1] - 471:16
GENTLEMEN [2] - 513:22, 545:12
GENUINELY [1] - 488:13
GEOSCIENCE [1] -

527:5
GEOSIG [4] - 479:6, 479:9, 479:13, 479:22
GEOTEK [1] - 509:6
GIVEN [10] - 474:3, 474:6, 474:20, 475:2, 475:11, 475:16, 475:17, 514:1, 542:23, 545:13
GLENDORA [3] - 518:16, 518:23, 533:24
GMAIL [3] - 494:1, 494:2, 494:5
GOD [1] - 514:8
GODDARD [4] - 475:21, 480:9, 480:16, 502:17
GOLF [2] - 546:9, 546:11
GOVERN [1] - 550:13
GOVERNMENT [24] - 495:1, 498:13, 503:16, 512:25, 513:19, 513:23, 514:3, 516:1, 517:5, 519:22, 521:23, 522:10, 523:19, 525:22, 527:24, 529:23, 548:1, 548:19, 549:10, 549:14, 549:17, 549:25, 550:21, 551:13
GOVERNMENT [1] - 489:18
GOVERNMENT'S [6] - 494:21, 494:22, 546:23, 550:10, 551:4, 553:7
GRACED [1] - 467:24
GREAT [1] - 483:1
GREATER [1] - 542:14
GREEN [2] - 524:6, 524:7
GROUND [2] - 483:19, 484:17
GROUP [1] - 499:25
GSL [20] - 469:18, 471:14, 473:22, 483:11, 484:2, 485:1, 485:22, 486:11, 486:15, 486:21, 490:19, 491:19, 492:17, 493:22, 496:23, 499:5, 499:8, 499:21, 500:5, 500:6

GSL'S [3] - 486:24, 487:2, 487:5
GUARANTEE [1] - 467:12
GUATEMALA [1] - 482:8
GUESS [2] - 510:12, 510:13
GURALP [31] - 469:23, 469:25, 470:18, 470:24, 471:16, 472:6, 475:1, 480:24, 492:13, 492:18, 493:4, 499:11, 499:13, 501:10, 506:15, 507:1, 507:3, 522:8, 522:19, 523:5, 523:12, 524:21, 525:1, 525:16, 542:3, 543:2, 543:12, 543:22, 544:9, 544:19, 545:6

## H

HALF [2] - 476:12, 528:8
HAMILTON [1] - 547:25
HAND [5] - 514:5, 518:11, 518:18, 533:20, 535:10
HANDWRITTEN [1] - 470:22
HAPPY [2] - 472:20, 500:13
HARD [7] - 469:9, 472:12, 482:4, 510:12, 517:24, 530:3, 530:16
HAT [2] - 506:6
HATS [4] - 480:3, 480:9, 480:12, 506:5
HEAR [6] - 491:18, 494:24, 498:6, 550:1, 552:25, 553:8
HEARD [2] - 468:11, 545:18
HEARSAY [3] - 479:17, 488:18, 489:8
HEATED [1] - 472:18
HEESONG [3] - 507:25, 508:20, 509:6
HELP [8] - 474:21, 483:18, 483:21, 484:1, 486:1,

508:10, 514:8
HELPED [1] - 474:2
HELPFUL [1] - 487:22
HELPING [3] - 473:5, 497:2, 497:5
HEON [8] - 515:18, 515:21, 518:13, 528:16, 533:22, 537:15, 538:19, 541:10
HEON-CHEOL [8] - 515:18, 515:21, 518:13, 528:16, 533:22, 537:15, 538:19, 541:10
HEREBY [1] - 513:6
HIGH [2] - 489:19, 489:25
HIGH-RISK [1] - 489:19
HIMSELF [1] - 511:20
HIRE [2] - 492:12, 498:17
HIRED [1] - 476:1
HIT [1] - 520:24
HOME [2] - 494:3, 496:6
HONEST [3] - 476:7, 476:8, 499:4
HONOR [50] - 467:18, 467:20, 468:4, 468:8, 469:6, 479:17, 488:18, 488:24, 489:8, 494:7, 494:14, 495:2, 495:10, 503:3, 506:11, 511:12, 512:2, 512:21, 512:24, 513:4, 513:18, 514:14, 516:1, 516:5, 516:12, 517:4, 517:13, 519:22, 521:23, 522:10, 523:19, 525:22, 527:24, 529:23, 530:1, 530:6, 531:6, 531:14, 545:11, 546:4, 546:14, 547:1, 547:13, 547:17, 548:1, 549:3, 550:4, 552:21, 553:2, 553:23
HOPE [1] - 483:6
HOPEFULLY [1] - 502:15
HOTEL [1] - 487:5
HOUR [3] - 467:11,

8

467:14, 503:19
**HOURS** [3] - 470:10, 470:11, 494:4
**HUNDRED** [2] - 469:21, 470:10
**HWANG** [7] - 528:22, 534:8, 534:9, 536:1, 538:14, 541:8, 541:21

# I

**IDEA** [1] - 472:12
**IDENTIFICATION** [14] - 494:16, 513:18, 513:20, 515:24, 517:11, 520:2, 522:3, 522:12, 522:15, 523:24, 526:1, 528:4, 530:10, 531:17
**IDENTIFIED** [1] - 510:18
**IDENTIFY** [10] - 518:11, 518:14, 527:4, 527:8, 528:17, 528:19, 529:5, 532:24, 533:20, 537:14
**IDENTIFYING** [1] - 520:14
**IDENTITY** [1] - 510:16
**ILLEGAL** [5] - 500:16, 502:3, 502:10, 502:13, 511:21
**ILLEGALITY** [1] - 502:18
**IMAGINE** [2] - 495:3, 553:13
**IMPACT** [1] - 482:12
**IMPORTANT** [5] - 488:8, 489:5, 489:16, 490:11, 490:15
**IMPORTANTLY** [1] - 551:16
**IMPROPER** [2] - 511:21, 549:19
**IMPROVE** [3] - 487:19, 496:19, 496:21
**INADMISSIBLE** [1] - 549:15
**INCAPABLE** [1] - 486:10
**INCLUDE** [1] - 491:23
**INCLUDED** [2] - 503:23, 548:7
**INCLUDES** [3] - 493:10, 493:14,

507:1
**INCLUDING** [2] - 513:17, 545:14
**INCOMING** [9] - 519:13, 519:16, 519:19, 521:9, 521:13, 522:7, 523:4, 525:1, 525:15
**INCONVENIENT** [1] - 486:21
**INCREASE** [1] - 473:5
**INCREASED** [1] - 473:21
**INDICATE** [1] - 534:11
**INDICATED** [2] - 541:19, 552:22
**INDICATES** [1] - 522:25
**INDICTMENT** [6] - 532:21, 536:6, 536:22, 537:25, 540:13, 542:14
**INDIVIDUAL** [3] - 491:4, 526:12, 533:21
**INDUSTRY** [1] - 483:9
**INEXPENSIVELY** [1] - 490:12
**INFLUENCE** [5] - 478:8, 553:11, 553:12, 553:14, 553:17
**INFORM** [1] - 548:18
**INFORMATION** [12] - 473:17, 477:21, 504:16, 505:9, 505:24, 507:15, 519:9, 520:18, 521:1, 540:8, 541:18
**INFORMED** [3] - 496:5, 497:1, 498:11
**INITIAL** [1] - 473:18
**INPUT** [1] - 478:3
**INQUIRE** [1] - 552:21
**INQUIRIES** [1] - 518:22
**INSIDE** [4] - 504:16, 505:9, 505:24, 507:14
**INSTALL** [1] - 492:11
**INSTALLATION** [2] - 492:17, 508:14
**INSTALLED** [4] - 468:15, 482:14, 484:18, 492:8
**INSTALLING** [1] - 492:6
**INSTANCE** [1] - 537:20
**INSTANCES** [1] -

531:1
**INSTITUTE** [3] - 506:9, 507:5, 527:4
**INSTITUTE** [2] - 495:22, 496:2
**INSTITUTION** [1] - 513:13
**INSTITUTIONS** [1] - 551:5
**INSTRUCT** [4] - 550:13, 551:20, 552:6, 553:21
**INSTRUCTION** [2] - 545:13, 552:23
**INSTRUCTIONS** [4] - 474:9, 545:19, 551:23, 552:12
**INSTRUMENT** [2] - 471:7, 471:21
**INSTRUMENTAL** [1] - 473:5
**INSURANCE** [1] - 513:11
**INSURED** [2] - 513:13, 513:14
**INTELLIGENT** [1] - 470:6
**INTEND** [1] - 551:20
**INTENDS** [1] - 548:2
**INTENSIVE** [1] - 552:13
**INTENTIONS** [1] - 502:19
**INTERNALLY** [1] - 475:25
**INTERVIEW** [3] - 476:19, 480:9, 480:16
**INTERVIEWED** [1] - 475:21
**INTERVIEWS** [1] - 498:21
**INTRODUCED** [1] - 501:3
**INVALUABLE** [4] - 497:9, 497:12, 497:17, 499:8
**INVESTIGATION** [4] - 475:23, 475:24, 511:1, 515:17
**INVESTIGATION** [1] - 514:25
**INVESTIGATORS** [3] - 476:20, 478:13, 498:21
**INVESTMENT** [2] - 527:18, 539:16
**INVOICE** [4] - 474:2, 474:13, 496:6
**INVOICES** [6] -

473:23, 473:24, 473:25, 499:12, 499:16, 499:21
**INVOLVED** [5] - 477:14, 477:18, 493:21, 493:24, 545:15
**INVOLVEMENT** [1] - 480:25
**IRRELEVANT** [4] - 546:5, 550:16, 552:15, 553:13
**ISSUE** [16] - 516:15, 516:22, 516:23, 517:6, 517:7, 530:2, 546:3, 547:7, 550:5, 552:10, 552:23, 553:1, 553:3, 553:6
**ISSUES** [2] - 510:16, 550:20
**ITEM** [3] - 520:20, 540:12, 549:20
**ITEMS** [3] - 485:20, 520:22, 546:8
**ITSELF** [2] - 492:3, 551:24

# J

**JACKSON** [1] - 547:25
**JAMES** [1] - 513:9
**JANUARY** [2] - 523:12, 524:13
**JERSEY** [4] - 474:16, 474:18, 496:7, 529:7
**JOB** [8] - 472:22, 483:17, 483:19, 484:13, 484:15, 488:10, 515:3, 552:6
**JOINING** [1] - 515:5
**JOYS** [1] - 488:10
**JULY** [2] - 549:24, 552:19
**JULY** [1] - 467:1
**JUNE** [2] - 495:15, 549:23
**JUNIOR** [1] - 501:12
**JURORS** [3] - 545:15, 545:20, 545:24
**JURY** [24] - 467:5, 467:6, 468:25, 469:1, 469:2, 520:8, 520:20, 521:9, 523:3, 529:5, 541:16, 542:2, 546:1, 546:2, 550:13, 550:18, 551:19, 551:20, 552:7, 552:8, 552:10, 552:13,

552:23, 553:21

# K

**KEEP** [1] - 545:17
**KIGAM** [35] - 480:3, 480:21, 481:5, 484:19, 484:24, 484:25, 485:1, 490:18, 490:23, 491:16, 492:5, 492:6, 492:11, 492:16, 492:22, 493:4, 493:16, 493:22, 496:10, 506:5, 506:10, 506:18, 506:24, 507:3, 507:5, 507:17, 509:21, 509:25, 510:2, 510:4, 512:16, 527:8, 527:9, 549:9
**KIND** [4] - 470:3, 480:3, 483:1, 527:17
**KINDS** [1] - 508:17
**KINEMETRICS** [19] - 481:18, 519:17, 520:13, 521:3, 521:7, 521:11, 521:19, 522:22, 523:12, 525:7, 525:12, 525:16, 542:4, 543:2, 543:12, 543:22, 544:9, 544:19, 545:6
**KINGDOM** [1] - 501:3
**KMI** [6] - 480:23, 481:1, 481:3, 481:5, 481:7, 481:14
**KMI'S** [2] - 481:15, 481:20
**KMT** [1] - 508:4
**KNOWLEDGE** [5] - 507:18, 515:23, 527:19, 527:21, 549:12
**KNOWLEDGEABLE** [1] - 470:6
**KNOWN** [5] - 491:13, 491:14, 510:17, 514:25, 515:15
**KOREA** [36] - 472:5, 472:24, 476:21, 483:13, 483:16, 484:16, 484:20, 486:4, 486:12, 486:13, 486:16, 487:12, 488:14, 490:10, 490:16, 490:25, 491:3,

497:6, 497:17,
506:17, 507:11,
507:21, 507:23,
508:7, 508:16,
509:5, 509:18,
509:22, 512:13,
527:4, 546:6, 549:4,
549:14, 550:21,
551:13
KOREAN [5] - 487:23,
497:9, 551:4,
551:21, 551:22
KOURY [38] - 467:8,
467:10, 467:13,
467:18, 469:6,
469:15, 479:21,
488:23, 489:1,
489:3, 489:11,
494:7, 494:11,
494:14, 494:17,
494:22, 495:10,
495:13, 495:19,
495:20, 498:10,
499:10, 499:19,
501:7, 502:25,
504:20, 504:23,
505:10, 505:15,
505:17, 506:11,
506:19, 507:8,
509:12, 511:12,
512:2, 512:4, 512:19
KOURY [4] - 503:8,
504:15, 506:4, 510:6
KPMG [1] - 515:8
KUMAR [48] - 467:20,
468:1, 468:4, 468:8,
512:24, 513:4,
513:6, 514:3,
514:14, 514:20,
516:1, 517:4,
517:13, 517:15,
518:5, 518:6,
519:22, 520:4,
521:23, 522:5,
522:10, 522:17,
523:19, 524:1,
525:22, 526:3,
527:24, 528:6,
529:23, 530:12,
530:14, 530:15,
531:6, 531:7,
531:14, 531:19,
535:19, 540:2,
540:4, 545:11,
546:14, 546:25,
547:13, 547:16,
548:1, 549:3,
553:16, 553:19

**L**

LACKS [1] - 550:17
LADIES [2] - 513:22,
545:12
LANGUAGE [5] -
553:11, 553:12,
553:13, 553:17
LARGE [2] - 482:21,
483:7
LARGER [1] - 490:23
LAST [6] - 510:18,
511:1, 512:5,
522:24, 530:24,
535:13
LAW [1] - 475:21
LAW [4] - 512:10,
550:13, 552:7,
552:15
LAWYER [4] - 476:1,
476:2, 476:4, 476:5
LAWYERS [3] -
468:10, 476:6,
512:11
LAY [1] - 506:21
LEARNED [1] - 510:25
LEAST [8] - 513:12,
543:1, 543:11,
543:21, 544:7,
544:8, 544:20, 545:5
LEAVE [2] - 548:13,
553:7
LEAVING [1] - 502:14
LECTURING [1] -
489:20
LEE [2] - 529:7,
547:25
LEFT [11] - 469:21,
473:2, 474:14,
494:8, 496:23,
518:11, 526:5,
533:20, 535:10,
540:5, 544:13
LEFT-HAND [3] -
518:11, 533:20,
535:10
LEGAL [4] - 549:8,
549:14, 551:3, 551:6
LESS [4] - 472:25,
481:18, 481:19,
496:14
LIFE [2] - 510:16,
510:17
LIKEWISE [1] - 552:4
LIMINE [3] - 516:24,
517:10, 546:13
LIMIT [2] - 470:2,
470:7
LIMITED [1] - 522:8
LINDSAY [2] - 514:3,

514:12
LINDSAY [2] - 514:12,
514:17
LINE [11] - 495:17,
495:21, 496:20,
504:7, 520:20,
534:4, 534:18,
535:24, 538:12,
540:12, 541:6
LINE [1] - 520:21
LINES [2] - 474:12,
532:15
LINEUP [1] - 547:14
LIST [3] - 520:10,
548:7, 548:16
LISTED [7] - 518:14,
520:20, 521:7,
529:6, 540:8,
542:13, 548:22
LIVE [1] - 474:18
LIVES [2] - 488:9,
488:11
LOCALLY [1] - 482:13
LOCATION [2] -
533:1, 536:17
LODGING [1] - 474:22
LOGISTICAL [1] -
497:5
LOGO [1] - 479:23
LOOK [13] - 510:24,
518:18, 528:8,
530:24, 531:20,
532:23, 534:17,
537:23, 538:21,
540:12, 543:3,
544:22
LOOKED [7] - 503:19,
511:7, 532:2, 535:7,
538:3, 538:22,
542:24
LOOKING [4] -
480:20, 480:21,
495:14, 539:22
LOS [1] - 467:2
LOSE [1] - 478:16
LOST [2] - 478:17,
553:4
LOUNGE [1] - 468:12
LOW [2] - 482:22,
489:20
LOW-COST [1] -
489:20
LYNCH [24] - 526:17,
526:21, 526:23,
527:11, 527:13,
528:12, 529:16,
530:20, 531:12,
532:9, 533:9, 534:1,
534:11, 534:15,
535:21, 536:1,

537:3, 537:12,
538:11, 538:15,
539:3, 539:10,
540:23, 541:24

**M**

MAIL [10] - 479:4,
491:6, 495:14,
495:15, 496:5,
503:20, 503:21,
503:23, 511:4, 511:7
MAILED [2] - 474:7,
474:8
MAILING [1] - 474:16
MAILS [5] - 477:16,
477:25, 478:1,
505:6, 511:19
MAIN [1] - 484:13
MAINTAINING [2] -
492:7, 497:17
MAINTENANCE [2] -
486:14, 508:15
MAN [1] - 470:6
MANAGEMENT [2] -
473:25, 515:9
MANAGER [2] -
499:23, 499:24
MANIPULATE [2] -
477:3, 478:9
MANNER [1] - 498:2
MANUFACTURED [1]
- 484:16
MARCH [1] - 534:21
MARGIN [1] - 508:23
MARKED [3] - 513:18,
515:24, 522:11
MARKET [5] - 497:9,
497:14, 505:12,
505:25, 507:16
MARKUP [4] - 491:20,
491:24, 492:2, 493:7
MASSAGES [2] -
546:9, 546:11
MASTER [1] - 520:10
MASTER'S [1] -
515:13
MATCH [1] - 540:8
MATHEMATICS [1] -
515:12
MEAN [8] - 470:2,
480:7, 480:19,
483:14, 486:18,
489:19, 496:13,
553:21
MEET [1] - 483:19
MEETING [4] - 475:5,
476:3, 476:5, 502:21
MEMBERS [1] -
545:15

MEMO [5] - 534:4,
535:24, 538:12,
541:6, 541:20
MEMORY [2] - 471:5,
553:9
MENTION [1] - 479:15
MENTIONED [5] -
479:5, 480:24,
481:4, 489:4, 489:15
MENTIONING [1] -
479:12
MENTIONS [2] -
477:25, 478:1
MERELY [2] - 550:17,
552:8
MERRILL [24] -
526:17, 526:21,
526:23, 527:11,
527:13, 528:12,
529:16, 530:20,
531:12, 532:9,
533:9, 534:1,
534:11, 534:15,
535:21, 536:1,
537:3, 537:12,
538:11, 538:15,
539:3, 539:10,
540:23, 541:24
MEXICO [1] - 482:7
MICROPHONE [2] -
469:8, 535:17
MIGHT [6] - 481:21,
482:21, 483:4,
491:20, 510:14,
517:23
MIKE [3] - 471:19,
471:25, 472:2
MILLION [2] - 473:3,
523:11
MIND [3] - 476:11,
476:17, 545:17
MINE [1] - 488:3
MINERAL [1] - 527:5
MINUTE [3] - 468:18,
500:20, 538:21
MINUTES [5] - 468:16,
479:4, 491:6,
547:16, 547:21
MISCHARACTERIZE
S [1] - 504:23
MISCHIEVOUS [1] -
502:19
MISLEAD [1] - 550:17
MODIFICATIONS [1] -
547:11
MOMENT [3] - 467:6,
494:7, 530:3
MONDAY [1] - 503:22
MONEY [1] - 497:20
MOREOVER [1] -

550:15
**MORNING** [2] - 545:9, 547:8
**MOST** [2] - 483:2, 490:20
**MOTION** [3] - 516:24, 517:10, 546:13
**MOTIVATING** [1] - 488:16
**MOVE** [10] - 494:23, 516:2, 519:23, 521:24, 522:11, 523:20, 525:23, 527:25, 529:24, 531:14
**MR** [68] - 467:8, 467:10, 467:13, 467:18, 469:6, 469:15, 479:17, 479:21, 488:18, 488:23, 489:1, 489:3, 489:8, 489:11, 494:7, 494:11, 494:14, 494:17, 494:22, 495:2, 495:5, 495:10, 495:13, 495:19, 495:20, 498:8, 498:10, 499:10, 499:17, 499:19, 501:7, 502:25, 503:3, 503:6, 503:16, 503:18, 504:20, 504:21, 504:23, 505:7, 505:10, 505:11, 505:15, 505:17, 505:22, 506:11, 506:14, 506:19, 506:22, 507:8, 507:13, 509:12, 509:16, 511:10, 511:12, 511:16, 511:18, 511:25, 512:2, 512:4, 512:19, 512:21, 525:22, 550:4, 550:7, 552:21, 553:2, 553:23
**MS** [68] - 467:20, 468:1, 468:4, 468:8, 468:11, 468:14, 468:19, 468:22, 494:13, 512:24, 513:4, 513:6, 514:3, 514:14, 514:20, 516:1, 516:5, 516:7, 516:12, 516:16, 516:20, 516:22,

516:24, 517:4, 517:13, 517:15, 518:5, 518:6, 519:22, 520:4, 521:23, 522:5, 522:10, 522:17, 523:19, 524:1, 526:3, 527:24, 528:6, 529:23, 530:1, 530:6, 530:12, 530:14, 530:15, 531:6, 531:7, 531:14, 531:19, 535:19, 540:2, 540:4, 545:11, 546:4, 546:10, 546:14, 546:17, 546:25, 547:5, 547:13, 547:16, 547:20, 548:1, 548:10, 548:25, 549:3, 553:16, 553:19
**MULTIPLE** [2] - 489:24, 498:20
**MUST** [2] - 551:25, 552:9

# N

**NAIVE** [1] - 502:18
**NAME** [13] - 508:3, 514:11, 515:21, 518:12, 518:14, 521:18, 527:15, 528:14, 529:6, 533:20, 534:9
**NAMES** [2] - 508:1, 508:2
**NATALIE** [1] - 469:12
**NECESSARILY** [2] - 472:2, 486:19
**NECESSARY** [2] - 492:12, 507:22
**NEED** [6] - 474:12, 483:1, 485:14, 487:24, 493:12, 547:12
**NEEDED** [2] - 483:17, 483:23
**NEEDS** [1] - 487:21
**NEGOTIATED** [1] - 492:13
**NEVER** [2] - 480:25, 498:15
**NEW** [7] - 474:16, 474:18, 496:7, 529:7, 531:12, 538:16, 541:24
**NEW** [3] - 482:20,

487:21, 501:5
**NEXT** [4] - 512:23, 514:2, 548:20, 548:21
**NINE** [1] - 532:12
**NINETEEN** [1] - 523:6
**NOON** [1] - 548:11
**NORMALLY** [1] - 477:8
**NORTH** [1] - 515:14
**NOTE** [2] - 519:13, 522:7
**NOTED** [2] - 520:17, 534:4
**NOTHING** [6] - 502:25, 511:25, 512:19, 514:8, 516:9, 551:22
**NOTIFIED** [4] - 485:11, 485:14, 486:10, 516:14
**NOTIFY** [3] - 501:8, 502:5, 502:9
**NOVEMBER** [6] - 492:13, 492:17, 492:19, 493:2, 523:13, 541:17
**NUMBER** [11] - 473:4, 517:22, 518:19, 518:20, 520:21, 522:25, 528:17, 528:23, 530:25, 536:9, 540:16
**NUMBER** [1] - 520:21
**NUMBERS** [1] - 491:10

# O

**O'CLOCK** [2] - 467:11, 545:21
**OBJECT** [10] - 504:23, 505:10, 505:15, 506:11, 506:19, 507:8, 509:12, 516:8, 549:10, 549:15
**OBJECTION** [16] - 479:17, 488:18, 489:8, 489:9, 494:25, 495:5, 498:8, 499:17, 504:20, 504:25, 505:16, 506:13, 506:20, 511:15, 530:7, 549:17
**OBJECTIONS** [2] - 505:19, 516:10
**OBLIGATION** [2] - 492:16, 493:1

**OBVIATES** [1] - 548:3
**OBVIOUSLY** [1] - 549:11
**OCCASION** [1] - 515:16
**OCCASIONALLY** [3] - 474:20, 475:2, 494:1
**OCCASIONS** [9] - 477:20, 485:11, 485:25, 486:9, 486:11, 487:11, 487:12, 487:14, 487:16
**OFF-THE-RECORD** [2] - 494:10, 530:5
**OFFER** [1] - 552:19
**OFFICE** [1] - 475:21
**OFFICES** [1] - 468:6
**OFFICIAL** [7] - 481:4, 498:13, 549:9, 550:23, 550:25, 552:2, 552:3
**OFFICIAL'S** [1] - 552:11
**OFTEN** [11] - 475:11, 475:16, 475:17, 481:6, 481:8, 482:16, 484:4, 484:9, 498:1, 498:5
**ONCE** [1] - 484:15
**ONE** [33] - 471:4, 471:16, 478:9, 479:5, 480:8, 482:7, 482:12, 482:19, 483:11, 488:6, 488:10, 490:5, 491:3, 492:22, 493:2, 493:6, 499:13, 499:25, 508:1, 511:16, 516:18, 517:2, 520:5, 530:3, 538:21, 539:9, 539:15, 546:17, 547:3, 552:22
**ONES** [2] - 536:25, 538:2
**OPEN** [8] - 478:16, 478:17, 485:6, 491:13, 496:15, 499:6, 514:1, 545:17
**OPENING** [4] - 528:12, 529:3, 537:12, 549:5
**OPERATED** [1] - 483:12
**OPINION** [1] - 502:22
**OPINIONS** [2] - 550:12, 552:18
**OPPOSITION** [2] -

549:25, 550:11
**OPTIMISTICALLY** [1] - 467:10
**OPTIONS** [2] - 484:5, 484:8
**ORDER** [13] - 472:7, 474:10, 474:11, 484:1, 485:23, 487:24, 520:22, 534:1, 535:21, 538:10, 548:18, 548:19, 551:25
**ORDERED** [1] - 507:3
**ORDINARY** [2] - 471:10, 471:13
**ORGANIZATION** [1] - 491:11
**ORIGINAL** [1] - 547:12
**ORIGINATED** [1] - 525:11
**OTHERWISE** [3] - 549:8, 549:14, 550:2
**OUTSIDE** [1] - 510:13
**OVERRULED** [8] - 479:18, 489:9, 504:25, 505:16, 505:19, 506:13, 507:10, 509:13
**OWN** [2] - 500:14, 512:11

# P

**P.M** [1] - 553:24
**P.M** [1] - 467:1
**PAGE** [21] - 517:17, 518:3, 521:3, 522:25, 528:8, 529:2, 529:8, 531:1, 533:5, 533:16, 535:4, 536:14, 536:16, 536:20, 537:23, 539:8, 539:18, 539:24, 540:21, 547:3
**PAGES** [5] - 527:22, 546:15, 546:19, 546:20, 546:21
**PAID** [14] - 471:6, 471:14, 471:17, 471:21, 471:24, 471:25, 472:5, 472:13, 473:8, 474:11, 507:7, 508:20, 534:1, 538:10
**PARDON** [1] - 494:20
**PARENTHESES** [3] - 534:8, 538:13, 541:7

**PART** [8] - 474:24, 477:20, 484:13, 484:21, 500:7, 503:24, 529:3, 548:16

**PARTICULAR** [12] - 483:17, 483:23, 491:4, 491:5, 496:19, 515:20, 521:4, 523:1, 528:20, 532:24, 534:13, 539:19

**PARTICULARLY** [1] - 497:16

**PARTIES** [5] - 467:21, 467:22, 513:6, 513:15, 513:17

**PARTIES'** [6] - 516:2, 519:23, 521:24, 522:12, 523:20, 527:25

**PARTS** [2] - 485:23, 486:1

**PASSED** [1] - 474:4

**PASSION** [2] - 488:3, 488:5

**PAY** [8] - 472:7, 474:1, 475:2, 475:11, 487:14, 497:23, 499:12, 535:21

**PAYING** [5] - 486:24, 487:2, 487:5, 490:5, 496:11

**PAYMENT** [5] - 499:15, 504:12, 526:10, 526:11, 552:1

**PAYMENTS** [4] - 500:2, 502:18, 503:8, 503:12

**PC** [3] - 479:13, 479:15, 479:23

**PC-BASED** [2] - 479:13, 479:15

**PEARCE** [1] - 469:12

**PEARCE** [6] - 469:16, 494:19, 495:14, 503:7, 503:19, 506:7

**PEARCE'S** [1] - 467:21

**PEOPLE** [15] - 469:20, 472:13, 472:21, 474:1, 474:20, 474:25, 475:15, 484:14, 486:11, 490:16, 492:12, 502:1, 510:22, 545:15, 548:17

**PEOPLE'S** [1] - 488:11

**PER** [8] - 471:6, 471:14, 471:21, 472:5, 472:13, 516:2, 516:7, 522:12

**PERCENT** [6] - 525:3, 525:13, 525:17, 526:24, 542:5, 542:6

**PERCENTAGE** [5] - 524:25, 525:10, 525:14, 526:20, 542:2

**PERCIPIENT** [1] - 549:12

**PERFORMING** [1] - 550:24

**PERHAPS** [1] - 494:20

**PERIOD** [3] - 478:7, 502:2, 503:12

**PERMIT** [1] - 552:18

**PERSON** [2] - 480:12, 501:11

**PERSONAL** [1] - 510:20

**PERTAINING** [1] - 516:25

**PETER** [7] - 528:22, 534:8, 534:9, 536:1, 538:14, 541:8, 541:21

**PHONE** [2] - 472:9, 472:10

**PHOTOCOPY** [1] - 468:5

**PHRASE** [3] - 480:8, 480:10, 480:11

**PICKING** [1] - 469:9

**PIE** [2] - 524:3, 524:18

**PIN** [3] - 531:1, 532:24, 537:20

**PLACE** [3] - 475:18, 484:1, 485:7

**PLAINTIFF'S** [2] - 469:13, 514:18

**PLAN** [2] - 467:19, 467:22

**PLANE** [1] - 548:14

**PLANNED** [1] - 548:10

**PLAY** [1] - 480:15

**PLAYS** [1] - 480:14

**PLUGS** [1] - 468:15

**PLUSH** [1] - 468:6

**POCKETS** [1] - 490:9

**POINT** [5] - 473:6, 508:25, 547:21, 548:24, 549:1

**POINTED** [2] - 478:13, 482:24

**POINTS** [1] - 550:21

**POLICY** [1] - 501:5

**PORTION** [5] - 518:5,

524:7, 525:4, 526:5, 539:12

**POSES** [1] - 512:17

**POSITION** [3] - 500:14, 506:8, 553:7

**POSSIBILITY** [1] - 496:15

**POSSIBLE** [4] - 476:20, 477:3, 485:17, 490:12

**POSTED** [6] - 520:23, 532:16, 534:21, 536:7, 537:17, 541:16

**POSTING** [1] - 540:14

**POTENTIALLY** [1] - 512:8

**POTTS** [11] - 467:17, 496:24, 497:16, 497:19, 497:22, 497:25, 498:1, 498:11, 499:22, 512:10, 512:11

**POWER** [2] - 484:5, 484:11

**PRACTICE** [5] - 477:10, 483:9, 551:7, 551:14, 551:17

**PREJUDICIAL** [1] - 549:15

**PREPARATION** [2] - 518:8, 531:4

**PREPARE** [1] - 519:3

**PREPARED** [3] - 520:6, 530:20, 550:2

**PRESENCE** [3] - 467:5, 469:1, 546:1

**PRESENT** [7] - 469:2, 469:3, 471:2, 471:5, 476:2, 513:12, 546:2

**PRESENTED** [1] - 549:22

**PRESUME** [3] - 473:16, 477:8, 487:7

**PRETRIAL** [7] - 516:2, 516:10, 519:24, 521:25, 522:12, 523:21, 528:1

**PRETTY** [1] - 489:18

**PREVIOUS** [1] - 524:21

**PREVIOUSLY** [3] - 471:23, 522:11, 524:10

**PREVIOUSLY** [1] - 469:13

**PRICE** [5] - 482:5, 482:7, 482:17, 482:22, 483:3,

483:4, 483:6, 491:2, 491:3, 491:13, 491:14, 491:15, 491:19, 493:6, 493:11, 493:19

**PRICES** [5] - 481:20, 482:3, 482:9, 482:13, 491:9

**PRICING** [2] - 505:13, 506:1

**PRIMARILY** [1] - 481:24

**PRIMARY** [1] - 539:12

**PRINTERS** [1] - 468:19

**PRINTOUT** [1] - 530:19

**PRIVATE** [3] - 491:7, 551:3, 551:5

**PRO** [1] - 552:3

**PROBLEM** [9] - 468:12, 485:12, 485:13, 500:9, 501:9, 512:17, 546:24, 547:5

**PROBLEMS** [2] - 485:14, 508:10

**PROCEED** [2] - 469:4, 469:11

**PROCESS** [10] - 491:9, 510:19, 510:25, 521:6, 522:21, 522:23, 529:17, 530:17, 530:21, 531:24

**PRODUCT** [12] - 471:17, 482:6, 482:21, 486:3, 486:10, 486:12, 486:16, 491:20, 492:17, 493:7, 509:18, 509:22

**PRODUCTS** [29] - 470:5, 471:17, 477:11, 478:18, 478:24, 479:2, 479:6, 479:9, 479:13, 481:6, 481:7, 481:8, 481:9, 481:14, 481:17, 481:18, 481:20, 481:23, 482:1, 483:12, 485:23, 487:13, 490:19, 491:2, 492:5, 493:16, 507:1, 507:3, 508:14

**PROFESSIONALS** [1] - 510:22

**PROFESSOR** [6] -

549:22, 550:11, 550:15, 551:11, 551:17, 552:18

**PROFESSORS** [2] - 551:15, 551:18

**PROFFER** [2] - 549:22, 549:23

**PROFFERED** [2] - 550:12, 552:18

**PROGRAM** [1] - 485:17

**PROGRAMMERS** [1] - 471:24

**PROGRAMS** [1] - 471:14

**PROJECT** [7] - 472:16, 482:4, 482:20, 482:25, 496:16, 496:18

**PROJECTS** [3] - 477:24, 491:4

**PROMISED** [1] - 552:1

**PROMPTLY** [1] - 545:21

**PROOF** [1] - 552:19

**PROPERLY** [2] - 482:14, 496:4

**PROPOSED** [6] - 550:16, 551:1, 551:8, 551:17, 552:4, 552:8

**PROSECUTOR** [1] - 551:11

**PROVIDE** [5] - 478:22, 478:23, 482:14, 487:20, 497:8

**PROVIDED** [15] - 474:9, 479:1, 480:22, 487:18, 497:12, 499:5, 499:8, 507:14, 507:21, 517:20, 518:2, 520:18, 528:12, 529:13, 537:11

**PROVIDING** [4] - 478:20, 496:24, 551:15, 551:18

**PUBLIC** [3] - 491:10, 515:14, 550:23

**PUBLISH** [1] - 495:8

**PULL** [1] - 511:10

**PURCHASE** [2] - 490:18, 506:16

**PURCHASED** [2] - 492:6, 506:15

**PURCHASES** [1] - 524:10

**PURCHASING** [1] - 506:23

**UNITED STATES DISTRICT COURT**

**PURE** [3] - 469:24, 470:1, 470:3
**PURSUANT** [4] - 519:23, 521:24, 523:20, 527:25
**PUT** [5] - 491:20, 494:23, 503:16, 508:23, 519:10
**PUTTING** [1] - 497:13

## Q

**QUALIFICATIONS** [1] - 551:12
**QUALIFIED** [1] - 551:12
**QUANTERRA** [20] - 480:25, 481:19, 519:20, 520:13, 521:3, 521:7, 521:11, 521:19, 522:22, 523:12, 525:7, 525:12, 525:16, 542:4, 543:2, 543:12, 543:22, 544:9, 544:19, 545:6
**QUARTERS** [1] - 540:1
**QUESTIONS** [6] - 503:2, 503:7, 507:20, 508:25, 549:11, 549:19
**QUICK** [1] - 489:20
**QUID** [1] - 552:3
**QUITE** [10] - 470:10, 472:18, 473:24, 474:23, 480:6, 488:22, 498:1, 498:2, 553:7, 553:10
**QUO** [1] - 552:3
**QUOTE** [1] - 502:18

## R

**R-O-H** [1] - 549:22
**RAILROAD** [3] - 496:16, 496:18, 496:20
**RAISE** [2] - 498:4, 514:5
**RANGE** [3] - 504:17, 539:19, 539:21
**RATHER** [1] - 551:25
**RAYNOR** [5] - 550:4, 550:7, 552:21, 553:2, 553:23
**REACH** [3] - 542:22, 543:9, 543:19
**REACHED** [1] - 548:2

**READ** [10] - 467:22, 512:25, 517:24, 519:1, 528:14, 530:3, 530:16, 541:6, 553:4, 553:5
**REAL** [1] - 553:10
**REALIZE** [1] - 510:18
**REALLY** [7] - 467:10, 471:12, 472:12, 474:17, 481:15, 530:3, 553:13
**REASON** [6] - 472:11, 484:25, 488:7, 491:5, 494:6, 510:10
**REASONS** [4] - 500:14, 510:20, 550:10, 552:17
**RECEIPT** [1] - 529:15
**RECEIVE** [1] - 507:12
**RECEIVED** [1] - 540:6
**RECEIVED** [33] - 487:13, 495:7, 495:15, 500:17, 509:14, 510:3, 511:19, 513:21, 517:12, 519:10, 519:25, 520:3, 520:12, 522:1, 522:4, 522:13, 522:16, 523:11, 523:22, 523:25, 525:6, 525:24, 526:2, 527:12, 528:2, 528:5, 529:25, 530:8, 530:11, 531:16, 531:18, 545:18, 552:1
**RECEIVES** [1] - 493:7
**RECEIVING** [1] - 509:11
**RECENT** [1] - 511:23
**RECENTLY** [1] - 510:9
**RECOGNIZE** [8] - 517:17, 526:5, 528:9, 529:9, 529:11, 533:6, 537:6, 537:9
**RECOGNIZED** [1] - 551:6
**RECOLLECTION** [6] - 470:19, 472:1, 479:11, 479:19, 479:25, 546:6
**RECOMMENDED** [1] - 506:16
**RECORD** [3] - 494:10, 514:11, 530:5
**RECORDER** [2] - 484:10, 485:13

**RECORDS** [7] - 519:8, 521:21, 526:12, 532:4, 536:17, 539:1, 546:21
**RECROSS** [1] - 512:3
**RECROSS-EXAMINATION** [1] - 512:3
**RED** [2] - 525:4, 525:6
**REDACT** [1] - 546:18
**REDACTION** [1] - 547:11
**REDIRECT** [1] - 503:5
**REDUCE** [1] - 483:6
**REDUCING** [1] - 483:4
**REFER** [2] - 504:7, 504:8
**REFERENCE** [8] - 494:14, 520:21, 520:23, 536:13, 536:16, 546:16, 546:20, 553:17
**REFERENCE** [5] - 521:4, 522:25, 530:25, 532:23, 536:13
**REFERENCED** [1] - 532:20
**REFERENCES** [2] - 517:4, 546:19
**REFERRED** [1] - 527:11
**REFERS** [1] - 509:2
**REFLECT** [1] - 530:17
**REFLECTS** [1] - 502:22
**REFUND** [1] - 542:19
**REFUNDS** [6] - 524:8, 524:9, 524:15, 542:8, 543:7, 544:2
**REGARDING** [10] - 467:23, 542:22, 543:9, 543:20, 544:6, 544:17, 545:4, 546:6, 549:4, 551:17
**REGARDLESS** [2] - 509:21, 510:4
**REGARDS** [1] - 522:22
**REGULARLY** [1] - 495:25
**REGULATIONS** [3] - 477:12, 495:22, 496:1
**REGULATOR** [1] - 477:9
**REJECTED** [1] - 479:16
**RELATED** [1] - 552:23

**RELATES** [1] - 516:16
**RELATIONSHIP** [4] - 472:7, 481:2, 503:13, 504:3
**RELATIONSHIPS** [3] - 472:21, 550:22, 551:5
**RELATIVE** [1] - 486:18
**RELATIVELY** [1] - 473:13
**RELEVANCE** [1] - 498:8
**RELEVANT** [3] - 549:12, 552:7, 552:10
**RELIABLE** [9] - 481:6, 481:8, 481:9, 481:10, 481:12, 481:14, 481:15, 490:11
**REMAIN** [1] - 545:25
**REMAINED** [1] - 491:3
**REMAINING** [5] - 542:6, 542:20, 543:17, 544:3, 545:1
**REMEMBER** [4] - 479:12, 480:9, 486:5, 502:16
**REMIND** [4] - 524:23, 542:2, 545:12, 545:17
**REMOVAL** [1] - 547:11
**REMOVE** [2] - 517:9, 546:14
**REMOVED** [1] - 517:3
**REMUNERATED** [1] - 472:3
**REP** [1] - 468:14
**REPAIR** [7] - 485:14, 485:18, 485:23, 486:1, 486:12, 486:16
**REPAIRED** [2] - 486:4, 486:7
**REPAIRING** [1] - 486:10
**REPAIRS** [2] - 486:5, 486:14
**REPEAT** [6] - 474:23, 483:21, 489:12, 492:15, 500:7, 505:23
**REPHRASE** [1] - 488:19
**REPRESENTATION** [1] - 531:21
**REPRESENTS** [3] - 524:19, 524:20,

526:7
**REQUEST** [2] - 504:8, 504:13
**REQUIRE** [2] - 489:25, 490:3
**REQUIRED** [3] - 473:22, 473:25, 496:1
**REQUIREMENTS** [2] - 477:2, 487:21
**REQUIRES** [1] - 489:23
**RESEARCH** [4] - 506:9, 506:24, 507:5, 511:8
**RESEARCH** [2] - 479:8, 479:24
**RESEARCHERS** [2] - 551:14, 551:18
**RESERVATIONS** [3] - 501:14, 501:17, 501:24
**RESOLVE** [1] - 553:3
**RESOURCES** [1] - 527:5
**RESPECT** [2] - 546:3, 551:8
**RESPONSE** [2] - 494:24, 498:7
**RESPONSIBILITIES** [4] - 480:4, 480:13, 480:17, 480:20
**RESPONSIBILITY** [2] - 492:6, 552:6
**RESULT** [3] - 498:11, 498:17, 498:20
**RETRIEVING** [1] - 548:15
**RETURN** [2] - 534:17, 542:12
**REVELATION** [1] - 511:23
**REVERB** [1] - 535:18
**REVIEW** [10] - 478:11, 515:16, 515:20, 519:12, 521:17, 521:18, 522:6, 523:15, 526:12, 527:12
**REVIEWED** [6] - 515:23, 518:8, 519:6, 520:16, 539:1, 539:9
**RIGHT-HAND** [1] - 518:18
**RISE** [2] - 468:25, 545:24
**RISK** [1] - 489:19
**ROH** [4] - 549:22, 550:11, 551:11,

552:18
**ROH'S** [2] - 550:15, 551:17
**ROLE** [1] - 550:13
**ROLES** [2] - 480:14, 480:15
**ROUGHLY** [2] - 467:13, 473:19
**ROW** [1] - 520:19
**RULE** [2] - 549:18, 550:3
**RULED** [1] - 517:9
**RULING** [4] - 516:7, 549:16, 549:21, 550:9
**RUNNING** [2] - 468:23, 470:4

## S

**SAFETY** [2] - 496:19, 496:21
**SALARY** [1] - 486:24
**SALE** [4] - 493:21, 507:11, 509:18, 510:3
**SALES** [9] - 472:24, 473:2, 473:6, 473:13, 473:18, 473:21, 501:4, 508:6, 509:25
**SALESPERSON** [1] - 481:24
**SAVING** [1] - 488:9
**SAW** [4] - 479:4, 491:6, 524:20, 526:8
**SCHEDULE** [1] - 529:20
**SCHEDULING** [1] - 530:18
**SCIENTIST** [4] - 469:24, 470:1, 470:4
**SCOPE** [5] - 511:13, 549:9, 549:13, 551:10, 552:11
**SCREEN** [3] - 495:10, 495:11, 517:24
**SEATED** [1] - 514:10
**SECOND** [3] - 495:2, 511:11, 551:8
**SEE** [15] - 470:15, 480:20, 491:18, 494:19, 495:17, 495:21, 518:19, 518:23, 532:16, 534:19, 536:7, 539:13, 540:5, 552:20, 553:10
**SEEING** [1] - 470:19
**SEEM** [1] - 510:23

**SEISMIC** [1] - 489:19
**SELECTED** [1] - 478:18
**SELL** [6] - 482:1, 482:6, 482:7, 491:19, 491:21, 493:11
**SELLING** [3] - 477:11, 481:23, 496:12
**SEND** [3] - 474:14, 485:22, 486:15
**SENSOR** [2] - 484:11, 485:12
**SENSORS** [3] - 483:1, 496:18, 496:22
**SENT** [7] - 484:16, 485:24, 486:1, 486:4, 487:12, 492:9, 495:21
**SEPARATELY** [1] - 547:2
**SEPTEMBER** [3] - 475:20, 502:17, 552:15
**SERVICE** [4] - 470:14, 470:17, 487:13, 487:15
**SERVICES** [1] - 491:22
**SERVICING** [1] - 508:18
**SESSION** [1] - 545:25
**SET** [4] - 477:2, 477:6, 477:8, 477:11
**SETS** [1] - 480:13
**SETTING** [3] - 477:14, 477:19, 477:20
**SHALL** [2] - 514:6, 514:7
**SHIPPED** [2] - 472:5, 485:4
**SHORT** [1] - 498:6
**SHORTLY** [1] - 496:23
**SIDE** [3] - 518:18, 533:20, 540:5
**SIGN** [2] - 501:5, 501:6
**SIGNATURE** [12] - 517:20, 517:25, 529:8, 529:9, 529:12, 529:13, 537:6, 537:9, 537:10, 537:11, 538:18, 547:2
**SIGNATURES** [1] - 537:14
**SIGNED** [5] - 468:2, 471:3, 492:18, 513:17, 541:9
**SIGNIFICANT** [4] -

473:21, 486:20, 491:24, 553:10
**SIMILAR** [9] - 522:21, 526:8, 529:17, 530:21, 531:23, 535:7, 536:2, 536:24, 538:2
**SIMILARLY** [1] - 507:14
**SINGLE** [3] - 509:17, 509:18, 510:3
**SIT** [1] - 498:20
**SITUATION** [2] - 483:2, 553:14
**SITUATIONS** [4] - 478:14, 481:10, 481:11, 481:12
**SIX** [1] - 542:13
**SLEEP** [1] - 468:16
**SLIGHTLY** [1] - 510:15
**SLIP** [1] - 533:9, 536:2, 541:12
**SMALL** [5] - 469:18, 473:1, 473:14, 494:20, 542:7
**SMART** [3] - 471:19, 471:25, 472:2
**SO-CALLED** [2] - 509:10, 509:11
**SOFT** [1] - 469:8
**SOLD** [8] - 471:17, 471:21, 491:15, 491:16, 493:16, 493:19, 509:18
**SOLEMNLY** [1] - 514:6
**SOLVES** [1] - 546:23
**SOMEONE** [6] - 477:12, 482:13, 485:18, 500:2, 508:16, 509:2
**SOMETIMES** [3] - 470:10, 482:20, 492:2
**SOMEWHERE** [2] - 485:5, 491:11
**SORRY** [17] - 474:23, 476:13, 476:22, 477:4, 479:25, 480:6, 489:10, 490:22, 492:15, 499:24, 500:7, 505:21, 508:13, 510:13, 528:20, 529:16, 538:21
**SORT** [2] - 474:22, 520:22
**SOUND** [1] - 535:18
**SOUNDS** [3] - 547:6,

548:14, 548:15
**SOURCE** [11] - 524:4, 524:25, 526:9, 542:23, 542:24, 543:10, 543:20, 544:6, 544:17, 545:4
**SOURCE-OF-FUNDS** [1] - 542:24
**SOURCES** [2] - 523:16, 525:18
**SOUTH** [6] - 482:10, 509:5, 550:21, 551:4, 551:13, 551:22
**SPAN** [1] - 527:22
**SPECIFIC** [6] - 516:25, 520:14, 520:15, 531:1, 532:5, 532:24
**SPECIFICALLY** [2] - 535:12, 550:18
**SPECIFICATIONS** [15] - 476:20, 477:2, 477:6, 477:8, 477:11, 477:15, 477:19, 477:21, 478:3, 479:1, 483:18, 483:23, 497:3, 505:13, 506:1
**SPECIFICS** [3] - 516:16, 546:5, 546:8
**SPECULATION** [3] - 499:17, 506:19, 507:9
**SPELL** [1] - 514:11
**SPEND** [1] - 497:20
**SPENT** [1] - 489:19
**SPOKEN** [1] - 467:21
**SPREADSHEET** [2] - 519:11, 530:20
**STABLE** [1] - 482:4
**STAND** [1] - 514:4
**START** [2] - 473:22, 489:1
**STARTED** [4] - 469:18, 469:23, 469:25, 473:12
**STATE** [2] - 514:11, 529:5
**STATEMENT** [6] - 476:21, 502:16, 517:2, 520:17, 539:19, 549:5
**STATEMENTS** [9] - 517:5, 518:8, 519:9, 519:13, 520:25, 529:17, 539:9, 546:12, 547:3
**STATES** [1] - 535:12
**STATION** [1] - 490:6

**STATIONS** [4] - 489:24, 490:3, 490:6, 492:1
**STATUS** [1] - 547:9
**STEEP** [1] - 490:19
**STILL** [2] - 485:7, 486:19
**STIPULATE** [3] - 513:6, 513:15, 546:21
**STIPULATED** [2] - 513:16, 513:23
**STIPULATION** [16] - 467:22, 467:25, 512:25, 513:2, 513:3, 513:4, 513:15, 516:3, 516:10, 519:24, 521:25, 522:12, 523:21, 528:1, 547:24, 548:3
**STORE** [1] - 492:1
**STRAIGHT** [1] - 501:5
**STRICTLY** [1] - 495:22
**STUFF** [2] - 481:20, 486:1
**SUBJECT** [1] - 546:13
**SUBJECTIVE** [1] - 551:2
**SUBMIT** [2] - 474:10, 550:7
**SUBMITTED** [3] - 478:11, 491:10, 491:12
**SUBMITTING** [1] - 473:22
**SUBSET** [2] - 532:1, 532:3
**SUBSTANTIAL** [1] - 496:10
**SUBSTANTIALLY** [3] - 478:21, 481:17, 481:19
**SUBTRACT** [7] - 542:18, 542:25, 543:6, 543:16, 544:1, 544:13, 544:25
**SUCCESSFUL** [1] - 548:16
**SUGGESTION** [2] - 474:4, 546:17
**SUGGESTS** [2] - 480:12, 551:23
**SUITE** [1] - 468:9
**SUPERVISORY** [1] - 513:10
**SUPPLEMENTAL** [2] - 520:17, 553:4
**SUPPLIES** [1] - 484:5

**SUPPLY** [1] - 484:11
**SUPPORT** [3] - 497:12, 508:9, 546:21
**SUPPORTING** [2] - 519:9, 521:1
**SUSTAIN** [1] - 511:14
**SUSTAINED** [3] - 498:9, 499:18, 506:20
**SWEAR** [1] - 514:6
**SWITCH** [2] - 545:7, 545:8
**SWORN** [2] - 469:13, 514:18
**SWORN** [1] - 513:24
**SYSTEM** [9] - 487:23, 487:24, 488:14, 489:5, 489:7, 489:15, 489:17, 490:1, 490:2
**SYSTEMS** [3] - 479:15, 488:9, 489:23
**SYSTEMS** [3] - 471:16, 493:4, 522:8

**T**

**TABLE** [1] - 494:8
**TECHNICAL** [24] - 470:14, 470:17, 470:25, 474:19, 474:25, 478:21, 478:22, 478:23, 479:1, 480:4, 480:23, 482:14, 485:5, 487:13, 487:18, 487:20, 500:9, 504:15, 507:12, 507:21, 508:10, 551:15, 551:18, 551:23
**TEST** [1] - 495:23
**TESTED** [1] - 496:3
**TESTIFIED** [4] - 499:7, 504:19, 504:22, 513:24
**TESTIFIED** [2] - 469:13, 514:18
**TESTIFY** [6] - 513:10, 513:24, 548:23, 550:12, 551:13, 552:18
**TESTIFYING** [1] - 548:17
**TESTIMONIAL** [2] - 513:3, 513:4
**TESTIMONY** [26] - 467:21, 467:23,

504:24, 513:7, 513:25, 514:1, 514:6, 518:9, 520:6, 531:4, 534:10, 548:3, 549:7, 549:21, 550:15, 550:16, 550:19, 551:1, 551:9, 551:10, 551:17, 552:5, 552:8, 552:15
**THE** [108] - 467:6, 467:9, 467:12, 467:15, 467:24, 468:3, 468:6, 468:9, 468:13, 468:18, 468:20, 468:24, 468:25, 469:2, 469:7, 479:18, 479:19, 488:19, 488:22, 488:25, 489:2, 489:9, 489:10, 494:9, 494:21, 494:25, 495:3, 495:6, 495:8, 495:11, 495:12, 495:18, 498:9, 499:9, 499:18, 500:20, 500:23, 500:24, 501:1, 503:1, 503:4, 504:25, 505:3, 505:4, 505:5, 505:16, 505:19, 505:21, 506:13, 506:20, 507:10, 507:11, 509:13, 509:14, 511:14, 512:1, 512:20, 512:22, 513:2, 513:5, 513:22, 514:5, 514:9, 514:10, 514:12, 514:16, 516:4, 516:6, 516:9, 516:14, 516:18, 516:21, 516:23, 517:1, 517:8, 517:14, 519:25, 522:1, 522:13, 523:22, 525:24, 528:2, 529:25, 530:4, 530:8, 531:16, 535:17, 545:8, 545:12, 545:24, 545:25, 546:2, 546:8, 546:11, 547:6, 547:14, 547:18, 547:23, 548:4, 548:20, 549:2, 549:16, 550:6,

550:8, 553:1, 553:3, 553:18, 553:20
**THEMSELVES** [1] - 508:22
**THEREAFTER** [1] - 531:11
**THIRD** [2] - 504:7, 552:4
**THOROUGHLY** [1] - 496:3
**THOUSAND** [3] - 473:14, 473:15
**THOUSANDS** [1] - 527:22
**THREE** [3] - 486:16, 527:18, 540:1
**THREE-QUARTERS** [1] - 540:1
**THREW** [1] - 472:10
**THROUGHOUT** [1] - 500:13
**TILT** [2] - 476:20, 477:3
**TODAY** [4] - 468:2, 534:10, 548:11, 549:21
**TOMORROW** [6] - 468:2, 545:21, 547:14, 548:5, 552:20, 553:20
**TONE** [1] - 498:5
**TONIGHT** [1] - 548:19
**TOOK** [3] - 474:6, 492:6, 519:8
**TOP** [4] - 491:20, 518:5, 528:8, 529:2
**TOPICS** [2] - 545:7, 545:8
**TOTAL** [12] - 521:13, 523:7, 523:9, 524:15, 525:8, 525:10, 525:14, 527:1, 532:10, 532:13, 543:4, 547:22
**TOUCH** [1] - 548:13
**TOWN** [2] - 474:21, 475:3
**TRACK** [1] - 553:4
**TRAINING** [3] - 500:18, 501:2, 510:24
**TRANSACTION** [4] - 520:10, 520:24, 521:4
**TRANSACTIONS** [7] - 519:10, 520:15, 520:16, 521:7, 529:20, 530:18, 532:5

**TRANSCRIPT** [1] - 477:5
**TRANSFERS** [9] - 519:14, 519:16, 519:19, 521:10, 521:14, 522:7, 523:11, 527:4, 527:8
**TRANSGENDER** [1] - 510:17
**TRANSPORTATION** [1] - 474:21
**TRAVEL** [2] - 475:18, 481:25
**TRAVELED** [1] - 475:10
**TRAVELING** [3] - 475:13, 475:15, 489:19
**TREAT** [1] - 513:25
**TREATED** [1] - 513:7
**TRIAL** [4] - 513:7, 513:9, 513:16, 545:15
**TRIED** [3] - 481:25, 499:6, 501:6
**TROUBLESHOOTIN G** [1] - 492:7
**TRUE** [15] - 478:24, 478:25, 479:3, 482:15, 483:10, 484:2, 484:18, 487:19, 488:1, 489:18, 489:24, 491:11, 496:12, 499:22, 500:11
**TRUTH** [3] - 514:7, 514:8
**TURKEY** [1] - 472:16
**TURN** [5] - 533:16, 536:5, 539:7, 539:18, 539:24
**TURNING** [1] - 540:11
**TWELVE** [1] - 521:12
**TWO** [12] - 480:3, 480:8, 480:12, 480:14, 480:15, 482:18, 486:22, 488:7, 506:5, 512:5, 521:14
**TYPE** [2] - 474:13, 486:6
**TYPICALLY** [1] - 477:13

**U**

**U.K** [2] - 475:1, 486:5
**U.S** [1] - 482:10
**UNBELIEVABLE** [1] - 468:22

**UNCOMFORTABLE** [1] - 510:20
**UNCOMMON** [2] - 482:11, 483:10
**UNDER** [4] - 524:16, 529:6, 546:7, 551:21
**UNDERLYING** [3] - 536:21, 537:24, 539:1
**UNDERSTOOD** [2] - 472:23, 510:25
**UNIT** [3] - 471:15, 472:5, 472:13
**UNITED** [1] - 501:3
**UNIVERSITY** [1] - 515:13
**UNLESS** [1] - 490:8
**UNRESOLVED** [1] - 552:23
**UNSURE** [1] - 501:6
**UP** [12] - 469:9, 485:4, 485:6, 485:7, 494:23, 503:16, 511:10, 518:5, 530:14, 540:2, 545:9, 547:12
**UPCOMING** [3] - 487:21, 505:12, 505:25
**UPPER** [3] - 518:11, 535:9, 539:12
**UPSET** [7] - 472:4, 472:6, 472:9, 472:11, 478:15, 478:18, 497:25
**USER** [4] - 477:12, 491:21, 496:2, 496:14
**USERS** [2] - 490:20
**USGS** [2] - 479:9, 479:16

**V**

**VACUUM** [1] - 549:18
**VAGUE** [1] - 506:12
**VALUE** [7] - 542:14, 542:20, 543:4, 543:14, 543:17, 543:24, 544:11
**VARIABLES** [1] - 484:8
**VARIES** [1] - 482:5
**VARIETY** [3] - 470:7, 477:25, 549:5
**VARY** [1] - 482:3
**VERSUS** [3] - 478:10, 494:5, 509:24
**VIEWED** [2] - 480:17, 480:19

**VIEWPOINT** [1] - 512:7

**VIEWS** [2] - 545:19, 551:13

**VIOLATED** [1] - 552:16

**VIRTUE** [1] - 496:9

**VISIT** [1] - 475:1

**VISUALLY** [2] - 524:3, 526:9

**VOICE** [2] - 469:8, 498:4

**VOLUME** [1] - 553:24

**VOLUME** [1] - 467:3

## W

**WAIT** [3] - 468:1, 468:18, 500:20

**WAITING** [1] - 494:24

**WARNING** [10] - 487:23, 488:3, 488:8, 488:14, 489:5, 489:6, 489:15, 489:17, 489:20, 489:23

**WARRANTY** [2] - 483:12, 483:14

**WAS** [1] - 514:18

**WEARING** [2] - 506:5

**WEDNESDAY** [1] - 467:1

**WEEK** [2] - 470:10, 486:22

**WEEKS** [1] - 486:22

**WEST** [3] - 518:16, 521:21, 533:24

**WHISTLE** [1] - 502:8

**WHISTLE-BLOWING** [1] - 502:8

**WHOLE** [3] - 476:15, 504:17, 514:8

**WIDE** [2] - 470:7, 484:7

**WIND** [1] - 485:4

**WIRE** [14] - 519:9, 519:13, 519:16, 519:19, 520:17, 521:1, 521:2, 521:9, 521:13, 522:7, 523:1, 523:11, 527:4, 527:8

**WIRES** [12] - 520:12, 521:12, 522:19, 523:3, 523:6, 523:7, 523:8, 524:20, 525:1, 525:6, 525:8, 525:15

**WISH** [2] - 490:13, 550:1

**WITHDRAW** [1] - 530:7

**WITNESS** [12] - 469:5, 495:9, 512:1, 512:20, 512:23, 513:9, 513:24, 514:2, 514:15, 547:24, 548:16, 548:22

**WITNESS** [15] - 469:13, 479:19, 488:22, 489:10, 495:12, 500:23, 501:1, 505:3, 505:5, 505:21, 507:11, 509:14, 514:9, 514:12, 514:18

**WITNESS'S** [2] - 552:4, 552:14

**WITNESSES** [5] - 547:25, 548:2, 548:6, 549:4, 549:7

**WORD** [1] - 502:20

**WORDS** [3] - 478:9, 498:13, 552:2

**WORE** [1] - 480:3

**WORLD** [4] - 481:25, 482:1, 485:4, 489:20

**WORTH** [1] - 497:20

**WRITING** [1] - 511:8

**WRITTEN** [8] - 477:16, 526:16, 526:21, 526:23, 532:7, 535:16, 535:20, 537:3

**WRITTEN** [1] - 518:22

**WROTE** [1] - 511:4

## Y

**YEAR** [7] - 473:3, 473:11, 476:11, 510:19, 511:4

**YEARS** [8] - 473:9, 473:19, 481:22, 481:24, 489:19, 508:19, 511:1, 512:5

**YORK** [3] - 531:12, 538:16, 541:24

**YOURSELF** [1] - 498:23

## Z

**Z-I-M-M-E-R-M-A-N** [1] - 514:13

**ZIMMERMAN** [36] - 514:3, 514:12, 514:21, 515:16, 517:16, 518:7,

519:3, 520:5, 522:6, 522:18, 523:10, 524:2, 525:14, 526:4, 528:7, 529:15, 530:16, 531:20, 533:6, 533:18, 534:19, 536:2, 537:6, 537:16, 537:25, 538:20, 540:3, 540:22, 541:11, 541:22, 542:1, 542:10, 543:13, 544:10, 545:7, 547:15

**ZIMMERMAN** [1] - 514:17