1       **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**            )
                                             )
6                       **Plaintiff,**       )
                                             )
7           **vs.**                          )   **Case No. CR 16-824 JFW**
                                             )
8   **HEON-CHEOL CHI,**                       )        **VOLUME 8**
                                             )   **(Pages 857 - 931)**
9                       **Defendant.**        )
    ─────────────────────────────────        )

10

11

12                     **REPORTER'S TRANSCRIPT OF**
                          **TRIAL DAY 4**
13                   **FRIDAY, JULY 14, 2017**
                          **12:20 P.M.**
14                  **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22   _____

23        **MYRA L. PONCE, CSR 11544, RPR, RMR, RDR, CRR**
                 FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, SUITE 4455
                 LOS ANGELES, CALIFORNIA 90012
25                  MYRAPONCE@SBCGLOBAL.NET

**UNITED STATES DISTRICT COURT**

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         SANDRA R. BROWN
          Acting United States Attorney
5         BY:  POONAM KUMAR
               Assistant United States Attorney
6         312 North Spring Street
          Los Angeles, California  90012
7
          DEPARTMENT OF JUSTICE
8         BY:  DAVID M. FUHR
          BY:  ANNA G. KAMINSKA
9              Assistant United States Attorneys
          1400 New York Avenue NW
10        Washington, DC  20005

11

12   **FOR THE DEFENDANT:**

13        LAW OFFICES OF JOEL C. KOURY
          BY:  JOEL C. KOURY
14             Attorney at law
          3435 Ocean Park Boulevard, Suite 107-50
15        Santa Monica, California  90405

16        KAYE MCLANE BEDNARSKI & LITT, LLP
          BY:  MARILYN E. BEDNARSKI
17        BY:  KEVIN J. LAHUE
               Attorneys at Law
18        234 East Colorado Boulevard, Suite 230
          Pasadena, California  91101
19
          LAW OFFICES OF RICHARD W. RAYNOR
20        BY:  RICHARD W. RAYNOR
               Attorney at Law
21        800 South Pacific Coast Highway, Suite 8-284
          Redondo Beach, California  90277
22

23
     **ALSO PRESENT:**
24
          JULIE WAGNER, Certified Korean Interpreter
25        AGNES WOO, Certified Korean Interpreter


                    **UNITED STATES DISTRICT COURT**

1              **FRIDAY, JULY 14, 2017; 12:20 P.M.**

2                **LOS ANGELES, CALIFORNIA**

3                     **VOLUME 8**

4                         **---**

5         (Out of the presence of the jury:)

6         THE COURT:  All right.  The jury is on the way in.

7         I've provided counsel with a copy of the jury

8    instructions and the verdict form.

9         One of the things that I'm going to caution counsel

10   during the closing argument, do not suggest to the jury that

11   they have a transcript of the trial that's available to them to

12   read.  The first question we'll get back is they want

13   everything read back.

14        MR. RAYNOR:  Your Honor, can we make the Rule 29 --

15        THE COURT:  Yes.  I'm sorry?

16        MR. RAYNOR:  Can we make the Rule 29 -- we'd like to

17   make our Rule 29.

18        THE COURT:  It's preserved.  Your colleague used up

19   all your time.  I'll hear it after the argument.

20        Come on in, Shannon.

21        (In the presence of the jury:)

22        THE COURT:  All right.  Welcome back, ladies and

23   gentlemen.  Now that the evidence has concluded, we will hear

24   the closing arguments of counsel.

25        The Government may proceed.

1          MS. KAMINSKA:  Good morning.

2          The defendant, Heon-Cheol Chi, pocketed over a

3  million dollars in bribes in exchange for helping two private

4  companies make sales in South Korea.  And in the process, he

5  abused his official position in Korea, and he abused the U.S.

6  financial system where he funneled those illegal proceeds.

7          The defendant's very first job was as a researcher

8  at KIGAM in Korea where he also held the position of director

9  at the Earthquake Research Center.  And that's where he held

10  the public's trust.  But the defendant, who was motivated by

11  greed and self-enrichment, then took on a separate secret role

12  where he gave business advantages to two companies, Guralp and

13  Kinemetrics, in exchange for payment.

14          And in that capacity, the defendant used his

15  official position to, first, purchase and recommend those

16  companies' products both to KIGAM and other customers in Korea;

17  and second, gave those companies inside information about the

18  testing of their products and about the bidding process in a

19  way that gave them a competitive edge in Korea.

20          And in return, the defendant demanded and received

21  payment for that assistance into a personal bank account here

22  in California far away from where he lived and worked in Korea

23  and unknown to his colleagues, as you just witnessed.

24          Then he moved that money into an investment account

25  in New York.  And worst of all, while he was doing it, he knew

**UNITED STATES DISTRICT COURT**

1    that it was wrong.  In fact, he thought it was illegal.  He

2    said it repeatedly and he said it in e-mails and he said it in

3    person.

4           Ladies and gentlemen, you've heard a lot of evidence

5    over the last several days.  You've seen documents, and you

6    heard from witnesses.  And you're about to receive the Court's

7    instructions as to the law in this case.  And I'm here to

8    summarize that evidence in light of those instructions as you

9    begin your deliberations in this case.

10          Now, defendant is charged with six counts of the

11   same offense, which is money laundering.  That's Title 18 of

12   the United States Code, Section 1957.  And each count relates

13   to his deposit of the illegal proceeds from his Bank of America

14   account in California to his investment account at

15   Merrill Lynch in New York.  And the dates and the amounts of

16   accounts differ, but the essential elements of that crime are

17   exactly the same.

18          And I'll caution you that the Court's instructions

19   are the ones that control.  But for the purposes of guiding the

20   summary of the evidence in the closing, I'll put them here for

21   your reference.

22          Here are the elements of that charge.  The

23   Government must prove beyond a reasonable doubt the following

24   five elements:  The defendant knowingly engaged or attempted to

25   engage in a monetary transaction; secondly, the defendant knew

```
1    that the transaction involved criminally derived property;

2    three, that property had a value greater than $10,000; fourth,

3    the property was, in fact, derived from specified unlawful

4    activity; and, fifth, the transaction occurred in the

5    United States.

6              Ladies and gentlemen, the focus of this closing

7    largely will be on this element, No. 4, the property was, in

8    fact, derived from specified unlawful activity.

9              And you'll see that the Court's charge essentially

10   has two key components.  You can call them chapters for this

11   purpose.

12             Chapter 1 relates to how the defendant abused his

13   position in Korea, his illegal conduct in accepting the

14   payments from Guralp and Kinemetrics in exchange for giving

15   them a leg up in business.  That's what's called the specified

16   unlawful activity.  And I'll show you the elements of that

17   here.

18             You've heard the most about this piece of the

19   puzzle, and it's what I'm going to spend the most attention to

20   here.  And it's relevant to all six counts.

21             Chapter 2 relates to what the defendant then did

22   with those proceeds in the United States, his transfers of the

23   bribe payments from his Bank of America account to the

24   investment account at Merrill Lynch in New York.

25             So let's turn to Chapter 1 first.  The Court will
```

1    instruct you that in order to establish that the property was

2    derived from specified unlawful activity, the Government will

3    have to prove that the defendant violated Article 129 of

4    South Korea's Criminal Code.

5            The judge will also instruct you that a researcher

6    or director at KIGAM is a public official for purposes of that

7    law.  And so if the Government establishes that the defendant

8    is a researcher or director at KIGAM, then you must find that

9    he's a public official.

10           Ladies and gentlemen, the proof that the defendant

11   was a researcher and director at KIGAM at trial was

12   overwhelming.  We showed you a number of pieces of evidence on

13   this point.  For those of you taking notes, I'd like to give

14   you a few references.

15           We showed you Dr. Chi's KIGAM personnel card that

16   listed him as a researcher or a director during the period 1994

17   to 2016.  You can find that information at Government

18   Exhibit 1A.

19           We also showed you Dr. Chi's business cards about

20   which Dr. Potts testified which listed him as a seismologist

21   and as a director at KIGAM.  Those you can find at Government

22   Exhibit 58.

23           And finally, his own colleagues at KIGAM testified

24   on his behalf yesterday and confirmed that he held these

25   positions at the institute.

1            Now, the second requirement in this instruction is

2    that the Government must prove that the defendant received,

3    demanded, or promised to accept money in exchange for

4    exercising his official duties.

5            And ladies and gentlemen, you heard hours of

6    testimony on this point because we presented evidence about all

7    of the ways that the defendant helped those two companies,

8    Guralp and Kinemetrics.

9            And in those e-mails, he described exactly what he

10   was doing within his official duties in order to help the

11   company succeed.  And what he was doing, as I mentioned at the

12   outset, essentially span two categories.

13           First, in exchange for the personal payments, he

14   abused his position by purchasing these companies' products for

15   KIGAM and also recommending them to other customers in Korea,

16   including other government agencies.  In addition, he also

17   provided inside information.

18           So with respect to the first topic, which was his

19   recommending and purchasing products to KIGAM, we showed you,

20   for example, Government Exhibit 80.  And we spent some time on

21   it.  In fact, you would have seen it today.

22           This is an e-mail from the defendant to

23   Nathan Pearce of Guralp on December 21st, 2004.  And in it, as

24   we just discussed, the defendant purchased products for KIGAM

25   itself and then took a cut of the sales.  Why?  Because,

1    frankly speaking, he wanted to make a large order -- I'm

2    sorry -- he wanted to make a large fortune from the order of

3    Guralp's equipment in connection with a railway project in

4    which he was a participating member.

5           Just yesterday, ladies and gentlemen, during the

6    testimony of Dr. Chi's colleague, Mr. Shin, we also showed you

7    how Dr. Chi ordered Guralp's products behind his colleague's

8    back for the same railway project to which he was assigned.

9    Those are at Government's Exhibits 2A, 73, and 87.

10          In addition, in Government Exhibit 88, which we also

11   talked about today, we showed you an e-mail where the defendant

12   not only bought equipment for KIGAM and took his advice fee but

13   also argued against a discount for KIGAM.  And you can see that

14   towards the bottom of the page.

15          "At present," he wrote, "on May 18th, 2005, I

16   officially asked the purchase division to order your systems.

17   The personnel at the purchase division told me that the amount

18   of systems for express train is very large, so he wanted to ask

19   some discount for that order.  You do not need to give any

20   discount to all the other orders."

21          Finally, in Government Exhibit 63, we showed you how

22   the defendant specifically told the companies that he was

23   recommending their equipment to their customers in connection

24   with his official duties.

25          Toward the middle of the page, he says, "As I

**UNITED STATES DISTRICT COURT**

1    mentioned before, there is an official committee of earthquake

2    observation institutes in Korea.

3              "Your sensors, CMG-3TB and CMG-40T, are registered

4    as the standard sensors in the committee because I reported

5    them as reliable sensors."

6              And in exchange for payment from these sales, the

7    defendant also provided inside information to the companies,

8    including with respect to testing their equipment and the

9    process of contract bidding at the expense of these companies'

10   competitors.

11             With respect to testing, you may remember

12   Exhibit 120.  This is an e-mail from the defendant to a

13   representative of Guralp dated July 3rd, 2008.

14             He says here toward the bottom of the page, "As you

15   knew, my institute will be responsible for inspection of

16   seismic instruments by law.  Even now we inspected and gave the

17   certificate of acceptance of your systems for gas company."  In

18   the same e-mail, in exchange for providing that service, he

19   requests an advice fee for that -- for that sale.

20             In Government Exhibit 108, we showed you how the

21   defendant manipulated the bidding process in favor of Guralp

22   and Kinemetrics by including testing by KIGAM as a prerequisite

23   of the bidding.  You can see that in this e-mail from the

24   defendant to a representative of -- representatives of Guralp

25   on December 26th, 2007.

1    He says in the middle of the page, "This week, the

2    official request for bidding will be announced by gas company

3    with 20 sets of your systems including box.  Next year, 50 sets

4    and the remained ones on 2009.  By the regulation of announced

5    requirement, all participants should submit the certificate of

6    satisfied system from my institute.  In another word, without

7    my recognition, no company can participate in the bidding."

8    And in Exhibit No. 75, we showed you how Dr. Chi

9    wrote the specifications for bidding in a way that slanted the

10   process in these companies' favor.  You can see that in an

11   e-mail from Dr. Chi dated July 7th, 2004, to representatives of

12   Guralp.

13   Toward the bottom of the page, he says, "Gas company

14   also wanted to know whether I can recommend the specifications

15   for open bidding.  As you knew, Quanterra recorders were

16   dominant, and they have been used by all earthquake monitoring

17   institutes in Korea.

18   "Hence, when I make a specification, it should be

19   proper to Quanterra as well as Guralp.  But other companies

20   cannot be accepted by specification."

21   And on these points, ladies and gentlemen,

22   Natalie Pearce testified that having this kind of information

23   provided a business advantage to Guralp because they could

24   learn information about their competitors and position

25   themselves better in the market.  And he did all of these

 1    things in exchange for payment.

 2            We showed you e-mails in which Dr. Chi demanded an

 3    advice fee for recommending a company's products to another

 4    agency.  One of those is at Government Exhibit 223.

 5            You also heard Michelle Harrington, the controller

 6    at Kinemetrics, testify about the company's sales orders.  That

 7    was Government Exhibit 255.  On those orders, on KIGAM's own

 8    orders, defendant took a cut.  And so when Kinemetrics made a

 9    sale, Dr. Chi took an advice fee from that order.  It was a

10    quid pro quo.

11            Dr. Potts also testified that Dr. Chi received an

12    advice fee on every single sale of an instrument in Korea,

13    which meant that the more equipment that Guralp sold, the more

14    money the defendant made.  And in return for all that effort,

15    Dr. Chi was compensated handsomely.

16            The FBI forensic accountant Lindsay Zimmerman

17    testified regarding the wires incoming to defendant for -- to

18    the defendant from Guralp and Kinemetrics, into his Bank of

19    America account right here in California.  Those can be found

20    at Government Exhibits 31 and 32.

21            And she told you that the defendant received well

22    over his annual salary in bribes each year and that that

23    enabled the companies who he was helping to maintain steady and

24    increased growth.

25            Now, the payments themselves bring us to Chapter 2.

1    And I'll bring back the elements of the money laundering

2    charge.

3              Now, ladies and gentlemen, I submit to you that

4    there's not a real dispute about many of the other elements.

5    Again, this one relates to the Korean bribery issue.  The rest

6    relate to the transactions I'm about to talk about now.

7              Now, the term "monetary transactions" that you'll

8    see at the top, as the Court will instruct you, simply means a

9    deposit or transfer in or affecting interstate commerce of

10   money through a financial institution.  And a monetary

11   instrument, as you'll learn, includes a personal check.  And by

12   the term "financial institution," we just mean a federally

13   insured financial institution.  And that's obviously a

14   mouthful, but let me simplify.

15             The monetary transactions in this case are Dr. Chi's

16   transfer of proceeds from Bank of America, which is FDIC

17   insured, to the investment account in New York at

18   Merrill Lynch.

19             And yesterday, you heard Steve Hamilton from

20   Merrill Lynch come and testify.  And he told you that the

21   defendant's Bank of America account was located in California

22   and that the Merrill Lynch account was located in New York.

23   And we showed you Exhibit 26 which confirmed these locations.

24             So when Dr. Chi moved the money from California to

25   New York, he was participating in a transaction that affected

1    interstate commerce.

2            You also heard my colleague read in a testimonial

3    stipulation for a witness from the FDIC, the Federal Deposit

4    Insurance Corporation, named James Czeranko.  And the

5    stipulation provided that Bank of America has been FDIC insured

6    since 1999.  So that qualifies Bank of America as a financial

7    institution for purposes of this statute.

8            Ladies and gentlemen, there's also no real question

9    that these transactions occurred in the United States, as per

10   No. 5, and that they were each in excess of $10,000, as per

11   No. 3.

12           We showed you in Government Exhibit 33 the summary

13   chart of the checks that Dr. Chi wrote from his Bank of America

14   account into Merrill Lynch.  And you heard Ms. Zimmerman

15   describe her work in compiling those charts.

16           And if you remember, she explained that almost all

17   the funds in the Bank of America account, 99 percent, actually,

18   from 2009 on came from either Guralp or Kinemetrics.  And so

19   any transfers of the monies to New York necessarily included

20   more than 10,000 -- at least $10,000 in bribe payments.  And

21   that was shown in Government Exhibit 34.

22           And so other than the specified and unlawful

23   activity that I just mentioned, which is bribery in violation

24   of Korean bribe -- of Korean law, the only real question that

25   remains is:  Did the defendant know that the money he was

1    transferring from California to New York was criminally derived

2    property?

3            And the evidence that we presented on this point,

4    ladies and gentlemen, showed that he knew full well that he was

5    transferring property that came from something illegal.  And so

6    let's review the evidence on that point now.

7            First, as you heard, the defendant asked on multiple

8    occasions to receive these advice fee payments in cash.  And

9    you heard Dr. Potts testify that paying a consultant in cash

10   was a bad business practice because there was no paper trail

11   and it left open room for abuse.

12           And Dr. Chi did that repeatedly, asking, for

13   example, for Natalie Pearce to give him an advice fee in pounds

14   or the euro equivalent, like in this e-mail which is at

15   Government Exhibit 70.

16           This is an e-mail on October 30th, 2003, from

17   Dr. Chi to representatives of Guralp.  We read this today, but

18   it's worth emphasizing.

19           "The technical advice fee, 4,000, for previous order

20   and 1500 for the order of 3 sensors could be got at this time.

21   If possible, I want to get the equivalent pound at your office

22   without notice of my colleague.  My colleague is working below

23   me, and I do not want to open this to anyone.  Delete this note

24   please."

25           Second, Dr. Chi admitted to Natalie Pearce that he

1    had an account in Bank of America because funneling the

2    proceeds overseas helped conceal them from people in Korea.

3    For that, let's bring up Exhibit 141.

4            The second page of the exhibit, which is an e-mail

5    on March 31st, 2010, Dr. Chi writes:  "The total of real estate

6    and cash flow of me and my family should be reported to the

7    government every year.  That is why I got the advice fee from

8    you through the American bank."

9            We also know, based upon Dr. Chi's use of funds,

10   that after subtracting the money that went into the

11   Merrill Lynch account, 70 percent went back to Korea for his

12   own use, even though Dr. Chi had a Citibank account in Korea

13   that could be used for that purpose.  And then a further

14   portion of the funds from Merrill Lynch also went back to

15   Korea.  In other words, the defendant, who was living and

16   working in Korea, basically sent money to the United States

17   only to use much of it back in Korea.

18           In addition, you saw e-mails in which Dr. Chi asked

19   Natalie Pearce not to disclose their secret side agreement with

20   anyone at KIGAM or Heesong, the distributor.  Dr. Chi's

21   interest in keeping the information secret was confirmed when,

22   in a telephone recording that we played you, on January 10th of

23   this year, defendant noted, quote, "Anyhow, they said I should

24   have reported it.  Uh, well, as I mentioned earlier, if I tell

25   you exactly, I had a consulting contract for a long time."

1          The defendant also repeatedly asked Nathan Pearce to

2    delete her e-mails, as we showed in a prior exhibit.

3          Dr. Chi also spoke in code, as we showed you in

4    Exhibits 141 and 226, with both representatives of Guralp and

5    representatives of Kinemetrics.  He asked those people that --

6    in the advice he was paid, that they should not reply with

7    specifics but simply say, "Your request is being processed."

8    And that language appeared in both of the e-mails as to the

9    different representatives of the companies.

10          And you also heard that Dr. Chi submitted invoices

11   to Guralp containing an address in New Jersey where

12   Daniel Yongkoo Lee testified Dr. Chi had never lived.  In fact,

13   Dr. Potts called those invoices bogus.  Mr. Lee, as you

14   remember, had no idea who Dr. Chi was and had never met him and

15   said that he had never lived at that address.

16          And all of these measures, I submit to you, were

17   done in a concerted effort by Dr. Chi to distance himself from

18   the illegal conduct in order to avoid detection.

19          Why would someone go to such lengths to conceal

20   their conduct?  Well, you know why.  You can look no further

21   than the defendant's own e-mails.  They tell you why.  Because

22   he knew that what he was doing was totally illegal.

23          Ladies and gentlemen, the science underlying this

24   case, the very seismic instruments and the names they're given

25   are complex and confusing.  But I submit to you that this case

1    isn't.

2            And I'll leave you with this parting thought.  Let's

3    bring up Government Exhibit 89 for that.

4            In an e-mail from Dr. Chi to Nathan Pearce dated

5    April 21st, 2005, here's what he said.  "Usually I deleted

6    almost all e-mail or papers related to the agent fee or advice

7    fee because I am the director of Earthquake Research Center and

8    I am not allowed to be involved in it."

9            My colleague told you at the outset of this case

10   that it was one about greed and corruption.  The defendant,

11   based on the evidence that we've presented, broke the law.  He

12   knew it, and he said it.

13           And when you go back to deliberate today, I ask you

14   to consider all of the evidence that we presented to you and

15   hold him accountable and return the only verdict consistent

16   with the evidence in this case, which is guilty on all six

17   counts.

18           Thank you.

19           THE COURT:  All right.  Thank you very much.

20           We'll now hear from the defense.

21           MR. KOURY:  Can I just have a moment, Your Honor --

22           THE COURT:  Sure.

23           MR. KOURY:  -- briefly to set up?

24           (Pause in the proceedings.)

25           MR. KOURY:  It's a little awkward because I like to

1    look at the screen and look at you at the same time.

2             Good afternoon.

3             THE JURORS:  (Collectively) Good afternoon.

4             MR. KOURY:  Grab one last thing.

5             Thank you for taking the time.  Thank you for paying

6    attention.  Thank you for sitting here now and listening to me.

7             By now, I don't think there's any doubt in anyone's

8    mind that Dr. Chi is a distinguished Korean seismologist.

9             You're going to have all those books in the back.

10   If you go to Volume 1, Exhibit 1, you're going to see his

11   record.  You're going to see that even now, KIGAM has him on a

12   leave of absence.  They haven't fired him.

13            You're going to see in there that he is an

14   award-winning seismologist.  He's received the Head Chief

15   Award, the Minister's Commendation, the Presidential Award, the

16   Prime Minister's Award.  He's got 22 patents for various

17   hardware and software.  You've heard testimony that he is

18   instrumental in founding the Korean earthquake early warning

19   system.  I told you that at the beginning.  And you've heard

20   it.  It's been proven.

21            It's interesting because the Government made some

22   claims at the beginning of their case.  And, frankly, I

23   question whether any of their claims have been proven except

24   for the fact that Dr. Chi earned a lot of money and kept it in

25   a U.S. bank account.

1            Part of the claims that the Government told you at

2    the outset that I think have not been proven:  One, that

3    Dr. Chi is part of the Korean Government.  Those words came out

4    of Chris Potts's mouth; two, that Dr. Chi was bribed to violate

5    his official duties; three, that he manipulated bids and

6    certified testing products.

7            The Government has spent a great deal of time in

8    their first set of comments to you here today talking about the

9    law, but they seem to ignore all of the witnesses that are

10   sitting here.  They seem to ignore Dr. Park, the director of

11   the earthquake center, who said Dr. Chi is not involved in

12   certifying anything.  And yet that was a central part of their

13   claim.

14           In their opening statement, they said Dr. Chi fixed

15   bids.  Well, that's not the case.  We heard just a few --

16   45 minutes to an hour ago from Mr. Byung Kim who worked at

17   Heesong, a competitor to KIGAM, that the future projects are

18   announced before the bid.

19           It's interesting because Nathan Pearce talked about

20   how Dr. Chi was such a valuable resource because he would tell

21   him about these future bids.  Apparently, Mr. Pearce didn't

22   realize that a lot of people knew about it.  Sounds like all

23   you had to do was pick up the paper.

24           But, you know, Mr. Pearce is halfway around the

25   globe.  So he needs somebody on the ground to give him that

 1    information.  That's why Dr. Chi was valuable in that regard.

 2              But the other thing that I found interesting that

 3    came from Mr. Kim, the Heesong distributor of GSL products, you

 4    remember how Mr. Potts told you -- or certainly implied -- that

 5    these prices are so much higher because of the money that was

 6    paid to Dr. Chi?  And yet Dr. Chi was arrested.  Chris Potts

 7    said, "I'm not paying you anymore."  And what did Mr. Kim tell

 8    you today?  The price of the products hasn't dropped one

 9    dollar.

10              I think that says more about Chris Potts than it

11    does about Dr. Chi.

12              The other thing that Mr. Kim told us just a few

13    minutes ago is that Dr. Chi never influenced a bid from 2002

14    until 2013, never.

15              We heard from the auditor from KIGAM, that Dr. Chi's

16    contracts never impacted KIGAM's purchases because there's an

17    equipment committee review that approves all requests for KIGAM

18    purchases.  She's not on that committee.  He can say this is a

19    good device, but it goes to a team of scientists that look it

20    over and figures out, Is this the right product for this

21    particular project?

22              Mr. Kim also told us that the rules have been

23    tightened and that those rules have changed since his arrest,

24    but they don't go back in time.  They don't apply to old

25    contracts.

**UNITED STATES DISTRICT COURT**

 1          This case is about bribery.  If Dr. Chi is not
 2   guilty of bribery, he's not guilty of money laundering.  It's
 3   that simple.  That's really what it comes down to.  And bribery
 4   is paying someone to violate their official duties.  And the
 5   instruction you're going to have is going to say the official
 6   duty must be something that he is responsible for under the
 7   law.
 8          The Government has given you a series of regulations
 9   and other things that come from KIGAM.  Interestingly, they
10   never decided that they -- they never talked to people at
11   KIGAM, they never brought anyone over here from KIGAM.  The
12   only duty that I recall hearing about Dr. Chi throughout all of
13   this experience is that under the law, KIGAM is responsible for
14   checking the data for the nuclear test-ban treaty.  I'll come
15   back to this later.
16          The Court's going to instruct you that bribery is
17   quid pro quo, which is a Latin phrase.  And lawyers like to try
18   and prove how smart they are by using Latin phrases because it
19   makes them look -- sound smarter.
20          Basically what it means is money in exchange for
21   something.
22          By the time I'm done, I think I'm going to convince
23   you that Dr. Chi was paid for legitimate services that had
24   nothing to do with his official duties because it has to be
25   paid in exchange for his official duties.  So let's go back.

 1    Let's recall what happened.

 2              2003, there was no early warning system in

 3    South Korea.  Dr. Chi, a young, ambitious seismologist, meets

 4    up with another scientist, Cansun Guralp -- well, before that,

 5    he meets up with Joe Steim who is sort of the Thomas Edison of

 6    these instruments in the United States -- well, actually, it

 7    came from, I think, Switzerland initially.  He's the guy that

 8    revolutionized the technology.

 9              And he goes to Joe Steim, and he says, "Dr. Steim, I

10    live in Korea.  We want to build this system.  We need your

11    equipment.  What can we do."

12              Dr. Steim says, "I'll give you a contract.  I'll pay

13    you for technical advice.  And in exchange, I'll give your

14    company discounted equipment."  It's a win-win because you go

15    through these mountains of regulations that the government

16    supplied to you from KIGAM.  There's nothing that prohibits

17    that.

18              So Dr. Chi says, "Great."  Dr. Chi does that and

19    then goes over and meets with Cansun Guralp -- pardon me,

20    Guralp in England.  Says the same thing, tells him about the

21    contract that he has with Quanterra and KMI, shows it to him,

22    e-mails it to him.

23              And Cansun Guralp says, "Great.  Let's do something

24    similar.  Use my equipment too.  I need help.  I don't sell

25    anything in Korea.  Let's start selling stuff in Korea.  It

```
 1    will benefit my company.  It will benefit the people of Korea."
 2              This is Nathan Pearce right here -- Natalie Pearce
 3    but, at the time, was Nathan Pearce in the meeting.
 4              So Cansun Guralp and Dr. Chi write out this little
 5    handwritten agreement.  You have it as evidence.  I'll get you
 6    a number in a second.
 7              This agreement says that Dr. Chi will be unbiased
 8    and reasonable in his transactions.  It's No. 504.  So I don't
 9    know where it is in the binder.  I wish I could direct you to
10    the binder, but it's probably the last binder.
11              And in exchange, Cansun Guralp will pay Dr. Chi
12    500 bucks per instrument.  I know it's hard to read on my copy.
13    But you have -- you're going to have the hard copy.  You're
14    going to be able to read it.
15              Then they draft this contract.  And you heard it
16    from Dr. Park, how they draft this contract, how they
17    structured it identically to the Quanterra contract.  They even
18    mentioned Quanterra and Kinemetrics because Dr. Guralp looked
19    at it.  And then Dr. Park prepares this PowerPoint
20    demonstration to take back to his colleagues at KIGAM.
21              Well, if you're going to commit bribery, if you're
22    going to hide, if you're going to keep things secret, that's a
23    pretty poor way of doing it.  I don't recommend having
24    PowerPoint demonstrations.  But that's what they did.
25              And they stood outside, and they celebrated.
```

**UNITED STATES DISTRICT COURT**

1    Dr. Park, Dr. Chi, Dr. Guralp, and Nathan Pearce, they

2    celebrate.  Why?  Because as Ms. Pearce testified to here just

3    a couple of days ago -- I think it was two days ago, I lose

4    track of time when I'm in trial -- "We were passionate about

5    establishing an early warning system."  Makes sense.  They have

6    a vision to create a system that saves lives.

7              If you follow the motivation of the people involved,

8    I think it will help you make a determination about what really

9    is going on here.

10             Chris Potts, when he first walked in here, mentions

11   the word "seismology."  "I'm" -- "I studied seismology at one

12   point in my career 35 years ago -- oh, but, by the way, spent

13   the last 30 years in finance, investment banking, buying

14   companies.  Some of the companies" -- "We buy companies, we

15   sell off assets, we flip them.  Sometimes it doesn't work out

16   that way and they collapse, had multiple companies collapse."

17             So when Mr. Potts, who, I think, in 30-some years,

18   is more involved in financing than investment banking drives

19   out the inventor, the founder, the CEO of Guralp instruments,

20   Cansun Guralp, the head of sales for natural gas and

21   exploration leaves, Ms. Pearce leaves, even though she was a

22   13-year employee.  And this was something that she felt

23   passionate about.  The chief financial officer left, with a

24   high-profile position like that, to go run a flower shop, which

25   kind of suggests what conditions must have been like at GSL

1    after Mr. Potts took over.

2            And then Mr. Potts got involved in a lawsuit with

3    Cansun Guralp.  And Mr. Potts also told you how he spent

4    hundreds of thousands of dollars hiring lawyers, going to the

5    British authorities, trying to convince them to file criminal

6    charges against Dr. Chi, then getting on a plane and flying

7    with his lawyers over the U.S. and coming to Washington to try

8    to convince the U.S. to file criminal charges.

9            You heard, also, how Mr. Potts admitted,

10   reluctantly, that Cansun Guralp has accused him -- pardon me --

11   has accused the new management of GSL that they've committed

12   fraud against Cansun Guralp.

13           But what was going on?  Well, what we know for a

14   fact is that roughly $12 million is owed to Cansun Guralp for

15   creating the company, for running the company, for building the

16   company.  We know for a fact that Chris Potts owns 6 percent of

17   that company.  Simple math.  6 percent of 12 million is

18   $720,000.  It's a small fortune.

19           You think somebody might have a tendency to shade

20   their testimony or maybe manipulate things for $720,000?  The

21   Government thinks that's the case with Dr. Chi.  Certainly

22   seems to be equally the case with Chris Potts.

23           The bribery claim is entirely based on Chris Potts.

24   Well, maybe we're overstating that a bit.  I'll come back to

25   that.  It's substantially based on Chris Potts.  He's the one

 1    that instigated, he's the one that got it going.

 2            Now, remember, he came in, one of the first things

 3    he said was if he works -- if that man there, Dr. Chi, works in

 4    a government office -- that's very important.  That's why I

 5    asked him on multiple occasions.  That's why I confronted him.

 6            Well, during the course of this trial, due to the

 7    witnesses we heard from, we know now the answer to that.  No.

 8    KIGAM is not a government office.  It's an independent -- it's

 9    an independent government-funded research institute.

10            Mr. Potts also said it's very important to know did

11    anyone at KIGAM know about this.  Well, yes.  Yes.  We've heard

12    from the witnesses.  Yes, we did.  They didn't know the

13    specifics, they didn't know the details, they didn't know how

14    much he was making, but they knew that he had a contract.  How

15    do we know he had a contract?

16            I think it was Dr. Shin -- Shim -- Shin, I

17    apologize -- Dr. Shin who was in charge of the railway project

18    who said that he went out of his way to go talk to Dr. Chi

19    because he knew that he had that contract and he knew that that

20    contract was invaluable to building the high-speed rail

21    network.  That was the only way they could get it in under

22    budget.

23            Now, you heard from Dr. Potts how the prior invoices

24    were all approved by the prior CEOs.  He said that was

25    important.  Well, we know that was approved.  And why do we

```
 1    know it was approved?  Because, as Ms. Pearce said, Dr. Chi was
 2    useful in assessing problems with products in Korea.  In other
 3    words, he was providing a very valuable technical service.
 4            Now, it's a service that meant that GSL managed to
 5    go from making or selling 40-, $50,000 worth of equipment in
 6    2003 to selling millions of dollars worth of equipment in 2016.
 7    It wouldn't have happened unless they had a person on the
 8    ground that was doing -- helping to advise customers, helping
 9    to troubleshoot, helping to make it happen.
10            You know, the motivation, I said, is the clue to
11    what's going on here.  Natalie Pearce described Mr. Potts as
12    abrupt, somebody who doesn't listen.
13            When you saw the questions he was asking -- these
14    are important questions.  It's one thing to ask questions, but
15    it's only really helpful if you listen to the answer.  And
16    Dr. Potts wouldn't care about the answer because he had his
17    goal.  He had his direction.  He was looking at it without
18    wavering.  He wants to cut costs, he wants to make this
19    business, and he wants to flip it.
20            As I pointed out earlier, Mr. Kim talked to us today
21    about how, even though GSL stopped paying Dr. Chi, they kept
22    their price the same.  So Mr. Potts's motive wasn't to give the
23    sensor-buying public a break.  His motive was to increase the
24    profits for GSL or he would have passed that discount on to the
25    customers.
```

1          We've heard about Dr. Guralp's passion, Dr. Chi's

2     passion, and Natalie Pearce's passion for building an early

3     warning earthquake system.

4          The one thing that I will remind you is that every

5     decision of Dr. Chi was scientifically based.  He was looking

6     at two different types of instruments -- a KMI instrument,

7     highly reliable, highly expensive; a GSL instrument, reliable

8     but less costly.  They sometimes had different purposes.

9          And he knew that if cost wasn't an issue and you

10    want the best, you want the Lexus of cars, you go out and you

11    get the KMI product.  But if you just need transportation and

12    you just need to get to work and you -- and money is an issue,

13    you get the Toyota, you get the GSL product.

14         What did Natalie Pearce tell us?  Well, as I said

15    earlier, that Dr. Chi was passionate about the early warning

16    system.  Natalie Pearce also told us it's not possible -- I

17    just was always fascinated with British talk.  It's not

18    possible to tilt the bids.  Influence, manipulate.

19         And the specifications are set by the end user.  And

20    she recalls talking now that Dr. Chi wore two hats, two hats,

21    the official KIGAM responsibility hat and the moonlighting side

22    technical service responsibility.

23         And the best clue about Dr. Chi's intent came from

24    Natalie Pearce because Natalie Pearce was there, unlike

25    Chris Potts, during all those years.  She described Dr. Chi's

```
 1    intent as naive but not mischievous.

 2            Now, the Government basically is saying hiding money

 3    is a crime for this man.  He hid the money; therefore, it must

 4    be a clue that he committed a bribe.  As opposed to being able

 5    to point to some exchange for money, that meant he was

 6    violating his official duty.  They don't have that.  They keep

 7    saying squint your eyes, turn your head a little bit, see if

 8    it's there, maybe it's there, look at this e-mail, read into

 9    that e-mail.  Oh, he's embellishing, exaggerating.  That must

10    be the really bad part.

11            But hiding your money is not a crime.  Hiding your

12    money from your coworkers is not a crime.  Revealing -- failing

13    to reveal your earnings is not a crime.

14            Just think of it this way.  If someone walks up to

15    any one of us and says, "How much did you make last year?  How

16    much did you get paid at work?  How much are you getting paid

17    for that job that you just quoted?  How much are you making?"

18    what is our natural reaction?

19            Take it further.  "Hey, how much are you paying in

20    taxes?"  Your natural reaction is, "Um, excuse me?  That's a

21    little private."  I mean, other than asking about somebody's

22    sex life, I don't know that there's much more private

23    information than that.  How much do you make?

24            The Government also says, well, look at these

25    e-mails.  Clearly Dr. Chi is embellishing his status.  Clearly
```

1    he's lying and manipulating, and that's got to be evidence that

2    he's getting bribes because he calls himself a government

3    official multiple times.

4         He was doing this to stop people from using his

5    status at KIGAM in their advertising.  In that stack over

6    there, you can find Binder 11, Exhibit 144.  I encourage you to

7    go take a look at it.  This is Nathan Pearce writing to

8    Dr. Chi.  "I'm writing to ask if we may use you as a reference

9    for the railway project.  Can you confirm?"

10        Well, if you're being bribed and you're taking money

11   to violate your official duties, go ahead.  Do it.  How much

12   are you going to pay me?

13        So Dr. Chi responds, "Officially, I cannot support

14   any private company by regulation.  I'm very sorry for my

15   status as a government officer."

16        Well, he's overstating it.  The reason why he's

17   overstating it is -- when you go into these binders, you're

18   going to see the regulations.  They take up about this much

19   room in the binder, about an inch or so.

20        Now, Dr. Chi could get into a lengthy discussion

21   with Nathan Pearce about the regulations say this and I've got

22   to get with that, I've got to get approval, I've got to -- or

23   you can just shut it down with just three lines, which is what

24   he does.  "Government officer.  By regulation, I can't do it."

25   But we know, as we've heard from the witnesses, he's not a

1    government officer.  Government-supported independent research

2    institute.

3           One more example.  This is from Outhay Viengkhou.

4    Dr. Chi sends him an e-mail and says, "Due to the earthquake

5    disaster at Japan, the Minister of Science" -- I don't know

6    what ICT is -- "in future planning visited my Center, and I

7    gave a presentation of earthquake hazard possibility at Korea.

8    I just recognized that I forgot to send the picture to show

9    that I explained your Q330 to my minister.  I also attached a

10   downloaded file."

11          Mr. Viengkhou responds, "Wow, you're famous now.

12   I'll pass along the link to my colleagues."

13          And then Dr. Chi suddenly realized, wait a minute,

14   wait a minute.  There's a picture of me.  And if he passes

15   along the picture of me in KIGAM garb, it could show up in the

16   advertising.  I better back this off.

17          And so in his somewhat broken syntax, "I and

18   Dr. Minister are government officers.  You cannot use this

19   picture for advertising.  Just for reference."

20          I can go on and on.  When you look at all these

21   chains, that's what's going on.  He's trying to make clear that

22   he can't be used in advertising officially for KIGAM.

23          Now, we already talked about how private earnings

24   are.  That was kind of information you don't share with a

25   person that just walks up.  And you certainly, certainly don't

 1    share it with your colleagues who may not be making as much as

 2    you are.

 3             But there was another reason why Dr. Chi was -- kept

 4    the money in the United States.  There's another reason why he

 5    didn't want anybody to know about it.  And he made it quite

 6    clear, very clear.  "The total of real estate and cash flow of

 7    me and my family should be reported to government every year.

 8    That is why I got the advice fee from you through the American

 9    bank."

10             What Dr. Chi did was he hid money from the Korean

11    Government and didn't pay his Korean taxes on that money that

12    he earned for his advice.  And that's a crime.  And someone at

13    a different time and place may decide to prosecute for that

14    crime.  But that crime is not the crime that he's been charged

15    with here.

16             He's charged with bribery.  He's charged with money

17    laundering based on bribery.  And the only way you can find him

18    guilty is if you find that he did, in fact, exchange money for

19    violating his official duty.  And Dr. Chi never accepted money

20    to violate his official duties.

21             We've heard today or yesterday -- I don't remember

22    when Mr. Shin testified.  Well, I think we heard both days that

23    KIGAM allows you to accept money.  Dr. Shin had his own

24    technical service agreement to accept money -- or agreements.

25             And Dr. Chi wasn't hiding this from GSL.  He

1    submitted invoices.  And do you remember where Ms. Pearce said

2    he got the invoice from?  Ms. Pearce sent him the invoice, the

3    template, the form.  She sent it to him because it was designed

4    by someone at GSL.  Fill in this box.  Fill in this little box.

5            Chris Potts says, "Well, there wasn't that much

6    information in it.  I couldn't really tell."  Well, what if you

7    worked for yourself and you submit a bill to someone and the

8    person says, "I don't want to pay this bill because I need more

9    information," well, usually they send it back and you give them

10    more information.

11            What did Chris Potts do?  "I'm not paying this bill.

12    It's inappropriate."

13            And you remember his response, Dr. Chi's response?

14    He was confused.  He didn't seem to understand what he meant by

15    "inappropriate."  "We could go to jail."  Well, at that point,

16    I think most people would go, "What's going on?"  And they're

17    in shock.

18            I've been using your form.  I've been doing this for

19    years.  You're the new guy.

20            And, you know, there's another thing.  The

21    Government keeps, keeps repeatedly talking about cash, as if

22    Dr. Chi was walking around with wheel barrels full of cash,

23    boxes of cash, you know, like he's some kind of a character

24    actor on one of those narco shows or something.

25            How do we know that he was paid in cash?  Well, we

know because GSL documented it and kept it on their

spreadsheet.  There was a record of it.  It's Exhibit 54.  You

can go in there and you can see how much cash was given.  And

typically, the cash was always when he was coming to town and

he was going to be in London or in Europe.  And if you've ever

traveled overseas, most people want to carry around a little

cash.  And that's when he would ask for it.

You've heard from the KIGAM witnesses that, when it

came to bids, there was no fixing of bids, there was no skewing

or manipulation of data to get something approved for a bid.

You've heard from Mr. Kim that the information, the

inside information was publicly announced.

But the other thing that makes it clear that it's --

under KIGAM rules and regulations, it's all right to have a

technical service agreement.  The best evidence of it all, I

think, is found in Volume 1, Exhibit 6.  It's right over there.

You can go take a look at it.  You can pull it out.  It's a

form.  It's this form.  It's on the very last page of

Exhibit 6.

It's called -- this is KIGAM's form.  This has been

translated from Korean.  It's called "Acceptance of Money and

Other Goods Report."

Now, this form was created and added November 7th,

2016.  Why would you need a form if you're not allowed to

collect any money outside your work?  Of course you're allowed

```
 1    to collect money.  It's just that as of November 7th, 2016,
 2    after this investigation, after Dr. Chi, they decided we better
 3    have a form to track it all a little better because that's what
 4    we're doing.  So they created this form.
 5            A couple of years ago, my family and I went to
 6    Philadelphia.  We went to the Constitutional Center.  They gave
 7    out these great Constitutions, it's a little thing.  And in the
 8    Constitution it says --
 9            MS. KUMAR:  Objection, Your Honor.
10            THE COURT:  Sustained.
11            MR. KOURY:  In the Constitution it says a person has
12    a right to a public jury trial.  They have a right to have a
13    jury decide whether or not they're guilty of a crime.  They
14    have a right to have the jury decide the facts and decide
15    whether the law applies to those facts or not.
16            Despite other issues of our founding fathers or
17    whatever over the years, they created a system that makes each
18    of you very powerful.  On this issue, you're the most powerful
19    person in this room because you decide what facts you believe
20    and what you don't.  You decide which witnesses are trustworthy
21    and which ones aren't.  You decide whether this evidence is
22    sufficient to say a person's guilty or not.
23            And when you go into the jury room, you're going to
24    have a piece of paper.  And eventually one of you is going to
25    be the foreperson.  One of you is going to sign that form for
```

```
 1    the Court.  And you have to talk about it.  You go through the

 2    evidence.

 3              And at the end, you're going to write your decision

 4    on that piece of paper.  It's going to come out to the Court,

 5    and the Court is going to accept that piece of paper if all 12

 6    of you agree.  If some of you disagree and you can't reach a

 7    verdict, then there's a process for that too.

 8              But if you write "Not Guilty" on that piece of

 9    paper, what happens is, when you come out, the Court's going

10    to -- we all will thank you for your time, say we really

11    appreciate you taking the time.

12              This is -- this is a very important decision that

13    you're about to make.  It's a critically important decision.

14    And just -- in conclusion, I just want to cover a couple of

15    things.

16              We've heard about Dr. Chi's responsibilities.  We've

17    heard how he's a seismologist.  We've heard how he analyzes

18    data and interprets data.  We've heard about how his job is to

19    monitor the seismic activity in South Korea.  One component of

20    his job, dictated by Korean law, is to distinguish between

21    natural events and nuclear explosions that happen north of

22    their border.

23              You've heard from the current director.  You've

24    heard from two past presidents.  You've heard from the auditor.

25    You've heard from a researcher.  You heard from a Heesong
```

**UNITED STATES DISTRICT COURT**

1    competitor.  We brought -- we didn't bring the janitor, but we

2    brought a lot of other people here to try and give you a

3    picture of what Dr. Chi's responsibilities are.

4            Who do you think is in the best position to define

5    what his official responsibilities are?  Chris Potts or the

6    people that work with him day in, day out, see when he's taking

7    a coffee break, see when he's going to the restroom, see when

8    he's issuing a report?

9            Dr. Chi made science-based recommendations.  His

10   motivation was to build an early warning earthquake system for

11   South Korea.  He approached the two most reliable companies to

12   do that -- three if you count Quanterra, which is now part of

13   KMI.  And Korea was able to build that system.  He did it.  He

14   overcame the problems and the hurdles, the budget impasses and

15   the political end fighting.  He was instrumental in getting

16   that project done.

17           And nowhere along the way ever did he get paid to

18   make a corrupt decision related to his official duties.  That's

19   what bribery is.  Did he exaggerate his status in the e-mails?

20   Yes.  Did he try and keep his coworkers from knowing how much

21   money he made?  Yes.  But he also provided significant advice

22   and benefit for the money he earned.  And if that's what he was

23   paid for, that's not bribery.  And if that's not bribery, then

24   he's not guilty of money laundering.

25           You've heard from the KIGAM officials.  Never

1    impacted the bidding process, never impacted the certification

2    process, never impacted the purchasing process.  He built the

3    system.  He monitored the North Korean nuclear explosions,

4    which is his official duty.  And he wore two hats,

5    Nathan Pearce's phrase.

6            Now, the Government, I think, is trying to shock you

7    with the amount of money he made.  That's a lot of money.  He

8    got paid a lot of money.  But he has unique skills.  He

9    provided an unusual service, not -- not a unique service

10   because you could have got it from somewhere else.  Could have

11   got it from one of his colleagues.  Could have got it from the

12   people at Heesong.  He provided a service and was paid for it.

13   And GSL's products went from 5-, $10,000 worth of products in

14   2003 to millions of dollars worth of products in 2016 with

15   Dr. Chi's help.

16           Don't be shocked by the amount of money.  We live in

17   a world where athletes and performers get paid, you know, half

18   a million dollars for one concert or, you know, $100,000 for

19   one basketball game or somebody invents some crazy little app

20   for your phone and now they're a billion-dollar -- you know,

21   people on the *National Enquirer*.

22           This is a man who used his skill and his technology

23   to make the world safer, to make his people safer, to save

24   lives.  Yes, he's getting financially rewarded for it.  Thank

25   goodness.

1          There's -- I just want to go back to the idea of

2     bribery just for one quick second, and then I'm just going to

3     sit down.

4          It has to be -- the money has to be exchanged for

5     your official duties.  And the best example that I can come up

6     with is a police officer, a police officer standing on the

7     corner.  And he sees someone jaywalk across the street.  And he

8     walks up to them and he says, "I'm giving you a ticket.  You

9     just jaywalked.  I saw it."  And that person pulls 20 bucks out

10    of their pocket and they hand it to the police officer.  And he

11    puts it in his pocket and says, "I didn't see anything."  That

12    is bribery.  It's exchanging money for that police officer to

13    violate his official duty.

14         Let me give you another example.  Same police

15    officer standing on the same corner and somebody walks up to

16    him and says, "Hey, Officer.  You got a Taser on your belt

17    there.  Is that a good Taser?"

18         And he says, "This Taser is the top-of-the-line

19    Taser.  It's the KMI Taser.  Never fails, holds a charge

20    forever.  It's the best."

21         And the person says, "I'd love to buy a Taser

22    because, you know, my wife has to go to and from work.  And I

23    want her to have a Taser in the car in case somebody" --

24    "something" -- "God forbid something bad happens.  Where can I

25    get a Taser?"

1          "Top-of-the-line KMI Taser store is right down the

2     street.  They'll sell you one for 500 bucks."

3          "Ooh.  500 bucks?  That's a little" -- "that's a

4     little rich for my blood.  Can I get one a little cheaper?"

5          "GSL Taser down that street.  GSL Tasers sell for a

6     hundred bucks.  Just as good for what you need.  You know, for

7     our purposes, law enforcement, we need the top of the line

8     because we have different needs.  But for you, it's probably

9     good enough.  A hundred bucks right down the street."

10          "Still a little rich.  How about that other store,

11    the GeoSIG store over there?"

12          "Well, those Tasers are pretty crappy.  Trust me.

13    Law enforcement is familiar with Tasers.  Those are pretty

14    bad."

15          Now, let's suppose that same officer is getting paid

16    a fee from the KMI store and getting paid a fee from the GSL

17    store.  Or let's say the customer hands him 20 bucks for the

18    advice.  It doesn't matter whether KMI is paying him, GSL's

19    paying him, or the customer is paying him directly.  It is not

20    bribery because that police officer is not violating -- taking

21    that money for his official duties.

22          What Dr. Chi did when he would call GSL, when he

23    would send e-mails, when he would travel there, when he would

24    do that -- when he would do the same with KMI, was he was

25    wearing his private non-police officer hat and giving advice

1    and getting paid for it.  And that is not a crime.  It might be

2    tax evasion, but it's not the crime that he's charged with

3    here.

4            And if that's all that they have, your obligation,

5    if you have a doubt based on reason or a reasonable doubt, is

6    to give him the benefit of that doubt and find him not guilty.

7            Thank you.

8            THE COURT:  All right.  We'll now hear from the

9    Government.

10            MS. KUMAR:  Yes, Your Honor.

11            Good afternoon, ladies and gentlemen.  The

12    Government gets one more chance to speak to you before you go

13    back to the deliberation room, and that's because the

14    Government has the burden of proof.  And I submit to you we've

15    met that burden of proof.

16            The defendant, Heon-Cheol Chi, was a public official

17    in Korea.  Defense counsel's right, he was important.  His job

18    was to make the lives of people in Korea safer.  He was

19    supposed to save lives.  But he abused that position, and he

20    accepted and demanded over a million dollars in bribes between

21    2009 and 2016 by abusing that position and lining his own

22    pockets.

23            Ladies and gentlemen, that's why we're here today.

24            He then took that money, and he brought it here.  He

25    used the American financial system to launder the proceeds of

1    his bribery scheme.

2              Counsel spoke about a number of issues, and I'm just

3    going to address them briefly.

4              The first is whether KIGAM is a government entity.

5    Ladies and gentlemen, I anticipate you're going to hear shortly

6    from the Court that a director or researcher at KIGAM is a

7    public official for the purposes of the law in South Korea.

8              And if you look at Exhibit 1A, the defendant's

9    research card, or Exhibit 58, his business cards, you'll see

10   that's exactly the position he held.  You heard from the KIGAM

11   employees that that was the position he held.  He's a public

12   official.

13             Defense counsel also said there was no quid pro quo.

14   He didn't get anything -- companies didn't get anything in

15   exchange.  But they did; they got benefits.

16             You heard from Natalie Pearce.  She told you that

17   there were benefits they got from Dr. Chi that they would not

18   have otherwise gotten had they not paid him.  Every sale Guralp

19   or Kinemetrics or Quanterra made anywhere in Korea, the

20   defendant got a cut, thousands upon thousands of dollars.

21             So really the issue that you're left with is:  What

22   did he do in exchange for that money?

23             Now, counsel said that he never did anything in the

24   scope of his official duties, that what he was doing was

25   entirely legitimate.  It was technical consultations.  But you

1  heard from the witnesses from KIGAM.  Technical consultations

2  don't involve skewing specifications, manipulating bids,

3  purchasing equipment, and then taking a cut of it.  And that's

4  exactly what the defendant did over and over and over again for

5  a number of years.

6          The defendant's scope of duties included anything by

7  law.  You heard testimony that the director of the Earthquake

8  Research Center sits on an official committee required by law.

9  And what did the defendant do while sitting on that committee?

10 He directed others to buy products that he was getting a cut

11 of, also duties that were closely related to his duties, also

12 duties that a -- he was practically and customarily responsible

13 for.

14         You heard Dr. Park, the current director of the

15 Earthquake Research Center.  He said while he doesn't

16 technically do the certifications, he oversees them.  It's his

17 department.  He's practically responsible for them.  And the

18 defendant was too.

19         And you saw the series of e-mails in which the

20 defendant said, "Don't worry.  Your products are going to pass

21 the test.  Don't worry.  Your products aren't exactly working,

22 but they're going to pass the test.  And really don't worry

23 because your competitors, they're not going to pass.  They're

24 not going to meet the specification."

25         Ask yourselves why.  Because, ladies and gentlemen,

1    he was getting paid to do that.

2           Defense counsel said everything he did was with his

3    non-KIGAM hat.

4           I'd like to direct your attention to Exhibit 2A,

5    which is in evidence, specifically the bottom of the page.

6    There is a particular entry right here (indicating), "For the

7    establishment of earthquake monitoring system for high-speed

8    railway."

9           You heard a lot about this project.  Dr. Park told

10   you about it.  He -- sorry, excuse me, Dr. Chin told you about

11   it.  He, as it's listed here, was the researcher in charge.

12   Who participated in that research?  Heon-Cheol Chi.  And who

13   was the director of the Earthquake Research Center at the time

14   this project was going on?  The defendant.  He was in charge.

15   He was Dr. Shin's boss, as you heard.

16          And so what did this defendant do on that project?

17   You heard testimony that he told the purchase division to buy

18   the products, to buy the Guralp products, something Mr. Shin

19   knew nothing about.

20          And if we look at Exhibit 80, which you've heard

21   several times, Dr. Chi got a cut of every single piece of

22   equipment purchased in connection with that project.  And why

23   did he get a cut?  Why did he agree to steer the purchase

24   towards Guralp?  Because, frankly speaking, "I want to make a

25   large" order -- "large fortune," excuse me, "by the order (6)."

 1          He wanted to make a large fortune on the purchase of

 2    equipment on the Korea train project, a project that is listed

 3    in internal KIGAM documents as part of his job, that you heard

 4    Dr. Shin testify the defendant worked on, a project ongoing

 5    while the defendant was the director of the Earthquake Research

 6    Center.

 7          Ladies and gentlemen, he was wearing his KIGAM hat.

 8    What he wasn't telling anyone is that he had this secret role

 9    for which he was accepting secret payments.

10          You heard from all of these KIGAM witnesses.  They

11    didn't know about this agreement.  They didn't know that he was

12    aiming to make a large fortune.  They thought, like everyone

13    else, that as a public official, the defendant was concerned

14    about the safety of the lives in Korea.

15          That's what motivated him, making money, his greed,

16    as you repeatedly heard.

17          Defense counsel said every decision the defendant

18    made was scientifically based.  Ladies and gentlemen,

19    Exhibit 80 that you just saw showed that it wasn't

20    scientifically based.  It was based on what the defendant was

21    going to get as a result of that order.  And you saw that over

22    and over and over again.  And you know what?  The result was

23    for Guralp and Kinemetrics, their share of the market increased

24    exponentially during the time the defendant was in charge,

25    business advantages, as you heard from Natalie Pearce, they

1    never would have gotten had it not been for the defendant.

2            Ladies and gentlemen, if what the defendant was

3    doing was legitimate, if he was providing legitimate services,

4    why go to the lengths he did to hide it from everyone?  He

5    never told his colleagues.  He came back and made a

6    presentation, just like defense counsel said, Exhibit 508A.

7    Not a single page in that presentation mentions the fact that

8    the defendant had had a secret arrangement for the months

9    before with Guralp and for the years before with Kinemetrics

10   and Quanterra and that he had been receiving payments from

11   those companies since before that contract.

12           That's what he told his colleagues.  That's what he

13   presented them because he didn't want them to know.

14           Ladies and gentlemen, that contract was in the name

15   of KIGAM.  But you heard that KIGAM didn't get any payments.

16   Defendant kept all of the money to himself, here in the

17   United States, here in California.  That's what motivated him,

18   his greed.

19           He then moved that money from California to

20   New York, which is why he's charged with money laundering.  And

21   you heard from Ms. Zimmerman that each of those checks, if you

22   take out the beginning balance, was more than $10,000 and that

23   90 percent -- 99 percent of the defendant's Bank of America

24   account was funded by Guralp, Kinemetrics, and Quanterra.  So

25   each of those checks, Counts 1 through 6, had at least more

1    than $10,000 for money derived from them.

2            She did a separate analysis for you, trying to

3    segregate them out.  Those were those charts in Exhibit 40.

4    She was able to segregate them for some of the companies.  But

5    in the end, all of the money, 99 percent of the money, was

6    bribe money.  In fact, as you heard, it was pretty much the

7    only money the defendant had in that account from 2009 going

8    forward.

9            And what did he do with that money?  He sent it to

10   Merrill Lynch, and he spent the rest in Korea where he lived

11   and worked.  And why would you go to all that trouble?  Because

12   he knew what he was doing was illegal.  You saw it over and

13   over and over again.  The defendant said it.  "My contract is

14   illegal.  I'm not allowed to do it."  And you heard that he

15   told Dr. Potts that.

16           Defense counsel spent a lot of time talking about

17   Dr. Potts and what may have been motivating Dr. Potts.  But I'd

18   like to direct your attention to Exhibit 188.  In the fourth

19   paragraph, February of 2016, after Dr. Potts has said no more

20   payments, what does the defendant say?  "Yes, I am a government

21   officer, so I could not make any private contract.  Hence, the

22   previous one was illegal to me."

23           He knew what he was doing was illegal.  He -- he

24   demanded those payments.  He used his duties to help those

25   companies instead of abiding by his obligations.  And by doing

1    so, he committed the act of bribery in South Korea.  And by

2    bringing those funds, by choosing to bring those funds here and

3    moving them within our financial system, the defendant

4    committed the crime of money laundering.

5             And so I ask -- the Government submits we've

6    established, we've proven beyond a reasonable doubt the

7    defendant is guilty of all six counts of money laundering and

8    would ask that you return the only verdict consistent with all

9    of the evidence, one of guilty on all six counts.

10            THE COURT:  All right.  Thank you very much.

11            "Members of the jury, now that you have heard all

12   the evidence, it's my duty to instruct you on the law that

13   applies to this case.  A copy of these instructions will be

14   available in the jury room for you to consult.

15            "It is your duty to weigh and to evaluate all the

16   evidence received in the case and, in that process, to decide

17   the facts.  It is also your duty to apply the law as I give it

18   to you to the facts as you find them, whether you agree with it

19   or not.  You must decide this case solely on the evidence and

20   the law and must not be influenced by any personal likes,

21   dislikes, opinions, prejudices, or sympathy.  You'll recall

22   that you took an oath promising to do so at the beginning of

23   the case.

24            "You must follow all of these instructions and not

25   single out some and ignore others.  They are all important.

1    Please do not read into these instructions or into anything

2    that I may have said or done any suggestion as to what your

3    verdict should be.  That matter is entirely up to you.

4              "The First Superseding Indictment is not evidence.

5    The defendant has pleaded not guilty to each of the charges.

6    The defendant is presumed to be innocent unless and until the

7    Government proves the defendant guilty beyond a reasonable

8    doubt.

9              "In addition, the defendant does not have to testify

10   or present any evidence to prove innocence.  The Government has

11   the burden of proving every element of the charge beyond a

12   reasonable doubt.

13             "Proof beyond a reasonable doubt is proof that

14   leaves you firmly convinced the defendant is guilty.  It is not

15   required that the Government prove guilt beyond all possible

16   doubt.

17             "A reasonable doubt is a doubt based upon reason and

18   common sense and is not based purely on speculation.  It may

19   arise from a careful and impartial consideration of all of the

20   evidence or from the lack of evidence.

21             "If after a careful and impartial consideration of

22   all the evidence you are not convinced beyond a reasonable

23   doubt that the defendant is guilty, it is your duty to find the

24   defendant not guilty.  On the other hand, if after a careful

25   and impartial consideration of all the evidence you are

convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

"You are here only to determine whether the defendant is guilty or not guilty of the charges in the First Superseding Indictment. The defendant is not on trial for any conduct or offense not charged in the First Superseding Indictment.

"A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

"Now, the evidence you are to consider in deciding what the facts are is the following:

"The sworn testimony of any witness, the exhibits received into evidence, and any facts to which the parties have agreed.

"The following things are not evidence, and you may not consider them in deciding what the facts are:

"Questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's question to understand the answers of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not

 1    evidence.  If the facts as you remember them differ from the

 2    way the lawyers state them, your memory of them controls.

 3            "Any testimony that I have excluded, stricken, or

 4    instructed you to disregard is not evidence.  In addition, some

 5    evidence may have been received for only a limited purpose.

 6    When I have instructed you to consider certain evidence in a

 7    limited way, you must do so.

 8            "Anything you may" hear -- "you may have seen or

 9    heard when the court was not in session is not evidence.  You

10    are to decide the case solely on the evidence received at

11    trial.

12            "Now, evidence may be direct or circumstantial.

13    Direct evidence is direct proof of a fact, such as testimony by

14    a witness about what that witness personally saw or heard or

15    did.  Circumstantial evidence is indirect evidence, that is, it

16    is proof of one or more facts from which you can find another

17    fact.

18            "You are to consider both direct and circumstantial

19    evidence.  Either can be used to prove any fact.  The law makes

20    no distinction between the weight to be given to either direct

21    or circumstantial evidence.  It is for you to decide how much

22    weight to give to any evidence.

23            "In deciding the facts in this case, you may have to

24    decide which testimony to believe and which testimony not to

25    believe.  You may believe everything a witness says or part of

1    it or none of it.

2                "In considering the testimony of any witness, you

3    may take into account the following:

4                "The witness's opportunity and ability to see or

5    hear or know the things testified to;

6                "The witness's memory;

7                "The witness's manner while testifying;

8                "The witness's interest in the outcome of the case,

9    if any;

10               "The witness's bias or prejudice, if any;

11               "Whether other evidence contradicted the witness's

12   testimony;

13               "The reasonableness of the witness's testimony in

14   light of all the evidence; and

15               "Any other factors that bear on believability.

16               "The weight of the evidence as to a fact does not

17   necessarily depend on the number of witnesses who testify.

18   What is important is how believable the witnesses were and how

19   much weight you think their testimony deserves.

20               "A defendant in a criminal case has a constitutional

21   right not to testify.  You may not draw any inference of any

22   kind from the fact that the defendant did not testify.

23               "You have heard testimony that the defendant made a

24   statement.  It's for you to decide whether the defendant made

25   the statement and, if so, how much weight to give to it.  In

1    making those decisions, you should consider all of the evidence

2    about the statement, including the circumstances under which

3    the defendant may have made it.

4                "You've heard evidence that the defendant committed

5    other crimes, wrongs, or acts not charged here.  You may

6    consider this evidence only for its bearing, if any, on the

7    question of the defendant's intent, motive, opportunity,

8    preparation, plan, knowledge, identity, absence of mistake, or

9    absence of accident and for no other purpose.  You may not

10   consider this evidence as evidence of guilt of the crime for

11   which the defendant is now on trial.

12               "You've heard testimony from Natalie Pearce, a

13   witness who received immunity.  That testimony was given in

14   exchange for a promise by the Government that the witness will

15   not be prosecuted.  For this reason, in evaluating the

16   testimony of Natalie Pearce, you should consider the extent to

17   which and whether her testimony may have been influenced by

18   this factor.  In addition, you should examine the testimony of

19   Natalie Pearce with greater caution than that of other

20   witnesses.

21               "Now, the Korean language has been used during the

22   course of this trial.  The evidence you are to consider is only

23   that provided through the official court translators.  Although

24   some of you may know the Korean language, it's important that

25   all jurors consider the same evidence.  Therefore, you must

accept the evidence presented in the English translations and

disregard any different meanings.

"Certain charts and summaries may have been admitted

into evidence.  Charts and summaries are only as good as the

underlying supporting material.  You should, therefore, give

them only such weight as you think the underlying material

deserves.

"The First Superseding Indictment charges that

the" -- "charges that the offenses alleged in Counts 1 through

6 were committed on or about a certain date.  Although it is

necessary for the Government to prove beyond a reasonable doubt

that the offense was committed on a date reasonably near the

date alleged in Counts 1 through 6 of the First Superseding

Indictment, it is not necessary for the Government to prove

that the offense was committed precisely on the date charged.

"Now, the defendant is charged in Counts 1 through 6

of the First Superseding Indictment with money laundering, in

violation of Section 1957 of Title 18 of the United States

Code.

"In order for the defendant to be found guilty of

that charge, the Government must prove each of the following

elements beyond a reasonable doubt:

"First, the defendant knowingly engaged or attempted

to engage in a monetary transaction;

"Second, the defendant knew the transaction involved

1    criminally derived property;

2            "Third, the property had a value of greater than

3    $10,000;

4            "Fourth, the property was, in fact, derived from

5    bribery of a public official, in violation of foreign law,

6    namely, Article 129 of South Korea's Criminal Code; and

7            "Fifth, the transaction occurred in the

8    United States.

9            "The term *monetary transaction* means the deposit,

10   withdrawal, or transfer in or affecting interstate commerce of

11   funds or a monetary instrument by, through, or to a financial

12   institution.  A monetary instrument includes personal checks,

13   banks checks, and money orders.

14           "The term *financial institution* means a federally

15   insured financial institution.

16           "The term *criminally derived property* means property

17   constituting or derived from the proceeds of a criminal

18   offense.  The Government must prove the defendant knew that the

19   property involved in the monetary transaction constituted or

20   was derived from proceeds obtained by some criminal offense.

21   The Government does not need to prove that the defendant knew

22   the precise nature of the criminal offense or knew the property

23   involved in the transaction represented the proceeds of bribery

24   of a public official, in violation of foreign law, namely,

25   Article 129 of South Korea's Criminal Code.

1          "Although the Government must prove that of the

2    property at issue more than $10,000 was criminally derived, the

3    Government does not need to prove that all of the property at

4    issue was criminally derived.

5          "The First Superseding Indictment alleges that the

6    property involved in the monetary transaction was derived from

7    bribery of a public official, in violation of foreign law,

8    namely, Article 129 of South Korea's Criminal Code.

9    Article 129 prohibits a public official from receiving,

10   demanding, or promising to accept a bribe in connection with

11   his duties.

12         "In order to establish that the property involved in

13   the monetary transaction was derived from bribery of a public

14   official, in violation of Article 129, South Korea's Criminal

15   Code, the Government must prove each of the following elements

16   beyond a reasonable doubt:

17         "1.  The defendant is a public official for purposes

18   of Article 129; and

19         "2.  The defendant received, demanded, or promised

20   to accept a payment in exchange for exercising his official

21   duties or, in other words, as a quid pro quo for exercising his

22   official duties.

23         "I instruct you as a matter of law that a director

24   or researcher at the Korea Institute of Geoscience and Mineral

25   Resources is a public official for purposes of Article 129.

1          "Official duties include duties for which the public

2     official was responsible under the law, acts closely related to

3     such duties, acts that the public official is practically or

4     customarily responsible for, and acts that may influence

5     decision-makers.

6          "An act is done knowingly if the defendant is aware

7     of the act and does the act and does not act through ignorance,

8     mistake, or accident.  You may consider evidence of the

9     defendant's words, acts, or omissions along with all of the

10    other evidence in deciding whether the defendant acted

11    knowingly.

12         "The defendant may be found guilty of money

13    laundering as charged in Counts 1 through 6, even if the

14    defendant personally did not commit the act or acts

15    constituting the crime but caused the act or acts to be done.

16         "To prove a defendant guilty of causing the

17    commission of a crime, the" defendant -- "the Government must

18    prove beyond a reasonable doubt, first, the crime was committed

19    by someone and, second, the defendant willfully ordered,

20    directed, or otherwise brought about the commission of the

21    crime.

22         "Now, when you begin your deliberations, you will

23    elect one member of the jury as your foreperson who will

24    preside over the deliberations and speak for you here in court.

25         "You will then discuss the case with your fellow

1    jurors to reach an agreement if you can do so.  Your verdict,

2    whether guilty or not guilty, must be unanimous.

3              "Each of you must decide the case for yourself, but

4    you should do so only after you have considered all of the

5    evidence, discussed it fully with other jurors, and listened to

6    the views of your fellow jurors.

7              "Do not be afraid to change your opinion if the

8    discussion persuades you that you should, but do not come to a

9    decision simply because other jurors think it is right.

10             "It is important that you attempt to reach a

11   unanimous verdict but, of course, only if each of you can do so

12   after having made your own conscientious decision.  Do not

13   change an honest belief about the weight and effect of the

14   evidence simply to reach a verdict.

15             "Now, some of you have taken notes during the course

16   of the trial.  Whether or not you took notes, you should rely

17   on your own memory of what was said.  Notes are only to assist

18   your memory.  You should not be overly influenced by your notes

19   or those of your fellow jurors.

20             "The punishment provided by law for this crime is

21   for the Court to decide.  You may not consider punishment in

22   deciding whether the Government has proved its case against the

23   defendant beyond a reasonable doubt.

24             "Now, a verdict form has been prepared for you.

25   After you have reached unanimous agreement on a verdict, your

foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you're ready to return to the courtroom.

"If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing. And I will respond to the jury concerning the case only in writing or here in open court.

"If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.

"Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged."

All right.  That concludes the reading of the instructions.

Counsel, are there any objections to the jury instructions that were read by the Court?

MS. KUMAR:  No, Your Honor.

MR. RAYNOR:  No, Your Honor.

THE COURT:  All right.  Let's call and swear the

```
 1   bailiff.
 2                THE COURTROOM DEPUTY:  Please state your name for
 3   the record.
 4                THE BAILIFF:  David Williams.
 5                THE COURTROOM DEPUTY:  Do you solemnly swear to keep
 6   this jury together in some private and convenient place, that
 7   you will not permit any person to speak to or communicate with
 8   them, nor do so yourself, unless by order of the Court or to
 9   ask whether they have agreed upon a verdict, and that you will
10   return them to court when they have so agreed or when ordered
11   by the Court, so help you God?
12                THE BAILIFF:  I do.
13                THE COURT:  All right.  Ladies and gentlemen, a
14   couple of additional rules.
15                First of all, you can only deliberate when you're
16   all assembled in the jury room.  There can't be any side
17   caucuses.  So if you need to take a break from your
18   deliberations and somebody steps out, you've got to stop
19   deliberating.  And I'm going to rely on each of you
20   individually to enforce that rule and also the foreperson to
21   enforce that rule.
22                Unfortunately, the alternates cannot be present in
23   the jury room.  So you're going to have to remain in the --
24                Where do we put them, Shannon?  In the jury -- the
25   alternates.  They can't sit in the jury room.  Where do the --
```

1          Well, Shannon will make arrangements for the

2    alternates.

3          I understand that as a result of a personal

4    commitment of one of the jurors, that the jury is not going to

5    be able to stay much past 2:00 o'clock today.

6          We have ordered lunch, so make sure that you enjoy

7    your -- you enjoy your lunch before you leave.  And I'm going

8    to order you to come back at 8:00 o'clock on Monday morning.

9    And you should be prepared to deliberate until at least

10   4:00 o'clock on Monday.

11         Because we're coming up against the weekend, I want

12   to make sure that the jurors understand their obligations not

13   to discuss this case with anyone.  So I'm going to give you

14   another instruction.

15         "Because you must base your verdict only on the

16   evidence received in this case and on the Court's instructions,

17   I want to remind you that you must not be exposed to any other

18   information about the case or the issues that it involves.

19   Except for discussing the case with your fellow jurors when

20   you're all together deliberating:

21         "Do not communicate with anyone and do not let

22   anyone else communicate with you in any way about this case or

23   anything to do with it.  This includes discussing the case in

24   person, in writing, by phone, electronic means, e-mail, text

25   messaging, any Internet Web site, or other feature.  This also

1    applies to communicating with your family members, your

2    employer, and the people involved in the trial.  If you're

3    asked or approached in any way about your jury service or

4    anything about this case, you must respond that you've been

5    ordered not to discuss the matter and to report the contact to

6    the court.

7              "Also, it's very important that you not do any

8    research, such as consulting dictionaries, searching the

9    Internet, or using any other reference materials.  Do not make

10   any investigation or in any way try to learn anything about

11   this case on your own.

12             "The law requires this restriction to ensure the

13   parties have a fair trial based upon the same evidence that

14   each party has had an opportunity to address.  Any juror who

15   violates these instructions or restrictions jeopardizes the

16   fairness of these proceedings and a mistrial could result,

17   which would require the entire process to start over again."

18             So I'm now going to have you go back to the jury

19   room with Shannon.  And I appreciate your attention.  I know

20   it's been -- it's been a long week.  And I wish everybody to

21   have a good weekend and a safe drive home.  And we will see you

22   Monday morning, bright and early, at 8:00 o'clock.

23             THE COURTROOM DEPUTY:  All rise for the jury.

24             (Out of the presence of the jury:)

25             THE COURT:  All right.  The jury is not present.

**UNITED STATES DISTRICT COURT**

```
 1                    There's a couple of matters I want to discuss with
 2      counsel.
 3                    Counsel will have the responsibility to review the
 4      exhibits and the exhibit list that Shannon has prepared to
 5      verify that the list accurately identifies the exhibits that
 6      have been received into evidence.
 7                    Counsel should also carefully review all of the
 8      admitted exhibits that will be delivered to the jury room and
 9      make sure that there are no -- that all the pages are there and
10      there are no extraneous marks on them.
11                    If you do not advise the Court to the contrary, I
12      will assume that you will agree with Shannon's list of
13      exhibits, that it accurately reflects those exhibits received
14      into evidence, and you have no objections to the exhibits that
15      will be delivered to the jury by Shannon.
16                    I will send a copy of the jury instructions to
17      the -- to the jury room.  Obviously, we'll send the verdict
18      form.
19                    I'm also -- I'll ask counsel what their views are in
20      terms of sending in the First Superseding Indictment.  I
21      usually do send it in.
22                    Anybody have any objection?
23                    MS. KUMAR:  No, Your Honor, not from the Government.
24                    MR. KOURY:  We'd prefer that it not go in,
25      Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  All right.  If that's an objection, it
 2   will be overruled.  I'll send it in.
 3            All right.  I think that's all I have.
 4            What we're going to do now is we're going to give
 5   the court reporter a brief ten-minute break, and then I'll come
 6   back out and I'll hear the Rule 29 motion that Mr. Raynor has
 7   been itching for days to make.
 8            MR. RAYNOR:  Thank you, Your Honor.
 9            (Break taken.)
10            (Out of the presence of the jury:)
11            THE COURT:  We're back on the record.  The jury is
12   not present.  All counsel and -- or most counsel and the
13   defendant are present.
14            All right, Mr. Raynor.
15            MR. RAYNOR:  Thank you, Your Honor.
16            First of all, I would like to make a generic Rule 29
17   motion to dismiss each of the six counts of the First
18   Superseding Indictment based upon insufficiency of the evidence
19   as to each element of each charge.
20            Um, and then in addition to that general Rule 29
21   motion, there are some specifics that I would point out.
22            And although the Court gave a jury instruction
23   defining just Article 129 as the predicate specified unlawful
24   activity, the Court can and should consider the fact that there
25   is a generic federal definition at this stage in determining
```

1   whether or not bribery of a public official under foreign law

2   has been satisfied.

3           And the federal definition requires that a person

4   act corruptly.  And -- and I would suggest that there is

5   insufficient evidence of that.

6           And there's also a generic federal definition for,

7   um, a public official.  And it does not include commercial

8   bribery.  And it requires the formal exercise of governmental

9   power.  And we would suggest that there's insufficient

10  evidence, um, that -- that that has been the case.

11          Um, in particular, you have the Government

12  ultimately coming up with a few things that they suggest was,

13  um -- um, the, um -- the official acts.  But the question is:

14  What was this over a million dollars paid for?  Was it -- uh,

15  uh -- a few acts of giving, uh, some information on bidding, or

16  was it for, uh, years and years of providing, uh, what

17  essentially was a warranty service?  And we know that --

18          THE COURT:  A million dollars worth of warranty

19  service or a million dollars worth of technical advice?  To me,

20  that's absurd.  But --

21          MR. RAYNOR:  It's -- he provided very useful

22  information.  It was useful for them.  And -- and the question

23  was:  What was it in exchange for?  And, uh, it benefited these

24  companies greatly.  They made a lot of money.  The products

25  were made better in Korea.  Just, for example, the -- the, um,

```
 1    software, the Scream software.  The application of that was

 2    only made -- uh, uh -- was basically facilitated by Dr. Chi's

 3    suggestion of that use.

 4              THE COURT:  You know, I've sat through the evidence

 5    now, and one thing is clear to me and that is that Dr. Chi is

 6    very intelligent.  And the efforts and what he did in terms of

 7    his -- not the facts of this case but what he contributed to

 8    the country of Korea in terms of the development of various

 9    systems was obviously very important.

10              But I don't think that gives him a pass on what the

11    Government's evidence has, in my view, established and that is

12    the violation of Article 129.

13              But I do think that Dr. Chi's efforts and especially

14    his participation in the -- in whatever the -- it's been a long

15    day -- the acronym is for the nuclear --

16              MR. RAYNOR:  Comprehensive test-band treaty.

17              THE COURT:  Yes.  I mean, obviously, that's

18    extremely important, not only to South Korea.  I couldn't

19    imagine living in South Korea being next to a North Korea under

20    the current -- the current regime in north Korea.

21              So I understand what you're saying.  I'll give you a

22    few more minutes.  The court reporter's been going at it for a

23    long time.

24              MR. RAYNOR:  Okay.  Well, Your Honor, I would

25    just -- I would just point out that, you know, we had reserved
```

**UNITED STATES DISTRICT COURT**

```
 1    the motion and, you know, at the point that the Government
 2    rested, even before we put on our witnesses.
 3              And -- and I would suggest that really the
 4    Government, um, hasn't, um, shown anything more than they have
 5    indicated in their previous proffers, uh, which, uh, is -- is
 6    not enough to show that -- that, uh -- that the acts alleged
 7    were in exchange for the money, as opposed to a technical
 8    advice fee, an advice fee that he was paid for.
 9              And, you know, even if -- even assuming that --
10    that, uh, the Government's allegations are correct, um, it
11    still could be that he was paid for technical advice and he
12    gave other things, but that was not in exchange for the
13    payment.  He may have had a financial motivation for that, but
14    that does not make it a bribe.  It has to be an exchange, uh,
15    of the official act for the money as opposed to maybe
16    incidental or maybe due to incentivizing certain things but
17    nothing to suggest that it was -- that was what was negotiated.
18              Because, you see, the -- the, uh, handwritten
19    contracts, the initial contracts that were described as
20    personal contracts, they all talk about him providing certain
21    technical service.  We noted that technical service was
22    provided.  Uh, it was detailed particularly by Ms. Pearce.
23              And so it very well could have been that, uh -- that
24    he was paid for that -- uh, uh -- technical service.  And maybe
25    some other things that may be considered official duties were
```

1    provided but not in exchange for.

2            And for that reason, uh -- with that element in

3    particular, we would suggest that, uh -- um, there's not enough

4    for a rational jury to conclude beyond a reasonable doubt, um,

5    that, um, there was a -- a predicate, um, specified unlawful

6    activity.

7            THE COURT:  All right.  I will deny the Rule 29

8    motion.

9            And I also want to take this opportunity because

10   I -- I want to make a clear record with respect to the motion

11   in limine that was filed with respect to the defense experts.

12   That motion was filed by the Government to preclude two of the

13   defendant's expert witnesses, Carl Knudson and Jean -- how do

14   you pronounce that last name?

15           MR. KOURY:  Avouac.

16           THE COURT:  Avouac?

17           MR. KOURY:  Yes.

18           THE COURT:  All right.  From testifying at trial.

19           The defendant filed an expert witness disclosure

20   relating to Avouac on July 6.  It was Docket No. 130.  And the

21   Government filed a response to the notice of expert witness

22   that same day, Docket No. 132.

23           The Court informed the parties on Friday that it

24   would grant the Government's motion to exclude Knudson because

25   the defendant did not file an offer of proof for that witness.

```
 1    The Court also noted it was inclined to grant the Government's
 2    request to preclude Avouac from testifying and explained the
 3    basis for its tentative ruling.
 4            The Court concluded they could not see how that
 5    testimony would be relevant because the witness did not have
 6    any idea what the defendant did on a day-to-day basis over the
 7    past ten years.
 8            I heard brief argument from counsel who indicated
 9    that the testimony was necessary to interpret the technical
10    language and e-mails to help the jury better understand the
11    scope of defendant's work at KIGAM.  But I found the
12    defendant's argument was not persuasive.
13            The Court pointed out that the defendant's offer of
14    proof did not contain anything about that witness's
15    interpretation of the technical language.  And I didn't see how
16    that explanation would be relevant or helpful to the jury.
17            However, I agreed to defer ruling until the
18    Government witness Gee testified, and the Court agreed to allow
19    the defendant to file an offer of proof after that testimony.
20            On July 11th, after considering Gee's testimony, I
21    informed counsel that the -- my tentative ruling would probably
22    be my final ruling but that I would permit defendant to file a
23    supplemental offer of proof.  The defendant indicated it was
24    not necessary and declined to do so.
25            Accordingly, I confirmed my -- or adopted my
```

previous tentative ruling, and the defendant indicated that he
did not need a more formal ruling on this issue.  However, I
thought it would be important to elaborate on the record the
basis for my rulings.

For the reasons stated in the Government's
opposition, I conclude that the witness Avouac may not proffer
the opinions outlined in the witness disclosure.  It's the
jury's role to determine what the scope of the defendant's job
duties were as the director and principal researcher at KIGAM
and what acts he took on behalf of GSL and Kinemetrics.

These are purely factual questions.  And an expert
witness testimony is not necessary or helpful to the jury in
resolving these issues.

Moreover, as to the substance of Avouac's testimony,
I concluded that the proposed testimony is irrelevant,
unreliable, and prejudicial and would simply serve as a conduit
for the admission of inadmissible evidence and the defendant's
self-serving testimony.

First, I conclude that Avouac's testimony is
inappropriate expert testimony under Rule 702 and irrelevant
under 401 because it will not assist the jury in understanding
the evidence or determining the facts at issue, and it does not
bear on any of the issues in this case.

As the Government noted, seismologists may have
markedly different roles in different companies, and the duties

1    and responsibility of a seismologist can vary depending upon

2    that capacity in which the -- depending on the capacity in

3    which the seismologist is employed.

4            Thus, Avouac's proposed testimony about general

5    roles and duties of a seismologist, how seismologists use the

6    type of equipment involved in this case and the market for such

7    equipment has no bearing on what the defendant's role was at

8    KIGAM or the duties and responsibilities he had in that role.

9            Avouac's proposed testimony that the work of a

10   seismologist is generally not related to the work of a field

11   technician is similarly irrelevant because Avouac has no

12   knowledge of what responsibilities those roles entail at KIGAM.

13           Second, I find that the testimony is unreliable and

14   based on speculation.  Avouac has no personal knowledge of

15   KIGAM or defendant's responsibilities or areas of influence.

16   Rather, Avouac intended to -- had reviewed hundreds of

17   documents from KIGAM and e-mails from the defendant and, based

18   upon that review, was going to opine whether defendant acted as

19   a seismologist while working at KIGAM.

20           But as the Government pointed out, Avouac's

21   knowledge of seismology does not assist him in defining the

22   scope of the defendant's official duties.  Accordingly, I

23   concluded that his testimony would be speculative and,

24   therefore, unreliable.

25           So that was the basis of my precluding Avouac from

**UNITED STATES DISTRICT COURT**

1    testifying.

2            I do want to express my appreciation to counsel in

3    this case.  I thought that it was a well -- a well tried case.

4            I also was very appreciative of your efforts in the

5    pretrial preparation of the case.  I could only imagine that we

6    would have been here for a week if counsel had not come to an

7    agreement with respect to the exhibits that were included and

8    basically stipulated to in the -- in the pretrial exhibit

9    stipulation.

10            I realize it was a lot of work to prepare that

11   document, but I think the trial went much smoother.  And at

12   certain points in time, I think the jury was getting a

13   little -- I won't say bored, but they were getting a little

14   inundated with information.  And the thought of having to go

15   through each one of those exhibits with the jurors would have

16   been -- I don't think it would have been in the interest of

17   either the Government or the defendant, certainly not in the

18   interest of the Court to sit here and listen to that.

19            So I appreciate counsel's efforts.

20            We'll see you back here on Monday morning.  Make

21   sure you come to court on Monday morning at 8:00 o'clock and

22   check in with Shannon and give Shannon your contact

23   information.  And I'm sure you'll be down in your plush

24   quarters in the attorney's conference room as well as the

25   assistants --

```
 1                  Are you going back to Washington this weekend?

 2                  MR. FUHR:  Not yet.  We'll be here Monday morning.

 3                  THE COURT:  You'll be here.  You're going to milk

 4      another two days out of this?

 5                  MR. KOURY:  Where does the Court order lunch for the

 6      jurors?

 7                  THE COURT:  Pardon me?

 8                  MR. KOURY:  Where does the Court order lunch for the

 9      jurors?

10                  THE COURT:  Downstairs.

11                  MR. KOURY:  Downstairs.

12                  THE COURT:  We have it -- we order it and have it

13      brought up.  Quite frankly, I -- I've not eaten down there, so

14      I have no idea.

15                  Has anybody eaten down there?  Is it any good?

16                  In any event, if we want to chitchat, we can go off

17      the record because I know the court reporter's very tired.

18                  But make sure you spend time with Shannon because

19      Shannon's going to bring in the -- she's going to have the

20      exhibits, the jury instructions, and the verdict form in the

21      jury room at 8:00 o'clock on Monday.  So you need to -- I don't

22      want you to leave here today until you're -- until that issue

23      is resolved.

24                  We're off the record.

25                  (Proceedings concluded at 2:33 p.m.)
```

1         **CERTIFICATE OF OFFICIAL REPORTER**

2

3  COUNTY OF LOS ANGELES   )
                          )

4  STATE OF CALIFORNIA    )

5

6          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7  REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8  CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9  TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17          DATED THIS 14TH DAY OF JULY, 2017.

18

19

20               /S/ MYRA L. PONCE

             _____

21         MYRA L. PONCE, CSR NO. 11544, CRR, RDR
            FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$10,000** [8] - 862:2, 870:10, 870:20, 895:13, 903:22, 904:1, 912:3, 913:2
**$100,000** [1] - 895:18
**$12** [1] - 882:14
**$50,000** [1] - 884:5
**$720,000** [2] - 882:18, 882:20

## 1

**1** [11] - 862:12, 862:25, 875:10, 891:16, 903:25, 911:9, 911:13, 911:16, 913:17, 914:13
**10,000** [1] - 870:20
**108** [1] - 866:20
**10TH** [1] - 872:22
**11** [1] - 887:6
**11TH** [1] - 926:20
**12** [2] - 882:17, 893:5
**120** [1] - 866:12
**129** [10] - 863:3, 862:6, 912:25, 913:8, 913:9, 913:14, 913:18, 913:25, 921:23, 923:12
**12:20** [1] - 859:1
**13-YEAR** [1] - 881:22
**130** [1] - 925:20
**132** [1] - 925:22
**14** [1] - 859:1
**141** [2] - 872:3, 873:4
**144** [1] - 887:6
**1500** [1] - 871:20
**18** [2] - 861:11, 911:18
**188** [1] - 904:18
**18TH** [1] - 865:15
**1957** [2] - 861:12, 911:18
**1994** [1] - 863:16
**1999** [1] - 870:6
**1A** [2] - 863:18, 899:8

## 2

**2** [3] - 862:21, 868:25, 913:19
**20** [3] - 867:3, 896:9, 897:17
**2002** [1] - 877:13
**2003** [4] - 871:16, 879:2, 884:6, 895:14
**2004** [2] - 864:23, 867:11
**2005** [2] - 865:15,

**874:5**
**2007** [1] - 866:25
**2008** [1] - 866:13
**2009** [4] - 867:4, 870:18, 898:21, 904:7
**2010** [1] - 872:5
**2013** [1] - 877:14
**2016** [7] - 863:17, 884:6, 891:24, 892:1, 895:14, 898:21, 904:19
**2017** [1] - 859:1
**21ST** [2] - 864:23, 874:5
**22** [1] - 875:16
**223** [1] - 868:4
**226** [1] - 873:4
**255** [1] - 868:7
**26** [1] - 869:23
**26TH** [1] - 866:25
**29** [7] - 859:14, 859:16, 859:17, 921:6, 921:16, 921:20, 925:7
**2:00** [1] - 918:5
**2:33** [1] - 930:25
**2A** [2] - 865:9, 901:4

## 3

**3** [2] - 870:11, 871:20
**30** [1] - 881:13
**30-SOME** [1] - 881:17
**30TH** [1] - 871:16
**31** [1] - 868:20
**31ST** [1] - 872:5
**32** [1] - 868:20
**33** [1] - 870:12
**34** [1] - 870:21
**35** [1] - 881:12
**3RD** [1] - 866:13

## 4

**4** [1] - 862:7
**4,000** [1] - 871:19
**40** [2] - 884:5, 904:3
**401** [1] - 927:21
**45** [1] - 876:16
**4:00** [1] - 918:10

## 5

**5** [2] - 870:10, 895:13
**50** [1] - 867:3
**500** [3] - 880:12, 897:2, 897:3
**504** [1] - 880:8
**508A** [1] - 903:6

**54** [1] - 891:2
**58** [2] - 863:22, 899:9

## 6

**6** [10] - 882:16, 882:17, 891:16, 891:19, 903:25, 911:10, 911:13, 911:16, 914:13, 925:20
**6)** [1] - 901:25
**63** [1] - 865:21

## 7

**70** [2] - 871:15, 872:11
**702** [1] - 927:20
**73** [1] - 865:9
**75** [1] - 867:8
**7TH** [3] - 867:11, 891:23, 892:1

## 8

**8** [1] - 859:3
**80** [3] - 864:20, 901:20, 902:19
**87** [1] - 865:9
**88** [1] - 865:10
**89** [1] - 874:3
**8:00** [4] - 918:8, 919:22, 929:21, 930:21

## 9

**90** [1] - 903:23
**99** [3] - 870:17, 903:23, 904:5

## A

**ABIDING** [1] - 904:25
**ABILITY** [1] - 909:4
**ABLE** [5] - 880:14, 886:4, 894:13, 904:4, 918:5
**ABRUPT** [1] - 884:12
**ABSENCE** [3] - 875:12, 910:8, 910:9
**ABSURD** [1] - 922:20
**ABUSE** [1] - 871:11
**ABUSED** [5] - 860:5, 862:12, 864:14, 898:19
**ABUSING** [1] - 898:21
**ACCEPT** [7] - 864:3, 889:23, 889:24, 893:5, 911:1, 913:10, 913:20

**ACCEPTANCE** [1] - 891:21
**ACCEPTANCE** [1] - 866:17
**ACCEPTED** [3] - 867:20, 889:19, 898:20
**ACCEPTING** [2] - 862:13, 902:9
**ACCIDENT** [2] - 910:9, 914:8
**ACCORDING** [1] - 916:1
**ACCORDINGLY** [2] - 926:25, 928:22
**ACCOUNT** [19] - 860:21, 860:24, 861:14, 862:23, 862:24, 868:19, 869:17, 869:21, 869:22, 870:14, 870:17, 872:1, 872:11, 872:12, 875:25, 903:24, 904:7, 909:3
**ACCOUNTABLE** [1] - 874:15
**ACCOUNTANT** [1] - 868:16
**ACCOUNTS** [1] - 861:16
**ACCURATELY** [2] - 920:5, 920:13
**ACCUSED** [2] - 882:10, 882:11
**ACRONYM** [1] - 923:15
**ACT** [9] - 905:1, 914:6, 914:7, 914:14, 914:15, 922:4, 924:15
**ACTED** [2] - 914:10, 928:18
**ACTIVITY** [8] - 862:4, 862:8, 862:16, 863:2, 870:23, 893:19, 921:24, 925:6
**ACTOR** [1] - 890:24
**ACTS** [11] - 910:5, 914:2, 914:3, 914:4, 914:9, 914:14, 914:15, 922:13, 922:15, 924:6, 927:10
**ADDED** [1] - 891:23
**ADDITION** [7] - 864:16, 865:10, 872:18, 906:9, 908:4, 910:18,

**921:20**
**ADDITIONAL** [1] - 917:14
**ADDRESS** [4] - 873:11, 873:15, 899:3, 919:14
**ADMISSION** [1] - 927:17
**ADMITTED** [4] - 871:25, 882:9, 911:3, 920:8
**ADOPTED** [1] - 926:25
**ADVANTAGE** [1] - 867:23
**ADVANTAGES** [2] - 860:12, 902:25
**ADVERTISING** [4] - 887:5, 888:16, 888:19, 888:22
**ADVICE** [21] - 865:12, 866:19, 868:3, 868:9, 868:12, 871:8, 871:13, 871:19, 872:7, 873:6, 874:6, 879:13, 889:8, 889:12, 894:21, 897:18, 897:25, 922:19, 924:8, 924:11
**ADVISE** [3] - 884:8, 916:2, 920:11
**AFFECTED** [1] - 869:25
**AFFECTING** [2] - 869:9, 912:10
**AFRAID** [1] - 915:7
**AFTERNOON** [3] - 875:2, 875:3, 898:11
**AGENCIES** [1] - 864:16
**AGENCY** [1] - 868:4
**AGENT** [1] - 874:6
**AGO** [6] - 876:16, 877:13, 881:3, 881:12, 892:5
**AGREE** [4] - 893:6, 901:23, 905:18, 920:12
**AGREED** [5] - 907:16, 917:9, 917:10, 926:17, 926:18
**AGREEMENT** [9] - 872:19, 880:5, 880:7, 889:24, 891:15, 902:11, 915:1, 915:25, 929:7
**AGREEMENTS** [1] - 889:24
**AHEAD** [1] - 887:11

**AIMING** [1] - 902:12
**ALLEGATIONS** [1] - 924:10
**ALLEGED** [3] - 911:9, 911:13, 924:6
**ALLEGES** [1] - 913:5
**ALLOW** [1] - 926:18
**ALLOWED** [4] - 874:8, 891:24, 891:25, 904:14
**ALLOWS** [1] - 889:23
**ALMOST** [2] - 870:16, 874:6
**ALTERNATES** [3] - 917:22, 917:25, 918:2
**AMBITIOUS** [1] - 879:3
**AMERICA** [11] - 861:13, 862:23, 868:19, 869:16, 869:21, 870:5, 870:6, 870:13, 870:17, 872:1, 903:23
**AMERICAN** [3] - 872:8, 889:8, 898:25
**AMOUNT** [4] - 865:17, 895:7, 895:16
**AMOUNTS** [1] - 861:15
**ANALYSIS** [1] - 904:2
**ANALYZES** [1] - 893:17
**ANGELES** [1] - 859:2
**ANNOUNCED** [4] - 867:2, 867:4, 876:18, 891:12
**ANNUAL** [1] - 868:22
**ANSWER** [4] - 883:7, 884:15, 884:16, 916:12
**ANSWERING** [1] - 916:11
**ANSWERS** [1] - 907:22
**ANTICIPATE** [1] - 899:5
**ANYHOW** [1] - 872:23
**APOLOGIZE** [1] - 883:17
**APP** [1] - 895:19
**APPEARED** [1] - 873:8
**APPLICATION** [1] - 923:1
**APPLIES** [3] - 892:15, 905:13, 919:1
**APPLY** [2] - 877:24, 905:17

**APPRECIATE** [3] - 893:11, 919:19, 929:19
**APPRECIATION** [1] - 929:2
**APPRECIATIVE** [1] - 929:4
**APPROACHED** [2] - 894:11, 919:3
**APPROVAL** [1] - 887:22
**APPROVED** [4] - 883:24, 883:25, 884:1, 891:10
**APPROVES** [1] - 877:17
**APRIL** [1] - 874:5
**AREAS** [1] - 928:15
**ARGUED** [1] - 865:13
**ARGUMENT** [4] - 859:10, 859:19, 926:8, 926:12
**ARGUMENTS** [3] - 859:24, 907:19, 907:24
**ARISE** [1] - 906:19
**ARRANGEMENT** [1] - 903:8
**ARRANGEMENTS** [1] - 918:1
**ARREST** [1] - 877:23
**ARRESTED** [1] - 877:6
**ARTICLE** [10] - 863:3, 912:6, 912:25, 913:8, 913:9, 913:14, 913:18, 913:25, 921:23, 923:12
**ASSEMBLED** [1] - 917:16
**ASSESSING** [1] - 884:2
**ASSETS** [1] - 881:15
**ASSIGNED** [1] - 865:8
**ASSIST** [3] - 915:17, 927:21, 928:21
**ASSISTANCE** [1] - 860:21
**ASSISTANTS** [1] - 929:25
**ASSUME** [1] - 920:12
**ASSUMING** [1] - 924:9
**ATHLETES** [1] - 895:17
**ATTACHED** [1] - 888:9
**ATTEMPT** [2] - 915:10, 916:7
**ATTEMPTED** [2] - 861:24, 911:23

**ATTENTION** [5] - 862:19, 875:6, 901:4, 904:18, 919:19
**ATTORNEY'S** [1] - 929:24
**AUDITOR** [2] - 877:15, 893:24
**AUTHORITIES** [1] - 882:5
**AVAILABLE** [2] - 859:11, 905:14
**AVOID** [1] - 873:18
**AVOUAC** [9] - 925:15, 925:16, 925:20, 926:2, 927:6, 928:11, 928:14, 928:16, 928:25
**AVOUAC'S** [5] - 927:14, 927:19, 928:4, 928:9, 928:20
**AWARD** [1] - 875:14
**AWARD** [3] - 875:15, 875:16
**AWARD-WINNING** [1] - 875:14
**AWARE** [1] - 914:6
**AWKWARD** [1] - 874:25

# B

**BAD** [4] - 871:10, 886:10, 896:24, 897:14
**BAILIFF** [1] - 917:1
**BAILIFF** [2] - 917:4, 917:12
**BALANCE** [1] - 903:22
**BAN** [1] - 878:14
**BAND** [1] - 923:16
**BANK** [4] - 860:21, 872:8, 875:25, 889:9
**BANK** [1] - 861:13, 862:23, 868:18, 869:16, 869:21, 870:5, 870:6, 870:13, 870:17, 872:1, 903:23
**BANKING** [2] - 881:13, 881:18
**BANKS** [1] - 912:13
**BARRELS** [1] - 890:22
**BASE** [1] - 918:15
**BASED** [17] - 872:9, 874:11, 882:23, 882:25, 885:5, 889:17, 894:9, 898:5, 902:18, 902:20, 906:17,

906:18, 919:13, 921:18, 928:14, 928:17
**BASIS** [4] - 926:3, 926:6, 927:4, 928:25
**BASKETBALL** [1] - 895:19
**BEAR** [2] - 909:15, 927:23
**BEARING** [2] - 910:6, 928:7
**BECOMES** [1] - 916:4
**BEGIN** [2] - 861:9, 914:22
**BEGINNING** [4] - 875:19, 875:22, 903:22, 905:22
**BEHALF** [2] - 863:24, 927:10
**BEHIND** [1] - 865:7
**BELIEF** [1] - 915:13
**BELIEVABILITY** [1] - 909:15
**BELIEVABLE** [1] - 909:18
**BELOW** [1] - 871:22
**BELT** [1] - 896:16
**BENEFIT** [4] - 880:1, 894:22, 898:6
**BENEFITED** [1] - 922:23
**BENEFITS** [2] - 899:15, 899:17
**BEST** [6] - 885:10, 885:23, 891:15, 894:4, 896:5, 896:20
**BETTER** [6] - 867:25, 888:16, 892:2, 892:3, 922:25, 926:10
**BETWEEN** [3] - 893:20, 898:20, 908:20
**BEYOND** [14] - 861:23, 905:6, 906:7, 906:11, 906:13, 906:15, 906:22, 907:1, 911:11, 911:22, 913:16, 914:18, 915:23, 925:4
**BIAS** [1] - 909:10
**BID** [3] - 876:18, 877:13, 891:10
**BIDDING** [10] - 860:18, 866:9, 866:21, 866:23, 867:2, 867:7, 867:9, 867:15, 895:1, 922:15

**BIDS** [7] - 876:5, 876:15, 876:21, 885:18, 891:9, 900:2
**BILL** [3] - 890:7, 890:8, 890:11
**BILLION** [1] - 895:20
**BILLION-DOLLAR** [1] - 895:20
**BINDER** [1] - 887:6
**BINDER** [4] - 880:9, 880:10, 887:19
**BINDERS** [1] - 887:17
**BIT** [2] - 882:24, 886:7
**BLOOD** [1] - 897:4
**BOGUS** [1] - 873:13
**BOOKS** [1] - 875:9
**BORDER** [2] - 893:22
**BORED** [1] - 929:13
**BOSS** [1] - 901:15
**BOTTOM** [4] - 865:14, 866:14, 867:13, 901:5
**BOUGHT** [1] - 865:12
**BOX** [3] - 867:3, 890:4
**BOXES** [1] - 890:23
**BREAK** [4] - 884:23, 894:7, 917:17, 921:5
**BREAK** [1] - 921:9
**BRIBE** [7] - 862:23, 870:20, 870:24, 886:4, 904:6, 913:10, 924:14
**BRIBED** [2] - 876:4, 887:10
**BRIBERY** [24] - 869:5, 870:23, 878:1, 878:2, 878:3, 878:16, 880:21, 882:23, 889:16, 889:17, 894:19, 894:23, 896:2, 896:12, 897:20, 899:1, 905:1, 912:5, 912:23, 913:7, 913:13, 922:1, 922:8
**BRIBES** [4] - 860:3, 868:22, 887:2, 898:20
**BRIEF** [2] - 921:5, 926:8
**BRIEFLY** [2] - 874:23, 899:3
**BRIGHT** [1] - 919:22
**BRING** [7] - 868:25, 869:1, 872:3, 874:3, 894:1, 905:2, 930:19
**BRINGING** [1] - 905:2
**BRITISH** [2] - 882:5, 885:17
**BROKE** [1] - 874:11

BROKEN [1] - 888:17
BROUGHT [6] -
878:11, 894:1,
894:2, 898:24,
914:20, 930:13
BUCKS [7] - 880:12,
896:9, 897:2, 897:3,
897:6, 897:9, 897:17
BUDGET [2] - 883:22,
894:14
BUILD [3] - 879:10,
894:10, 894:13
BUILDING [3] -
882:15, 883:20,
885:2
BUILT [1] - 895:2
BURDEN [3] - 898:14,
898:15, 906:11
BUSINESS [8] -
860:12, 862:15,
863:19, 867:23,
871:10, 884:19,
899:9, 902:25
BUY [5] - 881:14,
896:21, 900:10,
901:17, 901:18
BUYING [2] - 881:13,
884:23
BYUNG [1] - 876:16

## C

CALIFORNIA [1] -
859:2
CALIFORNIA [8] -
860:22, 861:14,
868:19, 869:21,
869:24, 871:1,
903:17, 903:19
CANNOT [4] - 867:20,
887:13, 888:18,
917:22
CANSUN [10] - 879:4,
879:19, 879:23,
880:4, 880:11,
881:20, 882:3,
882:10, 882:12,
882:14
CAPACITY [3] -
860:14, 928:2
CAR [1] - 896:23
CARD [2] - 863:15,
899:9
CARDS [2] - 863:19,
899:9
CARE [1] - 884:16
CAREER [1] - 881:12
CAREFUL [5] -
906:19, 906:21,
906:24

CAREFULLY [1] -
920:7
CARL [1] - 925:13
CARRY [1] - 891:6
CARS [1] - 885:10
CASE [40] - 861:7,
861:9, 869:15,
873:24, 873:25,
874:9, 874:16,
875:22, 876:15,
878:1, 882:21,
882:22, 896:23,
905:13, 905:16,
905:19, 905:23,
908:10, 908:23,
909:8, 909:20,
914:25, 915:3,
915:22, 916:8,
918:13, 918:16,
918:18, 918:19,
918:22, 918:23,
919:4, 919:11,
922:10, 923:7,
927:23, 928:6,
929:3, 929:5
CASH [11] - 871:8,
871:9, 872:6, 889:6,
890:21, 890:22,
890:23, 890:25,
891:3, 891:4, 891:7
CATEGORIES [1] -
864:12
CAUCUSES [1] -
917:17
CAUSED [1] - 914:15
CAUSING [1] - 914:16
CAUTION [3] - 859:9,
861:18, 910:19
CELEBRATE [1] -
881:2
CELEBRATED [1] -
880:25
CENTER [1] - 876:11
CENTER [8] - 860:9,
874:7, 888:6, 892:6,
900:8, 900:15,
901:13, 902:6
CENTRAL [1] - 876:12
CEO [1] - 881:19
CEOS [1] - 883:24
CERTAIN [6] - 908:6,
911:3, 911:10,
924:16, 924:20,
929:12
CERTAINLY [5] -
877:4, 882:21,
888:25, 929:17
CERTIFICATE [2] -
866:17, 867:5
CERTIFICATION [1] -

895:1
CERTIFICATIONS [1]
- 900:16
CERTIFIED [1] - 876:6
CERTIFYING [1] -
876:12
CHAINS [1] - 888:21
CHANCE [1] - 898:12
CHANGE [2] - 915:7,
915:13
CHANGED [1] -
877:23
CHAPTER [2] -
862:12, 862:21
CHAPTER [2] -
862:25, 868:25
CHAPTERS [1] -
862:10
CHARACTER [1] -
890:23
CHARGE [11] -
861:22, 862:9,
869:2, 883:17,
896:19, 901:11,
901:14, 902:24,
906:11, 911:21,
921:19
CHARGED [12] -
861:10, 889:14,
889:16, 898:2,
903:20, 907:6,
907:8, 910:5,
911:15, 911:16,
914:13
CHARGES [6] - 882:6,
882:8, 906:5, 907:4,
911:8, 911:9
CHART [1] - 870:13
CHARTS [4] - 870:15,
904:3, 911:3, 911:4
CHEAPER [1] - 897:4
CHECK [2] - 869:11,
929:22
CHECKING [1] -
878:14
CHECKS [5] - 870:13,
903:21, 903:25,
912:12, 912:13
CHEOL [3] - 860:2,
898:16, 901:12
CHI [72] - 860:2,
865:7, 867:8,
867:11, 868:2,
868:9, 868:11,
868:15, 869:24,
870:13, 871:12,
871:17, 871:25,
872:5, 872:12,
872:18, 873:3,
873:10, 873:12,

873:14, 873:17,
874:4, 875:8,
875:24, 876:3,
876:4, 876:11,
876:14, 876:20,
877:1, 877:6,
877:11, 877:13,
878:1, 878:12,
878:23, 879:3,
879:18, 880:4,
880:7, 880:11,
881:1, 882:6,
882:21, 883:3,
883:18, 884:1,
884:21, 885:5,
885:15, 885:20,
886:25, 887:8,
887:13, 887:20,
888:4, 888:13,
889:3, 889:10,
889:19, 889:25,
890:22, 892:2,
894:9, 897:22,
898:16, 899:17,
901:12, 901:21,
923:5
CHI'S [16] - 863:15,
863:19, 865:6,
869:15, 872:9,
872:20, 877:15,
885:1, 885:23,
885:25, 890:13,
893:16, 894:3,
895:15, 923:2,
923:13
CHIEF [1] - 881:23
CHIEF [1] - 875:14
CHIN [1] - 901:10
CHITCHAT [1] -
930:16
CHOOSING [1] -
905:2
CHRIS [12] - 876:4,
877:6, 877:10,
881:10, 882:16,
882:22, 882:23,
882:25, 885:25,
890:5, 890:11, 894:5
CIRCUMSTANCES [1]
- 910:2
CIRCUMSTANTIAL
[4] - 908:12, 908:15,
908:18, 908:21
CITIBANK [1] - 872:12
CLAIM [2] - 876:13,
882:23
CLAIMS [3] - 875:22,
875:23, 876:1
CLEAR [6] - 888:21,
889:6, 891:13,

923:5, 925:10
CLEARLY [2] - 886:25
CLERK [2] - 916:2,
916:5
CLOSELY [2] -
900:11, 914:2
CLOSING [5] - 859:10,
859:24, 861:20,
862:6, 907:24
CLUE [3] - 884:10,
885:23, 886:4
CMG-3TB [1] - 866:3
CMG-40T [1] - 866:3
CODE [1] - 873:3
CODE [7] - 861:12,
863:4, 911:19,
912:6, 912:25,
913:8, 913:15
COFFEE [1] - 894:7
COLLAPSE [2] -
881:16
COLLEAGUE [6] -
859:18, 865:6,
870:2, 871:22, 874:9
COLLEAGUE'S [1] -
865:7
COLLEAGUES [8] -
860:23, 863:23,
880:20, 888:12,
889:1, 895:11,
903:5, 903:12
COLLECT [2] -
891:25, 892:1
COLLECTIVELY [1] -
875:3
COMING [4] - 882:7,
891:4, 918:11,
922:12
COMMENDATION [1]
- 875:15
COMMENTS [1] -
876:8
COMMERCE [3] -
869:9, 870:1, 912:10
COMMERCIAL [1] -
922:7
COMMISSION [2] -
914:17, 914:20
COMMIT [2] - 880:21,
914:14
COMMITMENT [1] -
918:4
COMMITTED [9] -
882:11, 886:4,
905:1, 905:4, 910:4,
911:10, 911:12,
911:15, 914:18
COMMITTEE [6] -
866:1, 866:4,
877:17, 877:18,

900:8, 900:9
**COMMON** [1] - 906:18
**COMMUNICATE** [5] - 916:5, 916:7, 917:7, 918:21, 918:22
**COMMUNICATING** [1] - 919:1
**COMPANIES** [20] - 860:4, 860:12, 860:17, 864:7, 865:22, 866:7, 867:19, 868:23, 873:9, 881:14, 881:16, 894:11, 899:14, 903:11, 904:4, 904:25, 922:24, 927:25
**COMPANIES'** [4] - 860:16, 864:14, 866:9, 867:10
**COMPANY** [12] - 864:11, 866:17, 867:2, 867:7, 867:13, 879:14, 880:1, 882:15, 882:16, 882:17, 887:14
**COMPANY'S** [2] - 868:3, 868:6
**COMPENSATED** [1] - 868:15
**COMPETITIVE** [1] - 860:19
**COMPETITOR** [2] - 876:17, 894:1
**COMPETITORS** [3] - 866:10, 867:24, 900:23
**COMPILING** [1] - 870:15
**COMPLETE** [1] - 916:1
**COMPLEX** [1] - 873:25
**COMPONENT** [1] - 893:19
**COMPONENTS** [1] - 862:10
**COMPREHENSIVE** [1] - 923:16
**CONCEAL** [2] - 872:2, 873:19
**CONCERNED** [1] - 902:13
**CONCERNING** [1] - 916:8
**CONCERT** [1] - 895:18
**CONCERTED** [1] - 873:17

**CONCLUDE** [3] - 925:4, 927:6, 927:19
**CONCLUDED** [5] - 859:23, 926:4, 927:15, 928:23, 930:25
**CONCLUDES** [1] - 916:19
**CONCLUSION** [1] - 893:14
**CONDITIONS** [1] - 881:25
**CONDUCT** [4] - 862:13, 873:18, 873:20, 907:6
**CONDUIT** [1] - 927:16
**CONFERENCE** [1] - 929:24
**CONFIRM** [1] - 887:9
**CONFIRMED** [4] - 863:24, 869:23, 872:21, 926:25
**CONFRONTED** [1] - 883:5
**CONFUSED** [1] - 890:14
**CONFUSING** [1] - 873:25
**CONNECTION** [4] - 865:3, 865:23, 901:22, 913:10
**CONSCIENTIOUS** [1] - 915:12
**CONSIDER** [15] - 874:14, 907:12, 907:18, 907:21, 908:6, 908:18, 910:1, 910:6, 910:10, 910:16, 910:22, 910:25, 914:8, 915:21, 921:24
**CONSIDERATION** [3] - 906:19, 906:21, 906:25
**CONSIDERED** [2] - 915:4, 924:25
**CONSIDERING** [2] - 909:2, 926:20
**CONSISTENT** [2] - 874:15, 905:8
**CONSTITUTED** [1] - 912:19
**CONSTITUTING** [2] - 912:17, 914:15
**CONSTITUTION** [2] - 892:8, 892:11
**CONSTITUTIONAL** [1] - 909:20
**CONSTITUTIONAL** [1]

- 892:6
**CONSTITUTIONS** [1] - 892:7
**CONSULT** [2] - 905:14, 916:10
**CONSULTANT** [1] - 871:9
**CONSULTATIONS** [1] - 899:25, 900:1
**CONSULTING** [2] - 872:25, 919:8
**CONTACT** [2] - 919:5, 929:22
**CONTAIN** [1] - 926:14
**CONTAINING** [1] - 873:11
**CONTINUE** [1] - 916:12
**CONTRACT** [15] - 866:9, 872:25, 879:12, 879:21, 880:15, 880:16, 880:17, 883:14, 883:15, 883:19, 883:20, 903:11, 903:14, 904:13, 904:21
**CONTRACTS** [5] - 877:16, 877:25, 924:19, 924:20
**CONTRADICTED** [1] - 909:11
**CONTRARY** [1] - 920:11
**CONTRIBUTED** [1] - 923:7
**CONTROL** [2] - 861:19, 907:10
**CONTROLLER** [1] - 868:5
**CONTROLS** [1] - 908:2
**CONVENIENT** [1] - 917:6
**CONVINCE** [3] - 878:22, 882:5, 882:8
**CONVINCED** [3] - 906:14, 906:22, 907:1
**COPY** [5] - 859:7, 880:12, 880:13, 905:13, 920:16
**CORNER** [2] - 896:7, 896:15
**CORPORATION** [1] - 870:4
**CORRECT** [1] - 924:10
**CORRUPT** [1] - 894:18

**CORRUPTION** [1] - 874:10
**CORRUPTLY** [1] - 922:4
**COST** [1] - 885:9
**COSTLY** [1] - 885:8
**COSTS** [1] - 884:18
**COUNSEL** [21] - 859:7, 859:9, 859:24, 899:2, 899:13, 899:23, 901:2, 902:17, 903:6, 904:16, 916:21, 920:2, 920:3, 920:7, 920:19, 921:12, 926:8, 926:21, 929:2, 929:6
**COUNSEL'S** [2] - 898:17, 929:19
**COUNT** [6] - 861:12, 894:12, 907:9, 907:10, 907:11
**COUNTRY** [1] - 923:8
**COUNTS** [5] - 903:25, 911:9, 911:13, 911:16, 914:13
**COUNTS** [5] - 861:10, 862:20, 874:17, 905:7, 905:9, 921:17
**COUPLE** [5] - 881:3, 892:5, 893:14, 917:14, 920:1
**COURSE** [5] - 883:6, 891:25, 910:22, 915:11, 915:15
**COURT** [24] - 859:6, 859:15, 859:18, 859:22, 874:19, 874:22, 892:10, 898:8, 905:10, 916:25, 917:13, 919:25, 921:1, 921:11, 922:18, 923:4, 923:17, 925:7, 925:16, 925:18, 930:3, 930:7, 930:10, 930:12
**COURT** [10] - 908:9, 910:23, 914:24, 916:9, 917:10, 919:6, 921:5, 923:22, 929:21, 930:17
**COURT** [21] - 862:25, 869:8, 893:1, 893:4, 893:5, 899:6, 915:21, 916:22, 917:8, 917:11,

920:11, 921:22, 921:24, 925:23, 926:1, 926:4, 926:13, 926:18, 929:18, 930:5, 930:8
**COURT'S** [6] - 861:6, 861:18, 862:9, 878:16, 893:9, 918:16
**COURTROOM** [1] - 916:3
**COURTROOM** [3] - 917:2, 917:5, 919:23
**COVER** [1] - 893:14
**COWORKERS** [2] - 886:12, 894:20
**CRAPPY** [1] - 897:12
**CRAZY** [1] - 895:19
**CREATE** [1] - 881:6
**CREATED** [3] - 891:23, 892:4, 892:17
**CREATING** [1] - 882:15
**CRIME** [20] - 861:16, 886:3, 886:11, 886:12, 886:13, 889:12, 889:14, 892:13, 898:1, 898:2, 905:4, 907:8, 910:10, 914:15, 914:17, 914:18, 914:21, 915:20
**CRIMES** [1] - 910:5
**CRIMINAL** [5] - 863:4, 912:6, 912:25, 913:8, 913:14
**CRIMINAL** [6] - 882:5, 882:8, 909:20, 912:17, 912:20, 912:22
**CRIMINALLY** [6] - 862:1, 871:1, 912:1, 912:16, 913:2, 913:4
**CRITICALLY** [1] - 893:13
**CURRENT** [4] - 893:23, 900:14, 923:20
**CUSTOMARILY** [2] - 900:12, 914:4
**CUSTOMER** [2] - 897:17, 897:19
**CUSTOMERS** [5] - 860:16, 864:15, 865:23, 884:8, 884:25
**CUT** [8] - 864:25, 868:8, 884:18, 899:20, 900:3,

900:10, 901:21, 901:23
**CZERANKO** [1] - 870:4

# D

**DANIEL** [1] - 873:12
**DATA** [4] - 878:14, 891:10, 893:18
**DATE** [5] - 911:10, 911:12, 911:13, 911:15, 916:2
**DATED** [3] - 866:13, 867:11, 874:4
**DATES** [1] - 861:15
**DAVID** [1] - 917:4
**DAY-TO-DAY** [1] - 926:6
**DAYS** [6] - 861:5, 881:3, 889:22, 921:7, 930:4
**DEAL** [1] - 876:7
**DECEMBER** [2] - 864:23, 866:25
**DECIDE** [16] - 889:13, 892:13, 892:14, 892:19, 892:20, 892:21, 905:16, 905:19, 907:9, 908:10, 908:21, 908:24, 909:24, 915:3, 915:21
**DECIDED** [2] - 878:10, 892:2
**DECIDING** [5] - 907:12, 907:18, 908:23, 914:10, 915:22
**DECISION** [9] - 885:5, 893:3, 893:12, 893:13, 894:18, 902:17, 914:5, 915:9, 915:12
**DECISION-MAKERS** [1] - 914:5
**DECISIONS** [1] - 910:1
**DECLINED** [1] - 926:24
**DEFENDANT** [103] - 860:2, 860:10, 860:14, 860:20, 861:10, 861:24, 861:25, 862:12, 862:21, 863:3, 863:7, 863:10, 864:2, 864:7, 864:22, 864:24, 865:11, 865:22,

866:7, 866:12, 866:21, 866:24, 868:8, 868:14, 868:17, 868:18, 868:21, 870:25, 871:7, 872:15, 872:23, 873:1, 874:10, 898:16, 899:20, 900:4, 900:9, 900:18, 900:20, 901:14, 901:16, 902:4, 902:5, 902:13, 902:17, 902:20, 902:24, 903:1, 903:2, 903:8, 903:16, 904:7, 904:13, 904:20, 905:3, 905:7, 906:5, 906:6, 906:7, 906:9, 906:14, 906:23, 906:24, 907:1, 907:2, 907:4, 907:5, 907:8, 909:20, 909:22, 909:23, 909:24, 910:3, 910:4, 910:11, 911:16, 911:20, 911:23, 911:25, 912:18, 912:21, 913:17, 913:19, 914:6, 914:10, 914:12, 914:14, 914:16, 914:17, 914:19, 915:23, 916:17, 921:13, 925:19, 925:25, 926:6, 926:19, 926:22, 926:23, 927:1, 928:17, 928:18, 929:17
**DEFENDANT'S** [17] - 860:7, 869:21, 873:21, 899:8, 900:6, 903:23, 910:7, 914:9, 925:13, 926:11, 926:12, 926:13, 927:8, 927:17, 928:7, 928:15, 928:22
**DEFENSE** [8] - 874:20, 898:17, 899:13, 901:2, 902:17, 903:6, 904:16, 925:11
**DEFER** [1] - 926:17
**DEFINE** [1] - 894:4
**DEFINING** [2] - 921:23, 928:21

**DEFINITION** [3] - 921:25, 922:3, 922:6
**DELETE** [2] - 871:23, 873:2
**DELETED** [1] - 874:5
**DELIBERATE** [3] - 874:13, 917:15, 918:9
**DELIBERATING** [2] - 917:19, 918:20
**DELIBERATION** [1] - 898:13
**DELIBERATIONS** [7] - 861:9, 914:22, 914:24, 916:2, 916:4, 916:12, 917:18
**DELIVERED** [2] - 920:8, 920:15
**DEMANDED** [6] - 860:20, 864:3, 868:2, 898:20, 904:24, 913:19
**DEMANDING** [1] - 913:10
**DEMONSTRATION** [1] - 880:20
**DEMONSTRATIONS** [1] - 880:24
**DENY** [1] - 925:7
**DEPARTMENT** [1] - 900:17
**DEPOSIT** [1] - 870:3
**DEPOSIT** [3] - 861:13, 869:9, 912:9
**DEPUTY** [3] - 917:2, 917:5, 919:23
**DERIVED** [15] - 862:1, 862:3, 862:8, 863:2, 871:1, 904:1, 912:1, 912:4, 912:16, 912:17, 912:20, 913:2, 913:4, 913:6, 913:13
**DESCRIBE** [1] - 870:15
**DESCRIBED** [4] - 864:9, 884:11, 885:25, 924:19
**DESERVES** [2] - 909:19, 911:7
**DESIGNED** [1] - 890:3
**DESPITE** [1] - 892:16
**DETAILED** [1] - 924:22
**DETAILS** [1] - 883:13
**DETECTION** [1] - 873:18
**DETERMINATION** [1] - 881:8

**DETERMINE** [2] - 907:3, 927:8
**DETERMINING** [2] - 921:25, 927:22
**DEVELOPMENT** [1] - 923:8
**DEVICE** [1] - 877:19
**DICTATED** [1] - 893:20
**DICTIONARIES** [1] - 919:8
**DIFFER** [2] - 861:16, 908:1
**DIFFERENT** [8] - 873:9, 885:6, 885:8, 889:13, 897:8, 911:2, 927:25
**DIRECT** [8] - 880:9, 901:4, 904:18, 908:12, 908:13, 908:18, 920:20
**DIRECTED** [2] - 900:10, 914:20
**DIRECTION** [1] - 884:17
**DIRECTLY** [1] - 897:19
**DIRECTOR** [16] - 860:8, 863:6, 863:8, 863:11, 863:16, 863:21, 874:7, 876:10, 893:23, 899:6, 900:7, 900:14, 901:13, 902:5, 913:23, 927:9
**DISAGREE** [1] - 893:6
**DISASTER** [1] - 888:5
**DISCHARGED** [1] - 916:18
**DISCLOSE** [1] - 872:19
**DISCLOSURE** [2] - 925:19, 927:7
**DISCOUNT** [4] - 865:13, 865:19, 865:20, 884:24
**DISCOUNTED** [1] - 879:14
**DISCUSS** [4] - 914:25, 918:13, 919:5, 920:1
**DISCUSSED** [2] - 864:24, 915:5
**DISCUSSING** [2] - 918:19, 918:23
**DISCUSSION** [2] - 887:20, 915:8
**DISLIKES** [1] - 905:21
**DISMISS** [1] - 921:17
**DISPUTE** [1] - 869:4
**DISREGARD** [2] -

908:4, 911:2
**DISTANCE** [1] - 873:17
**DISTINCTION** [1] - 908:20
**DISTINGUISH** [1] - 893:20
**DISTINGUISHED** [1] - 875:8
**DISTRIBUTOR** [2] - 872:20, 877:3
**DIVISION** [3] - 865:16, 865:17, 901:17
**DOCKET** [2] - 925:20, 925:22
**DOCUMENT** [1] - 929:11
**DOCUMENTED** [1] - 891:1
**DOCUMENTS** [3] - 861:5, 902:3, 928:17
**DOLLAR** [2] - 877:9, 895:20
**DOLLARS** [10] - 860:3, 882:4, 884:6, 895:14, 895:18, 898:20, 899:20, 922:14, 922:18, 922:19
**DOMINANT** [1] - 867:16
**DONE** [6] - 873:17, 878:22, 894:16, 906:2, 914:6, 914:15
**DOUBT** [20] - 861:23, 875:7, 898:5, 898:6, 905:6, 906:8, 906:12, 906:13, 906:16, 906:17, 906:23, 907:1, 911:11, 911:22, 913:16, 914:18, 915:23, 925:4
**DOWN** [9] - 878:3, 887:23, 896:3, 897:1, 897:5, 897:9, 929:23, 930:13, 930:15
**DOWNLOADED** [1] - 888:10
**DOWNSTAIRS** [2] - 930:10, 930:11
**DR** [113] - 863:15, 863:19, 863:20, 865:6, 865:7, 867:8, 867:11, 868:2, 868:9, 868:11, 868:15, 869:15, 869:24, 870:13, 871:9, 871:12,

871:17, 871:25, 872:5, 872:9, 872:12, 872:18, 872:20, 873:3, 873:10, 873:12, 873:13, 873:14, 873:17, 874:4, 875:8, 875:24, 876:3, 876:4, 876:10, 876:11, 876:14, 876:20, 877:1, 877:6, 877:11, 877:13, 877:15, 878:1, 878:12, 878:23, 879:3, 879:9, 879:12, 879:18, 880:4, 880:7, 880:11, 880:16, 880:18, 880:19, 881:1, 882:6, 882:21, 883:3, 883:16, 883:17, 883:18, 883:23, 884:1, 884:16, 884:21, 885:1, 885:5, 885:15, 885:20, 885:23, 885:25, 886:25, 887:8, 887:13, 887:20, 888:4, 888:13, 888:18, 889:3, 889:10, 889:19, 889:23, 889:25, 890:13, 890:22, 892:2, 893:16, 894:3, 894:9, 895:15, 897:22, 899:17, 900:14, 901:9, 901:10, 901:15, 901:21, 902:4, 904:15, 904:17, 904:19, 923:2, 923:5, 923:13

**DRAFT** [2] - 880:15, 880:16
**DRAW** [1] - 909:21
**DRIVES** [1] - 881:18
**DROPPED** [1] - 877:8
**DUE** [1] - 888:4
**DUE** [2] - 883:6, 924:16
**DURING** [9] - 859:10, 863:16, 865:5, 883:6, 885:25, 902:24, 910:21, 915:15, 916:4
**DUTIES** [30] - 864:4,

864:10, 865:24, 876:5, 878:4, 878:24, 878:25, 887:11, 889:20, 894:18, 896:5, 897:21, 899:24, 900:6, 900:11, 900:12, 904:24, 913:11, 913:21, 913:22, 914:1, 914:3, 924:25, 927:9, 927:25, 928:5, 928:8, 928:22
**DUTY** [11] - 878:6, 878:12, 886:6, 889:19, 895:4, 896:13, 905:12, 905:15, 905:17, 906:23, 907:2

---

# E

**E-MAIL** [15] - 864:22, 865:11, 866:12, 866:18, 866:23, 867:11, 871:14, 871:16, 872:4, 874:4, 874:6, 886:8, 886:9, 888:4, 918:24
**E-MAILS** [14] - 861:2, 864:9, 868:2, 872:18, 873:2, 873:8, 873:21, 879:22, 886:25, 894:19, 897:23, 900:19, 926:10, 928:17
**EARLY** [7] - 875:18, 879:2, 881:5, 885:2, 885:15, 894:10, 919:22
**EARNED** [3] - 875:24, 889:12, 894:22
**EARNINGS** [2] - 886:13, 888:23
**EARTHQUAKE** [9] - 866:1, 867:16, 875:18, 876:11, 885:3, 888:4, 888:7, 894:10, 901:7
**EARTHQUAKE** [6] - 860:9, 874:7, 900:7, 900:15, 901:13, 902:5
**EATEN** [2] - 930:13, 930:15
**EDGE** [1] - 860:19
**EDISON** [1] - 879:5
**EFFECT** [1] - 915:13
**EFFORT** [2] - 868:14,

873:17
**EFFORTS** [4] - 923:6, 923:13, 929:4, 929:19
**EITHER** [4] - 870:18, 908:19, 908:20, 929:17
**ELABORATE** [1] - 927:3
**ELECT** [1] - 914:23
**ELECTRONIC** [1] - 918:24
**ELEMENT** [4] - 862:7, 906:11, 921:19, 925:2
**ELEMENTS** [8] - 861:16, 861:22, 861:24, 862:16, 869:1, 869:4, 911:22, 913:15
**EMBELLISHING** [2] - 886:9, 886:25
**EMPHASIZING** [1] - 871:18
**EMPLOYED** [1] - 928:3
**EMPLOYEE** [1] - 881:22
**EMPLOYEES** [1] - 899:11
**EMPLOYER** [1] - 919:2
**ENABLED** [1] - 868:23
**ENCOURAGE** [1] - 887:6
**END** [4] - 885:19, 893:3, 894:15, 904:5
**ENFORCE** [2] - 917:20, 917:21
**ENFORCEMENT** [2] - 897:7, 897:13
**ENGAGE** [2] - 861:25, 911:24
**ENGAGED** [2] - 861:24, 911:23
**ENGLAND** [1] - 879:20
**ENGLISH** [1] - 911:1
**ENJOY** [2] - 918:6, 918:7
**ENQUIRER** [1] - 895:21
**ENRICHMENT** [1] - 860:11
**ENSURE** [1] - 919:12
**ENTAIL** [1] - 928:12
**ENTIRE** [1] - 919:17
**ENTIRELY** [3] - 882:23, 899:25, 906:3

**ENTITY** [1] - 899:4
**ENTRY** [1] - 901:6
**EQUALLY** [1] - 882:22
**EQUIPMENT** [16] - 865:3, 865:12, 865:23, 866:8, 868:13, 877:17, 879:11, 879:14, 879:24, 884:5, 884:6, 900:3, 901:22, 902:2, 928:6, 928:7
**EQUIVALENT** [2] - 871:14, 871:21
**ESPECIALLY** [1] - 923:13
**ESSENTIAL** [1] - 861:16
**ESSENTIALLY** [3] - 862:9, 864:12, 922:17
**ESTABLISH** [2] - 863:1, 913:12
**ESTABLISHED** [2] - 905:6, 923:11
**ESTABLISHES** [1] - 863:7
**ESTABLISHING** [1] - 881:5
**ESTABLISHMENT** [1] - 901:7
**ESTATE** [2] - 872:5, 889:6
**EURO** [1] - 871:14
**EUROPE** [1] - 891:5
**EVALUATE** [1] - 905:15
**EVALUATING** [1] - 910:15
**EVASION** [1] - 898:2
**EVENT** [1] - 930:16
**EVENTS** [1] - 893:21
**EVENTUALLY** [1] - 892:24
**EVIDENCE** [73] - 859:23, 861:4, 861:8, 861:20, 863:12, 864:6, 871:3, 871:6, 874:11, 874:14, 874:16, 880:5, 887:1, 891:15, 892:21, 893:2, 901:5, 905:9, 905:12, 905:16, 905:19, 906:4, 906:10, 906:20, 906:22, 906:25, 907:12, 907:15, 907:17, 907:20,

907:23, 907:25, 908:1, 908:4, 908:5, 908:6, 908:9, 908:10, 908:12, 908:13, 908:15, 908:19, 908:21, 908:22, 909:11, 909:14, 909:16, 910:1, 910:4, 910:6, 910:10, 910:22, 910:25, 911:1, 911:4, 914:8, 914:10, 915:5, 915:14, 918:16, 919:13, 920:6, 920:14, 921:18, 922:5, 922:10, 923:4, 923:11, 927:17, 927:22
**EXACTLY** [6] - 861:17, 864:9, 872:25, 899:10, 900:4, 900:21
**EXAGGERATE** [1] - 894:19
**EXAGGERATING** [1] - 886:9
**EXAMINE** [1] - 910:18
**EXAMPLE** [6] - 864:20, 871:13, 888:3, 896:5, 896:14, 922:25
**EXCEPT** [3] - 875:23, 916:7, 918:19
**EXCESS** [1] - 870:10
**EXCHANGE** [23] - 860:3, 860:13, 862:14, 864:3, 864:13, 866:6, 866:18, 868:1, 878:20, 878:25, 879:13, 880:11, 886:5, 889:18, 899:15, 899:22, 910:14, 913:20, 922:23, 924:7, 924:12, 924:14, 925:1
**EXCHANGED** [1] - 896:4
**EXCHANGING** [1] - 896:12
**EXCLUDE** [1] - 925:24
**EXCLUDED** [1] - 908:3
**EXCUSE** [3] - 886:20, 901:10, 901:25
**EXERCISE** [1] - 922:8
**EXERCISING** [3] - 864:4, 913:20,

913:21
**EXHIBIT** [4] - 872:4, 873:2, 920:4, 929:8
**EXHIBIT** [29] - 863:18, 863:22, 864:20, 865:10, 865:21, 866:12, 866:20, 867:8, 868:4, 868:7, 869:23, 870:12, 870:21, 871:15, 872:3, 874:3, 875:10, 887:6, 891:2, 891:16, 891:19, 899:8, 899:9, 901:4, 901:20, 902:19, 903:6, 904:3, 904:18
**EXHIBITS** [3] - 865:9, 868:20, 873:4
**EXHIBITS** [10] - 907:14, 920:4, 920:5, 920:8, 920:13, 920:14, 929:7, 929:15, 930:20
**EXPENSE** [1] - 866:9
**EXPENSIVE** [1] - 885:7
**EXPERIENCE** [1] - 878:13
**EXPERT** [5] - 925:13, 925:19, 925:21, 927:11, 927:20
**EXPERTS** [1] - 925:11
**EXPLAINED** [3] - 870:16, 888:9, 926:2
**EXPLANATION** [1] - 926:16
**EXPLORATION** [1] - 881:21
**EXPLOSIONS** [2] - 893:21, 895:3
**EXPONENTIALLY** [1] - 902:24
**EXPOSED** [1] - 918:17
**EXPRESS** [2] - 865:18, 929:2
**EXTENT** [1] - 910:16
**EXTRANEOUS** [1] - 920:10
**EXTREMELY** [1] - 923:18
**EYES** [1] - 886:7

## F

**FACILITATED** [1] - 923:2
**FACT** [18] - 861:1, 862:3, 862:8,

864:21, 873:12, 875:24, 882:14, 882:16, 889:18, 903:7, 904:6, 908:13, 908:17, 908:19, 909:16, 909:22, 912:4, 921:24
**FACTOR** [1] - 910:18
**FACTORS** [1] - 909:15
**FACTS** [13] - 892:14, 892:15, 892:19, 905:17, 905:18, 907:13, 907:15, 907:18, 908:1, 908:16, 908:23, 923:7, 927:22
**FACTUAL** [1] - 927:11
**FAILING** [1] - 886:12
**FAILS** [1] - 896:19
**FAIR** [1] - 919:13
**FAIRNESS** [1] - 919:16
**FAMILIAR** [1] - 897:13
**FAMILY** [4] - 872:6, 889:7, 892:5, 919:1
**FAMOUS** [1] - 888:11
**FAR** [1] - 860:22
**FASCINATED** [1] - 885:17
**FATHERS** [1] - 892:16
**FAVOR** [2] - 866:21, 867:10
**FBI** [1] - 868:16
**FDIC** [3] - 869:16, 870:3, 870:5
**FEATURE** [1] - 918:25
**FEBRUARY** [1] - 904:19
**FEDERAL** [1] - 870:3
**FEDERAL** [3] - 921:25, 922:3, 922:6
**FEDERALLY** [1] - 869:12, 912:14
**FEE** [16] - 865:12, 866:19, 868:3, 868:9, 868:12, 871:8, 871:13, 871:19, 872:7, 874:6, 874:7, 889:8, 897:16, 924:8
**FELLOW** [4] - 914:25, 915:6, 915:19, 918:19
**FELT** [1] - 881:22
**FEW** [6] - 863:14, 876:15, 877:12, 922:12, 922:15, 923:22
**FIELD** [1] - 928:10

**FIFTH** [2] - 862:4, 912:7
**FIGHTING** [1] - 894:15
**FIGURES** [1] - 877:20
**FILE** [6] - 882:5, 882:8, 888:10, 925:25, 926:19, 926:22
**FILED** [4] - 925:11, 925:12, 925:19, 925:21
**FILL** [2] - 890:4
**FINAL** [1] - 926:22
**FINALLY** [2] - 863:23, 865:21
**FINANCE** [1] - 881:13
**FINANCIAL** [12] - 860:6, 869:10, 869:12, 869:13, 870:6, 881:23, 898:25, 905:3, 912:11, 912:14, 912:15, 924:13
**FINANCIALLY** [1] - 895:24
**FINANCING** [1] - 881:18
**FIRED** [1] - 875:12
**FIRMLY** [1] - 906:14
**FIRST** [16] - 859:12, 860:7, 860:15, 862:25, 864:13, 864:18, 871:7, 876:8, 881:10, 883:2, 899:4, 911:23, 914:18, 917:15, 921:16, 927:19
**FIRST** [9] - 906:4, 907:4, 907:6, 911:8, 911:13, 911:17, 913:5, 920:20, 921:17
**FIVE** [1] - 861:24
**FIXED** [1] - 876:14
**FIXING** [1] - 891:9
**FLIP** [2] - 881:15, 884:19
**FLOW** [2] - 872:6, 889:6
**FLOWER** [1] - 881:24
**FLYING** [1] - 882:6
**FOCUS** [1] - 862:6
**FOLLOW** [2] - 881:7, 905:24
**FOLLOWING** [6] - 861:23, 907:13, 907:17, 909:3, 911:21, 913:15
**FORBID** [1] - 896:24

**FOREIGN** [4] - 912:5, 912:24, 913:7, 922:1
**FORENSIC** [1] - 868:16
**FOREPERSON** [4] - 892:25, 914:23, 916:1, 917:20
**FOREVER** [1] - 896:20
**FORGOT** [1] - 888:8
**FORM** [15] - 859:8, 890:3, 890:18, 891:18, 891:20, 891:23, 891:24, 892:3, 892:4, 892:25, 915:24, 916:1, 920:18, 930:20
**FORMAL** [2] - 922:8, 927:2
**FORTUNE** [5] - 865:2, 882:18, 901:25, 902:1, 902:12
**FORWARD** [1] - 904:8
**FOUNDER** [1] - 881:19
**FOUNDING** [2] - 875:18, 892:16
**FOURTH** [3] - 862:2, 904:18, 912:4
**FRANKLY** [4] - 865:1, 875:22, 901:24, 930:13
**FRAUD** [1] - 882:12
**FRIDAY** [1] - 925:23
**FRIDAY** [1] - 859:1
**FUHR** [1] - 930:2
**FULL** [2] - 871:4, 890:22
**FULLY** [1] - 915:5
**FUNDED** [2] - 883:9, 903:24
**FUNDS** [6] - 870:17, 872:9, 872:14, 905:2, 912:11
**FUNNELED** [1] - 860:6
**FUNNELING** [1] - 872:1
**FUTURE** [3] - 876:17, 876:21, 888:6

## G

**GAME** [1] - 895:19
**GARB** [1] - 888:15
**GAS** [3] - 866:17, 867:2, 881:20
**GAS** [1] - 867:13
**GEE** [1] - 926:18
**GEE'S** [1] - 926:20

**GENERAL** [2] - 921:20, 928:4
**GENERALLY** [1] - 928:10
**GENERIC** [3] - 921:16, 921:25, 922:6
**GENTLEMEN** [20] - 859:23, 861:4, 862:6, 863:10, 864:5, 865:5, 867:21, 869:3, 870:8, 871:4, 873:23, 898:11, 898:23, 899:5, 900:25, 902:7, 902:18, 903:2, 903:14, 917:13
**GEOSCIENCE** [1] - 913:24
**GEOSIG** [1] - 897:11
**GIVEN** [5] - 873:24, 878:8, 891:3, 908:20, 910:13
**GLOBE** [1] - 876:25
**GOAL** [1] - 884:17
**GOD** [2] - 896:24, 917:11
**GOODNESS** [1] - 895:25
**GOODS** [1] - 891:22
**GOVERNMENT** [14] - 864:16, 872:7, 879:15, 883:4, 883:8, 883:9, 887:2, 887:15, 888:1, 888:18, 889:7, 899:4, 904:20
**GOVERNMENT** [58] - 859:25, 861:23, 863:2, 863:7, 863:17, 863:21, 864:2, 864:20, 865:10, 865:21, 866:20, 868:4, 868:7, 868:20, 870:12, 870:21, 871:15, 874:3, 875:21, 876:1, 876:3, 876:7, 878:8, 882:21, 886:2, 886:24, 887:24, 889:11, 890:21, 895:6, 898:9, 898:12, 898:14, 905:5, 906:7, 906:10, 906:15, 910:14, 911:11, 911:14, 911:21, 912:18, 912:21, 913:1, 913:3,

913:15, 914:17, 915:22, 920:23, 922:11, 924:1, 924:4, 925:12, 925:21, 926:18, 927:24, 928:20, 929:17
**GOVERNMENT'S** [6] - 865:9, 923:11, 924:10, 925:24, 926:1, 927:5
**GOVERNMENT-FUNDED** [1] - 883:9
**GOVERNMENT-SUPPORTED** [1] - 888:1
**GOVERNMENTAL** [1] - 922:8
**GRAB** [1] - 875:4
**GRANT** [2] - 925:24, 926:1
**GREAT** [2] - 879:18, 879:23
**GREAT** [2] - 876:7, 892:7
**GREATER** [3] - 862:2, 910:19, 912:2
**GREATLY** [1] - 922:24
**GREED** [4] - 860:11, 874:10, 902:15, 903:18
**GROUND** [2] - 876:25, 884:8
**GROWTH** [1] - 868:24
**GSL** [16] - 877:3, 881:25, 882:11, 884:4, 884:21, 884:24, 885:7, 885:13, 889:25, 890:4, 891:1, 897:5, 897:16, 897:22, 927:10
**GSL'S** [2] - 895:13, 897:18
**GUIDING** [1] - 861:19
**GUILT** [3] - 906:15, 910:10, 916:16
**GUILTY** [1] - 893:8
**GUILTY** [24] - 874:16, 878:2, 889:18, 892:13, 892:22, 894:24, 898:6, 905:7, 905:9, 906:5, 906:7, 906:14, 906:23, 906:24, 907:2, 907:4, 911:20, 914:12, 914:16, 915:2
**GURALP** [36] - 860:12, 862:14,

864:8, 864:23, 866:13, 866:21, 866:24, 867:12, 867:19, 867:23, 868:13, 868:18, 870:18, 871:17, 873:4, 873:11, 879:4, 879:19, 879:20, 879:23, 880:4, 880:11, 880:18, 881:1, 881:19, 881:20, 882:3, 882:10, 882:12, 882:14, 899:18, 901:18, 901:24, 902:23, 903:9, 903:24
**GURALP'S** [3] - 865:3, 865:7, 885:1
**GUY** [2] - 879:7, 890:19

# H

**HALF** [1] - 895:17
**HALFWAY** [1] - 876:24
**HAMILTON** [1] - 869:19
**HAND** [2] - 896:10, 906:24
**HANDS** [1] - 897:17
**HANDSOMELY** [1] - 868:15
**HANDWRITTEN** [2] - 880:5, 924:18
**HARD** [2] - 880:12, 880:13
**HARDWARE** [1] - 875:17
**HARRINGTON** [1] - 868:5
**HAT** [4] - 885:21, 897:25, 901:3, 902:7
**HATS** [1] - 885:20, 895:4
**HAZARD** [1] - 888:7
**HEAD** [2] - 881:20, 886:7
**HEAD** [1] - 875:14
**HEAR** [8] - 859:19, 859:23, 874:20, 898:8, 899:5, 908:8, 909:5, 921:6
**HEARD** [60] - 861:4, 861:6, 862:18, 864:5, 868:5, 869:19, 870:2, 870:14, 871:7, 871:9, 873:10,

875:17, 875:19, 876:15, 877:15, 880:15, 882:9, 883:7, 883:11, 883:23, 885:1, 887:25, 889:21, 889:22, 891:8, 891:11, 893:16, 893:17, 893:18, 893:23, 893:24, 893:25, 894:25, 899:10, 899:16, 900:1, 900:7, 900:14, 901:9, 901:15, 901:17, 901:20, 902:3, 902:10, 902:16, 902:25, 903:15, 903:21, 904:6, 904:14, 905:11, 908:9, 908:14, 909:23, 910:4, 910:12, 926:8
**HEARING** [1] - 878:12
**HEESONG** [5] - 872:20, 876:17, 877:3, 893:25, 895:12
**HELD** [5] - 860:8, 860:9, 863:24, 899:10, 899:11
**HELP** [8] - 864:10, 879:24, 881:8, 895:15, 904:24, 907:25, 917:11, 926:10
**HELPED** [2] - 864:7, 872:2
**HELPFUL** [3] - 884:15, 926:16, 927:12
**HELPING** [5] - 860:3, 868:23, 884:8, 884:9
**HENCE** [2] - 867:18, 904:21
**HEON** [3] - 860:2, 898:16, 901:12
**HEON-CHEOL** [3] - 860:2, 898:16, 901:12
**HID** [2] - 886:3, 889:10
**HIDE** [2] - 880:22, 903:4
**HIDING** [4] - 886:2, 886:11, 889:25
**HIGH** [3] - 881:24, 883:20, 901:7
**HIGH-PROFILE** [1] - 881:24
**HIGH-SPEED** [2] -

883:20, 901:7
**HIGHER** [1] - 877:5
**HIGHLY** [2] - 885:7
**HIMSELF** [3] - 873:17, 887:2, 903:16
**HIRING** [1] - 882:4
**HOLD** [1] - 874:15
**HOLDS** [1] - 896:19
**HOME** [1] - 919:21
**HONEST** [1] - 915:13
**HONOR** [1] - 859:14, 874:21, 892:9, 898:10, 916:23, 916:24, 920:23, 920:25, 921:8, 921:15, 923:24
**HOUR** [1] - 876:16
**HOURS** [1] - 864:5
**HUNDRED** [2] - 897:6, 897:9
**HUNDREDS** [2] - 882:4, 928:16
**HURDLES** [1] - 894:14

# I

**ICT** [1] - 888:6
**IDEA** [4] - 873:14, 896:1, 926:6, 930:14
**IDENTICALLY** [1] - 880:17
**IDENTIFIES** [1] - 920:5
**IDENTITY** [1] - 910:8
**IGNORANCE** [1] - 914:7
**IGNORE** [3] - 876:9, 876:10, 905:25
**ILLEGAL** [11] - 860:6, 861:1, 861:13, 862:13, 871:5, 873:18, 873:22, 904:12, 904:14, 904:22, 904:23
**IMAGINE** [2] - 923:19, 929:5
**IMMUNITY** [1] - 910:13
**IMPACTED** [4] - 877:16, 895:1, 895:2
**IMPARTIAL** [3] - 906:19, 906:21, 906:25
**IMPASSES** [1] - 894:14
**IMPLIED** [1] - 877:4
**IMPORTANT** [15] - 883:4, 883:10, 883:25, 884:14, 893:12, 893:13,

898:17, 905:25, 909:18, 910:24, 915:10, 919:7, 923:9, 923:18, 927:3
**INADMISSIBLE** [1] - 927:17
**INAPPROPRIATE** [3] - 890:12, 890:15, 927:20
**INCENTIVIZING** [1] - 924:16
**INCH** [1] - 887:19
**INCIDENTAL** [1] - 924:16
**INCLINED** [1] - 926:1
**INCLUDE** [2] - 914:1, 922:7
**INCLUDED** [3] - 870:19, 900:6, 929:7
**INCLUDES** [3] - 869:11, 912:12, 918:23
**INCLUDING** [7] - 864:16, 866:8, 866:22, 867:3, 910:2, 916:14, 916:16
**INCOMING** [1] - 868:17
**INCREASE** [1] - 884:23
**INCREASED** [2] - 868:24, 902:23
**INDEPENDENT** [3] - 883:8, 883:9, 888:1
**INDICATED** [4] - 924:5, 926:8, 926:23, 927:1
**INDICATING** [1] - 901:6
**INDICTMENT** [9] - 906:4, 907:5, 907:7, 911:8, 911:14, 911:17, 913:5, 920:20, 921:18
**INDIRECT** [1] - 908:15
**INDIVIDUALLY** [1] - 917:20
**INFERENCE** [1] - 909:21
**INFLUENCE** [3] - 885:18, 914:4, 928:15
**INFLUENCED** [4] - 877:13, 905:20, 910:17, 915:18
**INFORMATION** [20] - 860:17, 863:17, 864:17, 866:7, 867:22, 867:24,

872:21, 877:1,
886:23, 888:24,
890:6, 890:9,
890:10, 891:11,
891:12, 918:18,
922:15, 922:22,
929:14, 929:23
**INFORMED** [2] -
925:23, 926:21
**INITIAL** [1] - 924:19
**INNOCENCE** [1] -
906:10
**INNOCENT** [1] - 906:6
**INSIDE** [4] - 860:17,
864:17, 866:7,
891:12
**INSPECTED** [1] -
866:16
**INSPECTION** [1] -
866:15
**INSTEAD** [1] - 904:25
**INSTIGATED** [1] -
883:1
**INSTITUTE** [5] -
863:25, 866:15,
867:6, 883:9, 888:2
**INSTITUTE** [1] -
913:24
**INSTITUTES** [2] -
866:2, 867:17
**INSTITUTION** [7] -
869:10, 869:12,
869:13, 870:7,
912:12, 912:14,
912:15
**INSTRUCT** [6] - 863:1,
863:5, 869:8,
878:16, 905:12,
913:23
**INSTRUCTED** [2] -
908:4, 908:6
**INSTRUCTION** [4] -
864:1, 878:5,
918:14, 921:22
**INSTRUCTIONS** [13] -
859:8, 861:7, 861:8,
861:18, 905:13,
905:24, 906:1,
916:20, 916:22,
918:16, 919:15,
920:16, 930:20
**INSTRUMENT** [7] -
868:12, 869:11,
880:12, 885:6,
885:7, 912:11,
912:12
**INSTRUMENTAL** [2] -
875:18, 894:15
**INSTRUMENTS** [5] -
866:16, 873:24,

879:6, 881:19, 885:6
**INSUFFICIENCY** [1] -
921:18
**INSUFFICIENT** [2] -
922:5, 922:9
**INSURANCE** [1] -
870:4
**INSURED** [4] - 869:13,
869:17, 870:5,
912:15
**INTELLIGENT** [1] -
923:6
**INTENDED** [2] -
907:25, 928:16
**INTENT** [3] - 885:23,
886:1, 910:7
**INTEREST** [4] -
872:21, 909:8,
929:16, 929:18
**INTERESTING** [3] -
875:21, 876:19,
877:2
**INTERESTINGLY** [1] -
878:9
**INTERNAL** [1] - 902:3
**INTERNET** [2] -
918:25, 919:9
**INTERPRET** [2] -
907:25, 926:9
**INTERPRETATION** [1]
- 926:15
**INTERPRETS** [1] -
893:18
**INTERSTATE** [3] -
869:9, 870:1, 910:10
**INUNDATED** [1] -
929:14
**INVALUABLE** [1] -
883:20
**INVENTOR** [1] -
881:19
**INVENTS** [1] - 895:19
**INVESTIGATION** [2] -
892:2, 919:10
**INVESTMENT** [6] -
860:24, 861:14,
862:24, 869:17,
881:13, 881:18
**INVOICE** [2] - 890:2
**INVOICES** [4] -
873:10, 873:13,
883:23, 890:1
**INVOLVE** [1] - 900:2
**INVOLVED** [13] -
862:1, 874:8,
876:11, 881:7,
881:18, 882:2,
911:25, 912:19,
912:23, 913:6,
913:12, 919:2, 928:6

**INVOLVES** [1] -
918:18
**IRRELEVANT** [3] -
927:15, 927:20,
928:11
**ISSUE** [10] - 869:5,
885:9, 885:12,
892:18, 899:21,
913:2, 913:4, 927:2,
927:22, 930:22
**ISSUES** [5] - 892:16,
899:2, 918:18,
927:13, 927:23
**ISSUING** [1] - 894:8
**ITCHING** [1] - 921:7
**ITSELF** [1] - 864:25

---

## J

**JAIL** [1] - 890:15
**JAMES** [1] - 870:4
**JANITOR** [1] - 894:1
**JANUARY** [1] - 872:22
**JAPAN** [1] - 888:5
**JAYWALK** [1] - 896:7
**JAYWALKED** [1] -
896:9
**JEAN** [1] - 925:13
**JEOPARDIZES** [1] -
919:15
**JERSEY** [1] - 873:11
**JOB** [7] - 860:7,
886:17, 893:18,
893:20, 898:17,
902:3, 927:8
**JOE** [2] - 879:5, 879:9
**JUDGE** [1] - 863:5
**JULY** [1] - 859:1
**JULY** [4] - 866:13,
867:11, 925:20,
926:20
**JUROR** [1] - 919:14
**JURORS** [1] - 875:3
**JURORS** [12] - 910:25,
915:1, 915:5, 915:6,
915:9, 915:19,
918:4, 918:12,
918:19, 929:15,
930:6, 930:9
**JURY** [42] - 859:5,
859:6, 859:7,
859:10, 859:21,
892:12, 892:13,
892:14, 892:23,
905:11, 905:14,
914:23, 916:6,
916:8, 916:15,
916:21, 917:6,
917:16, 917:23,
917:24, 917:25,

918:4, 919:3,
919:18, 919:23,
919:24, 919:25,
920:8, 920:15,
920:16, 920:17,
921:10, 921:11,
921:22, 925:4,
926:10, 926:16,
927:12, 927:21,
929:12, 930:20,
930:21
**JURY'S** [1] - 927:8

---

## K

**KAMINSKA** [1] - 860:1
**KEEP** [4] - 880:22,
886:6, 894:20, 917:5
**KEEPING** [1] - 872:21
**KEEPS** [2] - 890:21
**KEPT** [5] - 875:24,
884:21, 889:3,
891:1, 903:16
**KEY** [1] - 862:10
**KIGAM** [52] - 860:8,
860:16, 863:6,
863:8, 863:11,
863:15, 863:21,
863:23, 864:15,
864:19, 864:24,
865:12, 865:13,
866:22, 872:20,
875:11, 876:17,
877:15, 877:17,
878:9, 878:11,
878:13, 879:16,
880:20, 883:8,
883:11, 885:21,
887:5, 888:15,
888:22, 889:23,
891:8, 891:14,
894:25, 899:4,
899:6, 899:10,
900:1, 901:3, 902:3,
902:7, 902:10,
903:15, 926:11,
927:9, 928:8,
928:12, 928:15,
928:17, 928:19
**KIGAM'S** [3] - 868:7,
877:16, 891:20
**KIM** [7] - 876:16,
877:3, 877:7,
877:12, 877:22,
884:20, 891:11
**KIND** [5] - 867:22,
881:25, 888:24,
890:23, 909:22
**KINEMETRICS** [15] -
860:13, 862:14,

864:8, 866:22,
868:6, 868:8,
868:18, 870:18,
873:5, 880:18,
899:19, 902:23,
903:9, 903:24,
927:10
**KMI** [9] - 879:21,
885:6, 885:11,
894:13, 896:19,
897:1, 897:16,
897:18, 897:24
**KNOWING** [1] -
894:20
**KNOWINGLY** [4] -
861:24, 911:23,
914:6, 914:11
**KNOWLEDGE** [4] -
910:8, 928:12,
928:14, 928:21
**KNUDSON** [2] -
925:13, 925:24
**KOREA** [42] - 860:4,
860:5, 860:8,
860:16, 860:19,
860:22, 862:13,
864:15, 866:2,
867:17, 868:12,
872:2, 872:11,
872:12, 872:15,
872:16, 872:17,
879:3, 879:10,
879:25, 880:1,
884:2, 888:7,
893:19, 894:11,
894:13, 898:17,
898:18, 899:7,
899:19, 902:2,
902:14, 904:10,
905:1, 913:24,
922:25, 923:8,
923:18, 923:19,
923:20
**KOREA'S** [5] - 863:4,
912:6, 912:25,
913:8, 913:14
**KOREAN** [13] - 869:5,
870:24, 875:8,
875:18, 876:3,
889:10, 889:11,
891:21, 893:20,
895:3, 910:21,
910:24
**KOURY** [11] - 874:21,
874:23, 874:25,
875:4, 892:11,
920:24, 925:15,
925:17, 930:5,
930:8, 930:11
**KUMAR** [4] - 892:9,

898:10, 916:23, 920:23

## L

**LACK** [1] - 906:20
**LADIES** [20] - 859:22, 861:4, 862:6, 863:10, 864:5, 865:5, 867:21, 869:3, 870:8, 871:4, 873:23, 898:11, 898:23, 899:5, 900:25, 902:7, 902:18, 903:2, 903:14, 917:13
**LANGUAGE** [5] - 873:8, 910:21, 910:24, 926:10, 926:15
**LARGE** [7] - 865:1, 865:2, 865:18, 901:25, 902:1, 902:12
**LARGELY** [1] - 862:7
**LAST** [7] - 861:5, 875:4, 880:10, 881:13, 886:15, 891:18, 925:14
**LATIN** [2] - 878:17, 878:18
**LAUNDER** [1] - 898:25
**LAUNDERING** [10] - 861:11, 869:1, 878:2, 889:17, 894:24, 903:20, 905:4, 905:7, 911:17, 914:13
**LAW** [27] - 861:7, 863:7, 866:16, 870:24, 874:11, 876:9, 878:7, 878:13, 892:15, 893:20, 897:7, 897:13, 899:7, 900:7, 900:8, 905:12, 905:17, 905:20, 908:19, 912:5, 912:24, 913:7, 913:23, 914:2, 915:20, 919:12, 922:1
**LAWSUIT** [1] - 882:2
**LAWYER'S** [2] - 907:21, 907:22
**LAWYERS** [8] - 878:17, 882:4, 882:7, 907:20, 907:23, 908:2, 916:11

**LEARN** [3] - 867:24, 869:11, 919:10
**LEAST** [3] - 870:20, 903:25, 918:9
**LEAVE** [4] - 874:2, 875:12, 918:7, 930:22
**LEAVES** [3] - 881:21, 906:14
**LEE** [2] - 873:12, 873:13
**LEFT** [3] - 871:11, 881:23, 899:21
**LEG** [1] - 862:15
**LEGITIMATE** [4] - 878:23, 899:25, 903:3
**LENGTHS** [2] - 873:19, 903:4
**LENGTHY** [1] - 887:20
**LESS** [1] - 885:8
**LEXUS** [1] - 885:10
**LIFE** [1] - 886:22
**LIGHT** [2] - 861:8, 909:14
**LIMINE** [1] - 925:11
**LIMITED** [2] - 908:5, 908:7
**LINDSAY** [1] - 868:16
**LINE** [3] - 896:18, 897:1, 897:7
**LINES** [1] - 887:23
**LINING** [1] - 898:21
**LINK** [1] - 888:12
**LIST** [3] - 920:4, 920:5, 920:12
**LISTED** [4] - 863:16, 863:20, 901:11, 902:2
**LISTEN** [3] - 884:12, 884:15, 929:18
**LISTENED** [1] - 915:5
**LISTENING** [1] - 875:6
**LIVE** [2] - 879:10, 895:16
**LIVED** [4] - 860:22, 873:12, 873:15, 904:10
**LIVES** [5] - 881:6, 895:24, 898:18, 898:19, 902:14
**LIVING** [2] - 872:15, 923:19
**LOCATED** [2] - 869:21, 869:22
**LOCATIONS** [1] - 869:23
**LONDON** [1] - 891:5
**LOOK** [12] - 873:20, 875:1, 877:19,

878:19, 886:8, 886:24, 887:7, 888:20, 891:17, 899:8, 901:20
**LOOKED** [1] - 880:18
**LOOKING** [2] - 884:17, 885:5
**LOS** [1] - 859:2
**LOSE** [1] - 881:3
**LOVE** [1] - 896:21
**LUNCH** [4] - 918:6, 918:7, 930:5, 930:8
**LYING** [1] - 887:1
**LYNCH** [9] - 861:15, 862:24, 869:18, 869:20, 869:22, 870:14, 872:11, 872:14, 904:10

## M

**MAIL** [15] - 864:22, 865:11, 866:12, 866:18, 866:23, 867:11, 871:14, 871:16, 872:4, 874:4, 874:6, 886:8, 886:9, 888:4, 918:24
**MAILS** [14] - 861:2, 864:9, 868:2, 872:18, 873:2, 873:8, 873:21, 879:22, 886:25, 894:19, 897:23, 900:19, 926:10, 928:17
**MAINTAIN** [1] - 868:23
**MAKERS** [1] - 914:5
**MAN** [3] - 883:3, 886:3, 895:22
**MANAGED** [1] - 884:4
**MANAGEMENT** [1] - 882:11
**MANIPULATE** [2] - 882:20, 885:18
**MANIPULATED** [2] - 866:21, 876:5
**MANIPULATING** [2] - 887:1, 900:2
**MANIPULATION** [1] - 891:10
**MANNER** [1] - 909:7
**MARCH** [1] - 872:5
**MARKEDLY** [1] - 927:25
**MARKET** [3] - 867:25, 902:23, 928:6
**MARKS** [1] - 920:10
**MATERIAL** [2] - 911:5, 911:6

**MATERIALS** [1] - 919:9
**MATH** [1] - 882:17
**MATTER** [4] - 897:18, 906:3, 913:23, 919:5
**MATTERS** [1] - 920:1
**MEAN** [3] - 869:12, 886:21, 923:17
**MEANINGS** [1] - 911:2
**MEANS** [6] - 869:8, 878:20, 912:9, 912:14, 912:16, 918:24
**MEANT** [4] - 868:13, 884:4, 886:5, 890:14
**MEASURES** [1] - 873:16
**MEET** [1] - 900:24
**MEETING** [1] - 880:3
**MEETS** [3] - 879:3, 879:5, 879:19
**MEMBER** [3] - 865:4, 914:23, 916:6
**MEMBERS** [2] - 905:11, 919:1
**MEMORY** [4] - 908:2, 909:6, 915:17, 915:18
**MENTIONED** [5] - 864:11, 866:1, 870:23, 872:24, 880:18
**MENTIONS** [2] - 881:10, 903:7
**MERRILL** [9] - 861:15, 862:24, 869:18, 869:20, 869:22, 870:14, 872:11, 872:14, 904:10
**MESSAGING** [1] - 918:25
**MET** [2] - 873:14, 898:15
**MICHELLE** [1] - 868:5
**MIDDLE** [2] - 865:25, 867:1
**MIGHT** [2] - 882:19, 898:1
**MILK** [1] - 930:3
**MILLION** [8] - 860:3, 882:14, 882:17, 895:18, 898:20, 922:14, 922:18, 922:19
**MILLIONS** [2] - 884:6, 895:14
**MIND** [1] - 875:8
**MINERAL** [1] - 913:24
**MINISTER** [2] - 888:9, 888:18

**MINISTER** [1] - 888:5
**MINISTER'S** [2] - 875:15, 875:16
**MINUTE** [3] - 888:13, 888:14, 921:5
**MINUTES** [3] - 876:16, 877:13, 923:22
**MISCHIEVOUS** [1] - 886:1
**MISTAKE** [2] - 910:8, 914:8
**MISTRIAL** [1] - 919:16
**MOMENT** [1] - 874:21
**MONDAY** [7] - 918:8, 918:10, 919:22, 929:20, 929:21, 930:2, 930:21
**MONETARY** [11] - 861:25, 869:7, 869:10, 869:15, 911:24, 912:9, 912:11, 912:12, 912:19, 913:6, 913:13
**MONEY** [61] - 860:24, 861:11, 864:3, 868:14, 869:1, 869:10, 869:24, 870:25, 872:10, 872:16, 875:24, 877:5, 878:2, 878:20, 885:12, 886:2, 886:3, 886:5, 886:11, 886:12, 887:10, 889:4, 889:10, 889:11, 889:16, 889:18, 889:19, 889:23, 889:24, 891:25, 892:1, 894:21, 894:22, 894:24, 895:7, 895:8, 895:16, 896:4, 896:12, 897:21, 898:24, 899:22, 902:15, 903:16, 903:19, 903:20, 904:1, 904:5, 904:6, 904:7, 904:9, 905:4, 905:7, 911:17, 912:13, 914:12, 922:24, 924:7, 924:15
**MONEY** [1] - 891:21
**MONIES** [1] - 870:19
**MONITOR** [1] - 893:19
**MONITORED** [1] - 895:3
**MONITORING** [2] - 867:16, 901:7

MONTHS [1] - 903:8
MOONLIGHTING [1] - 885:21
MOREOVER [1] - 927:14
MORNING [6] - 860:1, 918:8, 919:22, 929:20, 929:21, 930:2
MOST [7] - 862:18, 862:19, 890:16, 891:6, 892:18, 894:11, 921:12
MOTION [8] - 921:6, 921:17, 921:21, 924:1, 925:8, 925:10, 925:12, 925:24
MOTIVATED [3] - 860:10, 902:15, 903:17
MOTIVATING [1] - 904:17
MOTIVATION [4] - 881:7, 884:10, 894:10, 924:13
MOTIVE [3] - 884:22, 884:23, 910:7
MOUNTAINS [1] - 879:15
MOUTH [1] - 876:4
MOUTHFUL [1] - 869:14
MOVED [3] - 860:24, 869:24, 903:19
MOVING [1] - 905:3
MR [20] - 859:14, 859:16, 874:21, 874:23, 874:25, 875:4, 892:11, 916:24, 920:24, 921:8, 921:15, 922:21, 923:16, 923:24, 925:15, 925:17, 930:2, 930:5, 930:8, 930:11
MS [5] - 860:1, 892:9, 898:10, 916:23, 920:23
MULTIPLE [4] - 871:7, 881:16, 883:5, 887:3
MUST [24] - 861:23, 863:8, 864:2, 878:6, 881:25, 886:3, 886:9, 905:19, 905:20, 905:24, 907:9, 907:21, 908:7, 910:25, 911:21, 912:18, 913:1, 913:15,

914:17, 915:2, 915:3, 918:15, 918:17, 919:4

## N

NAIVE [1] - 886:1
NAME [3] - 903:14, 917:2, 925:14
NAMED [1] - 870:4
NAMELY [3] - 912:6, 912:24, 913:8
NAMES [1] - 873:24
NARCO [1] - 890:24
NATALIE [16] - 867:22, 871:13, 871:25, 872:19, 880:2, 884:11, 885:2, 885:14, 885:16, 885:24, 899:16, 902:25, 910:12, 910:16, 910:19
NATHAN [10] - 864:23, 873:1, 874:4, 876:19, 880:2, 880:3, 881:1, 887:7, 887:21, 895:5
NATIONAL [1] - 895:21
NATURAL [4] - 881:20, 886:18, 886:20, 893:21
NATURE [1] - 912:22
NEAR [1] - 911:12
NECESSARILY [2] - 870:19, 909:17
NECESSARY [6] - 911:11, 911:14, 916:4, 926:9, 926:24, 927:12
NEED [14] - 865:19, 879:10, 879:24, 885:11, 885:12, 890:8, 891:24, 897:6, 897:7, 912:21, 913:3, 917:17, 927:2, 930:21
NEEDS [2] - 876:25, 897:8
NEGOTIATED [1] - 924:17
NETWORK [1] - 883:21
NEVER [17] - 873:12, 873:14, 873:15, 877:13, 877:14, 877:16, 878:10, 878:11, 889:19,

894:25, 895:1, 895:2, 896:19, 899:23, 903:1, 903:5
NEW [2] - 882:11, 890:19
NEW [10] - 860:25, 861:15, 862:24, 869:17, 869:22, 869:25, 870:19, 871:1, 873:11, 903:20
NEXT [2] - 867:3, 923:19
NON [2] - 897:25, 901:3
NON-KIGAM [1] - 901:3
NON-POLICE [1] - 897:25
NONE [1] - 909:1
NORTH [2] - 895:3, 923:19
NORTH [2] - 893:21, 923:20
NOTE [2] - 871:23, 916:5
NOTED [4] - 872:23, 924:21, 926:1, 927:24
NOTES [5] - 863:13, 915:15, 915:16, 915:17, 915:18
NOTHING [4] - 878:24, 879:16, 901:19, 924:17
NOTICE [2] - 871:22, 925:21
NOVEMBER [2] - 891:23, 892:1
NOWHERE [1] - 894:17
NUCLEAR [4] - 878:14, 893:21, 895:3, 923:15
NUMBER [5] - 863:12, 880:6, 899:2, 900:5, 909:17
NUMERICALLY [1] - 916:15

## O

O'CLOCK [6] - 918:5, 918:8, 918:10, 919:22, 929:21, 930:21
OATH [1] - 905:22
OBJECTION [3] - 892:9, 920:22, 921:1
OBJECTIONS [3] -

907:19, 916:21, 920:14
OBLIGATION [1] - 898:4
OBLIGATIONS [2] - 904:25, 918:12
OBSERVATION [1] - 866:2
OBTAINED [1] - 912:20
OBVIOUSLY [4] - 869:13, 920:17, 923:9, 923:17
OCCASIONS [2] - 871:8, 883:5
OCCURRED [3] - 862:4, 870:9, 912:7
OCTOBER [1] - 871:16
OFFENSE [7] - 861:11, 907:6, 911:12, 911:15, 912:18, 912:20, 912:22
OFFENSES [1] - 911:9
OFFER [4] - 925:25, 926:13, 926:19, 926:23
OFFICE [3] - 871:21, 883:4, 883:8
OFFICER [13] - 881:23, 887:15, 887:24, 888:1, 896:6, 896:10, 896:12, 896:15, 897:15, 897:20, 897:25, 904:21
OFFICER [1] - 896:16
OFFICERS [1] - 888:18
OFFICIAL [51] - 860:5, 860:15, 863:6, 863:9, 864:4, 864:10, 865:24, 866:1, 867:2, 876:5, 878:4, 878:5, 878:24, 878:25, 885:21, 886:6, 887:3, 887:11, 889:19, 889:20, 894:5, 894:18, 895:4, 896:5, 896:13, 897:21, 898:16, 899:7, 899:12, 899:24, 900:8, 902:13, 910:23, 912:5, 912:24, 913:7, 913:9, 913:14, 913:17, 913:20,

907:19, 916:21, 920:14 -- wait

913:22, 913:25, 914:1, 914:2, 914:3, 922:1, 922:7, 922:13, 924:15, 924:25, 928:22
OFFICIALLY [1] - 887:13
OFFICIALLY [2] - 865:16, 888:22
OFFICIALS [1] - 894:25
OLD [1] - 877:24
OMISSIONS [1] - 914:9
ONE [35] - 859:9, 868:4, 869:5, 874:10, 875:4, 876:2, 877:8, 881:11, 882:25, 883:1, 883:2, 884:14, 885:4, 886:15, 888:3, 890:24, 892:24, 892:25, 893:19, 895:11, 895:18, 895:19, 896:2, 897:2, 897:4, 898:12, 904:22, 905:9, 907:10, 908:16, 914:23, 916:6, 918:4, 923:5, 929:15
ONES [3] - 861:19, 867:4, 892:21
ONGOING [1] - 902:4
OOH [1] - 897:3
OPEN [4] - 867:15, 871:11, 871:23, 916:9
OPENING [2] - 876:14, 907:24
OPINE [1] - 928:18
OPINION [1] - 915:7
OPINIONS [2] - 905:21, 927:7
OPPORTUNITY [4] - 909:4, 910:7, 919:14, 925:9
OPPOSED [3] - 886:4, 924:7, 924:15
OPPOSITION [1] - 927:6
ORDER [20] - 863:1, 864:10, 865:1, 865:2, 865:16, 865:19, 868:9, 871:19, 871:20, 873:18, 901:25, 902:21, 911:20, 913:12, 917:8,

918:8, 930:5, 930:8, 930:12

**ORDERED** [5] - 865:7, 914:19, 917:10, 918:6, 919:5

**ORDERS** [5] - 865:20, 868:6, 868:7, 868:8, 912:13

**OTHERWISE** [3] - 899:18, 914:20, 916:15

**OUTCOME** [1] - 909:8

**OUTHAY** [1] - 888:3

**OUTLINED** [1] - 927:7

**OUTSET** [3] - 864:12, 874:9, 876:2

**OUTSIDE** [2] - 880:25, 891:25

**OVERCAME** [1] - 894:14

**OVERLY** [1] - 915:18

**OVERRULED** [1] - 921:2

**OVERSEAS** [2] - 872:2, 891:6

**OVERSEES** [1] - 900:16

**OVERSTATING** [3] - 882:24, 887:16, 887:17

**OVERWHELMING** [1] - 863:12

**OWED** [1] - 882:14

**OWN** [9] - 863:23, 868:7, 872:12, 873:21, 889:23, 898:21, 915:12, 915:17, 919:11

**OWNS** [1] - 882:16

---

**P**

---

**P.M** [1] - 859:1

**P.M** [1] - 930:25

**PAGE** [9] - 865:14, 865:25, 866:14, 867:1, 867:13, 872:4, 891:18, 901:5, 903:7

**PAGES** [1] - 920:9

**PAID** [21] - 873:6, 877:6, 878:23, 878:25, 886:16, 890:25, 894:17, 894:23, 895:8, 895:12, 895:17, 897:15, 897:16, 898:1, 899:18, 901:1, 922:14, 924:8, 924:11,

924:24

**PAPER** [6] - 871:10, 876:23, 892:24, 893:4, 893:5, 893:9

**PAPERS** [1] - 874:6

**PARAGRAPH** [1] - 904:19

**PARDON** [3] - 879:19, 882:10, 930:7

**PARK** [6] - 876:10, 880:16, 880:19, 881:1, 900:14, 901:9

**PART** [7] - 876:1, 876:3, 876:12, 886:10, 894:12, 902:3, 908:25

**PARTICIPANTS** [1] - 867:5

**PARTICIPATE** [1] - 867:7

**PARTICIPATED** [1] - 901:12

**PARTICIPATING** [2] - 865:4, 869:25

**PARTICIPATION** [1] - 923:14

**PARTICULAR** [4] - 877:21, 901:6, 922:11, 925:3

**PARTICULARLY** [1] - 924:22

**PARTIES** [3] - 907:15, 919:13, 925:23

**PARTING** [1] - 874:2

**PARTY** [1] - 919:14

**PASS** [5] - 888:12, 900:20, 900:22, 900:23, 923:10

**PASSED** [1] - 884:24

**PASSES** [1] - 888:14

**PASSION** [3] - 885:1, 885:2

**PASSIONATE** [3] - 881:4, 881:23, 885:15

**PAST** [3] - 893:24, 918:5, 926:7

**PATENTS** [1] - 875:16

**PAUSE** [1] - 874:24

**PAY** [5] - 879:12, 880:11, 887:12, 889:11, 890:8

**PAYING** [10] - 871:9, 875:5, 877:7, 878:4, 884:21, 886:19, 890:11, 897:18, 897:19

**PAYMENT** [6] - 860:13, 860:21, 866:6, 868:1,

913:20, 924:13

**PAYMENTS** [11] - 862:14, 862:23, 864:13, 868:25, 870:20, 871:8, 902:9, 903:10, 903:15, 904:20, 904:24

**PEARCE** [32] - 864:23, 867:22, 871:13, 871:25, 872:19, 873:1, 874:4, 876:19, 876:21, 876:24, 880:2, 880:3, 881:1, 881:2, 881:21, 884:1, 884:11, 885:14, 885:16, 885:24, 887:7, 887:21, 890:1, 890:2, 899:16, 902:25, 910:12, 910:16, 910:19, 924:22

**PEARCE'S** [2] - 885:2, 895:5

**PEOPLE** [16] - 872:2, 873:5, 876:22, 878:10, 880:1, 881:7, 887:4, 890:16, 891:6, 894:2, 894:6, 895:12, 895:21, 895:23, 898:18, 919:2

**PER** [3] - 870:9, 870:10, 880:12

**PERCENT** [7] - 870:17, 872:11, 882:16, 882:17, 903:23, 904:5

**PERFORMERS** [1] - 895:17

**PERIOD** [1] - 863:16

**PERMIT** [2] - 917:7, 926:22

**PERSON** [11] - 861:3, 884:7, 888:25, 890:8, 892:11, 892:19, 896:9, 896:21, 917:7, 918:24, 922:3

**PERSON'S** [1] - 892:22

**PERSONAL** [8] - 860:21, 864:13, 869:11, 905:20, 912:12, 918:3, 924:20, 928:14

**PERSONALLY** [2] - 908:14, 914:14

---

**PERSONNEL** [2] - 863:15, 865:17

**PERSUADES** [1] - 915:8

**PERSUASIVE** [1] - 926:12

**PHILADELPHIA** [1] - 892:6

**PHONE** [2] - 895:20, 918:24

**PHRASE** [2] - 878:17, 895:5

**PHRASES** [1] - 878:18

**PICK** [1] - 876:23

**PICTURE** [5] - 888:8, 888:14, 888:15, 888:19, 894:3

**PIECE** [6] - 862:18, 892:24, 893:4, 893:5, 893:8, 901:21

**PIECES** [1] - 863:12

**PLACE** [2] - 889:13, 917:6

**PLAN** [1] - 910:8

**PLANE** [1] - 882:6

**PLANNING** [1] - 888:6

**PLAYED** [1] - 872:22

**PLEADED** [1] - 906:5

**PLUSH** [1] - 929:23

**POCKET** [2] - 896:10, 896:11

**POCKETED** [1] - 860:2

**POCKETS** [1] - 898:22

**POINT** [10] - 863:13, 864:6, 871:3, 871:6, 881:12, 886:5, 890:15, 921:21, 923:25, 924:1

**POINTED** [3] - 884:20, 926:13, 928:20

**POINTS** [2] - 867:21, 929:12

**POLICE** [7] - 896:6, 896:10, 896:12, 896:14, 897:20, 897:25

**POLITICAL** [1] - 894:15

**POOR** [1] - 880:23

**PORTION** [1] - 872:14

**POSITION** [12] - 860:5, 860:8, 860:15, 862:13, 864:14, 867:24, 881:24, 894:4, 898:19, 898:21, 899:10, 899:11

**POSITIONS** [1] - 863:25

---

**POSSIBILITY** [1] - 888:7

**POSSIBLE** [4] - 871:21, 885:16, 885:18, 906:15

**POTTS** [29] - 863:20, 868:11, 871:9, 873:13, 877:4, 877:6, 877:10, 881:10, 881:17, 882:1, 882:2, 882:3, 882:9, 882:16, 882:22, 882:23, 882:25, 883:10, 883:23, 884:11, 884:16, 885:25, 890:5, 890:11, 894:5, 904:15, 904:17, 904:19

**POTTS'S** [2] - 876:4, 884:22

**POUND** [1] - 871:21

**POUNDS** [1] - 871:13

**POWER** [1] - 922:9

**POWERFUL** [2] - 892:18

**POWERPOINT** [2] - 880:19, 880:24

**PRACTICALLY** [3] - 900:12, 900:17, 914:3

**PRACTICE** [1] - 871:10

**PRECISE** [1] - 912:22

**PRECISELY** [1] - 911:15

**PRECLUDE** [2] - 925:12, 926:2

**PRECLUDING** [1] - 928:25

**PREDICATE** [2] - 921:23, 925:5

**PREFER** [1] - 920:24

**PREJUDICE** [1] - 909:10

**PREJUDICES** [1] - 905:21

**PREJUDICIAL** [1] - 927:16

**PREPARATION** [2] - 910:8, 929:5

**PREPARE** [1] - 929:10

**PREPARED** [3] - 915:24, 918:9, 920:4

**PREPARES** [1] - 880:19

**PREREQUISITE** [1] - 866:22

**PRESENCE** [4] - 859:5, 859:21,

---

919:24, 921:10
**PRESENT** [6] -
865:15, 906:10,
917:22, 919:25,
921:12, 921:13
**PRESENTATION** [3] -
888:7, 903:6, 903:7
**PRESENTED** [6] -
864:6, 871:3,
874:11, 874:14,
903:13, 911:1
**PRESERVED** [1] -
859:18
**PRESIDE** [1] - 914:24
**PRESIDENTIAL** [1] -
875:15
**PRESIDENTS** [1] -
893:24
**PRESUMED** [1] -
906:6
**PRETRIAL** [2] - 929:5,
929:8
**PRETTY** [4] - 880:23,
897:12, 897:13,
904:6
**PREVIOUS** [4] -
871:19, 904:22,
924:5, 927:1
**PRICE** [2] - 877:8,
884:22
**PRICES** [1] - 877:5
**PRIME** [1] - 875:16
**PRINCIPAL** [1] - 927:9
**PRIVATE** [8] - 860:3,
886:21, 886:22,
887:14, 888:23,
897:25, 904:21,
917:6
**PRO** [4] - 868:10,
878:17, 899:13,
913:21
**PROBLEMS** [2] -
884:2, 894:14
**PROCEED** [1] -
859:25
**PROCEEDINGS** [3] -
874:24, 919:16,
930:25
**PROCEEDS** [9] -
860:6, 861:13,
862:22, 869:16,
872:2, 898:25,
912:17, 912:20,
912:23
**PROCESS** [11] -
860:4, 860:18,
866:9, 866:21,
867:10, 893:7,
895:1, 895:2,
905:16, 919:17

**PROCESSED** [1] -
873:7
**PRODUCT** [3] -
877:20, 885:11,
885:13
**PRODUCTS** [20] -
860:16, 860:18,
864:14, 864:19,
864:24, 865:7,
868:3, 876:6, 877:3,
877:8, 884:2,
895:13, 895:14,
900:10, 900:20,
900:21, 901:18,
922:24
**PROFFER** [1] - 927:6
**PROFFERS** [1] -
924:5
**PROFILE** [1] - 881:24
**PROFITS** [1] - 884:24
**PROHIBITS** [2] -
879:16, 913:9
**PROJECT** [13] - 865:3,
865:8, 877:21,
883:17, 887:9,
894:16, 901:9,
901:14, 901:16,
901:22, 902:2, 902:4
**PROJECTS** [1] -
876:17
**PROMISE** [1] - 910:14
**PROMISED** [2] -
864:3, 913:19
**PROMISING** [2] -
905:22, 913:10
**PRONOUNCE** [1] -
925:14
**PROOF** [11] - 863:10,
898:14, 898:15,
906:13, 908:13,
908:16, 925:25,
926:14, 926:19,
926:23
**PROPER** [1] - 867:19
**PROPERTY** [18] -
862:1, 862:2, 862:3,
862:7, 863:1, 871:2,
871:5, 912:1, 912:2,
912:4, 912:16,
912:19, 912:22,
913:2, 913:3, 913:6,
913:12
**PROPOSED** [3] -
927:15, 928:4, 928:9
**PROSECUTE** [1] -
889:13
**PROSECUTED** [1] -
910:15
**PROVE** [17] - 861:23,
863:3, 864:2,

878:18, 906:10,
906:15, 908:19,
911:11, 911:14,
911:21, 912:18,
912:21, 913:1,
913:3, 913:15,
914:16, 914:18
**PROVED** [1] - 915:22
**PROVEN** [4] - 875:20,
875:23, 876:2, 905:6
**PROVES** [1] - 906:7
**PROVIDED** [13] -
859:7, 864:17,
866:7, 867:23,
870:5, 894:21,
895:9, 895:12,
910:23, 915:20,
922:21, 924:22,
925:1
**PROVIDING** [5] -
866:18, 884:3,
903:3, 922:16,
924:20
**PROVING** [1] - 906:11
**PUBLIC** [19] - 863:6,
863:9, 884:23,
892:12, 898:16,
899:7, 899:11,
902:13, 912:5,
912:24, 913:7,
913:9, 913:13,
913:17, 913:25,
914:1, 914:3, 922:1,
922:7
**PUBLIC'S** [1] - 860:10
**PUBLICLY** [1] -
891:12
**PULL** [1] - 891:17
**PULLS** [1] - 896:9
**PUNISHMENT** [2] -
915:20, 915:21
**PURCHASE** [6] -
860:15, 865:16,
865:17, 901:17,
901:23, 902:1
**PURCHASED** [2] -
864:24, 901:22
**PURCHASES** [2] -
877:16, 877:18
**PURCHASING** [4] -
864:14, 864:19,
895:2, 900:3
**PURELY** [2] - 906:18,
927:11
**PURPOSE** [4] -
862:11, 872:13,
908:5, 910:9
**PURPOSES** [5] -
861:19, 863:6,
870:7, 885:8, 897:7,

899:7, 913:17,
913:25
**PUT** [3] - 861:20,
917:24, 924:2
**PUTS** [1] - 896:11
**PUZZLE** [1] - 862:19

**Q**

**Q330** [1] - 888:9
**QUALIFIES** [1] - 870:6
**QUANTERRA** [9] -
867:15, 867:19,
879:21, 880:17,
880:18, 894:12,
899:19, 903:10,
903:24
**QUARTERS** [1] -
929:24
**QUESTIONS** [6] -
884:13, 884:14,
907:19, 907:22,
927:11
**QUICK** [1] - 896:2
**QUID** [4] - 868:10,
878:17, 899:13,
913:21
**QUITE** [2] - 889:5,
930:13
**QUO** [4] - 868:10,
878:17, 899:13,
913:21
**QUOTE** [1] - 872:23
**QUOTED** [1] - 886:17

**R**

**RAIL** [1] - 883:20
**RAILWAY** [5] - 865:3,
865:8, 883:17,
887:9, 901:8
**RATHER** [1] - 928:16
**RATIONAL** [1] - 925:4
**RAYNOR** [2] - 921:6,
921:14
**RAYNOR** [8] - 859:14,
859:16, 916:24,
921:8, 921:15,
922:21, 923:16,
923:24
**REACH** [4] - 893:6,
915:1, 915:10,
915:14
**REACHED** [2] -
915:25, 916:17
**REACTION** [2] -
886:18, 886:20
**READ** [9] - 859:12,
859:13, 870:2,
871:17, 880:12,

880:14, 886:8,
906:1, 916:22
**READING** [1] - 916:19
**READY** [1] - 916:3
**REAL** [5] - 869:4,
870:8, 870:24,
872:5, 889:6
**REALIZE** [2] - 876:22,
929:10
**REALIZED** [1] -
888:13
**REALLY** [9] - 878:3,
881:8, 884:15,
886:10, 890:6,
893:10, 899:21,
900:22, 924:3
**REASON** [7] - 887:16,
889:3, 889:4, 898:5,
906:17, 910:15,
925:2
**REASONABLE** [16] -
861:23, 880:8,
898:5, 905:6, 906:7,
906:12, 906:13,
906:17, 906:22,
907:1, 911:11,
911:22, 913:16,
914:18, 915:23,
925:4
**REASONABLENESS**
[1] - 909:13
**REASONABLY** [1] -
911:12
**REASONS** [1] - 927:5
**RECEIVE** [2] - 861:6,
871:8
**RECEIVED** [14] -
860:20, 864:2,
868:11, 868:21,
875:14, 905:16,
907:15, 908:5,
908:10, 910:13,
913:19, 918:16,
920:6, 920:13
**RECEIVING** [2] -
903:10, 913:9
**RECOGNITION** [1] -
867:7
**RECOGNIZED** [1] -
888:8
**RECOMMEND** [3] -
860:15, 867:14,
880:23
**RECOMMENDATION
S** [1] - 894:9
**RECOMMENDING** [4]
- 864:15, 864:19,
865:23, 868:3
**RECORD** [8] - 875:11,
891:2, 917:3,

921:11, 925:10, 927:3, 930:17, 930:24
**RECORDERS** [1] - 867:15
**RECORDING** [1] - 872:22
**REFERENCE** [4] - 861:21, 887:8, 888:19, 919:9
**REFERENCES** [1] - 863:14
**REFLECTS** [1] - 920:13
**REGARD** [1] - 877:1
**REGARDING** [1] - 868:17
**REGIME** [1] - 923:20
**REGISTERED** [1] - 866:3
**REGULATION** [3] - 867:4, 887:14, 887:24
**REGULATIONS** [5] - 878:8, 879:15, 887:18, 887:21, 891:14
**RELATE** [1] - 869:6
**RELATED** [5] - 874:6, 894:18, 900:11, 914:2, 928:10
**RELATES** [4] - 861:12, 862:12, 862:21, 869:5
**RELATING** [1] - 925:20
**RELEVANT** [3] - 862:20, 926:5, 926:16
**RELIABLE** [4] - 866:5, 885:7, 894:11
**RELUCTANTLY** [1] - 882:10
**RELY** [2] - 915:16, 917:19
**REMAIN** [1] - 917:23
**REMAINED** [1] - 867:4
**REMAINS** [1] - 870:25
**REMEMBER** [10] - 866:11, 870:16, 873:14, 877:4, 883:2, 889:21, 890:1, 890:13, 908:1, 916:14
**REMIND** [2] - 885:4, 918:17
**REPEATEDLY** [5] - 861:2, 871:12, 873:1, 890:21, 902:16

**REPLY** [1] - 873:6
**REPORT** [1] - 891:22
**REPORT** [2] - 894:8, 919:5
**REPORTED** [4] - 866:4, 872:6, 872:24, 889:7
**REPORTER** [1] - 921:5
**REPORTER'S** [2] - 923:22, 930:17
**REPRESENTATIVE** [2] - 866:13, 866:24
**REPRESENTATIVES** [6] - 866:24, 867:11, 871:17, 873:4, 873:5, 873:9
**REPRESENTED** [1] - 912:23
**REQUEST** [3] - 867:2, 873:7, 926:2
**REQUESTS** [2] - 866:19, 877:17
**REQUIRE** [1] - 919:17
**REQUIRED** [2] - 900:8, 906:15
**REQUIREMENT** [2] - 864:1, 867:5
**REQUIRES** [3] - 919:12, 922:3, 922:8
**RESEARCH** [5] - 883:9, 888:1, 899:9, 901:12, 919:8
**RESEARCH** [6] - 860:9, 874:7, 900:8, 900:15, 901:13, 902:5
**RESEARCHER** [10] - 860:7, 863:5, 863:8, 863:11, 863:16, 893:25, 899:6, 901:11, 913:24, 927:9
**RESERVED** [1] - 923:25
**RESOLVED** [1] - 930:23
**RESOLVING** [1] - 927:13
**RESOURCE** [1] - 876:20
**RESOURCES** [1] - 913:25
**RESPECT** [6] - 864:18, 866:8, 866:11, 925:10, 925:11, 929:7
**RESPOND** [2] - 916:8, 919:4
**RESPONDS** [2] -

887:13, 888:11
**RESPONSE** [3] - 890:13, 925:21
**RESPONSIBILITIES** [6] - 893:16, 894:3, 894:5, 928:8, 928:12, 928:15
**RESPONSIBILITY** [4] - 885:21, 885:22, 920:3, 928:1
**RESPONSIBLE** [7] - 866:15, 878:6, 878:13, 900:12, 900:17, 914:2, 914:4
**REST** [2] - 869:5, 904:10
**RESTED** [1] - 924:2
**RESTRICTION** [1] - 919:12
**RESTRICTIONS** [1] - 919:15
**RESTROOM** [1] - 894:7
**RESULT** [4] - 902:21, 902:22, 918:3, 919:16
**RETURN** [6] - 860:20, 868:14, 874:15, 905:8, 916:3, 917:10
**REVEAL** [1] - 886:13
**REVEALING** [1] - 886:12
**REVIEW** [5] - 871:6, 877:17, 920:3, 920:7, 928:18
**REVIEWED** [1] - 928:16
**REVOLUTIONIZED** [1] - 879:8
**REWARDED** [1] - 895:24
**RICH** [2] - 897:4, 897:10
**RISE** [1] - 919:23
**ROLE** [5] - 860:11, 902:8, 927:8, 928:7, 928:8
**ROLES** [3] - 927:25, 928:5, 928:12
**ROOM** [14] - 871:11, 887:19, 892:19, 892:23, 898:13, 905:14, 917:16, 917:23, 917:25, 919:19, 920:8, 920:17, 929:24, 930:21
**ROUGHLY** [1] - 882:14
**RULE** [8] - 859:14,

859:16, 859:17, 921:6, 921:16, 921:20, 925:7, 927:20
**RULE** [2] - 917:20, 917:21
**RULES** [4] - 877:22, 877:23, 891:14, 917:14
**RULING** [6] - 926:3, 926:17, 926:21, 926:22, 927:1, 927:2
**RULINGS** [1] - 921:4
**RUN** [1] - 881:24
**RUNNING** [1] - 882:15

## S

**SAFE** [1] - 919:21
**SAFER** [3] - 895:23, 898:18
**SAFETY** [1] - 902:14
**SALARY** [1] - 868:22
**SALE** [4] - 866:19, 868:9, 868:12, 899:18
**SALES** [5] - 860:4, 864:25, 866:6, 868:6, 881:20
**SAT** [1] - 923:4
**SATISFIED** [2] - 867:6, 922:2
**SAVE** [2] - 895:23, 898:19
**SAVES** [1] - 881:6
**SAW** [8] - 872:18, 884:13, 896:9, 900:19, 902:19, 902:21, 904:12, 908:14
**SCHEME** [1] - 899:1
**SCIENCE** [2] - 873:23, 894:9
**SCIENCE** [1] - 888:5
**SCIENCE-BASED** [1] - 894:9
**SCIENTIFICALLY** [3] - 885:5, 902:18, 902:20
**SCIENTIST** [1] - 879:4
**SCIENTISTS** [1] - 877:19
**SCOPE** [5] - 899:24, 900:6, 926:11, 927:8, 928:22
**SCREAM** [1] - 923:1
**SCREEN** [1] - 875:1
**SEARCHING** [1] - 919:8
**SECOND** [9] - 860:17,

864:1, 871:25, 872:4, 880:6, 896:2, 911:25, 914:19, 928:13
**SECONDLY** [1] - 861:25
**SECRET** [7] - 860:11, 872:19, 872:21, 880:22, 902:8, 902:9, 903:8
**SECTION** [2] - 861:12, 911:18
**SEE** [22] - 862:9, 865:13, 866:23, 867:10, 869:8, 875:10, 875:11, 875:13, 886:7, 887:18, 891:3, 894:6, 894:7, 896:11, 899:9, 909:4, 919:21, 924:18, 926:4, 926:15, 929:20
**SEEM** [3] - 876:9, 876:10, 890:14
**SEES** [1] - 896:7
**SEGREGATE** [2] - 904:3, 904:4
**SEISMIC** [3] - 866:16, 873:24, 893:19
**SEISMOLOGIST** [10] - 863:20, 875:8, 875:14, 879:3, 893:17, 928:1, 928:3, 928:5, 928:10, 928:19
**SEISMOLOGISTS** [2] - 927:24, 928:5
**SEISMOLOGY** [3] - 881:11, 928:21
**SELF** [2] - 860:11, 927:18
**SELF-ENRICHMENT** [1] - 860:11
**SELF-SERVING** [1] - 927:18
**SELL** [4] - 879:24, 881:15, 897:2, 897:5
**SELLING** [3] - 879:25, 884:5, 884:6
**SEND** [9] - 888:8, 890:9, 897:23, 916:5, 916:10, 920:16, 920:17, 920:21, 921:2
**SENDING** [1] - 920:20
**SENDS** [1] - 888:4
**SENSE** [2] - 881:5, 906:18
**SENSOR** [1] - 884:23

**SENSOR-BUYING** [1] - 884:23

**SENSORS** [4] - 866:3, 866:4, 866:5, 871:20

**SENT** [4] - 872:16, 890:2, 890:3, 904:9

**SEPARATE** [3] - 860:11, 904:2, 907:8

**SEPARATELY** [1] - 907:9

**SERIES** [2] - 878:8, 900:19

**SERVE** [1] - 927:16

**SERVICE** [15] - 866:18, 884:3, 884:4, 885:22, 889:24, 891:15, 895:9, 895:12, 919:3, 922:17, 922:19, 924:21, 924:24

**SERVICES** [2] - 878:23, 903:3

**SERVING** [1] - 927:18

**SESSION** [1] - 908:9

**SET** [3] - 874:23, 876:8, 885:19

**SETS** [2] - 867:3

**SEVERAL** [2] - 861:5, 901:21

**SEX** [1] - 886:22

**SHADE** [1] - 882:19

**SHANNON** [9] - 859:20, 917:24, 918:1, 919:19, 920:4, 920:15, 929:22, 930:18

**SHANNON'S** [2] - 920:12, 930:19

**SHARE** [3] - 888:24, 889:1, 902:23

**SHIM** [1] - 883:16

**SHIN** [6] - 865:6, 883:16, 883:17, 889:23, 901:18, 902:4

**SHIN** [2] - 883:16, 889:22

**SHIN'S** [1] - 901:15

**SHOCK** [2] - 890:17, 895:6

**SHOCKED** [1] - 895:16

**SHOP** [1] - 881:24

**SHORTLY** [1] - 899:5

**SHOW** [4] - 862:16, 888:8, 888:15, 924:6

**SHOWED** [16] - 863:12, 863:15, 863:19, 864:19,

865:6, 865:11, 865:21, 866:20, 867:8, 868:2, 869:23, 870:12, 871:4, 873:2, 873:3, 902:19

**SHOWN** [2] - 870:21, 924:4

**SHOWS** [2] - 879:21, 890:24

**SHUT** [1] - 887:23

**SIDE** [3] - 872:19, 885:21, 917:16

**SIGN** [2] - 892:25, 916:2

**SIGNED** [2] - 916:6, 916:7

**SIGNIFICANT** [1] - 894:21

**SIMILAR** [1] - 879:24

**SIMILARLY** [2] - 907:23, 928:11

**SIMPLE** [2] - 878:3, 882:17

**SIMPLIFY** [1] - 869:14

**SIMPLY** [5] - 869:8, 873:7, 915:9, 915:14, 927:16

**SINGLE** [4] - 868:12, 901:21, 903:7, 905:25

**SIT** [3] - 896:3, 917:25, 929:18

**SITE** [1] - 918:25

**SITS** [1] - 900:8

**SITTING** [3] - 875:6, 876:10, 900:9

**SIX** [6] - 861:10, 862:20, 874:16, 905:7, 905:9, 921:17

**SKEWING** [2] - 891:9, 900:2

**SKILL** [1] - 895:22

**SKILLS** [1] - 895:8

**SLANTED** [1] - 867:9

**SMALL** [1] - 882:18

**SMART** [1] - 878:18

**SMARTER** [1] - 878:19

**SMOOTHER** [1] - 929:11

**SOFTWARE** [3] - 875:17, 923:1

**SOLD** [1] - 868:13

**SOLELY** [2] - 905:19, 908:10

**SOLEMNLY** [1] - 917:5

**SOMEONE** [8] - 873:19, 878:4,

886:14, 889:12, 890:4, 890:7, 896:7, 914:19

**SOMETIMES** [2] - 881:15, 885:8

**SOMEWHAT** [1] - 888:17

**SOMEWHERE** [1] - 895:10

**SORRY** [4] - 859:15, 865:2, 887:14, 901:10

**SORT** [1] - 879:5

**SOUND** [1] - 878:19

**SOUNDS** [1] - 876:22

**SOUTH** [13] - 860:4, 863:4, 879:3, 893:19, 894:11, 899:7, 905:1, 912:6, 912:25, 913:8, 913:14, 923:18, 923:19

**SPAN** [1] - 864:12

**SPEAKING** [2] - 865:1, 901:24

**SPECIFICALLY** [2] - 865:22, 901:5

**SPECIFICATION** [3] - 867:18, 867:20, 900:24

**SPECIFICATIONS** [4] - 867:9, 867:14, 885:19, 900:2

**SPECIFICS** [3] - 873:7, 883:13, 921:21

**SPECIFIED** [7] - 862:3, 862:8, 862:15, 863:2, 870:22, 921:23, 925:5

**SPECULATION** [2] - 906:18, 928:14

**SPECULATIVE** [1] - 928:23

**SPEED** [2] - 883:20, 901:7

**SPEND** [2] - 862:19, 930:18

**SPENT** [6] - 864:20, 876:7, 881:12, 882:3, 904:10, 904:16

**SPREADSHEET** [1] - 891:2

**SQUINT** [1] - 886:7

**STACK** [1] - 887:5

**STAGE** [1] - 921:25

**STANDARD** [1] - 866:4

**STANDING** [2] - 896:6, 896:15

**STANDS** [1] - 916:15

**START** [2] - 879:25, 919:17

**STATE** [2] - 908:2, 917:2

**STATEMENT** [4] - 876:14, 909:24, 909:25, 910:2

**STATEMENTS** [2] - 907:19, 907:24

**STATES** [10] - 861:12, 862:5, 862:22, 870:9, 872:16, 879:6, 889:4, 903:17, 911:18, 912:8

**STATUS** [4] - 886:25, 887:5, 887:15, 894:19

**STATUTE** [1] - 870:7

**STAY** [1] - 918:5

**STEADY** [1] - 868:23

**STEER** [1] - 901:23

**STEIM** [4] - 879:5, 879:9, 879:12

**STEPS** [1] - 917:18

**STEVE** [1] - 869:19

**STILL** [2] - 897:10, 924:11

**STIPULATED** [1] - 929:8

**STIPULATION** [3] - 870:3, 870:5, 929:9

**STOOD** [1] - 880:25

**STOP** [2] - 887:4, 917:18

**STOPPED** [1] - 884:21

**STORE** [5] - 897:1, 897:10, 897:11, 897:16, 897:17

**STREET** [4] - 896:7, 897:2, 897:5, 897:9

**STRICKEN** [1] - 908:3

**STRUCTURED** [1] - 880:17

**STUDIED** [1] - 881:11

**STUFF** [1] - 879:25

**SUBMIT** [6] - 867:5, 869:3, 873:16, 873:25, 890:7, 898:14

**SUBMITS** [1] - 905:5

**SUBMITTED** [3] - 873:10, 890:1, 916:16

**SUBSTANCE** [1] - 927:14

**SUBSTANTIALLY** [1]

- 882:25

**SUBTRACTING** [1] - 872:10

**SUCCEED** [1] - 864:11

**SUDDENLY** [1] - 888:13

**SUFFICIENT** [1] - 892:22

**SUGGEST** [7] - 859:10, 922:4, 922:9, 922:12, 924:3, 924:17, 925:3

**SUGGESTION** [2] - 906:2, 923:3

**SUGGESTS** [1] - 881:25

**SUMMARIES** [2] - 911:3, 911:4

**SUMMARIZE** [1] - 861:8

**SUMMARY** [2] - 861:20, 870:12

**SUPERSEDING** [9] - 906:4, 907:5, 907:6, 911:8, 911:13, 911:17, 913:5, 920:20, 921:18

**SUPPLEMENTAL** [1] - 926:23

**SUPPLIED** [1] - 879:16

**SUPPORT** [1] - 887:13

**SUPPORTED** [1] - 888:1

**SUPPORTING** [1] - 911:5

**SUPPOSE** [1] - 897:15

**SUPPOSED** [1] - 898:19

**SUSTAINED** [1] - 892:10

**SWEAR** [2] - 916:25, 917:5

**SWITZERLAND** [1] - 879:7

**SWORN** [1] - 907:14

**SYMPATHY** [1] - 905:21

**SYNTAX** [1] - 888:17

**SYSTEM** [16] - 860:6, 867:6, 875:19, 879:2, 879:10, 881:5, 881:6, 885:3, 885:16, 892:17, 894:10, 894:13, 895:3, 898:25, 901:7, 905:3

**SYSTEMS** [5] - 865:16, 865:18, 866:17, 867:3, 923:9

# T

**TASER** [10] - 896:16, 896:17, 896:18, 896:19, 896:21, 896:23, 896:25, 897:1, 897:5
**TASERS** [3] - 897:5, 897:12, 897:13
**TAX** [1] - 898:2
**TAXES** [2] - 886:20, 889:11
**TEAM** [1] - 877:19
**TECHNICAL** [16] - 871:19, 879:13, 884:3, 885:22, 889:24, 891:15, 899:25, 900:1, 922:19, 924:7, 924:11, 924:21, 924:24, 926:9, 926:15
**TECHNICALLY** [1] - 900:16
**TECHNICIAN** [1] - 928:11
**TECHNOLOGY** [2] - 879:8, 895:22
**TELEPHONE** [1] - 872:22
**TEMPLATE** [1] - 890:3
**TEN** [2] - 921:5, 926:7
**TEN-MINUTE** [1] - 921:5
**TENDENCY** [1] - 882:19
**TENTATIVE** [3] - 926:3, 926:21, 927:1
**TERM** [5] - 869:7, 869:12, 912:9, 912:14, 912:16
**TERMS** [3] - 920:20, 923:6, 923:8
**TEST** [4] - 878:14, 900:21, 900:22, 923:16
**TEST-BAN** [1] - 878:14
**TEST-BAND** [1] - 923:16
**TESTIFIED** [10] - 863:20, 863:23, 867:22, 868:11, 868:17, 873:12, 881:2, 889:22, 909:5, 926:18
**TESTIFY** [8] - 868:6, 869:20, 871:9, 902:4, 906:9, 909:17, 909:21,

909:22
**TESTIFYING** [4] - 909:7, 925:18, 926:2, 929:1
**TESTIMONIAL** [1] - 870:2
**TESTIMONY** [35] - 864:6, 865:6, 875:17, 882:20, 900:7, 901:17, 907:14, 908:3, 908:13, 908:24, 909:2, 909:12, 909:13, 909:19, 909:23, 910:12, 910:13, 910:16, 910:17, 910:18, 926:5, 926:9, 926:19, 926:20, 927:12, 927:14, 927:15, 927:18, 927:19, 927:20, 928:4, 928:9, 928:13, 928:23
**TESTING** [5] - 860:18, 866:8, 866:11, 866:22, 876:6
**TEXT** [1] - 918:24
**THE** [30] - 859:6, 859:15, 859:18, 859:22, 874:19, 874:22, 875:3, 892:10, 898:8, 905:10, 916:25, 917:2, 917:4, 917:5, 917:12, 917:13, 919:23, 919:25, 921:1, 921:11, 922:18, 923:4, 923:17, 925:7, 925:16, 925:18, 930:3, 930:7, 930:10, 930:12
**THEMSELVES** [2] - 867:25, 868:25
**THEREFORE** [4] - 886:3, 910:25, 911:5, 928:24
**THEY'VE** [1] - 882:11
**THINKS** [1] - 882:21
**THIRD** [1] - 912:2
**THOMAS** [1] - 879:5
**THOUSANDS** [3] - 882:4, 899:20
**THREE** [4] - 862:2, 876:5, 887:23, 894:12
**THROUGHOUT** [1] - 878:12
**TICKET** [1] - 896:8

**TIGHTENED** [1] - 877:23
**TILT** [1] - 885:18
**TIRED** [1] - 930:17
**TITLE** [2] - 861:11, 911:18
**TODAY** [11] - 864:21, 865:11, 871:17, 874:13, 876:8, 877:8, 884:20, 889:21, 898:23, 918:5, 930:22
**TOGETHER** [2] - 917:6, 918:20
**TOOK** [10] - 860:11, 864:25, 865:12, 868:8, 868:9, 882:1, 898:24, 905:22, 915:16, 927:10
**TOP** [4] - 869:8, 896:18, 897:1, 897:7
**TOP-OF-THE-LINE** [1] - 896:18, 897:1
**TOPIC** [1] - 864:18
**TOTAL** [2] - 872:5, 889:6
**TOTALLY** [1] - 873:22
**TOWARD** [2] - 865:25, 866:14, 867:13
**TOWARDS** [2] - 865:14, 901:24
**TOWN** [1] - 891:4
**TOYOTA** [1] - 885:13
**TRACK** [2] - 881:4, 892:3
**TRAIL** [1] - 871:10
**TRAIN** [2] - 865:18, 902:2
**TRANSACTION** [12] - 861:25, 862:1, 862:4, 869:25, 911:24, 911:25, 912:7, 912:9, 912:19, 912:23, 913:6, 913:13
**TRANSACTIONS** [5] - 869:6, 869:7, 869:15, 870:9, 880:8
**TRANSCRIPT** [1] - 859:11
**TRANSFER** [3] - 869:9, 869:16, 912:10
**TRANSFERRING** [2] - 871:1, 871:5
**TRANSFERS** [2] - 862:22, 870:19
**TRANSLATED** [1] - 891:21
**TRANSLATIONS** [1] -

911:1
**TRANSLATORS** [1] - 910:23
**TRANSPORTATION** [1] - 885:11
**TRAVEL** [1] - 897:23
**TRAVELED** [1] - 891:6
**TREATY** [2] - 878:14, 923:16
**TRIAL** [14] - 859:11, 863:11, 881:4, 883:6, 892:12, 907:5, 908:11, 910:11, 910:22, 915:16, 919:2, 919:13, 925:18, 929:11
**TRIED** [1] - 929:3
**TROUBLE** [1] - 904:11
**TROUBLESHOOT** [1] - 884:9
**TRUST** [2] - 860:10, 897:12
**TRUSTWORTHY** [1] - 892:20
**TRY** [5] - 878:17, 882:7, 894:2, 894:20, 919:10
**TRYING** [4] - 882:5, 888:21, 895:6, 904:2
**TURN** [2] - 862:25, 886:7
**TWO** [15] - 860:3, 860:12, 862:10, 864:7, 864:12, 876:4, 881:3, 885:6, 885:20, 893:24, 894:11, 895:4, 925:12, 930:4
**TYPE** [1] - 928:6
**TYPES** [1] - 885:6
**TYPICALLY** [1] - 891:4

# U

**U.S** [4] - 860:5, 875:25, 882:7, 882:8
**ULTIMATELY** [1] - 922:12
**UNANIMOUS** [4] - 915:2, 915:11, 915:25, 916:17
**UNBIASED** [1] - 880:7
**UNDER** [10] - 878:6, 878:13, 883:21, 891:14, 910:2, 914:2, 922:1, 923:19, 927:20, 927:21

**UNDERLYING** [3] - 873:23, 911:5, 911:6
**UNFORTUNATELY** [1] - 917:22
**UNIQUE** [2] - 895:8, 895:9
**UNITED** [10] - 861:12, 862:5, 862:22, 870:9, 872:16, 879:6, 889:4, 903:17, 911:18, 912:8
**UNKNOWN** [1] - 860:23
**UNLAWFUL** [7] - 862:3, 862:8, 862:16, 863:2, 870:22, 921:23, 925:5
**UNLESS** [3] - 884:7, 906:6, 917:8
**UNLIKE** [1] - 885:24
**UNRELIABLE** [3] - 927:16, 928:13, 928:24
**UNUSUAL** [1] - 895:9
**UP** [19] - 859:18, 862:15, 872:3, 874:3, 874:23, 876:23, 879:4, 879:5, 886:14, 887:18, 888:15, 888:25, 896:5, 896:8, 896:15, 906:3, 918:11, 922:12, 930:13
**USEFUL** [3] - 884:2, 922:21, 922:22
**USER** [1] - 885:19

# V

**VALUABLE** [3] - 876:20, 877:1, 884:3
**VALUE** [2] - 862:2, 912:2
**VARIOUS** [2] - 875:16, 923:8
**VARY** [1] - 928:1
**VERDICT** [18] - 859:8, 874:15, 893:7, 905:8, 906:3, 907:10, 915:1, 915:11, 915:14, 915:24, 915:25, 916:1, 916:18, 917:9, 918:15, 920:17, 930:20
**VERIFY** [1] - 920:5
**VIENGKHOU** [2] -

888:3, 888:11
**VIEW** [1] - 923:11
**VIEWS** [2] - 915:6, 920:19
**VIOLATE** [5] - 876:4, 878:4, 887:11, 889:20, 896:13
**VIOLATED** [1] - 863:3
**VIOLATES** [1] - 919:15
**VIOLATING** [3] - 886:6, 889:19, 897:20
**VIOLATION** [7] - 870:23, 911:18, 912:5, 912:24, 913:7, 913:14, 923:12
**VISION** [1] - 881:6
**VISITED** [1] - 888:6
**VOLUME** [1] - 859:3
**VOLUME** [2] - 875:10, 891:16

### W

**WAIT** [2] - 888:13, 888:14
**WAITING** [1] - 916:12
**WALKED** [1] - 881:10
**WALKING** [1] - 890:22
**WALKS** [4] - 886:14, 888:25, 896:8, 896:15
**WANTS** [3] - 884:18, 884:19
**WARNING** [6] - 875:18, 879:2, 881:5, 885:3, 885:15, 894:10
**WARRANTY** [2] - 922:17, 922:18
**WASHINGTON** [2] - 882:7, 930:1
**WAVERING** [1] - 884:18
**WAYS** [1] - 864:7
**WEARING** [2] - 897:25, 902:7
**WEB** [1] - 918:25
**WEEK** [3] - 867:1, 919:20, 929:6
**WEEKEND** [3] - 918:11, 919:21, 930:1
**WEIGH** [1] - 905:15
**WEIGHT** [7] - 908:20, 908:22, 909:16, 909:19, 909:25, 911:6, 915:13

**WELCOME** [1] - 859:22
**WHEEL** [1] - 890:22
**WIFE** [1] - 896:22
**WILLFULLY** [1] - 914:19
**WILLIAMS** [1] - 917:4
**WIN** [2] - 879:14
**WIN-WIN** [1] - 879:14
**WINNING** [1] - 875:14
**WIRES** [1] - 868:17
**WISH** [2] - 880:9, 919:20
**WITHDRAWAL** [1] - 912:10
**WITNESS** [17] - 870:3, 907:14, 907:22, 908:14, 908:25, 909:2, 910:13, 910:14, 925:19, 925:21, 925:25, 926:5, 926:18, 927:6, 927:7, 927:12
**WITNESS'S** [8] - 909:4, 909:6, 909:7, 909:8, 909:10, 909:11, 909:13, 926:14
**WITNESSED** [1] - 860:23
**WITNESSES** [15] - 861:6, 876:9, 883:7, 883:12, 887:25, 891:8, 892:20, 900:1, 902:10, 907:20, 909:17, 909:18, 910:20, 924:2, 925:13
**WORD** [2] - 867:6, 881:11
**WORDS** [5] - 872:15, 876:3, 884:3, 913:21, 914:9
**WORE** [2] - 885:20, 895:4
**WORKS** [2] - 883:3
**WORLD** [2] - 895:17, 895:23
**WORRY** [3] - 900:20, 900:21, 900:22
**WORST** [1] - 860:25
**WORTH** [7] - 871:18, 884:5, 884:6, 895:13, 895:14, 922:18, 922:19
**WOW** [1] - 888:11
**WRITE** [3] - 880:4, 893:3, 893:8
**WRITES** [1] - 872:5
**WRITING** [5] - 887:7,

887:8, 916:7, 916:9, 918:24
**WRONGS** [1] - 910:5
**WROTE** [3] - 865:15, 867:9, 870:13

### Y

**YEAR** [6] - 867:3, 868:22, 872:7, 872:23, 886:15, 889:7
**YEARS** [12] - 881:12, 881:13, 881:17, 885:25, 890:19, 892:5, 892:17, 900:5, 903:9, 922:16, 926:7
**YESTERDAY** [4] - 863:24, 865:5, 869:19, 889:21
**YONGKOO** [1] - 873:12
**YORK** [9] - 860:25, 861:15, 862:24, 869:17, 869:22, 869:25, 870:19, 871:1, 903:20
**YOUNG** [1] - 879:3
**YOURSELF** [3] - 890:7, 915:3, 917:8
**YOURSELVES** [1] - 900:25

### Z

**ZIMMERMAN** [3] - 868:16, 870:14, 903:21

**UNITED STATES DISTRICT COURT**