Marilyn E. Bednarski, SBN 105322
E-mail: mbednarski@kmbllaw.com
Kevin J. LaHue, SBN 237556
E-mail: klahue@kmbllaw.com
Kaye, McLane, Bednarski & Litt, LLP
234 Colorado Blvd., Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Joel C. Koury, SBN 143856
E-mail: jckoury@aol.com
Law Offices of Joel C. Koury
3435 Ocean Park Boulevard, Suite 107-50
Santa Monica, California 90405
Telephone: (424) 248-8670

Attorneys for Defendant
HEON CHEOL CHI

WESTERN DIVISION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br><br>      vs.<br><br><br>HEON CHEOL CHI,<br><br>              Defendant. | CASE NO. 16-824(A)-JFW<br><br>DEFENDANT'S SENTENCING POSITION AND OBJECTIONS TO THE PRESENTENCE REPORT AND RECOMMENDATION; DECLARATION; EXHIBITS 1-4<br><br>Hearing Date:      October 2, 2017<br>Hearing Time:      9 a.m. |

Defendant Heon Cheol Chi by and through his counsel of record hereby files

/ /

/ /

1

his Objections to the Presentence Report and Recommendation and Sentencing Position; Declaration of Bednarski and Exhibits 1 to 4.

DATED: September 11, 2017          Respectfully Submitted,


By:___/S/ Marilyn E. Bednarski_____
Joel C. Koury
Marilyn E. Bednarski
Kevin J. LaHue
Attorneys for Heon Cheol Chi

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

This position paper sets forth why a sentence of 6 months, a sentence that will permit Dr. Chi to be home with his family by the end of the year, is reasonable in light of all of the 3553(a) factors. Between the time he served in custody before bonding out, and the time between his self-surrender and sentencing, a sentence of 6 months will essentially have been served. He is 58 years old and has no prior criminal record.  His professional life is destroyed by this conviction. His personal life has significantly suffered. He will never regain the financial security he built over a lifetime of hard work. He is unemployed, and it is reasonable to conclude unemployable in his field.  For all of the reasons argued below, a sentence that requires no additional time in custody "sufficient and not greater than necessary" to achieve the goals of sentencing.

## II.

## OBJECTIONS TO THE PSR

PSR at p. 1 "Release Status and p. 4, ¶6.

Dr. Chi was arrested in San Francisco on December 12, 2016, not January 6. That later date is when he first appeared in the Central District. Dkt. Entry No. 1, 16-MJ-71637-MAG-1 (N.D.Ca.).

PSR at ¶9

Dr. Chi worked with KIGAM as a researcher for his entire career from 1994 through his arrest December, 2016.  KIGAM terminated him on August 3, 2017. PSR at ¶64; Decl. Bednarski ¶9. Regarding being a director: his personnel records reflect that at *various* and <u>not</u> continuous periods of time, he would serve in the administrative capacity as director of the earthquake division. Govt. Trial Exh. 1 (Chief of Center 2011; Laboratory Director/Chief 2014, VP/Laboratory Director

2016).  The Division's structure is like academic institution's hierarchical structure: a professor who acts as department dean is still a professor. Decl. Bednarski ¶10.

PSR ¶9 states that KIGAM "is an official testing center that certifies seismic instruments which are sold to and used by KIGAM and other government and private entities in Korea."  This statement implies too much.  KIGAM only performed certification testing for a few years, starting in 2010 and lasting to 2015. Decl. Bednarski at ¶11.  Moreover, for part of that term another entity, KRISS, also provided certification testing for seismic equipment. *Id.*  Additionally, witnesses Dr. Park testified at trial that Dr. Chi did not conduct any certification testing, did not influence the testing, and did not alter the testing or any results. Decl. Bednarski ¶4.

PSR ¶11a -d

The defense disagrees with the characterization of the business advantages as described in PSR¶¶11a thru d, however agrees with ¶11e. See below.

PSR ¶12

The defense disagrees with the inferences and conclusions the presentence officer draws from the three emails referenced. See below argument.

PSR ¶¶20-25

The defense disagrees with the guideline calculations in the PSR. See below.

PSR ¶69, 73

The Taejeon apartment is Dr. Chi's wife's sole and separate property. It is her asset, and her mortgage. Decl. Bednarski at ¶14.

PSR at ¶76

The PSR had a typographical error here, misstating Dr. Chi's wife's monthly income as a real estate agent to be $30,000, it is $3,000.  PSR ¶ 69 correctly states her monthly income (combined $2,500 and $650 (rental)).

/ /

/ /

4

**III.**

**GUIDELINE CALCULATIONS**

The decision for this Court, in determining what sentence is reasonable and not greater than necessary to serve the purposes of sentencing, must be based upon consideration of all of the 3553(a) factors. *Id.*

**A. DEFENSE POSITION REGARDING GUIDELINE CALCULATION**

The guideline calculations are only one of the 3553 factors to consider when imposing sentence. Title 18 U.S.C. § 3553(a); *Gall v. United States*, 552 U.S. 38, 58 (2007). This is a difficult case in which to apply the sentencing guidelines, and the difficulty highlights why strict adherence to the guidelines here would be antithetical to effective and conscientious sentencing. The presentence officer calculates the advisory range by starting with guideline §2S1.1 (normally applied in money laundering cases), and then based on the language in §2S1.1(a)(1) calculates the sentencing guidelines by cross reference to §2C1.1[1]. PSR at 20.

**1. U.S.S.G. §2C1.1 Should Not Be Used**

The defense position is that §2C1.1, the guideline applied to U.S. bribery under Title 18 U.S.C. 201(b) should <u>not</u> be used because Dr. Chi has not been convicted of bribery under U.S. law which requires a corrupt intent and therefore is a more serious crime than Korean bribery which requires only an exchange of payment in return for an official act and does not require corrupt intent. Cf. Ninth Circuit Model 8.13 (elements 18 U.S.C. §201(b)(2) and Court's Jury Instruction No. 22 (elements Korean bribery). Presumably corruption is the reason for §2C1.1's

---

[1]     Section 2S1.1(a)(1) directs the court to use the offense level for the underlying offense from which the laundered funds were derived if (a) the defendant committed the underlying offense (here bribery) and (b) the offense level for that offense can be determined. Seemingly that would direct this Court to use the bribery guideline §2C1.1. The defense position is that §2C1.1 should not be used. The Ninth Circuit reached that conclusion but for different reasons and on different facts than proposed here in *United States v. Chou Fan Xu,* 706 F. 3d 965 (9th Cir. 2013).

5

high starting base offense level of 14.  Fraud, embezzlement and theft start at level 7 (§2B1.1), counterfeiting at level 9 (§2B5.1), money laundering at 8 (§2S1.1 (a)(2)) and conflict of interest/receipt of unauthorized compensation at level 6 (§2C1.3). Thus rather than applying the guideline that would otherwise have applied to U.S. bribery, the defense position is that the §2S1.1 money laundering guideline should be used.

It is further the defendant's position that if this Court disagrees and applies the §2C1.1 guideline (and its starting base offense level of 14), that the adjustment for monetary increase should be limited to +6 ($56,000).  Two common methods of valuing the offense are the benefit to the briber and the value of the payments to the bribe.  Here, the first method cannot be used as it is not possible to value the benefit to the companies and in any event would overstate the offense, and the second method –while the payments can be totaled—is not an appropriate method because it is not a fair measure of the offense for several reasons. The defense proposes for the reasons articulated here that only the funds that are the subject of Count 6 be used as a fair measure of the nature of the offense.

Similar factors that existed in *United States v. Ring*, 811 F. Supp. 2d 359 (D.D.C. 2011) support why here the value of the "benefits" to the companies not be used as the measure of the offense.  *Ring* involved a dishonest services scheme in which the conduct was bribery. The district court did <u>not</u> add an adjustment for "value of benefits" because it could not reasonably be calculated.  The District Court noted significant problems with valuation of benefits received by the briber including the "attenuated, if not nonexistent, causal link between these appropriations and corrupt lobbying." *Id.* at 377.  The court explained, that in determining the value of benefits received in return for the payment the "court must take care to take into account benefits that would have been received in any event.") *Id.* at 378, *citing United States v. Whitfield*, 590 F. 3d 325, 368 (5th Cir 2009).  Other problems existed that could not be overcome in determining the net value accruing

1    to Ring's clients as a result of the payments including: there were no specific

2    contracts to quantify value received; it was hard to value the projects including the

3    larger jail, transportation projects, a future water project; and, even if gross value

4    could be determined, costs would have to be subtracted to determine net value.

5    *Ring*, 811 F. Supp. 2d 359.

6        The alternative method of valuation for the monetary enhancement under

7    §2C1.1 is to determine the value of the corrupt payments themselves. *Ring*, 811 F.

8    Supp. 2d at 378. Here, this method of valuation would also be flawed because not all

9    of the payments were necessarily corrupt—the fundamental factor in the application

10   of the enhancement.  The jury verdict on Count 6 does not support a finding of

11   corruption for all payments received by Dr. Chi. The government did not have to

12   prove corruption in its case (Instruction No. 22) and the evidence does not support

13   that all the funds paid to Dr. Chi were corrupt.[2]

14       Not all of the money paid him was illicit, unearned or even undeserved.  Dr.

15   Chi was paid well for his technical advice, but indeed that advice was very valuable

16   as Natalie Pearce and Chris Potts testified.  Decl. Bednarski ¶7-8. Pearce also

17   testified that Dr. Chi wore two hats: one as a KIGAM employee and the other

18   providing technical advice to GSL. Decl. Bednarski ¶8.  In addition to direct witness

19   testimony, the evidence circumstantially shows the improvement of GSL products

20   over the years as the company with Dr. Chi's assistance developed software that

21   made GSL products perform better in Korea etc. The companies paid him

22   lucratively, but he also put in a lot of time and was invaluable to the product

23   improvement.  A summary of this work for GSL was prepared by Cansun Guralp's

24   lawyers for GSL's lawyers.  Att. Exh. 4, Letter.  It is the defendant position that the

25

26   [2]        Nor do references in multiple emails over the years by Dr. Chi using the word
     "illegal" support that all the funds paid to him were briberous.  It is reasonable to conclude that his
27   use of the word "illegal" may have been a reference to violation of his company's regulations or to
     violations of Korean tax law.  He had several reasons to hide his earnings from his colleagues, his
28   company and his country, all of which are short what is required to satisfy "corruption" in the
     context of US bribery.

fair market value of the work done by Dr. Chi must be subtracted from the payments made to him.  *See*, *Ring,* 811 F. Supp. 2d at 380 (in valuing payments made, government conceded that the Court had to subtract fair market value of work done from the payments).  But it would be impossible to do that since he did not keep time sheets. He did not have to because the contracts contemplated paying him a percentage of sales making timesheets unnecessary.

While loss calculations need not be precise, and the Guidelines require only that the Court "make a reasonable estimate" of these values. §2B1.1 cmt. n. 3(C), still  the proponent of the enhancement –here the government -- "bears the burden of supporting its loss calculation with reliable and specific evidence," and it may not simply guess where such evidence is unavailable. *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006) (While "generally a district court's 'reasonable estimate of the intended loss will be upheld on appeal' ... such calculation may not be mere speculation.") In sum, as the presentence officer concluded, holding Dr. Chi accountable for the $56,000 in laundered funds which can precisely be calculated and which is supported by the jury's verdict, is a reasonable measure of the offense conduct.  PSR at ¶23.

## 2. The §2C1.1(b)(3) Adjustment For High Level Government Official Should Not Apply.

The defense position is that the adjustment of +4 levels under §2C1.1(b)(3) does not apply.  In the event this Court disagrees the arguments support that the enhancement overstates Dr. Chi's culpability and therefore a downward variance of -4 is appropriate.  As argued above, the application of guideline §2C1.1 --which only applies to bribery involving "public officials" – is strained to begin with. Dr. Chi is unlike any U.S. "public official."  He is only considered a "public official" by application of a Korean law which makes a researcher at an institution receiving Korean government funding, a "public official" under Korean bribery law.  The application of the (b)(3) +4 enhancement is even more strained.

8

Section §2C1.1(b)(3) applies if the offense involves a public official in a high level decision making or sensitive position.  Application note 4(A) defines high level decision making or sensitive position as a position characterized by a direct authority to make decisions for a government department or agency, or by a substantial influence over the decision making process. U.S.S.G. §2C1.1(b)(3) cmt. 4(A). Application note 4(A) gives examples of a public official in a high level decision making position, and Dr. Chi is dissimilar to all of the 4(A) examples: prosecutor, judge, agency administrator, or any other public official with a similar level of authority. Application note 4(B) gives examples of a public official in a sensitive position, and Dr. Chi is dissimilar to all of the 4(B) examples: juror, law enforcement officer, election official and any other similarly situated individual. What distinguishes these above categories of people is that it is their very position is essential to obtaining the service in exchange for the bribe.  U.S.S.G. 2C1.1(b)(3) cmt. 4(B).

Neither the purpose of the adjustment nor the facts support its application here.  The enhancement of +4 for "high level or sensitive position" public officials is aimed only at those involved in a crime of "high-level" corruption.  Not all public officials deserve the enhancement.  *See* Haines, Bowman, Woll, "Federal Sentencing Guidelines Handbook" at p. 498 (Thompson Reuters, 2013) ("Under §2C1.1(b)(3) , if the payment was for the purpose of influencing an official act by <u>certain officials</u>, the offense level is increased by 4 levels."). *See*, *United States v. Barraza*, 655 F.3d 375 (5th Cir 2011) (the four-level enhancement should be applied "if the payment was for the purpose of *influencing an official act* by certain officials, U.S.S.G. §1B1.3 cmt. background. Here, the payment Barraza [judge] solicited was for the purpose of influencing the way he handled a criminal case in his capacity as an elected state judge.")(emphasis added).  *See also, United States v. Santos,* 501 Fed. Appx. 630, 634 (9th Cir 2012) (unpublished)( noting enhancement aimed only at

1   those involved in "high level" corruption and is distinct from "individual official's

2   breach of public trust.")

3           Secondly, the facts do not support the application here.  The payments were

4   not made for the purpose of high level corruption.  The companies making the

5   payments sought to improve their products and the performance of those products in

6   Korea. They paid Dr. Chi because he was a very qualified researcher,

7   knowledgeable, smart and passionate about earthquake warning. He in fact

8   performed extensive work which was "invaluable" to the improvement of the

9   products and their performance. PSR at ¶14 a to g (provided services including

10  hardware and software monitoring troubleshooting, research and development of

11  new features and ideas, updates on technological and regulatory changes,

12  coordination of technical support in Korea including remote places); Exh. 4, C.

13  Guralp Lawyer letter, describing such services in detail.

14          Additionally, the timing of the contracts circumstantially supports that the

15  contracting parties' intent was the objective improvement of products and

16  performance, not briberous intent.  The contracts were entered into at times when

17  Dr. Chi was a young researcher in the early years of his career (1996 KMI contract

18  and 2003 GSL contract).  Moreover the inventors of the products/company

19  presidents engaged Dr. Chi out of mutual scientific interest and respect, not because

20  of any key position within KIGAM. Both companies needed help on the ground in

21  Korea with technical problems and it was cost effective to have someone there rather

22  than send a team.  The weight of evidence shows that the majority of services he

23  provided could have been provided by other civilian seismologists not an "official."

24  In fact, as explained above, many of Dr. Chi's technical services were merely in

25  place of more costly GSL technicians who were clearly not themselves public

26  officials.  Dr. Chi was one of many researchers in the Earthquake division for the

27  entire period of time involved in this case. They analyzed data of seismic movement

28  from natural and human causes.  On occasions they would bid on seismic projects

1    and in such cases would assemble a team, project manager etc. At times the

2    researchers would work on projects either as a member of a team or as a project

3    manager.   Dr. Chi's personnel records show the periods of time when he was a

4    project manager, were few and far between over his 25 years of service.  Govt. Trial

5    Exh. 1, Personnel File.  Also at times the researchers would be called upon to take

6    on administrative duties as the Director of the earthquake center.  This author has

7    found little support in case law for extending the enhancement this far to someone

8    like Dr. Chi, who was consistently a researcher not on any board, not on the

9    Procurement Agency in Korea that decided public bids, was only occasionally a

10   project manager, and irregularly over his career had the administrative position of

11   director.

12       In *United States v. Whiteford,* 676 F. 3d 348, 365 (3rd Cir. 2012), the +4

13   enhancement was applied to the defendant, an Army officer who was the project

14   officer for the Coalition Authority in Iraq, because he "was an integral participant in

15   the bidding, and contracting and payment process. . . .[h]is signatures had to be on

16   recommendations for projects before they went to the contract officers for review...."

17   In *United States v. Watkins*, 691 F. 3d 841 (6th Cir 2012), affirming the application

18   of the +4 enhancement under (b)(3) applied to defendant Watkins, supervisor of

19   security systems contracts for a school district in Ohio who solicited and obtained

20   payments from a contractor of security cameras. Watkins was found to have

21   substantial influence over the selection process: he would take 10 to 15 vendors,

22   narrow them to a smaller group to present, and then recommend a particular vendor

23   and could singlehandedly stop payment on invoices.  In *United States v. Smith*, the

24   defendant was a civilian Army employee who served as Water and Petroleum

25   Program Manager for many years. He reviewed contract bids and supervised

26   contractor performance for the Army's water purification equipment and services.

27   He compiled contract requests, statements of work and costs estimates and based on

28   that work and his experience made recommendations to the Army.  In the case of

1   *United States v. Stephenson*, the court concluded that the defendant, an export

2   licensing officer in the Department of Commerce, was not subject to the

3   enhancement. Although his job of deciding whether to approve applications to

4   export high-technology equipment to the Soviet Union and China "involved some

5   degree of discretion and required him to possess a security clearance," the court

6   concluded that he was not different "from a multitude of personnel in the federal

7   service." 895 F.2d 867, 878 (2d Cir. 1990).

8       This enhancement exists to address people who push their weight around in an

9   official capacity, not because of merit, or knowledge but undue influence.  Thus, this

10  enhancement is directed at only those in "high-level" or sensitive positions." The US

11  Geological witness testified at trial that their seismologists also make

12  recommendations about strengths or deficiencies of products when asked.  Indeed

13  the testimony established that Dr. Chi consulted USGS persons for their opinions on

14  equipment.  Decl. Bednarski ¶12 (referencing inquiries of the USGS seismologists

15  about their use and opinion of the GSL borehole sensor and Geosig instruments).

16      Dr. Chi had the ability to request purchase of equipment for research

17  purposes, to request equipment on occasional projects he managed, and to give his

18  opinion to others at KIGAM as well as other agencies working on projects involving

19  seismology.  However these facts do not support "direct authority" to make

20  decisions for his agency within the meaning of §2C1.1(b)(3). When he was a project

21  leader for instance, it would have been his job to choose the appropriate equipment,

22  to include the pricing in the budget, to submit the budget with the bid, and if

23  approved, the purchase would be made by the purchasing department.  Mr. Byung

24  Chul Kim, who worked as an agent for GSL and KMI (through Korea EMT and

25  Heesong) bidding on seismology projects, testified that because of how the Public

26  Procurement Service in Korea operated, that Dr. Chi could not have, and did not

27  affect the bidding process.  Decl. Bednarski ¶6. Mr. Kim further testified that the

28  decision makers on that Service consisted of very qualified experts who decided the

bids and that Dr. Chi was not one of them.  *Id.* There is no showing that he had any substantial influence over that body. These facts compare starkly to examples from cases in which the defendants to which the enhancement was applied were the decision makers and thus in a "high level" or sensitive position.  *See*, *United States v. Hill*, 645 F. 3d 900, 908 (7th Cir 2011) applying the +4 because the defendant as Deputy Liquor Commissioner exercised substantial influence of the decision making process, in that he reviewed and accepted liquor license applications, conducted background checks, and like a law enforcement officer had authority to do inspections, issue citations for violations and direct license holders to make changes to comply with the code.  *See* also the facts in *United States v. Jacobs*, a Ninth Circuit memorandum opinion, which although unpublished, has persuasive value. 506 Fed. Appx. 558, 560 (9th Cir 2013 (unpub)(Jacobs was an immigration officer who adjudicated petitions for residency and citizenship and supervised and controlled other officers in adjudication of benefits).

Clearly, Dr. Chi had influence because of his unique and superior technical knowledge and passion for seismology.  Undoubtedly other seismologists might put great weight on his recommendations.  But the ability to influence directly or indirectly because of intellectual capabilities must be distinguished from the exercise of official authority, the key factor in the assessment of a high level public official for enhancement purposes.  The central factual determination to consider is what was Dr. Chi's level of responsibility in his position and whether his exercise of responsibility in that position lacked further authorization or review above him.

Here there is insufficient evidence to conclude he made or substantially influenced decisions linked to all or even the majority of payments.  There are emails suggesting he influenced other scientists in Korea to favorably consider GSL or KMI products, but there is an absence of evidence to show his honest factual recommendations were nefarious.  Countering any inference that his recommendations translated into payments, there is evidence from trial witnesses

1   that others, not Dr. Chi, made the official decisions. For instance Dr. Shin, who was

2   project director of the High Speed Rail project from 2005 to 2007 testified that he

3   made the decision about purchasing GSL equipment for the train project and did so

4   because KIGAM could purchase GSL materials directly and without paying an agent

5   fee.  Dr. Park was in charge of certification testing at KIGAM. Dr. Park testified that

6   Dr. Chi did nothing to influence testing/certification results or the reporting of those

7   tests.[3]  Decl. Bednarski at ¶4. There was also evidence from Mr. Kim (of GSL's

8   agent Heesong) that Dr. Chi did nothing to influence the bidding process, that GSL

9   would sometimes lose competitive bids, and that the price of GSL products did not

10  change substantially after the relationship between GSL and Dr. Chi ended.  *Id.* ¶6.

11      There is no case finding that this high level public official enhancement would

12  apply to a researcher like Dr. Chi, someone who at times was a project manager, at

13  other times had some administrative functions as the director of the earthquake

14  division. The government can not prove that while he was in those positions, there

15  was a connection between any payment and any "official" action taken by virtue of

16  his position.  Indeed the government did even prove any increase in overall

17  compensation from KMI or GSL tied to Dr. Chi's irregular positions of director or

18  project manager.

19      The reasons the presentence officer gives in support of the enhancement in

20  PSR ¶11a to ¶11d are based on a misunderstanding of the facts and therefore lead

21  to erroneous conclusions and, with respect to ¶11e, is insufficient to support the

22  enhancement.  The PSR says that Dr. Chi advocated the purchase and use of KMI

23  and GSL products "at the expense of their competitors. . . ." PSR at ¶11a.  That

24  conclusion is not supported: there is no evidence of loss of sales or even proof that

25

26      [3]    This trial testimony from Dr. Park and Mr. Byung Kim contradicts the
    statement in the presentence report at PSR ¶11c that he "influenced KIGAM to
27  certify these products, even when they were otherwise not working; . . . " The
    undersigned is unaware of any evidence to support that statement and believes it is
28  factually incorrect.  Decl. Bednarski ¶¶4, 6.

"competitors" lost jobs or money because Dr. Chi did not help them. That conclusion is speculative and not supported in fact. *See, e.g. United States v. Clinton*, 825 F.3d 809, 812 (7th Cir. 2016) (reversing enhancement and rejecting as speculation the conclusion that a gun was paid for with drugs merely because it was sold by a drug addict to a drug dealer); *United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010) (due process requires that sentencing determinations be based on reliable evidence rather than speculation or unfounded allegations).  Moreover, Mr. Kim (of GSL's agent Heesong) testified that he too, would provide advance notice if he heard of upcoming projects that could be bid and feedback on the testing process. Decl. Bednarski ¶6. The evidence does not support that any competitors lost any project or bid because of any action Dr. Chi took. There were times he criticized faults or weaknesses in competitor's products, and there were times he told GSL or KMI if a competitor was bidding on a project, but that does not support the conclusory statement of probation that he advocated the use of KMI and GSL at the expense of competitors.

Next the presentence officer asserts in support of the application of the adjustment that Dr. Chi "advocated the use of the companies" products to other organizations in Korea, including through his participation in an earthquake monitoring committee in which he served in an official capacity.  The presentence officer references particular emails but extends their content too far, misconstruing his references to "being on a committee" and the fact that the committee in some way referenced seismological equipment, to decisions that resulted in illicit payments to him.  PSR at ¶11b, 12. More information is needed to understand that the emails do not mean what the probation officer concluded.

Dr. Chi states in the first email that he was on a committee that had accepted certain standards for equipment.  Dr. Chi reported what KIGAM was using to that committee.  In that 2003 email (Government Trial Exh. 63), Dr. Chi told Dr. Guralp that sensors CMG-3TB and CMG-40T "are registered" as the standard sensors in the

committee and that he told the committee they were reliable. *Id.* Dr. Chi also said that he could not say that about the recorders and other equipment he had not installed/used.  *Id.*  The committee Dr. Chi spoke of is a reporting committee within KMA. Decl. Bednarski ¶15. Annually KMA would gather information from institutions concerning seismology and publish that information in a report.  *Id.* The institutions would report to that committee the seismology instruments they were and would be using in the future.  *Id.* Ten years later in a 2013 email from Dr. Chi to Outhay Viengkhou at KMI (Government Trial Exh. 228), Dr. Chi explains that KMI's broadband sensor STS-2 is only used in Korea by KIGAM, KMA and  some nuclear related organizations and that the main concern was quality not price. Therefore, the email goes on, he told the agent to recommend STS-2 for broadband sensors at permanent stations. The inference is clear in the email that KMI's higher quality [compared to GSL's] broadband sensors were appropriate for those installations and that he had said so.  He refers to the policy of that committee, that higher quality but more expensive KMI broadband sensors would be used at the permanent stations. While the email reflects he provided such information to the KMA "committee," neither the 2013 or 2003 emails support that the presentence officer's inherent conclusion: that the committee made decisions (relevant to his payments), what those decisions if any were, nor that Dr. Chi's accurate and supported  information/opinions influenced any decision of that committee (relevant to his payments).

The third email that the presentence officer references is a 2011 email that vaguely references some "official advisory committee." In that email Dr. Chi writes to Nathan Pearce that he is back to being the head of the research center and therefore must be officially cautious because he "would be involved in the "official advisory committee." (Govt. Exh. 148) The email is so vague that it is not possible to determine what his "involvement" would be, what decisions if any the "advisory" committee made, nor what his information/opinions he would give or what if any

1  particular decision of that committee would be influenced, or if it had any

2  connection whatsoever to his payments.  In sum, there is no actual proof that he

3  misused any authority on any such committee to "advocate or promote" KMI or

4  GSL's products. Cf. PSR ¶11-12.

5       It is actual, not apparent, authority that is relevant for purposes of the

6  enhancement. *United States v. Hill*, 645 F. 3d 900, 907 (7th Cir 2011).  There is no

7  case precedent applying the enhancement based on anything at all similar to the facts

8  here: a scientist who says there is an official committee; that he has reported to that

9  committee an opinion or information; and an absence of evidence that committee

10  took any action based on that information connected to any illicit financial benefit.

11       Next probation says that he influenced KIGAM to certify the companies'

12  products even when they were otherwise not working. PSR at ¶11c.  This is simply

13  an incorrect statement. The undersigned is unaware of any such evidence. Decl.

14  Bednarski ¶13.  Additionally, the enhancement is not supported by the allegation in

15  PSR ¶11d that that Dr. Chi provided the companies with market intelligence and

16  bidding information to allow the companies to better position their products over

17  their competitors.  PSR ¶11d.  What happened here is a far cry from the PSR's

18  implication that he traded on confidential information.  The information Dr. Chi

19  provided about upcoming public projects and the type of equipment that those

20  projects would need was not confidential information. Mr. Byung Chul Kim from

21  Korea EMT (formerly of Heesong) testified in sum that the third party agents knew

22  ahead of time what projects would be coming up in Korea and advised their clients

23  as well.  Decl. Bednarski ¶6.

24       The defense does not dispute the allegation in PSR ¶11e, that Dr. Chi

25  provided technical advice to GSL and KMI, so as to increase the chance of sales.

26  PSR ¶11e.  That evidence alone is not sufficient to support the application of the +4

27  enhancement in §2C1.1 (b)(3) because Dr. Chi's provision of technical advice in

28

1 whole or at least significant part did not require  "high level" or "sensitive" access or

2 decision making within the meaning of §2C1.1(b)(3).

### 3. U.S.S.G. §2S1.1 Should Be Used and The Loss Adjustment Limited to $56,000, The Dollar Amount in Count 6, For An Adjustment of +6.

5 The defense position  is that if this Court applies the §2S1.1 guideline (which

6 starts at a base offense level of 8), then the loss adjustment should be limited to +6,

7 the adjustment for conviction under 1957 (+1) be applied, and no adjustment under

8 Chapter 3 be applied, for a total adjusted offense level of 15.

9 The presentence officer takes a reasonable position concerning a loss

10 adjustment under the §2B1.1 table, which is that only the funds involved in Count 6

11 are included in the loss calculation.  PSR at ¶23. This is an appropriate conclusion

12 for several reasons.  First, by failing to convict Dr. Chi of counts one through five,

13 the jury rejected the government's theory that the funds received in years 2011

14 through 2016 were all laundered briberous funds.  Finally any more egregious

15 application of the 2B1.1 table–such as the government has posited – to add up all the

16 funds alleged in the charged six counts-- would result in an overstatement of the

17 offense severity and would fail to take into account the atypical nature of the

18 conduct.  See below, overstatement argument section.

19 The government's expected position is that all the money he earned over the

20 years of the consulting contracts (over a million) should be used to generate an

21 increase of +14 should be rejected. The government "bears the burden of supporting

22 its loss calculation with reliable and specific evidence." *United States v. Gupta*, 463

23 F.3d 1182, 1200 (11th Cir. 2006).  An adjustment which so grossly aggravates the

24 calculation requires proof of a clear and convincing nature that over a million dollars

25 in briberous funds were laundered.  That being said, the government cannot prove to

26 a clear and convincing level of proof that over $1 million payments were briberous

27 or even to a preponderance level of proof that such funds were briberous as opposed

28

1   to legitimate.   The government cannot separate how much of that was legitimate/fair

2   value/earned monies and how much was illegitimate/inflated / briberous money.

3       Here the evidence at trial showed that over the years Dr. Chi provided

4   substantial technical advice to Guralp Systems Limited and Kinemetrics (hereinafter

5   GSL and KMI respectively) which advice and technical contributions contributed

6   greatly to the improvement of their products and performance of those products

7   within the Korean seismological networks.  Decl. Bednarski ¶¶7-8.  The evidence

8   does not show that all of the monies paid Dr. Chi between 2011 and 2016 (over

9   $1M), or any earlier dates, were briberous. Witnesses at trial, including other senior

10  researchers and two past presidents (Dr. Lee from 2003 when the KMI contracts was

11  signed, and Dr. Kim from 2015 when Mr. Potts and Dr. Chi discussed a new

12  contract comporting with rule changes) testified that third party consulting contracts

13  for researchers were lawful, and that such arrangements were promoted by KIGAM

14  and engaged in by other researchers (as Dr. Park and Dr. Shin testified). Even if this

15  Court were to conclude that Dr. Chi was overcompensated for his advice/consulting

16  that does mean all of the fees paid him were illegitimate.

17      Furthermore, the government failed to connect any payments to specific

18  contracts KMI or GSL had in Korea much less to any evidence that Dr. Chi

19  promoted or facilitate those contracts.  The evidence did not establish such

20  connections for the years involved in the indicted counts 2011 through 2016 or any

21  other un-convicted conduct. *United States v. Ring*, 811 F. Supp. 2d 359, 376 (D.D.C.

22  Cir 2011)(" Courts have cautioned, however, that 'when the benefit calculation is

23  based largely on conduct for which the defendant was not convicted, the district

24  court must be careful to explain exactly how the conduct factors into the benefit

25  calculus.'" *quoting United States v. Anderson*, 517 F.3d 953, 963 (7th Cir.2008)

26  (*citing United States v. Schaefer*, 291 F.3d 932, 938 (7th Cir.2002)).

27      The sentencing commission's commentary notes relevant to calculation of

28  "loss" amount under §2B1.1 and under §2C1.1 are helpful to a certain extent. The

notes to §2C1.1 state that "loss" shall be determined in accordance with Application note 3 to §2B1.1. Those notes direct that where loss cannot be quantified, that "gain" is an alternative means of calculation. Here however gain suffers the same problem. How can one calculate how much Dr. Chi gained from briberous conduct?

### B. THE LACK OF EMPIRICAL EVIDENCE TO SUPPORT THAT THE GOALS OF SENTENCING ARE ACHIEVED BY THE LOSS ADJUSTMENT WITHIN EITHER §2S1.1 OR 2C1.1 SUPPORTS NOT APPLYING THE ADJUSTMENT AND OR FINDING THAT THE INCREASE OVERSTATES THE OFFENSE

The difficulty posed here of a calculation of a higher guideline range based on "loss" increase from the §2B1.1 table is consistent with published case law criticizing the guideline as lacking empirical evidence to support any argument that such increases achieve any of the goals of §3553(a).   The guideline incorporating the §2B1.1 "loss table amount" should not be followed because it lacks an empirical basis and was driven instead by Congressional directive.  See *Kimbrough v. United States*,  552 U.S. 85, 89 (2007) ( In cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case.");  *Gall v. United States*, 552 U.S. 38, 73 n. 2  (2007) (noting that not all Guidelines are tied to empirical evidence, most notably, those for drug offenses).  When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the § 3553(a)'s purposes, even in "a mine-run case."  *Kimbrough*, 552 U.S. 85; *United States v. Barsumyan*, 517 F.3d 1154 (9th Cir. 2008) ("Post-Booker, defendants certainly may attack the effect of the Sentencing Guidelines by arguing that they reflect over-broad or mistaken policy priorities"—but only after total offense level accurately calculated).

The money laundering guideline §2S1.1 suffers the same deficiency in that its high base offense level and adjustments are inflexible, arbitrary and not reflective of the actual offense conduct involved. *United States v. Carter*, 538 F.3d 784 (7th Cir. 2008)(where 61 year old defendant convicted of money laundering and tax fraud and guidelines 87-108 months, district court's sentence of 24 months reasonable in part because district court properly found that case was atypical and referred to a 1997 report by the Sentencing Commission. The opinion described that report as concluding that the "relatively high base offense levels under the money laundering guidelines," are "inflexible and arbitrarily determined" without connection "to the seriousness of the defendant's actual offense conduct." *Id.*

As many sentencing and appellate review courts have noted, in cases involving the loss adjustment table, because of the sentencing guidelines arithmetic approach and also in an effort to appear "objective," the guidelines tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors. *United States v. Adelson*, 441 F.Supp.2d 506, 508 (S.D.N.Y.,2006); and *United States v. Morris*, 837 F. Supp. 726, 729 (E.D. Va. 1993)(court justified its self-described "lenient" and well below guidelines sentence in a drug case for a defendant lawyer in light of his age, health and disgrace before the bar, stating: "[m]echanical application of the Federal Sentencing Guidelines may yield 'an illusory mathematical precision that, when slavishly followed, is antithetical to effective and conscientious sentencing.'".

Other examples of overstatement in loss cases include: *United States v. Desmond*, 2008 WL 686779 *2 (N.D.Ill.,2008), the sentencing court found that the loss adjustment of 20 levels "vastly overstates Desmond's culpability and produces a Guidelines sentence that is grossly disproportional" to Desmond's participation in the offense. *See also*, *United States v. Samaras*, 390 F.Supp. 2d 805, 809-10

1    (E.D.Wis.2005) (sentence below the Guidelines range appropriate where range was

2    driven by a high loss amount, defendant had no role in setting that amount, and did

3    not profit from it any more than from his legitimate business dealings).

4        There are many factors supporting that this offense is atypical. When Dr. Chi

5    entered into the agreements he was a junior researcher with little status and or

6    authority.  Dr. Chi could not have foreseen the great increase in value the business

7    arrangements would have because he could not have foretold the disastrous events

8    that the future brought such as the destruction caused by the 2004 earthquake and

9    tsunami in the Indian Ocean which motivated South Korea to pass legislation

10   requiring fitting structures with measuring equipment, or the 2011 earthquake that

11   damaged the nuclear plant in Japan and caused much suffering, or the intensified

12   nuclear testing activity in North Korea. The fact that forces beyond his control or

13   foreseeability increased sales and therefore his earnings supports why monetary

14   compensation is a poor measure of culpability here.[4]

15       Another atypical factor is the economic and social value of Dr. Chi's

16   scientific/technical contributions to the products developed and improved by the two

17   companies involved GSL and KMI.  Both Dr. Potts and Natalie Pearce testified to

18   the value of his contributions to GSL.  He provided invaluable technical guidance.

19   Dr. Chi's coworkers testified about the consultation services provided.  This

20   testimony is corroborated in Exh. 4, the letter Dr. Guralp's lawyers provided GSL.

21

22       [4]    Similarly the "loss" amount was a poor measure of culpability in

23   *Emmenegger.* The court reasoned that the precipitous decline in stock price that
     typically accompanies a revelation of fraud generates a multiplier effect that may

24   lead to guideline offense levels that are, quite literally, off the chart without any
     explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]").

25   *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (The
     specific amount of loss is often "a kind of accident" and thus "a relatively weak

26   indicator of [ ] moral seriousness . . . or the need for deterrence" most defendants do
     not set out to defraud a specific amount of money; rather, the amount of loss is

27   dependent on the security procedures in place and the point in time when the

28   ongoing fraud happens to be detected.

Another atypical factor is that there is no victim[5]. The companies benefited economically because their products improved. These were not lesser products that would otherwise not have been used, nor did the product placement jeopardize anyone's safety.  Quite the contrary was shown at trial: the products and were appropriate products to install and benefited Korea as well as the companies that improved and manufactured the products.

### C. THE U.S.S.G §3B1.1 ENHANCEMENT FOR ABUSE OF POSITION OF TRUST SHOULD NOT BE APPLIED

Finally, no adjustment of abuse of position of trust or special skill under §3B1.1 is applicable to the §2S1.1 calculation.  Note 2c to that guideline sets forth that the application of the Chapter 3 adjustments is determined based on the money laundering offense, not on the underlying offense from which the funds were derived [Korean bribery].  U.S.S.G. §2S1.1, cmt. (n. 2c).  Here Dr. Chi did not have any special skill or position of trust with regard to the banking transfer.  He was not a bank employee or financial manager.  He was only a customer of Bank of America and of its investment division Merrill Lynch.

### D. SUBSTANTIAL MITIGATING EVIDENCE SUPPORTS DEFENDANT'S REQUEST FOR A SENTENCE OF SIX MONTHS

Having calculated the applicable guidelines this Court must then consider all of the sentencing factors listed in 18 U.S.C. § 3553(a)(4) and undertake "an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 49–50 (2007). Title 18 U.S.C. §3661 allows sentencing courts to receive without limitation information concerning a defendant's "background, character, and conduct." *Pepper v. United States*, 562 U.S. 476, 489 (2011) ("Permitting sentencing

---

[5]     The government's theory that other companies were disadvantaged is speculative. No company has sued Dr. Chi , GSL or KMI for unfair competition. GSL and KMI continue to manufacture their products and sell heartily in Korea. There is no evidence of any slowdown in sales now that Dr. Chi is not involved. Decl. Bednarski ¶6.

courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.' "[citation omitted]."). There are numerous positive characteristics applicable to Dr. Chi which are recognized as mitigating either as the basis of "variance" from the guidelines or under 18 U.S.C. §3553. The presentence officer identified that numerous factors warranted a variance from the guidelines. (PSR ¶95: work history, lack of criminal history, family circumstances and health issues). The presentence officer recommends a variance from the calculated range to a sentence of 18 months. PSR Recommendation Letter at p. 5  The defense respectfully recommends a sentence of 6 months. This sentence is supported by Dr. Chi's extraordinarily positive mitigating circumstances, which address all of the goals of sentencing without necessity for any greater prison sentence, including:

- Dr. Chi's lifelong scientific career distinguished by extraordinary contributions to his profession, his country and his region of the world (vis-a vis his creation of the early warning earthquake system in Korea and detection and analysis of nuclear activity by the North Koreans);
- Lifelong Responsible Personal Behavior;
- Collateral Consequences Have Been Very Severe: financially, professionally and personally;
- Dr. Chi's medical condition (age related macular degeneration); and,
- Harsher Consequences as a Foreigner

## 1. Dr. Chi's Loss of Reputation, Job, and Future Employability Are Collateral Consequences That Mitigate Against Additional Prison Time

Dr. Chi has dedicated his life to seismology and sharing his knowledge in Korea and the international community. Numerous cases support that it is appropriate to consider loss of reputation, loss of business and/or work and future earning ability as collateral consequences that are harsh punishment and achieve some of the objectives of sentencing. *See United States v. Redemann*, 295 F. Supp.

24

2d 887 (E.D. Wisc. 2003) (adverse publicity in small town and ruination of defendant's business supported departure); *United States v. Gaind*, 829 F.Supp. 669 (S.D.N. Y. 1993) (departure granted in part because the destruction of the defendant's business); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir.) *reh'g denied*, 597 F.3d 514, *cert. denied*, 559 U.S. 1031 (2009)(20 month sentence in face of range of 78 to 97 not unreasonable because the conviction made it doubtful defendant could pursue his career as an academic or translator, lessening the need for further deterrence and protection of the public); *United States v. Anderson*, 533 F.3d 623 (8th Cir.  2008)(reduction of defendant's sentence in case of insider trading and money laundering was reasonable in part because of collateral consequences defendant suffered such as the loss of his reputation and his company); and *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007)(reduction of sentence because of defendant's loss of "teaching certificate and his state pension as a result of his conduct" appropriate and consistent with 3553 a's directive for 'just punishment and 'adequate deterrence.'").

None of the cases found even come close to the loss of an entire career, and the complete destruction of reputation as Dr. Chi has suffered.  As Dr. Chi explains in his letter to this Court, this is especially painful to him because of the critical events now taking place in the Korean Peninsula. He writes:

> "It has also been very difficult to receive the news of the latest North Korean nuclear testing through my wife and news reports. Based on the limited information that I have received, I do have some reason to think that the nuke test-related measurements and evaluation are not accurate. And due to the arrest of me in America, it also seems that the task of reporting on the nuclear testing has been transferred from KIGAM to KMA. To be in jail and not to be able to use my knowledge and experience to help my colleagues in Korea make accurate evaluation has been very difficult for me. I know that I could help my country, but my own bad behavior now has caused my separation. This is my great burden, pain and regret.

Att. Exh. 1 at p. 2 Dr. Chi's letter to Court.

1    The arrest and conviction in this case has already exacted severe punishment:

2    Dr. Chi has lost most of what he has built in his life including: his great reputation,

3    his position at KIGAM, his status as an internationally renowned seismologist, and

4    undermined his financial stability for his remaining years.  He cannot draw on his

5    pension until he is 61, which will only be $2,000 a month, is unemployed (and

6    unemployable), and his savings are severely depleted.  PSR at ¶76. The desolation

7    of his career will be with him the rest of his life.

8        His wife writes: "This case has caused him the greatest pain in his life. He has

9    been discharged from the research center that was the work place and devotion of his

10   life." Att. Exh.2 at p. 26-27, Letter of wife, Ki Jeong Seok.  His absence from his

11   wife and family during the duration of this case has been devastating: "the reality

12   that my husband, who had been the head and center of our family, is no longer with

13   us is too agonizing for all of us even to the point of hopelessness." *Id.* The EESK

14   petition reflects the severity of dismissal from the job he loves so much. "Dr. Shin,

15   the president of the EESK society has known Dr. Chi since 1997, and writes:  "I

16   heard that Dr. Chi is deeply regretting his actions. I know him so well that without

17   hesitation I can say he would feel deeply humiliated and sorry for any harm to

18   KIGAM, his country or the advancement of his field." Att. Exh.2 at pp. 1-6, EESK

19   Petition.

20       Dr. Chi's conviction by jury was so widely published in news print and on

21   television in Korea, "no one could miss it."  Att. Exh.2 at p. 41, Letter from Hak

22   Sung Kim (Professor of Political Science).  This press has been humiliating to him,

23   and his family.  Professor Kim writes: "his conviction has already punished him to

24   severe degree; the news report on him undermined seriously his achievements as

25   well as his reputation which he earned over a long and distinguished career."  *Id.*

26   Att. Exh.2 at pp. 7-8, Letter from Professor Jaedong Kim "he has suffered severely

27   professionally because of this criminal case," and "he and his family have suffered

28   much personally").  Dr. Chi's brother, the attorney and former judge writes: "I was

26

embarrassed at the news of his arrest because he is a very fair person and well thought of here."  Att. Exh.2 at p. 11, Letter Young Cheol Chi.  His sister writes "his sudden arrest was an unbelievable news and great shock to our family." Att. Exh.2 at p. 13, Letter Jung Ok Ji.  His friend and a professional colleague who now owns and operates Seoul Stainless Ltd. writes of the harsh negative news in Korea and the negative effect on Dr. Chi's lifelong achievements and reputation. Att. Exh.2 at pp. 31-32, Letter from Joong Kyung Sung ("the punishment of his conviction and loss of his good name and lifelong career is very big").  His sons write:

> "To such a father and person, the latest events must have been a tremendous and desperate shock, and he undoubtedly would have suffered and will suffer from a sense of guilt for making not only us but the rest of the family members and relatives worry about him. During our telephone conversation, he has stated how very sorry he was to the people near him and that he certainly wants to restore the fallen honor- the honor he had built during his life time. Over his tears, we too earnestly hoped that he surely does regain his honor. We have never seen him so embarrassed and hurt. He has always been so respectful to others and himself, and it is heartbreaking for us to hear his broken spirit and to be so far away from him in his fallen state."

Att. Exh.2 at pp. 37-38, Letter of sons Chang Woon Chi and Chang Youp Chi.

The negative publicity-- which caused the loss of his job and career -- will likely make teaching –something he loves and inspired to after retirement from KIGAM impossible. His son's spoke of that dream in their letter:

> "Our father is born in 1958 and is soon facing retirement. After we became college students we heard a number of his retirement plans, and one of them is to become an honorary emeritus based on the expertise he has built over the years, and foster as many earthquake specialists in Korea and contribute to the society. Indeed, our father has once taught college students after receiving his Ph.D. from Texas A&M University in the U.S.A. He is a great teacher; he can courteously and enthusiastically teach others everything he knows."

Att. Exh.2 at pp. 37-38, Letter of sons Chang Woon Chi and Chang Youp Chi.

Dr. Chi's past nine months (including 5 months on electronic monitoring with curfew) have been very difficult, and are part of the consequences already suffered. Dr. Chi writes to this Court:

> "For nine long months, from my arrest at the airport, bailout, trial to self-surrender, my most painful feeling was my disappointing those who trusted and supported me and my being separated from my loved ones. Each and every day, through the loneliness and shamefulness, I utterly regret and painfully look back at my greed and stupidity. I truly missed seeing my mother, wife, my babies, my brother, sister and friends. I lost everything in the world and gave up everything as well. My only remaining hope is that I will live to love all my loved ones and I want to love them more and more and more."

Att. Exh.1, Letter Dr. Chi to Court at p.2.

### 2. The Financial Consequences of the Case and Conviction Are Devastating And Further Mitigate Against Prison Time

In addition to the devastating personal and professional consequences to his and his family reputation, the case has had huge financial consequences, including:

**$690,000:** Dr. Chi will lose 6 years of income from KIGAM (from his arrest to when he would have had to retire at age 64). Based on an approximate yearly income of $115,000 per year, that totals a minimum of $690,000 of lost KIGAM income.[6]

**$56,000: the amount of the criminal forfeiture** resultant from Count 6.

**$ 110,334:** $403, 657 was the value of the assets in the financial accounts at B of A and Merrill Lynch at the time of the notice of seizure. That seizure and civil asset forfeiture case that followed is expected to result per the anticipated settlement agreement in the government keeping approximately $110,334.

---

[6] There would also be additional earnings from future years of sharing income from of 23 patents he developed with KIGAM, which are owned by KIGAM and which until now was entitled to share, an entitlement he lost when fired. PSR at ¶62, 64. This amount cannot be quantified.

**$250,000 to $300,000.** Several hundred thousand dollars remains unpaid by GSL and KMI.  Even though those companies would agree that pursuant to the contracts funds between $250,000 and $300,000 are owed to Dr. Chi, they will likely never be paid because the government accuses those companies, as it did Dr. Chi, with any funds from the contracts being bribes.

In conclusion, Dr. Chi has suffered huge financial losses due to this case. Those amounts as referenced above are very substantial exceed the earnings he made from the contracts.  Given his age, and loss of his job and reputation, it is reasonable to conclude that he will never recover from the financial losses of this case.

The President of the Earthquake Engineering Society of Korea (EESK) and 15 additional signatories of great intellect and stature (directors, leaders, and professors of the esteemed educational institutions) prepared and submitted the attached letter to Judge Walter which sets forth:

"Dr. Chi is permanently dismissed[7] from office of KIGAM due to the current case.  It is not only his personal misfortune but also a great disruption to Korean earthquake research that Dr. Chi's research activity was suspended due to the conviction. Furthermore, we are losing a great driving force in the development of Korea's seismic observation technology, which is very unfortunate for both national and societal perspectives."

Att. "Combined Dr. Chi Sentencing Letters Packet," hereinafter "Packet" at p. 1-6. This Petition from the Earthquake Engineering Society (hereinafter EESK) submitted by President Shin and 15 Signatories.  The EESK Petition describes Dr. Chi's immense contribution to the science and the country:

"Dr. Chi is a talented seismologist in Korea and has greatly contributed not only to the development of EESK but also to the advancement of seismology in Korea. In particular, Dr. Chi has accomplished many research achievements in detection of North Korea's nuclear test, observation of earthquakes and development of analytical techniques. Many seismologists have used his research findings and techniques to carry out further studies. We are in incessant need of Dr. Chi's experience and contributions to Korean earthquake

---

[7]      Dr. Chi's institute advised him on August 3, 2017, after the guilty verdict that he is dismissed from his job at KIGAM. Decl. Bednarski ¶9.

29

1  research. I cannot even count how many other seismologists' work is built on
2  the foundations of what Dr. Chi was himself developed and created."
*Id.* Att. Exh.2 at p. 1-6.

3  Dr. Chi's lifelong friends hold the same opinion expressed in the EESK
4  petition, that Dr. Chi is devoted to the advancement of his science and what he can
5  contribute to improve society through his work.   "He is devoted to doing what he
6  can to improve society for the better." Att. Exh.2 at p. 7-8, Letter  from Prof.
7  Jaedong Kim (friend of 44 years).  "Dr. Chi was carrying out very important works
8  for Korea distinguishing North Korean experiences in nuclear weapons from natural
9  earth movement activity.  Att. Exh.2 pp. 9-10, Letter from Dr. Moonsu Sung (friend
10  of 40 years).  Dr. Sung asks the court to consider Dr. Chi's achievements and
11  contributions to society.  *Id.*  Att. Exh.2 p. 12, Letter Pyungwoo Jang, physics
12  professor, high school and college friend ("he is a very important person to South
13  Korea and US who have been paying attention to nuclear crisis provoked by North
14  Korea government and have cooperated to keep Korean peninsula peaceful without
15  war").
16

17  Dr. Chi's life is characterized by generous contributions of his time and
18  intellect to scientists and scientific pursuits; his earnings in this case are due to his
19  special talent and intellect not due to any avaricious nature—in fact the contrary
20  appears to be true of him: that he is not a greedy person.  He chose a career because
21  he loved the science; seismology is known to be a field that does <u>not</u> reap great
22  economic rewards.

23  Friends and family who have known him his entire life can speak to his
24  lifelong nature and character.  His younger brother, Young Cheol Chi --also highly
25  educated and smart --describes Heon Chi: "He has a great vocation [aptitude] for
26  science and studied hard," a highly competitive national standardized university
27  admission test score was so high he could have gone to medical school.  Att. Exh.2
28  at p. 11, Letter Young Cheol Chi (brother/attorney) and Att. Exh.2  at p. 13 Letter

Jung Ok Ji (sister/doctor).  He was admitted to Seoul National University, reputed to be the best university in Korea.   He chose engineering over medicine, and after earning his Bachelor of Science, studied and earned his PhD in seismology in the U.S.  He then returned to Korea, and was hired as a researcher at KIGAM, a position he chose for his love of seismology -- not its earning potential.  Att. Exh.2 at p. 14-14, Letter from Bok Jae Chung, chemical engineer, businessman and friend of 40 years (seismology does not bring economic benefits but is a discipline for humanity and society), Att. Exh.2 at pp. 16-17; Letter from Inmock Choi businessman and friend since 1974 (when he started at KIGAM no one in Korea thought much about earthquakes, his field was not a h high income area compared to energy sciences where one earns more).

Dr. Chi sacrificed much personally to his career: Dr. Chi spent his entire career at KIGAM, a research institution, where as noted above his salary was modest and, as explained above, less than he could have earned as an energy engineer or businessman.  His scientific contributions as a researcher at KIGAM were of great social value. He is credited by those who worked with him for his passion in developing the earthquake early warning system in Korea and supporting the safety of the people by his work and analysis in detecting military activity by the North Koreans and his participation in the CTBTO.

> "Dr. Chi has attained brilliant research and academic achievements in the field of earthquake that was once a wasteland in academics in Korea. As far as I know, Dr. Chi had devoted and led a life that concentrated all of his time and energy into research and studies, without much social life of his own."

Att. Exh.2 at 18, Letter from Hag Soo Kim (junior classmate Seoul Nat'l Univ.).

Over the many years he worked at KIGAM he invented many improvements within his profession as reflected in the 23 patents that he shares with KIGAM.  PSR at ¶62.  He was a highly respected scientist in Korea and in the international community of seismologists.  His friend of 40 years, engineer and now board member of a Mining Company, Dr. Changhun Lee writes "Dr. Chi's expertise and

experience have helped ensure the safety and maintain the peace of the Korean and other peoples who have benefited from his many contributions." Govt. Trial Exh. 1, Personnel File; Att. Exh.2 at pp 19-21. Letter Changhun Lee, engineer, director of Samtan and friend of 40 years (speaking of how Dr. Chi has helped with regard to earthquake safety and North Korea's pursuit of nuclear weapons as a threat to peace in the Korean Peninsula).

As was established at trial, Dr. Chi was his country's representative to the Comprehensive Nuclear Test Ban Treaty Organization "CTBTO" and was the respected advisor to South Korea's president/government on military ballistics and nuclear testing by North Korea. As also established by testimony and photographs, at trial and referenced in sentencing letters to the Court, Dr. Chi has appeared on national TV and radio news broadcasts discussing North Korea nuclear missile testing and called upon to calm the public after large earthquakes in or near South Korea, for example concerning the 2011 and 2016 large earthquakes in Japan, analyzing size and strength, offering preparatory and recovery plans, and calming the public where appropriate.  Att. Exh.2 at pp. 22-25, Letter of Jae Goo Shim (a friend of forty years).

Dr. Chi has also advised on the safety of structure and design of nuclear plants in Korea. See Att. Exh.2 at p. 24, Letter Jae Goo Shim ("Dr. Chi has served as a member of the Nuclear Safety Advisory Committee, and has directly participated in earthquake resistant designs of nuclear plants in Korea").  Dr. Chi's brother, an attorney and former judge in Korea, writes: "he is so widely known as a leading expert of earthquake learning in the geologic field in Korea that even all my students of Judicial Research and Training Institute know of him well." Att. Exh.2 at p.11, Letter Young Cheol Chi.

He used his fame to generate donations for victims of earthquake disasters in Korea, often donating his time and talent on broadcasts to collect donations for international victims of earthquakes. Packet at p. 26-27, Wife Ki Jeong Seok Letter.

Dr. Chi has been a frequent mentor, generously sharing his knowledge for the progress of others and the science.  Inmock Choi, director of a freight forwarding company, and 40 year friend since high school writes:

> "Dr. Chi "is passionately dedicated to improving the state of research and knowledge of earthquakes in Korea. He is always generous with his time, energy and intellect to his colleagues, fellow academics, students and the general public."

Att. Exh.2 at pp. 16-17, Letter from Inmock Choi.

Mr. Jaedong Kim, engineering professor in the College of Energy and Resources at Kangwon National University in Korea has known Dr. Chi for 44 years. He writes that Dr. Chi and he share the same belief in the importance of mentoring juniors and students, that is "a deep commitment to mentor and guide future engineers so that they may contribute their abilities to analyze and solve technical problems in a way best for society."  Att. Exh.2 at pp. 28-30, Letter from Jaedong Kim; Att. Exh.2 at pp. 18, Letter from Hag Soo Kim, underclassman at high school ("Though all these years I knew him, he has been very generous in sharing his knowledge and idea" and since I started work as a geophysicist I call him often for help).  Att. Exh.2 at pp. 22-25, Letter from Jaegoo Shim, friend since high school (Dr. Chi "especially excelled in mathematics, and. . . kindly tutored me in mathematics when I was lagging behind in class"); Att. Exh.2 at pp. 28-30, Letter from Junggwan Kim, a still close friend from high school and college ("when we were in school together, . . . [Dr. Chi] was generous with his time and knowledge. He studied hard but would not refuse to help someone else to gain advantage. He succeeded on his own merit while also elevating those around him").

Joong Kyung Sung, owner of Seoul Stainless Steel Ltd, has been a friend of Dr. Chi's since 1999 when they met at a seminar.  He similarly describes Dr. Chi's generous provision of professional help: "I was involved in constructing IT infra-network over the Korea and he was very generous and helpful with his knowledge and ideas." Att. Exh.2 at pp. 31-32, Letter from Joong Kyung Sung.  Dr. Han,

professor of philosophy has been a lifelong friend of Dr. Chi, he "know[s] him to be a scientist and scholar of exceptional quality who generously shares his time, his work, and creative ideas with other researchers and scholars."   Att. Exh.2 at 33-34, Letter from Hyong Han. See also, Att. Exh.2 at 28-30, Letter from Junggwan Kim (Mr. Kim heard from Dr. Chi's colleagues both senior and junior to him that he "helped those junior to him without compensation.")

### 3. Dr. Chi's Work and Family Stability Evidence His Substantial Moral Character Which Further Mitigates Against Prison Time

Here the exemplary history and character of Dr. Chi supports the six month sentence requested, far below the guideline range. Section 3553(a) (1) permits the Court to consider the history and characteristics of the defendant.  *United States v. Autery*,  555 F.3d 864 (9th Cir. 2009) (Courts sentence of probation in child pornography case with guideline range of 41-51 months was reasonable in part because of Autery's positive characteristics such as his having no history of substance abuse, personal stability, no sociopathic or criminalistic attitude, motivation and intelligence, and the support of his wife and child); *Stewart*, 590 F.3d at 147 (Lynne Stewart had devoted her life long career as a lawyer to the defense of the poor and oppressed for little money, thereby providing a service to her clients and the nation, which history and characteristics justified a sentence of 28 months despite guidelines for her conviction of providing support to terrorists); *United States v. Carter*, 530 F.3d 565 (7th Cir. 2008) (sentencing courts are charged with considering as part of the § 3553(a) factors "the history and characteristics of the defendant," which would include a defendant's public service.

The majority of the twenty letters in the attached packet are from people who have known Dr. Chi for 40 years; that factor alone is a testament to his responsible and respectful nature.  Nearly all of those lifelong friends are engineers and academicians – again a characteristic which speaks to the quality of his character.

Dr. Chi is devoted to his work and family.  PSR ¶¶48-49, 51 (married since 1986; theirs is a strong and loving marriage; Dr. Chi's wife, sons, siblings, friends and colleagues are very supportive); see also Att. Exh.2 of Letters at pp. 35-36, Letter from Jeong Jae Cho (friend of forty years). As discussed in the presentence interview, Dr. Chi and his wife married thirty one years ago, after being introduced by their parents through the then common Korean custom of arranged marriage. See attached notarized marriage certificate and Packet at pp. 226-27, Letter of wife, Ki Jeong Seok. Together they raised two loving sons who are extremely proud of their father.  *Id.*   Despite his demanding job and fame, he continued to devote himself to his family.  *Id.*  His wife writes: that while he always studied and worked hard:

> "My husband is a strong patron and companion whom I can rely on and always depend upon. We have shared our joys anger, sorrows and pleasure together, and my husband is the truest friend of mine. . . . He is a very respectful kind and sharing husband and father."

Att. Exh.2 at 26-27, Letter of wife, Ki Jeong Seok.  His sister writes: "[he] is the most beloved son and has frequented the hospital to see mother almost every week, unless in a foreign business trip."  *Id.* and Letter Jung Ok Ji, Att. Exh.2 at 13.  Their mother is elderly (83) and is in the early stage of Alzheimer's disease.  *Id.*

Dr. Chi is "his family's pride."  Att. Exh.2 at pp. 11, Letter Young Cheol Chi. He is highly regarded in his family, "kind and generous" and "doing his best as the first son before and after [his] father's death."  *Id.*  People who have known him forty years and more are shocked at the conviction because it is inconsistent with the man they know.  Mr. Choi has known Dr. Chi since high school and is the director of an international forwarding company.   This conviction for laundering money surprised him because he knows Dr. Chi to be a dedicated scientist, a hardworking person and "not a person who takes an easy way or commits crimes."  Att. Exh.2 at pp. 16-17, Letter of Inmock Choi.  Consistent with that character trait, he taught his sons the value of hard work:

> "When he was raising us, he would always tell us that "you can earn only as hard as you work" and has shown us that the money earned with hard work is

the only true earnings of life. He had considered money as an observable asset whereas honor is unseen and yet much more valuable asset in life. He had always regarded honor very highly above anything else in life and had a strong pride in that. . . [p]erhaps due to his influence, we have dreams to grow up and someday become individuals who are respected by people."
Att. Exh.2 at pp. 37-38, Letter of sons Chang Woon Chi and Chang Youp Chi.

Dr. Sung, and professor and chair of the obstetrics and gynecology department at Inje College of Medicine writes that "[Dr. Chi] is not the person who would intentionally commit [an] illegal act or conduct himself immorally."  Att. Exh.2 at pp. 9-10, Letter of Dr. Moonsu Sung.  Mr. Cho, a friend of forty years says the man he knows "does not have corrupt character. . . rather is a complete academician who does not have the nerve to commit such activities."  Att. Exh.2 at pp. 35-36, Letter from Jeong Jae Cho (friend of forty years). Att. Exh.2 at pp. 28-30, Letter from Junggwan Kim ("the judgment is a great shock to us all and a  profound contradiction to the upright and fine character that he has always proven to me , his friends and colleagues.")  Att. Exh.2 at p. 39, Letter from Kyunghee Lee (friend of forty years and manager of a paralegal firm for the Korean Judicial System) believes that Dr. Chi "is not a business man and is not a shrewd character," is a "hardworking diligent and dedicated scientist and academic," and "does not have a criminal nature").  Mr. Chang, CEO of a mining company in Korea has known Dr. Chi since college.  He knows him to have "an honorable and respectable personality and has outstanding sense of responsibility and justice who actively seeks and drives forward what he considers to be just and right." Att. Exh.2 at p. 40, Letter from Hyunsam Chang.  Dr. Han, professor of philosophy and friend since high school, describes that his deep friendship with Dr. Chi is reflected in intimate philosophical conversations about human existence.  He recalls "Heon Cheol's passionate comments on the core issue of science, his glaring eyes of passion, and his endless thirst in pursuit of curiosity.") Att. Exh.2 at pp. 33-34, Letter from Hyong Han.

These opinions which in short speak to Dr. Chi's lack of criminal character, and substantial moral character, make sense even in light of the evidence that Dr.

Chi knowingly undertook a financial arrangement with two private companies against company regulations, that he did not share money, and that he hid the activities from the Korean government and his company.  People commonly think of bribery as involving extortion, pressure, and financial bullying, etc. of which there was no such behavior here.  As established at trial, the financial arrangements with GSL and KMI were cooperatively entered into and were arrangements suggested by the owners/inventors themselves.  Those arrangements were mutually beneficial to the companies and to Dr. Chi.  When first entered into the contracts at issue in this case, and in the early years of those contracts, Dr. Chi had little status.   He was merely a junior researcher.  The companies knew of each other's arrangements with Dr. Chi. While their products competed as the best in the industry, each improved their products with the technical assistance of Dr. Chi.

Accepting the jury's verdict that money earned and deposited in this case was the product of Korean bribery, this is an unusual case of money laundering from bribery as there was no corruption such as commonly seen in bribery cases, such as "pay to play," threats to harm or end business if the parties did not pay. There was no evidence that the products were anything other than the most appropriate ones to use. The evidence was all consistent with the products the companies sold (the basis used for the payments to Dr. Chi) being the most appropriate products for the seismology projects they were used for in Korea.

Moreover this is an unusual case of money laundering from bribery because the jury's verdict in other words did not involve an implicit finding of corruption. Even though the conviction required the jury to find that the money was derived from bribery, the jury did not have to find the proof of corruption.  The jury instruction on Korean bribery given to this jury did not require proof of, or a finding of, corruption.

/ /

/ /

37

### 4. Dr. Chi's Medical Condition and 3553(a)(2)(D)'s Directive That The Sentence Must Insure Medical Care In The Most Effective Manner Mitigates Against Further Prison Time

The sentence imposed must ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Sentencing Commission now recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted," and has always recognized that "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. §5H1.4, p.s..

Dr. Chi was diagnosed last August 2016 with age related macular degeneration.  PSR ¶55.  His doctor in Korea immediately began injections of intravitreal injections including Elyea, the same medicine prescribed and injected on occasion by Dr. Hanscom who saw and treated Dr. Chi while on bond.  PSR at ¶55; Medical Records File, Att. Exhibit 3; Att. Exh.2 at pp.42-47, Letter of Dr. Kwon and medical records from Dr. Ra and references (attached to Kwon letter).

Dr. Ra described the treatment plan for proper treatment of Dr. Chi's condition:

> "The patient is currently receiving regular follow- up examinations in the Retina clinic and additional intravitreal injections may be needed according to the examination results.  Considering the patient's disease status if treatment is not received in the appropriate timing, the risk for blindness in both eyes is high. It is recommended that the patient undergo minimal physical and psychological stress as this can contribute to disease progression."

Att. Exh.2 at p. 43, Medical record from Dr. Ra (attached to Kwon letter).

Dr. Chi's condition was discovered last autumn when his physician sister became worried that his eyesight was deteriorating and recognized the condition as the same suffered by their mother.  Att. Exh.2 at p. 13, Letter Jung Ok Ji; PSR ¶44 (Dr. Chi's mother is blind from macular degeneration).

The condition is very real and serious if there is a lapse and or insufficient care and treatment.  As the presentence officer concluded, it is reasonable to believe

1   that Chis vision will further deteriorate in custody as his medication is not listed on

2   the BOP formulary list." PSR Recommendation Letter at p.4, Dkt. 187.  Dr. Chi

3   suffers from -- macular degeneration-- the same condition that caused his mother to

4   lose her sight. Att. Exh.2 at p. 11, Letter Young Cheol Chi. His life has been spent

5   studying, reading, and analyzing his science. As his brother says "I cannot imagine if

6   he cannot read or see." *Id.*

7       The defense has great concern that the BOP will not give him the regular and

8   consistent care his eyes need given the BOP well known track record in his case, and

9   historically toward incarcerated inmates in general.  (Bail motion Dkt. No. 156 filed

10   7/19/17 detailed the lack of care given Dr. Chi while in custody between December

11   2016 and March 2017).

12       This opinion of the undersigned about the absence of faith in the BOP

13   providing reliable consistent care for Dr. Chi's eyes is based not only on his

14   experience but on defense counsel's personal experience over the years and on the

15   numerous audits and reports written over the years by government agencies

16   identifying and criticizing inadequate medical care in the BOP. Audits discuss

17   escalating medical costs in the BOP, use of practical nurses instead of doctors to cut

18   costs, difficulty in obtaining quality medical professionals to work for the BOP.[8]

19   The BOP tries to cut costs, for instance by using generic medicines.  As applicable

20

21   _____

22   [8]     An audit by the Office of the Inspector General found systemic
     deficiencies in the Bureau of Prisons' delivery of health services. See U.S. Dep't of

23   Justice, Office of the Inspector General Audit Division, The Federal Bureau of
     Prison's Efforts to Manage Inmate Health Care ii-xix, 32-34 (2008), available at

24   www.justice.gov/oig/reports/BOP/a0808/final.pdf.  A similar result was obtained in
     2016.  See Office of the Inspector General U.S. Department of Justice Review of the

25   Federal Bureau of Prisons' Medical Staffing Challenges Evaluation and Inspections

26   Division 16-02 March 2016, EXECUTIVE SUMMARY (staffing shortages limit
     inmate access to medical care, result in an increased need to send inmates outside the

27   institution for medical care, and contribute to increases in medical costs).

28

1   to this case, Elyea is not on the BOP published formulary; it is likely that even if the

2   BOP were to give Dr. Chi regular and appropriate eye exams by qualified

3   professionals, and determine he needs an injections, he would not the treatment he

4   needs. PSR at ¶55 (2016 formulary of BOP list revealed that neither medication Dr.

5   Hanscom prescribed Elyea or Avastin are provided by the BOP).

6       Numerous cases support that it is appropriate for this Court to consider Dr.

7   Chi's medical circumstances and the need for medical treatment in the most

8   effective manner.  Here the facts are that he has a sensitive condition that if not

9   appropriately monitored and treated effectively could cost permanent loss of vision

10  and even blindness. *United States v. Edwards*, 595 F.3d 1004 (9th Cir.  2010)

11  (defendant convicted of bankruptcy fraud, guidelines range of 27-33 months,

12  sentence of 7 months, house arrest, fine and restitution justified by defendant's

13  condition including diabetes and other illnesses. Opinion noted "while the district

14  court agreed with the Government that the Bureau of Prisons was capable of

15  providing for Edwards's medical care, it found that a sentence of probation would

16  satisfy the requirement of providing needed care in the most effective manner. 18

17  U.S.C. § 3553(a)(2)(D; *United States v. Willis*, 322 F. Supp. 2d 76, (D. Mass. 2004)

18  (in tax evasion case departure granted from 27 months to probation with six months

19  home confinement based upon inordinate number of potentially serious medical

20  conditions, and age (69) where such conditions would have invariably gotten worse

21  in prison—in response to gov. argument that BOP could care for defendant. Opinion

22  reflected district court stated: "I have never had a case before me in which the

23  Bureau of Prisons suggested that it did not have the capacity to care for a

24  defendant").  *United States v. Baron*, 914 F.Supp. 660, 662-665 (D.Mass. 1995) (in

25  bankruptcy  fraud, departure from range of 27-33 months to probation and home

26  detention for 76-year old defendant with medical problems which could be made

27  worse by incarceration); *United States v. Moy*, 1995 WL 311441, Court Sentencing

28  Order at *10 (N.D.Ill. May 18, 1995) (departure based upon defendant's advanced

age, aggravated health condition, and emotionally depressed state) and *United States v. Ribot*, 97 F.Supp.2d 74, 84 (D.Mass.1999) (downward departure of seven levels justified to preserve medical treatment plan).

### 5.  That Any Additional Sentence Imposed Will Be Harsher For Dr. Chi Than For A Non-Alien Defendant Is Further Mitigation

There are additional hardships Dr. Chi will suffer as a result of being an "alien." Dr. Chi will not be eligible for a camp placement or halfway house placement[9] because of his foreign status. In addition, he will likely face additional time in INS custody awaiting his deportation following completion of any BOP sentence.[10]  In *United States v. Cubillos*, 91 F.3d 1342 (9th Cir. 1996)(the district court for the Central District departed from offense level 24 to 21 based on Cubillos' increased sentence severity resulting from her status as a deportable alien); *United States v. Davoudi*, 172 F.3d 1130 (9th Cir.1999) (district court had discretion to depart downward because deportable alien in false statements to bank case may be unable to take advantage of minimum security designation of the up to six months of home confinement authorized by 18 U.S.C. §3624(c)). Thus, if this Court imposes any additional sentence it will necessarily be more onerous for Dr. Chi than the same sentence imposed upon a U.S. citizen.

/ /

---

[9]      Title 18 U.S.C. § 3624(c), charges the Bureau of Prisons with assuring, "to the extent practicable ... that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term" in a halfway house or other community custody program that may include "home confinement." 18 U.S.C.A. § 3624(c) (Supp.1992).

[10]      In addition to any prison term, it is likely that he will be incarcerated in an INS facility post-sentence or about two months awaiting deportation.  United States General Accounting Office, Immigration Control: Immigration Policies Affect INS Detention Efforts 25 (1992)(average length of INS detention pending deportation post release 59 days).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**

**CONCLUSION**

A sentence of 6 months and not more is consistent with the goals of sentencing.

DATED: September 11, 2017       Respectfully Submitted,

By: ____/S/ Marilyn E. Bednarski_____

Joel C. Koury

Marilyn E. Bednarski

Kevin J. Lahue

Attorneys for Heon Cheol Chi

DM148673