1  Marilyn E. Bednarski, SBN 105322
   E-mail: mbednarski@kmbllaw.com
2  Kevin J. LaHue, SBN 237556
   E-mail: klahue@kmbllaw.com
3  Kaye, McLane, Bednarski & Litt, LLP
4  234 Colorado Blvd., Suite 230
   Pasadena, California 91101
5  Telephone: (626) 844-7660
   Facsimile: (626) 844-7670
6

7  Joel C. Koury, SBN 143856
   E-mail: jckoury@aol.com
8  Law Offices of Joel C. Koury
9  3435 Ocean Park Boulevard, Suite 107-50
   Santa Monica, California 90405
10 Telephone: (424) 248-8670

11
   Attorneys for Defendant
12 HEON CHEOL CHI

13                          WESTERN DIVISION

14               UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16 UNITED STATES OF AMERICA,           CASE NO. 16-824(A)-JFW

17            Plaintiff,
                                       DEFENDANT'S RESPONSE TO
18       vs.                           GOVERNMENT'S SENTENCING
                                       POSITION (DKT. 193); EXHIBIT 5
19
                                       Hearing Date:    October 2, 2017
20                                     Hearing Time:    9 a.m.

21 HEON CHEOL CHI,

22            Defendant.

23

24       Defendant Heon Cheol Chi by and through his counsel of record hereby files

25 / /

26 / /

27 / /

28

                                    1

1  his Response to the Government's Sentencing Position filed September 18, 2017

2  (Dkt. 193).

3   DATED: September 20, 2017        Respectfully Submitted,

4

5                                    By:___/S/ Marilyn E. Bednarski_____

6                                    Joel C. Koury
                                     Marilyn E. Bednarski
7                                    Kevin J. LaHue

8                                    Attorneys for Heon Cheol Chi

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## INTRODUCTION

4      The government essentially argues that Dr. Chi's crime is so serious that the

5 Court should impose a rote Guidelines sentence untethered to empirical data (Def.

6 Pos. Dkt. 192 at 20-21).  Furthermore, the government fails to support its position

7 that "*no* variance is appropriate" despite the compelling evidence of Dr. Chi's

8 uniquely pro-social and exemplary work-history, age, health, financial condition,

9 and complete lack of criminal record.  Govt. Sent. Pos. Dkt. No. 193 at p.10:18-22

10 (emphasis added).  Finally, as at trial, the government has failed to provide the

11 necessary evidence[1] of additional conduct it alleges in aggravation.

12 / /

13 / /

14 / /

15

16

17      _____

18 [1] The defendant submits that where the government is seeking to use unproven

19 conduct to disproportionately impact Dr. Chi's ultimate sentence it must prove an
enhancement (including value of laundered funds under §2B1.1(b)(1)(H)) by "clear

20 and convincing evidence."  *See, e.g. United States v. Hymas*, 780 F.3d 1285, 1291

21 (9th Cir. 2015)(holding that where sentence was not entirely based on the loan that
was the subject of conviction and other loans raised total offense by an additional 8

22 levels, the clear and convincing standard of proof should have been applied to

23 determine the amount of loss)*; United States v. Gambaryan*, 654 F. App'x 888, 890

24 (9th Cir. 2016)(stating "We have held that 'facts found in support of Guidelines
enhancements that turn out to have a disproportionate impact on the ultimate

25 sentence imposed [must] be established by clear and convincing evidence,' rather

26 than the otherwise applicable preponderance of the evidence standard…Indeed,
'where a severe sentencing enhancement is imposed on the basis of uncharged or

27 acquitted conduct, due process may require clear and convincing evidence of that

28 conduct.'")(internal citations omitted).

3

## II.

## ARGUMENT

**A. Contrary to the Government's Argument, The Legitimate Services Provided by Dr. Chi to GSL and KMI Necessarily Reduce Loss Amount As a Measure of Culpability Under the Guidelines And As A Mitigating Factor under §3553.**

The government's position on "loss" amount is too limited and defies common sense and analogous case law. Specifically, it fails to consider and take into account the unrebutted testimony from percipient KIGAM witnesses that Dr. Chi was permitted to engage in entrepreneurial activity even while being a researcher and was permitted to earn money from such outside consulting activity. It also fails to consider the government's own witness testimony from Dr. Potts and Ms. Pearce that Dr. Chi worked hard and performed a compensatory service to GSL and KMI. The circumstances here, therefore, are different from a bribery case in which the defendant did not provide any service other than to misuse an official position to allow the briber to get what he/she wanted. Under these unique facts, the government's position that all the money Dr. Chi was paid by these companies is unlawful and should be tallied to increase his sentence, is too extreme.

Here, the above circumstances make it extremely difficult to parse between legitimate earnings and illegitimate earnings. In response to the defense argument that the evidence did not connect the over million dollars of earnings to an act(s) of using official influence, the government's thin response does much to prove this point. The government argues that Ms. Pearce said in her testimony that GSL was helped to GeoSig's disadvantage (Govt. Pos. Dkt. 193 at p. 4:1-10); however, while the government elicited that general conclusion, it failed to elicit specifics upon which to believe Ms. Pearce had a credible basis in fact to render such an opinion or to extend such an opinion beyond any specific incident to the conclusion the government draws, which is that is all of the money earned was unlawful. Ms.

4

1   Pearce did not state how GeoSig was hurt, and may not even have known whether it

2   was or was not hurt. Moreover, the government failed to present any evidence of a

3   particular lost contract or sum of money to GeoSig due to Dr. Chi.

4     Furthermore, the government's only other evidentiary citation to support its

5   position is that Dr. Chi exerted influence concerning the high speed rail project

6   (Govt. Pos. Dkt. 193 at p. 3:19-28). That citation is undermined by defense witness

7   Dr. Shin's specific testimony that KIGAM was only able to obtain the project on the

8   budget set by the Railroad Authority because KIGAM was able to purchase GSL

9   equipment at a 20 % discount because of Dr. Chi's agreement (which avoided any

10  additional agent fee to the cost) and by Dr. Shin's testimony that he made the

11  decision as project manager about what equipment to purchase. *See,* Defendant's

12  Sentencing Position, Dkt. 192, at p. 14; 1-10. Dr. Shin also testified that the Railroad

13  Authority set the specifications which required high quality seismometers that at that

14  point only KMI and GSL could make.

15    The government's fall back argument –undoubtedly because it could not

16  prove any actual harm to any company, is that under Korean bribery law, harm is not

17  an element of Article 129.  Govt. Pos. Dkt. 193 at p. 4:8-10.  This government

18  argument implies that actual harm does not matter, but case law contradicts the

19  government and supports that lack of actual financial harm is relevant to sentencing

20  to both under the guidelines and as a mitigating factor under §3553.  For example, in

21  *United States v. Schweitzer*, 5 F.3d 44 (3rd Cir. 1993) the Third Circuit noted that the

22  Guidelines "allow for a deduction of value that would be derived in a legitimate

23  transaction not induced by a bribe…Because the sale item had a value that any

24  purchaser in a legitimate transaction would receive, that value was not received as a

25  result of the bribe *and should not be considered in determining the degree of the*

26  *bribe giver's culpability*."  *Id.* at 47 (emphasis added).  Similarly in *United States v.*

27  *Sayakhom*, 186 F.3d 929, 946 (9th Cir. 1999) the Ninth Circuit stated "We have

28  recognized that 'value may be rendered even amid fraudulent conduct,' and that in

1    calculating loss, the district court should give credit for any legitimate services
2    rendered to the victims."
3        This concept is rooted in the loss Guideline itself, specifically, Note 3(E)(i),
4    which provides that sentencing courts "shall" reduce loss by the "fair market value
5    of property returned and the services rendered [], by the defendant." U.S.S.G.
6    §2B1.1, cmt. n. 3(E)(i); U.S. Sentencing Guidelines Manual, app. C, vol. II, amend.
7    617 at 183 (2003)("the offender who transfers something of value to the victim(s)
8    generally is committing a less serious offense than an offender who does not."); *See,*
9    *also United States v. Crummy*, 2017 WL. 1411461 (D.C.C. April 20, 2017) at *9
10   (explaining that the Guidelines broadly provide a two-step framework for calculating
11   loss amount for section 2B1.1(b)(1) purposes "first, the application notes outline
12   various rules of construction to assist courts in defining "loss[,]" and second, the
13   notes provide that the "loss shall be reduced by" certain factors, including the fair
14   market value of the services rendered.")
15       Here, while the Court may not conclude that the "legitimate" value of the
16   consulting services Dr. Chi performed for GSL and KMI over more than ten years
17   equaled the *entire* over 1 million dollars he received, those services certainly had
18   undisputed and significant legitimate value separate and apart from any bribery
19   scheme.  As emphasized in Defendant's Sentencing Position (Dkt. 192) at p. 22,
20   government witnesses Dr. Potts and Natalie Pearce testified to the value of Dr. Chi's
21   contributions to GSL, Dr. Chi's coworkers testified about consultation services
22   provided and long hours worked, and GSL's founder Cansun Guralp's lawyers
23   produced a comprehensive document outlining Dr. Chi's contributions to the
24   company.  *See also,* Dkt. 192-1 Declaration of Bednarski at ¶¶7-8 summarizing Potts
25   and Pearce trial testimony.  Ms. Pearce testified that Dr. Chi "wore two hats" one his
26   KIGAM responsibilities and one his technical advice with Guralp.  *Id.*  Given the
27   advanced technical education and vast practical experience necessary to assist GSL
28   and KMI with complicated hardware and software issues, it is not unreasonable to

6

1   assume Dr. Chi could have *legitimately* been compensated $50,000-100,000 per year

2   by GSL/KMI for actual technical services rendered.  Under either a Guidelines or

3   §3553 analysis, Dr. Chi's significant valuable contributions should mitigate loss as a

4   measure of his culpability.

**B. Contrary to the Government's Argument, Dr.Chi's "True" First
    Offender Status Is Mitigating And May be Considered Beyond the
    Fact that He Falls Within Criminal History Category I.**

8        The government essentially argues that because Dr. Chi is in Criminal History

9   Category I, this Court should not further consider his complete absence of law

10  enforcement contact. Govt. Pos. Dkt. 193 at p. 10:11-17.  Case law makes clear that

11  this Court <u>can further consider</u> someone's lack of any criminal record whatsoever as

12  a §3553 factor beyond and after the Criminal History Category I and guideline range

13  calculation.  The government implies it would be double counting to do so, but the

14  government is wrong and again contradicted by case law.

15       Here, Dr. Chi, at age 59, would submit that he is a "true" first offender and

16  that a criminal history calculation of I, while the "lowest" category, still overstates

17  his criminal history.  As the United States Sentencing Commission has noted,

18  Criminal History Category I can be broken down into further classifications with

19  widely varying rates of recidivism: a) offenders with no prior arrests or convictions,

20  b) offenders with prior arrests but no prior convictions, c) offenders with prior

21  convictions that do not count towards criminal history points, and d) offenders with

22  one criminal history point.  *See* U.S. Sentencing Commission, Recidivism and the

23  "First Offender," May 2004 available at http://www. ussc.gov/publicat/recidivism_

24  firstoffender.pdf.[2]  Based in part on this empirical data, numerous courts have given

25  great weight to the fact that similarly situated defendants were "true" first offenders.

26  *See, e.g. United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009)(finding that

27  _____

28       [2] The Defendant asks the Court to consider this as a pertinent policy statement
    of the Sentencing Commission under 18 U.S.C. § 3553(a)(5)(A).

1   because criminal history category I does not fully account for a defendant's
2   complete lack of any criminal history, it was not redundant or improper for the
3   district court to consider the defendant's complete lack of criminal history as a
4   mitigating factor); *United States v. Duane*, 533 F.3d 441, 453 (6th Cir.
5   2008)("Because Duane had zero points at age 57, he might plausibly argue that even
6   category I – which applies when a defendant has zero or one criminal history
7   point(s) – overstated his criminal history to some degree."); *United States v.*
8   *Germosen*, 473 F.Supp.2d 221, 227 (D.Mass 2007)(in conspiracy to import heroin
9   by swallowing pellets, below guideline sentence of 6 months home detention
10  warranted in part because first offender and "there is a demonstrable difference in
11  recidivism rates of real first offenders as compared to other defendants in Criminal
12  History Category I."); *United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wisc.
13  2008)(approximately 140 month variance with guidelines justified in part because 49
14  year old "had no prior record whatsoever" and "he had never been to jail for even
15  one day."); *United States v. Paul* 2007 WL 2384234 (9th Cir. August 17,
16  2007)(unpublished)(within guideline sentence of 16 months (high end) for taking
17  government money unreasonably high in part because defendant was "a first-time
18  offender with absolutely no criminal record whatsoever.")

### C. Contrary to the Government's Argument, Dr. Chi is Not an Identity Thief

21       The government argues Dr. Chi's conduct is aggravated because he
22  "victimized an innocent young man from New Jersey" and "stole that young man's
23  [Yongkoo Lee's] identity." Govt. Pos. Dkt. 193 at p. 9:19-22.  This hyperbole is
24  simply not true.  Dr. Chi never represented himself to be Yongkoo Lee. He was
25  given permission by the owner of the home, his childhood friend (Mr. Lee's father)
26  to use that address.  Dr. Chi did so after his Merrill Lynch broker asked Dr. Chi to
27  provide a United States address for mailing bills and correspondence, knowing that
28  Dr. Chi lived and worked in Korea.  The Merrill Lynch mail was clearly sent C/O

1    YongKoo Lee.   *See,* Exhibit 5, Example showing how the Mail from Merrill Lynch

2    was addressed to Dr. Chi C/O YongKoo Lee.

**D. The Government's Assertion That The BOP "Can Adequately Care"**
**For Dr. Chi, Is Contrary to the History of Lack of Care To Date, and**
**Conflicts With The Pressure on the BOP to Cut Costs of Medical Care**

6        The government concedes it has no reason to doubt Dr. Chi's medical issues.

7    Govt. Pos. Dkt. 193 at p. 10:23.  Contrary to the government's mere assertion that

8    the BOP can "adequately  accommodate defendant's health concerns in prison [*Id.* at

9    10:25]," given the actual proven track record of lack of consistent or appropriate

10   monitoring and treatment of Dr. Chi's wet macular degeneration while incarcerated,

11   there is every reason to believe he will not properly be monitored or treated.  The

12   doctors[3] agree that the appropriate treatment for Dr. Chi to receive is (1) regular

13   consistent monthly eye exams by a qualified eye doctor, and (2) injections of Eylea

14   when bleeding occurs. Eylea is very expensive, at a cost of $1,939 per injection.[4]

15   Given the demonstrated history here of lack of treatment and the pressure on the

16   BOP to cut costs in its own documented audits of spiraling health care costs for its

17   prison population and efforts to cut and curtail such costs—it is unlikely that the

18   BOP will provide Dr. Chi "the most effective medical treatment," an important

19   consideration for this Court.  18 U.S.C. 3553(a)(2)(D); and s*ee U.S. Dep't of Justice,*

20   *Office of the Inspector General Audit Division, The Federal Bureau of Prison's*

21   *Efforts to Manage Inmate Health Care ii-xix, 32-34 (2008), available at*

22   *www.justice.gov/oig/reports/BOP/a0808/final.pdf.*  A similar result was reported in

23   the OIG March 2016 audit report discussed in the Defendant's Position, Dkt. 192 at

24   p. 39, fn. 8 (that report at p. 1 specifically noted that outside care and the cost of

25   pharmaceuticals and medical procedures contributed to increased medical spending).

27   ───────────────

[3]        The doctors referenced are: the Korean doctors who treated Dr. Chi before his
arrest, Dr. Khanna (the MDC referral), and Dr. Hanscom (Dr. Chi's treating doctor while on bond).
[4]        The undersigned researched the cost of Eylea injections finding the published cost
of $1,939 per Eylea injection (40mg/ml) on www.drugs.com.

9

1    Dr. Chi has lost so much already: his job, his career, his good name, his

2  financial stability for retirement, and as a first offender spent time in jail (6 months)

3  in addition to several months on electronic monitoring on bond (a circumstance

4  much closer to actual custody than it would otherwise be for an American with a job

5  and family).  These burdens are harsh consequences. However, this case, and

6  punishment should not risk leaving him blind. Blindness or even diminished sight is

7  a permanent condition, not a lesson.  Incarceration at MDCLA is likely "as good as

8  it gets," in terms of access to treatment with state of the art medical facilities and

9  doctors a short drive away, yet still he has not received regular monitoring or

10  treatment.  It is reasonable to assume it "will only get worse" if Dr. Chi is sentenced

11  to additional time and moved away from Los Angeles.

12

13                                    **III.**

14                                **CONCLUSION**

15    As stated in the Defendant's Sentencing Position, and for the above reasons, a

16  sentence of 6 months and not more is consistent with the goals of sentencing.

17   DATED: September 20, 2017       Respectfully Submitted,

18

19                                  By:___/S/ Marilyn E. Bednarski_____
                                    Joel C. Koury
20                                  Marilyn E. Bednarski
                                    Kevin J. Lahue
21                                  Attorneys for Heon Cheol Chi

22   DM148673

23

24

25

26

27

28